## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-10140 (JTD) |
| | ) | |

### DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (III) GRANTING SENIOR POSTPETITION SECURITY INTERESTS, AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(C) AND 364(D) OF THE BANKRUPTCY CODE, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, <u>AND (VI) GRANTING RELATED RELIEF</u>

The debtor and debtor in possession in the above-captioned case (the "<u>Debtor</u>") files this motion (the "<u>Motion</u>") for the entry of an interim order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>") and final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>Financing Orders</u>"), (i) authorizing the Debtor to use Cash Collateral; (ii) authorizing the Debtor to obtain postpetition secured financing on the terms set forth in the DIP Credit Facility Documents (as defined below); (iii) granting liens and providing superpriority claims with respect to such postpetition financing; (iv) approving the form of adequate protection to be provided by the Debtor to the Prepetition Secured Parties; (v) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim Order; (vi) scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order; and (vii) granting related relief. *For the avoidance of doubt, the Debtor is seeking entry of the Interim Order solely with respect to the use of Cash Collateral (as defined below). The Debtor will seek final approval of the use of*

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is:  BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address for purposes of this Chapter 11 Case is 16192 Coastal Highway, Lewes, Delaware 19958.

*Cash Collateral and the DIP Credit Facility pursuant to the Final Order at the Final Hearing. The term sheet attached hereto as **Exhibit B** outlines the key proposed terms of the DIP Credit Facility.  The Debtor will file the Final Order and related credit agreement no less than 14 days prior to the Final Hearing.*

In support of this Motion, the Debtor relies on and incorporates by reference the *Declaration of Timothy R. Pohl, Director, CEO, and Secretary of BYJU's Alpha, Inc., in Support of the Debtor's Chapter 11 Petition* (the "First Day Declaration") which was filed concurrently herewith.  In further support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief sought herein are sections 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-1, 4001-2, and 9013-1.

**RELIEF REQUESTED**

4. By this Motion, the Debtor respectfully requests entry of the Financing Orders granting, among other things, the following relief, as applicable:

(a) authorizing the Debtor to use any and all "cash collateral," as defined in section 363 of the Bankruptcy Code (the "<u>Cash Collateral</u>"), which term shall include, without limitation, all cash and cash equivalents of the Debtor, whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition Secured Parties, including all rights, interests, and obligations in and to any cause of action of the Borrower with respect to fraud, fraudulent conveyance, or breach of fiduciary duties and any proceeds thereof (collectively, the "<u>Litigation Claims</u>"), in accordance with the terms set forth in the Interim Order;

(b) authorizing the Debtor, as borrower (the "<u>Borrower</u>"), to enter into a senior secured, superpriority debtor-in-possession credit facility in an aggregate principal amount up to $260.0 million, $20 million of which will be new money term loans (the "<u>DIP Credit Facility</u>," and the loans thereunder, the "<u>DIP Loans</u>") pursuant to the terms of (i) the term sheet attached hereto as **Exhibit B** ("<u>DIP Term Sheet</u>"); (ii) that certain DIP Credit Agreement (as amended, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), to be executed by and among the Borrower, certain members of the ad hoc group of lenders (in their capacity as lenders under the DIP Credit Facility Documents) (the "<u>DIP Lender</u>"), GLAS Trust Company LLC, as administrative and collateral agent (in such capacities, together with its successors and permitted assigns, the "<u>DIP Agent</u>," and together with the DIP Lender, the "<u>DIP Secured Parties</u>"), which will include the terms set forth in the DIP Term Sheet, (iii) the Financing Orders; and (iv) any and all other Loan Documents (as may be defined in the DIP Credit Agreement and, together with the DIP Term Sheet, the Interim Order, the Final Order, and such other documents as may be designated by the DIP Agent, collectively, the "<u>DIP Credit Facility Documents</u>"), to fund the administrative costs of the Chapter 11 Case and other specified uses of the DIP Loans specifically set forth in the DIP Credit Facility Documents;

(c) granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, to secure all obligations owed under the DIP Credit Facility and the other DIP Credit Facility Documents, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claim status (the "<u>DIP Superpriority Claim</u>"), with priority over all administrative expense claims and unsecured claims now existing or hereafter arising, against the Debtor;

(d) authorizing and approving the Debtor to incur obligations under the DIP Credit Facility Documents, including to borrow under the DIP Credit Facility and to accrue interest on the DIP Loans (collectively, the "<u>DIP Obligations</u>"), and to use the proceeds of the DIP Credit Facility on the terms and conditions set forth in the Financing Orders and DIP Credit Facility Documents, including the Approved Budget (as defined below);

(e)    authorizing the Debtor to pay principal, interest, expenses, and other DIP Obligations payable under the DIP Credit Facility Documents as they become due;

(f)    authorizing and approving the form of adequate protection to be provided by the Debtor to the Prepetition Secured Parties, solely to the extent of the aggregate Diminution in Value (as defined below), if any;

(g)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the terms of the Financing Orders and the DIP Credit Facility Documents as set forth herein; waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Financing Orders; and providing for the immediate effectiveness of the Financing Orders;

(h)    scheduling the Final Hearing on this Motion to consider entry of the Final Order on a final basis and approving the form of notice with respect to such Final Hearing; and

(i)    granting related relief.

## **BACKGROUND**

5.      On February 1, 2024 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (this "Chapter 11 Case") in the Court.  The Debtor is authorized to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed in this Chapter 11 Case, and no request has been made for the appointment of a trustee or an examiner.  Additional information regarding the Debtor, its capital structure, and the circumstances leading to the filing of this Chapter 11 Case is set forth in the First Day Declaration.

6.      As of the Petition Date, the Debtor has over $1.4 billion in outstanding borrowings, representing the entire principal amount of the term loans outstanding plus accrued and outstanding interest, certain premiums, and fees, under that certain Credit and Guaranty Agreement, dated as of November 24, 2021 (the "Prepetition Credit Agreement"), by and among the Debtor, Think and Learn Private Limited, a company established under the laws of India with corporate identification

4

number U80903KA2011PTC061427 (the "Parent Guarantor"), certain subsidiaries of the Parent Guarantor, each lender from time to time party thereto, and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as administrative agent and as collateral agent.   Approximately $5.0 million of such aggregate outstanding borrowings were extended under the Prepetition Credit Agreement by participating lenders in the lead-up to this chapter 11 case (the "Bridge Loan").[2]

7.     With the exception of the obligations owed under the Prepetition Credit Agreement (including the Bridge Loan), the Debtor has no other known secured or unsecured debt.

8.     All of the Debtor's cash constitutes Cash Collateral under section 363(a) of the Bankruptcy Code, and immediate access to that Cash Collateral is critical to the Debtor's ability to accomplish a smooth transition into chapter 11 and facilitate the Debtor's efforts to investigate and pursue claims and expeditiously secure the Debtor's assets, including the $533 million that is at immediate risk of dissipation.

9.     However, the Debtor's current cash is insufficient to fund the anticipated administrative costs in this Chapter 11 Case, including investigating and prosecuting currently-known and prospective claims.   Accordingly, the Debtor engaged in good-faith, arm's-length negotiations with the Prepetition Secured Lenders over the terms of the DIP Credit Facility.

---

[2]   Borrowings extended under the Bridge Loan represent secured obligations under the Prepetition Credit Agreement and are held in an account by GLAS Trust Company LLC (the "GLAS Account").   The lenders who extended the borrowings under the Bridge Loan have security interests in such cash, making it "cash collateral" under section 363(a) of the Bankruptcy Code.

As more fully set forth in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Maintenance and Use of Prepetition Bank Accounts, (II) Authorizing Continued Use of Existing Checks and Business Forms, (III) Temporarily Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (IV) Granting Related Relief*, filed contemporaneously herewith, the cash proceeds of the Bridge Loan will remain in the GLAS Account until and upon entry of the Final Order, at which point such Cash Collateral will be transferred to a bank account to be opened following the Petition Date (the "Postpetition Bank Account").

10.     Without access to the Cash Collateral and the DIP Credit Facility (the Debtor's sole postpetition financing option at this time), the Debtor will be unable to achieve the objective of this Chapter 11 Case.  Accordingly, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

**SUMMARY OF DIP CREDIT FACILITY AND USE OF CASH COLLATERAL**

11.     In accordance with Bankruptcy Rules 4001(b)(1) and 4001(c)(1), and Local Rule 4001-2(a)(i) and (ii), a summary of certain key terms of the DIP Credit Facility and Financing Orders is set forth below.  The below summary is qualified in its entirety by reference to the applicable provisions of the Financing Orders and the DIP Credit Facility Documents, and the Financing Orders and the DIP Credit Facility Documents will control in the event of any inconsistency between the below summary and such documents, as applicable.

| **Interim Order**<br>**Summary of Material Terms of Use of Cash Collateral[3]** | |
|---|---|
| **Parties with Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Interim Order, ¶¶ E(i), F | The Prepetition Secured Parties hold an interest in the Cash Collateral. |
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>Interim Order, ¶ G | The Debtor has an immediate and critical need to obtain permission to use Cash Collateral (subject to the Approved Budget), in order to, among other things, pay professional fees and to pursue a restructuring for the benefit of the Debtor's stakeholders.  The absence of access to Cash Collateral would immediately and irreparably harm the Debtor, its estate, and parties in interest.  The Debtor does not have sufficient available sources of working capital and financing to preserve the value of its business without the ability to use Cash Collateral.  The Debtor and its estate will be immediately and irreparably harmed if the Debtor is unable to use Cash |

---

[3]    Capitalized terms used in this summary of the use of Cash Collateral but not defined in the summary shall have the meanings ascribed to them in the Financing Orders, as applicable.

