**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) <br> ) <br> BYJU'S ALPHA, INC.,[1] )    Chapter 11 <br> ) <br>               Debtor. )    Case No. 24-10140 (JTD) <br> ) <br> ───────────────────────── ) <br> ) <br> BYJU'S ALPHA, INC., )    Adv. Pro. Case No. 24-50013 (JTD) <br>               Plaintiff, ) <br> ) <br>       v. ) <br> ) <br> CAMSHAFT CAPITAL FUND, LP, ) <br> CAMSHAFT CAPITAL ADVISORS, LLC, and ) <br> CAMSHAFT CAPITAL MANAGEMENT, LLC ) <br> ) <br>               Defendants. ) <br> ) | |

**EMERGENCY MOTION OF DEBTOR FOR LIMITED EXPEDITED DISCOVERY,
OR, ALTERNATIVELY, FOR AN ORDER PURSUANT TO
BANKRUPTCY RULE 2004 AUTHORIZING EXAMINATION[2]**

The debtor-plaintiff, BYJU's Alpha, Inc. (the "Debtor"),[3] moves (the "Motion") for entry of an order substantially in the form of **Exhibit A** attached hereto (the "Proposed Order"): (i) permitting the Debtor to immediately serve the interrogatories and document requests substantially in the form of **Exhibits B**, **C**, and **D**, (ii) approving the proposed expedited discovery schedule that requires Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC, and Camshaft Capital Management, LLC (collectively, "Camshaft") and Riju Ravindran to provide written answers to those discovery requests within five calendar days of service and complete the

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this chapter 11 case is: 16192 Coastal Highway, Lewes, Delaware 19958.

[2] The Debtor is filing identical versions of this Motion in both its main case (Case No. 24-10140) and its adversary proceeding against the Camshaft Defendants (Adv. Pro. Case No. 24-50013).

[3] Capitalized terms, unless otherwise defined, shall have the same definitions as ascribed to them in the Complaint (Dkt. No. 1).

1

production of responsive documents within ten calendar days of service, (iii) setting a case management conference within fourteen calendar days of entry of the Proposed Order, and (iv) granting related relief.

In support of this Motion, the Debtor respectfully states as follows:

## **INTRODUCTION**

1. In most fraudulent transfer actions, certain matters are frequently the subject of dispute—*e.g.*, actual intent of the debtor-transferor and/or reasonably equivalent value. One matter of fact that is usually not in dispute, however, is the locus of the allegedly fraudulently transferred asset. This action differs from most. The customary matters of dispute are all but conceded through brazen and boastful concessions by former management. The actual location of the fraudulently transferred asset, however, is an alarming mystery.

2. This Motion centers on that question:

**Where is the Debtor's $533 million?**

3. For the past five months, the Debtor's creditors, then the Debtor itself (once under the stewardship of a faithful fiduciary), have struggled to get the answer to that straightforward question. Upon defaulting on over $1 billion in loans, the Debtor's former management (Riju Ravindran) and corporate parents stashed $533 million in Camshaft Capital Fund, an unknown and unproven hedge fund, in an effort to hinder, delay, and/or defraud the Debtor's Lenders. Then, around the time that negotiations about those defaults reached an impasse and those same Lenders signaled their intention to exercise remedies, the Debtor's former management, Mr. Ravindran, transferred the hidden funds further away from the reach of the Debtor and its Lenders—all in exchange for not a peppercorn of identifiable consideration.

4. Yet, despite being unable (or unwilling) to verify the existence of the cash, the Debtor's founder (Mr. Ravindran's brother, Byju) still claims as recently as mid-January 2024 that over $500 million still exists, "in cash and cash equivalents," in the control of one of the Debtor's former affiliates. If true, that is obviously significant. As soon as the Debtor learns the location of the $533 million, it will likely make good sense, in service of a debtor in possession's fiduciary duties, to seek to enjoin the further transfer and dissipation of the money.

5. Camshaft knows the location of the $533 million as the recipient of the initial transfer and the facilitator of the putative subsequent transactions in respect thereof—the money either remains in one of Camshaft's investor accounts today or it does not. If the money is still there, Camshaft will know in whose account the funds are being held. If the money is no longer at Camshaft, Camshaft must have authorized the redemption or transfer (as required by its internal procedures) and will know exactly when and where the money was moved. Camshaft should be required to promptly provide that information.

