## Exhibit A

**(Florida Complaint Brought Against Camshaft Defendant)**

## VERIFIED RETURN OF SERVICE

| State of Florida | County of Dade | County Court |
|---|---|---|

Case Number: 2023-022640-CA-01 (43)

Plaintiff:
GLAS TRUST COMPANY LLC

vs.

Defendant:
CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS LLC,
CAMSHAFT CAPITAL MANAGEMENT LLC AND JOHN DOE

For:
DIEGO PEREZ ARA
LEON COSGROVE, LLP
255 ALHAMBRA CIRCLE
8TH FLOOR
MIAMI, FL 33134

Received by Tony Tamayo & Associates on the 8th day of September, 2023 at 3:43 pm to be served on CAMSHAFT CAPITAL FUND LP C/O LEGALINC CORPORATE SERVICES INC., REGISTERED AGENT, 651 N. BROAD STREET, STE. 201, MIDDLETOWN, DE 19709.

I, Sharlene Brooks, do hereby affirm that on the 11th day of September, 2023 at 3:12 pm, I:

CORPORATE: served by delivering a true copy of the 20 DAY SUMMONS AND COMPLAINT, NOTICE OF CONFIDENTIAL INFORMATION WITHIN COURT FILING, FIRST SET OF REQUESTS FOR PRODUCTION TO THE CAMSHAFT DEFENDANTS, ORDER GRANTING PLAINTIFFS EMERGENCY EX PARTE MOTION TO SHORTEN THE DEADLINE FOR THE CAMSHAFT DEFENDANTS TO RESPOND TO DISCOVERY with the date and hour of service endorsed thereon by me, to: KALIYAH BAYARD as AUTHORIZED AGENT for CAMSHAFT CAPITAL FUND LP C/O LEGALINC CORPORATE SERVICES INC., REGISTERED AGENT, at the address of: 651 N. BROAD STREET, STE. 201, MIDDLETOWN, DE 19709 and informed said person of the contents therein, in compliance with Florida Rules of Civil Procedure, Florida Statue 48.081 (1) or other state statute as applicable.

Description of Person Served: Age: 30, Sex: F, Race/Skin Color: BLACK, Height: 5'9, Weight: 180, Hair: BLACK, Glasses: N

Under penalty of perjury, I declare that I have read the foregoing Verified Return of Service and that the facts stated in it are true.

_____ 9/12/2023
Sharlene Brooks
Process Server

Tony Tamayo & Associates
Nationwide Service
7600 W. 20 Avenue, Ste. 217
Hialeah, FL 33016
(305) 821-5558

Our Job Serial Number: TTT-2023023351
Ref: 00660.0001

Copyright © 1992-2023 Database Services, Inc. - Process Server's Toolbox V8.2o

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2023-022640-CA-01 (43) |
|---|---|---|
| PLAINTIFF(S)<br>GLAS Trust Company LLC | VS.  DEFENDANT(S)<br>Camshaft Capital Fund, LP;<br>Camshaft Capital Advisors, LLC;<br>Camshaft Capital Management, LLC; and<br>John Doe | SERVICE |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s):  Camshaft Capital Fund, LP

c/o Legalinc Corporate Services Inc., Registered Agent

651 N. Broad Street, Suite 201

Middletown, Delaware 19709

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney:  Diego Perez Ara

whose address is:  Leon Cosgrove Jimenez, LLP, 255 Alhambra Circle, 8th Floor

Miami, Florida 33134

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| JUAN FERNANDEZ-BARQUIN<br>CLERK OF THE COURT AND COMPTROLLER<br>MIAMI-DADE COUNTY<br>CIRCUIT AND COUNTY COURTS | BY: _____<br>DEPUTY CLERK | DATE<br>9/8/2023 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

PRINT   SAVE   RESET

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

CASE NO.: 2023-_____-__-__

GLAS TRUST COMPANY LLC, in its capacity as
Administrative Agent and Collateral Agent,

     Plaintiff,

v.

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT
CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL
MANAGEMENT, LLC, and JOHN DOE,

     Defendants.

_____/

## COMPLAINT

Plaintiff GLAS Trust Company LLC ("GLAS") files this Complaint and alleges against Defendants Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC, Camshaft Capital Management, LLC, and John Doe as follows:

## NATURE OF ACTION

1.    This is a fraudulent transfer action arising from the fraudulent transfer and concealment of *over half a billion dollars*, the troubling details of which are still coming to light.

2.    BYJU's Alpha, Inc.—a special purpose financing vehicle formed in September 2021 by "BYJU's," the trade name of the self-proclaimed world's largest education technology company, to borrow $1.2 billion in Term Loans in November 2021—transferred $533 million in mid-2022 to Defendant Camshaft Capital Fund, an unproven high-risk hedge fund. BYJU's Alpha made the transfers while it was insolvent and in default under the Term Loans it had entered into with the various Lenders for whom Plaintiff GLAS serves as Administrative and Collateral Agent.

GLAS's and the Lenders' concerns about Camshaft cannot be overstated: there is absolutely no apparent legitimate reason for BYJU's Alpha to have chosen Camshaft to manage over half a billion of its dollars—money that was included in the collateral for the $1.2 billion in Term Loans. Camshaft Capital Fund was founded in August 2020 by William Cameron Morton—a 23-year old with no formal training in investing and money management, and no apparent qualification to manage a hedge fund, let alone one with over half a billion dollars in assets under management (indeed, the Fund's reported minimum investment threshold is only $50,000, well below market standards).

3.      Then in 2023, after a forbearance had expired and certain Lenders were considering exercising remedies on acknowledged defaults, BYJU's Alpha apparently intentionally moved, *again*, that same $533 million (or any limited partnership interest in Camshaft Capital Fund attributable to the purported "investment"—exactly what happened has been intentionally concealed by BYJU's) to Defendant John Doe so that the Lenders would not be able to locate the money if they exercised contractual remedies, as they did.  All BYJU's has disclosed about John Doe is that it is a BYJU's-affiliated entity.  The reason for this second apparent transfer is not in dispute.  After GLAS exercised remedies at the Lenders' direction, BYJU's eponymous founder and CEO Byju Raveendran taunted the Lenders directly, saying: "**the money is someplace the Lenders will never find it**."  Days later, in litigation filed in Delaware, BYJU's' counsel admitted in open court that BYJU's Alpha "moved the funds" to John Doe "based on fear of lenders acting expeditiously."  These are tailor-made admissions of an actual fraudulent transfer.

