**<u>Exhibit D</u>**

**(Camshaft Motion to Vacate Ex Parte Order)**

.IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2023-022640-CA-01 (43)

GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent,

      Plaintiff,

v.

CAMSHAFT CAPITAL FUND, LP, CAMSHAFT CAPITAL ADVISORS, LLC, CAMSHAFT CAPITAL MANAGEMENT, LLC, and JOHN DOE,

      Defendants.

_____/

## DEFENDANTS' MOTION TO VACATE EX PARTE ORDER

Defendant Camshaft Capital Advisors, LLC, on behalf of itself and Camshaft Capital Fund, LP, and Camshaft Capital Management, LLC (collectively, "Defendants"), by and through undersigned counsel, respectfully move the Court for entry of an Order vacating the Court's September 11, 2013 Order Granting Plaintiff's Emergency Ex Parte Motion to Shorten the Deadline for the Camshaft Defendants to Respond to Discovery.

## INTRODUCTION

Florida law is clear that a trial court should only order relief in an ex parte proceeding where there exists an immediate threat of irreparable injury that forecloses the opportunity to give reasonable notice. When seeking extraordinary *ex parte* relief, a lawyer has a heightened duty of candor and disclosure to the Court to inform of all material facts, whether or not such facts are adverse. Plaintiff's Emergency Ex Parte Motion failed to meet this duty of candor and disclosure, and if it had done so, it would have revealed the substance of other proceedings regarding the same

issue and the court's consideration of same, in those other proceedings. Therefore, the Movant could not have shown any immediate threat of irreparable injury.

First, Plaintiff concealed from this Court that the same issues presented in its Complaint regarding non-party borrower BYJU are the subject of two different litigations in New York and Delaware that have been pending for months, before courts that are more familiar with the complex documents and transactions at issue. Plaintiff did not disclose that the Delaware Court which already held a bench trial dealing with issues described in Plaintiff's Complaint three months ago, denied Plaintiffs the same discovery it now seeks in Florida on a purportedly emergency basis. Nor did Plaintiff disclose that it sent BYJU a notice of default nearly six months before claiming that emergency discovery is required. Nor did Plaintiff apprise the Court about any of the voluminous discovery it has obtained in its pending actions in Delaware or New York. Instead, Plaintiff makes salacious allegations, gratuitously attacks Camshaft's founder, and, in its most recent request for emergency relief, attaches unsubstantiated reports from various news outlets. Plaintiff's representations and omissions to the Court warrant vacatur of the Court's ex parte order.

Further, relevant, publicly available facts show Plaintiff took **no action** to provide Defendants with reasonable notice. Plaintiff never contacted Defendants' counsel. Plaintiff never disclosed to the Court that it was creatively avoiding the other two courts that were litigating these same issues, by opening litigation in Florida in lieu of pursuing discovery in its pending litigation in New York, and after its request in the Delaware litigation for such discovery was denied. Plaintiff still fails to allege facts to establish its own standing or identify the anonymous parties in interest whom Plaintiff claims to represent. In short, Plaintiff's motion violated its duty of candor and disclosure to the Court, identified no emergency whatsoever, let alone any emergency

justifying *ex parte* relief that should overcome Defendants' due process rights to notice and an opportunity to be heard. The Ex Parte Order should be vacated.

## STATEMENT OF FACTS

1.      In its Complaint, Plaintiff alleges that it is an "Administrative and Collateral Agent" for "various Lenders," which the Complaint leaves unidentified and anonymous. Compl., ¶¶ 2, 13.

2.      The Complaint alleges that a non-party, BYJU  and not Defendants  breached a Credit Agreement, which Plaintiff did not attach to the Complaint. Compl., ¶¶ 14-18.

3.      Plaintiff's Complaint alleges that the non-party BYJU improperly transferred funds to Defendants in **April and July of 2022**. Compl., ¶¶ 20-22.

4.      In May 2023, Plaintiff brought an action in Delaware Chancery Court against non-party BYJU. Compl., ¶ 48. Though the Complaint mentions the Delaware Proceeding's existence, Plaintiff omitted to identify the case number or style, and failed to apprise the Court of developments in that case that are highly relevant to the relief it now seeks on an ex parte and emergency basis.

5.      The Delaware Proceeding filed May 3, 2023, is captioned *GLAS Trust Company LLC et al. v. Riju Ravindran et al.,* No. 2023-0488 (Del. Ch. 2023). In that action, Plaintiff sought a *Status Quo* Order. On May 22, 2023, Riju Ravindran, a director and officer of Byju's Alpha, Inc. ("BYJU") and Tangible Play, Inc, submitted a declaration in support of Defendants' Answering Brief in Opposition to Plaintiffs' Motion for a Status Quo Order and in Support of Defendants' Motion to Seal the Courtroom. *See* **Ex. 1 hereto** (Ravindran Decl.). That declaration detailed the discovery that is now being sought by Plaintiff on an emergency basis. Plaintiff failed

3

to disclose to the Court the following important details that it has known since May 22, 2023 on the basis of this declaration:

    a.  The Lenders' security in the Term Loan has not been compromised, as they still have a robust security package to cover the borrowing. *Id.* ¶ 36.

    b.  Plaintiff is an Administrative Agent for various of lenders, some of which, contrary to the terms of the Credit Agreement, are dealers in distressed debt. *Id.* ¶¶ 12-13.

    c.  The Lenders have extracted substantial fees from BYJU for the Lenders' agreement to forbear from accelerating any obligations. *Id.* ¶ 37.

    d.  On March 3, 2023, Plaintiff sent a notice of default and notice of enforcement of remedies. *Id.* ¶¶ 40-41.

    e.  BYJU agreed not to engage in any transactions outside the normal course of business. *Id.* ¶¶ 61.

    f.  Specifically, notice was provided that funds were moved to another entity BYJU-affiliated entity in the U.S. *Id.* ¶¶ 56, 57. In fact, contrary to Plaintiff's assertion in the Complaint and its motion, the funds were never meant to serve as collateral for the Lenders and there is no basis (under the Credit Agreement or otherwise) which prohibits the investment of sums.

6.    This was all disclosed to Plaintiff in May 2023. Plaintiff, however, disclosed none of these facts to the Court.

7.    On May 22, 2023, the Delaware court entered a *Status Quo* order and appointed Plaintiff's nominee director, Timothy R. Pohl, as BYJU's sole director. **See Ex. 2 hereto**.

8.    Further, Plaintiff did not disclose — either in its sealed Complaint or in either of its ex parte emergency motions — that it received access to BYJU's bank accounts as far back as May

2023 and these bank accounts showed (as Plaintiff admits at ¶ 51 of the Complaint) that the funds had been transferred to Camshaft. The urgency that Plaintiffs seem to make out now is clearly feigned.

9.     Plaintiffs also failed to disclose that on June 26, 2023, i.e., ***nearly three months ago, the Delaware court denied Plaintiff the very discovery it now demands on an emergency basis.*** Plaintiff sought and order compelling BYJU to "provide Pohl with . . . all records of BYCU's Alpha authorizing or reflecting [the] transfer [to Camshaft]." *See* **Ex. 3 hereto.** (June 26, 2023 Order).  The Court denied Plaintiff's demand for discovery, holding that "Plaintiff has no basis to further investigate the transfer itself in this action."

