## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BYJU's ALPHA, INC., | Case No. 24-10140 (JTD) |
| Debtor. | **Objection Deadline: March 14, 2024 at 4:00 p.m. (ET)**<br>**Hearing Date: April 9, 2024 at 10:00 a.m. (ET)** |

### CAMSHAFT'S MOTION TO DISMISS DEBTOR'S CHAPTER 11 CASE[1]

Camshaft Capital Fund, LP, Camshaft Capital Advisors, LLC, and Camshaft Capital Management, LLC (collectively, "Camshaft") hereby file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), dismissing the chapter 11 case of BYJU's Alpha, Inc. (the "Debtor") pursuant to sections 105(a) and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. §§ 105(a) and 1112(b). In support of the Motion, Camshaft respectfully states as follows:

### PRELIMINARY STATEMENT

1. The Debtor filed its Chapter 11 petition (the "Petition") in a bad faith attempt to take refuge in this Court and shield itself from negative outcomes in litigation proceedings pending in various state courts. Through the Petition, the Debtor has taken what is essentially a two-party dispute, which was pending in Florida state court through an action brought by GLAS (as defined below) against Camshaft (the "Florida Action"), and moved it to this Court in an effort to seek out a more favorable jurisdiction.

---

[1] Camshaft filed this document in a similar form as a joinder to a now-withdrawn motion to dismiss (*see* D.I. 102), but is now re-filing it as a motion.

2.      In its first day filings, the Debtor failed to show any basis on which the Petition may be viewed as an attempt to use the bankruptcy procedures in good faith.  In order to be considered a good faith filing, a bankruptcy petition must: (1) not be the result of unfair litigation tactics, and (2) serve a valid reorganizational purpose.  The Petition fails on both counts.

3.      *First*, the Petition was conspicuously filed <u>less than one day</u> before a hearing was to be held in the Florida Action (that had been going on for almost 5 months) on the merits of the claims and the propriety of GLAS's discovery requests.  Instead of continuing to litigate in state court, the Debtor decamped to this Court, staying the Florida Action and any judgment that was to be rendered there.  And, one day after filing the Petition, the Debtor commenced an adversary proceeding (the "<u>Adversary Proceeding</u>") by filing a complaint (the "<u>Adversary Complaint</u>"), which asserts the same type of fraudulent transfer claims that had been pending in the Florida Action.  The Debtor's intent is clear: to employ bad faith litigation tactics against Camshaft in an effort to secure a more favorable venue and take a second bite at the apple in asserting its fraudulent transfer claims, thereby undermining the ongoing judicial process in Florida.  The dispute between the Debtor and Camshaft belongs in state court, which is more than equipped to resolve the disagreement between the parties.

4.      *Second*, the Debtor does not seek protection of this Court to effectuate a valid restructuring effort, as is required by the Bankruptcy Code.  This failure underscores that the Debtor's intent is solely to derail the judicial proceeding in Florida.  To begin with, nowhere in its first day motions does the Debtor explain how it will reorganize while in bankruptcy.  There is no mention of a sale process or recapitalization effort, or any other tactic debtors commonly use while in bankruptcy to rehabilitate themselves.  Instead, the Debtor seeks use of this Court for one purpose only: to claw back what it believes to be improperly transferred funds.  Use of the

2

protections of the Bankruptcy Code to claw back alleged fraudulent transfers—a remedy that can be sought in state court—is not a valid restructuring purpose. The Debtor's failure to state a valid basis on which it will pursue a restructuring through this proceeding also disqualifies the Petition as a bad faith filing, which is an affront to this Court and the Florida state court.

5.      Accordingly, the Court should grant the Motion and dismiss the chapter 11 case.

## FACTUAL BACKGROUND

6.      As of 2022, the Debtor was a wholly-owned indirect subsidiary of Think & Learn Pvt Ltd ("T&L"), a private limited company under the laws of India with its registered office in that country. T&L is part of a group of related business entities, collectively called "BYJU's," with our understanding that BYJU's comprises the world's largest private education technology business, providing personalized learning programs to more than 150 million kids around the world with an emphasis on young children who do not have access to typical educative resources. Ravindran was the former sole director and officer of the Debtor.

7.      The Debtor is the borrower under the credit agreement (the "Credit Agreement") for a $1.2 billion term loan facility (the "Term Loan"). (*See* **Exhibit B** hereto.) The Debtor's obligations under the Term Loan are guaranteed by various of its affiliates, including Tangible, and by its parent, T&L. GLAS Trust Company LLC ("GLAS") acts as the Administrative and Collateral Agent ("Administrative Agent") under the Term Loan.