| | |
|---|---|
| | Collateral. Entry of this Interim Order is necessary and appropriate to avoid such harm to the Debtor, its estate, and other parties in interest. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(b)(1)(C)(ii)<br><br>Interim Order, ¶ 8 | In consideration of the stipulations and consents set forth herein, the Debtor has agreed to provide the Prepetition Secured Parties adequate protection of their interests in the Cash Collateral, solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Carve Out, the Debtor's use of the Cash Collateral, the imposition of the automatic stay, or any other decline in value that constitutes diminution in value under applicable law (each Prepetition Secured Party's claim for such Diminution in Value, an "<u>Adequate Protection Claim</u>"). |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors and any official committee appointed in the Chapter 11 Case pursuant to section 1103 of the Bankruptcy Code, and a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order. |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(iii)<br><br>DIP Term Sheet, p. 7<br><br>Interim Order, ¶ 7, <u>Exhibit 1</u> | The Approved Budget is attached as <u>Exhibit 1</u> to the Interim Order.<br><br>The Debtor believes that the Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period prior to entry of the Final Order. |
| **<u>Final Order</u>**<br>**Summary of Material Terms of DIP Credit Facility[4]** | |
| **Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Term Sheet, p. 1 | **<u>Borrower (or "Debtor" or "DIP Loan Party")</u>**:<br>Byju's Alpha, Inc., a Delaware corporation<br><br>**<u>Lenders</u>**: certain members of the ad hoc group of lenders under a senior debtor-in-possession credit agreement (in their capacity as lenders under the DIP Credit Agreement) |

---

[4] The Debtor will provide a supplement to this summary upon the filing of the Final Order

| | |
|---|---|
| | **DIP Agent**: GLAS Trust Company LLC |
| **DIP Facility Amount**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>DIP Term Sheet, p. 1 | A senior secured multiple-draw term loan facility denominated in U.S. dollars, in an aggregate principal amount up to $260.0 million. $20 million of the DIP Facility will be new money term loans (the "New Money DIP Loans"). |
| **Use of Proceeds**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ii), (iii)<br><br>DIP Term Sheet, p. 5 | The proceeds of DDTL Tranche 1 will be used solely to fund (x) bankruptcy-related professionals in connection with a bankruptcy filing for the Borrower, (y) the reasonable and documented expected fees and expenses of Timothy R. Pohl, in his capacity as sole director and officer of the Borrower, and (z) other ordinary and customary fees and expenses in connection with the administration of the Borrower in the Chapter 11 Case, including, without limitation, the ordinary fees and expenses of any claims agents.<br><br>The proceeds of DDTL Tranche 2, if any, will be used solely to provide funding to the Borrower to pay the Borrower's indemnification obligations owed to Mr. Pohl in his capacity as the sole director and officer of the Borrower solely to the extent the Borrower has received such requests for indemnification and otherwise met the Tranche 2 Funding Conditions. To the extent any proceeds of DDTL Tranche 2 have not been utilized for indemnification obligations of the Borrower on the date that is the later to occur of (i) the date that is six years following the end of the Chapter 11 Case (the "Tail Date") and (ii) the date of any final and binding resolution of any litigation pending against Mr. Pohl prior to the Tail Date for which he is entitled to indemnification under the indemnification agreement with the Borrower (the "Indemnification Termination Date"), the Borrower shall promptly return all such proceeds to the DIP Agent for application against the DIP Obligations under the DIP Credit Agreement.<br><br>The proceeds of the Delayed Draw, with respect to DDTL Tranche 1 and DDTL Tranche 2, will be funded into an escrow account of the Borrower with the DIP Agent that is subject to a first priority lien in favor of the DIP Agent and the DIP Lenders and not any liens or claims of other existing pre-petition or post-petition creditors of the DIP Loan Party (including any existing secured credit facilities) (the "Escrow Account") and, for the avoidance of doubt, shall accrue interest from the date of such funding.<br><br>The Borrower will not be permitted to draw upon the DDTL Tranche 1 proceeds in the Escrow Account other than subject to the Required Lenders' consent following delivery of an Approved Budget documenting |

| | |
|---|---|
| | the specific use of proceeds for such draw, including, among other things, ordinary course expenses involved in managing a company and the Chapter 11 Case.<br><br>After the DDTL Tranche 2 funding date, the Borrower will only be permitted to draw upon the DDTL Tranche 2 proceeds in the Escrow Account, which may be from time-to-time, following delivery to the DIP Agent of an Indemnification Notice and then only up to the Indemnification Amount specified in each such notice. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>DIP Term Sheet, p. 6 | The obligations of the Borrower and of each other DIP Loan Party under the Guaranty (if any) shall be secured by: a perfected first-priority security interest (subject to permitted liens and other exceptions to be set forth in the DIP Credit Agreement) in substantially all of the DIP Loan Party's tangible and intangible assets now owned or hereafter acquired on a senior basis to the loans under the Prepetition Credit Agreement, including, without limitation, all rights, interests and obligations in and to any cause of action of the Borrower with respect to fraud, fraudulent conveyance, or breach of fiduciary duties and any proceeds thereof (collectively, the <u>Litigation Claims</u>").<br><br>The New Money DIP Loans (and related obligations) shall benefit from payment priority and turn-over rights (and related rights) in respect of any recovery received from or in respect of any guarantor under the Existing Credit Agreement that is not a DIP Loan Party pursuant to an intercreditor arrangement to be entered into by and between the DIP Agent and the Prepetition Credit Agreement Agent (the "<u>Priority Waterfall</u>"). For the avoidance of doubt, the Roll-Up Loans will not benefit from the Priority Waterfall (and shall not benefit from a guarantee from or other right of recovery in respect of any guarantor under the Existing Credit Agreement that is not a DIP Loan Party).<br><br>All obligations under the DIP Credit Agreement shall constitute an allowed administrative expense claim (the "<u>DIP Superpriority Claim</u>") having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expense claims in the Chapter 11 Case and recourse to all of the DIP Loan Party's assets and property, and proceeds and products thereof, subject only to the Carve-Out.<br><br>All liens granted under the DIP Credit Agreement will be granted pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, as applicable, and will be deemed to be valid, enforceable, fully perfected, and non-avoidable in the Final Order.<br><br>The New Money DIP Loans shall rank prior to the Roll-Up Loans on a payment basis. |
| **Interest Rate**<br><br>Bankruptcy Rule | The New Money DIP Loans shall accrue interest at a rate *per annum* equal to Term SOFR plus [●]%, which interest shall be payable quarterly and of which, (x) an amount equal to Term SOFR plus [1.00]% multiplied by the |

| | |
|---|---|
| 4001(c)(1)(B)<br><br>Local Rule<br>4001-2(a)(i)(B)<br><br>DIP Term Sheet, p. 3 | aggregate outstanding amount of the Bridge Loans and the New Money DIP Loans shall be payable **in cash**, and (y) the remaining interest accrued shall be payable in kind rather than in cash and shall be issued in additional New Money DIP Loans.<br><br>The Roll-Up Loans shall accrue interest at a rate *per annum* equal to Term SOFR plus [●]% per annum, which interest shall be payable quarterly and which shall be paid in kind rather than in cash and shall be issued in additional Roll-Up Loans. |
| **Conditions of Closing and Borrowing**<br><br>Bankruptcy Rule<br>4001(c)(1)(B)<br><br>Local Rule<br>4001-2(a)(i)(E)<br><br>DIP Term Sheet, p. 4 | The Delayed Draw will be comprised of two distinct tranches.<br><br>(a) The first tranche ("DDTL Tranche 1"), in an amount up to an aggregate principal amount of $10.0 million will be available subject to the DDTL Funding Conditions and entry of the Final Order.<br><br>(b) The second tranche ("DDTL Tranche 2"), in an amount up to an aggregate principal amount of $10.0 million will be available subject to the Tranche 2 Funding Conditions.<br><br>The "DDTL Funding Conditions" shall include (in addition to other customary conditions):<br><br>(a) the entry of the Final Order,<br><br>(b) the accuracy in all material respects of all representations and warranties in the Credit Documentation,<br><br>(c) no default or event of default exists or would exist after giving effect thereto,<br><br>(d) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date,<br><br>(e) delivery of an updated Approved Budget,<br><br>(f) compliance with all Case Milestones (as defined below) applicable as of such Delayed Draw Date,<br><br>(g) the filing of one or more complaints by the Debtor with respect to the Litigation Claims; and<br><br>(h) amendment no. 9 to the Existing Credit Agreement shall have been executed by the Borrower and shall have become effective pursuant to the terms thereof.<br><br>The "Tranche 2 Funding Conditions" shall be limited to the below:<br><br>(a) on any date after the Petition Date until the date 2 weeks prior to the Indemnification Termination Date: |

|  | (i) the delivery of a certificate signed by a responsible officer of the Borrower certifying that (x) the Borrower has received a bona fide request in good faith from Tim Pohl for indemnification under the indemnification agreement reviewed and approved by the DIP Lenders prior to the closing date, (y) the request is for bona fide indemnifiable amounts determined in good faith under the indemnification agreement (the "Indemnification Payment") and (z) the amount of such request (the "Indemnified Amount") (such notice a "Indemnification Notice"); and<br><br>(ii) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date; or<br><br>(b) on any date after the date that is 2 weeks prior to the Indemnification Termination Date (but, in any case, prior to the Indemnification Termination Date):<br><br>(i) the delivery of a certificate signed by a responsible officer of the Borrower certifying that the Borrower has received a bona fide request in good faith from Tim Pohl to fund DDTL Tranche 2 for purposes of payment of potential future Indemnification Payments; and<br><br>(ii) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date. |
|---|---|
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | See Carve-Out Annex attached to the DIP Term Sheet. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(b)(1)(C)(ii)<br><br>Interim Order, ¶ 8<br>Final Order, ¶ [●] | In consideration of the stipulations and consents set forth herein, the Debtor has agreed to provide the Prepetition Secured Parties adequate protection of their interests in the Cash Collateral, solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "Diminution in Value"), resulting from the imposition of the Carve Out, the Debtor's use of the Cash Collateral, the imposition of the automatic stay, or any other decline in value that constitutes diminution in value under applicable law (each Prepetition Secured Party's claim for such Diminution in Value, an "Adequate Protection Claim"). |
| **DIP Liens on Unencumbered Assets**<br><br>Local Rule 4001-2(a)(i)(G) | See "**Liens and Priorities**" above. |