6. Likewise, the Debtor's former management, Mr. Ravindran, presumably *must* know the location of the Debtor's primary asset—the $533 million. Mr. Ravindran possesses the complete corporate records of the Debtor, which he still withholds from the Debtor as of today. He participated in the fraudulent transfer of the $533 million to Camshaft, and, as the Debtor's sole director and officer at the time, must have authorized any subsequent transactions. Mr. Ravindran, who has already appeared and advanced an objection in this chapter 11 case, should be required to tell the Debtor where the $533 million is now.

7. As this Court remarked at the First Day Hearing, "[t]here really is no reason the [Debtor], at this point, shouldn't know where that money is." Feb. 5, 2024 Hrg. Tr. 48:8-12. Accordingly, this Court ordered Mr. Ravindran to talk to the Debtor to help figure out where its

assets are, *id.* 48:12-17, and Camshaft to meet and confer with the Debtor regarding this motion to expediate discovery, *id.* 51:10-12. Counsel for both Mr. Ravindran and Camshaft said "yes" to the Court's instructions. Neither has complied. *Cf. Waste Conversion, Inc. v. Rollins Environmental Services*, 893 F.2d 605, 614 (3d Cir. 1990) (reciting "the basic rule that all court orders and judgments must be complied with promptly and that those who privately determine the law and refuse to obey a court order risk contempt").

8. After the First Day Hearing, the Debtor immediately contacted Mr. Ravindran to ask four simple yet critical questions—(i) where the $533 million is, (ii) in whose name it is being held, (iii) how much of it is still left, and (iv) whether Mr. Ravindran would agree to freeze such funds pending subsequent order in this action. *See* **Ex. E** (Feb. 5, 2024 email from B. Finestone to S. Korpus). Mr. Ravindran ignored the Debtor for two days before telling the Debtor it would not answer the inquires and ignoring the request to meet and confer. *See* **Ex. E** (Feb. 7, 2024 email from S. Korpus to B. Finestone).

9. When the Debtor repeatedly tried to schedule a meet-and-confer with Camshaft, Camshaft's counsel also refused on the basis that it is still "finalizing the engagement" with Camshaft, even though the very same law firm just appeared for Camshaft before this Court at the First Day Hearing, acknowledged service of the Complaint, and has been acting for Camshaft for months in two pre-petition lawsuits involving the very issues present here: the transfer of $533 million and the Debtor's entitlement to information about those transfers. **Ex. F** (Feb. 7, 2024 email from B. Finestone to P. Van Tol).

10. So mere days into this chapter 11 case, the primary parties with knowledge of the $533 million have already refused to comply with this Court's clear instructions. The Debtor needs the Court's help to obtain immediate discovery into the whereabouts of the $533 million and it

4

needs it now, before the money disappears again. As this Court knows, fraudulent transfer statutes provide a tool for debtors to locate and freeze assets in the hands of transferees early on, before those same assets are moved again or dissipated. *See, e.g.*, Delaware Code Title 6 Sec. 1307 (providing for special remedies, including "injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property" and "[a]ppointment of a receiver to take charge of the asset transferred or of other property of the transferee" and "[a]ny other relief the circumstances may require").

11. Otherwise, depleted debtors and their creditors, as here, could be left with no practical remedy, particularly when the specific assets at issue—cash—can easily be moved and hidden at any time. Without responses to its targeted discovery requests, the Debtor will be hard-pressed to determine the current location of the $533 million. In the interim, the Debtor's former management, Mr. Ravindran, once again will be able to hide and dissipate the money.

12. Against this pressing need, there is no undue burden or prejudice to Camshaft. The Debtor is attaching to its Motion **eight** targeted interrogatories (**Exhibit B**) and **six** targeted document requests (**Exhibit C**), each one focused on the whereabouts, transfers, redemptions, and uses of the $533 million, or any limited partnership or other interest in Camshaft Capital Fund associated with those funds. There is no undue burden to answering these questions and producing the requested documents, which are readily available to Camshaft with a few clicks of the mouse.