4.      In March 2023, GLAS accelerated the Term Loans based on four conceded Events of Default, causing over $1 billion of Term Loans to become immediately due and payable, and took control of the pledged equity in BYJU's Alpha, only to later learn that it had *less than $1*

*million in assets* as of May 2023. It took months of further investigation and the commencement of litigation in Delaware before it was determined that the $533 million had been originally transferred to, and possibly invested in, Camshaft Capital Fund.

5.  Among other relief, GLAS now brings this action (i) to avoid the actually and constructively fraudulent transfers of $533 million to Camshaft Capital Fund; (ii) to avoid any and all above-market management and incentive fees paid by or on account of BYJU's Alpha to the Fund's investment manager and general partner, Defendants Camshaft Capital Advisors and Camshaft Capital Management, respectively; and (iii) to otherwise ascertain what happened to BYJU's Alpha's money that was intended to serve as the Lenders' collateral, including the identity of Defendant John Doe, the purported current beneficial owner of those funds or the limited partnership interest in Camshaft Capital Fund acquired with those Funds.

## PARTIES

6.  Plaintiff GLAS Trust Company LLC is a limited liability company organized and existing under the laws of the State of New Hampshire. GLAS is the Administrative Agent and Collateral Agent under the Credit Agreement.

7.  Defendant Camshaft Capital Fund, LP is a limited partnership organized and existing under the laws of the State of Delaware, with, upon information and belief, its principal place of business in Miami, Florida. As reported in SEC filings, Camshaft Capital Fund had 42 limited partners as of April 2023, which likely would render the parties in this action non-diverse.

8.  Defendants Camshaft Capital Advisors, LLC, which is the sole investment manager of Camshaft Capital Fund, and Camshaft Capital Management, LLC, which is the sole general partner of the Fund, are limited liability companies organized and existing under the laws of the State of Florida, with their principal place of business in Miami, Florida. Camshaft Capital Fund,

Camshaft Capital Advisors, and Camshaft Capital Management are collectively referred to as "Camshaft."

9.      Defendant John Doe is an unidentified corporate affiliate, entity, or a combination of affiliates and entities of or related to non-party BYJU's Alpha.  It is the apparent recipient of certain improper transfers or distributions that underlie this lawsuit.  Once appropriate expedited discovery occurs that provides more information regarding the identity and activities of the John Doe entity, GLAS intends to amend its Complaint and properly serve John Doe.

## JURISDICTION AND VENUE

10.      The Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida has personal jurisdiction over Defendants pursuant to Fla. Stat. Ann. § 48.193.  Among other things, one or more of the Camshaft Defendants have their principal place of business in Miami-Dade County, Florida.  Additionally, the Defendants engage in substantial and not isolated activity within Florida, in that the Defendants Camshaft Capital Advisors and Camshaft Capital Management operate and manage Defendant Camshaft Capital Fund, a hedge fund, in Florida.

11.      Venue is proper in Miami-Dade County, Florida pursuant to Fla. Stat. Ann. § 47.011, because the causes of action accrued in Miami-Dade County, Florida, and one or more of the three Camshaft entities have their principal place of business and are domiciled in Miami-Dade County, Florida.

12.      All conditions precedent to the bringing of this action have occurred, been performed, or been waived.

## GENERAL ALLEGATIONS

### A.      The Underlying Lending Arrangement

13.      This dispute traces back to a November 2021 term loan arrangement.  On November 24, 2021, GLAS as Administrative and Collateral Agent, various lenders (the

"Lenders"), BYJU's Alpha—a special purpose financing vehicle formed to be the borrower under these Term Loans and which has no, and has never had any, active business operations—and certain other BYJU's entities as guarantors closed on a $1.2 billion loan facility that would mature in five years (November 24, 2026). The definitive terms of the parties' loans (the "Term Loans") are memorialized in several agreements, including a Credit and Guaranty Agreement (the "Credit Agreement") and various security agreements that reflect that BYJU's Alpha pledged substantially all of its assets.

14.    The Credit Agreement contains the legal promises that underlie GLAS's and the Lenders' contractual disputes with BYJU's, and which motivated the fraudulent transfers at issue in this case, as discussed below. In exchange for $1.2 billion, BYJU's Alpha and its affiliated guarantors undertook various covenants so that GLAS and the Lenders could carefully monitor and/or protect the Term Loans. Each relevant covenant is clear and unambiguous—the result of extensive negotiations by sophisticated parties, with advice of counsel and sophisticated bankers.

15.    Most relevant here are the financial reporting and guarantee covenants, and the restrictions on outside investments. As of November 24, 2021, BYJU's knew that it owed the following obligations under the Credit Agreement:

16.    **Audited Financial Disclosures:** Under Section 5.1(a) of the Credit Agreement, by the 180th day after the end of BYJU's ultimate corporate parent Think and Learn Private Ltd.'s ("T&L") fiscal year, T&L had to provide its annual audited financials to GLAS, accompanied by an audit report from an auditing firm of recognized national standing.

17.    **Unaudited Financial Disclosures:** Under Section 5.1(b) of the Credit Agreement, by the 75th day following the end of Q1, Q2, and Q3 of each fiscal year of T&L, T&L was required to furnish to GLAS unaudited consolidated financial statements for that fiscal quarter and the then-

elapsed portion of the then-current fiscal year, along with comparative figures for the corresponding periods of the prior fiscal year.