10.     In addition to the Delaware litigation, on June 5, 2023, a *second* litigation was filed in New York state court between Plaintiff and BYJU, which remains pending.  *BYJU's Pte. Ltd. et al v. Glas Trust Company LLC*, No. 652717-2023 (N.Y. Sup. Ct. 2023).  Plaintiff's Ex Parte Motion and its Complaint did not disclose this litigation to the Court.  Plaintiff has not sought <u>any</u> discovery in the New York litigation to date.

11.     In filing its sealed Complaint, Plaintiff concealed from this Court all of these facts and, further, did not provide the Court with any of the discovery that Plaintiff obtained in these already pending litigations. Instead, Plaintiff resorted to salacious accusations about, for example, the age of Defendants' principal in a pejorative manner, his purported automobile purchases, and referenced and attached to its filings unsubstantiated reports from various media outlets.[1]

---

[1]   In its September 19, 2023 "Emergency Motion to Compel Camshaft Capital Fund LP To Respond to Discovery," Plaintiff repeated these allegations but admitted in a footnote that these "troubling details" relied on "an unnamed 'person in the know,'" and "[w]hat actually happened remains to be seen . . . ." Motion at 3, n.,1.  It is self-evident that unsourced rumors are not a basis for extraordinary Ex Parte relief.

12.     On September 7, 2023   more than a year after the challenged transfers, more than a month after the Delaware bench trial against non-party BYJU, and over two months after the denial of this very discovery, Plaintiff filed its "*Emergency Ex Parte* Motion to Shorten the Deadline for the Camshaft Defendants to Respond to Discovery" (the "Ex Parte Motion").

13.     Like the Complaint, the Ex Parte Motion did not identify the anonymous lenders who are the beneficial owners and true parties in interest.  It did not attach the Credit Agreement. It did not disclose the New York proceeding or critical details of the Delaware proceeding, including facts that could have affected the Court's consideration of the Ex Parte Motion.  And it did not identify any emergency basis for ex parte relief without notice to Defendants.  Nor did it advise the Court that such discovery was previously sought unsuccessfully or that it should have sought third party discovery from courts already litigating these very issues, rather than file an *ex parte* motion without notice.[2]

14.     The Ex Parte Motion further did not disclose facts that minimal due diligence would have revealed, such as the fact that undersigned counsel this year has represented Defendants in two other matters pending in this same Court, (i) *Camshaft Capital Fund, LP v. Aliya Growth Fund LLC Series CC et al*, Case No. 2023-018518-CA-01 (CA43) (Miami Dade Fla. Cir. Ct.), and (ii) *Camshaft CRE 1 LLC v. Prime Capital Ventures, LLC*, Case No. 2023-019591-CA-01 (CA21) (Miami Dade Fla. Cir. Ct.).

15.     On September 11, 2023, the Court entered an Order Granting Plaintiff's Emergency Ex Parte Motion (the "Ex Parte Order").  The Ex Parte Order directed Defendants to respond to

---

[2]  Should the Movant attempt to parse the language in the Delaware court's ruling to the effect that: "Plaintiff has no basis to further investigate the transfer itself in this action" gives Plaintiff a license to bring an ex parte proceeding elsewhere, this Court can easily determine that all the these facts should have been disclosed to it in light of Plaintiff's heightened duty of candor to the tribunal in an Ex Parte proceeding.

the Requests within seven days, running from the date of service of process of the Ex Parte Order together with other documents.

16.     On September 12, 2023, Plaintiff filed a return of service on Legalinc Corporate Services Inc. ("Legalinc"). Legalinc, however, was not Defendants' registered agent and did not forward the Complaint, process, or the Ex Parte Order to Defendants. *See* Declaration of Craig R. Lerman, attached hereto as **Ex. 4**.

17.     Also on September 12, 2023    one day after the Court entered the Ex Parte Order the undersigned filed a Notice of Appearance in this action. Since filing the appearance until September 18, 2023, Plaintiff's counsel did not attempted to contact the undersigned or send them its Ex Parte Motion.

18.     Undersigned counsel did not receive actual notice of the Ex Parte Order, the return of service, or the Requests until September 18, 2023, based on a review of the court docket. Instead, counsel for Defendants conferred with Plaintiff's counsel by telephone on September 18, 2023, to advise of the lack of service issue.

19.     On September 19, 2023, Counsel for Defendants again met and conferred with Plaintiff's counsel by telephone to advise that (1) Defendants had not been properly served; (2) the facts presented in the Ex Parte Motion did not meet the standard of full disclosure and may have also been erroneous; (3) Defendants offered to accept service if allowed to respond to discovery within the time permitted by the Florida Rules of Civil Procedure, and (4) no relevant records would be removed or destroyed in the interim.

20.     On September 19, 2023, Defendants filed an Emergency Motion to Compel that did not reflect the substance of the matters discussed in the parties' meet-and-confer.

21.     There is no good cause for why Plaintiff's Motion for Expedited Response to Discovery cannot be heard upon normal motion practice and a briefing schedule that allows both parties notice and an opportunity to be heard.

## LEGAL STANDARD

Due process requires "notice and an opportunity to be heard" and ex-parte proceedings may be a departure from the essential requirements of the law. *Rho-Sigma, Inc. v. Int'l Control & Measurements, Corp.*, 691 So. 2d 16, 16 (Fla. 3d DCA 1997) (quashing discovery order entered on ex-parte basis).

"The trial court should only order relief in an ex parte proceeding where there exists an immediate threat of irreparable injury that forecloses the opportunity to give reasonable notice." 29 Fla. Jur 2d Injunctions § 78. "This rule rests on the rationale that courts should not intercede in the affairs of men except on a showing of necessity where injury and damage are shown by proofs. Because orders are sustained by proofs, and proofs result from adversarial presentations, a court should never issue an ex parte order without notice to the defendants and without a hearing unless an immediate threat of irreparable injury exists that forecloses the opportunity to give reasonable notice and in which a subsequent remedy for damages or other relief would be inadequate." *Id*.

Florida Rule of Professional Responsibility Rule (Candor Towards the Tribunal) 4-3.3 states: "(d) Ex Parte Proceedings.   In an ex parte proceeding a lawyer *shall inform the tribunal of all material facts* known to the lawyer that will enable the tribunal to make an informed decision, *whether or not the facts are adverse.*" Rule 4-3.3(d) (emphasis added). The Comment to Rule 4-3.3(d) concerning ex parte proceedings provides:

> Ordinarily, an advocate has the limited responsibility of presenting 1 side of the matters that a tribunal should consider in reaching a decision; the conflicting

position is expected to be presented by the opposing party. However, in an ex parte proceeding, such as an application for a temporary injunction, there is no balance of presentation by opposing advocates. The object of an ex parte proceeding is nevertheless to yield a substantially just result. The judge has an affirmative responsibility to accord the absent party just consideration. *The lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision.*

Rule 4-3.3 Comment (emphasis added).