8.      Upon information and belief, the lenders were unable to make the Term Loan directly to an Indian company for various regulatory reasons. As a result, a special purpose vehicle ("SPV"), BYJU's Alpha, the Debtor, was created in the United States solely for the purpose of entering into the Credit Agreement, utilizing the proceeds to: make investments (*i.e.*, investing in an institutionally serviced ([*i.e.* Audited by Deloitte] *see* **Exhibit C**) and valued ([*i.e.* institutional

3

valuation policy] *see* **Exhibit D**) hedge fund (Camshaft) to receive a steady appreciated return from a fixed income portfolio administered by a Tier 1 administrator [Apex Fund Services]) (*see* **Exhibit E**) and transfer monies to other T&L subsidiaries/affiliates for the main purpose of funding the business operations of its parent/affiliate.[2]  For clarity, the Use of Proceeds provision in the Credit Agreement explicitly permits the Debtor to engage in those actions:

> Section 5.8. Use of Proceeds. The proceeds of the Term Loans will be used for (i) funding Transaction Costs and (ii) working capital and general corporate purposes of the Group, including for the making of Investments (including acquisitions) permitted (or not expressly prohibited) hereunder (notwithstanding anything to the contrary under this Agreement, such Investments or acquisitions shall be permitted without any requirement to satisfy any Consolidated Total Net Leverage Ratio or any other financial or ratio-based metrics).

(Ex. B, § 5.8.)

9.      Thus, as repeatedly asserted by GLAS in the Florida Action, the SPV was never intended to conduct any business or earn any income.  Its only purposes was to make investments and transfer monies to other T&L subsidiaries/affiliates until the Loan proceeds were depleted to zero in accordance with the requirements of the Credit Agreement.  As such, the term insolvency does not apply to this SPV and it is not an entity that meets any requirements of United States bankruptcy laws for restructuring or any associated protections.

10.      As of May 3, 2023, when GLAS and Pohl commenced the Delaware Action (as defined below), it is important to note that the Debtor had made all requisite payments under the Credit Agreement, on time and in full (with it being known that at least $139,958,326.75 was paid). (*See* **Exhibit F**.)  Despite this payment history, certain unnamed lenders, on March 3, 2023 and

---

[2]      The dates for the statements in Ex. E reflect when they were printed or saved, not when they were generated.

acting through GLAS, sent notices purporting to accelerate the Term Loans and to seize control of the Debtor by purporting to replace Ravindran with Pohl on the basis of supposed non-monetary "events of default," and replace Byju's Pte. Ltd. with GLAS as sole shareholder. This acceleration of the Term Loans spurred significant litigation in a variety of state courts, as well as this bankruptcy case.

11.    It is clear that the reason the "creditors" (the funds Ares, Davidson Kempner, HPS, CQS, Redwood, HG Vora, TOR, Varde, Vertitas and others) are represented by GLAS as "unnamed lenders" is to prevent the public from knowing their identity, opportunistic activity, and unethical tactics. These "creditors" include the apex titans (and their cohort) in the distressed credit space, and to simply generate a profit, the "creditors" are killing the continuity of an educational company whose focus is on services for little children and to bully a comparatively smaller, but rising 26, now 27 year old fund manager who is a non-party to the Credit Agreement. Ironically, most of them have been disqualified per the Credit Agreement because they are trading or acquiring distressed debt. (*See* Ex. B at 20; **Exhibit G**.) Their plethora of machinations also include lawsuits that were filed to feed press outlets around the globe falsehoods about Camshaft (under the guise of litigation privilege). Such actions have lowered the Term Loan's trading price, allowing the "creditors" to buy more interests in the Debtor at lower prices and creating an opportunity to generate higher profits than would be realized through the Term Loan repayment in full. Bloomberg data for the Term Loan shows steep drops in prices and upticks in buy volumes coinciding with bad press/litigation news related to the Debtor and other associated parties (such as Camshaft). Further, before the "creditors" took action in May 2023, it is known that the Debtor was gearing up for an IPO. Given the Debtor's latest private valuation at 22 Billion, it would have been the largest IPO in U.S. history, with Ares's CEO David Kaplan writing that "we would value

the Company on a pre-money total equity value of $50 billion." (**Exhibit H**).  Additionally, for

the Debtor's IPO preparation, Camshaft's affiliated consulting business was assisting T&L with a

half billion dollar debt raise, which included very late stage funding conversations (*i.e.* non-

binding terms from Morgan Stanley).  When news of the May 2023 GLAS broke out, the Debtor's

IPO plans and Camshaft's affiliated consulting entity's Byju's debt raising efforts subsequently

ceased.