| | |
|---|---|
| DIP Term Sheet, p. 6 | |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Local Rule 4001-2(a)(i)(H)<br><br>DIP Term Sheet, pp. 7-8. | With respect to the chapter 11 plan for the Borrower, customary milestones for a facility of this type (the "<u>Case Milestones</u>"), including:<br><br>(a) the filing of an order for relief with respect to Byju's Alpha on or before February 1, 2024 (the "<u>Petition Date</u>"),<br><br>(b) the entry of an order of the bankruptcy court in form and substance acceptable to the DIP Lenders no later than 3 business days after the Petition Date that authorizes the use of cash collateral pending approval of the Final Order,<br><br>(c) the entry of an order of the bankruptcy court in form and substance acceptable to the DIP Lenders no later than 45 days after the Petition Date, that, among other matters (i) authorizes the Debtor to execute and perform under the terms of the Credit Documentation, (ii) authorizes the Delayed Draw to be incurred after the date of such final order, and (iii) approves the incurrence of additional roll-up term loans in the amount to be agreed by the Required Lenders, and<br><br>(d) the filing of at least one complaint by the Debtor with respect to the Litigation Claims does not occur on or before [●] days after the chapter 11 filing by Byju's Alpha. |
| **Limitations on Investigations of Liens**<br><br>Local Rule 4001–2(a)(i)(L) | To be provided |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will mature on the date which is [2] years following the date of the first draw thereunder (the "<u>Draw Date</u>"); *provided*, that the Credit Documentation shall provide the right for individual Lenders to agree to extend the maturity date of the outstanding DIP Loans held by such Lenders upon the request of the Borrower and without the consent of any other Lender. |
| **Maturity Date and Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(M)<br><br>DIP Term Sheet, p. 8 | Appropriate and customary events of default for credit facilities of this type, in form and substance acceptable to the Lenders, which include:<br><br>(a) the removal of Mr. Pohl as the sole director of the Debtor,<br><br>(b) the appointment of any trustee or examiner with expanded powers (or any other person with a similar function) without the express written consent of the Required Lenders, and |

| | |
|---|---|
| | (c) any additional or replacement director being appointed to the Debtor without the express written consent of the Required Lenders. |
| **Roll-Up**<br><br>Local Rule 4001–2(a)(i)(O)<br><br>DIP Term Sheet, pp. 1-2 | Subsequent to the Draw Date, and subject to approval of the Bankruptcy Court pursuant to the Final Order:<br><br>(i) at the sole option of each DIP Lender who has funded New Money DIP Loans and the Bridge Loans, for every dollar of New Money DIP Loans and the Bridge Loans committed or funded, such DIP Lender may elect to convert up to seven dollars of loans under the Prepetition Credit Agreement held by such DIP Lender (and any of its affiliates) into an equivalent amount of loans under the DIP Facility; and<br><br>(ii) at the sole option of each DIP Lender who has funded the Prepetition Reimbursements, for every dollar of Prepetition Reimbursement funded by such DIP Lender (and any of its affiliates), such DIP Lender may elect to convert up to two dollars of loans under the Prepetition Credit Agreement into an equivalent amount of loans under the DIP Facility (the loans rolled up pursuant to clauses (i) and (ii), the "Roll-Up Loans" and together with the New Money DIP Loans and any Bridge Loans and Prepetition Reimbursements that subsequently becomes DIP Loans pursuant to the terms hereof, the "DIP Loans").<br><br>The roll-up options set forth in clauses (i) and (ii) above shall be attributable to and travel with (in the case of any assignment or transfer after the Closing Date) the funded New Money DIP Loans and/or Prepetition Reimbursements, as applicable, and will require written notice to the Administrative Agent prior to exercising such option (which notice shall be in a form acceptable to the Required Lenders to be attached to the Credit Documentation).<br><br>For illustrative purposes only, a DIP Lender that has funded (or subsequently been assigned) $1 million in connection with the Bridge Loans and $4 million in connection with the New Money DIP Loan shall have the right, but not the obligation, to convert up to $35 million of loans under the Existing Credit Agreement into Roll-Up Loans on a dollar-for-dollar basis. |
| **Debtor's Stipulations**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001–2(a)(i)(Q) | To be provided |

| | |
|---|---|
| **Notice of an Event of Default**<br><br>Local Rule 4001–2(a)(i)(S) | To be provided |
| **Limitations on Arguments in the Event of a Default**<br><br>Local Rule 4001–2(a)(i)(T) | To be provided |
| **Liens on Chapter 5 Causes of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001– 2(a)(i)(U)<br><br>DIP Term Sheet, p. 6 | See "**Liens and Priorities**" above. |
| **Marshalling Waiver**<br><br>Local Rule 4001–2(a)(i)(X) | To be provided |
| **506(c) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001– 2(a)(i)(V) | To be provided |
| **Section 552(b)(1) "Equities of the Case" Waiver**<br><br>Local Rule 4001– 2(a)(i)(W) | To be provided |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | To be provided |
| **Release, Waiver, or Limitation on Any Claim** | To be provided |

| | |
|---|---|
| **or Cause of Action Belonging to the Estate**<br><br>Bankruptcy Rule 4001-2(c)(1)(B)(viii) | |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | To be provided |

**BASIS FOR RELIEF**

I.      **The Court Should Approve the DIP Credit Facility.**

12.     The Debtor's ability to maximize the value of its estate hinges upon its access to the postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis.  Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  *See* 11 U.S.C. § 364(c).  Further, under section 364(d) of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

A.      **Entry into the DIP Credit Facility Is an Exercise of the Debtor's Sound Business Judgment.**

13.     The Court should authorize the Debtor to enter into the DIP Credit Facility, obtain postpetition financing under the DIP Credit Facility, and continue using the Cash Collateral of the Prepetition Secured Parties as a sound exercise of the Debtor's business judgment.  Courts grant

considerable deference to a debtor's business judgment in obtaining postpetition secured credit so long as the agreement to obtain such credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

14.     Courts generally will not second-guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'"  *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second-guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").  Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider

the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

15.     The Debtor's entry into the DIP Credit Facility represents a sound exercise of its business judgment.  The Debtor requires access to the DIP Credit Facility because access to the proceeds thereof will permit the Debtor to administer this Chapter 11 Case, pay professional fees, locate and recover fraudulently-transferred assets, and take such actions as are necessary to maximize the value of its estate.  The terms of the DIP Credit Facility were thoroughly negotiated in good faith and at arm's length, resulting in proposed postpetition financing on terms that are most favorable to all parties, including the Debtor, its estate, and its stakeholders.  Accordingly, the Court should authorize the Debtor's entry into the DIP Credit Facility as a reasonable exercise of the Debtor's business judgment.

**B.     No Comparable Alternative to the DIP Credit Facility Is Reasonably Available.**

16.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113.

17.     Given the Debtor's current financial condition, lack of business operations, financing arrangements, and capital structure, the Debtor did not believe there would be any actionable alternative sources of interim and long-term financing other than the DIP Lenders, and did not believe it to be possible that it could obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  Among other issues, the Prepetition Secured Lenders have liens on substantially all of the Debtor's assets, and the Debtor does not have an operating business.  Furthermore, the DIP Lenders hold all of the obligations and commitments under the Debtor's prepetition finance agreements described above.  The DIP Lenders hold all of the Debtors' prepetition funded debt, with first liens on the collateral securing such funded debt.

18.     Further, the Prepetition Secured Parties would not consent to the Debtor's incurrence of priming financing by any other party than the DIP Lenders.  Absent receiving such consent from the Prepetition Secured Parties, the Debtors would have faced a potentially costly and difficult non-consensual priming dispute between any potential postpetition priming lenders (assuming any such hypothetical lender exists) and the Prepetition Secured Parties.

19.     In sum, considering the facts and circumstances of this Debtor, and its decision to file for chapter 11, the Debtor's entry into the DIP Credit Facility is the only logical post-petition financing option for this Chapter 11 Case.

**C.     The Debtor Should Be Authorized to Pay Any Fees Required by the DIP Credit Facility Documents.**

20.     In connection with the DIP Credit Facility, the Debtor has agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Secured Parties.  The Debtor

has also agreed to pay the fees and expenses of counsel and other professionals retained by the DIP Secured Parties as provided for in the DIP Credit Facility Documents.

21.     In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  *See In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364–65 n.7 (W.D. Mich. 1986) (recognizing debtor may have to enter into "hard" bargains to acquire funds for its reorganization); *In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at \*4 (Bankr. S.D.N.Y. July 6, 2009) ("Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.").  The propriety of a proposed financing facility should also be considered in light of current market conditions. *See* Tr. of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09 10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP financing] pricing terms are, I find the provisions [of a DIP financing facility that included a roll-up of prepetition secured debt] reasonable here and now.")

22.     The Debtor submits that the interest, fees, and expenses to be paid under the DIP Credit Facility are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of this Chapter 11 Case, and represent the most favorable terms available to the Debtor.  In particular, the interest rate and fees contemplated by the DIP Credit Facility are similar to the interest rate and fees in other debtor-in-possession financing arrangements approved by courts in this District and in other jurisdictions.  *See In re Lucky Bucks*, Case No. 23-10758 (KBO) (D. Del. July 14, 2023) (approving $20.5 million new money DIP Credit Facility with

19

interest rate of SOFR + 10% (+ 2% for the default interest rate), 5% new money backstop fee, 4% commitment fee, and 3% exit fee); *In re Clovis Oncology, Inc.*, Case No. 22-11292 (JKS) (Jan. 24, 2023) (approving a $75 million DIP Credit Facility with 8% interest rate, 7% backstop fee, 1.5% upfront fee, and 1.5% contingent sale fee); *In re Phasebio Pharmaceuticals, Inc.*, Case No. 22-10995 (LSS) (Nov. 15, 2022) (approving a $15 million DIP Credit Facility with 14% interest rate, 2% commitment fee, and 5% exit fee).