13. Similarly, the burden or prejudice to Mr. Ravindran is also minimum, because the Debtor requests to propound just **six** targeted interrogatories (**Exhibit D**), focused on the whereabouts of the $533 million. This discovery is warranted especially after Mr. Ravindran refused the Court's instruction to meet and confer with respect to the location of the transferred funds.

5

14. All the Court needs to decide at this stage is if there is "good cause" for requiring Camshaft and Mr. Ravindran to provide basic discovery about the $533 million on an expedited basis—not months from now when that same information could be rendered obsolete, if and when the Debtor's former management and corporate parent moves the money yet again. *See Vision Films, Inc. v. John Does 1-24*, 2013 WL 1163988, at *3 (D. Del. Mar. 20, 2013) (adopting a "good cause" standard for expediting discovery). Good cause exists to expedite discovery here, and the Motion should be granted.

## FACTUAL BACKGROUND

15. This section summarizes the allegations of the Debtor's Complaint, filed on February 2, 2024, and discovery requests, which establish the need for expedited discovery:

### A.     The Complaint.

16. As alleged in the Debtor's Complaint, the Debtor's former management borrowed $1.2 billion in November 2021, repeatedly defaulted on its loans four months later in March-April 2022, and, shortly thereafter, beginning in late April 2022, made the first of six transfers totaling approximately $533 million to Defendant Camshaft Capital Fund. Compl. ¶¶ 2, 35. Camshaft is a high-risk and unknown hedge fund founded in 2020 by William Cameron Morton, then a 23-year-old with no formal training in investing and money management, and which originally ran its operations out of an IHOP (*i.e.*, an "International House of Pancakes") in Miami. *Id.* ¶¶ 4, 75, 80.

17. There was no legitimate reason for the transfers, which were made with the intent to hinder, delay, and defraud the Debtor's creditors. *Id.* ¶ 4. Significantly, the Debtor was in default and in financial distress as a result of its defaults. It chose to stash the money where the Lenders could not access it. That location became Camshaft, and Camshaft received $533 million

and millions of dollars in management and potentially other fees due to its obscurity and pliability. *Id.* ¶¶ 8, 86.

18. Then, in March 2023, after negotiations with the Debtor's representatives reached an impasse, the Lenders' Agent accelerated the over-$1 billion due under the Term Loans. *Id.* ¶¶ 8, 57. GLAS also took control of the pledged equity in the Debtor, becoming the Debtor's sole stockholder and subsequently appointing Timothy Pohl as the Debtor's sole director. *Id.* In May 2023, GLAS and Pohl sued the Debtor's former management, among others, in Delaware state court to confirm that their exercise of remedies had effectuated a valid change of control of the Debtor, thereby permitting Pohl's appointment. *Id.* ¶ 69. Only after suing in Delaware did the Lenders learn that over half a billion dollars—money they were led to believe remained in the Debtor's bank accounts—were no longer there. *Id.* ¶ 70.

19. The facts only get worse and more confusing and alarming. In representations to a Florida court in fall of 2023, Camshaft has declared that the Debtor "owned" the $533 million, and is the "beneficial owner" of those funds. *Id.* ¶ 98. But when Mr. Pohl subsequently asked about the Debtor's $533 million "investment" in Camshaft Capital Fund, Camshaft—through the same counsel that now refuses to meet and confer with the Debtor—then declared that the Debtor no longer has any interest in the Fund, notwithstanding the transfer of the $533 million. *Id.* ¶¶ 95-96. Now according to Camshaft, "one hundred percent of [the Debtor's] interest" in the Fund had been transferred to an unidentified "third party" sometime "[i]n the first quarter of 2023, and prior to Mr. Pohl's appointment[.]" *Id.* ¶ 98. At other times, the Debtor's former management has asserted that they, *i.e.*, former insiders, are still in control of the funds. *Id.* ¶ 58. In essence conceding an actual fraudulent transfer had taken place, the Debtor's founder admitted that the money was moved "someplace the Lenders will never find it." *Id.* ¶¶ 9, 70. The Debtor's former management

had stripped the Debtor of virtually all of its assets, including a staggering sum of money, before someone else could take control of it. *Id.* ¶ 61, 107. There was no legitimate reason for these transfers, nor has the Debtor's former management ever bothered to give the pretense that one exists. *Id.* ¶¶ 3, 107.