18.     **Whitehat Guarantee:** Under Section 5.9 of the Credit Agreement, one of T&L's Indian subsidiaries, Whitehat Education Technology Private Ltd. ("Whitehat India"), had to sign onto an Onshore Guarantee Deed by no later than April 1, 2022, to guarantee the full amount of BYJU's Alpha's Term Loans.[1]

19.     As will be shown, BYJU's apparently understood in the months after it signed the Credit Agreement—and certainly by April 28, 2022, when the first of the relevant transfers was made—that it would default on its financial reporting and guarantee covenants and ultimately entitle the Lenders and GLAS to exercise remedies, as they did in March 2023.

**B.      BYJU's Alpha's transfers to Camshaft Capital Fund in April and July 2022**

20.     In a series of five wire transfers in April and July 2022, BYJU's Alpha transferred a total of $533 million to Camshaft Capital Fund, each of which was made without notice to the Lenders or GLAS.

21.     On April 28, 2022, BYJU's Alpha made two transfers in the total amount of $317,999,900.00 from one of its checking accounts to "APEX FUND CAMSHAFT CAPITAL LP." Ex. A, BYJU's Alpha Wire Transfer (filed under seal).

---

[1]     This April 1, 2022 deadline had been specifically negotiated. During negotiations, counsel for the lead lenders, known as the "Arrangers," pressed for Whitehat India to issue a guarantee at the outset of the Term Loans. When BYJU's resisted, the Arrangers offered a compromise: "OK to live without guarantee from Whitehat on day 1 provided it accedes after [Reserve Bank of India] approval is granted or if such approval is not obtained, on 1 April 2022." BYJU's agreed to that revised structure, as reflected in the ultimate Credit Agreement.

22.    Fewer than three months later, on July 12-13, 2022, BYJU's Alpha made more transfers in the total amount of $215,000,100.00 from another checking account to "CAMSHAFT CAPITAL FUND LP." Exs. B-C, BYJU's Alpha Wire Transfers (filed under seal).[2]

23.    Once the last of these transfers was made, BYJU's Alpha had around $100 million in available funds across its known checking and brokerage accounts. It had no other known assets. Among other uses, BYJU's Alpha used its remaining funds to make interest payments, and there also were multiple transfers to and from related entities. Today, BYJU's Alpha has less than $1 million in cash on hand with no other known assets. As a result, and setting aside that the Term Loans were accelerated as of March 3, 2023, BYJU's Alpha has been financially unable to make scheduled payments on the Term Loans, including an approximately $38 million interest payment that would have come due in the ordinary course in May 2023 had the Term Loans not been accelerated.

**C.     BYJU's Alpha's insolvency as of April 2022, and later admissions of Events of Default**

24.    Before the April and July 2022 transfers, BYJU's Alpha had defaulted under the Credit Agreement twice, and already had entered into one waiver and forbearance agreement with its Lenders. In the coming months, there would be two more Defaults. Those four Defaults eventually matured into four Events of Defaults, and they were the basis upon which GLAS, on March 3, 2023, accelerated the Term Loans, which at the time had (and still have) over $1 billion outstanding.

25.    Specifically, first, when the Q3 FY 2021-22 unaudited financial statements were due on March 16, 2022, T&L only provided financials for the then-elapsed portion of its fiscal

---

[2]    In addition to three wire transfers reflected in Exhibits A to C, there also were two more transfers in the total amount of $200.00 in April and July 2022.

year. T&L did not furnish any information for just the quarter itself or comparative figures for the corresponding period of the prior fiscal year.

26.     Then, on April 1, 2022, Whitehat India failed to provide a Guarantee as of that date. Nonetheless, on April 5, 2022, the Lenders agreed to temporarily waive Whitehat India's obligation to obtain that Guarantee until October 8, 2022. Whitehat India failed to meet that extended deadline, too.

27.     Soon after these two Defaults and the Camshaft Capital Fund transfers, BYJU's would default twice more. As for its third Default, on September 13, 2023, T&L failed to provide comparative figures for the Q1 FY 2022-23 quarterly period. Therefore, T&L failed to furnish a substantial amount of required information across this and the earlier quarterly period.

28.     As for its fourth Default, T&L failed to deliver audited annual financial statements for its 2021-22 fiscal year, as of the September 27, 2022 deadline. Even today—almost a year after that due date—T&L *still* has not delivered those audited annual financials. T&L's failure to provide audited annual financials was so significant that, in June 2023, its auditor Deloitte publicly resigned citing T&L's failure to provide financial information necessary to complete the audit.[3]

29.     Around the same time as the third and fourth Defaults, in summer and fall 2022, an *ad hoc* group of Lenders engaged legal and financial advisors, and contacted BYJU's and its legal and financial advisors in an effort to resolve the outstanding Defaults and restructure the Term

---

[3]     Further, BYJU's essentially has claimed that the failure to deliver audited annual financials for FY 2021-22 was foreseeable as of November 24, 2021, when the Credit Agreement was executed. Specifically, Riju Raveendran, one of T&L's directors and the former sole director and officer of the borrower BYJU's Alpha, swore under oath in a declaration that work could not begin on the FY 2021-22 audit "until the audited financial statements for the year ending March 31, 2021 ('FY '21 Audit') were completed and delivered," but, as known on November 24, 2021, the FY 2020-21 audited annual financials were going to be "delayed for various reasons." Ex. D, May 15, 2023 R. Raveendran Decl. ¶¶ 31-33.

Loans.  Over the next eight months, the Lenders and their advisors spent countless hours and negotiated and implemented eight separate Amendments to the Credit Agreement, all in a good faith and yet unsuccessful effort to reach a negotiated solution.  As part of that process and so that the negotiations did not prejudice the Lenders' rights to exercise remedies, BYJU's Alpha and its guarantors acknowledged its four Defaults, which matured into Events of Default, in numerous Amendments to the Credit Agreement, and further memorialized the Lenders' entitlement to exercise remedies.

30.    Specifically, on October 12, 2022, BYJU's and the Lenders entered into Amendment No. 2.  In it, the parties agreed to add to the Credit Agreement the defined term "Specified Defaults," memorializing that BYJU's four reporting and guarantee breaches constituted Defaults.  The parties also amended Section 8.1(e) of the Credit Agreement—the contractual provision governing "Events of Default"—to provide that the 45-day cure period for the Specified Defaults would expire on November 24, 2022, at which point the Specified Defaults would mature into Events of Default.