The Florida Rules of Civil Procedure provide that in the normal course of discovery "a defendant may serve a response within 45 days after service of the process and initial pleading on that defendant." 1.350(b). The rule provides that "[t]he court may allow a shorter or longer time," but Rule 1.090 provides that "[a] copy of any written motion which may not be heard ex parte and a copy of the notice of the hearing thereof shall be served a reasonable time before the time specified for the hearing." Fla. R. Civ. P. 1.090(d).

## LEGAL ARGUMENT

Plaintiff's Emergency Ex Parte Motion omitted relevant facts that were or should have been known to Plaintiff with due diligence, and otherwise failed to satisfy the elevated duty of candor owed to the Court.

First, the Ex Parte Motion did not disclose that the undersigned has represented Defendants in two litigations this year *in this same court*, a fact that should have been apparent to Plaintiff's counsel with any reasonable diligence. Plaintiff could have searched Camshaft on the publicly available Miami-Dade electronic docket and would have quickly determined that Hogan Lovells represents Defendants in other pending cases (including in the Complex Business Division). Plaintiff declined to do so, and failed to advise the Court of this total lack of basic due diligence conducted before seeking extraordinary ex parte relief.

Second, the Ex Parte Motion did not disclose that Plaintiff is a party to litigation with the alleged debtor BYJU  a nonparty in this proceeding  in two separate litigations in Delaware and New York that have been pending for months. Plaintiff could have sought the requested discovery in those two proceedings, but apparently frustrated by the Delaware court's refusal to provide such discovery, instead commenced this Florida action to request emergency, ex-parte relief from this Court.

Indeed, Plaintiff failed to apprise the Court that it has had access to BYJU's bank accounts since at least late May 2023 and these bank accounts statements (as the Plaintiff concedes in the Complaint) made evident that monies had been transferred to the Defendants. The reason for Plaintiff's non-disclosure is obvious  the facts make it clear that there is simply no urgency that warrants the haste with which Plaintiff requested this relief.

Plaintiff also failed to disclose that nearly three months ago, on June 26, 2023, the Delaware court denied Plaintiff the very discovery it now demands. Plaintiff sought an order compelling BYJU to "provide [it's appointed director] with access to, and exclusive control over, all [BYJU]'s accounts, including the account from which the >$500 million transfer occurred, and all records of [BYJU] authorizing or reflecting that transfer." See **Ex. 3** (June 26, 2023 Order).[3]

The Court denied Plaintiff's demand for discovery, holding that "Plaintiff has no basis to further investigate the transfer itself in this action." Accordingly, the court that had received many pleadings, arguments, and even held proceedings as to the substance of these issues, denied Plaintiff's attempt to obtain the discovery it now seeks. Moreover, Plaintiff failed to explain why

---

[3] This is a reference to the transfer to Camshaft, and obviously, Camshaft could have been subpoenaed as a third party witness in either of the two other proceedings. But given this adverse ruling, Movant sought to conceal this from the Court and seek Ex Parte relief. Of course, if Camshaft was subpoenaed as a third-party witness it could have defended such subpoena and argued the Delaware court's prior ruling as to this issue. By pursuing an Ex Parte tactic, Movant hoped to eliminate such due process.

obtaining discovery on an emergency basis is warranted when the Delaware court shut down its attempts for similar discovery nearly three months ago. More importantly, Plaintiff does not explain why it failed to disclose to the Court these very material facts so the Court could have considered such facts to make an informed decision.

Third, Plaintiff failed to identify the anonymous "various lenders" who are the beneficial owners and true parties in interest of the subject funds, produce the Credit Agreement that is the basis for its Complaint, or allege any facts sufficient to establish that it has standing to enforce purported contract rights that belong to other "various lenders." The reason for this is also obvious a perusal of the Credit Agreement would make it clear not only that there is no prohibition on the movement of funds but also that there is no obligation to retain cash as collateral.

Fourth, Plaintiff failed to identify any facts showing an "emergency" exists relating to funds that were transferred more than a year ago, let alone an "emergency" justifying ex parte relief without notice or an opportunity to be heard.

Fifth, Plaintiff cites two cases for the proposition of "when fraudulent transfers are at issue, Florida courts have granted motion for expedited discovery," Ex Parte Motion at 5, without disclosing that the cited cases do not state that such relief may be provided on an *ex parte* basis.

Sixth, Plaintiff misleadingly represented to the Court that "the discovery requests are narrowly tailored" and "any burden to the Camshaft Defendants is minimal . . . ." Ex Parte Motion at 5. In reality, Plaintiff's broadly requests Defendants to provide items including:

- "All state, federal, regulatory, and international filings You have made since Your formation." RFP No. 8
- "Documents sufficient to show Your organizational, ownership, and control structure at all times since Your formation." RFP No. 9.
- "Documents sufficient to show all general partners, limited partners, and other interest holders of Camshaft Capital Fund, LP, since August 2020, including the limited partnership agreements and any other Documents memorializing the terms of

the limited partnership interests held in Camshaft Capital Fund, LP and/or its general partner and investment manager." RFP No. 10.

- Defendants define "BYJU" to include at least *30 different entities* (RFP Definition No. 3), and request all "Communications *at any time* between You or Your representatives, on the one hand, and BYJU's Alpha, BYJU's, or their representatives, on the other hand."[4]

Seventh, the Ex Parte Motion misleadingly argued to the Court that "as it relates to GLAS's request for the entry of an order on ex parte basis, the Camshaft Defendants have taken steps to make service on them difficult." Ex Parte Motion at 5-6. Plaintiff asserted that "two entities list as their principal place of business a residential condominium with no public access on Brickell Bay Drive," which allegedly created "hurdles in service that may confront GLAS as a result of Defendants' tactics." *Id*. However, Plaintiff's counsel are on notice that Florida statutes provide that "A gated residential community, including a condominium association or a cooperative, shall grant unannounced entry into the community, including its common areas and common elements, to a person who is attempting to serve process on a defendant or witness who resides within or is known to be within the community." Section 48.031(7), Fla. Stat. Despite citing to the Florida service of process statute, Plaintiff never apprised the Court that the statute eliminates such "hurdles". There therefore was no "hurdle in service" in serving such an address, and Plaintiff does not even allege that it attempted service there.

The only service that Plaintiff ever attempted came *after* it sought Ex Parte relief. And as Defendants informed Plaintiff and the Court on September 18, 2023, such process was improper and insufficient. *See* Ex. 4. More importantly at no time either before Plaintiff sought Ex Parte relief or after at any time until September 18, 2023 did Plaintiff ever contact Defense counsel regarding this matter, even after Defense counsel served a Notice of Appearance.

---

[4] As Plaintiff has been in two separate litigations with BYJU throughout 2023, it is not clear why this request for BYJU's communications should be an emergency to a Florida court justifying ex parte relief.