I.      **The Delaware Action**

        12.     On May 3, 2023, Pohl and GLAS commenced a proceeding in Delaware, seeking,

among other things, a determination from the Court of Chancery under Section 225 of the

Delaware General Corporations Law that Pohl was correctly appointed as sole director of the

Debtor (the "<u>Delaware Action</u>").

        13.     After a one-day trial on a paper record on August 4, 2023, the Court of Chancery

entered judgment in favor of GLAS and Pohl declaring that Ravindran was validly removed as

sole director and officer of the Debtor and that Pohl was properly appointed to those posts in his

stead.  The judgment was a result of the Court of Chancery's November 2, 2023 bench ruling,

which Ravindran maintains was the product of several legal errors involving, *inter alia*, incorrect

contract interpretation and a failure to correctly apply the doctrines of legal impossibility and

unconscionability under governing New York law, as well as incorrectly treating certain

dispositive arguments as having been waived.  This proceeding, including Ravindran's right to

appeal the court's judgment, has been stayed by this bankruptcy.

II.     **The New York Action**

        14.     On June 5, 2023, Tangible Play, along with certain of its affiliates (T&L, Byju's

Pte. Ltd., Epic! Creations Inc., Great Learning Education Pte. Ltd. and Neuron Fuel, Inc.),

commenced an action in the Supreme Court of the State of New York against GLAS (the "New York Action"). Plaintiffs in the New York Action filed an amended complaint on December 11, 2023, adding Lenders Redwood Master Fund, Ltd., Redwood Drawdown Master Fund III, LP, and Redwood Opportunity Master Fund, Ltd. (collectively, "Redwood") as defendants.  The amended complaint in the New York Action sought, among other things, a declaration that plaintiffs had not defaulted under the Credit Agreement and sought damages for breach of the Credit Agreement on the part of defendants, as well as tortious interference with plaintiffs' business relations. Additionally, plaintiffs in the New York Action sought a declaration that Redwood had been properly designated a disqualified lender.

15.     Under the Credit Agreement, T&L, acting under an irrevocable agency from the Debtor, is permitted to designate certain entities as disqualified lenders.  Among those are entities whose "primary activity is the trading or acquisition of distressed debt."  (*See* Ex. B at 20.) Disqualified lenders are subject to certain restrictions, including restrictions on their ability to vote for GLAS, as Administrative Agent, to take certain actions.

16.     On June 5, 2023, T&L, acting under the irrevocable agency, designated Redwood as a disqualified lender.  Contrary to its duty under the Credit Agreement, GLAS declined to treat Redwood as a disqualified lender.  Resolution of the New York Action, therefore, implicates, among other things, GLAS's authority to act on behalf of lenders.

## III.    The Florida Action

17.     GLAS, in coordination with the Debtor, commenced the Florida Action on September 5, 2023 against Camshaft.  GLAS asserted the same legally deficient fraudulent transfer claims that are advanced against Camshaft in the Adversary Proceeding.  GLAS acknowledged in the complaint in the Florida Action (the "GLAS Complaint") that the purpose of the case was,

among other things, to "ascertain what happened to [the Debtor's] money." (D.I. 78 , Ex. A, ¶ 5.) In the GLAS Complaint, GLAS indicated that it would seek "expedited discovery" from Camshaft to determine the "identity and activities" of an alleged John Doe entity, which GLAS asserted was the recipient of "certain improper transfers or distributions" from Camshaft sometime between January and May 2023. (*Id.* at ¶¶ 9, 70.)

18.     To that end, on September 7, 2023, GLAS filed an *ex parte* submission seeking emergency discovery of Camshaft on the same topics of discovery that are involved in the Adversary Proceeding.   On September 11, 2023, the Florida court initially granted expedited discovery but, on October 3, 2023, it vacated the initial decision after Camshaft raised several troubling facts surrounding the procurement of the *ex parte* relief.   Specifically, Camshaft noted GLAS's failure to mention that, more than three months earlier, it had sought the same discovery in an earlier action and the request was denied, which demonstrated the lack of any emergency.

19.     On October 3, 2023, in addition to vacating the *ex parte* relief, the Florida court denied GLAS's emergency motion to compel discovery from Camshaft and granted Camshaft's motion to proceed with discovery on an ordinary schedule.   Camshaft then filed dispositive motions to dismiss the GLAS Complaint and a motion to stay discovery pending resolution of those motions, which, if granted, would dispose of the case in its entirety and obviate the need for discovery.   GLAS objected to the motions and argued, in opposition to the motion to stay discovery, that discovery as to the whereabouts of the money should proceed notwithstanding the motions.   Rather than await the outcome of those motions, which were set for hearing on February 2, 2024, the Debtor filed the Petition on February 1, 2024.