23.     The Debtor considered the DIP Credit Facility's pricing when determining, in its sound business judgment, that the DIP Credit Facility constituted the best actionable terms that provides the necessary postpetition financing for the Debtor to administer and prosecute the Chapter 11 Case.  Accordingly, the Court should authorize the Debtor to pay the interest, costs, and expenses provided under the DIP Credit Facility Documents in connection with the DIP Credit Facility.

**D.     The Proposed "Roll-Up" of the DIP Credit Facility Is Appropriate.**

24.     Section 363 of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

25.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.   Indeed, courts within this District regularly approve this practice.   *See In re PGX Holdings, Inc.*, Case No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) (authorizing approximately $12 million new money DIP and a roll-up of approximately $39.85 million); *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) (approving approximately $20.5 million new money DIP and a roll-up of approximately $61.5 million); *In re Charming Charlie Holdings Inc.*, Case No. 19-11534 (MFW) (Bankr. D. Del. July 11, 2019) (approving approximately $20 million new money DIP and a roll-up for approximately $40 million); *In re JAB Energy Solutions II, LLC*, Case No. 21-11226 (CTG) (Bankr. D. Del. Sept. 7, 2021) (approving approximately $720,000 new money DIP and a roll-up of approximately $3 million); *In re Radioshack Corp*, Case No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015) (approving approximately $20 million new money DIP and a roll-up of approximately $250.3 million).

26.     The Debtor submits that the Roll-Up, as set forth in the DIP Credit Facility, is appropriate in this Chapter 11 Case.   As a threshold matter, no creditors or other parties in interest are prejudiced by the Roll-Up.   Indeed, the Prepetition Secured Parties have liens on substantially all of the Debtor's assets and, based on the Debtor's current corporate records, are the Debtor's only material creditors.   The Prepetition Secured Parties also made clear in their negotiations with the Debtor that the inclusion of this Roll-Up was an essential inducement to their willingness to extend the DIP Credit Facility.   For these reasons, the Debtor respectfully submits that the Roll-Up is a sound exercise of the Debtor's business judgment, appropriate under the circumstances, and should be approved.

**II.**     **The Use of Cash Collateral Is Warranted and Necessary.**

27.     In addition to the DIP Credit Facility, the Debtor requires use of Cash Collateral to fund this Chapter 11 Case and maximize the value of its estate.  The Debtor submits that, under the circumstances, its request to use Cash Collateral should be approved.

28.     The Debtor's use of property of its estate, including Cash Collateral, is governed by section 363(c) of the Bankruptcy Code.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

29.     Here, the Debtor has negotiated consensual use of Cash Collateral with the Prepetition Secured Parties.  Because the Debtor has the consent of the only entities with an interest in the Cash Collateral—based on the Debtor's current corporate records—the Court should approve such use under section 363(c)(2)(A) of the Bankruptcy Code.   *In re Sorenson Communications, Inc.*, No. 14-10454 (BLS), 2014 WL 929351, at *5 (Bankr. D. Del. Mar. 4, 2014) ("The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization."); *In re WP Steel Venture LLC*, No. 12-11661 (KJC), 2012 WL 5288123 (Bankr. D. Del. 2012) ("The ability of the Debtors to obtain sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the value of the Debtors' assets.").

**A.**     **The Proposed Adequate Protection Is Reasonable and Appropriate.**

30.     Additionally, the Debtor submits that the agreed adequate protection package to be provided to the Prepetition Secured Parties is sufficient to approve the use of the Cash Collateral

22

under section 363 of the Bankruptcy Code.  Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1); *see also In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).

31.  Generally, courts decide what constitutes adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (internal citation omitted).

32.  Adequate protection may be provided in various forms, including a grant of replacement liens or administrative claims.  *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting the application of adequate protection is case-specific, but "its focus is protection of the secured creditor from

diminution in the value of its collateral during the reorganization process").  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor-in-possession.  *See In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization.").

33.     Here, the agreed adequate protection package to be provided to the Prepetition Secured Parties is sufficient to approve the use of the Cash Collateral.  The Financing Orders will provide the Prepetition Secured Parties with adequate protection liens to the extent of any diminution in value, if any, of their interest in the prepetition collateral resulting from, as provided in the Bankruptcy Code, the use by the Debtor of such collateral, including the Cash Collateral, or the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "Diminution in Value"), as well as superpriority administrative expense claims to the extent of any Diminution in Value, reimbursement of reasonable and documented professional fees and expenses, and reporting obligations consistent with the Prepetition Credit Agreement. Moreover, the use of Cash Collateral to preserve the value of the prepetition collateral itself protects the Prepetition Secured Parties against diminution in value of that collateral.

**B.      The Scope of the Carve-Out Is Reasonable and Appropriate.**

34.     The Prepetition Secured Parties' respective interests in the prepetition collateral (including the Cash Collateral) are subject to the Carve Out.  Without the Carve Out, the Debtor and other parties in interest may be deprived of certain rights and powers because the services for which such professionals may be paid in this Chapter 11 Cases would be restricted.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection,

the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtor's estate or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of this Chapter 11 Case by ensuring that assets remain for payment of the clerk of the Court, trustee fees, and professional fees of the Debtor.

### C.   Interim Relief Should Be Granted.

35.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 449 (Bankr. D. Co. 1985); *see also In re Ames Dep't Stores Inc.*, 115 B.R. at 38. After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to use cash collateral that it believes prudent in the operation of its business. *See, e.g.*, *Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

36.     As set forth above, pending the Final Hearing, the Debtor requires immediate access to Cash Collateral to fund the administrative costs of this Chapter 11 Case. All of these expenses are required to maximize the value of the Debtor's estate. In addition, the agreed-upon Approved Budget ensures that the Debtor's use of Cash Collateral will not prejudice the Prepetition Secured Parties.

### D.   The Automatic Stay Should Be Modified on a Limited Basis.

37.     The relief requested herein contemplates a modification of the automatic stay solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and

documents, and to pay all fees that may be reasonably required or necessary for the Debtor's performance of its obligations set forth in this Interim Order.  Stay modifications of this kind are ordinary and standard features for the use of cash collateral and, in the Debtor's business judgment, are reasonable and fair under the circumstances.

## IMMEDIATE RELIEF IS NECESSARY

38.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use the property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within 21 days of the Petition Date requires the Debtor to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  As described above, without access to Cash Collateral, the Debtor would be unable to fund this Chapter 11 Case.  For this reason and those set forth above, the Debtor respectfully submits that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 4001(a)(3)

39.     The Debtor requests a waiver of the stay of the effectiveness of the order granting the relief requested herein pursuant to Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The use of Cash Collateral is essential to prevent irreparable damage to the Debtor's estate.  Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

40.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As provided herein, and to implement the foregoing successfully, the Debtor requests that the Interim Order include a finding that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

41.    For this reason and those set forth above, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Interim Order.

## RESERVATION OF RIGHTS

42.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtor's rights under the Bankruptcy Code or any other applicable law; and (g) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtor expressly reserves its rights to contest the extent, validity, or perfection or seek avoidance of all such liens..

## NOTICE

43.     Notice of this Motion has been or will be provided to: (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor (on a consolidated basis, as and if identified); (c) the office of the attorney general for each of the states in which the Debtor operates; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the Prepetition Agent and counsel thereto; (i) the Prepetition Secured Lenders and counsel thereto; (j) Think and Learn Private Limited and counsel thereto; (k) BYJU's Pte. Ltd.; (l) Great Learning Education Pte. Ltd.; (m) Epic! Creations Inc.; (n) Neuron Fuel Inc.; (o) Tangible Play, Inc.; (p) Whitehat Education Technology LLC; (q) shareholders to Think and Learn Private Limited; (r) Camshaft Capital Fund, LP, Camshaft Capital Management, and Camshaft Capital Advisors, and counsel thereto; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary. No previous motion for the relief sought herein has been made to this or any other court.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests entry of the Interim Order, substantially in the form annexed hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court may deem just and equitable.

Dated: February 2, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (pro hac vice pending)
Benjamin Finestone (pro hac vice pending)
Daniel Holzman (pro hac vice pending)
Jianjian Ye (pro hac vice pending)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

Proposed Counsel for the Debtor

**Exhibit A**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| BYJU'S ALPHA, INC.,[1] | )    Chapter 11 |
| | ) |
| Debtor. | )    Case No. 24-10140 (JTD) |
| | ) |
| | )    **Re:  Docket No. ___** |

## INTERIM ORDER
## (I) AUTHORIZING THE USE OF CASH COLLATERAL,
## (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING
## THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Upon the Motion (the "Motion")[2] filed by the above-captioned debtor and debtor in possession (the "Debtor") for entry of an interim order (this "Interim Order") pursuant to sections 361, 362, 363, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), among other things:

(a)    authorization for the Debtor, pursuant to sections 361, 362, 363, and 507 of the Bankruptcy Code to (i) use Cash Collateral, solely in accordance with the terms of this Interim Order, and (ii) provide adequate protection to the Prepetition Secured Parties;

(b)    authorization to grant the Adequate Protection Liens and the Adequate Protection Claims;

---

[1]    The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is:  BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address for purposes of this Chapter 11 Case is 16192 Coastal Highway, Lewes, Delaware 19958.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(c)     modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein;

(d)     subject to entry of the Final Order, waiver of all rights to surcharge any Prepetition Collateral or Adequate Protection Collateral under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity or law;

(e)     waiver of the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Adequate Protection Collateral;

(f)     scheduling of a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis; and

(g)     waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order; and

(h)     granting related relief.