### B.     The Requested Expedited Discovery.

20.    Attached as **Exhibits B**, **C**, and **D** are targeted interrogatories and document requests to which the Debtor seeks answers and documents on an expedited basis. Specifically, the Debtor has sought:

- The details about all transfers and/or redemptions of the $533 million or any limited partnership or other interest (whether equity or debt) that the Debtor ever held in Camshaft Capital Fund. Ex. B, Camshaft Interrogatory Nos. 1-2; Ex. D, Ravindran Interrogatory Nos. 1, 4.

- The persons that are currently holding the $533 million or any limited partnership or other interest in Camshaft Capital Fund associated with those funds. Ex. D, Ravindran Interrogatory Nos. 2-3, 5-6.

- The exact fund, and any subsequent funds, if the investment was transferred, in which the $533 million was invested within Camshaft and its current risk profile. Ex. B, Camshaft Interrogatory No. 8; Ex. C, Camshaft RFP No. 6.

- Confirmation of whether Camshaft Capital Fund still has the $533 million in transferred funds and, if not, where and to whom those funds were disbursed. Ex. B, Camshaft Interrogatory Nos. 1-2; Ex. C, Camshaft RFP No. 4.

- All account and transaction records, agreements, and financial statements associated with the Debtor, its former affiliates, the $533 million in transferred funds, and any limited partnership or other agreement associated with those funds. Ex. C, Camshaft RFP No. 4.

- All limited partnership and other agreements between Camshaft and the Debtor. Ex. C, Camshaft RFP Nos. 1-2.

- The names of potentially relevant witnesses. Ex. B, Camshaft Interrogatory Nos. 6-7; Ex. C, Camshaft RFP No. 5.

21.    To avoid any delay in receiving documents, before filing this Motion, on February 5, 2024, the Debtor's counsel sent a draft Protective Order to Camshaft to resolve any

confidentiality concerns. The Debtor has not received comments to date, and Camshaft has not indicated if and when it would respond.

## RELIEF REQUESTED

22. By this Motion, the Debtor respectfully requests that the Court grant the Motion and approve the Proposed Order, thereby entering the following discovery schedule prior to the scheduling of the conference under Federal Rule of Civil Procedure 26(f):

- The Debtor shall be given leave to serve the discovery requests substantially in the form of **Exhibits B**, **C**, and **D** upon the entry of the Court's order.
- Written answers to the Debtor's initial interrogatories and initial document requests within five calendar days of service of the Debtor's discovery requests.
- Completion of the production of documents responsive to the Debtor's initial document requests within ten calendar days of service of the Debtor's discovery requests.

23. Additionally, to avoid the Camshaft and Mr. Ravindran asserting blanket, boilerplate objections and refusing to provide any information (as Camshaft did in prepetition litigation, *see* Compl. ¶ 92), the Debtor requests that the Court (i) direct Camshaft and Mr. Ravindran to comply with the aforementioned deadlines and cooperate in good faith in the requested discovery, and (ii) set a status conference within 14 calendar days of the entry of the Court's order concerning the status of discovery with Camshaft's and Mr. Ravindran's discovery responses submitted to the Court in advance of such conference.

## BASIS FOR RELIEF REQUESTED

24. This Court has the inherent authority to expedite discovery and issue scheduling orders on discovery, briefing and hearings, when warranted by the circumstances. *See, e.g.*, *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir. 1983) (every court has inherent power to "schedule disposition of the cases on its docket so as to promote fair and efficient adjudication");

*see also Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 176 (3d Cir. 1991) (district court has "substantial discretion in managing its own docket").