31.    As of November 24th, BYJU's had failed to cure any of the Specified Defaults, which therefore matured into Events of Default, entitling GLAS and the Lenders to exercise remedies.  Also on November 24th, BYJU's executed Amendment No. 3, in which it "acknowledged and agreed" that the cure period had expired without any of the Specified Defaults being cured.  Significantly, BYJU's went one step further: it agreed that the Lenders were "*entitled*" to deliver to the "Loan Parties" (*i.e.*, the borrower BYJU's Alpha and its guarantors) a "Specified Notice of Default and Acceleration," meaning "a notice of default and acceleration with respect to the Specified Defaults" (emphasis added).  BYJU's agreed:

1.      Agreements.

(a)      It is hereby acknowledged and agreed by the parties hereto that (i) ==the Cure Period for each of the Specified Defaults== referred to in the Amendment No. 2 ==will expire or has expired on November 24, 2022, without any of the Specified Defaults being cured== by the Loan Parties, and (ii) ==the Required Lenders will be or are therefore entitled to, on and from November 25, 2022, request the Administrative Agent to deliver to the Loan Parties the Specified Notice of Default and Acceleration==. (Emphasis added.)

32.      The Lenders nonetheless agreed to forbear through December 1, 2022.

**D.      BYJU's Alpha's apparent transfer of its limited partnership interest in Camshaft Capital Fund to Defendant John Doe**

33.      As calendar year 2022 closed, the parties had entered into seven formal waivers and amendments to their Credit Agreement to address the outstanding Defaults, which then had matured into Events of Default (after the Defaults were not cured). BYJU's Alpha had even gone so far as to concede the Lenders' entitlement to exercise remedies, which it would do yet again on January 6, 2023, in an Amendment No. 7. Amendment No. 7 also set February 10, 2023 as a new forbearance termination date.

34.      BYJU's' financial statement for the period ended December 31, 2022 showed that BYJU's Alpha had 5,220.6 crore Indian Rupees—>$500 million—in "Cash and Bank" balances. To state the obvious, this financial statement (and earlier financial statements) showed that BYJU's Alpha—the borrower on a defaulted loan—had over $500 million in liquid cash or cash equivalents available to it to service that debt.

35.      Unbeknownst to the Lenders and GLAS, the bulk of that money was not held by BYJU's Alpha in cash or in one of its bank or brokerage accounts. Instead, those funds already had been transferred to Camshaft. Further, whatever interest in Camshaft Capital Fund that

BYJU's Alpha received on account of its $533 million in transfers was itself soon to be transferred away from BYJU's Alpha, again unbeknownst to the Lenders and GLAS.

36.    After the final forbearance expired, GLAS, at the Lenders' direction, began exercising remedies.  On March 3, 2023, GLAS accelerated all amounts outstanding—over $1 billion in principal plus outstanding interest and fees—under the Term Loans to become due and payable immediately.  That same day, GLAS also exercised control of the pledged equity in BYJU's Alpha and, as the now-shareholder of BYJU's Alpha, appointed Timothy Pohl, an experienced restructuring professional, as BYJU's Alpha's sole director.

37.    Sometime between December 31, 2022 and May 3, 2023 (when GLAS commenced a lawsuit in Delaware to recognize the change of control at BYJU's Alpha), BYJU's Alpha apparently transferred, *again*, the $533 million—or whatever limited partnership interests or other proceeds that BYJU's Alpha received on account of the April and July 2022 transfers—to Camshaft Capital Fund.  As Riju Raveendran admitted in a declaration under oath, "[p]rior to the commencement of the present action, **the amount to the credit of Alpha with the Investment Fund was moved to another BYJU's-affiliated entity within the United States**."  Ex. E, June 25, 2023 R. Raveendran Decl. ¶ 10 (emphasis added).  Based on a detailed review of BYJU's Alpha's bank statements (which GLAS obtained pursuant to its rights under the Credit Agreement to request and receive information about the borrower), the referenced "Investment Fund" appears to be Camshaft Capital Fund.  After the purported transfer occurred, "the Investment Fund in respect of Alpha was inactive."  *Id.*  That other "BYJU's-affiliated entity within the United States" is Defendant John Doe.

38.    These sworn statements were cleverly drafted to be vague.  The $533 million might still be invested in Camshaft Capital Fund, if the declaration is taken at face value.  As Riju

Raveendran said, "the amount **to the credit of Alpha** . . . was moved," suggesting that the funds could still be under the management of Camshaft Capital Fund but the ownership of the limited partnership interest in the Fund could have been transferred to another U.S.-based BYJU's entity's name. Alternatively, such investment could have been withdrawn from Camshaft Capital Fund entirely with the proceeds thereof distributed to that U.S.-based BYJU's entity. Or something else altogether could have happened to the $533 million. Riju intentionally omitted that critical detail.

39.     Further, this transfer or withdrawal, if it occurred, had to have been made with the prior consent of Camshaft Capital Management, as the sole general partner of Camshaft Capital Fund, and/or Camshaft Capital Advisors, as the Fund's sole investment manager. As Camshaft Capital Advisors disclosed in its registered investment advisor brochure (the "Camshaft Brochure")—a document that is publicly filed with the U.S. Securities and Exchange Commission on its investment adviser database, which is intended to be distributed to prospective investors, and which outlines Camshaft Capital Fund's investment strategy and risks, among other information—"[a]lthough amounts may be redeemed/withdrawn from the Camshaft Funds on a periodic basis according to the terms set forth in the applicable agreement, *shares/interests may not be assigned, pledged or otherwise transferred without the prior written consent of the Firm*," *i.e.*, Camshaft Capital Advisors. Ex. F, Camshaft Brochure at 10 (emphasis added). Moreover, there is "no market for the shares/interests, and none is expected to develop." *Id.*