Florida law is clear that "[t]he trial court should only order relief in an ex parte proceeding where there exists an immediate threat of irreparable injury that forecloses the opportunity to give reasonable notice." 29 Fla. Jur 2d Injunctions § 78. Here, Plaintiff's Emergency Ex Parte Motion reveals that Plaintiff took **no action** to obtain the discovery at issue through normal channels that were already available to Plaintiff in two other proceedings that would provide Defendants with reasonable notice. Plaintiff never contacted Defendants' counsel. It has been in litigation for months in two separate actions with the BYJU entity in New York and Delaware without a subpoena to Defendants. Plaintiff failed to disclose these facts, failed to meet its duty of candor and disclosure to the Court, and it still fails to identify the anonymous parties in interest whom Plaintiff claims to represent. In short, Plaintiff's motion identifies no emergency whatsoever, let alone any emergency justifying ex parte relief without Defendants' due process rights to notice and an opportunity to be heard.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Court vacate its September 11, 2013 Order Granting Plaintiff's Emergency Ex Parte Motion to Shorten the Deadline for the Camshaft Defendants to Respond to Discovery.

Dated: September 21, 2023                    Respectfully submitted,

HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, Florida 33131
Telephone:    (305) 459-6500
Facsimile:    (305) 459-6550

By:/s/ David Massey
David Massey
Florida Bar No. 86129
david.massey@hoganlovells.com

13

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 21st day of September, 2023, a true and correct copy of the foregoing was filed with the Court using the Florida Courts e-filing portal system, which will generate a Notice of Filing to all counsel of record via the Court's e-service system.

By:    */s/ David Massey*
David Massey

# Exhibit 1

EFiled:  May 22 2023 04:59PM EDT
Transaction ID 70062623
Case No. 2023-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent, and TIMOTHY R. POHL, <br><br> Plaintiffs, <br><br> v. <br><br> RIJU RAVINDRAN, BYJU'S ALPHA, INC., and TANGIBLE PLAY, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 2023-0488-MTZ

**PUBLIC VERSION
filed May 22, 2023**

### UNSWORN FOREIGN DECLARATION OF RIJU RAVINDRAN

I, Riju Ravindran, hereby declare as follows pursuant to 10 *Del.* C. § 5356:

1.       I am a Defendant in the above-captioned action.

2.       I submit this Declaration in support of Defendants' Answering Brief in Opposition to Plaintiffs' Motion for a *Status Quo* Order and in Support of Defendants' Motion to Seal the Courtroom.

3.       This Declaration is based on my personal knowledge as well as knowledge I have gained as a director and officer of Byju's Alpha, Inc. ("Byju's Alpha") and Tangible Play, Inc. ("Tangible").

4.       Byju's Alpha was incorporated on September 27, 2021.  I was appointed as the sole director and Chief Executive Officer, President, Chief Financial Officer and Secretary of Byju's Alpha on September 27, 2021.  I continue to serve as a director of Byju's Alpha to this day.  In those roles, I maintain access

to and control over Byju's Alpha's property, including, among other things, its accounts and systems.

## Background

5.      Byju's Alpha and Tangible are part of a group of related business entities (collectively, "Byju's"), which together make up the world's largest education technology business, that provide personalized learning programs to more than 150 million students around the world.

6.      Byju's Alpha is the borrower under a credit and guarantee agreement, dated as of November 24, 2021 (the "Credit Agreement"), governing a term loan facility with an aggregate principal amount of $1.2 billion (the "Term Loan"). I signed the Credit Agreement and related documents as director of Byju's Alpha and Tangible.

7.      Byju's has received investments from numerous well-known financial institutions—including Blackrock, Silver Lake, General Atlantic, T Rowe Price, Sequoia, International Finance Corporation and Blackstone—and has recently been valued at over $22 billion.

8.      GLAS Trust Company ("GLAS") is the Administrative Agent and Collateral Agent under the Credit Agreement. It is my understanding that GLAS represents an ad hoc group of lenders (the "Lenders") under the Credit Agreement.

2

9.     Byju's Alpha's parent company, Think & Learn Private Limited, a private limited company under Indian Law ("Think & Learn"), is the "Parent Guarantor" under the Credit Agreement. Byju's Alpha is a step-down subsidiary of Think & Learn; and Tangible is a subsidiary of Think & Learn.

10.     To date, Byju's Alpha has made all payments, on time and in full, to the Lenders as required under the Credit Agreement, and the loans are trading at non-distressed levels.

### Disqualified Lenders

11.     The parties to the Credit Agreement intended that financial entities that primarily deal in distressed debt would not participate as lenders.

12.     For that reason, the Credit Agreement (attached as **Exhibit 1** to this Declaration) provides that Byju's Alpha could designate any person, *inter alia*, whose "primary activity is the trading or acquisition of distressed debt" a Disqualified Lender, by giving GLAS written notice. (Ex. 1 at § 1.1).

13.     I understand that, contrary to the intent of the parties to the Credit Agreement, several of the Lenders are in fact dealers in distressed debt.

### The Whitehat Guarantee

14.     The Credit Agreement provided that Byju's Alpha would procure guarantees for its obligations under the loan facility from its corporate parent, Think & Learn, and certain of its affiliates located in the United States, Singapore and

3

India. With the exception of one Indian affiliate, the private limited company Whitehat Education Technology Pvt. Ltd. ("Whitehat"), Byju's Alpha was able to timely obtain all of the requisite guarantees.

15. At the time the Credit Agreement was negotiated and executed, Whitehat had a negative net worth as calculated by the then-applicable Indian financial regulations (the "Former ODI Regulations"). To the best of my knowledge, Whitehat's financial condition was made known to all parties to the Credit Agreement.

16. Under the Former ODI Regulations, approval by the Reserve Bank of India ("RBI") was required before any Indian entity could undertake a financial commitment involving, *inter alia*, (i) more than $1 billion in any financial year (the "Amount Test") or (ii) an amount exceeding 400% of the entity's net worth (the "Net Worth Test"). However, the Former ODI Regulations allowed an entity to seek to satisfy the Net Worth Test by "borrowing" net worth from its parent.

17. Because Whitehat's net worth was negative at the time the Credit Agreement was negotiated and executed, the parties to that Agreement were aware that Whitehat could not then satisfy the Net Worth Test (or the Amount Test) and that, as a result, it would not be able to provide a guarantee for Byju's Alpha's obligations under the loan facility (the "Whitehat Guarantee") unless and until the RBI granted its approval.

4

18.    The Credit Agreement thus provided that the time for Whitehat to provide the Whitehat Guarantee would be the earlier of April 1, 2022, or within five days of receipt of approval from the RBI. (Ex. 1 at § 5.9).

19.    Similarly, the Credit Agreement provided that Think & Learn, in its capacity as "Parent Guarantor" under the Agreement, would use "reasonable commercial efforts" to procure the RBI's approval by April 1, 2022, and that the failure to obtain such approval by that date would not constitute a breach of the Credit Agreement requiring prepayment of the Term Loan. (Ex. 1 at § 5.17(d)).

20.    The parties to the Credit Agreement further agreed that, if the RBI conditioned its approval on terms that would render the Whitehat Guarantee "impractically burdensome," they would enter into "good faith" discussions to negotiate appropriate amendments to the terms of financing in the Credit Agreement. (Ex. 1 at § 5.17(d)).