## IV.    The Duplicative Adversary Proceeding

20.    On February 2, 2024, one day after filing the Petition, the Debtor filed the Adversary Complaint for the "avoidance and recovery" of the $533 million allegedly transferred from the Debtor to the Camshaft under federal and Florida state law.  This proceeding is duplicative of the Florida Action, in that it is based on the same alleged facts and seeks the same remedies.

## ARGUMENT

### The Bankruptcy Case Must be Dismissed For Cause as a
### Bad Faith Bankruptcy Filing Pursuant to Section 1112(b) of the Bankruptcy Code

21.    Section 1112(b) of the Bankruptcy Code provides that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  When a party seek to dismiss a bad faith filing under section 1112(b), the "burden is on the bankruptcy petitioner to establish good faith." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (citation and quotation marks omitted).

22.    The Third Circuit has identified two key elements of a good faith bankruptcy filing. *First*, the petition cannot have been filed "merely to obtain tactical litigation advantages." *NMSBPCSLDHB, L.P., v. Integrated Telecom Express, Inc. (Integrated Telecom Express)*, 384 F.3d 108, 120 (3d Cir. 2004); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (dismissing petition on basis that petitioning debtor was not seeking to reorganize and was instead using the bankruptcy court to gain litigation advantages).  *Second*, the bankruptcy petition must serve a valid reorganizational purpose.  *See Integrated Telecom.*, 384 F.3d at 120.

23.     Generally, the court makes a good faith determination through the consideration of circumstantial evidence surrounding the bankruptcy filing. *See Y.J. Sons & Co. v. Anemone, Inc. (In re Y.J.Sons & Co.)*, 212 B.R. 793, 801 (D.N.J. 1997). In addition to the factors listed above, this includes the review of several, distinct equitable limitations that courts have placed on chapter 11 filings. *See SGL Carbon*, 200 F.3d at 165-66. Courts have enforced such equitable limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws. *Id.* at 165 (citing *In re Marsch*, 36 F.3d 825, 828 (9th Cir.1994)).

24.     The Third Circuit has enumerated a number of these equitable considerations, which include whether the debtor: (a) has a single asset; (b) has few unsecured creditors; (c) has no ongoing business or employees; (d) has filed the petition on eve of foreclosure; (e) is engaged in a two-party dispute which can be resolved in pending state court action; (f) has no cash or income; (g) has no pressure from non-moving creditors; (h) has filed a previous bankruptcy petition; (i) has engaged in improper prepetition conduct; (j) has no possibility of reorganization; (k) was formed immediately prepetition; (l) filed solely to create automatic stay; as well as (m) the subjective intent of the debtor. *See Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002) (applying the above factors); *see also In re Jer/Jameson Mezz Borrower II, LLC,* 461 B.R. 293, 298-99 (Bankr. D. Del. 2011) (same).

25.     The Petition exhibits a number of the indicia of bad faith, warranting dismissal of this bankruptcy proceeding.

I.      **The Debtor's Case is a Two-Party Dispute Filed to Gain a Tactical Litigation Advantage**

26.      Filing a bankruptcy petition "merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws.'"  *SGL Carbon*, 200 F.3d at 165 (citing *Marsch* 36 F.3d at 828); *see also In re GVS Portfolio I B, LLC*, No. 21-10690, 2021 Bankr. LEXIS 1513, at *21 (Bankr. D. Del. June 4, 2021) ("A case is filed in bad faith 'if the petition is filed merely to obtain a tactical litigation advantage.'") (citation omitted).  Further, a bankruptcy petition that is a two-party dispute "[does] not belong in the bankruptcy courts."  *In re Mazzocone*, 183 B.R. 402, 420 (Bankr. E.D. Pa. 1995), *aff'd,* 200 B.R. 568 (E.D. Pa. 1996) (dismissing case that involved a two-party dispute that could be resolved in non-bankruptcy forums).  Here, the Debtor's bad faith litigation tactics and the two-party nature of the proceeding requires the Petition to be dismissed as a bad faith filing.

A.      **The Petition Is the Result of Unfair Litigation Tactics**

27.      "Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation."  *In re Integrated Telecom* F.3d at 120 (citing *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983)). Where the "timing of the filing of the Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."  *See In re HBA E., Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988) (holding impending deadlines in state court litigation led the debtor to file bankruptcy which indicated bad faith filing); *see also In re Rent-A-Wreck of Am., Inc.,* 580 B.R. 364, 387 (Bankr. D. Del. 2018) (discussing that debtor cannot "fabricate the basis of a good faith filing" through a desire to avoid the outcome of prepetition litigation).