Having considered the Motion, the First Day Declaration and the evidence submitted or proffered at the hearing on the Motion held on February [__], 2024 (the "Interim Hearing"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having determined that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the First Day Declaration, and the arguments of counsel at the Interim Hearing; and the Court having found that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate, as contemplated by Bankruptcy Rules 4001 and 6003; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor and its estate, creditors, and other parties in interest; and it appearing that the Debtor's use of Cash Collateral and granting of

adequate protection to the Prepetition Secured Parties are sound and prudent exercises of the

Debtor's business judgment; and the Court having found that proper and adequate notice of the

Motion and the Interim Hearing thereon has been given under the circumstances and that no other

or further notice is necessary for the interim relief requested in the Motion; and the Court having

found that good and sufficient cause exists for the granting of the relief requested in the Motion

after having given due deliberation to the Motion and all of the proceedings had before the Court

in connection with the Motion, **THE COURT HEREBY MAKES THE FOLLOWING**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.      <u>Petition Date</u>.  On February 1, 2024 (the "<u>Petition Date</u>"), the Debtor filed a

voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the District of Delaware (the "<u>Court</u>"), commencing the above-captioned chapter 11 case

(the "<u>Chapter 11 Case</u>").

B.      <u>Debtor in Possession</u>.  The Debtor continues to operate its business as debtor in

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner

has been appointed in this Chapter 11 Case.

C.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Case, the

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334

and the *Amended Standing Order of Reference from the United States District Court for the*

*District of Delaware*, dated February 29, 2012.  Consideration of the Motion constitutes a core

proceeding under 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Case and proceedings on the

Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for

---

[3]      Where appropriate in this Interim Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

the relief sought herein are sections 361, 362, 363, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

      D.      <u>Committee</u>. As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

      E.      <u>Debtor's Stipulations</u>. In requesting the use of Cash Collateral, and in exchange for and as a material inducement to the Prepetition Secured Parties to agree to provide, or consent to, the Debtor's access to the Cash Collateral and subordination of the Prepetition Liens to the Carve Out and as a condition to consenting to the use of Cash Collateral, subject to the rights of the parties in interest (other than the Debtor) set forth in this Interim Order, the Debtor permanently and irrevocably admits, stipulates, acknowledges, and agrees, as follows (collectively, the "<u>Debtor's Stipulations</u>"):

      (i)      <u>Prepetition Secured Parties</u>. The Debtor, as borrower, GLAS Trust Company LLC ("<u>GLAS</u>" or the "<u>Prepetition Agent</u>"), as administrative agent and collateral agent, the lenders party thereto (collectively, the "<u>Prepetition Secured Lenders</u>" and, together with GLAS, the "<u>Prepetition Secured Parties</u>"), among others, entered into that certain Credit and Guaranty Agreement dated November 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>").

      (ii)      <u>Prepetition Collateral</u>. As security for the prompt and complete payment and performance in full when due of all obligations under the Prepetition Credit Agreement, the Debtor, entered into a pledge and security agreement dated November 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Pledge and Security Agreement</u>")

with GLAS[4] (such collateral, the "<u>Prepetition Collateral</u>" and such liens granted, the "<u>Prepetition Liens</u>").

(iii)     <u>Cash Collateral</u>.  Any and all of the Debtor's cash, including all amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtor, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral or deposited into the Debtor's banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").  The Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Cash Collateral, for any Diminution in Value of their respective interests as of the Petition Date resulting from the use of Cash Collateral.

(iv)     <u>Good Faith</u>.  The Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral, including in respect of granting the Adequate Protection Liens, any challenges or objections to the use of Cash Collateral, and all documents relating to any and all transactions contemplated by the foregoing.

F.     <u>Cash Collateral</u>.  All of the Debtor's cash, including any cash in deposit accounts of the Debtor, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties. The Prepetition Secured Parties consent to the Debtor's use of the Cash Collateral in accordance with and subject to the terms and conditions provided for in this Interim Order.  The Debtor has agreed to provide each Prepetition Secured Party with adequate protection of its respective interest in the Cash Collateral for any Diminution in Value thereof.

G.     <u>Need for Cash Collateral</u>.  The Debtor has an immediate and critical need to obtain permission to use Cash Collateral (subject to the Approved Budget), in order to, among other things to pay professional fees and to pursue a restructuring for the benefit of the Debtor's

---

[4]     Under the Pledge and Security Agreement, the Debtor granted a security interest in the "Collateral" (as defined in the Pledge and Security Agreement) to GLAS for its benefit and for the benefit of the Prepetition Secured Parties.

stakeholders.  The absence of access to Cash Collateral would immediately and irreparably harm the Debtor, its estate, and parties in interest.  The Debtor does not have sufficient available sources of working capital and financing to preserve the value of its business without the ability to use Cash Collateral.  The Debtor and its estate will be immediately and irreparably harmed if the Debtor is unable to use Cash Collateral.  Entry of this Interim Order is necessary and appropriate to avoid such harm to the Debtor, its estate, and other parties in interest.

H.      In light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out and to permit the use of their Cash Collateral as set forth herein, upon entry of the Final Order, each Prepetition Secured Party shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Cash Collateral, as applicable.

I.      Section 506(c).  In light of the Prepetition Secured Parties' agreement to extend credit to the Debtor on the terms described herein, the Prepetition Secured Parties have negotiated for and the Debtor will seek in the Final Order a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the Adequate Protection Collateral, subject to the Carve Out.

J.      Good Faith.  The terms and conditions of the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtor and the Prepetition Secured Parties with the assistance and counsel and their respective advisors.  The Prepetition Secured Parties have agreed to the use of Cash Collateral in good faith, and the Prepetition Secured Parties shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or modified on appeal.

K.      Notice.   Proper, timely, adequate, and sufficient notice of the interim relief requested in the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, whether by facsimile, email, overnight courier, and/or hand delivery, to certain parties in interest, including:  (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor (on a consolidated basis, as an if identified); (c) the office of the attorney general for each of the states in which the Debtor operates; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the Prepetition Agent and counsel thereto; (i) the Prepetition Secured Lenders and counsel thereto; (j) Think and Learn Private Limited and counsel thereto; (k) BYJU's Pte. Ltd.; (l) Great Learning Education Pte. Ltd.; (m) Epic! Creations Inc.; (n) Neuron Fuel Inc.; (o) Tangible Play, Inc.; (p) Whitehat Education Technology LLC; (q) shareholders to Think and Learn Private Limited; (r) Camshaft Capital Fund, LP, Camshaft Capital Management, and Camshaft Capital Advisors, and counsel thereto; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.  No other or further notice of the Motion with respect to the relief requested at the Interim Hearing or entry of this Interim Order is or shall be required.

L.      Immediate Entry.  The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003.  Absent entry of this Interim Order, the Debtor's business and its estate would be immediately and irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and stakeholders and sufficient cause exists for immediate entry of this Interim Order.

31239975.3

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      <u>Interim Approval</u>.  The Motion is GRANTED on an interim basis as set forth herein.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are OVERRULLED on the merits.

3.      <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and in accordance with the budget (the "<u>Approved Budget</u>") attached hereto as **<u>Exhibit 1</u>**, the Debtor is hereby authorized to use the Cash Collateral from the date of entry of this Interim Order through and including the date of termination of the DIP Credit Agreement.

4.      In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents, and to pay all fees that may be reasonably required or necessary for the Debtor's performance of its obligations set forth in this Interim Order.

5.      All payments or proceeds remitted to or on behalf of any Prepetition Secured Parties pursuant to the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers

of rights under sections 506(c) and the "equities of the case" exception of section 552(b), in each case subject to the entry of the Final Order granting such relief).

6.      The cash proceeds of the Bridge Loan are held, and shall remain, in the GLAS Account until and upon the date on which the Final Order is entered.  Upon entry of the Final Order, the Debtor shall transfer all such Cash Collateral from the GLAS Account to the Postpetition Bank Account.

7.      <u>Approved Budget</u>.  The proceeds of the Cash Collateral shall be used solely in accordance with the Approved Budget.  In the event the Debtor deems it necessary to use cash that constitutes Cash Collateral outside the amounts permitted under the Approved Budget, the Debtor may make such request to the Prepetition Agent.  Any variation or modification to the Approved Budget shall be subject in all respects to the Prepetition Agent's consent in consultation with the Prepetition Secured Lenders.

8.      <u>Adequate Protection for the Prepetition Secured Parties</u>.  In consideration of the stipulations and consents set forth herein, the Debtor has agreed to provide the Prepetition Secured Parties adequate protection of their interests in the Cash Collateral, solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the Carve Out, the Debtor's use of the Cash Collateral, the imposition of the automatic stay, or any other decline in value that constitutes diminution in value under applicable law (each Prepetition Secured Party's claim against the Debtor for such Diminution in Value, an "<u>Adequate Protection Claim</u>").

9.      <u>Adequate Protection Collateral</u>.  "<u>Adequate Protection Collateral</u>" shall mean, collectively, all of the Debtor's property and assets (whether now owned or after-acquired, and whether real or personal, tangible, or intangible), including, without limitation:  the Debtor's

Prepetition Collateral; all rights, interests, and obligations in and to any cause of action of the Debtor with respect to fraud, fraudulent conveyance, or breach of fiduciary duties and any proceeds thereof (collectively, the "Litigation Claims"); postpetition revenues; insurance; bank accounts and other security or deposit accounts of the Debtor (including, for the avoidance of doubt, any accounts opened prior to, on, or after the Petition Date); all equity interests; all intercompany claims, accounts, and receivables (and all rights associated therewith); and any and all proceeds, products, rents, and profits of all of the foregoing.

10.    Adequate Protection Liens.  As security against the Debtor for any Diminution in Value of the Prepetition Collateral, subject and subordinate only to the Carve Out, each Prepetition Secured Party is hereby granted additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens on the Adequate Protection Collateral as of the date of this Interim Order (collectively, the "Adequate Protection Liens"), without the necessity of the execution by the Debtor (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.  Subject only to the Carve Out, the Adequate Protection Liens and the Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to this Interim Order shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code and shall not be subordinated to or made *pari passu* with any lien, security interest, or administrative claim under section 364 of the Bankruptcy Code or otherwise.

11.    Adequate Protection Superpriority Claims.  As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Adequate Protection Claims shall be, subject and subordinate to the Carve Out, allowed

Case 24-10140-JTD   Doc 5   Filed 02/02/24   Page 41 of 67

superpriority administrative expense claims against the Debtor in the Chapter 11 Case ("Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition property and postpetition property of the Debtor and shall be senior to any and all other administrative expense claims in such Chapter 11 Case now existing or hereafter arising, of any kind or nature whatsoever, including administrative expense claims of the kinds specified in or ordered pursuant to sections, subject and subordinate only to the Carve Out.