25. Additionally, under the Federal Rules of Civil Procedure, made applicable here, expedited discovery is permissible when "ordered by the court." Fed. R. Civ. P. 33(b)(2), 34(b)(2)(A); *see also* Fed. R. Civ. P. 26(d)(1) (empowering the Court to authorize discovery before the Rule 26(f) conference). Courts in this Circuit have "typically required the party seeking discovery to show 'good' cause for its motion, such that the request is 'reasonable' in light of the circumstance." *Samuel, Son & Co., Inc. v. Beach*, 2013 WL 4855325, at *3 (W.D. Pa. Sept. 11, 2013) (cleaned-up); *see also Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 176 (3d Cir. 1991) (finding that the court has "substantial discretion in managing its own docket"); *Vision Films, Inc.* 2013 WL 1163988, at *3 (adopting a "good cause" standard for expedition of discovery and further explaining a court's "broad discretion to manage the discovery process").[4] To find "good cause," the Court should consider in particular whether "the [requesting party's] need for expedited discovery . . . outweighs the possible prejudice or hardship to the defendant." *Fonovisa, Inc. v. Does 1–9*, 2008 WL 919701, at *10 n.22 (W.D. Pa. Apr. 3, 2008); *see also Vision Films, Inc.* 2013 WL 1163988, at *3 (considering the "need for discovery[] and the breadth of the moving party's discovery requests").

26. Alternatively, the Court is empowered to order Mr. Ravindran to respond to interrogatories pursuant to Federal Rule of Bankruptcy Procedure 2004, the "purpose" of which, as here, "is to enable the [debtor in possession] to discover the nature and extent of the bankruptcy

---

[4] Courts in this Circuit continue to apply the "good cause" standard following the 2015 amendment to Federal Rule 26(b). *Strike 3 Holdings, LLC v. Doe*, 2020 WL 6342770, at *1 n.1 (E.D. Pa. Oct. 29, 2020) ("Although the 2015 amendments to the Rule eliminated the good cause requirement and replaced it with the overarching relevance and proportionality standard, district court's [sic] in this Circuit have continued to look to the good cause factors in analyzing motions for expedited discovery") (internal citations omitted).

estate." *In re Washington Mut., Inc.*, 408 B.R. 45, 49-50 (Bankr. D. Del. 2009) (finding that "[t]he scope of a Rule 2004 examination is 'unfettered and broad,'" "commonly recognized as more in the nature of a 'fishing expedition,'" and "may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate").

27. Here, balancing the pros and cons tilts one-sidedly in favor of targeted expedited discovery proceeding forthwith, and the "good cause" standard is easily met. There is an immediate need to locate and safeguard the $533 million originally transferred to Camshaft and, in comparison, no meaningful burden to Camshaft or Mr. Ravindran from having to provide that basic discovery now, particularly after rejecting the Debtor's informal efforts to obtain this same information cooperatively.

**I.     THERE ARE SIGNIFICANT BENEFITS TO EXPEDITING DISCOVERY.**

28. To state the obvious, fraudulent transfer law embodies the "goal of protecting creditors from wrongful asset transfers," including under applicable state law, *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So. 2d 189, 193 (Fla. 2003); and, more generally, there is "considerable urgency" to expedite discovery into "the location of defendants' possible assets[,]" when they have "both incentive and capacity to hide their assets," as here. *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005). These goals necessarily require discovery early in a case, including so that the debtor, as here, can prepare to seek preliminary relief to enjoin further transfers. *See EXL Lab'y, LLC v. Egolf*, 2010 WL 5000835, at *8 (E.D. Pa. Dec. 7, 2010) ("Expedited discovery is particularly appropriate where a plaintiff seeks injunctive relief.").

29. Under the present circumstances, the Debtor has a real, legitimate, and immediate need to obtain discovery relating to the current location and ownership of, and the terms by which,

the $533 million or any portion thereof was transferred or redeemed, as well as how much of the $533 million remains.  The Debtor's concerns cannot be overstated given the troubled history of what has happened to the $533 million to date, as underscored by the refusal of Mr. Ravindran and Camshaft to engage with the Debtor following the First Day Hearing.  As summarized above, the Debtor's former management (namely, Mr. Ravindran) actively concealed and transferred the $533 million away from creditors possessing valid claims to the money while the Debtor was in default.  When the truth about these transfers came out, the Debtor's former management's response was a flat out refusal to disclose where the money had gone, coupled with an assertion that the Lenders would never find it.  Compl. ¶¶ 9, 70, 108.  Even after this Court had instructed Mr. Ravindran to provide information about the location of the $533 million, he chose to rather violate the Court's instruction than providing such basic information to the Debtor.  *See* **Ex. E**.  The length Mr. Ravindran would go to, in order to hide the $533 million from the Debtor, further exacerbates the Debtor's concerns of asset dissipation.