40.     What is abundantly clear is BYJU's' motivation for having BYJU's Alpha apparently transfer or withdraw its interest in Camshaft Capital Fund: to conceal the assets from the Lenders and GLAS. Again, as of December 31, 2022, there were four conceded Events of Default, each one entitling the Lenders and GLAS to accelerate the over-$1 billion outstanding on the Term Loans. In response, BYJU's unlawfully caused BYJU's Alpha to move over half a billion

dollars in value—the $533 million or whatever BYJU's Alpha received on account of investing

those funds—to another BYJU's-entity in the United States. BYJU's Alpha received no known

consideration in return, and BYJU's Alpha made the transfer to frustrate GLAS's and the Lenders'

contractual rights under the loan agreements. BYJU's counsel later admitted this motive in a

public hearing in a Delaware court, with numerous Lenders listening in:

> [GLAS and Pohl] raised this issue of the $500 million transfer as a
> reason to rule against defendants, and obviously this is -- you know,
> when first hearing about it, it raises [*sic*] antenna. I understand that,
> Your Honor.
>
> . . . **Byju's moved the funds, and Byju's moved the funds to an
> entity that it controls in the United States**. The money is in the
> United States. I don't know exactly when it was done.
>
> **To be candid, these were based on fear of lenders acting
> expeditiously** with these unconscionable tactics to assets without a
> proper determination and due process under the credit agreement.
> **Byju's felt the need to protect the cash**.

Ex. G, Hearing Transcript at 34:2-35:1, *GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-

MTZ (Del. Ch. May 18, 2023) (emphasis added).

    41.    Regardless of where the money was moved—if it was in fact moved at all—BYJU's

Alpha's bank statements record no transfer of funds back to BYJU's Alpha from any Camshaft

entity. Nor has Riju Raveendran or anyone else at BYJU's ever shared any record of BYJU's

Alpha receiving consideration for any purported transfer or withdrawal.

    **E.**    **BYJU's Alpha's concealment of those transfers from the Lenders and GLAS**

    42.    At the start of 2023, the Lenders continued to work towards a negotiated resolution,

if one could be had. But those efforts were exhausted without success and with only more

concerns, including regarding the BYJU's enterprise's overall financial condition and the

predicted risk that BYJU's Alpha would move the vast majority of the money it held to frustrate

Lender remedies. In light of the lack of meaningful progress and the lack of responsiveness by

their borrower and its affiliates, the Lenders exercised their contractual remedies to address the acknowledged Events of Default and to protect their collateral.

43.    As mentioned, on March 3, 2023, GLAS, at the Lenders' direction, declared Events of Default and began exercising remedies.    Immediately, BYJU's co-founder and CEO, Byju Raveendran, reached out to the Lenders, requesting that the parties reengage on a potential resolution.    The Lenders were willing to engage, which then prompted several weeks of negotiation. And, during those negotiations, one of the Lenders' focuses was on cash verification.

44.    On March 16, 2023, BYJU's posted with GLAS, for distribution to the Lenders, its Q3 FY 2022-23 financial statements, which included the above-referenced representation that BYJU's Alpha had over $500 million in "Cash and Bank" balances as of December 31, 2022.

45.    Also in March 2023, in support of broader negotiations between the parties, the Lenders' counsel requested that BYJU's confirm the funds available to BYJU's Alpha.    In response to the Lenders' cash-verification request, BYJU's' representatives agreed to a roundabout cash verification process.    On or about March 27, 2023, BYJU's' outside counsel informed the Lenders' outside counsel that, on a recent Zoom call, he watched his client virtually log into a bank portal and saw a cash statement showing that the account held a material amount of cash, which counsel said was in the United States.    Counsel disclosed the exact amount of funds he saw, an amount that is consistent with the amount of the April and July 2022 transfers.

46.    The Lenders sought comfort as part of broader negotiations that substantial liquid assets in the United States were available for debt service, and BYJU's' statements naturally—and very likely intentionally—led the Lenders to believe that BYJU's Alpha continued to hold or have access to this cash.

47.     The Lenders' hopes for a negotiated resolution turned out to be misplaced. BYJU's would frequently go incommunicado and ultimately appeared insincere about trying to enter into a completed amendment.

48.     Then, on May 3, 2023, GLAS and Pohl filed a lawsuit in the Delaware Court of Chancery, seeking confirmation that, pursuant to a Delaware statutory code, 8 *Del. C.* § 225, their exercise of remedies had effectuated a proper change of control at BYJU's Alpha.

49.     Five days later, during a May 8, 2023 call, Byju Raveendran, with his general counsel on the line, told one of the Lenders' advisors that BYJU's Alpha no longer had the money. Rather, "**the mon[ey] is someplace the Lenders will never find it.**"

50.     Byju Raveendran's comments were so shocking that the Lenders' advisor wrote them down on a piece of scratch paper.



51.     On May 18, 2023, the Delaware court issued a *Status Quo* Order—an interim order similar to a temporary injunction—authorizing Pohl to remain in control of BYJU's Alpha as director and officer pending a final case decision and requiring the BYJU's defendants in that lawsuit to provide Pohl with access to and control of BYJU's Alpha's open bank accounts and other accounts.  Other than BYJU's Alpha bank statements reflecting the Camshaft Capital Fund

transfers, BYJU's never shared any information about Camshaft. BYJU's flatly refused to disclose any information about the >$500 million transfers.

52.     On August 4, 2023, the Delaware court held a bench trial. As of the date hereof, the parties are awaiting the Court's decision.

**F.     BYJU's' reasons for transferring over half a billion dollars to Camshaft Capital Fund**

53.     There is no readily apparent legitimate reason for why BYJU's Alpha would "invest" over half a billion dollars in Camshaft Capital Fund, particularly after multiple loan defaults had occurred. Camshaft Capital Fund is an unknown hedge fund founded in August 2020 by William Morton—a 23-year old with no formal training in investing and money management, and no apparent qualification to manage a hedge fund—and which once listed on federal and state regulatory filings the address of an International House of Pancakes in Miami as its principal place on business.