21.    On February 11, 2022, Think & Learn submitted its finalized application to the RBI seeking its approval, *inter alia*, of the Whitehat Guarantee. Throughout the rest of February and March 2022, Think & Learn engaged in a series of detailed discussions with the RBI and provided information requested by the RBI concerning the Whitehat Guarantee.

22.    Despite Think & Learn's diligent efforts to obtain the RBI's approval for the Whitehat Guarantee by April 1, 2022, the RBI did not provide its approval.

5

23.     On March 29, 2022, Think & Learn sought a waiver from the Lenders under the Credit Agreement of the requirement to provide the Whitehat Guarantee. The Lenders refused to provide the requested waiver.

24.     On or about April 5, 2022, the parties to the Credit Agreement entered into a limited waiver agreement pursuant to which the Lenders agreed to defer the deadline for obtaining the RBI approval for the Whitehat Guarantee until October 8, 2022, in exchange for an exorbitant "consent fee" of 0.125% of each lender's outstanding term loans (the "Limited Waiver Agreement"). The Limited Waiver Agreement further provided that if the RBI conditioned its approval on terms that rendered the Whitehat Guarantee "impractically burdensome," the parties "shall negotiate in good faith" to amend the loan documents to avoid such burden.

25.     On August 22, 2022, the Government of India and the RBI promulgated amendments to the Former ODI Regulations (the "New ODI Regulations"). Under the New ODI Regulations, Indian entities seeking to undertake a financial commitment are no longer permitted to "borrow" net worth from a corporate parent in order to satisfy the "Net Worth Test."

26.     This regulatory change rendered it a practical impossibility for Think & Learn to obtain the RBI's approval for the Whitehat Guarantee at all, let alone by the October 8, 2022 deadline agreed to in the Limited Waiver Agreement.

27.   On or about October 6, 2022, in a call with Lenders, Byju's proposed a solution to the practical impossibility brought about by the changed regulations that would provide the Lenders with financial guarantees equivalent to the Whitehat Guarantee.  Byju's offered to move all assets out of Whitehat into subsidiaries of Think & Learn that are already guarantors (or the subsidiaries of guarantors) under the Credit Agreement.  At the time, the Lenders rejected this proposal without justification.

## Financial Disclosures

28.   On or about August 29, 2022, counsel for GLAS sent a letter to Byju's Alpha and Think & Learn requesting certain financial disclosures.

29.   Subsequent to the receipt of that letter, Think & Learn hosted a number of calls with the Lenders.  In connection with these calls, Think & Learn's management made presentations and took questions from the Lenders, and provided extensive financial disclosures to the Lenders, verbally and in writing.  These disclosures include, but are not limited to:

- FY2021 Audited Financial Statements
- FY2020 Interim Reporting
- 1Q23 Interim Reporting
- Internal Budget documents for FY ending March 31, 2023
- explanations of cash burn, Key Performance Indicators
- industry/marketing reports
- details on cash equity investments

- M&A earnout payment schedules
- contingent liability schedule for earn-outs and acquisitions
- cash balances held by Byju's Alpha and the Parent Guarantor
- consolidated financial statements for the quarter ending December 31, 2022

30.    In addition to these discussions and disclosures, Think & Learn has focused on delivering audited financial statements for the year ending March 31, 2022 (the "FY '22 Audit"). I understand that counsel for GLAS has taken the position that Think & Learn's failure to provide the FY '22 Audit by September 27, 2022, as provided under the Credit Agreement, constitutes a material breach of that Agreement and an event of default.

31.    Think & Learn could not begin work on the FY '22 Audit until the audited financial statements for the year ending March 31, 2021 ("FY '21 Audit") were completed and delivered.

32.    At the time when the Credit Agreement was negotiated and executed, Think & Learn had disclosed that the FY '21 Audit would be delayed for various reasons, including the complexity resulting from the company's rapid internal growth and recent corporate acquisitions. Accordingly, the Credit Agreement did not provide a specific deadline for Think & Learn to deliver the FY '21 Audit to the Lenders.

33.     The FY '21 Audit was finalized and delivered to the Lenders on August 30, 2022, at which point Think & Learn promptly began work on the FY '22 Audit.

34.     Though it has not yet been completed, progress has been made on the FY '22 Audit, and no issues have been identified with it to date.  In the interim, Think & Learn has worked in good faith to provide GLAS and the Lenders with information they have requested, including by retaining external advisors to prepare a report on Think & Learn's cash balances.

35.     Contrary to the position taken by GLAS through its counsel that the failure to provide the FY '22 Audit by September 27, 2022, as specified in the Credit Agreement, constitutes a material breach of that Agreement, the parties to the Credit Agreement never originally intended that a delay in furnishing audited financial statements would be considered a material breach of the Credit Agreement; that is evidenced because the original Credit Agreement provided that such a delay would be "deemed to be cured upon delivery" of such statements to GLAS, "notwithstanding that the time period for delivery of such [statements] shall have expired or passed." (Ex. 1 at § 1.11).

36.     In fact, neither the refusal of the RBI to grant approval to Whitehat, nor the non-material delay in providing the FY'22 Audit or other financial information, has caused Lenders any injury or increased the likelihood that they will suffer loss in the future. Further and as stated above, Byju's Alpha has made and continues to

9

make all payments required of it under the Credit Agreement, and the Lenders' security in the Term Loan has not been compromised, as they still have multiple guarantors with ample financial resources to cover the borrowing. Notwithstanding the foregoing, GLAS and Lenders continued to demand additional information and to accuse Byju's of breaching its disclosure obligations under the Credit Agreement.

37.     Between October 2022 and January 2023, the parties negotiated and executed a series of amendments to the Credit Agreement to address Lenders' and GLAS's purported concerns and to ensure that the financial interests of the Lenders would not be compromised in the interim. At all times, Byju's was under significant financial pressure to reach agreement with Lenders. Among other things, in these amendments Byju's agreed to pay a "forbearance fee" to GLAS and the Lenders' advisors in exchange for the Lenders' agreement to forbear from accelerating any obligations or exercising rights or remedies with respect to any purported "specified default." Additionally, these amendments temporarily limited Byju's right to designate Lenders as Disqualified Lenders, despite the fact that those Lenders indeed primarily trade in distressed debt.

38.     In none of these amendments did Byju's actually concede that an actual event of default had occurred, and Byju's maintains that no event of default has occurred.

**Lenders' Bad Faith Negotiations**

39.    Despite the fact that no defaults had occurred, Byju's attempted to negotiate matters with Lenders to bring matters to an amicable close.  However, Lenders continued to act in bad faith.  Thus, for instance:

a.    in October 2022, when parties were negotiating waivers of the alleged defaults, Lenders presented Byju's with two options: (i) one option conditioned the waiver upon ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████; and (ii) another option, which conditioned the waiver upon, *inter alia*, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

11

███████████████████████████████ Needless to mention, this facially unreasonable and coercive "proposal" was not accepted; and

b.      similarly, in February 2023, Byju's Alpha sent to GLAS an email attaching a proposed term sheet summarizing certain commercial amendments, a draft waiver and amendment agreement to the Credit Agreement, in return for significant commercial concessions from Defendants worth ███████████████ to the Lenders ("February 8 Proposal"). However, on or around February 10, 2023, Lenders rejected the February 8 Proposal outright. Instead, GLAS, on behalf of the Lenders, sent Defendants an aggressive counter-proposal ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

**The Default Notice And Notice of Enforcement**

40.     On March 3, 2023, GLAS sent a notice of default to Byju's (the "Default Notice") asserting, among other things, events of default in connection with their failure to obtain the Whitehat Guarantee and their putative failure to timely make certain financial disclosures. A copy of the Default Notice is attached hereto as **Exhibit 2**. The Default Notice purported to accelerate the Term Loan under the

12

Credit Agreement and demanded immediate payment from Byju's Alpha and its guarantors.