28.     The conspicuous timing of this bankruptcy filing cannot be overstated.  The Debtor

filed the Petition on February 1, 2024, <u>less than one day</u> prior to the hearing scheduled in the

Florida Action on the motions to dismiss the matter and stay pending discovery.  Upon the filing

of the Petition, the Florida Action was stayed and GLAS no longer had to litigate its fraudulent

transfer claims in what it clearly viewed to be an unfavorable jurisdiction.  Further, the order issued

in the Delaware Action appointing Pohl as sole director and officer of the Debtor is subject to an

appeal by the Debtor's prior management.  The Delaware Action has also been stayed, foiling any

attempt to appeal the Chancery Court's order.  The Debtor filed the Petition to avoid impending

deadlines in the Florida and Delaware Actions and to require Camshaft to litigate in bankruptcy

court instead, making this a bad faith filing.  *See In re HBA E., Inc.,* 87 at 260 ("Chapter 11 relief

should not be available to entities filing to obtain a perceived advantage in litigation with others

or to provide an alternate judicial forum.").

29.     The Debtor defends the bankruptcy filing on the basis that it is "the best way…to

locate, secure, and recover funds transferred away" from the Debtor.  (Pohl Decl. ¶ 17.)  However,

if the Debtor was truly worried about preserving the assets of its estate and locating money it

believes to have been wrongfully transferred, it would have filed for bankruptcy as early as

November 2023, when the interim restriction on Pohl's right to file the Debtor for bankruptcy was

lifted. (Pohl Decl. ¶ 85.)  It did not do so.  Instead, the Debtor and GLAS continued to pursue

litigation in various state court proceedings for nearly three months after Pohl had the authority to

file bankruptcy.  Only when the Debtor and GLAS believed their position in those litigations to be

in danger—either as a result of unfavorable rulings or appeals—did the Debtor file for bankruptcy

and move its fraudulent transfer claims to this Court.  Transferring ongoing litigation to a more

favorable jurisdiction is a blatant use of unfair litigation tactics and an indication of the bad faith nature of the Petition.

**B.      The Petition Is a Two-Party Dispute and Therefore Is a Bad Faith Filing**

30.      In addition to the unfair litigation tactics employed by the Debtor, the Petition relates to a two-party dispute between the Debtor and Camshaft that can, and should be, resolved in state court.  Chapter 11 cases that represent a two-party civil lawsuit involving non-bankruptcy law under the guise of reorganization indicate a bad faith filing.  *See In re HBA E., Inc.*, 87 B.R. at 260 ("Chapter 11 was never intended to be used as a fist in a two party bout."); *see also LaSalle Bus. Credit v. Toth (In re Toth)*, 269 B.R. 587, 590 (Bankr. W.D. Pa. 2001) ("'Several courts have held that the filing of a bankruptcy petition as a litigation tactic, or to resolve what is essentially a two-party dispute, is an indication of a bad faith filing.") (quoting *In re Bus. Info. Co., Inc.*, 81 B.R. 382, 385 (Bankr. W.D. Pa. 1988)).

31.      Courts in this Circuit and others regularly dismiss bankruptcy petitions that are two-party disputes on the basis that "such disputes do not belong in bankruptcy court."  *In re Mazzocone*, 183 B.R. at 420 (holding bankruptcy case was a two-party dispute involving only state law issues and therefore should be dismissed); *see also Jer/Jameson*, 461 B.R. at 299-300 (Bankr. D. Del. 2011) (dismissing bankruptcy case as two-party dispute where parties could pursue rights in state court); *In re Scarborough-St. James Corp.*, No. 15-10625 (LSS), 2015 WL 5672628, at *2 (Bankr. D. Del. Sept. 24, 2015) (holding cause existed to dismiss bankruptcy case on the basis that it was a  two-party dispute already being litigated in state court); *In re Shar*, 253 B.R. 621, 636 (Bankr. D.N.J. 1999) (finding dismissal was appropriate because debtor's reorganization efforts was essentially a two-party dispute with judgement creditors); *In re Outta Control Sportfishing,*

*Inc.*, 642 B.R. 180, 186 (Bankr. S.D. Fla. 2022) (dismissing bankruptcy filing as two-party dispute that could be resolved in district court proceeding stayed by the bankruptcy).