12. <u>Right to Seek Additional Adequate Protection</u>. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtor or any other party to contest such request. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Cash Collateral during the Chapter 11 Case.

13. <u>Cash Management</u>. The Debtor shall maintain its cash management arrangements in a manner consistent with the Court order approving the Debtor's cash management motion or any further Court order.

14. <u>Reporting</u>. The Debtor shall comply with the reporting requirements set forth in the Prepetition Credit Agreement.

15. <u>Carve Out</u>. Each of the Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall each be subject to and subordinate to payment of the Carve Out. The Carve Out shall have such priority claims and liens over all assets of the Debtor.

31239975.3

16.     As used in this Interim Order, the "Carve Out" means the sum of (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (c) below); (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (c) below); (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and an official committee of unsecured creditors (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Prepetition Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (d) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1 million incurred after the first business day following delivery by the Prepetition Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition Agent to the Debtor, its lead restructuring counsel, the U.S. Trustee, and counsel to the official committee (if any), which notice may be delivered following the Carve Out Trigger Notice Date (as defined below), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

17.     <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the Prepetition Agent to the Debtor with a copy to counsel to any official committee (if any) (the "<u>Carve Out Trigger Notice Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtor to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtor shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Carve Out Trigger Notice Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtor shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (a) through (c) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Agent for the benefit of the Prepetition Secured Parties, unless such obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtor's creditors in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (d) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Agent for the benefit of the Prepetition

Secured Lenders, unless such obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtor's creditors in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the Loan Documents (as defined in the Prepetition Credit Agreement) or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 14, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 14, prior to making any payments to the Prepetition Agent or any of the Debtor's creditors, as applicable.  Notwithstanding anything to the contrary in the Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtor until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Prepetition Agent for application in accordance with the Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtor from the Carve Out Reserves shall not constitute loans under the Prepetition Credit Agreement or increase or reduce the obligations under the Loan Documents, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtor.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or in the Loan Documents, the Carve Out shall be senior to all liens and claims securing the

Prepetition Collateral, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the Loan Documents.

18.     _Payment of Allowed Professional Fees Prior to the Carve Out Trigger Notice Date_.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

19.     _No Direct Obligation To Pay Allowed Professional Fees_.  None of the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Case or any successor case(s) under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

20.     _Payment of Carve Out On or After the Carve Out Trigger Notice Date_.  Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

21.     _No Third-Party Rights_.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

22.     _Section 507(b) Reservation_.  Subject only to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for

any Diminution in Value of their interests in Cash Collateral, respectively, during the Chapter 11 Case. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties, respectively, against any Diminution in Value, as applicable, of their respective interests in the Cash Collateral.

23.    No Waiver for Failure to Seek Relief. The failure or delay of the Prepetition Agent or the Prepetition Secured Parties to exercise rights and remedies under this Interim Order or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

24.    Perfection of the Adequate Protection Liens. With respect to the Adequate Protection Liens, the Prepetition Agent is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments against the Debtor in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether the Prepetition Agent shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments against the Debtor, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order. If the Prepetition Agent (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments against the Debtor, the Debtor shall cooperate and assist in any such execution and/or filings as reasonably requested by the Prepetition Agent (at the direction of the applicable required

16

lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

25.     A certified copy of this Interim Order may (at the direction of the applicable required lenders) be filed with or recorded in filing or recording offices by the Prepetition Agent in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of this Interim Order.

26.     <u>Marshaling</u>.  Subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Adequate Protection Collateral.

27.     <u>Survival of Interim Order</u>.  The provisions of this Interim Order, including all findings herein, shall be binding upon and inure to the benefit of all parties in interest in the Chapter 11 Case, including the Prepetition Secured Parties, the Debtor, any official committee appointed in the Chapter 11 Case, and their respective successors and assigns, including any chapter 11 trustee appointed during the Chapter 11 Case or upon a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Chapter 11 Case to chapter 7, dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise, or confirming or consummating any plan of reorganization.

28.     <u>Proofs of Claim</u>.  Neither the Prepetition Agent nor the Prepetition Secured Parties will be required to file proofs of claim in the Chapter 11 Case, and the Debtor's Stipulations shall be deemed to constitute a timely filed proof of claim against the Debtor.

31239975.3

17

29.     <u>Inspection Rights</u>.  In addition to, and without limiting, whatever rights to access the Prepetition Secured Parties have under the Prepetition Credit Agreement, upon reasonable prior written notice (email being sufficient) and during normal business hours, the Debtor shall permit representatives, agents, an employees of the Prepetition Secured Parties to (a) have reasonable access to and inspect and copy the Debtor's books and records, including all records and files of the Debtor pertaining to the Prepetition Collateral and the Adequate Protection Collateral, (b) have reasonable access to and inspect the Debtor's properties, and (c) discuss the Debtor's affairs, finances, and condition with the Debtor's officers and financial advisors.

30.     <u>Indemnification</u>.  The Debtor shall indemnify and hold harmless the Prepetition Secured Parties in respect of any claim or liability incurred in or related to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens and all documents related to and all transactions contemplated by the foregoing.

31.     <u>Final Hearing</u>.  The Final Hearing on the Motion will be held on **_____, 2024, at __:__ __.m., prevailing Eastern Time**.  Any objections or responses to entry of the Final Order shall be filed on or before **4:00 p.m., prevailing Eastern Time, on _____, 2024**, and shall be served on:  (a) proposed counsel to the Debtor (i) Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn:  Benjamin I. Finestone and Brian Holzman and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N King St, Wilmington, DE 19801, Attn:  Robert Brady and Kenneth Enos; (b) counsel to the Prepetition Agent, (i) Kirkland & Ellis LLP, 300 N La Salle Dr., Chicago, IL 60654, Attn:  Patrick J. Nash, P.C., and 601 Lexington Ave., New York, NY 10022, Attn:  Brian Schartz, P.C., and Andrew Townsell, (ii) Pachulski Stang Ziehl & Jones, 919 N Market St # 1700, Wilmington, DE 19801,

Attn:  Laura Davis Jones and Peter J. Keane, and (iii) Reed Smith, 599 Lexington Avenue, New

York, NY, 10022, Attn: David Pisciotta and Nicholas Vislocky; and (c) counsel to the Prepetition

Secured Lenders (i) Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005, Attn:  Joel

Moss and Jordan Wishnew and (ii) Cole Schotz, 500 Delaware Avenue, Suite 1410, Wilmington,

DE 19801, Attn:  G. David Dean.

32.     Effect of this Interim Order.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon entry of this Interim Order.

33.     Bankruptcy Rule 6003(b) has been satisfied.

34.     The requirements of Bankruptcy Rule 6004(a) are waived or are inapplicable due

to Bankruptcy Rules 4001(b)(2) and (c)(2).

35.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim

Order shall be immediately effective and enforceable upon entry of this Interim Order.

36.     The Debtor is authorized to take all such actions as are necessary or appropriate to

implement the terms of this Interim Order.

37.     Headings.  All paragraph headings used in this Interim Order are for ease of

reference only and are not to affect the construction hereof or to be taken into consideration in the

interpretation hereof.

38.     Retention of Jurisdiction.  The Court retains exclusive jurisdiction with respect to

all matters arising from or related to the implementation of this Interim Order.

**<u>Exhibit 1</u>**

**Approved Budget**

**In re BYJU's Alpha, Inc.**
**Quarterly Cash Use Forecast for the Period of February - April 2024***

| February 2024 | |
|---|---|
| *($ '000s)* | |
| | |
| T. Pohl Director Fee | $75 |
| Potential litigation expenses | $935 |
| General chapter 11 administrative fees (UST Fees, noticing expenses, etc.) | $50 |
| DIP Agent Fee | $50 |
| Collateral Agent Fee | $30 |
| Cash DIP Interest** | $0 |
| | |
| **Total Fees for Month** | **$ 1,140** |

| March 2024 | |
|---|---|
| *($ '000s)* | |
| | |
| T. Pohl Director Fee | $75 |
| Potential litigation expenses | $875 |
| General chapter 11 administrative fees (UST Fees, noticing expenses, etc.) | $25 |
| | |
| | |
| | |
| | |
| **Total Fees for Month** | **$ 975** |

| April 2024 | |
|---|---|
| *($ '000s)* | |
| | |
| T. Pohl Director Fee | $75 |
| Potential litigation expenses | $1,065 |
| General chapter 11 administrative fees (UST Fees, noticing expenses, etc.) | $25 |
| | |
| | |
| | |
| | |
| **Total Fees for Month** | **$ 1,165** |

| **Total Fees for Entire Quarter** | **$ 3,280** |
|---|---|

**Notes:**

* These are estimates only, prepared for budgeting purposes.  The cost and duration of bankruptcy and litigation proceedings are inherently difficult to forecast and estimate. Numerous variables may increase or decrease these estimates.

** Although there is no cash interest payment due on the DIP loan during this quarter, it has been included as a line item as a placeholder for future cash use forecasts.