30.     Camshaft, for its part, ended up tying itself in knots with contradictions and refusing every request for basic information concerning the whereabouts of the money.  Compl. ¶¶ 95, 98.  As with Mr. Ravindran, it too has chosen not to engage with the Debtor, continuing to rely on any reason it can find to delay answers to basic questions.  The Debtor apparently was Camshaft Capital Fund's *single largest client by far*, accounting for approximately 90% of the Fund's assets under management and paying Camshaft millions of dollars in fees, yet Camshaft refuses to tell that client what happened to its money.  The Debtor should not have to wait on Camshaft's restructuring counsel to "finalize the engagement."  This information should have been provided long ago, without the involvement of lawyers.

31.     For those reasons, it is imperative that Camshaft and Mr. Ravindran promptly produce basic discovery an expedited basis. With that crucial discovery in hand, the Debtor can take the necessary steps to secure the funds and identify any "John Doe" defendants that should be added to this lawsuit. Specifically, once the $533 million is located, the Debtor intends to file an Amended Complaint adding all transferees as defendants, then likely file a TRO and, in turn, a motion for preliminary injunction enjoining the further movement and dissipation of those funds (or any limited partnership or other interest in Camshaft Capital Fund on account thereof) during the pendency of this litigation. Otherwise, the Debtor may be left with no practical remedy if and when the Debtor's former management and/or Camshaft transfer or redeem the $533 million yet again. The Debtor and its creditors will remain one step behind wherever the money is moved next.

## II.   THE COSTS TO CAMSHAFT AND MR. RAVINDRAN OF PROCEEDING WITH DISCOVERY ARE NEGLIGIBLE.

32.     Against the immense benefits of proceeding with discovery forthwith, the burden on Camshaft and Mr. Ravindran is negligible. Indeed, Camshaft *inevitably* will have to provide the requested discovery regardless of what happens in this adversary proceeding. *See* Fed. R. Bankr. P. 2004.[5] Accordingly, the ultimate question here is simply one of timing: *when* should Camshaft have to disclose basic information about the location, ownership, and use of the $533 million and any limited partnership or other interest in Camshaft Capital Fund associated with those funds. As detailed above, there is an immediate need for this information.

33.     Additionally, there is no undue cost or burden to Camshaft. The Debtor's requests are not difficult to respond to. For instance:

---

[5] Specifically, to expeditiously prosecute its fraudulent transfer claims, the Debtor decided to commence this lawsuit concurrently with the commencement of its chapter 11 case. Regardless of what happens in this adversary proceeding, the Debtor has tools to compel Camshaft's production of the requested discovery at issue.

13

<u>Camshaft RFP No. 1</u>. All agreements between You and the Debtor.

<u>Camshaft RFP No. 3</u>. Documents sufficient to show the current beneficial owner of the Alpha Funds, the Camshaft LP Interest, and any other interest (whether equity or debt) in Camshaft Capital Fund that the Debtor ever was issued or received.

<u>Camshaft RFP No. 4</u>. All account records, transaction records, agreements, and financial statements of Camshaft concerning (i) the Debtor, (ii) T&L and its subsidiaries and affiliates, (iii) the "third party[,]" as referenced in Paragraph 1 of the Camshaft Corrected Complaint (and any affiliated Persons); (iv) the Alpha Funds, and any subsequent transfers, including redemptions, in respect of that money, (v) the Camshaft LP Interest or any other interest (whether equity or debt) that the Debtor owns or ever owned (directly or indirectly) in Camshaft Capital Fund, and (vi) any subsequent transfers, including redemptions, in respect of the Camshaft LP Interest, including the Debtor having "transferred all of its investment interest as a limited partner in Camshaft Capital Fund to a third party[,]" as referenced in Paragraph 1 of the Camshaft Corrected Complaint.[6]

<u>Camshaft Interrogatory No. 3</u>. Identify all Persons that currently beneficially own the Camshaft LP Interest.[7]

<u>Camshaft Interrogatory No. 5</u>. Identify the exact date(s) (by month, day, and year) on which the Debtor "transferred all of its investment interest as a limited partner in Camshaft Capital Fund to a third party" (and any affiliated Persons thereof), as referenced in Paragraph 1 of the Camshaft Corrected Complaint.