54.     Specifically, Camshaft Capital Fund was formed on August 13, 2020, as a Delaware limited partnership. Its sole general partner is Camshaft Capital Management, which had been formed two weeks earlier, on July 28, 2020. Its investment manager, Camshaft Capital Advisors, also was formed on July 28, 2020.

55.     All three Camshaft entities have disclosed an affiliation with Morton. Morton controls Camshaft. According to public filings, Morton is the managing member and sole owner of both the Camshaft general partner and the investment manager. Camshaft Capital Advisors' brochure states that Camshaft relies upon Morton as a "[k]ey [p]erson." Ex. F, Camshaft Brochure at 10.

56.     Hedge funds file a Form D with the SEC in connection with an exempt offering of securities under the federal securities laws. In its Form D filed on September 11, 2020, when it

launched, Camshaft Capital Fund disclosed an address at 285 NW 42nd Avenue in Miami. Camshaft Capital Fund disclosed the same address for William Morton, its Chief Executive Officer and Chief Compliance Officer.



57.    Likewise, Camshaft Capital Management, as General Partner, and Camshaft Capital Advisors, as Investment Manager, disclosed their offices as being located at the same address in their 2020 and 2021 filings with the Florida Secretary of State.[4]

58.    Since at least the 1990s, that address—285 NW 42nd Avenue—has been home to an IHOP.  IHOP's distinctive blue awning can be seen from this November 2019 satellite image of the location:



---

[4]    Subsequent filings changed the address to other locations in Miami-Dade County.

59.    Here is a ground-level picture of the location taken last week:



60.    This IHOP was the principal place of business of the Fund and its General Partner and Investment Manager, to which BYJU's Alpha transferred over half a billion dollars.[5]

61.    More recently, Camshaft Capital Advisors publicly disclosed that, as of December 31, 2022, it had $595,845,395 in regulatory assets under management in Camshaft Capital Fund, its only fund under management. Ex. F, Camshaft Brochure at 4. Based on BYJU's Alpha's bank statements, it appears that almost 90% of that amount originated from BYJU's Alpha's improper April and July 2022 transfers.

62.    There is no disclosed evidence of BYJU's Alpha having received *any* returns accruing from its enormous investment in the Camshaft Capital Fund, and no capital account balances, financial statements, or other reports from Camshaft have been shared with GLAS or

---

[5]    Also suspect is that Camshaft Capital Advisors and Camshaft Capital Management each list Morton as their registered agent with an address of 16850 Collins Avenue #112408, Sunny Isles Beach, Florida 33160—a mailbox at a UPS store. This designation violates Florida law, which requires registered agents to have a physical address where they can receive personal service of legal documents. *See, e.g.*, *TID Servs., Inc. v. Dass*, 65 So.3d 1, 6 (Fla. 2d DCA 2010) (registered agent must have physical address, not a P.O. box, so that it can receive service of process).

Pohl. Instead, it appears that BYJU's Alpha chose to "invest" half a billion dollars in an unproven high-risk hedge fund managed by a young and unknown portfolio manager with no reputation in the industry, at a time when BYJU's Alpha was in default on billion-dollar loans.

63.     Alarmingly, there are no material restrictions on Camshaft Capital Fund's investment activities. As disclosed in the Camshaft Brochure, Camshaft Capital Fund relies upon numerous high-risk trading strategies, including those that rely on leverage and short-selling, distressed and illiquid securities, derivative instruments, and emerging market investments. Ex. F, Camshaft Brochure at 8-9. Not surprisingly, one of Camshaft's self-disclosed risks is that investors must be "prepared to lose their entire investment":



*Potential Loss of Investment.* An investment in the Camshaft Funds involves a high degree of risk. There can be no assurance that the Camshaft Funds' investment objective will be achieved. There is a risk that an investment in the Camshaft Funds will be lost entirely or in part. The Camshaft Funds is not a complete investment program and should represent only a portion of an investor's portfolio. Investors must be prepared to lose their entire investment in the Camshaft Funds.

*Id.* at 10 (emphasis added).

64.     While BYJU's Alpha and its stakeholders have hundreds of millions of dollars at risk, Camshaft does not. It is profiting at its clients' sole expense with an above-market fee structure. Upon information and belief based on Camshaft's disclosures, Camshaft has charged a 3% per annum management fee—higher than many top-tier, established hedge funds—directly from BYJU's Alpha's (or the new holder's) capital account continuously since the investment was made. *Id.* at 4, 6. Based on BYJU's Alpha's investment activity, a 3% annual fee would result in **approximately $20 million** in aggregate management fees to date having been paid out of BYJU's

Alpha's capital account (assuming no profits and losses), a direct diminution in the value of its investment in Camshaft. Additionally, upon information and belief, Camshaft charges an above-market incentive fee: 30% subject to a 12% hurdle (*i.e.*, 30% of the returns in excess of 12%). Camshaft charges these egregious fees even though, according to Morton, trading is "a lot more simple than people make it out to be," in fact, "it's really simple."[6]

65.    With these fees, Morton appears to have dramatically upgraded his own personal standard of living.  Morton appears to have recently purchased three luxury cars for himself: a 2023 Ferrari Roma, a 2020 Lamborghini Huracán EVO, and a 2014 Rolls-Royce Wraith. Additionally, another entity Morton controls, Camshaft, LLC, lists its principal place of business at 18555 Collins Avenue, Suite #5405, Sunny Isles Beach, Florida 33160—a multi-million dollar, residential condominium overlooking the ocean that is listed for rent at $29,000 per month.

66.    The Lenders are owed over $1 billion, and Morton appears to be extravagantly spending their money.

## COUNT I
### (Avoidance and Injunction of Actual Fraudulent Transfer against Camshaft Capital Fund and John Doe under Section 726.105(1)[7])

67.    GLAS incorporates paragraphs 1-66 of this Complaint as if fully set forth herein.

68.    At all relevant times, BYJU's Alpha was indebted to the Lenders, for whom GLAS serves as Agent, in an amount exceeding $1 billion under Term Loans that were in default.

---

[6]    *See* William C. Morton "Lessons From a 24 yo Hedge Fund Manager" on Social Seller w Conor Paulsen Ep 29.1, https://www.youtube.com/watch?v=S6Z3u8Ka_TA.