41.     Also, on March 3, 2023, GLAS sent a document entitled "Notice of Enforcement of Rights and Remedies under Pledge and Security Agreements" (the "Notice of Enforcement"), in which GLAS invoked the alleged "events of default" identified in the Default Notice as grounds for triggering security and pledge agreements related to the Term Loan and thereby seizing control of all of the equity shares controlling Byju's Alpha.  A copy of the Notice of Enforcement is attached hereto as **Exhibit 3**.

42.     Pursuant to the Notice of Enforcement, GLAS claimed authority to issue "written consents" which, among other things, purported to replace the director and officer of Byju's Alpha with GLAS's own appointee, Timothy R. Pohl, and to give Mr. Pohl control over all of Byju's Alpha's bank accounts and similar corporate assets.  Copies of the written consents are attached hereto as **Exhibit 4**.

43.     Mr. Pohl has never actually acted as a director or officer of Byju's Alpha.

44.     Mr. Pohl never has had access to Byju's Alpha's accounts or systems.  It was not until the commencement of this action that Mr. Pohl took significant steps to obtain such access.

13

## Subsequent Negotiations And Lenders' Attempts To Exert Pressure

45.    Since receiving the Default Notice and Notice of Enforcement, Byju's has continued to engage in good faith discussions with GLAS and the Lenders in an attempt to negotiate a commercial solution to their dispute.  At the same time, Byju's has engaged in ongoing discussions with several large financial institutions for the purpose of obtaining additional funding that would, among other things, allow the Lenders to be paid out in full.  One such raise was recently completed: Aakash Educational Services Pvt. Ltd. ("Aakash"), a subsidiary of the Parent Guarantor, as of May 12, 2023, raised $250 million from Davidson Kempner Capital Management, a US-based investment manager, through convertible bonds.  In parallel, Byju's is

46.    To ensure that these discussions could proceed without risking public exposure of Byju's sensitive commercial information, the parties to the Credit Agreement entered into a Non-Disclosure Agreement ("NDA") that protects, among other things, all data and information provided to Lenders by Byju's. The NDA provided a limited, specific mechanism for the parties to make a "Cleansing Disclosure" of certain information.  A copy of the NDA is attached hereto as **Exhibit. 5**.

47.     Additionally, Lenders have engaged in increasingly bad faith conduct during the negotiations.   For example, they have made increasingly onerous conditions, both monetary and non-monetary, on any deal with Byju's:

a.     During negotiation discussions in March 2023, ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

b.     Additionally, Lenders sought the deletion of the "Disqualified Lender" provision under the Credit Agreement insofar as it would apply to (i) entities with trading or acquisition of distressed debt as their primary activity; and (ii) the ability of Byju's Alpha to designate, by providing a list, of institutions and persons which it sought to disqualify.  This is a self-serving

15

position given that the provision was in the Credit Agreement at the point that Lenders bought into the facility.

    c.    Further, inducing Byju's with the promises of immediate withdrawal of the Default Notice and the Notice of Enforcement, Lenders initially sought to mislead Byju's into conceding payment of ████████ ████████████████████████████████████████████████ ███████████████████████ Upon Byju's indicating their acceptance to these terms, Lenders retracted the offer of immediate withdrawal of the Default Notice and the Notice of Enforcement while continuing to demand such payment. Thereafter, the Lenders once again revised this ask, demanding ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████

48.    It has become increasingly clear that Lenders' only aim is to extort unreasonable amounts of money from Byju's and make windfall gains. In fact, certain Lenders who are leading negotiations are engaged primarily in the trading or acquisition of distressed debt, which is a ground for disqualification under the Credit Agreement. Lenders had substantially increased their positions under the Credit Agreement at periods when purported issues in relation thereto arose and when the

price of the Term Loans had been depressed (whether intentionally by the Lenders or otherwise) in the market. Lenders are continuing to act in bad faith, to capitalize on alleged breaches of the Credit Agreement.

49.     It has also become clear that the alleged breaches are merely a pretext to enable such extortion and it is clear that Lenders are not impacted by and unconcerned with any alleged breaches or their resolution. This is apparent not only from Lenders' egregious "proposals" but also their refusal to agree to Defendants' reasonable and commercially viable offers. For instance, and in addition to the examples already provided above, Lenders refused Defendants' good faith offer in October 2022 to move all assets out of Whitehat into the affiliates of Byju's Alpha that are already guarantors (or are owned by guarantors) under the Credit Agreement. This would have had the effect of negating the effect of any failure to obtain the Whitehat Guarantee. Similarly, and in relation to the alleged breach of financial reporting covenants, while these defaults were first alleged in September 2022, Lenders did not request that these documents be provided by a specific date until March 2023, almost 6 months later.

## Threats To Disclose Confidential Information

50.     As stated above, the NDA provided for a specified mechanism which permitted Lenders to "cleanse" confidential information, among other things, in relation to material terms of parties' negotiations, under certain circumstances and

within stipulated timelines.  While, pursuant to its obligations under the NDA, Think & Learn provided a draft cleansing statement, Lenders admittedly did not follow the procedure under the NDA to amend such statement.  Accordingly, Lenders' rights to "cleanse" lapsed and was forfeited.  However, despite this, Lenders have, with a view to coerce Defendants into agreeing to egregious terms, threatened, on multiple occasions, to publicize Byju's confidential and sensitive information (which includes details in relation to parties' negotiations), knowing fully well that such disclosure would contravene the express terms of the NDA.  In fact, Lenders were put on notice, by Think & Learn's counsel that (i) releasing this information would not only be contrary to the terms of the NDA, but would cause irreparable damage to Defendants, especially in relation to the potential fund raises; and (ii) Lenders would be liable for any damage caused.  A copy of this correspondence is attached hereto as **Exhibit 6**.

51.     These threats have increased recently, as Byju's negotiations with alternative financing counterparties ████████████████████ It appears that Lenders are using threats of disclosing Byju's confidential information that might delay or derail those negotiations to exert leverage in Lenders' negotiations with Byju's.

52.     Lenders have also engaged in a relentless campaign to damage Byju's Alpha's relationships with current and potential financing counterparties.  As

Plaintiffs admit in their Complaint, GLAS, on instructions from Lenders, sent "notices to approximately 300 financial institutions providing notice of the remedies exercised." Defendants' requests for copies of these notices have, expectedly, gone unheeded. More recently, Byju's has learned that Lenders have procured their

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

53. An additional tactic has been to make false and misleading statements about the conduct of Byju's Alpha.

54. In Plaintiffs' letter to the Court of May 11, 2023, Plaintiffs assert that Byju's Alpha has made "shocking statements" concerning funds transferred from Byju's Alpha. Plaintiffs' allegations are confected and misleading.