32.     Analogous to the situation at hand, in *In re GVS Portfolio I B, LLC*, a borrower defaulted on its loan and when the lender took enforcement action, the borrower filed for bankruptcy.  2021 Bankr. LEXIS 1513, at \*20-22 (Bankr. D. Del. June 4, 2021).  The court found that the two-party nature of the dispute between the lender and borrower, in conjunction with other inequitable facts, indicated that the bankruptcy petition was filed in bad faith.  *Id.*  The court dismissed the petition on the basis that "there is nothing that need happen in [the bankruptcy court] that cannot happen in state court," and thus the debtor failed to meet its "burden that the bankruptcy petition serves a valid bankruptcy purpose."  *Id.* at \*21.

33.     GLAS has already commenced litigation against Camshaft on the same type of fraudulent transfer claims the Debtor has brought in the Adversary Proceeding.  As explained above, GLAS commenced the Florida Action on September 5, 2023, in which it asserted fraudulent transfer claims against Camshaft under the Florida Uniform Fraudulent Transfer Act ("FUFTA").  One day after the Debtor filed the Petition (which of course stayed the Florida Action), it filed the Adversary Proceeding, wherein it asserted the same fraudulent transfer claims against Camshaft.[3] The discovery sought by the Debtor in the Adversary Proceeding is in fact substantially the same discovery GLAS sought (and has thus far been denied) in the Florida Action.  The Debtor has taken a two-party dispute between Camshaft and GLAS, and transferred it here to continue litigating in what the Debtor believes to be a more favorable jurisdiction.

---

[3]     The Adversary Proceeding includes claims for recovery of fraudulent transfer under Bankruptcy Code Sections 544(b) and 548(a)(1), claims which were not brought in the Florida Action.  However, the claims under the Bankruptcy Code have the same elements as claims for fraudulent transfer claims under the FUFTA, Fla. Stat. § 726.101 *et seq.*

34.     The fraudulent transfer claims can, and should, be resolved in Florida state court, not this Bankruptcy Court.  As in *GVS Portfolio*, there is nothing that need happen in this court that cannot be accomplished in state court. 2021 Bankr. LEXIS 1513, at *21. The Debtor knows this, which is why the original proceeding against Camshaft was brought in Florida state court.  In addition to state court being the most logical court to hear this two-party dispute, a significant amount of briefing has already occurred in the Florida Action, and it would be most efficient for the litigation to continue there.  The Debtor's attempt to force Camshaft to litigate a two-party dispute in this Court is a misuse of the Bankruptcy Code and thus, the Petition must be dismissed as a bad faith filing.

## II.     The Debtor's Case Serves No Valid Reorganizational Purpose

35.     The basic purpose of a chapter 11 filing is to "preserv[e] going concerns," and "maximiz[e] property available to satisfy creditors." *In re Integrated.*, 384 F.3d at 119 (citation omitted).   In situations "[w]here there is no going concern to preserve," the debtor must affirmatively prove that a chapter 11 liquidation would still "maximize value."  *United States Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital LLC)*, 572 B.R. 582, 590 (Bankr. W.D. Pa. 2017).

36.     Here, there is no dispute that the Debtor is not a "going concern" that can be reorganized successfully under chapter 11.  The Debtor is a single-purpose financing vehicle with no employees or operations and limited assets.  (Pohl Decl. ¶ 24.)  The Debtor was created for the sole purpose of being the borrower under the Term Loan.  *See In re 15375 Mem'l Corp.*, 589 F.3d at 619 (noting there was "no going concern to preserve" where the debtor had no employees, offices or business other that handling existing litigation).   The Debtor has one obligation—the Term

Loan—but otherwise no debts, interests or business to conduct.  There is no going-concern to protect here.

37.     Therefore, to establish a valid bankruptcy purpose, the Debtor must instead show the chapter 11 case will maximize the value of the Debtor's estate, and that such value would be lost outside of bankruptcy.  *See id.*  The Debtor has not made, and cannot make, this showing.

38.     "To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost—not merely distributed to a different stakeholder—outside of bankruptcy."  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 120 (3d Cir. 2004). Here, the Debtor has a singular stated purpose in filing the Petition: to locate and secure the $533 million it believes to be missing.  (Pohl Decl. ¶ 1.)  However, this purpose is not value-maximizing.  Locating and securing the $533 million will not provide any benefit for creditors that could not otherwise be realized outside of the bankruptcy court.  The relief sought by the Debtor in this Court is the same as would be provided in the Florida Action.