**Exhibit B**

**DIP Term Sheet**

*DRAFT 01.31.2024;*
*SUBJECT TO FURTHER MODIFICATION WITH THE CONSENT OF THE PARTIES*

**BYJU'S ALPHA INC.**

**$260.0 Million DIP Facility**

**SUMMARY OF TERMS AND CONDITIONS**

---

*This Summary of Terms and Conditions is confidential and is intended as a proposal only. It does not purport to list all terms, conditions, representations, warranties and other provisions which shall be mutually agreed upon and detailed in definitive legal documentation.*

---

| | |
|---|---|
| Borrower: | Byju's Alpha, Inc., a Delaware corporation ("<u>Byju's Alpha</u>" or the "<u>DIP Loan Party</u>"). |
| DIP Lenders: | The New Money DIP Loans shall be provided by certain members of the ad hoc group of lenders under a senior debtor-in-possession credit agreement (in their capacity as lenders under the Credit Documentation (the "<u>DIP Lenders</u>")). |
| DIP Administrative Agent/Collateral Agent: | GLAS Trust Company, LLC (the "<u>DIP Agent</u>"). |
| DIP Facility: | A senior secured multiple-draw term loan facility denominated in U.S. dollars, in an aggregate principal amount up to $260.0 million. $20 million of the DIP Facility will be new money term loans (the "<u>New Money DIP Loans</u>"). |

Subsequent to the Draw Date (as defined below) and subject to approval of the Bankruptcy Court pursuant to the Final DIP Order (as defined below):
(i) at the sole option of each DIP Lender who has funded New Money DIP Loans and the Bridge Loans, for every dollar of New Money DIP Loans and the Bridge Loans committed or funded, such DIP Lender may elect to convert up to seven dollars of loans under the Existing Credit Agreement held by such DIP Lender (and any of its affiliates) into an equivalent amount of loans under the DIP Facility and
(ii) at the sole option of each DIP Lender who has funded the Prepetition Reimbursements, for every dollar of Prepetition Reimbursement funded by such DIP Lender (and any of its affiliates), such DIP Lender may elect to convert up to two dollars of loans under the Existing Credit Agreement into an equivalent amount of loans under the DIP Facility (the loans rolled up pursuant to clauses (i) and (ii), the "<u>Roll-Up Loans</u>" and together with the New Money DIP Loans and any Bridge Loans and Prepetition Reimbursements that subsequently becomes DIP Loans pursuant to the terms hereof, the "<u>DIP Loans</u>").

The roll-up options set forth in clauses (i) and (ii) above shall be attributable to and travel with (in the case of any assignment or transfer after the Closing Date) the funded New Money DIP Loans and/or Prepetition Reimbursements, as applicable, and will require written notice to the Administrative Agent prior to exercising such option (which notice shall be in a form acceptable to the Required Lenders to be attached to the Credit Documentation).

For illustrative purposes only, a DIP Lender that has funded (or subsequently been assigned) $1 million in connection with the Bridge Loans and $4 million in connection with the New Money DIP Loan shall have the right, but not the obligation, to convert up to $35 million of loans under the Existing Credit Agreement into Roll-Up Loans on a dollar-for-dollar basis.

The "Existing Credit Agreement" means that certain Credit and Guaranty Agreement, dated as of November 24, 2021, among Think and Learn Private Limited, a company established under the laws of India with corporate identification number U80903KA2011PTC061427 (the "Parent Guarantor"), Byju's Alpha, certain subsidiaries of the Parent Guarantor, each lender from time to time party thereto, and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as administrative agent and as collateral agent (the "Existing Credit Agreement Agent").

| | |
|---|---|
| Prepetition 10.3(d) Reimbursements: | Pursuant to that certain cooperation agreement dated as of August 1, 2023, entered into by and among, *inter alios*, certain of the DIP Lenders (the "Cooperation Agreement") have reimbursed the Existing Credit Agreement Agent for certain expenses pursuant to the indemnification and expense reimbursement provisions therein and Section 10.3(d) of the Existing Credit Agreement for certain expenses incurred pursuant to the Existing Credit Agreement prior to the Closing Date (such reimbursed amounts, the "Prepetition Reimbursements"). |
| | Subject to reasonable diligence as to the amount of such Prepetition Reimbursements, upon the entry of the Final DIP Order (as defined below), the Prepetition Reimbursements will automatically convert into a post-petition, debtor-in-possession financing under Section 364 of the Bankruptcy Code that shall rank *pari passu* with the New Money DIP Loans and shall constitute DIP Loans for all purposes hereunder and New Money DIP Loans for all purposes of the Priority Waterfall (as defined below). |
| Prepetition Bridge Funding: | Prior to the date hereof, certain of the DIP Lenders have provided $5.0 million (the "Bridge Loan") to the Borrower pursuant to the indemnification provisions of the Cooperation Agreement and Section 10.3 of the Existing Credit Agreement. |
| | Upon the filing of chapter 11 cases in the United States Bankruptcy Court for the District of Delaware by Byju's Alpha and upon the entry of the Final |

DIP Order, the Bridge Loans will automatically convert into a post-petition, debtor-in-possession financing under Section 364 of the Bankruptcy Code that shall rank *pari passu* with the New Money DIP Loans and shall constitute DIP Loans for all purposes hereunder and New Money DIP Loans for all purposes of the Priority Waterfall (as defined below).

**Delayed Draws:** Subject to the satisfaction of the conditions precedent as specified below, two draws of New Money DIP Loans in an aggregate principal amount of up to $20.0 million (the "Delayed Draw") will be provided to the Borrower as post-petition, debt-in-possession financings under Section 364 of the Bankruptcy Code.

**Maturity Date:** The DIP Loans will mature on the date which is [2] years following the date of the first draw thereunder (the "Draw Date"); *provided*, that the Credit Documentation shall provide the right for individual Lenders to agree to extend the maturity date of the outstanding DIP Loans held by such Lenders upon the request of the Borrower and without the consent of any other Lender.

**Availability:** Each Delayed Draw will be funded into escrow in a single drawing (each such draw date, a "Delayed Draw Date"), as specified below, in each case, in the amount of $10.0 million.

The Borrower shall be able to draw on the Delayed Draw commitments until the earlier to occur of (i) the date on which the maximum amount of the Delayed Draw has been drawn, (ii) the date on which the commitments under the Delayed Draw have been terminated, and (iii) the date that is 24 months after the date of the Final DIP Order (such date, the "Delayed Draw Termination Date").

Amounts borrowed under the Delayed Draw that are repaid or prepaid may not be re-borrowed.

**Interest Rate:** The New Money DIP Loans shall accrue interest at a rate *per annum* equal to Term SOFR plus [●]%, which interest shall be payable quarterly and of which, (x) an amount equal to Term SOFR plus [1.00]% multiplied by the aggregate outstanding amount of the Bridge Loans and the New Money DIP Loans shall be payable **in cash**, and (y) the remaining interest accrued shall be payable in kind rather than in cash and shall be issued in additional New Money DIP Loans.

The Roll-Up Loans shall accrued interest at a rate *per annum* equal to Term SOFR plus [●]% per annum, which interest shall be payable quarterly and which shall be paid in kind rather than in cash and shall be issued in additional Roll-Up Loans.

**DDTL Conditions:** The Delayed Draw will be comprised of two distinct tranches.

(a) The first tranche ("DDTL Tranche 1"), in an amount up to an aggregate principal amount of $10.0 million will be available

subject to the DDTL Funding Conditions and entry of the Final DIP Order.

(b) The second tranche ("<u>DDTL Tranche 2</u>"), in an amount up to an aggregate principal amount of $10.0 million will be available subject to the Tranche 2 Funding Conditions.

The "<u>DDTL Funding Conditions</u>" shall include (in addition to other customary conditions):

(a) the entry of the Final DIP Order,

(b) the accuracy in all material respects of all representations and warranties in the Credit Documentation,

(c) no default or event of default exists or would exist after giving effect thereto,

(d) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date,

(e) delivery of an updated Approved Budget,

(f) compliance with all Case Milestones (as defined below) applicable as of such Delayed Draw Date,

(g) the filing of one or more complaints by Byju's Alpha with respect to the Litigation Claims, and

(h) amendment no. 9 to the Existing Credit Agreement shall have been executed by the Borrower and shall have become effective pursuant to the terms thereof.

| | |
|---|---|
| Tranche 2 Funding Conditions: | The "<u>Tranche 2 Funding Conditions</u>" shall be limited to the below: |

(a) on any date after the Petition Date until the date 2 weeks prior to the Maturity Date:

   (i) the delivery of a certificate signed by a responsible officer of the Borrower certifying that (x) the Borrower has received a bona fide request in good faith from Tim Pohl for indemnification under the indemnification agreement reviewed and approved by the DIP Lenders prior to the closing date, (y) the request is for bona fide indemnifiable amounts determined in good faith under the indemnification agreement (the "<u>Indemnification Payment</u>") and (z) the amount of such request (the "<u>Indemnified Amount</u>") (such notice a "<u>Indemnification Notice</u>"); and

   (ii) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date; or

(b) on any date after the date that is 2 weeks prior to the Maturity Date (but in any case, prior to the Maturity Date):

    (i) the delivery of a certificate signed by a responsible officer of the Borrower certifying that the Borrower has received a bona fide request in good faith from Tim Pohl to fund DDTL Tranche 2 for purposes of payment of potential future Indemnification Payments; and

    (ii) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date.

Use of Proceeds:

The proceeds of DDTL Tranche 1 will be used solely to fund (x) bankruptcy-related professionals in connection with a bankruptcy filing for the Borrower, (y) the reasonable and documented expected fees and expenses of Tim Pohl, in his capacity as director and officer of the Borrower, and (z) other ordinary and customary fees and expenses in connection with the administration of the Borrower in the Chapter 11 case, including, without limitation, the ordinary fees and expenses of any claims agents.

The proceeds of DDTL Tranche 2, if any, will be used solely to provide funding to Borrower to pay Borrower's indemnification obligations owed to Tim Pohl in his capacity as the director and officer of the Borrower solely to the extent the Borrower has received such requests for indemnification and otherwise met the Tranche 2 Funding Conditions. To the extent any proceeds of DDTL Tranche 2 have not been utilized for indemnification obligations of the Borrower on the date that is the later to occur of (i) the date that is six years following the end of the Borrower's chapter 11 case (the "Tail Date") and (ii) the date of any final and binding resolution of any litigation pending against Tim Pohl prior to the Tail Date for which he is entitled to indemnification under the indemnification agreement with the Borrower (the "Indemnification Termination Date"), the Borrower shall promptly return all such proceeds to the DIP Agent for application against the obligations under the DIP.

The proceeds of Delayed Draw, with respect to DDTL Tranche 1 and DDTL Tranche 2, will be funded into an escrow account of the Borrower with the DIP Administrative Agent that is subject to a first priority lien in favor of the DIP Administrative Agent and the DIP Lenders and not any liens or claims of other existing pre-petition or post-petition creditors of the DIP Loan Party (including any existing secured credit facilities) (the "Escrow Account") and, for the avoidance of doubt, shall accrue interest from the date of such funding.