<u>Camshaft Interrogatory No. 6</u>. Identify the name of the "third party" (and any affiliated Persons thereof) referenced in Paragraph 1 of the Camshaft Complaint.

34. Pulling relevant account statements, transfer details, and agreements is neither difficult nor time-consuming or costly. No burdensome email (or other ESI) searches are required;

---

[6] The term "<u>Camshaft Corrected Complaint</u>," in both the Interrogatories and RFPs, means the Complaint filed on December 15, 2023 in *Camshaft Capital Fund, LP v. BYJU's Alpha, Inc.*, Case No. 2023-027523-CA-01, in the Eleventh Judicial Circuit Court in Miami-Dade County, Florida.

[7] The term "<u>Camshaft LP Interest</u>," in both the Interrogatories and RFPs, means "any limited partnership interest (or the equivalent) that the Debtor was issued by Camshaft Capital Fund in consideration for the Alpha Funds," *i.e.*, the $533 million.

14

the Debtor's requests are intentionally drafted to avoid such digging. They are narrowly tailored and simple.[8]

35. Nor can Camshaft assert any claim of undue surprise. Camshaft has known about the requested topics of discovery since September 2023, as part of prepetition litigation in Florida, then again in November 2023, when the Debtor's current management made a books and records request of Camshaft (that Camshaft promptly rejected, Compl. ¶ 95). Camshaft has had months to collect responsive documents and information that are readily available to it. There is no reason for further delay.

36. Similarly, the burden to Mr. Ravindran is negligible. The six basic interrogatories that the Debtor requests to propound focus on the whereabouts of the $533 million (and any limited partnership or other interest in Camshaft Capital Fund associated with those funds) and in whose name it is now held. The questions are straightforward and simple. If Mr. Ravindran truly was acting as the Debtor's fiduciary, he would have the answers off the top of his head. He possesses the complete corporate records of the Debtor, and he is the only person with the corporate authority to have authorized the $533 million transfer and any subsequent transfers of those funds or any limited partnership interest in Camshaft Capital Fund. The Debtor and its creditors have been asking Mr. Ravindran and his brother these questions for months, yet still have not received a response.

---

[8] The absence of any undue burden should not even be in dispute. Camshaft entirely failed to make a burden objection in prepetition litigation brought in Miami (Florida), even when the Lenders' Agent requested broader (though still narrow) discovery than what is being requested here. *See* Compl., Ex. 9 (lodging twelve boilerplate, general objections to the Lenders' Agent's requests, but not objecting on the basis of burden).

### III. ALTERNATIVELY, DISCOVERY IS WARRANTED UNDER BANKRUPTCY RULE 2004.

37. Bankruptcy Rule 2004(a) provides that upon motion of any party in interest, a court may order the examination of any entity. Rule 2004 has been termed the "basic discovery device used [in] bankruptcy cases." *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992). It permits the examination of any party without the requirement of an adversary proceeding or contested matter. *Id.* The purpose of Bankruptcy Rule 2004 is to permit a broad investigation into the financial affairs of the debtor to assure the proper administration of bankruptcy estate. *In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997). A Rule 2004 examination is designed to permit interested parties to "discover[] assets, examin[e] transactions, and determin[e] whether wrongdoing has occurred." *Washington Mutual*, 408 B.R. at 50; *see also In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (E.D. Pa. 1990) (emphasizing that the breadth of Rule 2004's scope is designed to discover assets "which might be intentionally concealed or overlooked in ignorance or haste"). Courts have consistently held that the scope of Bankruptcy Rule 2004 examinations is broad, unfettered, and can legitimately be in the nature of a "fishing expedition." *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008); *In re Lev*, 2008 WL 207523, at *3 (Bankr. D.N.J. 2008); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996); *Valley Forge*, 109 B.R. at 674.