[7]    For each of Counts I-IV, GLAS's investigation of the state law applicable to Defendants' fraudulent transfers is ongoing, and it is possible that Defendants are liable under the laws of other states, too.

69.     Over the course of April and July 2022, BYJU's Alpha transferred $533 million to Camshaft Capital Fund, with the intent to hinder, delay, and/or defraud the Lenders.  Camshaft Capital Fund is liable for the transfers.

70.     Sometime between January and May 2023, it appears the $533 million—or, alternatively, the limited partnership interest in Camshaft Capital Fund attributable to the transferred funds (or some other interest on account of those funds)—was transferred or withdrawn and the proceeds distributed to Defendant John Doe, a BYJU's entity whose identity has been intentionally concealed from GLAS and the Lenders.  This was done with the knowledge and consent of Camshaft Capital Fund, its sole general partner Camshaft Capital Management, and its sole investment manager Camshaft Capital Advisors.  These transactions, whatever they may have been, also were made with the intent to hinder, delay, or defraud the Lenders; and John Doe is liable for these transfers.

71.     Among other evidence of BYJU's' improper intent, there is no legitimate commercial reason for the transfers of BYJU's Alpha's interest, and BYJU's has refused to disclose, and has actively obfuscated and concealed, the current location and use of the $533 million.  Indeed, there is direct evidence proving an actual fraudulent transfer: Byju Raveendran's admissions that money had been moved to "someplace the Lenders will never find it," and BYJU's counsel's public acknowledgement to a Delaware court that his clients' intent in moving the money was to frustrate the Lenders' remedies.

72.     GLAS has standing to assert a claim on behalf of the Lenders under at least Sections 726.102(5) and 726.108(1) of the Florida Statutes.

73.     The $533 million in transfers of BYJU's Alpha's interests are avoidable under at least Section 726.108(1) of the Florida Statutes.

74.    GLAS, as agent of the Lenders, seeks to avoid the transfer of the $533 million or any asset on account of the $533 million, as approximately half of an over $1.2 billion debt, as actual fraudulent transfers under at least Section 726.105(1) of the Florida Statutes.

WHEREFORE, GLAS, as Agent of the Lenders, requests that the Court enter a judgment against Camshaft Capital Fund and John Doe:

a) Declaring the transfers to Camshaft Capital Fund and John Doe as fraudulent transfers pursuant to at least Section 726.105(1) of the Florida Statutes;

b) Avoiding the transfers to Camshaft Capital Fund and John Doe pursuant to at least Section 726.108(1) of the Florida Statutes;

c) Alternatively, issuing an injunction relating to, or appointing a receiver over, the $533 million or any asset on account of the $533 million, pursuant to at least Section 726.108(1) of the Florida Statutes; and

d) Granting such other and further relief as the Court deems proper.

### COUNT II
**(Avoidance and Injunction of Constructive Fraudulent Transfer against Camshaft Capital Fund under Sections 726.105(1)(b) and 726.106(1))**

75.    GLAS incorporates paragraphs 1-66 of this Complaint as if fully set forth herein.

76.    At all relevant times, BYJU's Alpha was indebted to the Lenders, for whom Plaintiff GLAS serves as Agent, in an amount exceeding $1 billion under Term Loans that were in default.

77.    Over the course of April and July 2022, BYJU's Alpha transferred $533 million to Camshaft Capital Fund.

78.    BYJU's Alpha, a special purpose financing vehicle with no active operations, made the transfers when it was insolvent or became insolvent as a result of making the transfers. Specifically, BYJU's Alpha (a) had defaulted on the Term Loans and could foresee further defaults; (b) had no ability to comply with its obligations under the Credit Agreement, subsequent forbearance agreements, and other loan documents; and (c) owed the Lenders an amount, which

would soon be accelerated, exceeding $1 billion for which the remaining assets of BYJU's Alpha were unreasonably small in relation to the outstanding debt.

79.     There is no indication that BYJU's Alpha received a reasonably equivalent value in exchange for the April and July 2022 transfers to Camshaft Capital Fund, an unproven high-risk hedge fund run by a young and unknown portfolio manager.  Any limited partnership interest that BYJU's Alpha received in Camshaft Capital Fund, and the restrictions imposed on the transfer, pledge, and redemption or withdrawal of that limited partnership interest—which is not registered under the securities laws and subject to strict restrictions on resale and transferability—were not reasonably equivalent to the $533 million that BYJU's Alpha invested.  Simply, BYJU's Alpha exchanged a highly liquid asset—cash sitting in checking and brokerage accounts—for a highly *illiquid* asset—a limited partnership interest in a hedge fund, which has a limited market and would likely trade at a substantial discount.

80.     GLAS has standing to assert a claim on behalf of the Lenders under at least Sections 726.102(5) and 726.108(1) of the Florida Statutes.

81.     GLAS, as Agent of the Lenders, seeks to avoid the transfer of the $533 million to Camshaft Capital Fund as constructively fraudulent transfers under at least Sections 726.105(1)(b) and 726.106(1) of the Florida Statutes.

WHEREFORE, GLAS, as Agent of the Lenders, requests that the Court enter a judgment against Camshaft Capital Fund:

    a) Declaring the investment and related transfers as fraudulent transfers pursuant to at least Sections 726.105(1)(b) and 726.106(1) of the Florida Statutes;

    b) Avoiding the investment and related transfers pursuant to at least Section 726.108(1)(b) of the Florida Statutes;

    c) Alternatively, issuing an injunction relating to, or appointing a receiver over, the $533 million or any asset on account of the $533 million, pursuant to at least Section 726.108(1) of the Florida Statutes; and

d) Granting such other and further relief as the Court deems proper.

### COUNT III
### (Avoidance of Constructively Fraudulent Transfer against Camshaft Capital Advisors and Camshaft Capital Management under Sections 726.105(1)(b) and 726.106(1))

82.    GLAS incorporates paragraphs 1-66 of this Complaint as if fully set forth herein.

83.    At all relevant times, BYJU's Alpha was indebted to the Lenders, for whom Plaintiff GLAS serves as Agent, in an amount exceeding $1 billion under Term Loans that were in default.