55. On March 15, 2023, pursuant to a reporting requirement under the Credit Agreement, the Parent Guarantor provided GLAS consolidated statements for the financial quarter ended December 2022. This statement demonstrated that funds in the approximate amount of $500 million were available with Byju's Alpha as of December 2022; the statement was accompanied by a compliance certificate signed by myself.

56.     Sometime later, the cash in Byju's Alpha was moved to another Byju's-affiliated entity within the US.   There neither was, nor is, any prohibition on movement of funds.

57.     Around 27 March 2023, in aid of larger negotiations between parties, counsel for Lenders requested Byju's counsel to confirm the funds available with U.S. banking institutions.   Contrary to Plaintiffs' assertion, Lenders' counsel explicitly stated that they did not expect to be given the name of the entity or entities which held the assets.   Consequently, Byju's confirmed to Lenders' advisors, on a professional-eyes only basis, that a sum in the approximate amount of $500 million was being held in the US.   At no stage did Byju's or its advisors indicate that the sums were held by Byju's Alpha.

58.     There has thus been no "dissipation" or improper transfer, or any attempt to hide assets.   Plaintiffs' characterization is misleading.

## Potential Irreparable Harm

59.     The information contained in the Complaint and Motion for Status Quo (including in relation to remedies Lenders have purportedly adopted, amendments to the Credit Agreement, financial strategies, parties' negotiations and outside negotiations), apart from being subject to the terms of a binding NDA, is sensitive, confidential, non-public and potentially market-moving.  Release of this information will cause grave and irreparable harm to Byju's and is likely to adversely affect

20

Byju's position in the market and jeopardize its bargaining position in active negotiations. As stated above, Byju's, and Non-Party Think & Learn in particular, ███████████████████████████████████████████████████ There is a very real possibility that the information set out in the Complaint and the Motion for Status Quo will threaten the fundraising efforts that Byju's has taken great pains to procure in this challenging macro-economic climate. This will cause irreparable injury not only to Think & Learn's (and, indeed, Byju's) business plans and growth prospects, but result in dissemination of false, misleading and inaccurate information in relation to Byju's. Indeed Lenders' advisors have informed Defendants that Plaintiffs intend to invite the public to attend the May 18th hearing on Plaintiffs' motions as a way of making their allegations—based on Byju's Confidential Information—public.

60.     Any adverse publicity at this crucial juncture will result in disastrous consequences, not only in relation to the potential fund raise, but as regards Byju's business operation as a whole. Further, this will likely have a cascading impact on any future fundraising prospects, business growth and development (including expansion plans) of Byju's.

61.     For the duration of this action or further Court order, Defendants can agree not to engage in any transactions outside the normal course of Byju's Alpha's business.

I declare under penalty of perjury under the law of Delaware that the foregoing is true and correct and that I am physically located outside of the geographic boundaries of the United States, Puerto Rico the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

Executed this 15th day of May, 2023, in Dubai, United Arab Emirates.

_____

Riju Ravindran

WD49191

22

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2023 a copy of the foregoing document was

caused to be served via File and Serve*Xpress* upon the following counsel of record:

Lauren K. Neal, Esq.
Elizabeth A. Mullin, Esq.
**MORRIS, NICHOLS, ARSHT &**
   **TUNNELL LLP**
1201 North Market Street
Wilmington, DE 19801

Brock E. Czeschin, Esq.
Susan Hannigan Cohen, Esq.
Nicole M. Henry, Esq.
**RICHARDS, LAYTON &**
   **FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801


 */s/ Joseph B. Cicero*
Joseph B. Cicero (#4388)

# Exhibit 2

**GRANTED WITH MODIFICATIONS**

EFiled: May 22 2023 01:32PM EDT
Transaction ID 70059341
Case No. 2023-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent, and TIMOTHY R. POHL, | ) ) ) ) | |
| | ) | C.A. No. 2023-____-___ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RIJU RAVINDRAN, BYJU'S ALPHA, INC., and TANGIBLE PLAY, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

### [PROPOSED] *STATUS QUO* ORDER

WHEREAS, plaintiffs GLAS Trust Company LLC, in its capacity as Administrative Agent and Collateral Agent ("GLAS") and Timothy R. Pohl ("Mr. Pohl" and, together with GLAS, "Plaintiffs") filed a Verified Complaint Pursuant to 8 *Del. C.* § 225 (the "Complaint") against defendants Riju Ravindran, BYJU's Alpha, Inc. and Tangible Play, Inc. (collectively "Defendants" and with Plaintiffs, the "Parties," and each, a "Party"), a Motion for *Status Quo* Order, a Motion for Expedited Proceedings, and a Brief in Support of Their Motion for Expedited Proceedings and for *Status Quo* Order; and

WHEREAS, the Court of Chancery has considered Plaintiffs' Motion for *Status Quo* Order (the "Motion");

**IT IS HEREBY ORDERED** this ____ day of _____, 2023, as follows:

1.    Plaintiffs' Motion is GRANTED.

2.      Pending further Order of this Court, the Board of Directors (the "Board") of BYJU's Alpha, Inc. ("BYJU's Alpha" or the "Company") shall continue to consist of Timothy R. Pohl as sole director.

3.      Pending further Order of this Court, Mr. Pohl shall continue to serve as the Chief Executive Officer and Secretary of the Company, the sole officer of the Company.

4.      Pending further Order of this Court, Mr. Pohl, the sole director and officer of the Company, shall be provided immediately, and in no event later than within two (2) business days, access to and exclusive control over all the accounts (including all deposit, securities, and commodities accounts, and other bank accounts and similar assets), servers, systems, documents, and information of the Company—including any passwords, account numbers, credentials, permissions, or similar information necessary to facilitate such access and exclusive control—as necessary to perform his roles as sole director and officer of the Company in the ordinary course of business, and no Party shall take any steps to deny or restrict such access and control.