39.     The court's ruling in *Jer/Jameson* is instructive on this point.  There, the debtor, a single purpose entity, filed for bankruptcy the day before a state foreclosure sale was to take place. The secured lender filed a motion to dismiss on the basis that the petition was filed in bad faith, which the court granted.  461 B.R. at 296-97.  In its decision, the court found no basis on which the debtor, a single purpose entity, could reasonably be rehabilitated or reorganized through the chapter 11 proceeding.  *Id.* at 302-03.  Further, the debtor provided no evidence "that more value [would] be realized in bankruptcy than could have been realized without it," as there was no indication that the debtor's purported refinancing and restructuring efforts would be more successful in bankruptcy court then out.  *Id.* at 303.  The debtor had means to adequately protect its interests outside of bankruptcy court, and there was no evidence that a bankruptcy proceeding

would be more cost effective than other litigation. *Id.* at 303-04. All of this taken together made bankruptcy court an improper venue. *Id.*

40.    Here, as in *Jer/Jameson,* the Debtor provides no evidence that a chapter 11 proceeding for this single purpose entity will provide or maximize value of the Debtor's estate. The Pohl Declaration includes substantial discussion regarding how the bankruptcy proceeding can be and should be used to locate and secure the $533 million. (Pohl Decl. ¶¶ 17, 88.) However, pursuing turnover of the $533 million in bankruptcy court, through prosecution of the exact same claims against Camshaft pursued in the stayed Florida Action, will not create value that could only be obtained through bankruptcy. In other words, there is nothing to be gained from proceeding in bankruptcy court that could not otherwise be sought and gained in Florida state court.

41.    The Debtor additionally claims this bankruptcy case will provide a single forum for all pending litigation to be heard in a manner that is efficient and cost effective, thereby presumably providing value to the estate. (Pohl Decl. ¶ 89.) However, consolidation of litigation into a single forum is an insufficient basis to support the need to file for bankruptcy. *See 15375 Mem'l Corp.*, 589 F.3d at 621 (holding moving litigation in one forum does not serve a valid bankruptcy purpose where "centralization of claims in a single forum does not implicate the basic distribution problem bankruptcy was designed to resolve").

42.    In this case, the Delaware Action has been extensively litigated and has resulted in rulings from the Chancery Court. The Florida Action is similarly advanced with the parties having briefed numerous issues that are now ripe for decision by that court. By filing the Petition, the Debtor has stayed those proceedings, forcing the parties to litigate the same issues in a new venue. This is neither efficient nor cost effective. In his declaration, Pohl further states that he is interested in "obtaining recoveries for the Debtor's creditors and equitably distributing those recoveries,"

thus ostensibly using the bankruptcy proceeding to create value for creditors.  (Pohl Decl. ¶ 87.)
This statement is disingenuous as Pohl knows that there is only one creditor here—GLAS.  The
Petition was filed for the benefit of GLAS, and any assets recovered would be distributed among
the group of secured lenders on whose behalf GLAS is acting.[4]  The Debtor is not asking the
Bankruptcy Court for any sort of relief that could not otherwise be provided by the relevant state
court, and thereby the bankruptcy case will create no value for the Debtor's estate.

43.    Further, upon filing a chapter 11 petition, the Bankruptcy Code provides a debtor
with numerous protections—the automatic stay, the exclusive right to file a plan of reorganization,
the discharge of debts, broad investigation and litigation powers—to name just a few.  These
protections pose hardship on a debtor's creditors, and a debtor is only entitled to such protections
at the expense of creditors if its petition is filed in good faith.  *See SGL Carbon*, 200 F.3d at 165.

44.    Here, the Debtor has sought refuge in the Bankruptcy Court to take advantage of
the numerous protections and benefits the Bankruptcy Code has to offer a debtor.  However, the
fact that the Petition, by the Debtor's own admission, serves only to locate the $533 million of
loan proceeds (which were invested in accordance with the terms of the Credit Agreement), and
not to effectuate the reorganization of the Debtor, the Debtor should not be afforded the protections
of the Bankruptcy Code.  (*See* Pohl Decl. ¶¶ 1, 93.)  The Debtor has been able to stay the Florida
Action, depriving Camshaft the right to litigate the fraudulent transfer claims.  The Debtor has also
been afforded the right to seek expedited discovery and permissive intervention to gain a favorable
litigation position over Camshaft that it would not otherwise be entitled to outside of bankruptcy

---

[4]    The Debtor makes a passing reference to more than $400 million in transfers made by the Debtor
after the first event of default that Pohl may or may not seek to clawback.  (Pohl Decl. ¶ 95.)  To the extent
such transfers were made and were improper, there is no reason to believe that Pohl could not make use of
the applicable state fraudulent transfer laws to pursue such amounts in state court.

court.  To allow the Debtor to continue to prosecute its bankruptcy Petition would undermine the goals of the Bankruptcy Code and improperly reward a bad faith filer.