The Borrower will not be permitted to draw upon the DDTL Tranche 1 proceeds in the Escrow Account other than subject to the Required Lenders' consent following delivery of an Approved Budget documenting the specific use of proceeds for such draw, including, among other things,

ordinary course expenses involved in managing a company and a chapter 11 case.

After the DDTL Tranche 2 funding date, the Borrower will only be permitted to draw upon the DDTL Tranche 2 proceeds in the Escrow Account, which may be from time-to-time, following delivery to the DIP Agent of an Indemnification Notice and then only up to the Indemnification Amount specified in each such notice.

| | |
|---|---|
| Security and Collateral; Ranking: | The obligations of the Borrower and of each other DIP Loan Party under the Guaranty (if any) shall be secured by: a perfected first-priority security interest (subject to permitted liens and other exceptions to be set forth in the Credit Documentation) in substantially all of the DIP Loan Party's tangible and intangible assets now owned or hereafter acquired on a senior basis to the loans under the Existing Credit Agreement, including, without limitation, all rights, interests and obligations in and to any cause of action of the Borrower with respect to fraud, fraudulent conveyance, or breach of fiduciary duties and any proceeds thereof (collectively, the "<u>Litigation Claims</u>"). |

The New Money DIP Loans (and related obligations) shall benefit from payment priority and turn-over rights (and related rights) in respect of any recovery received from or in respect of any guarantor under the Existing Credit Agreement that is not a DIP Loan Party pursuant to an intercreditor arrangement to be entered into by and between the DIP Agent and the Existing Credit Agreement Agent (the "<u>Priority Waterfall</u>"). For the avoidance of doubt, the Roll-Up Loans will not benefit from the Priority Waterfall (and shall not benefit from a guarantee from or other right of recovery in respect of any guarantor under the Existing Credit Agreement that is not a DIP Loan Party).

All obligations under the Credit Documentation shall constitute an allowed administrative expense claim (the "<u>DIP Superpriority Claim</u>") having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expense claims in the chapter 11 cases and recourse to all of the DIP Loan Party's assets and property, and proceeds and products thereof, subject only to the Carve-Out (as defined in the Carve-Out Annex attached hereto).

All liens granted will be granted pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, as applicable, and will be deemed to be valid, enforceable, fully perfected, and non-avoidable in the Final DIP Order.

The New Money DIP Loans shall rank prior to the Roll-Up Loans on a payment basis.

| | |
|---|---|
| Documentation Principles: | The definitive financing documentation for the DIP Credit Facilities (the "<u>Credit Documentation</u>") shall be negotiated in good faith by the Borrower and the DIP Lenders and shall contain the terms and conditions set forth |

herein and such other terms as the Borrower and the DIP Lenders shall agree, it being understood and agreed that the Credit Documentation shall:

(a) eliminate the Borrower's ability to (i) incur debt, (ii) issue equity interests, (iii) grant liens and other encumbrances over the Borrower's assets, (iv) make dividends and other similar payments in respect of equity and subordinated debt, (v) make investments, (vi) conduct assets sales and (vii) enter into affiliate transactions, in each case, other than in compliance with and in accordance with the Approved Budget (as defined below). For the avoidance of doubt, the Credit Documentation shall be no more flexible for the Borrower than the Existing Credit Agreement, and

(b) include customary affirmative and negative covenants, representations and warranties and events of default as determined by reference to similarly situated borrowers.

| | |
|---|---|
| Budget Covenant with Respect to DDTL Tranche 1 | "<u>Approved Budget</u>" means a quarterly cash flow forecast of the Borrower containing expected monthly disbursements for the applicable quarterly period with respect to (i) the expected fees and expenses of legal counsel for the Borrower (itemized by law firm) in connection with the prosecution of the Litigation Claims (and any other related claims) on behalf of the Borrower, (ii) the expected fees and expenses of Tim Pohl, in his capacity as director and officer of the Borrower and (iii) other ordinary and customary fees and expenses in connection with the administration of the Borrower in the Chapter 11 cases, including, without limitation, the ordinary fees and expenses of any claims agents, each of which shall be delivered on or before the closing date and, thereafter, no later than 5:00 p.m. Eastern time on the ten (10) business days prior to the end of each fiscal quarter. |

Notwithstanding anything herein to the contrary, any such quarterly cash flow forecast delivered to the Lenders after the closing date shall only become the effective "Approved Budget" for purposes hereof following the Required Lenders' acknowledgement that the proposed budget is in form and substance satisfactory to the Lenders.

For the avoidance of doubt, if the Required Lenders do not approve the Approved Budget in their sole and absolute discretion, any proceeds with respect to DDTL Tranche 1 not already disbursed from the Escrow Account shall not be permitted to be disbursed from the Escrow Account until the Required Lenders have approved an updated Approved Budget.

| | |
|---|---|
| Case Milestones: | With respect to the chapter 11 plan for the Borrower, customary milestones for a facility of this type (the "<u>Case Milestones</u>"), including: |

(a) the filing of an order for relief with respect to Byju's Alpha on or before February 1, 2024 (the "<u>Petition Date</u>"),

(b) the entry of an order of the bankruptcy court in form and substance acceptable to the Required Lenders no later than 3 business days

after the Petition Date that authorizes the use of cash collateral pending approval of the Final Dip Order,

(c) the entry of an order of the bankruptcy court in form and substance acceptable to the Required Lenders no later than 45 days after the Petition Date, that, among other matters (i) authorizes the Borrower to execute and perform under the terms of the Credit Documentation, (ii) authorizes the Delayed Draw to be incurred after the date of such final order (the "<u>Final DIP Order</u>"), and (iii) approves the incurrence of additional roll-up term loans in the amount to be agreed by the Required Lenders, and

(d) the filing of at least one complaint by Byju's Alpha with respect to the Litigation Claims does not occur on or before [●] days after the chapter 11 filing by Byju's Alpha.

| | |
|---|---|
| Events of Default: | Appropriate and customary events of default for credit facilities of this type, in form and substance acceptable to the Lenders, which will include: |

(a) the removal of Tim Pohl as the sole director of Byju's Alpha,

(b) the appointment of any trustee or examiner with expanded powers (or any other person with a similar function) without the express written consent of the Required Lenders, and

(c) any additional or replacement director being appointed to Byju's Alpha without the express written consent of the Required Lenders.

| | |
|---|---|
| Negative Covenants: | Appropriate and customary events of default for credit facilities of this type, in form and substance acceptable to the Required Lenders. |
| Representations and Warranties: | Appropriate and customary events of default for credit facilities of this type, in form and substance acceptable to the Required Lenders. |
| Required Lenders: | DIP Lenders constituting in the aggregate more than [fifty percent (50%)] of the outstanding principal amount of commitments of all DIP Lenders. |

## **Carve-Out Annex**

[*Attached*]

1.      <u>Carve Out</u>.

(a)      <u>Carve Out</u>.  As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $[●] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the [DIP Agent] of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[●] incurred after the first business day following delivery by the [DIP Agent] of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the [DIP Agent] to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been

invoked.  For the avoidance of doubt and notwithstanding anything to the contrary, until the Indemnification Termination Date, the DDTL Tranche 2 proceeds in the Escrow Account shall remain available exclusively to pay any indemnification obligations of the Borrower owed to Tim Pohl in accordance with the requirements of the indemnification agreement between the Borrower and Tim Pohl.

Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the [DIP Agent] to the Debtors with a copy to counsel to the Creditors' Committee (if any) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing with respect to the DDTL Tranche 1 proceeds in the Escrow Account by the Debtors for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (each, as defined in the [DIP Credit Agreement]) (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) constitute a demand to the

Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such Delayed Draw Term Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Delayed Draw Term Loans under the Delayed Draw Term Facility, any termination of the Delayed Draw Term Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each Delayed Draw Term Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Delayed Draw Term Lender's pro rata share with respect to such borrowing in accordance with the Delayed Draw Term Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the [DIP Agent] for the benefit of the [DIP Lenders], unless the [DIP Obligations] have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Creditors] in accordance with their rights and priorities as

of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to

pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-

Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not

been reduced to zero, to pay the [DIP Agent] for the benefit of the [DIP Lenders], unless the [DIP

Obligations] have been indefeasibly paid in full, in cash, and all Commitments have been

terminated, in which case any such excess shall be paid to the [Prepetition Secured Creditors] in

accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the

contrary in the [DIP Documents], or this Final Order, if either of the Carve Out Reserves is not

funded in full in the amounts set forth in this paragraph [●], then, any excess funds in one of the

Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out

Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable

amount set forth in this paragraph [●], prior to making any payments to the [DIP Agent] or the

[Prepetition Secured Creditors], as applicable.  Notwithstanding anything to the contrary in the

[DIP Documents] or this Final Order, following delivery of a Carve Out Trigger Notice, the [DIP

Agent] and the [Prepetition Secured Agent] shall not sweep or foreclose on cash (including cash

received as a result of the sale or other disposition of any assets) of the Debtors until the Carve

Out Reserves have been fully funded, but shall have a security interest in any residual interest in

the Carve Out Reserves, with any excess paid to the [DIP Agent] for application in accordance

with the [DIP Documents].  Further, notwithstanding anything to the contrary in this Final Order,

(i) disbursements by the Debtors from the Carve Out Reserves shall not constitute [Loans] (as

defined in the [DIP Credit Agreement]) or increase or reduce the [DIP Obligations], (ii) the failure

of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the

priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-

Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in any [Prepetition Secured Facilities], the Carve Out shall be senior to all liens and claims securing the [DIP Facility], the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the [DIP Obligations] or the [Prepetition Secured Obligations].

Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

No Direct Obligation To Pay Allowed Professional Fees. None of the [DIP Agent], [DIP Lenders], or the [Prepetition Secured Creditors] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the [DIP Agent], the [DIP Lenders], or the [Prepetition Secured Creditors], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP

Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.