38. Here, the requested examination of Mr. Ravindran (**Exhibit D**)—focused on the whereabouts of the $533 million—seeks responses squarely relating to the Debtor's "acts, conduct, or property" and/or "liabilities and financial condition." Fed. R. Bankr. P. 2004. As such, discovery is warranted so that the Debtor can expeditiously locate, secure, and recover its assets, in order to protect the benefit of the estate's stakeholders.

**CERTIFICATION PURSUANT TO LOCAL RULES 2004-1(b) AND 7026-1(d)**

39. The Debtor's undersigned counsel certifies that it had made a reasonable effort to meet and confer with Camshaft's counsel to amicably resolve their dispute, but Camshaft's counsel refused to schedule a meet-and-confer. On February 5, 2024, right after this Court had instructed the parties to meet and confer, the Debtor's counsel emailed Camshaft's counsel to schedule a meet-and-confer for the next morning. Camshaft's counsel responded that "Wednesday morning should be okay." **Ex. F** at 4 (Feb. 5, 2024 email from P. Van Tol to J. Ye). The Debtor's counsel agreed to the Wednesday morning meet-and-confer, but Camshaft's counsel cancelled the meet-and-confer on Tuesday evening, because they "need some additional time to finalize the engagement." **Ex. F** at 2 (Feb. 6, 2024 email from P. Van Tol to B. Finestone). The Debtor's counsel offered to meet and confer on Thursday and pointed out the inconsistency in Camshaft's counsel's explanation given its recent appearance before this Court. **Ex. F** at 2 (Feb. 6, 2024 email from B. Finestone to P. Van Tol). Camshaft's counsel again refused to confer with the Debtor's counsel on Thursday. **Ex. F** at 1 (Feb. 7, 2024 email from P. Van Tol to B. Finestone).

40. Similarly, on February 5, 2024, the Debtor's counsel emailed Mr. Ravindran's counsel to schedule a meet and confer to discuss, among other topics, the location of the $533 million and its beneficial and legal holder(s). *See* **Ex. E** (Feb. 5, 2024 email from B. Finestone to S. Korpus). Mr. Ravindran's counsel did not respond for over 48 hours. Finally, on February 7, 2024, Mr. Ravindran's counsel responded and refused to engage with the Debtor. **Ex. E** (Feb. 7, 2024 email from S. Korpus to B. Finestone).

41. Though the Debtor's counsel remains willing to attempt to amicably resolve these discovery issues prior to any scheduled hearing on the Motion, the Debtor submits that, in light of

Camshaft's and Mr. Ravindran's responses, no further attempts to meet and confer would be productive or should be required at this time.

## NOTICE

42. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the three Camshaft Defendants; (c) Mr. Ravindran, (d) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (e) all the non-Debtor Loan Parties. The Debtor submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

43. WHEREFORE, for all of these reasons, the Debtor respectfully submits that the Court should enter the Proposed Order and grant the Debtor such other and further relief as is just and proper.

|  |  |
|---|---|
| Dated: Wilmington, Delaware<br>February 9, 2024 | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br>*/s/ Kenneth J. Enos*<br>Robert S. Brady (Del. No. 2847)<br>Kenneth J. Enos (Del. No. 4544)<br>Jared W. Kochenash (Del. No. 6557)<br>Timothy R. Powell (Del. No. 6894)<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>rbrady@ycst.com<br>kenos@ycst.com<br>jkochenash@ycst.com<br>tpowell@ycst.com<br><br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>Susheel Kirpalani (pro hac vice granted)<br>Benjamin Finestone (pro hac vice granted)<br>Daniel Holzman (pro hac vice granted)<br>Jianjian Ye (pro hac vice granted)<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Tel.: (212) 849 7000<br>susheelkirpalani@quinnemanuel.com<br>benjaminfinestone@quinnemanuel.com<br>danielholzman@quinnemanuel.com<br>jianjianye@quinnemanuel.com<br><br>Proposed Counsel for Debtor, BYJU's Alpha, Inc. |