84.    Since BYJU's Alpha transferred $533 million to Camshaft Capital Fund in April and July 2022, Camshaft Capital Advisors and Camshaft Capital Management have been charging an above-market 3% annual management fee directly from BYJU's Alpha's capital account on a monthly basis, along with an above-market incentive fee of 30% subject to a 12% hurdle. Based on BYJU's Alpha's investments, a 3% annual fee would result in **approximately $20 million** in fees to date having been paid out of BYJU's Alpha's capital account (assuming no profits and losses).

85.    BYJU's Alpha, a special purpose financing vehicle with no active operations, paid those fees when it was insolvent, or it became insolvent as a result of initiating the transfers to Camshaft that resulted in these fee payments. Specifically, BYJU's Alpha (a) had defaulted on the Term Loans, and could foresee further defaults; (b) had outstanding Events of Default as of November 25, 2022; (c) had no ability to comply with its obligations under the Credit Agreement, subsequent forbearance agreements, and other loan documents; and (d) owed the Lenders an amount, which would be accelerated on March 3, 2023, exceeding $1 billion for which the remaining assets of BYJU's Alpha were unreasonably small in relation to the outstanding debt.

86.     There is no indication that BYJU's Alpha and its affiliated guarantors received a reasonably equivalent value in exchange for the transfers or alleged management or incentive fees, particularly where the fees being charged are substantial, including in relationship to prevailing market fees and particularly in light of the information uncovered about Camshaft's operations and its CEO William Morton, as set forth above.

87.     GLAS has standing to assert a claim on behalf of the Lenders under at least Sections 726.102(5) and 726.108(1) of the Florida Statutes.

88.     GLAS, as Agent of the Lenders, seeks to avoid the fee payments and the further incurrence of management and incentive fees to Camshaft Capital Advisors and Camshaft Capital Management as constructively fraudulent transfers under at least Sections 726.105(1)(b) and 726.106(1) of the Florida Statutes.

WHEREFORE, GLAS, as Agent of the Lenders, requests that the Court enter a judgment against Camshaft Capital Advisors and Camshaft Capital Management:

a) Declaring the transfers and payments of management and incentive fees to Camshaft Capital Advisors and Camshaft Capital Management as fraudulent transfers pursuant to at least Sections 726.105(1)(b) and 726.106(1) of the Florida Statutes;

b) Avoiding the transfers and payments of, and preventing the further incurrence of, management and incentive fees pursuant to at least Sections 726.108(1) of the Florida Statutes; and

c) Granting such other and further relief as the Court deems proper.

## <u>COUNT IV</u>
### (Avoidance of Constructively Fraudulent Transfer against John Doe under Sections 726.105(1)(b) and 726.106(1))

89.     GLAS incorporates paragraphs 1-66 of this Complaint as if fully set forth herein.

90.     At all relevant times, BYJU's Alpha was indebted to the Lenders in an amount exceeding $1 billion under Term Loans that were in default.

91.     Over the course of April and July 2022, BYJU's Alpha transferred $533 million to Camshaft Capital Fund. Apparently sometime between January and May 2023, that $533 million—or some other "amount to the credit of Alpha"—was transferred or withdrawn with the proceeds distributed to John Doe, "a BYJU's-affiliated entity within the United States," whose name has been intentionally concealed from GLAS.

92.     BYJU's Alpha, a special purpose financing vehicle with no active operations, made that transfer or withdrawal when it was insolvent or it became insolvent as a result of initiating the initial investment in Camshaft Capital Fund. Specifically, BYJU's Alpha (a) had outstanding Events of Default as of November 25, 2022; (b) had no ability to comply with its obligations under the Credit Agreement, subsequent forbearance agreements, and other loan documents; and (c) owed the Lenders an amount, which would be accelerated on March 3, 2023, exceeding $1 billion for which the remaining assets of BYJU's Alpha were unreasonably small in relation to the outstanding debt.

93.     Based on a review of BYJU's Alpha's bank statements, there is no indication that BYJU's Alpha received *any* value, let alone reasonably equivalent value, in exchange for the transfer or withdrawal of the $533 million investment. John Doe is liable for a constructive fraudulent transfer.

94.     GLAS has standing to assert a claim on behalf of the Lenders under at least Sections 726.102(5) and 726.108(1) of the Florida Statutes.

95.     GLAS, as Agent of the Lenders, seeks to avoid the transfer or withdrawal of the $533-million investment to John Doe as a constructively fraudulent transfer under at least Sections 726.105(1)(b) and 726.106(1)-(2) of the Florida Statutes.

WHEREFORE, GLAS requests that the Court enter a judgment against John Doe:

a)  Declaring the transfer or withdrawal as a fraudulent transfer pursuant to at least Sections 726.105(1)(b) and 726.106(1)-(2) of the Florida Statutes;

b)  Avoiding the transfer or withdrawal pursuant to at least Section 726.108(1)(b) of the Florida Statutes; and

c)  Granting such other and further relief as the Court deems proper.

*[Rest of Page Intentionally Left Blank]*

Dated: September 5, 2023

Respectfully submitted,

*/s/ Diego Pérez Ara*
Marcos J. Jimenez
  Florida Bar No.: 441503
Diego Pérez Ara
  Florida Bar No.: 1023765
Andrew D. Zaron
  Florida Bar No.: 965790
**LEÓN COSGROVE JIMÉNEZ, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975
Facsimile: 305.351.4059
Email: mjimenez@leoncosgrove.com
Email: dperez@leoncosgrove.com
Email: azaron@leoncosgrove.com


OF COUNSEL:

Richard U.S. Howell, P.C. (*pro hac vice* application pending)
Ravi Subramanian Shankar (*pro hac vice* application pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: 312.862.2000
Email: rhowell@kirkland.com
Email: ravi.shankar@kirkland.com

*Counsel for GLAS Trust Company LLC*