5.      Except upon further Order of the Court or agreement between Plaintiffs, on the one hand, and Defendants, on the other hand, neither (i) the Parties; nor (ii) any of their respective directors, officers, employees, or agents shall cause the

2

Company to take any action outside the ordinary course of business, including, but not limited to:

(a)    taking any further action that could result in a change to the size or composition of the Board;

(b)    hiring and/or appointing any new officer of the Company;

(c)    issuing, selling, distributing, authorizing, establishing, creating, changing, or disposing of any securities of, or interest in securities of, the Company (including without limitation, any common stock, preferred stock, options, warrants or purchase rights);

(d)    authorizing or entering into any contract or arrangement or otherwise binding the Company, directly or indirectly, to sell, transfer, contribute, or otherwise dispose of, pledge, materially encumber or otherwise materially restrict or limit any interest in the Company, or any asset (whether tangible or intangible) in which the Company has an interest (including cash, cash equivalents, and securities), except in the ordinary course of business;

(e)    modifying, amending, or abandoning any contract or arrangement to which the Company is currently a party, except in the ordinary course of business;

(f)    authorizing, issuing, incurring, or assuming new debt or changing the terms of the Company's debt, except in the ordinary course of business;

3

(g)    undertaking, authorizing, approving or directing any action in furtherance of amending, altering, modifying, repealing, or adopting any provision of the Bylaws or the Certificate of Incorporation of the Company;

(h)    filing a bankruptcy petition or acquiring or selling any business or operation of the Company, whether by merger, purchase of assets or equity interest, or otherwise;

(i)    entering into any legally binding commitment with respect to, or agreeing to do, any of the foregoing, except to the extent required by an existing contract or applicable law; or

(j)    [intentionally omitted]

6.    For purposes of the preceding paragraph, the following actions shall be deemed to be actions taken in the ordinary course of business:

(a)    payment of regularly scheduled payments of interest and amortization under the Credit Agreement as they become due and payable;

(b)    payment of payroll, including standard employee benefits;

(c)    payment of recurring costs related to operating infrastructure including rent, information systems and technology, and utilities;

(d)    payment of fees and expenses to professional advisors, including without limitation, financial advisor, attorneys' and accountant fees, except no

4

Company funds may be used to advance any Party's fees or expenses (including but not limited to attorneys' fees) in this action;

(e)    maintenance and update of Company systems; and

(f)    service to existing clients, and solicitation and onboarding of new clients.

7.    The Parties shall not knowingly tamper with, destroy, relocate, or discard any documents or electronic data in their or the Company's possession, custody, or control relating in any way to the matters alleged in the Complaint.

8.    During the pendency of this action, none of the Parties, nor their respective affiliates, directors, agents, employees, attorneys or any other person acting in concert with them, shall take, or cause to be taken, any action in contravention of this Order.

9.    The restrictions imposed by this Order may be waived on a case-by-case basis by written agreement of the Parties or modified by the Court for good cause shown.

<br>

_____

Vice Chancellor Morgan T. Zurn

RLF1 29052762v.1

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Morgan Zurn |
| **File & Serve Transaction ID:** | 70055710 |
| **Current Date:** | May 22, 2023 |
| **Case Number:** | 2023-0488-MTZ |
| **Case Name:** | CONF/ORD - GLAS Trust Company LLC in its capacity as Administrative Agent and Collateral Agent and Timothy R. Pohl v. Riju Ravindran, et al. |
| **Court Authorizer:** | Morgan Zurn |

**Court Authorizer Comments:**

This order shall be interim if the parties continue to disagree about the provision previously supplied as Section 5(j); the standards for amending a status quo order shall not govern further discussions of that provision. Otherwise, this status quo order shall govern subject to those standards pending the final adjudication of this action.

**/s/ Judge Morgan Zurn**

# Exhibit 3



**DENIED**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GLAS TRUST COMPANY LLC, in its capacity as Administrative Agent and Collateral Agent, AND TIMOTHY R. POHL, | ) ) ) ) ) |
| Plaintiffs, | ) C.A. No. 2023-0488-MTZ ) ) |
| v. | ) ) |
| RIJU RAVINDRAN, BYJU'S ALPHA, INC., and TANGIBLE PLAY, INC., | ) ) ) |
| Defendants. | ) ) |

### [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO ENFORCE *STATUS QUO* ORDER AND TO COMPEL AN ANSWER TO INTERROGATORY NO. 1

WHEREAS, this Court having considered Plaintiffs' Motion to Enforce *Status Quo* Order and to Compel an Answer to Interrogatory No. 1 (the "Motion"), and for good cause shown:

IT IS HEREBY ORDERED THIS _____ day of _____, 2023, that:

1.    The Motion is GRANTED.

2.    Defendants are ordered to comply with Paragraph 4 of the *Status Quo* Order and immediately, but no later than three business days after entry of this order, provide Pohl with access to and exclusive control over all BYJU's Alpha, Inc. ("BYJU's Alpha") accounts, including the account

from which the >$500 million transfer occurred, and all records of BYJU's Alpha authorizing or reflecting that transfer.

3.     Defendants are compelled to answer Plaintiffs' Interrogatory No. 1 within two business days of entry of this order.

_____

Vice Chancellor Morgan T. Zurn

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---:|:---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Morgan Zurn |
| **File & Serve Transaction ID:** | 70242172 |
| **Current Date:** | Jun 26, 2023 |
| **Case Number:** | 2023-0488-MTZ |
| **Case Name:** | CONF/ORD - GLAS Trust Company LLC in its capacity as Administrative Agent and Collateral Agent and Timothy R. Pohl v. Riju Ravindran, et al. |
| **Court Authorizer:** | Morgan Zurn |

**Court Authorizer Comments:**

The status quo order in place pending resolution of this Section 225 action requires the interim director be provided "access to and exclusive control over all the accounts . . . , documents, and information of the Company . . . as necessary to perform his roles as sole director and officer of the Company in the ordinary course of business." In the opposition, defendants' counsel represents access and control over the three bank accounts the Company uses, and their records, has been provided. That is all that the status quo order requires. Counsel will be held to the representation that access to all of the Company's bank accounts and their records has been provided: based on that representation, there has been no violation of the status quo order.

If those records are inconsistent with the Compliance Certificate and the May 15 declaration, that is an issue for another day. Further investigation into the $500 million transfer that predated entry of the status quo order is not properly within the scope of this Section 225 action. See Box v. Box, 697 A.2d 395, 398 (Del. 1997). Plaintiff states that the transfer is relevant to whether an Event of Default has occurred to support the disputed appointment of the interim director. To my mind, at this stage, the transfer is at most a reaction to a potential Event of Default, but not an input into whether an Event of Default actually occurred. Plaintiff may rely on Ravindran's reaction as evidence that he perceived an Event of Default had occurred, and for other admissible purposes; but Plaintiff has no basis to further investigate the transfer itself in this action.

**/s/ Judge Morgan Zurn**

# Exhibit 4

## Affidavit Concerning Camshaft Capital Fund, LP

State of Georgia

County of Fulton

BEFORE ME, the undersigned authority, on this day personally appeared Craig Lerman as agent for Lerman Law Associates, PC, who being first duly sworn, deposes and says that:

1. A Certificate of Limited Partnership for Camshaft Capital Fund, LP was filed with the Division of Corporations for the State of Delaware on or about Augst 13, 2020.

2. Such certificate of Limited Partnership named Legaline Corporate Services, Inc. ("Legaline") to serve as the Registered Agent and office for Camshaft Capital Fund, LP in the State of Delaware.

3. Though Legaline was named in the Certificate of Partnership, due to an error and inadvertent oversight, Legaline was not notified as to its designation to serve as the registered agent.

Dated this 20th day of September 2023.

FURTHER AFFIANT SAYETH NOT.

Affiant

By Craig K. Lerman as agent for Lerman Law Associates, PC

Sworn to and subscribed before me this

20 day of September 2023.

Notary Public State of Georgia
My commission expires 5/25/2027

KYLE RINAUDO
NOTARY
EXPIRES
GEORGIA
May 25, 2027
PUBLIC
COBB COUNTY