### III.    Additional Indicia of Bad Faith are Present Here

#### A.    This Is a Single Asset Case

45.    The Debtor's sole asset is the $1.2 billion Term Loan.  (*See* Pohl Decl. ¶¶ 3, 24.) Although "there is nothing inherently improper in a single asset debtor filing" for chapter 11 bankruptcy, *Primestone,* 272 B.R. at 558 (citation omitted), courts have held that this factor weighs against a finding of good faith on the part of the debtor.  *See, e.g., Jer/Jameson*, 461 B.R. at 299 (chapter 11 filing was in bad faith where, among other things, the Debtor had a single asset); *Primestone,* 272 B.R. at 558 (same); *see also SGL Carbon,* 200 F.3d at 165 (same).

#### B.    There Are No Unsecured Creditors

46.    Neither the Pohl Declaration nor the Petition asserts that the Debtor has any unsecured creditors.  (*See generally* Adv. D.I. 7; Pohl Decl.)  Numerous courts have recognized that an unsecured claims pool that consists predominantly or exclusively of professional fee claims weighs in favor of a finding of bad faith.  *See, e.g., In re EFL Partners X,* No. 13-11495-MDC, 2013 WL 4508423, at *5 (Bankr. E.D. Pa. Aug. 23, 2013); *Jer/Jameson,* 461 B.R. at 299; *St. Paul Self Storage Ltd. P'ship v. Port Auth. (In re St. Paul Self Storage Ltd. P'ship),* 185 B.R. 580, 583 (B.A.P. 9th Cir. 1995) (the debtor's "lack of creditors, other than insiders and its own professionals, further indicated . . . that protection under the Bankruptcy Code was not necessary to a . . . legitimate reorganization").

#### C.    There Is No Pressure from Non-Moving Creditors

47.    To the extent that there are any unsecured creditors with valid claims against the estate, there is no indication that such creditors have been exerting pressure on or commenced

collection efforts against the Debtor prior to the bankruptcy filing.  *See Jer/Jameson,* 461 B.R. at 299 (the debtor's creditors, "if they [even] are creditors, were exerting no pressure on [the debtor] before the filing").

### D.    The Debtor Has No Ongoing Business or Employees

48.     The Debtor is a single-purpose financing vehicle created to act as the borrower on a "Term Loan B."  It does not have, and never has had, other ongoing business or employees. (Pohl Decl. ¶ 24.)  This fact weighs in favor of a finding of bad faith.  *See Primestones,* 272 B.R. at 558; *Jer/Jameson,* 461 B.R. at 298-99.

### E.    The Debtor Has No Cash or Income

49.     The Debtor—again, a single-purpose entity—has limited cash, no income and no plans to generate any income.  (*See* Pohl Decl. ¶ 98.)  As of its filing for chapter 11 bankruptcy, the Debtor has less than $4 million in cash, all of which is subject to the Loan Parties' lien.  *Id.* This factor also weighs in favor of a finding of bad faith.  *See Jer/Jameson,* 461 B.R. at 298-99.

<u>**CONCLUSION**</u>

WHEREFORE, for the foregoing reasons, the Court should grant the Motion and dismiss the Debtor's chapter 11 case.

Dated: Wilmington, DE
      February 29, 2024

| | |
|---|---|
| HOGAN LOVELLS US LLP | SAUL EWING LLP |
| Pieter Van Tol, Esq. *(admitted pro hac vice)* | |
| Christopher R. Bryant, Esq. *(admitted pro hac vice)* | */s/ Evan T. Miller* |
| Elizabeth C. Carter, Esq. *(admitted pro hac vice)* | Evan T. Miller (No. 5364) |
| 390 Madison Avenue | 1201 N. Market Street, Suite 2300 |
| New York, NY 10017 | P.O. Box 1266 |
| Tel: (212) 918-3000 | Wilmington, DE 19899 |
| Email: Pieter.vantol@hoganlovells.com | Tel: (302) 421-6864 |
|     Chris.bryant@hoganlovells.com | Email: Evan.miller@saul.com |
|     Elizabeth.carter@hoganlovells.com | |
| | - and - |
| - and - | |
| | Turner N. Falk, Esq. *(admitted pro hac vice)* |
| HOGAN LOVELLS US LLP | SAUL EWING LLP |
| David Massey, Esq. *(admitted pro hac vice)* | Centre Square West |
| 600 Brickell Avenue, Suite 2700 | 1500 Market Street, 38th Floor |
| Miami, FL 33131 | Philadelphia, PA 19102-2186 |
| Tel: (305) 459-6500 | Tel: (215) 972-7777 |
| Email: David.massey@hoganlovells.com | Email: turner.falk@saul.com |

*Counsel for Camshaft*