**<u>EXHIBIT 1</u>**

**Revised Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| BYJU'S ALPHA, INC.,[1] | ) |
| | ) |
| Debtor. | ) Case No. 24-10140 (JTD) |
| | ) |
| | ) **Re: Docket Nos. 5, 56, 98, & 133** |

**FINAL ORDER (I) AUTHORIZING
THE USE OF CASH COLLATERAL, (II) AUTHORIZING
THE DEBTOR TO OBTAIN POSTPETITION FINANCING,
(III) GRANTING SENIOR POSTPETITION SECURITY INTERESTS, AND
ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS
PURSUANT TO SECTIONS 364(C) AND 364(D) OF THE BANKRUPTCY
CODE, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF**

Upon the Motion and the *Supplement to Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Debtor to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 98] (together, the "Motion")[2] filed by the above-captioned debtor and debtor in possession (the "Debtor") for entry of a final order (this "Final Order") pursuant to sections 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this chapter 11 case is: 1007 N. Market St. Ste. G20 452, Wilmington, DE 19801..

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Credit Agreement, as applicable.

(the "<u>Bankruptcy Rules</u>"), and rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), among other things:

(a)    authorizing BYJU's Alpha, Inc., in its capacity as borrower (the "<u>DIP Borrower</u>"), to obtain postpetition financing commitments in connection with a senior secured multiple-draw term loan facility in the aggregate principal amount of up to $278,754,477.59 (the "<u>DIP Facility</u>" and, the commitments thereunder, the "<u>DIP Commitments</u>") subject to the terms and conditions set forth in that certain senior secured superpriority debtor-in-possession credit and guaranty agreement, attached hereto as **<u>Exhibit A</u>** (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the DIP Borrower, as borrower, certain Subsidiaries of the Borrower from time to time party thereto, the lenders from time to time party thereto (the "<u>DIP Lenders</u>"), and GLAS Trust Company LLC, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, the "<u>DIP Agent</u>" and, together with the DIP Lenders and all holders of all other DIP Obligations (as defined below), the "<u>DIP Secured Parties</u>"), consisting of:

(i)    <u>New Money DIP Loans</u>.  Senior secured multiple-draw term loans in the aggregate principal amount not to exceed $20 million (the "<u>New Money DIP Loan Commitments</u>" and the term loans made thereunder, the "<u>New Money DIP Loans</u>").

(ii)    <u>Roll-Up Loans</u>.  Senior secured term loans in the aggregate principal amount not to exceed $228,476,093.11, consisting of, subject to the DIP Credit Agreement:

A.    at the sole option of each DIP Lender, for every dollar of New Money DIP Loans and/or Bridge Loans held by such DIP Lender or any of its affiliates at the time of election, such DIP Lender may irrevocably elect to convert up to seven dollars of loans under the Prepetition Credit Agreement held by such DIP Lender or any of its affiliates (whether as a lender of record, by participation, or any other means) at the time of election into an equivalent amount of loans under the DIP Facility;[3] and

B.    at the sole option of each DIP Lender who holds any Prepetition Reimbursements, for every dollar of Prepetition Reimbursement

---

[3]    Upon the occurrence of the effective date of the DIP Credit Agreement (the "<u>Effective Date</u>"), the Bridge Loans and Prepetition Reimbursements outstanding immediately prior to the Effective Date shall be converted on a cashless basis into and deemed to be Term Loans and New Money Term Loans for all purposes under the DIP Credit Agreement and the other Loan Documents and will have identical terms as the New Money Term Loans.

held by such DIP Lender (or any of its affiliates) at the time of election, such DIP Lender may irrevocably elect to convert up to two dollars of loans under the Prepetition Credit Agreement held by such DIP Lender or any of its affiliates (whether as a lender of record, by participation, or by any other means) at the time of election into an equivalent amount of loans under the DIP Facility (the loans rolled up pursuant to subclause (A) and this subclause (B), the "Roll-Up Loans" and together with the New Money DIP Loans and any Bridge Loans and Prepetition Reimbursements that subsequently become DIP Loans pursuant to the terms hereof, the "DIP Loans").[4]

(b)     converting the Prepetition Reimbursements into postpetition, debtor-in-possession financing under section 364 of the Bankruptcy Code that shall rank pari passu with the New Money DIP Loans and shall constitute DIP Loans for all purposes hereunder.

(c)     converting the Bridge Loans into a postpetition, debtor-in-possession financing under section 364 of the Bankruptcy Code that shall rank pari passu with the New Money DIP Loans and shall constitute DIP Loans for all purposes hereunder.

(d)     authorizing the Debtor to execute, deliver, and perform under the DIP Credit Agreement, that certain Subordination and Intercreditor Agreement, by and among the Prepetition Agent and the DIP Borrower (the "Intercreditor Agreement"), and any other related documents, including pledge agreements, mortgages, guaranties, promissory notes, certificates, instruments, and such other documents that may be reasonably necessary, desirable or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent (collectively, as such may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Loan Documents"), each of which shall be in form and substance satisfactory to the DIP Agent and the Required DIP Lenders; and to perform such other acts as

---

[4]     As more fully set forth in the DIP Credit Agreement, at any time after the Effective Date but no later than 14 calendar days prior to the Maturity Date, each New Money Term Loan Lender shall have the right in its sole option to submit a Roll-Up Notice with respect to its (or any of its Affiliates' or Approved Funds') Prepetition Term Loans (which such Prepetition Term Loans may be held as a lender of record, by participation, or by any other means) in an amount up to the Applicable Roll-Up Amount. For the avoidance of doubt, a New Money Term Loan Lender may submit a Roll-Up Notice on more than one occasion as long as the aggregate principal amount of Prepetition Term Loans subject to all such Roll-Up Notices does not exceed the Applicable Roll-Up Amount of such New Money Term Loan Lender as of the date of such Roll-Up Notice.

The roll-up options set forth in the DIP Credit Agreement shall be attributable to and travel with (in the case of any assignment, participation, or transfer after the Effective Date) the funded New Money Term Loans, Bridge Loans, and/or Prepetition Reimbursements, as applicable. Any exercise of the roll-up option affiliated with any dollar of New Money Term Loans, Bridge Loans, and/or Prepetition Reimbursements shall be noted by the Administrative Agent on the Register within three Business Days of receiving the relevant Roll-Up Notice.

may be reasonably necessary, desirable or appropriate in connection with the DIP Loan Documents

(e)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (a) DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, which DIP Liens shall be, subject to the Carve Out (as defined below), senior to all liens, security interests, and pledges on the DIP Collateral and (b) DIP Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject and subordinate to the Carve Out;

(f)     authorizing and directing the Debtor to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Loan Documents as such become due and payable, as provided and in accordance therewith;

(g)     authorizing the Debtor to use the Cash Collateral from the date of entry of this Final Order through and including the date of termination of the DIP Credit Agreement;

(h)     authorizing the Debtor to perform such other and further acts as may be necessary or desirable in connection with this Final Order, the DIP Loan Documents (including the DIP Credit Agreement), and the transactions contemplated hereby and thereby, subject to this Final Order and the Approved Budget;

(i)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final Order;

(j)     granting adequate protection to the Prepetition Secured Parties as provided in this Final Order; and

(k)     providing for the immediate effectiveness of this Final Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the Motion, the *Declaration of Timothy R. Pohl, Director, CEO, and Secretary of BYJU's Alpha, Inc., in Support of the Debtor's Chapter 11 Petition* [Docket No. 3] (the "First Day Declaration"), and the evidence submitted or proffered at the hearing on the Motion held on February 5, 2024 (the "Interim Hearing"); and the Court having entered the Interim Order on February 8, 2024 [Docket No. 56]; and the Court having entered the *Second Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 133]; and the Court having

jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having determined that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having determined that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion and the First Day Declaration; and the Court having found that the final relief as approved in this Final Order is in the best interests of the Debtor and its estate, creditors, and other parties in interest; and it appearing that the Debtor's entry into the DIP Facility is a sound and prudent exercise of the Debtor's business judgment; and the Court having found that proper and adequate notice of the Motion and the Final Hearing thereon has been given under the circumstances and that no other or further notice is necessary for the relief requested in the Motion; and the Court having found that good and sufficient cause exists for the granting of the relief requested in the Motion after having given due deliberation to the Motion and all of the proceedings had before the Court in connection with the Motion, **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[5]

A.    <u>Petition Date</u>.  On February 1, 2024 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"), commencing the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>").

B.    <u>Debtor in Possession</u>.  The Debtor continues to operate its business as debtor in

---

[3]    Where appropriate in this Final Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.

C.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief sought herein are sections 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

D.      <u>Committee</u>.  As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee ("<u>Committee</u>") in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

E.      <u>Debtor's Stipulations</u>.  In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facility, the Debtor's access to the Cash Collateral, and subordination of the Prepetition Liens to the Carve Out and the DIP Liens (which DIP Liens shall be subject to the Carve Out), and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral, subject to the rights of the parties in interest (other than the Debtor) set forth in this Final Order, the Debtor permanently and irrevocably admits, stipulates, acknowledges, and agrees, as follows (collectively, the "<u>Debtor's Stipulations</u>"):

(i) <u>Prepetition Secured Parties</u>.  The Debtor, as borrower, GLAS Trust Company LLC ("<u>GLAS</u>" or the "<u>Prepetition Agent</u>"), as administrative agent and collateral agent, the lenders party thereto (collectively, the "<u>Prepetition Secured Lenders</u>" and, together with GLAS, the "<u>Prepetition Secured Parties</u>"), among others, entered into that certain Credit and Guaranty Agreement dated November 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>").

(ii) <u>Prepetition Secured Obligations</u>.  As of the Petition Date, the Debtor was justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, counterclaim, or offset of any kind, in the aggregate amount of not less than $1,189,513,685.0 attributable to principal of loans outstanding under the Prepetition Credit Agreement, plus approximately $267,548,427.0 in outstanding accrued and unpaid premium, interest, fees, and expenses, and other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the Prepetition Credit Agreement or the Loan Documents (as defined in the Prepetition Credit Agreement) (the "<u>Prepetition Secured Obligations</u>").

(iii) <u>Prepetition Collateral</u>.  As security for the prompt and complete payment and performance in full when due of all Prepetition Secured Obligations, the Debtor, entered into a pledge and security agreement dated November 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Pledge and Security Agreement</u>") with GLAS[6] (such collateral, the "<u>Prepetition Collateral</u>" and such liens granted, the "<u>Prepetition Liens</u>").  As of the Petition Date, the Prepetition Liens:  (A) have been properly recorded and are valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Collateral; (B) are not subject to any offset, contest, objection, recovery, recoupment, reduction, defense, counterclaim, subordination, recharacterization, disgorgement, disallowance, avoidance, challenge, or any other claim or cause of action of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or other applicable law; (C) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations or consideration secured or obtained thereby; (D) without giving effect to this Final Order, are senior with priority over any and all other liens on or

---

[6]   Under the Pledge and Security Agreement, the Debtor granted a security interest in the "Collateral" (as defined in the Pledge and Security Agreement) to GLAS for its benefit and for the benefit of the Prepetition Secured Parties.

security interests in the Prepetition Collateral; (E) encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (F) are entitled to adequate protection as set forth herein; and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(iv)    <u>Cash Collateral</u>.  Any and all of the Debtor's cash, including all amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtor, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral or deposited into the Debtor's banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").  The Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Cash Collateral, for any Diminution in Value of their respective interests as of the Petition Date resulting from the use of Cash Collateral.

(v)    <u>Good Faith</u>.  The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of granting the DIP Liens and the Adequate Protection Liens, any challenges or objections to the use of Cash Collateral, and all documents relating to any and all transactions contemplated by the foregoing.

(vi)    <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including impairment, set-off, avoidance, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (equitable or otherwise), attack, offset, defense, counterclaims or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtor and its estate have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the facility extended under the Prepetition Credit Agreement, the Obligations (as defined in the Prepetition Credit Agreement), the Prepetition Liens, or otherwise, whether arising at law or at equity, including any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502,

510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

(vii)  <u>Default</u>.  The Debtor is in default under the Prepetition Credit Agreement, and at least one event of default has occurred and is continuing under the Prepetition Credit Agreement.

F.  <u>Cash Collateral</u>.  All of the Debtor's cash, including any cash in deposit accounts of the Debtor, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties. The Prepetition Secured Parties consent to the Debtor's use of the Cash Collateral in accordance with and subject to the terms and conditions provided for in this Final Order.  The Debtor has agreed to provide each Prepetition Secured Party with adequate protection of its respective interest in the Cash Collateral for any Diminution in Value thereof.

G.  <u>Findings Regarding Postpetition Financing and Use of Cash Collateral</u>.

(a)  The Debtor has requested from each of the DIP Lenders, and the DIP Lenders are willing to provide financing to the Debtor subject to:  (i) this Final Order; (ii) Court approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (iii) satisfaction or waiver of the closing conditions and the funding conditions set forth in the DIP Loan Documents; and (iv) findings by this Court that the DIP Facility is essential to the Debtor's estate, that the DIP Secured Parties are extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Final Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(b)  The Debtor has an immediate and critical need to obtain (i) postpetition financing pursuant to the DIP Facility and (ii) permission to use Cash Collateral (subject to the Approved Budget), in order to, among other things to pay professional fees and to pursue a restructuring for the benefit of the Debtor's stakeholders.  The absence of access to Cash Collateral

would immediately and irreparably harm the Debtor, its estate, and parties in interest.  The Debtor does not have sufficient available sources of working capital and financing to preserve the value of its business without the ability to borrow under the DIP Facility and use Cash Collateral.  The Debtor and its estate will be immediately and irreparably harmed if financing under the DIP Facility is not obtained pursuant to the terms of this Final Order and, as applicable, the DIP Loan Documents, or if the Debtor is unable to use Cash Collateral.  Entry of this Final Order is necessary and appropriate to avoid such harm to the Debtor, its estate, and other parties in interest.

(c)       The Debtor is unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The Debtor is unable to obtain, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, (i) unsecured credit allowable under section 503(b) of the Bankruptcy Code as an administrative expense, (ii) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien, or (iii) credit secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien.  The Debtor is further unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without as provided for herein (1) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim (as defined below) and (2) granting the Prepetition Secured Parties the rights, remedies, privileges, benefits, and protections provided herein, including the Adequate Protection Liens.  The Roll-Up Loans are an integral part of the DIP Facility, without which the DIP Lenders would be unwilling to extend the New Money DIP Loan Commitments.

(d)       The DIP Facility and this Final Order have been negotiated in good faith and at arm's length among the Debtor and the DIP Secured Parties, and all of the Debtor's

obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including all loans made to and guarantees issued by the Debtor pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated or reversed or modified on appeal, and any liens or claims granted to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(e)    Subject to paragraph 8 of this Final Order, the Debtor has agreed to provide to the Prepetition Secured Parties pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof.

(f)    Subject to paragraph 8 of this Final Order, in light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, upon entry of this Final Order, each Prepetition Secured Party shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of

the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the DIP Collateral or such Prepetition Collateral, as applicable.

(g)     The Prepetition Secured Parties have consented to, conditioned on the entry of this Final Order, the Debtor's incurrence of the DIP Facility, and proposed use of Cash Collateral on the terms and conditions set forth in this Final Order, including the terms of the adequate protection provided for in this Final Order.

H.     Section 506(c).  In light of the DIP Secured Parties' agreement to extend credit to the Debtor on the terms described herein, the DIP Secured Parties have negotiated for and the Debtor and the DIP Secured Parties seek in this Final Order a waiver of the provisions of section 506(c) of the Bankruptcy Code in respect of the DIP Collateral, subject to the Carve Out.

I.     Business Judgment and Good Faith Pursuant to Section 364(e).  The terms and conditions of the DIP Facility, the DIP Loan Documents, and the fees paid and to be paid thereunder to the DIP Secured Parties, are fair, reasonable, and the best available to the Debtor under the circumstances, are ordinary and appropriate for secured postpetition financing to debtors in possession, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Good cause has been shown for entry of this Final Order, and entry of this Final Order is in the best interests of the Debtor and its estate, creditors, and other stakeholders.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtor, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.  Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties within the meaning of section 364(e) of the Bankruptcy Code and shall be entitled to the

full protection of section 364(e).  The Prepetition Secured Parties have agreed to the use of Cash Collateral in good faith, and the Prepetition Secured Parties shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is reversed or modified on appeal.  Based on the Motion and the First Day Declaration, the terms of the DIP Facility are fair and reasonable, reflect the Debtor's prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

J.      Notice.  Notice of the relief requested in the Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, whether by facsimile, email, overnight courier, and or hand delivery, to certain parties in interest, including:  (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor (on a consolidated basis, as and if identified); (c) the office of the attorney general for each of the states in which the Debtor operates; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the Prepetition Agent and counsel thereto; (i) the Prepetition Secured Lenders and counsel thereto; (j) Think and Learn Private Limited and counsel thereto; (k) BYJU's Pte. Ltd.; (l) Great Learning Education Pte. Ltd.; (m) Epic! Creations Inc.; (n) Neuron Fuel Inc.; (o) Tangible Play, Inc.; (p) Whitehat Education Technology LLC; (q) shareholders to Think and Learn Private Limited; (r) Camshaft Capital Fund, LP, Camshaft Capital Management, and Camshaft Capital Advisors, and counsel thereto; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.  No other or further notice of the Motion with respect to the relief requested at the Final Hearing or entry of this Final Order is or shall be required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    <u>Financing Approved</u>.  The Motion is GRANTED on a final basis as set forth herein.

2.    <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of this Final Order, to the extent not withdrawn or resolved, are OVERRULED on the merits.

3.    <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)    The DIP Borrower is hereby immediately authorized and empowered, on a final basis, to enter into, and execute and deliver, the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Secured Parties or the Prepetition Secured Parties to implement the terms or effectuate the purposes of this Final Order and the DIP Loan Documents and to effectuate the funding of the New Money DIP Loans and/or the Roll-Up Loans and deemed repayment of a corresponding amount of Prepetition Secured Obligations.  To the extent not entered into as of the date hereof, the Debtor and the DIP Secured Parties shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be, subject to the terms of this Final Order, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent (acting at the direction of the "Required Lenders" (as defined in the DIP Credit Agreement) under and pursuant to the DIP Credit Agreement (collectively, the "<u>Required DIP Lenders</u>")) and the Required DIP Lenders.  Upon entry of this Final Order, the DIP Credit Agreement and other DIP Loan Documents shall govern and control the DIP Facility.  The DIP Agent is hereby authorized to execute and enter into its

respective obligations under the DIP Loan Documents, subject to the terms and conditions set forth therein and this Final Order. Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtor enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Loan Documents and this Final Order, the terms and conditions of this Final Order shall govern and control.

(b)     Upon entry of this Final Order, the DIP Borrower is hereby authorized to borrow the DIP Loans subject to, and in accordance with, this Final Order.

(c)     Pursuant to the terms of this Final Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents and this Final Order, and in accordance with the Approved Budget, subject to any permitted variance as set forth in this Final Order and the DIP Loan Documents. Attached as Exhibit 1 to the Interim Order and incorporated herein by reference is a budget prepared by the Debtor and approved by the Required DIP Lenders in accordance with the DIP Credit Agreement (the "Approved Budget").

(d)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby or by the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Loan Documents) that may be reasonably required or necessary for the Debtor's performance of its obligations under the DIP Facility, including:

> (i)     the execution, delivery, and performance of the DIP Loan Documents, including the DIP Credit Agreement, the Security

Agreement (as defined in the DIP Credit Agreement), and any other Security Documents (as defined in the DIP Credit Agreement);

(ii) the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in form and substance acceptable to the Debtor, the DIP Agent, and the Required DIP Lenders), it being understood that no further Court approval shall be required for non-material amendments, waivers, consents, or other modifications to and under the DIP Loan Documents or the DIP Obligations;

(iii) the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Loan Documents, including all fees and other amounts owed to the DIP Agent; and

(iv) the performance of all other acts required under or in connection with the DIP Loan Documents.

(e)     Upon entry of this Final Order and subject and subordinate to the Carve Out, such DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their respective terms and the terms of this Final Order for all purposes during the Chapter 11 Case and any other proceeding superseding or relating thereto (each, a "Successor Case"). No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Final Order, subject to paragraph 8 of this Final Order, shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted (i) to or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (ii) subject to paragraph 8 of this Final Order, to or

on behalf of any Prepetition Secured Parties, in each case, pursuant to the DIP Loan Documents, the provisions of this Final Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code.

(f)     Upon entry of this Final Order, the Debtor shall transfer the proceeds of the Bridge Loan from the GLAS Account to the Postpetition Bank Account.

4.     <u>Approved Budget</u>.  The proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the Approved Budget.  In the event the Debtor deems it necessary to use DIP Loans or cash that constitutes Cash Collateral outside the amounts permitted under the Approved Budget, the Debtor may make such request to the DIP Agent.  Any variation or modification to the Approved Budget shall be subject in all respects to the DIP Agent's consent in consultation with the DIP Lenders.

5.     <u>Inspection Rights</u>.  In addition to, and without limiting, whatever rights to access the Prepetition Secured Parties have under the Prepetition Credit Agreement, upon reasonable prior written notice (email being sufficient) and during normal business hours, the Debtor shall permit representatives, agents, an employees of the Prepetition Secured Parties and the DIP Secured Parties to (a) have reasonable access to and inspect and copy the Debtor's books and records, including all records and files of the Debtor pertaining to the Prepetition Collateral and the Adequate Protection Collateral, (b) have reasonable access to and inspect the Debtor's properties, and (c) discuss the Debtor's affairs, finances, and condition with the Debtor's officers and financial advisors.

6.      <u>DIP Superpriority Claims</u>.  Subject and subordinate only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Secured Parties against the Debtor's estate (the "<u>DIP Superpriority Claims</u>") to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise to the extent allowable under the Bankruptcy Code, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof, including any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "<u>Avoidance Actions</u>").

7.      <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon the date of this Final Order, and without the necessity of the execution, recordation of filings by the Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtor to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clause 1(a) and (b) below being collectively referred to as the "<u>DIP</u>

Collateral"), subject and subordinate only to (x) valid, perfected and unavoidable liens, if any, existing as of the Petition Date, or that relate back pursuant to section 546(b) of the Bankruptcy Code, that are senior to the liens or security interests of the Prepetition Secured Parties, and (y) the Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Final Order and the DIP Loan Documents, the "DIP Liens"):

(a)    First Priority Lien on Any Unencumbered Property.    Subject and subordinate only to the Carve Out, and subject to paragraph 10 of this Final Order, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtor, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens, including, but not limited to:  the Debtor's Prepetition Collateral; postpetition revenues; insurance; bank accounts and other security or deposit accounts of the Debtor (including, for the avoidance of doubt, any accounts opened prior to, on, or after the Petition Date); all equity interests; all intercompany claims, accounts, and receivables (and all rights associated therewith); all rights, interests, and obligations in and to any cause of action of the Debtor with respect to fraud, fraudulent conveyance, or breach of fiduciary duties (collectively, the "Litigation Claims"); and any and all proceeds, products, rents, and profits of all of the foregoing.

(b)    Liens Priming the Prepetition Liens.  Subject and subordinate only to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all assets and property of the Debtor, subject to paragraph (c) below.

(c)     <u>Liens Junior to Certain Other Liens</u>.  Subject and subordinate only to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtor (other than the property described in clauses (a) or (b) of this paragraph 7, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clauses).

(d)     <u>Adequate Protection</u>.    Subject to paragraph 8 below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, the Debtor has agreed to provide the Prepetition Secured Parties adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely to the extent of and in an amount equal to the aggregate diminution in value of such interests from and after the Petition Date (each such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, and the Debtor's use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay (each Prepetition Secured Party's claim for such Diminution in Value, an "<u>Adequate Protection Claim</u>").

(e)     <u>Adequate Protection Collateral</u>.  "<u>Adequate Protection Collateral</u>" shall mean, collectively, all of the Debtor's property and assets (whether now owned or after-acquired, and whether real or personal, tangible, or intangible), including, without limitation:  the Debtor's Prepetition Collateral; the Litigation Claims; postpetition revenues; insurance; bank accounts and other security or deposit accounts of the Debtor (including, for the avoidance of doubt, any accounts opened prior to, on, or after the Petition Date); all equity interests; all intercompany

claims, accounts, and receivables (and all rights associated therewith); and any and all proceeds, products, rents, and profits of all of the foregoing.

(f)     <u>Adequate Protection Liens</u>.  As security for any Diminution in Value of the Prepetition Collateral, subject and subordinate only to (a) the Carve Out, (b)(i) any valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition Credit Agreement and (ii) any liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, or (c) the DIP Liens, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Final Order (collectively, the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtor (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral.

(g)     <u>Adequate Protection Superpriority Claims</u>.  As further adequate protection, and to the fullest extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Adequate Protection Claims shall be, subject and subordinate to the Carve Out, allowed superpriority administrative expense claims against the Debtor in the Chapter 11 Case ("<u>Adequate Protection Superpriority Claims</u>").

(h)     <u>Adequate Protection Payments</u>.  As further adequate protection, the Debtor is authorized, but not directed, to pay in accordance with the terms of paragraph 17 of this Final Order, all reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>") of the Prepetition Secured Parties, whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 1(a)(1)F(iii) hereof, including

all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Loan Documents and this Final Order, including, for the avoidance of doubt, of: (i) Kirkland & Ellis LLP, as counsel to the DIP Agent, and Prepetition Agent, (ii) Pachulski Stang Ziehl & Jones LLP, as counsel to the DIP Agent and Prepetition Agent, and (iii) Reed Smith, as counsel to the DIP Agent and Prepetition Agent (collectively, the "Adequate Protection Payments"). None of the Adequate Protection Fees or Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(i)     Right to Seek Additional Adequate Protection. This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtor or any other party to contest such request. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Case.

(j)     Cash Management. The Debtor shall maintain their cash management arrangements in a manner consistent with the Court order approving the Debtor's cash management motion or any further Court order.

(k)     Reporting Requirements. As additional adequate protection to the Prepetition Secured Parties, the Debtor shall comply with all reporting requirements set forth in the DIP Credit Agreement and shall provide all such reports, documents, and other information to the Prepetition Agent and the DIP Agent.

8.    <u>Carve Out</u>.

(a)    <u>Priority of Carve Out</u>.  Each of the Prepetition Liens, Adequate Protection Liens, Adequate Protection Claims, DIP Liens, and DIP Superpriority Claims shall each be subject to and subordinate to payment of the Carve Out.  The Carve Out shall have such priority claims and liens over all assets of the Debtor, including any DIP Collateral and Prepetition Collateral.

(b)    <u>Definition of Carve Out</u>.  As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and an official committee of unsecured creditors (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1 million incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out</u>

Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtor, its lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  For the avoidance of doubt and notwithstanding anything to the contrary, until the later to occur of (i) the date that is six years following the end of the Chapter 11 Case and (ii) the date of any final and binding resolution of any litigation pending against Timothy R. Pohl prior to the date in clause (i) for which he is entitled to indemnification under the Indemnification Obligations (as defined in the DIP Credit Agreement) with the DIP Borrower  the DDTL Tranche 2 proceeds in the Escrow Account shall remain available exclusively to pay any Indemnification Obligations of the DIP Borrower owed to Timothy R. Pohl subject to the Escrow Tail Agreement (as defined in the DIP Credit Agreement).

(c)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtor with a copy to counsel to the Committee (if any) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing with respect to the DDTL Tranche 1 proceeds in the Escrow Account by the Debtor for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) also constitute a demand to the Debtor to utilize all cash on hand as of such date and any available cash thereafter held by the Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtor shall

deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtor for Delayed Draw Term Loans under the Delayed Draw Term Loan Commitment (on a pro rata basis based on the then outstanding Delayed Draw Term Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Delayed Draw Term Loans) and (ii) constitute a demand to the Debtor to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtor shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such Delayed Draw Term Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtor to satisfy any or all of the conditions precedent for Delayed Draw Term Loans under the Delayed Draw Term Facility, any termination of the Delayed Draw Term Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each Delayed Draw Term Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Delayed Draw Term Lender's pro rata share with respect to such borrowing in accordance with the Delayed Draw Term Facility.  All funds in the

Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 8, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 8, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtor until the Carve Out Reserves

have been fully funded, but shall have a security interest in any residual interest in the Carve Out

Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan

Documents.    Further,   notwithstanding   anything   to   the   contrary   in   this   Final   Order,

(i) disbursements by the Debtor from the Carve Out Reserves shall not constitute Term Loans (as

defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of

the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority

of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out

Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation

on the amount of the Allowed Professional Fees due and payable by the Debtor.  For the avoidance

of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in

any prepetition facilities under the Prepetition Credit Agreement, the Carve Out shall be senior to

all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) claim,

and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations

or the Prepetition Secured Obligations.

(d)    Payment of Allowed Professional Fees Prior to the Termination Declaration
Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration

Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP
Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or

reimbursement of any fees or disbursements of any Professional Person incurred in connection

with  the  Chapter  11  Case  or  any  Successor  Case  under  any  chapter  of  the  Bankruptcy

Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the

DIP  Lenders,  or  the  Prepetition  Secured  Parties,  in  any  way,  to  pay  compensation  to,  or  to

reimburse expenses of, any Professional Person or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

(f)    <u>Payment of Carve Out on or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

9.    <u>Reservation of Rights</u>.  The failure or delay of the Prepetition Agent, the DIP Agent, the Prepetition Secured Parties, or the Prepetition Agent to exercise rights and remedies under this Final Order or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

10.    <u>Challenge Periods</u>.  Subject to the Challenge Periods (as defined herein), the stipulations, admissions, waivers, and releases contained in this Final Order, including the Debtor's Stipulations, shall be binding upon the Debtor, its estate, and any of its respective successors in all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date; *provided*, *however*, that the Debtor's stipulations, admissions, agreements, releases, and waivers contained in this Final Order shall not apply to a chapter 7 or chapter 11 trustee until the Known Creditor Challenge Period Termination Date (defined below).  The stipulations, admissions, and waivers contained in this Final Order, including the Debtor's Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtor's estate, unless and to the extent that a party in interest with proper standing granted by order of the

Court, has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (a) seeking to avoid, object to, or otherwise challenge the findings or the Debtor's Stipulations, including regarding:  (i) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any of the Prepetition Secured Parties; (ii) the validity, enforceability, allowability, priority, secured status, or amount of the Obligations; (iii) asserting or prosecuting any so-called "lender liability" claims, avoidance actions, or any other claim, counter claim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law, or otherwise, against any of the Prepetition Secured Parties or their respective representatives (any such claim, a "<u>Challenge</u>") and (b) in which the Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed Challenge.

11.    With respect to parties that are served with a copy of this Final Order, and any Committee, a Challenge must be filed on or prior to 75 days following entry of the Interim Order (the "<u>Known Creditor Challenge Period</u>" and the date of expiration of the Known Creditor Challenge Period, the "<u>Known Creditor Challenge Period Termination Date</u>").  With respect to parties that are not served with a copy of this Final Order, a Challenge must be filed on or prior to 60 days following entry of this Final Order (the "<u>Unknown Creditor Challenge Period</u>" and the date of expiration of the Unknown Creditor Challenge Period, the "<u>Unknown Creditor Challenge Period Termination Date</u>").[7]  The Debtor shall publish notice of the Unknown Creditor Challenge Period Termination Date, substantially in the form attached hereto as **<u>Exhibit B</u>** with any necessary

---

[7]    The Known Creditor Challenge Period, together with the Unknown Creditor Challenge Period, shall collectively be referred to as the "Challenge Periods."   The Known Creditor Challenge Period Termination Date, together with the Unknown Creditor Challenge Period Termination Date, shall collectively be referred to as the "Challenge Period Termination Dates."

modifications for ease of publication, within five days of the entry of this Final Order, in the national edition of The Wall Street Journal.

12.      If this Chapter 11 Case converts to chapter 7, or if a chapter 11 trustee is appointed, prior to the Known Creditor Challenge Period Termination Date, the Known Creditor Challenge Period Termination Date shall be extended for the chapter 7 or chapter 11 trustee to 14 days after their appointment.  If this Chapter 11 Case converts to chapter 7 following the commencement of a timely Challenge by a Committee appointed in the Chapter 11 Case, then the chapter 7 trustee may continue such Challenge in lieu of, and as successor to, the Committee.  Upon the occurrence of the Challenge Period Termination Dates without the filing of a Challenge (or if any such Challenge is withdrawn or filed and overruled):  (w) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in this Chapter 11 Case, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (x) the Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtor's Chapter 11 Case and any Successor Case; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected liens and security interests, not subject to recharacterization, subordination, or avoidance; and (z) all of the Debtor's stipulations and admissions contained in this Final Order, including the Debtor's Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Final Order shall be of full force and effect and forever binding upon the Debtor, the Debtor's estate, and all creditors, interest holders, and other parties in interest

31332888.3

30

in this Chapter 11 Case and any Successor Case.  Furthermore, if any such Challenge is timely and properly filed under the Bankruptcy Rules then (a) any claim or action that is not brought shall forever be barred and (b) the stipulations and admissions contained in this Final Order, including the Debtor's Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such Challenge prior to the Challenge Period Termination Dates (and solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, any other party in interest).  Nothing in this Final Order vests or confers on any person (as defined in section 101 of the Bankruptcy Code), including any Committee appointed in the Chapter 11 Case, standing or authority to pursue any cause of action belonging to the Debtor or its estates, including any challenges (including a Challenge) with respect to the Prepetition Liens and the Obligations, and a separate order of the Court conferring such standing on any Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party in interest; *provided*, *however*, that nothing herein prohibits the Prepetition Secured Parties from contesting any request to obtain standing on any other grounds permitted by applicable law.  In the event a Committee is later appointed, the Debtor will negotiate the terms of an investigation budget acceptable to the Debtor and the Committee.  For the avoidance of doubt, the roll up under the DIP Credit Agreement is subject in its entirety to the Challenge.

13.    <u>Termination Declaration Date</u>.  On the Termination Declaration Date, (a) all DIP Obligations shall be immediately due and payable and all New Money DIP Loan Commitments will terminate; (b) all authority to use Cash Collateral shall cease; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtor may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtor's

estate strictly in accordance with the Approved Budget; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Final Order.

14.     Events of Default.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (collectively, the "Events of Default"):  (a) the failure of the Debtor to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Final Order, (b) the failure of the Debtor to comply with any of the Required Milestones (as defined below), or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement, in each case unless waived by the Required DIP Lenders or DIP Agent, as applicable.

15.     Milestones.  The Debtor's failure to comply with those certain case milestones referred to in the definition of "In-Court Milestones" in the DIP Credit Agreement (collectively, the "Required Milestones") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement unless waived by the Required DIP Lenders in accordance with the terms of the DIP Loan Documents.

16.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default or the Termination Declaration Date, unless such Event of Default has been waived by the DIP Agent or Required DIP Lenders, as applicable, of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Court, subject to the terms of this Final Order and the Remedies Notice Period (defined below), (a) the DIP Agent may send a Carve Out Trigger Notice to the parties set forth in paragraph 8(b) declaring (i) all DIP Obligations owing under the DIP Loan Documents to be immediately accelerated and due and payable for all purposes, rights, and remedies, without

presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtor, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens, DIP Superpriority Claims or the DIP Obligations, (iv) the Carve Out shall be triggered, (v) the DIP Lenders shall be paid the DIP Termination Payment as provided in the DIP Loan Documents, and (vi) interest under the DIP Facility shall accrue at the default rate, as provided in the DIP Loan Documents and (b) subject to paragraph 8, the Prepetition Agent may declare a termination, reduction or restriction on the ability of the Debtor to use Cash Collateral.  The automatic stay in the Chapter 11 Case otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties is hereby modified so that five (5) business days after the Termination Declaration Date (the "Remedies Notice Period"):  (a) the DIP Agent shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Final Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; and (b) subject to the foregoing clause (a), the applicable Prepetition Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the Prepetition Credit Agreement and this Final Order with respect to the Debtor's use of Cash Collateral.  During the Remedies Notice Period, the Debtor, the Committee (if any), and any other party in interest may seek relief from the Court with respect to whether an Event of Default has occurred or is occurring.

17.     <u>Limitation on Charging Expenses Against Collateral</u>.     No expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be

charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, or the DIP Lenders or (b) the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

18.    <u>Use of Cash Collateral</u>.  Subject to the terms and conditions of this Final Order and in accordance with the Approved Budget, the Debtor is hereby authorized to use the Cash Collateral from the date of entry of this Final Order through and including the date of termination of the DIP Credit Agreement.

19.    <u>Expenses and Indemnification</u>.

(a)    The Debtor is hereby authorized to pay, in accordance with this Final Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Loan Documents as such amounts become due and without need to obtain further Court approval, including closing, arrangement, or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees and collateral agent's fees (including all fees and other amounts owed to the DIP Agent and the Prepetition Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraph 1(a)(1)F(iii)) and 7(h)  of this Final Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Final Order or the DIP Loan Documents.  Notwithstanding the foregoing, the Debtor is authorized to pay on the Effective Date all reasonable and documented fees, costs, and expenses, including the fees and expenses of

counsel to the DIP Lenders, the DIP Agent, the Prepetition Agent, and the Prepetition Secured Lenders, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition Agent, or the Prepetition Secured Lenders to be subject to the procedures set forth in paragraph 17(c).

(b)     The Debtor shall be obligated to pay all fees and expenses described above, which obligations owed to the DIP Secured Parties shall constitute DIP Obligations.  The Debtor shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in paragraphs 1(a)(1)F(iii) and 7(h) of this Final Order (collectively, the "Lender Professionals" and each, a "Lender Professional") no later than ten business days (the "Review Period") after the receipt by counsel for the Debtor, the Committee (if any), or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Chapter 11 Cases, and such invoice summary shall not be required to contain time entries, but shall include a reasonably detailed description of the services provided and the expenses incurred by the applicable professional, which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.

(c)      The Debtor, the Committee (if any), or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, the Debtor, the Committee (if any), or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten days' prior written notice to the submitting party of any hearing on such motion or other pleading).  Any hearing to consider such an objection to the payment of any fees, costs, or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs, and expenses that are the subject of the objection.  For the avoidance of doubt, the Debtor shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(d)      In addition, the Debtor hereby indemnifies and holds harmless the Prepetition Secured Parties and the DIP Secured Parties (and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing) in respect of any claim or liability incurred in or related to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility or the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens and all documents related to and all transactions contemplated by the foregoing.

20.     No Third-Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

21.     Section 507(b) Reservation.  This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to

request further or alternative forms of adequate protection at any time or the rights of the Debtor or any other party to contest such request. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Cash Collateral during the Chapter 11 Case.

22.     <u>Perfection of the DIP Liens and the Adequate Protection Liens</u>.  With respect to the DIP Liens and the Adequate Protection Liens, the Prepetition Agent is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments against the Debtor in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Subject to paragraph 8 of this Final Order, whether the Prepetition Agent or the DIP Agent shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments against the Debtor, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination. If the Prepetition Agent or the DIP Agent (in each case at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments against the Debtor, the Debtor shall cooperate and assist in any such execution and/or filings as reasonably requested by the Prepetition Agent or the DIP Agent (in each case at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Final Order.

23.     A certified copy of this Final Order may (at the direction of the applicable required lenders) be filed with or recorded in filing or recording offices by the Prepetition Agent or the DIP

Agent in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of this Final Order.

24.     <u>Preservation of Rights Granted Under this Final Order</u>.  In the event this Final Order or any provision hereof is reversed or modified on appeal, any liens or claims granted to the DIP Secured Parties or the respective Prepetition Secured Parties hereunder arising prior to the effective date of any such reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the respective Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

25.     Notwithstanding any order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under chapter 7 entered at any time, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations are indefeasibly paid in full in cash (otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders)).   To the fullest extent permitted by law, the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in the foregoing sentence.

26.     Subject to paragraph 8 of this Final Order and to the Carve Out, none of the DIP Liens or Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security

interest granted in any of the Chapter 11 Case or arising after the Petition Date, and none of the DIP Liens or the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code.

27.     <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Final Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral (including Cash Collateral), or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), analyze, initiate, assert, prosecute, join, commence, threaten, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Loan Documents, the Prepetition Credit Agreement, the Loan Documents, or this Final Order, including for the payment of any services rendered by the professionals retained by the Debtor or the Committee in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any

order, judgment, determination, declaration, or similar relief that would impair the ability of any

of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral, the

Prepetition Collateral, or seeking affirmative relief against any of the DIP Secured Parties or the

Prepetition Secured Parties related to the DIP Obligations or the Obligations; (ii) invalidating,

setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the

Obligations, or the DIP Agent's, the DIP Lenders', or the Prepetition Secured Parties' liens or

security interests in the DIP Collateral or the Prepetition Collateral, as applicable; or (iii) for

monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition

Secured Parties, or the DIP Agent's, the DIP Lenders', or the Prepetition Secured Parties'

respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, as

applicable, that would impair the ability of any of the DIP Secured Parties or the Prepetition

Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to

realize or recover on the DIP Obligations or the Obligations, to the extent applicable; (b) for

objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability

of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of

the Prepetition Secured Parties related to the Obligations, respectively, or by or on behalf of the

DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or

prosecuting any claims or causes of action whatsoever, including any Avoidance Actions related

to the DIP Obligations, the DIP Liens, the Obligations, or the Prepetition Liens; or (d) for

prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity,

extent, amount, perfection, priority, or enforceability of:  (x) any of the DIP Liens or any other

rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP

Liens or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Obligations or the Prepetition Liens.

28.     <u>Reservation of Rights Under the Intercreditor Agreement</u>.  Except as expressly provided in this Final Order, nothing in this Final Order shall amend, modify, or waive the terms or provisions of the Intercreditor Agreement, and all parties' rights and remedies under the Intercreditor Agreement are preserved.

29.     <u>Conditions Precedent</u>.  No DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Loan Documents have been satisfied in full or waived in accordance with such DIP Loan Documents.

30.     <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtor shall be permitted to use advances of credit under the DIP Facility only for the purposes specifically set forth in this Final Order and the DIP Loan Documents, and only in compliance with the Approved Budget, if required by the DIP Loan Documents, and the terms and conditions in this Final Order and the DIP Loan Documents.

31.     <u>Repayment of DIP Superpriority Claims</u>.  Notwithstanding anything to the contrary herein or in the other DIP Loan Documents, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a chapter 11 plan, unless such holder of a DIP Superpriority Claim consents to a different treatment with respect to such DIP Superpriority Claim.  The requirements set forth in this paragraph 29 may not be amended without the prior written consent of each holder of a DIP Superpriority Claim adversely affected thereby.

32.     <u>Proceeds of Subsequent Financing</u>.  If the Debtor, any trustee, any examiner, or any responsible officer subsequently appointed in these Chapter 11 Case or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents) and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Secured Parties, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Secured Parties to be distributed in accordance with this Final Order and the DIP Loan Documents.

33.     <u>Payments Held in Trust</u>.  Except as expressly permitted in this Final Order or the DIP Loan Documents, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents, and termination of the DIP Facility in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Secured Parties, for application in accordance with the DIP Credit Agreement and this Final Order.

34.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including the Debtor, the DIP Secured Parties, the Prepetition Secured Parties, any official committee appointed in the Chapter 11 Case, and each of their

respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of any of the Debtor in the Chapter 11 Case, any Successor Case, or upon dismissal of any Chapter 11 Case or Successor Case) to the extent permitted by applicable law and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; *provided* that, except to the extent expressly set forth in this Final Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the Debtor's estate.

35.    Limitation of Liability.  In determining to make any loan under the DIP Loan Documents or permitting the use of Cash Collateral, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Further, nothing in this Final Order or in the DIP Loan Documents shall in any way be construed or be interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the pre- or postpetition activities of the Debtor.

36.    Proofs of Claim.  Neither the Prepetition Agent, the Prepetition Secured Parties, the DIP Agent, nor the DIP Secured Parties will be required to file proofs of claim in the Chapter 11

Case, and the Debtor's Stipulations shall be deemed to constitute a timely filed proof of claim against the Debtor.

37.     <u>No Marshaling</u>.  The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

38.     <u>Equities of the Case</u>.  The Prepetition Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code and have negotiated for, and the Debtor believes that Prepetition Secured Parties are entitled to, a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code, which shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral (including the Prepetition Collateral).

39.     <u>Necessary Actions</u>.  The Debtor is authorized to take any and all actions as are reasonable or appropriate to implement the terms of this Final Order.

40.     <u>Effect of this Final Order</u>.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

41.     The requirements of Bankruptcy Rule 6004(a) are waived or are inapplicable due to Bankruptcy Rules 4001(b)(2) and (c)(2).

42.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon entry of this Final Order.

43.     <u>Headings</u>.  All paragraph headings used in this Final Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

44.    <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

## Exhibit A

**DIP Credit Agreement**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY
AGREEMENT

Dated as of April 3, 2024 among

BYJU's ALPHA, INC.
as the Borrower

the Guarantors party hereto

the Lenders party hereto

GLAS TRUST COMPANY LLC
as Administrative Agent and as Collateral Agent

**Table of Contents**

**Page No.**

ARTICLE I DEFINITIONS ...................................................................................................... 2

    Section 1.1.        Defined Terms ........................................................................................... 2
    Section 1.2.        Classification of Term Loans and Borrowings ................................. 33
    Section 1.3.        Terms Generally ...................................................................................... 33
    Section 1.4.        Accounting Terms; GAAP...................................................................... 33
    Section 1.5.        Divisions .................................................................................................. 34
    Section 1.6.        Interest Rates............................................................................................ 34

ARTICLE II THE CREDITS................................................................................................... 34

    Section 2.1.        The Commitments..................................................................................... 34
    Section 2.2.        Term Loans and Borrowings .................................................................. 36
    Section 2.3.        Requests for Borrowings ......................................................................... 36
    Section 2.4.        Funding of Borrowings ........................................................................... 36
    Section 2.5.        [Reserved]................................................................................................. 37
    Section 2.6.        Repayment of Term Loans; Evidence of Debt .................................... 37
    Section 2.7.        Prepayment of Term Loans..................................................................... 38
    Section 2.8.        Mandatory Prepayments ......................................................................... 38
    Section 2.9.        Fees............................................................................................................ 39
    Section 2.10.      Interest ...................................................................................................... 39
    Section 2.11.      Benchmark Replacement ........................................................................ 40
    Section 2.12.      Increased Costs ........................................................................................ 41
    Section 2.13.      [Reserved]................................................................................................. 42
    Section 2.14.      Taxes......................................................................................................... 42
    Section 2.15.      Payments Generally; Pro Rata Treatment; Sharing of Set-offs ........ 46
    Section 2.16.      Mitigation Obligations; Replacement of Lenders............................... 47
    Section 2.17.      Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations ..................................................................... 48
    Section 2.18.      [Reserved]................................................................................................. 48
    Section 2.19.      Defaulting Lenders .................................................................................. 48

ARTICLE III REPRESENTATIONS AND WARRANTIES ............................................ 49

    Section 3.1.        Organization; Powers............................................................................... 49
    Section 3.2.        Authorization; Enforceability ................................................................ 49
    Section 3.3.        Governmental Approvals; No Conflicts ............................................... 50
    Section 3.4.        Financial Condition; No Material Adverse Change............................ 50
    Section 3.5.        Title........................................................................................................... 50
    Section 3.6.        Litigation and Environmental Matters ................................................. 51
    Section 3.7.        Compliance with Laws and Agreements .............................................. 51
    Section 3.8.        Investment Company Status ................................................................... 52
    Section 3.9.        Taxes......................................................................................................... 52
    Section 3.10.      U.S. Plans and Non-U.S. Plans.............................................................. 52
    Section 3.11.      [Reserved]................................................................................................. 52
    Section 3.12.      Subsidiaries.............................................................................................. 52
    Section 3.13.      Anti-Terrorism Laws; USA Patriot Act ............................................... 53
    Section 3.14.      Anti-Corruption Laws and Sanctions.................................................... 53
    Section 3.15.      Margin Stock ............................................................................................ 53

Section 3.16.    [Reserved] .................................................................................... 54
Section 3.17.    [Reserved] .................................................................................... 54
Section 3.18.    Insurance Matters ........................................................................ 54
Section 3.19.    Material Contracts ....................................................................... 54
Section 3.20.    Collateral Documents ................................................................. 54
Section 3.21.    Employee Matters ....................................................................... 54
Section 3.22.    Pari Passu Ranking ..................................................................... 55
Section 3.23.    Status as Senior Indebtedness .................................................... 55
Section 3.24.    Security Documents ..................................................................... 55
Section 3.25.    Approved Budget .......................................................................... 55
Section 3.26.    Bankruptcy Matters ..................................................................... 55

ARTICLE IV CONDITIONS ............................................................................................... 55

Section 4.1.    The Effective Date ........................................................................ 55
Section 4.2.    Tranche 1 Funding Conditions ................................................... 57
Section 4.3.    Tranche 2 Funding Conditions. ................................................... 58
Section 4.4.    Conditions to Withdrawals from Funding Account. ................... 59
Section 4.5.    Conditions to Withdrawals from Indemnity Escrow Account ........... 60

ARTICLE V AFFIRMATIVE COVENANTS ....................................................................... 60

Section 5.1.    Financial Statements; Other Information ................................... 61
Section 5.2.    Notices of Material Events ........................................................... 61
Section 5.3.    Existence; Conduct of Business ................................................... 62
Section 5.4.    Payment of Obligations ............................................................... 62
Section 5.5.    Maintenance of Properties; Insurance ........................................ 62
Section 5.6.    Books and Records; Inspection Rights, Monthly Investor Calls ......... 62
Section 5.7.    Compliance with Laws and Agreements ..................................... 63
Section 5.8.    Use of Proceeds ............................................................................ 63
Section 5.9.    [Reserved] .................................................................................... 63
Section 5.10.    Further Assurances; Other Collateral Matters .......................... 64
Section 5.11.    [Reserved] .................................................................................... 64
Section 5.12.    [Reserved] .................................................................................... 64
Section 5.13.    Post-Closing Obligations ............................................................. 64
Section 5.14.    Designated Account. ..................................................................... 64
Section 5.15.    Environmental Matters ................................................................ 64
Section 5.16.    Approved Budget. .......................................................................... 64
Section 5.17.    In-Court Milestones ..................................................................... 65
Section 5.18.    Escrow Tail Agreement ................................................................ 49
Section 5.19.    Management of the Borrower ....................................................... 65

ARTICLE VI NEGATIVE COVENANTS ............................................................................ 65

Section 6.1.    Indebtedness ................................................................................. 65
Section 6.2.    Liens ............................................................................................. 67
Section 6.3.    Fundamental Changes; Assets Sales; Changes in Business ................. 68
Section 6.4.    Restricted Payments and Restricted Debt Payments .................. 68
Section 6.5.    Restrictive Agreements ................................................................ 68
Section 6.6.    Transactions with Affiliates ........................................................ 69
Section 6.7.    Investments .................................................................................. 69
Section 6.8.    [Reserved] .................................................................................... 70

Section 6.9.        Amendments or Waivers of Organizational Documents; Amendments of
                   Junior Financing Documentation ................................................................. 70
Section 6.10.       Fiscal Year ................................................................................................ 70
Section 6.11.       Accounting Policies ................................................................................... 70
Section 6.12.       Anti-Terrorism Laws ................................................................................. 70

ARTICLE VII GUARANTY ....................................................................................................... 71

Section 7.1.        Guaranty of the Obligations ....................................................................... 71
Section 7.2.        Payment by the Guarantors ........................................................................ 71
Section 7.3.        Liability of Guarantors Absolute ............................................................... 71
Section 7.4.        Waivers by Guarantors ............................................................................. 73
Section 7.5.        Guarantors' Rights of Subrogation, Contribution, Etc. ............................. 73
Section 7.6.        Subordination of Other Obligations ........................................................... 74
Section 7.7.        Continuing Guaranty ................................................................................. 74
Section 7.8.        Authority of Guarantors or the Borrower ................................................... 74
Section 7.9.        Financial Condition of the Borrower .......................................................... 74
Section 7.10.       Bankruptcy, Etc. ....................................................................................... 75

ARTICLE VIII EVENTS OF DEFAULT ................................................................................... 75

Section 8.1.        Events of Default ...................................................................................... 75
Section 8.2.        Application of Funds .................................................................................. 80

ARTICLE IX THE AGENTS ..................................................................................................... 81

Section 9.1.        Agents ...................................................................................................... 81
Section 9.2.        Collateral Agent ........................................................................................ 88
Section 9.3.        Certain ERISA Matters ............................................................................. 90

ARTICLE X MISCELLANEOUS ............................................................................................... 91

Section 10.1.       Notices ..................................................................................................... 91
Section 10.2.       Waivers; Amendments ............................................................................... 93
Section 10.3.       Expenses; Limitation of Liability; Indemnity, Etc. .................................... 95
Section 10.4.       Successors and Assigns .............................................................................. 97
Section 10.5.       Survival .................................................................................................. 101
Section 10.6.       Counterparts; Integration; Effectiveness .................................................. 101
Section 10.7.       Severability ............................................................................................. 101
Section 10.8.       Right of Set-off ....................................................................................... 102
Section 10.9.       Governing Law; Jurisdiction; Consent to Service of Process .................... 102
Section 10.10.      Waiver of Jury Trial ................................................................................ 103
Section 10.11.      Headings ................................................................................................ 103
Section 10.12.      Confidentiality ........................................................................................ 103
Section 10.13.      Interest Rate Limitation ........................................................................... 106
Section 10.14.      No Advisory or Fiduciary Responsibility .................................................. 106
Section 10.15.      Electronic Execution of Assignments and Certain Other Documents .......... 107
Section 10.16.      USA Patriot Act; Beneficial Ownership Regulation .................................. 107
Section 10.17.      Release of Liens and Guarantors .............................................................. 108
Section 10.18.      Acknowledgment and Consent to Bail-In of Affected Financial
                   Institutions ............................................................................................. 108
Section 10.19.      DIP Order ............................................................................................... 109

SCHEDULES

Schedule 1.1(a)      —  [Reserved]
Schedule 2.1         —  New Money Term Loan Commitments, Bridge Loans, Prepetition
                         Reimbursements
Schedule 3.6         —  [Reserved]
Schedule 3.10(a)     —  [Reserved]
Schedule 3.12        —  Subsidiaries
Schedule 5.11        —  [Reserved]
Schedule 5.13        —  Post-Closing Obligations
Schedule 6.1         —  Existing Indebtedness
Schedule 6.2(b)      —  Existing Liens
Schedule 6.7         —  Existing Investments

EXHIBITS

Exhibit A            —  Form of Assignment and Assumption
Exhibit B            —  Form of Borrowing Request
Exhibit C            —  Form of Approved Budget
Exhibit D            —  Form of Roll-Up Notice
Exhibit E            —  Form of Withdrawal Notice
Exhibit F            —  Form of Compliance Certificate
Exhibit G            —  Form of Counterpart Agreement
Exhibit H            —  [Reserved]
Exhibits I-1 – I-4   —  Forms of Portfolio Interest Certificate
Exhibit J            —  Form of Indemnity Funding Notice

CREDIT AND GUARANTY AGREEMENT, dated as of April 3, 2024, among BYJU's Alpha, Inc. a Delaware corporation (the "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as Administrative Agent and as Collateral Agent.

## RECITALS:

**WHEREAS**, each capitalized term used and not otherwise defined herein shall have the meaning assigned to it in Article I hereof.

**WHEREAS**, the Borrower has requested that the Lenders provide a senior secured superpriority debtor-in-possession term loan credit facility of up to an aggregate principal amount of up to $278,754,477.59, consisting of: (i) a new money term loan in an aggregate principal amount not to exceed $20,000,000 and (ii) term loans resulting from the exchange of certain Prepetition Obligations for term loans under this Agreement, in each case subject to the conditions set forth herein and in the Final DIP Order.

**WHEREAS**, on February 1, 2024 (the "Petition Date"), the Borrower commenced a case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operations of its business as debtors-in-possession.

**WHEREAS**, prior to the Petition Date, the Lenders (together with the other Prepetition Term Loan Lenders (as defined below)) provided financing to the Borrower pursuant to that certain Credit and Guaranty Agreement, dated as of November 24, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and together with all other Loan Documents (as defined in the Prepetition Term Loan Credit Agreement), in each case as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Documents," and the outstanding loans and all other Obligations (as defined therein) thereunder, the "Prepetition Term Loans"), by and among Byju's Alpha, Inc., as borrower, each lender party thereto from time to time (the "Prepetition Term Loan Lenders"), and GLAS Trust Company LLC, as administrative agent and collateral agent (in such capacity, the "Prepetition Term Loan Administrative Agent" and "Prepetition Term Loan Collateral Agent", respectively, collectively the "Prepetition Agents");

**WHEREAS**, on the Petition Date, the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement were owed not less than $1,189,513,685.0 in outstanding principal balance of Prepetition Term Loans, plus interest, fees, costs and expenses and all other Prepetition Term Loan Obligations under the Prepetition Term Loan Credit Agreement.

**WHEREAS**, the proceeds of borrowings hereunder are to be used for the purposes described in Section 5.8 hereof during the pendency of the Chapter 11 Case and, subject to Section 5.8, pursuant to and in accordance with the Approved Budget.

**WHEREAS**, subject to the terms hereof and the Final DIP Order, the Borrower has agreed to secure all of its Obligations under the Loan Documents by granting to the Administrative Agent and Collateral Agent, for the benefit of the Collateral Agent and the other Secured parties, a security interest in and lien upon all of their existing and after-acquired property.

**NOW, THEREFORE**, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.    Defined Terms.  As used in this Agreement, the following terms used herein, including in the preamble, recitals, appendices, schedules and exhibits hereto, shall have the meaning specified below:

"Acceptable Plan" means a Plan of Reorganization, the provisions of which are in form and substance satisfactory to the Administrative Agent (at the direction of the Required Lenders) and which contain market standard exculpations, indemnities and releases in favor of the Agents, the Lenders, the other Secured Parties, and their respective Related Parties in such capacities (as reasonably determined by the Administrative Agent (at the direction of the Required Lenders)).

"Acquisition" means any transaction or series of related transactions resulting in the acquisition by the Borrower or any of its Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, all or substantially all of the Equity Interests of, or a business line or unit or a division of, any Person.

"Action" means any charge, claim, action, complaint, petition, investigation, appeal, suit, litigation or other similar proceeding initiated or conducted by a mediator, arbitrator or Governmental Authority, whether administrative, civil, regulatory or criminal, and whether at law or in equity, or otherwise under any applicable law.

"Additional Agreement" has the meaning set forth in Section 9.1.

"Administrative Agent" means GLAS Trust Company LLC, in its capacity as administrative agent for the Lenders hereunder, or any successor administrative agent.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliated Lender" means the Borrower or any of its Subsidiaries to the extent that such Person is (or is to become) a Lender.

"Agent" means each of the Administrative Agent and the Collateral Agent and collectively, the "Agents".

"Agent Parties" has the meaning set forth in Section 10.1.

"Agent-Related Person" has the meaning set forth in Section 10.3(d).

"Agreement" means this Credit and Guaranty Agreement, as the same may hereafter be modified, supplemented, extended, amended, restated or amended and restated from time to time.

2

"Ancillary Document" has the meaning set forth in Section 10.15.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery, corruption or money laundering.

"Applicable Percentage" means, with respect to any Lender, the percentage of the total New Money Term Loan Commitments or New Money Term Loans of all Classes hereunder represented by the aggregate amount of such Lender's New Money Term Loan Commitments or New Money Term Loans of all Classes hereunder; *provided* that if any Defaulting Lender exists at such time, the Applicable Percentage shall be calculated disregarding such Defaulting Lender's New Money Term Loan Commitment.

"Applicable Rate" means, for any day, a rate *per annum* equal to 8.00%.

"Approved Budget" means a quarterly cash flow forecast of the Borrower containing expected monthly disbursements for the applicable quarterly period with respect to (i) the expected fees and expenses of legal counsel for the Borrower (itemized by law firm) in connection with the prosecution of the Litigation Claims (and any other related claims) on behalf of the Borrower, (ii) the expected fees and expenses of Pohl and (iii) other ordinary and customary fees and expenses in connection with the administration of the Borrower in the Chapter 11 cases, including, without limitation, the ordinary fees and expenses of any claims agents, prepared by the Borrower in the form attached hereto as Exhibit C and consented to by the Required Lenders (which consent may be given via e-mail) as the same shall be updated, modified or supplemented from time to time as provided in Section 3.25.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" means a sale, lease (as lessor or sublessor), sale and leaseback, exchange, transfer or other Disposition to, any Person, in one transaction or a series of transactions, of any part of the Borrower's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Equity Interests of any of the Borrower's Subsidiaries, other than:

(a)     Dispositions of inventory, ancillary services or goods held for sale, sold, leased or licensed out in the ordinary course of business;

(b)     [reserved];

(c)     [reserved];

(d)     [reserved];

(e)     Dispositions of property or assets in connection with casualty (or other insured damage) or condemnation events or any taking under power of eminent domain or by similar proceeding, or consisting of or subsequent to a total loss or constructive total loss of such property or asset;

(f)     Dispositions of past due accounts receivable in connection with the collection, write-down or compromise thereof in the ordinary course of business and the sale or discount without

3

recourse by the Borrower or its Subsidiaries of accounts receivable or notes receivable arising in the ordinary course of business in connection with the compromise or collection thereof or in connection with the bankruptcy or reorganization of the applicable account debtors and dispositions of any securities received in any such bankruptcy or reorganization;

(g)    [reserved];

(h)    Dispositions permitted by Section 6.3(a);

(i)    [reserved];

(j)    [reserved];

(k)    [reserved];

(l)    [reserved]; and

(m)    any conveyance, transfer, exchange or disposition of assets which would constitute a Restricted Payment permitted under Section 6.3 or an Investment permitted under Section 6.7.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.4), and accepted by the Administrative Agent, in the form of Exhibit A-1 or any other form approved by the Administrative Agent.

"Authorized Agent" has the meaning set forth in Section 10.9(f).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period".

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

4

"Bankruptcy Event" means any insolvency, bankruptcy, dissolution, liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or similar proceeding or arrangement.

"Base Rate" means, at any time, the greatest of (a) the Prime Rate at such time, (b) 1/2 of 1.00% in excess of the Federal Funds Effective Rate at such time, and (c) Term SOFR for a one-month tenor in effect on such day *plus* 1.00%; provided that in no event shall the Base Rate be less than zero. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate, or Term SOFR shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate, or Term SOFR, respectively. If for any reason Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or Term SOFR at such time for any reason, including the inability of Administrative Agent to obtain sufficient quotations in accordance with the terms hereof, the Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the first sentence of this definition until the circumstances giving rise to such inability no longer exist.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that, if a Benchmark Transition Event and the related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the other then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.11.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, for any then-current Benchmark, the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for syndicated credit facilities denominated in Dollars and (ii) the related Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as determined above would be less than 1.00% per annum, the Benchmark Replacement will be deemed to be 1.00% per annum for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for each applicable Interest Period and any Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in Dollars at such time (for the avoidance of doubt, such Benchmark Replacement Adjustment shall not be in the form of a reduction to the Applicable Rate).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

    (a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof)

permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; *provided* that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component), or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

6

"<u>Benchmark Transition Start Date</u>" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day (or such shorter or longer period of time as the Borrower and the Administrative Agent may reasonably agree) prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"<u>Benchmark Unavailability Period</u>" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 2.11</u> and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 2.11</u>.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Beneficiary</u>" means each Agent and Lender.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Bloomberg Currency Website</u>" means the website on the Internet at www.bloomberg.com/markets/currencies/fxc.html (or any successor website reasonably identified by the Administrative Agent).

"<u>Board of Directors</u>" means the board of directors or comparable governing body of the Borrower or a Guarantor, as the case may be, or any committee thereof duly authorized to act on its behalf.

"<u>Borrower</u>" has the meaning specified in the Preamble.

"<u>Borrowing</u>" means Term Loans of the same Class, made, converted or continued on the same date.

"<u>Borrowing Date</u>" means the date of funding any New Money Term Loans.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing in accordance with <u>Section 2.3</u>.

"<u>Bridge Loan</u>" means the amount up to $5,583,864.55 funded by the Bridge Loan Lenders to the Borrower on or after January 22, 2024, pursuant to the indemnification provisions of Section 10.3 of the Prepetition Term Loan Credit Agreement. The amount of Bridge Loans held by each Lender as of the Effective Date is set forth on Schedule 2.1.

"<u>Bridge Loan Lender</u>" means those Lenders who have funded a portion of the Bridge Loan or who have subsequently purchased or received a valid assignment of such portion of the Bridge Loan.

"<u>Bridge Loan New Money Term Loans</u>" means any Bridge Loans rolled up on a cashless basis on the Effective Date pursuant to Section 2.1(a)(iii) that are thereafter deemed to be New Money Term Loans.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"<u>Business Liability</u>" means debts, liabilities and obligations (including Taxes), whether accrued or fixed, absolute or contingent, matured or unmatured, deferred or actual, determined or determinable, known or unknown, including those arising under any law, action or governmental order and those arising under any agreement or contract.

"<u>Capital Lease Obligations</u>" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases (and not operating leases) on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; *provided* that, (a) all obligations that are or would have been treated as operating leases for purposes of GAAP prior to December 31, 2018 shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purposes of the Loan Documents (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with GAAP (on a prospective or retroactive basis or otherwise) to be treated as capitalized lease obligations in the financial statements to be delivered pursuant to the Loan Documents and (b) any lease (whether such lease is in existence as of December 31, 2018 or entered into thereafter) that would constitute a capital lease in conformity with GAAP as in effect on December 31, 2018 (assuming for purposes hereof that any such future leases were in existence on December 31, 2018) shall be considered capital leases (without giving effect to the adoption or effectiveness of any changes in, or changes in the application of, GAAP after December 31, 2018 with respect thereto), and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

"<u>Carve-Out</u>" shall have the meaning assigned to such term in the Cash Management Order.

"<u>Cash</u>" means any cash treated as such according to GAAP and as shown in the relevant annual financial statements or quarterly financial statements.

"<u>Cash Collateral</u>" shall have the meaning assigned to such term in the Cash Management Order.

"<u>Cash Equivalents</u>" means:

(a)     Dollars or money in other currencies received in the ordinary course of business, including all money held in current and savings accounts or held as demand deposits;

(b)     U.S. Government Obligations or certificates representing an ownership interest in U.S. Government Obligations maturing within 12 months from the date of acquisition;

(c)     (i) time deposits, fixed deposits, money market deposits and certificates of deposit, (ii) bankers' acceptances, and (iii) overnight bank deposits, in each case, with any bank or trust company organized or licensed under the laws of the United States of America or any State thereof or any foreign commercial bank having a combined capital and surplus of not less than (A) $500,000,000, in the case of any bank or trust company organized or licensed under the laws of the United States of America, and (B) $100,000,000 (or the Dollar Equivalent as of the date of determination), in the case of any foreign commercial bank;

8

*provided* that the maximum maturity of any such individual investment shall not exceed 12 months from the date of acquisition;

(d)     repurchase obligations with a term of not more than 30 days for underlying securities of the type described in clauses (b) and (c) above entered into with any financial institution meeting the qualifications specified in clause (c) above;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(f)     commercial paper rated at least "P-2" by Moody's or "A-2" by S&P or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(g)     securities with maturities of 12 months or less from the date of acquisition which (or the issuer of which) are rated at least "A" or "A-1" by S&P or "A2" or "P-1" by Moody's or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(h)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States of America or any political subdivision thereof having a rating of at least "A-3" by Moody's or "A-" by S&P or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(i)     readily marketable direct obligations issued by any foreign government or any political subdivision thereof having a rating of at least "A-3" by Moody's or "A-" by S&P or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization;

(j)     money market funds at least 90% of the assets of which consist of investments of the type described in clauses (a) through (i) above;

(k)     auction rate securities issued by any domestic corporation or any domestic government instrumentality, in each case rated at least "A-1" by S&P or at least "P-1" by Moody's or the equivalent of such rating by any other Nationally Recognized Statistical Ratings Organization and maturing within six months of the date of acquisition (or with interest rates or dividend yields that are reset at least every 35 days); and

(l)     in the case of the Borrower or any Subsidiary of the Borrower that is not incorporated or organized under the laws of the United States of America, any state thereof or in the District of Columbia, other short-term investments that are analogous to the foregoing, are of comparable credit quality and are customarily used by companies in the jurisdiction of the Borrower or such Subsidiary for cash management purposes.

"Cash Management Order" shall mean any order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments thereto, consistent with the Final DIP Order and in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders), which (among other matters) authorizes Borrowers and the other Loan Parties to maintain their existing treasury, depository, purchase card, and other cash management arrangements as in existence on the Effective Date or such other arrangements as shall be reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders) in all material respects.

"Change in Law" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Case" shall have the meaning assigned to such term in the recitals of this Agreement.

"Charges" has the meaning set forth in Section 10.13.

"Class", when used in reference to any Term Loan or Borrowing, refers to whether such Term Loan, or the Term Loans comprising such Borrowing, are Tranche 1 New Money Term Loans or Tranche 2 New Money Term Loans.

"Code" means the U.S. Internal Revenue Code of 1986.

"Collateral" means "DIP Collateral" as defined in the Final DIP Order.

"Collateral Agent" means GLAS Trust Company LLC, in its capacity as collateral agent for the Secured Parties hereunder, or any successor collateral agent.

"Collateral and Guarantee Requirement" means, at any time, subject to the applicable limitations set forth in this Agreement and/or any other Loan Document and the time periods (and extensions thereof) set forth in Section 5.9, Section 5.10 or Section 5.13, as applicable, the requirement that:

(i)     the Obligations shall have been secured by a perfected security interest in the Collateral with the priority required by the Final DIP Order (subject in all respects to the Carve-Out) through the provisions of the Final DIP Order, to the extent such security interests may be perfected by virtue of the Final DIP Order or by filings of Uniform Commercial Code financing statements or any other method of perfection referred to in this definition;

(ii)    the Administrative Agent shall have received, (1) each Security Agreement required to be delivered on the Effective Date, (2), evidence that each member of the Group which (x) has granted (or will grant) all asset security or whose shares are the subject of the Collateral in favor of the Collateral Agent (or any Subsidiary of such a person) or (y) owns Intellectual Property which is licensed to or used by any member of the Group listed in the previous clause (x), has in each case entered into or acceded to the IP Licensing Agreement; and (3) each other document required to be delivered pursuant to any Collateral Document, Section 5.9, Section 5.10 or Section 5.13, as applicable, at the time required to be delivered, in each case, duly executed by each Loan Party that is party thereto;

(iii)   the Obligations shall be unconditionally guaranteed by each direct and indirect Subsidiary incorporated or acquired after the Effective Date;

10

(iv)    with respect to any Real Estate Asset, the Administrative Agent shall have received such customary documents in the jurisdiction of such Real Estate Asset as the Administrative Agent may reasonably request in connection with such mortgage, deed or similar document (including title insurance policies and flood insurance, to the extent applicable); and

(v)    the Obligations shall be secured by a valid and perfected Lien on the Collateral, subject to no prior or equal Lien except those Liens permitted to be prior or equal by <u>Section 6.2</u>.

The Administrative Agent may grant extensions of time, in its reasonable discretion, for the perfection of a security interest in particular assets and the delivery of opinions with respect to the granting and perfection of any such security interest.

"<u>Collateral Documents</u>" means the Security Agreements and all other instruments, documents and agreements delivered by or on behalf of any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of the Lenders, a Lien on any Collateral of that Loan Party as security for the Obligations.

"<u>Commitment Termination Date</u>" shall be the earliest to occur of (i) the date on which the maximum amount of New Money Term Loans have been drawn, (ii) the date on which the New Money Term Loan Commitments have been terminated, and (iii) the date that is 24 months following the Effective Date; <u>provided</u>, <u>however</u>, that notwithstanding any provision of any Loan Documents to the contrary, the Commitment Termination Date for the Tranche 2 New Money Term Loans shall not expire or otherwise terminate prior to the earlier of (x) the date on which the maximum amount of Tranche 2 New Money Term Loans have been drawn and (y) the Maturity Date.

"<u>Communications</u>" has the meaning set forth in <u>Section 10.1</u>.

"<u>Compliance Certificate</u>" has the meaning set forth in <u>Section 5.1(c)</u>.

"<u>Confidentiality Restrictions</u>" has the meaning set forth in <u>Section 5.6</u>.

"<u>Conforming Changes</u>" means, with respect to either the use or administration of any Benchmark or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage periods and other technical, administrative or operational matters) that the Administrative Agent and the Borrower decide in their reasonable discretion may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent and the Borrower decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"Controlled" has a meaning correlative thereto.

"Cooperation Agreement" means that certain cooperation agreement dated as of August 1, 2023, entered into by and among, *inter alios*, certain of the Lenders.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Declined Proceeds" has the meaning set forth in Section 2.8(g).

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Term Loans within two (2) Business Days of the date such Term Loans were required to be funded hereunder or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to such funding or payment (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Term Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) become the subject of a Bail-In Action or (iii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender; or (d) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon receipt of such written confirmation by the Administrative Agent and the Borrower). Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"DIP Super-Priority Claims" means "DIP Superpriority Claims" as defined in the Final DIP Order.

"Disposition" or "Dispose" means, with respect to any property or right, any sale, lease, sale and leaseback, license, assignment, conveyance, transfer or other disposition thereof.

"Dollar Equivalent" means, at any date of determination, (a) with respect to any amount denominated in Dollars, such amount and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent at any time on the basis of the Spot Rate in effect on such date for the purchase of Dollars with such currency.

"Dollars" or "$" refers to lawful money of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) above, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.1 are satisfied (or waived in accordance with Section 10.2).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Environmental Claim" means any notice of violation, claim, action, suit, proceeding, demand, abatement order or other written notice or order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law, (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity, or (iii) in connection with any actual or alleged damage, injury, threat or harm to health or safety (with respect to exposure to Hazardous Materials), natural resources or the environment.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, use, handling, transportation, storage, treatment, disposal, management, release or threatened release of any Hazardous Material or, health and safety matters as they relate to Hazardous Materials.

"Environmental Liability" means any Liability, contingent or otherwise (including any Liability for damages, costs of investigation, reclamation or remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary of the Borrower directly or indirectly resulting from or based upon (a) compliance or noncompliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, release or threatened release of any Hazardous Materials into the environment,

13

or (e) any contract, agreement or other consensual arrangement pursuant to which Liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest; *provided* that Equity Interests shall not include any debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that together with the Borrower or any of its Subsidiaries is treated as a single employer under Section 414 of the Code.

"ERISA Event" means any one or more of the following: (a) any reportable event, as defined in Section 4043 of ERISA, with respect to a Pension Plan; (b) the termination of any Pension Plan under Section 4041 of ERISA; (c) the institution of proceedings by the PBGC under Section 4041 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (d) the failure to make a required contribution to any Pension Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Sections 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; (e) the Borrower or any of its Subsidiaries or any ERISA Affiliate requesting a minimum funding waiver or failing to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA (whether or not waived); (f) a determination that any Pension Plan is, or is reasonably expected to be, considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (g) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to a U.S. Plan; (h) the complete or partial withdrawal of the Borrower or any of its Subsidiaries or any ERISA Affiliate from a Multiemployer Plan; (i) a determination that any Multiemployer Plan is in endangered or critical status under Section 432 of the Code or Section 305 of ERISA or is, or is expected to be, "insolvent" within the meaning of Section 4245 of ERISA; (j) the filing by the Borrower or any of its Subsidiaries or any ERISA Affiliate pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (k) the failure by the Borrower or any of its Subsidiaries or any ERISA Affiliate to make by its due date any required contribution to a Multiemployer Plan; or (l) the imposition of liability on the Borrower or any of its Subsidiaries or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA.

"Escrow Agent" means the Escrow Agent under the Escrow Agreement, which shall initially be GLAS Trust Company LLC.

"Escrow Agreement" means the Escrow Agreement, dated as of the Effective Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Borrower, the Escrow Agent and the Administrative Agent for and on behalf of the Lenders relating to the Funding Account.

"Escrow Tail Agreement" means an agreement to be entered into within 30 days of the Effective Date (or such longer time as agreed by the Borrower and the Administrative Agent) specifying the rights and restrictions with respect to the use of proceeds in the Indemnity Escrow Account after the Maturity Date, which shall be in form and substance acceptable to the Administrative Agent (at the direction of the Required Lenders) and the Borrower that shall:

(a)      provide that, to the extent there are insufficient funds (without taking into account any amount of Tranche 2 New Money Term Loan proceeds then held in the Indemnity Escrow Account) to repay all then-outstanding Obligations, then (i) the Tranche 2 New Money Term Loans shall be refinanced in full and deemed re-loaned and re-issued in full and (ii) the amount of any Tranche 2 New Money Term Loan proceeds then held in the Indemnity Escrow Account shall be returned to the Administrative Agent on the Escrow Tail Date, in each case, in accordance with such agreement;

(b)      provide that, to the extent there are sufficient funds (without taking into account any amount of Tranche 2 New Money Term Loan proceeds then held in the Indemnity Escrow Account) to repay all then-outstanding Obligations, then the Tranche 2 New Money Term Loans shall be (i) repaid in full with such funds and (ii) the amount of any Tranche 2 New Money Term Loan proceeds then held in the Indemnity Escrow Account shall be returned to the Prepetition Term Loan Administrative Agent, in accordance with the Intercreditor Agreement and the Prepetition Term Loan Credit Agreement, on the Escrow Tail Date, in each case, in accordance with such agreement; and

(c)      be on terms substantially similar to and no less favorable to the Administrative Agent, the Collateral Agent and the Lenders than the terms of this Agreement applicable to the Tranche 2 New Money Term Loans, or otherwise reasonably acceptable to the Borrower and the Administrative Agent (at the direction of the Required Lenders) in every respect.

"Escrow Tail Date" means the date that is the later to occur of (i) the date that is six years following the end of the Chapter 11 Case and (ii) the date of any final and binding resolution of any litigation pending against Pohl prior to the date in clause (i) for which he is entitled to indemnification under the Indemnification Obligations with the Borrower.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning set forth in Section 8.1.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) Taxes imposed on (or measured by) its net income or gross profit, franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction (or any political subdivision thereof) imposing such Tax or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or New Money Term Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or New Money Term Loan Commitment (other than the acquisition of such interests on the Effective Date or pursuant to an assignment request by the Borrower under Section 2.16(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) withholding Taxes imposed under FATCA, and (d) any Taxes attributable to such recipient's failure to comply with Section 2.14(e).

"FATCA" means Sections 1471 through 1474 of the Code, as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered

into pursuant to Section 1471(b)(1) of the Code or any published intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depository institutions (as determined in such manner as the NYFRB shall set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; *provided* that if such rate shall be less than zero, such rate shall be deemed to be zero for all purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor thereto.

"Fee Letters" means (a) any fee letter in connection with this Agreement between the Agent and the Borrower, (b) any fee letter in connection with this Agreement between the Escrow Agent and the Borrower, and (c) any fee letter in connection with this Agreement between the Indemnity Escrow Agent and the Borrower, in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Final DIP Order" means an order of the Bankruptcy Court entered in the Chapter 11 Case in form and substance reasonably satisfactory to the Required Lenders (and, with respect to any provisions that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent or the Collateral Agent, as applicable), together with all extensions, modifications and amendments thereto, in each case in form and substance reasonably satisfactory to the Agents (at the direction of the Required Lenders) that, among other matters, (i) authorizes the Borrowers and the other Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, (ii) authorizes Term Loans to be incurred during the period after the Final DIP Order Date in the amounts and on the terms set forth herein, (iii) approves the conversion of outstanding Prepetition Obligations into postpetition Roll-Up Loans, (iv) approves the incurrence of additional Roll-Up Loans in an amount equal to the Maximum Roll-Up Amount authorized to be incurred during the period after the Final DIP Order Date, (v) grants the DIP Super-Priority Claims and the Liens on the assets of the Loan Parties referred to herein and in the other Loan Documents and (vi) authorizes the use of Cash Collateral.

"Final DIP Order Date" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"Final Notice Date" means the date that is 14 calendar days prior to the Maturity Date.

"Financial Officer" means the chief financial officer, chief accounting officer, head of finance, vice president of finance, corporate controller or equivalent financial officer of the Borrower.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Funding Account" means a deposit account in the name of the Borrower which is subject to a control agreement in favor of the Administrative Agent (in form and substance acceptable to the Required Lenders), on behalf of the Secured Parties, in which the proceeds of the Tranche 1 New Money Term Loans shall be deposited and held and withdrawn subject to the terms and conditions herein.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any *supra*-national bodies such as the European Union, the RBI or the European Central Bank).

"Group" means the Borrower and its Subsidiaries from time to time.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; *provided* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business, or customary indemnification obligations entered into in connection with any acquisition or Disposition of assets or of other entities (other than to the extent that the primary obligations that are the subject of such indemnification obligation would be considered Indebtedness hereunder). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning set forth in Section 7.1.

"Guarantor" means each Person that shall have become a party hereto as a "Guarantor" and shall have provided a Guaranty of the Obligations by (in respect of the Guarantors) executing and delivering to the Administrative Agent a signature page hereto or a Counterpart Agreement.

"Guaranty" means the guaranty of each Guarantor set forth in Article VII.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

17

"In-Court Milestones" has the meaning set forth in Section 5.17.

"Indebtedness" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade accounts, accounts payable and accrued expenses, accruals for payroll incurred in the ordinary course of business, and attorney and other professional fees payable in connection with the Chapter 11 Case and prosecution of the Litigation Claims), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness (excluding prepaid interest thereon) created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations (after giving effect to any prior drawings or reductions which may have been reimbursed) of such Person, contingent or otherwise, as an account party or applicant under or in respect of bankers' acceptances, letters of credit, surety bonds or similar arrangements, (g) [reserved]; in each case of any of the foregoing paragraphs, *provided* that Indebtedness of any direct or indirect parent of a Person appearing on the balance sheet of such Person solely by reason of push-down accounting under GAAP shall be excluded; (h) to the extent not otherwise included above, all Guarantees of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned or acquired by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. "Indebtedness" shall not include the obligations or liabilities of any Person to pay rent or other amounts with respect to any lease of office space (or other arrangement conveying the right to use office space), which obligations (i) would be required to be classified and accounted for as an operating lease under GAAP as existing prior to December 31, 2018 or (ii) would be required to be classified and accounted for as a Capital Lease Obligation at any time due to build-to-suit accounting rules, "failed" sale and leaseback accounting rules, other lease classification rules or other similar rules so long as such obligations are not entered into for a financing purpose, are unsecured (other than the provision of any letters of credit required to support such obligations), and do not otherwise constitute "Indebtedness" pursuant to clause (a), (b), (c) or (d) above.

"Indemnification Obligations" means the indemnification obligations of the Borrower under (i) that certain Independent Director Agreement, dated as of March 3, 2023, by and between the Borrower and Timothy R. Pohl, (ii) that certain Certificate of Incorporation of Byju's Alpha, Inc., filed on September 27, 2021, as amended by that certain Certificate of Amendment of Certificate of Incorporation of Byju's Alpha, Inc. filed on May 10, 2023 and (iii) those certain Bylaws of Byju's Alpha, Inc. adopted on September 29, 2021.

"Indemnification Notice" has the meaning set forth in Section 4.3.

"Indemnification Payment" has the meaning set forth in Section 4.3.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document or any Fee Letter and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Indemnitee" has the meaning set forth in Section 10.3(c).

"Indemnity Escrow Agent" means the Escrow Agent under the Indemnity Escrow Agreement, which shall initially be GLAS Trust Company LLC.

"Indemnity Escrow Agreement" means the Escrow Agreement, dated as of the Effective Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Borrower, the Indemnity Escrow Agent and the Administrative Agent for and on behalf of the Lenders relating to the Indemnity Escrow Account.

"Indemnity Escrow Account" means a deposit account in the name of the Borrower which is subject to a control agreement in favor of the Administrative Agent (in form and substance acceptable to the Required Lenders), on behalf of the Secured Parties, in which the proceeds of the Tranche 2 New Money Term Loans shall be deposited and held and withdrawn subject to the terms and conditions herein.

"Information" means all information received from the Borrower, or from any of its Affiliates, representatives or advisors on behalf of the Borrower, relating to the Borrower or its business, other than (a) any such information that is already known, or was lawfully disclosed without similar restriction prior to receipt thereof, to any Agent or any Lender prior to its receipt from the Borrower, or from any of its Affiliates, representatives or advisors on behalf of the Borrower and (b) publicly-available information provided to market data collectors, such as league tables or other service providers to the lending industry, regarding the Effective Date, size, type, purpose of, and parties to, this Agreement, *provided* that such information has become publicly available other than by reason of the breach of this Agreement or any other confidentiality obligations owing to the Borrower by any Agent, any Lender or any of their respective affiliates (to the extent such obligation is binding on the applicable Agent, Lender or affiliate).

"Intellectual Property" means, collectively, all rights, priorities and privileges in intellectual property (including copyrights, patents, trademarks, trade secrets, and proprietary rights in software and databases not otherwise included in the foregoing), and the right to sue at law or in equity or otherwise recover for any past, present or future infringement, dilution, misappropriation, breaches or other violation or impairment thereof, including the right to receive all proceeds therefrom, including license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto.

"Intercreditor Agreement" means, the senior intercreditor agreement dated as of the Effective Date between, among others, the Administrative Agent and the Prepetition Term Loan Administrative Agent, and acknowledged by the Loan Parties.

"Interest Payment Date" means the last day of each March, June, September and December.

"Interest Period" means, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter; provided that, (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means (a) any loan, advance (other than advances to officers, members of the Board of Directors, managers, consultants and employees or other providers of services for moving, entertainment

19

and travel expenses, drawing accounts and similar expenditures in the ordinary course of business), extension of credit (by way of Guarantee, assumption of debt or otherwise) or capital contributions by the Borrower or any of its Subsidiaries to any other Person and (b) any purchase, acquisition or holding by the Borrower or any of its Subsidiaries of any Equity Interests in or Indebtedness or other securities (including any Acquisitions and any option, warrant or other right to acquire any of the foregoing) of any other Person.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"IP Licensing Agreement" means the perpetual and exclusive licensing agreement entered into or to be entered into by the Borrower, one or more members of the Group which own Intellectual Property as licensor, the Borrower as main licensee and the Collateral Agent.

"IRS" means the U.S. Internal Revenue Service.

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"Junior Financing" means any Indebtedness of the Borrower and its Subsidiaries that is (i) subordinated in right of payment to the Obligations expressly by its terms, (ii) unsecured or (iii) is secured on a junior lien basis to the Liens securing the Obligations.

"Junior Financing Documentation" means any documentation governing any Junior Financing.

"law" means, as to any Person, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority, self-regulatory organization, market, exchange, or clearing facility charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, self-regulatory organization, market, exchange, or clearing facility, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether or not having the force of law.

"Lender-Related Person" has the meaning set forth in Section 10.3(b).

"Lenders" means the Persons listed in Schedule 2.1 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Liabilities" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Litigation Claims" means any causes of action held by the Borrower including (w) all claims with respect to: (i) any transfers of cash from Borrower to Camshaft Capital Fund, LP or its affiliates, (ii) Borrower's investments in or limited partnership interest in Camshaft Capital Fund, LLP or its affiliates, and (iii) any uses or subsequent transfers of such cash, investments, or limited partnership interest, including

the actual and constructive fraudulent transfer claims and the violation of the automatic stay claim subject to the lawsuit captioned, *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP (In re BYJU's Alpha, Inc.)*, Adv. Pro. Case No. 24-50013 (JTD) (Bankr. D. Del.), (x) all claims with respect to: (i) Riju Ravindran's breach of his fiduciary duties while serving as a director and officer of Borrower and (ii) any Person who aided and abetted any breaches of fiduciary duties by Riju Ravindran, including the fiduciary duties claims subject to the lawsuit captioned *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP (In re BYJU's Alpha, Inc.)*, Adv. Pro. Case No. 24-50013 (JTD) (Bankr. D. Del.), (y) all claims resulting from the Borrower's transfer of any assets after an event of default on any term loans made to Borrower, and (z) all other claims and theories of recovery, known or unknown, that the Borrower may bring in any current or future legal tribunal of any sort in any jurisdiction.

"<u>Loan Documents</u>" means this Agreement (including any amendment hereto or waiver hereunder), the Term Loan Notes (if any), the Fee Letters, any Counterpart Agreement, the Collateral Documents, any IP Licensing Agreement, the Intercreditor Agreement, the Escrow Tail Agreement and any other agreement entered into in connection herewith or therewith by the Borrower or any other Loan Party with or in favor of the Administrative Agent, the Collateral Agent or the Lenders and designated by the terms thereof as a "Loan Document".

"<u>Loan Parties</u>" means the Borrower and the Guarantors.

"<u>Margin Stock</u>" has the meaning assigned to such term in Regulation U of the Federal Reserve Board as in effect from time to time.

"<u>Marketable Securities</u>" means, without duplication of any of the items described in the definition of Cash Equivalents, investments permitted pursuant to any applicable member of the Group's investment policy as approved by the Board of Directors (or committee thereof) of such member of the Group from time to time.

"<u>Material Adverse Effect</u>" means a material adverse effect (other than the filing of the Chapter 11 Case and the events and conditions related and/or leading up thereto as disclosed in such declaration and the effects thereof and any action required to be taken under the Loan Documents or under the Final DIP Order) on (a) the business, assets, financial condition or results of operations, in each case, of the Loan Parties (taken as a whole), (b) the rights and remedies of the Lenders or the Administrative Agent under this Agreement or of any Agent, any Lender or any other Secured Party under the Loan Documents or the effectiveness or ranking of any Lien granted or purporting to be granted pursuant to any of the Collateral Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents.

"<u>Material Indebtedness</u>" means any Indebtedness for borrowed money and any other Indebtedness (other than any Indebtedness under the Loan Documents) of any one or more of the Borrower and its Subsidiaries in a principal amount exceeding $250,000.

"<u>Maturity Date</u>" means, the later of (i) the earliest of (x) the date falling two (2) years after the Effective Date and (y) the date on which all Term Loans are accelerated and all unfunded New Money Term Loan Commitments (if any) have been terminated in accordance with this Agreement, (ii) the Bankruptcy Court orders a conversion of the Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case, and (iii) the Plan Consummation Date.

"<u>Maximum Rate</u>" has the meaning set forth in <u>Section 10.13</u>.

"<u>Maximum Roll-Up Amount</u>" means an amount up to $228,476,093.11.

"<u>Ministerial Amendments</u>" means any waiver, amendment or modification to (a) cure any ambiguity, omission, error or defect (b) effect changes of a minor, administrative, operational, technical or immaterial nature, and/or (c) fix incorrect cross references or similar inaccuracies, in each case, in any Loan Document; *provided* that no such waivers, amendments or modifications are adverse in any respect to the Lenders.

"<u>Moody's</u>" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"<u>Multiemployer Plan</u>" means a Plan which is a multiemployer plan as defined in Section 3(37) of ERISA to which the Borrower or any of its Subsidiaries or any ERISA Affiliates has, or within the prior six years had, an obligation to contribute.

"<u>Nationally Recognized Statistical Ratings Organization</u>" means CRISIL Limited or ICRA Limited.

"<u>Net Cash Proceeds</u>" means, with respect to any event, (a) the cash proceeds actually received in respect of such event, and in each case, only as and when actually received, including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), and (ii) in the case of a Recovery Event, insurance proceeds and condemnation awards and similar payments, net of (b) the sum of (i) all duly documented fees (including attorney's fees, accountants' fees, and other expenses, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses), investment banking, consultant and other customary fees, commissions, discounts, (including underwriting discounts), and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event actually incurred, (ii) in the case of an Asset Sale or Recovery Event, the amount of all payments required to be made as a result of such event to repay Indebtedness (other than any Term Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (iii) in the case of any Asset Sale, Recovery Event or similar transaction by or of a non-wholly-owned Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly-owned Subsidiary as a result thereof, (iv) in the case of a Recovery Event, duly documented costs of preparing assets for transfer upon a taking or condemnation or similar event, and (v) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities or otherwise against any adjustment to the sale price reasonably estimated to be payable (including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations), in each case that are directly attributable, to such event (as determined reasonably and in good faith by a Responsible Officer of the Borrower); *provided* that on the date on which such reserve is no longer required to be maintained, the remaining amount of such reserve (other than in connection with a payment in respect of any such liability) shall then be deemed to be Net Cash Proceeds.

"<u>New Commitment New Money Term Loans</u>" means any New Money Term Loans funded on account of New Money Term Loan Commitments on and after the Effective Date, which for avoidance of doubt, shall not include any Bridge Loan New Money Term Loans or Prepetition Reimbursement New Money Term Loans.

"<u>New Money Term Loan</u>" has the meaning assigned to such term in <u>Section 2.1</u>.

"<u>New Money Term Loan Availability Period</u>" means the period commencing on the first Business Day following the Effective Date and ending on the earlier of (i) the date on which the maximum amount of the New Money Term Loan Commitments has been drawn, (ii) the date on which the New Money Term

Loan Commitments have been terminated; <u>provided</u>, that notwithstanding any provision of any Loan Documents to the contrary, the New Money Term Loan Availability Period for the Tranche 2 New Money Term Loans shall not expire or otherwise terminate prior to the earlier of (x) the date on which the maximum amount of Tranche 2 New Money Term Loans have been drawn and (y) the Maturity Date, and (iii) the date that is 24 months after the Effective Date.

"<u>New Money Term Loan Commitment</u>" means, with respect to each Lender, its obligation to make New Money Term Loans to Borrowers from time to time during the New Money Term Loan Availability Period in accordance with <u>Section 2.1</u> in an aggregate principal amount up to, and not to exceed, the amount set forth on <u>Schedule 2.1</u>, as such commitment may be reduced from time to time pursuant to <u>Section 2.8</u>; <u>provided</u>, <u>however</u>, that a Lender's New Money Term Loan Commitment shall not be reduced by the amount of any Bridge Loans and Prepetition Reimbursements converted into and deemed to be Term Loans pursuant to <u>Section 2.1(b)(i)</u>.  The aggregate amount of the Lenders' New Money Term Loan Commitments is $20,000,000.00 as of the Effective Date.

"<u>New Money Term Loan Facility</u>" means the New Money Term Loan Commitments and the extensions of credit made thereunder.

"<u>New Money Term Loan Lender</u>" means each Lender that has a New Money Term Loan Commitment or that holds a New Money Term Loan.

"<u>Non-Consenting Lender</u>" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of <u>Section 10.2</u> and (b) has been approved by the Required Lenders.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Non-U.S. Plan</u>" means any plan, fund (including any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States of America by the Borrower or one or more Subsidiaries of the Borrower, primarily for the benefit of employees of the Borrower or such Subsidiaries or any Loan Party residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"<u>NYFRB</u>" means the Federal Reserve Bank of New York.

"<u>NYFRB Rate</u>" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day).

"<u>NYFRB's Website</u>" means the website of the NYFRB at <u>http://www.newyorkfed.org</u>, or any successor source.

"<u>Obligations</u>" means all amounts owing by any Loan Party to any Agent or any Lender pursuant to the terms of this Agreement or any other Loan Document (including all interest which accrues after the commencement of any Bankruptcy Event, whether or not allowed or allowable).

"<u>Obligee Guarantor</u>" has the meaning set forth in <u>Section 7.6</u>.

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement or any other Loan Document, or sold or assigned an interest in this Agreement or any other Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary Taxes or any other excise, property, intangible, recording, filing or similar Taxes, in each case, which arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and the other Loan Documents; excluding, however, such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than such Taxes imposed with respect to an assignment that occurs as a result of the Borrower's request pursuant to Section 2.16(b)).

"Overnight Bank Funding Rate" means, for any day, the rate comprising both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate; *provided* that if the Overnight Bank Funding Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of calculating such rate.

"Participant" has the meaning set forth in Section 10.4(c)(i).

"Participant Register" has the meaning set forth in Section 10.4(c)(iii).

"PBGC" means the U.S. Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor entity performing similar functions.

"Pension Plan" means any U.S. Plan that is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes, assessments or governmental charges or levies that are not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves (including costs required to contest such Taxes, assessments or governmental charges or levies) are being maintained;

(b)     carriers', warehousemen's, mechanics', materialmen's, landlord's, supplier's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.4;

(c)     Liens incurred or pledges and deposits made in the ordinary course of business (i) in compliance with workers' compensation, unemployment insurance and other social security laws or regulations or employment laws or to secure other public, statutory or regulatory obligations or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or

similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary of the Borrower or otherwise supporting the payment of items set forth in the foregoing clause (i);

(d)     [reserved];

(e)     [reserved];

(f)     [reserved];

(g)     (i) covenants, easements, imperfections of title, building codes, restrictions (including zoning restrictions), rights-of-way, entitlements, conservation restrictions and other land use restrictions, encroachments and similar encumbrances on real property imposed by law or arising in the ordinary course of business, or (ii) any exceptions on any title policies issued in connection with any mortgaged Real Estate Assets, in each case, that do not secure any monetary obligations, and do not materially detract from the value of the affected property or interfere with the conduct of business of the Borrower or any Subsidiary of the Borrower;

(h)     [reserved];

(i)     rights of set-off, rights of pledge or similar rights and remedies, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents or contracts in relation to (A) establishment of depository relations with banks or other deposit- taking financial institutions or the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments, (B) [reserved] or (C) purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(j)     Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(k)     Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Borrower and any other Subsidiaries;

(l)     [reserved];

(m)     Liens on any Collateral securing any obligation in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or *pari passu* with the Liens created by the Collateral Documents, including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, workers compensation, governmental royalties or pension fund obligations; and

(n)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

25

(o)     Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(p)     [reserved];

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     [reserved];

(u)     Liens arising by operation of law in the United States under <u>Article 2</u> of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(v)     [reserved];

(w)     [reserved];

(x)     [reserved]; and

(y)     Liens arising pursuant to Section 107(l) of the means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as subsequently amended, and the regulations promulgated thereunder (CERCLA), 42 U.S.C. § 9607(l), or other Environmental Law.

"<u>Person</u>" means any natural person, corporation, exempted company incorporated with limited liability, limited liability company, trust, Joint Venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA.

"<u>Plan Asset Regulations</u>" means 29 CFR § 2510.3-101 *et seq.*, as modified by Section 3(42) of ERISA, as amended from time to time.

"<u>Plan Consummation Date</u>" means the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a chapter 11 plan of reorganization, which, for purposes of this Agreement, shall be no later than the effective date of a chapter 11 plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court.

"<u>Plan of Reorganization</u>" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Case.

"<u>Platform</u>" has the meaning set forth in <u>Section 10.1(c)</u>.

"<u>Pohl</u>" means Timothy R. Pohl, in his capacity as director and officer of the Borrower.

"<u>Portfolio Interest Certificate</u>" has the meaning set forth in <u>Section 2.14(e)(ii)(2)(C)</u>.

"<u>Prepetition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Case.

26

"Prepetition Collateral" means the "Collateral" as defined in and under the Prepetition Term Loan Credit Agreement.

"Prepetition Indebtedness" means all Indebtedness of the Loan Parties outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Case.

"Prepetition Obligations" means the Bridge Loans, the Prepetition Reimbursements and the Prepetition Term Loan Obligations.

"Prepetition Reimbursement New Money Term Loans" means any Prepetition Reimbursements rolled on a cashless basis on the Effective Date pursuant to Section 2.1(a)(iii) that are thereafter deemed to be New Money Term Loans.

"Prepetition Reimbursements" means the amounts reimbursed prior to the Effective Date pursuant to the indemnification and reimbursement provisions in the Cooperation Agreement and in Section 10.3(d) of the Prepetition Term Loan Credit Agreement for certain expenses incurred pursuant to the Prepetition Term Loan Credit Agreement; *provided* that, the Prepetition Reimbursements shall not include any amounts designated as Bridge Loans.  The amount of Prepetition Reimbursements held by each Lender as of the Effective Date is as set forth on Schedule 2.1.

"Prepetition Term Loan Administrative Agent" shall have the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Term Loan Credit Agreement" shall have the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Term Loan Lenders" has the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Term Loan Documents" means the "Loan Documents" as defined in the Prepetition Term Loan Credit Agreement.

"Prepetition Term Loan Obligations" means the Prepetition Term Loans plus interest, fees, costs and expenses and all other "Obligations" as defined in and under the Prepetition Term Loan Credit Agreement.

"Prepetition Term Loans" has the meaning assigned to such term in the recitals of this Agreement.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest *per annum* interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (i) the outstanding Term Loans of that Lender by (ii) the aggregate outstanding Term Loans of all Lenders.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Real Estate Asset" means, at any time of determination, any interest (fee or otherwise, but excluding any leasehold interest) in real property then owned by any Loan Party.

"Recipient" means the Administrative Agent, the Collateral Agent and any Lender, or any combination thereof (as the context requires).

"Recovery Event" means any settlement of or payment in respect of any property or casualty insurance claim (excluding the proceeds of business interruption insurance or other similar compensation for loss of revenue) or any condemnation proceeding relating to any asset of the Borrower or its Subsidiaries.

"Reference Date" means March 31, 2023.

"Register" has the meaning set forth in Section 10.4(b)(iv).

"Rejection Notice" has the meaning set forth in Section 2.8(g).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, or leaching of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material).

"Relevant Governmental Body" means, the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Required Governmental Authorization" means all material franchises, approvals, permits, consents, qualifications, certifications, authorizations, licenses, orders, registrations, certificates, variances or other similar permits, rights and all pending applications therefor from or with the relevant Governmental Authority required to operate the business of the Borrower and its Subsidiaries, as conducted as of the Effective Date, in accordance with applicable law.

"Required Lenders" means, at any time, a Lender or Lenders having outstanding Term Loans representing more than 50% of the sum of the total outstanding Term Loans at such time. The outstanding Term Loans of any Defaulting Lender and any Affiliated Lender shall be disregarded in determining Required Lenders at any time.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means any of the directors of the Board of Directors, the President, Chief Executive Officer, Vice President or Financial Officer of the applicable Loan Party, or any other officer or authorized signatory of the applicable Loan Party designated by such Person in writing to the Administrative Agent from time to time, acting singly.

"Restricted Debt Payment" means the making of any payment, prepayment, repurchase or redemption of or otherwise defeasing or segregating funds (including any offer to do any of the foregoing) in each case, whether optional, voluntary or mandatory (including as a result of a "change of control" or similar event having occurred), with respect to any Indebtedness (other than the Obligations hereunder), in each case, prior to the scheduled maturity thereof.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund, similar deposit or withholding Taxes, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any such Subsidiary.  The conversion of, or payment for (including payments of principal and payments upon redemption or repurchase), or paying any interest with respect to, any debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash shall not constitute a Restricted Payment.

"Retention Cap" means an aggregate amount up to $2,000,000.

"Roll-Up Loans" means, at any time, the amount of Prepetition Term Loans rolled-up pursuant to Section 2.1(b)(i).

"Roll-Up Multiple" means (a) with respect to any dollar of Bridge Loan New Money Term Loans or New Commitment New Money Term Loans, 7.00x and (b) with respect to any dollar of Prepetition Reimbursement New Money Term Loans, 2.00x.

"Roll-Up Notice" means a notice in the form of Exhibit D.

"S&P" means S&P Global Ratings, a Standard & Poor's Financial Services LLC business, a subsidiary of S&P Global Inc., and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clause (a) or (b) or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority or any jurisdiction in which the Borrower or its Subsidiaries do business or United Nations sanctions.

"Secured Parties" means, collectively (a) each Agent and each Lender and (b) the permitted successors and assigns of each of the foregoing.

"Security Agreements" means the Final DIP Order, that certain Pledge and Security Agreement, dated as of the Effective Date, by and among the Borrower and the Collateral Agent and any other document pursuant to which a Loan Party grants a security interest to secure the Obligations.

"Social Insurance" means any form of social insurance required under applicable law, including social security, employment, unemployment or employee insurance, workers' compensation and medical insurance, and any contribution payable therewith to any Governmental Authority or social welfare organization.

"Spot Rate" means, on any day, with respect to any currency other than Dollars, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 12:00 noon, Singapore time, on such date as quoted on the Bloomberg Currency Website after applying the currency converter set forth on the Bloomberg Currency Website.  In the event that such rate does not appear on the Bloomberg Currency Website, the Spot Rate shall be calculated by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Spot Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent, on or about 11:00 a.m., London time, on such date for the purchase of such currency for delivery two (2) Business Days later; *provided* that if, at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent, after consultation with the Borrower, may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one *minus* the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Sub-Agent" has the meaning set forth in Section 9.1.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, exempted company incorporated with limited liability, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, exempted company incorporated with limited liability, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity (including by value) or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the partnership interests are, as of such date, owned (directly or indirectly), controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent and which is required by GAAP to be consolidated in the consolidated financial statements of the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Note" means a promissory note in the form of Exhibit D, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Term Loans</u>" means, individually and collectively, the New Money Term Loans and the Roll-Up Loans.

"<u>Term SOFR</u>" means, the Term SOFR Reference Rate for a tenor comparable to the Interest Period on the day (such day, the "<u>Periodic Term SOFR Determination Day</u>") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 11:00 a.m. on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such Periodic Term SOFR Determination Day. If Term SOFR as so determined would be less than 1.00% per annum, then Term SOFR will be deemed to be 1.00% per annum for the purposes of this Agreement and the other Loan Documents.

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"<u>Term SOFR Loan</u>" means any Term Loans bearing interest at a rate determined by reference to Term SOFR.

"<u>Term SOFR Reference Rate</u>" means the forward-looking term rate based on SOFR.

"<u>Tranche 1 Funding Conditions</u>" has the meaning set forth in <u>Section 4.2</u>.

"<u>Tranche 2 Funding Conditions</u>" has the meaning set forth in <u>Section 4.3</u>.

"<u>Tranche 1 New Money Term Loans</u>" has the meaning set forth in <u>Section 2.1(a)</u>.

"<u>Tranche 2 New Money Term Loans</u>" has the meaning set forth in <u>Section 2.1(a)</u>.

"<u>Transactions</u>" means the execution, delivery and performance by the Loan Parties of each Loan Document to which it is a party, the borrowing of Term Loans and the use of the proceeds thereof, and the granting of Liens in the Collateral under the Collateral Documents.

"<u>Treasury Regulations</u>" means all proposed, temporary, and final regulations promulgated under the Code, as such regulations may be amended from time to time.

"<u>Type</u>", when referring to the New Money Term Loans, means whether such New Money Term Loan claim arose from New Money Term Loan Commitments as of the Effective Date, from Bridge Loans rolled on a cashless basis on the Effective Date pursuant to Section 2.1(a)(iii) or Prepetition Reimbursements rolled on a cashless basis on the Effective Date pursuant to Section 2.1(a)(iii).

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unasserted Contingent Obligations" shall mean, at any time, with respect to the Obligations, obligations for indemnifications, damages, reimbursements and other liabilities that expressly survive the termination of the underlying Loan Documents and in respect of which no written assertion of liability, claim or demand for payment has been made (and, in the case of such Obligations for indemnification, no written notice for indemnification has been issued by the indemnitee) at such time.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Uniform Commercial Code" means the Uniform Commercial Code enacted in the State of New York, as amended from time to time.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof; *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Plan" means any Plan, and any other plan, fund or arrangement that provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment or employee welfare or other benefits which are subject to ERISA or the Code, or other United States federal, state or local law, and in each case, which is, or within the prior six years was, sponsored, maintained or contributed to by, or required to be contributed to by the Borrower or any of its Subsidiaries or any ERISA Affiliate (other than a Multiemployer Plan), or with respect to which the Borrower or any of its Subsidiaries or ERISA Affiliates could have any liability (other than a Multiemployer Plan).

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"wholly-owned" means, when used in reference to a subsidiary of any Person, that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal" means a withdrawal from the Funding Account or the Indemnity Escrow Account, made in accordance with Section 4.4.

"Withdrawal Date" means the date of the making of any Withdrawal.

"Withdrawal Notice" means a notice substantially in the form attached hereto as Exhibit E to be delivered by the Borrower to the relevant Escrow Agent and the Administrative Agent from time to time (i) to request a Withdrawal from the Funding Account or (ii) prior to making a Withdrawal from the Indemnity Escrow Account.

"Withholding Agent" means the Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.2.    Classification of Term Loans and Borrowings.  For purposes of this Agreement, Term Loans may be classified and referred to by Class (e.g., a "Tranche 1 New Money Term Loan" or a "Tranche 2 New Money Term Loan") or by Type (e.g., a "Bridge Loan New Money Term Loan" or a "Prepetition Reimbursement New Money Term Loan").  Borrowings also may be classified and referred to by Class (e.g., a "New Money Term Loan Borrowing").

Section 1.3.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, replaced, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, replacements, amendments and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

Section 1.4.    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from

time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision has been amended in accordance herewith.

Section 1.5.    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws):  (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.6.    Interest Rates.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the Term SOFR Reference Rate, Term SOFR or with respect to any alternative or successor rate thereto, or replacement rate thereof (including (a) any such alternative, successor or replacement rate implemented pursuant to Section 2.11(b) or (c), upon the occurrence of a Benchmark Transition Event, and (b) the implementation of any Conforming Changes pursuant to Section 2.11(d)). The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

ARTICLE II
THE CREDITS

Section 2.1.    The Commitments.

(a)    New Money Term Loans. Subject to the terms and conditions hereof and in the Final DIP Order, each New Money Term Loan Lender severally agrees to make term loans denominated in Dollars (each, a "New Money Term Loan") to the Borrower at any time after the Effective Date and prior to the end of the New Money Term Loan Availability Period:

(i)    on the Borrowing Date of the Tranche 1 New Money Term Loans, subject to the satisfaction (or waiver) of the Tranche 1 Funding Conditions, in an aggregate principal amount not to exceed $10,000,000 (the "Tranche 1 New Money Term Loans");

(ii)    on the Borrowing Date of the Tranche 2 New Money Term Loans, subject to the satisfaction (or waiver) of the Tranche 2 Funding Conditions, in an aggregate principal amount not to exceed $10,000,000 (the "Tranche 2 New Money Term Loans");

provided that, (w) the proceeds of the Tranche 1 New Money Term Loans shall be deposited directly in the Funding Account, (x) the proceeds of the Tranche 2 New Money Term Loans shall be deposited directly in the Indemnity Escrow Account, (y) the proceeds of the New Money Term Loans shall be used solely as

permitted herein and (z) any amounts repaid in respect of New Money Term Loans may not be reborrowed and unless previously terminated, the New Money Term Loan Commitments (A) in respect of Tranche 1 New Money Term Loans shall terminate upon the making of the Tranche 1 New Money Term Loans on the Borrowing Date of the Tranche 1 New Money Term Loans and (B) in respect of Tranche 2 New Money Term Loans shall terminate upon the making of the Tranche 2 New Money Term Loans on the Borrowing Date of the Tranche 2 New Money Term Loans; and

(iii)    upon the occurrence of the Effective Date, the Bridge Loans and Prepetition Reimbursements outstanding immediately prior to the Effective Date shall be converted on a cashless basis into and deemed to be Term Loans and Tranche 1 New Money Term Loans for all purposes under this Agreement and the other Loan Documents and will have identical terms as the Tranche 1 New Money Term Loans; provided, however, that the amount of Bridge Loans and Prepetition Reimbursements so converted shall not reduce the amount of New Money Term Loan Commitments that Borrower is permitted to borrow pursuant to clause (i) of this Section 2.1(a) and shall accrue interest in kind as set forth in Section 2.10(c).

(b)    Roll-Up Loans.

(i)    At any time after the Effective Date and prior to the Final Notice Date, each New Money Term Loan Lender shall have the right in its sole option to submit to the Administrative Agent a Roll-Up Notice with respect to its (or any of its Affiliates' or Approved Funds') Prepetition Term Loans (which such Prepetition Term Loans may be held as a lender of record, by participation or by any other means) in an amount up to the product of (x) the applicable Roll-Up Multiple and (y) the amount of New Money Term Loans held by such New Money Term Loan Lender (or any of its Affiliates or Approved Funds) (such aggregate amount in respect of each such New Money Term Loan Lender, the "Applicable Roll-Up Amount") as of the date of such notice, which shall include:

(1)    the amount and Type of New Money Term Loans and the amount of Prepetition Term Loans held by the submitting New Money Term Loan Lender (or any of its Affiliates or Approved Funds) as of such date (which such Prepetition Term Loans may be held as a lender of record, by participation or by any other means);

(2)    the amount of Prepetition Term Loans the submitting New Money Term Loan Lender intends to roll-up;

(3)    the proposed effective date of such roll-up election;

(4)    the amount and Type of any New Money Term Loans held but for which a roll-up right were previously exercised under a prior Roll-Up Notice or as set forth in an Assignment and Assumption; and

(5)    whether such New Money Term Loan Lenders (or its Affiliates or Approved Funds, as applicable) own the Prepetition Term Loans subject to the Roll-Up Notice as a lender of record, as a participant or by some other means.

(ii)    The maximum amount of Prepetition Term Loans eligible to be rolled-up by each New Money Term Loan Lender will be based on the Roll-Up Multiple applicable to the Type of New Money Term Loans held by such New Money Term Loan Lender on the date such Lender submits a Roll-Up Notice.  Any Prepetition Term Loans rolled-up pursuant to a Roll-Up Notice shall be converted on a cashless basis into Roll-Up Loans deemed funded on the Roll-Up Effective Date, without constituting a novation.  For the avoidance of doubt, a New Money Term Loan Lender may submit a Roll-Up Notice on more than one occasion as long as the aggregate principal amount of Prepetition Term Loans subject to all

35

such Roll-Up Notices does not exceed the Applicable Roll-Up Amount of such New Money Term Loan Lender as of the date of such Roll-Up Notice.  The Roll-Up Loans will constitute Term Loans under this Agreement and all other Loan Documents.

(iii)    The roll-up options in clause (ii) above shall be attributable to and travel with (in the case of any assignment, participation or transfer after the Effective Date) the New Money Term Loans. Any exercise of the roll-up option affiliated with any dollar of New Money Term Loans shall be noted by the Administrative Agent on the Register within three (3) Business Days of receiving the relevant Roll-Up Notice (such date the "Roll-Up Effective Date").

(iv)    Unless designated otherwise in the applicable Roll-Up Notice, the amount of Prepetition Term Loans designated as being rolled up pursuant to such Roll-Up Notice will be debited on a *pro rata* basis among the Prepetition Term Loans held by the New Money Term Loan Lender and any of its Affiliates or Approved Funds on the Roll-Up Effective Date.

Section 2.2.    Term Loans and Borrowings.

(a)    Each New Commitment New Money Term Loan shall be made as part of a Borrowing consisting of New Money Term Loans of the same Class made by the Lenders in accordance with their respective Applicable Percentages.  The failure of any Lender to make any New Money Term Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the New Money Term Loan Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make New Money Term Loans as required hereunder.

(b)    The Tranche 1 New Money Term Loans and the Tranche 2 New Money Term Loans shall each be available only in a single drawing.

(c)    The New Money Term Loan Commitments shall be available to be drawn up to and including the Commitment Termination Date.

Section 2.3.    Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing not later than 12:00 p.m., New York City time, two (2) Business Days (or such shorter time period as may be agreed by the Administrative Agent in its sole discretion) before the date of the proposed Borrowing.  Each such written Borrowing Request shall be irrevocable and shall be confirmed promptly by e-mail (or other facsimile transmission) to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B attached hereto and signed by a Responsible Officer of the Borrower.  Each such written Borrowing Request shall specify the following information in compliance with Section 2.2:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the Class of Term Loans to be borrowed; and

(iii)    the date of such Borrowing, which shall be a Business Day.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's New Commitment New Money Term Loans to be made as part of the requested Borrowing.

Section 2.4.    Funding of Borrowings.

(a)        Each New Money Term Loan Lender shall make each New Money Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 10:00 a.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the New Money Term Loan Lenders.  Except as otherwise specified in the immediately preceding sentence, the Administrative Agent will make such New Money Term Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to either the Funding Account or the Indemnity Escrow Account, in accordance with the applicable Borrowing Request.

(b)        Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Applicable Percentage of such Borrowing, the Administrative Agent may (but shall not be obligated to) assume that such Lender has made such Applicable Percentage available on such date in accordance with paragraph (a) of this Section and may, in its sole discretion, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its Applicable Percentage of the applicable Borrowing available to the Administrative Agent and the Administrative Agent has made such amount available to the Borrower, then the applicable Lender severally agrees to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Term Loan included in such Borrowing.

Section 2.5.        [Reserved].

Section 2.6.        Repayment of Term Loans; Evidence of Debt.

(a)        The Borrower hereby unconditionally promises to pay to the Administrative Agent, for the account of each New Money Term Loan Lender, the then-unpaid principal amount of each New Money Term Loan of such New Money Term Loan Lender as provided in Section 2.6(c), in each case, together with accrued and unpaid interest on such Term Loan, to but excluding the date of payment.

(b)        [Reserved].

(c)        To the extent not previously repaid, all unpaid Term Loans shall be paid in full in Dollars by the Borrower on the Maturity Date; provided, however, that the Tranche 2 New Money Term Loans will be subject to any cashless roll or refinancing mechanics specified in the Escrow Tail Agreement in effect on the Maturity Date.

(d)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(e)        The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Term Loan made hereunder, the Class thereof and each Interest Payment Date applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(f)     The entries made in the accounts maintained pursuant to paragraph (e) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein (absent manifest error); *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans in accordance with the terms of this Agreement.

(g)     Any Lender may request that Term Loans made by it be evidenced by a Term Loan Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Term Loan Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).  Thereafter, the Term Loans evidenced by such Term Loan Note and interest thereon shall at all times (including after assignment pursuant to Section 10.4) be represented by one or more Term Loan Notes in such form payable to the payee named therein (or, if such Term Loan Note is a registered note, to such payee and its registered assigns).

Section 2.7.     Prepayment of Term Loans.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Borrowing (as provided in Section 2.8 below) in whole or in part, without premium or penalty, subject to prior notice in substantially the form of Exhibit J attached hereto and signed by a Responsible Officer of the Borrower, in accordance with this Section and subject to the requirements in Section 2.8(f).  The Borrower shall notify the Administrative Agent in writing by email (or other facsimile transmission or hand delivery of written notice) of any prepayment hereunder not later than 12:00 p.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; *provided* that, a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities or another transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Promptly following receipt of any such notice relating to a Borrowing of any Class, the Administrative Agent shall advise the applicable Lenders of the contents thereof.

Section 2.8.     Mandatory Prepayments.

(a)     [Reserved].

(b)     If any member of the Group shall actually receive Net Cash Proceeds from a final non-appealable judgment with respect to any of the Litigation Claims, then upon actual receipt of such Net Cash Proceeds, an amount equal to 100% of the Net Cash Proceeds thereof in excess of the Retention Cap shall be applied within five (5) Business Days of the receipt of such Net Cash Proceeds toward the prepayment of the Term Loans as set forth in Section 2.8(f).

(c)     If any member of the Group shall actually receive Net Cash Proceeds from any Asset Sale or Recovery Event, then upon actual receipt of such Net Cash Proceeds, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied within five (5) Business Days of the receipt of such Net Cash Proceeds toward the prepayment of the Term Loans as set forth in Section 2.8(f).

(d)     [Reserved].

(e)     [Reserved].

(f)     Prepayments of Term Loans shall be accompanied by accrued interest to the extent required by Section 2.10 and any costs or premiums as contemplated herein.  Prepayments of Term Loans shall be

applied in the case of prepayments pursuant to <u>Section 2.7</u> or <u>Section 2.8</u> to each Class of Term Loans, *pro rata* among all Classes of Term Loans (but subject to the priority provided for in <u>Section 8.2</u>).

(g)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to <u>Section 2.8</u> at least three (3) Business Days (or such shorter period of time as may be acceptable to the Administrative Agent) prior to the date of such prepayment. Each such notice shall be in substantially the form of <u>Exhibit J</u> attached hereto and signed by a Responsible Officer of the Borrower, shall specify the date of such prepayment and shall provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each New Money Term Loan Lender of the contents of any such prepayment notice and of such New Money Term Loan Lender's ratable portion of such prepayment (based on such Lender's Pro Rata Share of each relevant Class of the Term Loans). Each applicable New Money Term Loan Lender may reject all or a portion of its Pro Rata Share of any mandatory repayment of Term Loans pursuant to <u>Section 2.8</u> (such declined amounts, the "<u>Declined Proceeds</u>") by providing written (promptly confirmed by email) (each, a "<u>Rejection Notice</u>") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York City time, on the Business Day after the date of such New Money Term Loan Lender's receipt of notice from the Administrative Agent regarding such prepayment. Each Rejection Notice shall specify the principal amount of the Declined Proceeds with respect to such New Money Term Loan Lender. If a New Money Term Loan Lender fails to deliver such Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Declined Proceeds for such New Money Term Loan Lender, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Term Loans to which such New Money Term Loan Lender is otherwise entitled. Any Declined Proceeds shall be retained by the relevant member of the Group, as the case may be (subject to any prepayment obligations it may have with respect to other Indebtedness) and may be used for any purposes not expressly prohibited under this Agreement.

Section 2.9.    <u>Fees</u>.

(a)    The Borrower agrees to pay (i) to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent, (ii) to the Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between such Borrower and the Collateral Agent and (iii) to the Lenders, an upfront fee payable in the amount and at the times separately agreed upon between the Borrower and the Lenders.

(b)    All fees payable hereunder shall be paid on the dates due, in Dollars in immediately available funds, to the parties specified herein. Fees paid shall not be refundable under any circumstances.

Section 2.10.    <u>Interest</u>.

(a)    The Term Loans comprising each Borrowing shall bear interest at Term SOFR plus the Applicable Rate and shall be payable on each Interest Payment Date. Bridge Loan New Money Term Loans and Prepetition Reimbursement New Money Term Loans shall begin accruing interest from (and including) the Effective Date. All New Commitment New Money Term Loans shall begin accruing interest on the relevant Borrowing Date. Roll-Up Loans shall begin accruing interest on the "Effective Date" designated in the relevant Roll-Up Notice.

(b)    Accrued interest on the New Commitment New Money Term Loans shall be payable partially in cash in an amount equal to Term SOFR <u>plus</u> 1.00%, with the remaining accrued interest as of any Interest Payment Date payable in kind, which shall be capitalized by adding such amount to the then outstanding principal amount of the Tranche 1 New Money Term Loans on the applicable Interest Payment

Date.  Any interest paid in kind pursuant to this clause (b) shall begin accruing interest, beginning on and including the Interest Payment Date on which such interest paid in kind is added to the principal amount of the Term Loans in additional Tranche 1 New Money Term Loans.  Notwithstanding anything to the contrary herein or in any other Loan Document, (i) any principal amount of New Money Term Loans incurred on account of payment of interest in kind shall not be entitled to any roll-up option under Section 2.1(b) on account of such principal amount and (ii) any cash interest shall be payable solely out of proceeds of Tranche 1 New Money Term Loans or other cash on hand, but not out of proceeds of any Tranche 2 New Money Term Loans.

(c)      Accrued interest on the Roll-Up Loans, Bridge Loan New Money Term Loans and Prepetition Reimbursement New Money Term Loans shall be entirely payable in kind, which shall be capitalized by adding such amount to the then outstanding principal amount of the Roll-Up Loans on the applicable Interest Payment Date.  Any interest paid in kind pursuant to this clause (c) shall begin accruing interest, beginning on and including the Interest Payment Date on which such interest paid in kind is added to the principal amount of the Term Loans in additional Roll-Up Loans.  Interest on the Roll-Up Loans shall begin to accrue from (and including) the Roll-Up Effective Date for such Roll-Up Loans.

(d)      Notwithstanding the foregoing, at all times when any other Event of Default has occurred hereunder and is continuing all amounts outstanding hereunder shall bear interest, after as well as before judgment, at a rate *per annum* equal to (1) in the case of outstanding principal of any Term Loan, 2.0% *plus* the rate otherwise applicable to such Term Loan as provided in the preceding paragraphs of this Section or (2) in the case of any other outstanding amounts, 2.0% *plus* the rate applicable to Term Loans as provided in paragraph (a) of this Section.

(e)      All interest hereunder shall be computed on the basis of a year of 365 (or 366 in a leap year) days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(f)      In connection with the use or administration of the Term SOFR Reference Rate (or any Benchmark successor thereof), the Administrative Agent will have the right to make Conforming Changes (subject to the consent rights of the Borrower set forth in such definition) from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR Reference Rate (or any Benchmark successor thereof).

Section 2.11.    Benchmark Replacement.

(a)      Replacing Future Benchmarks. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.11(a) will occur prior to the applicable Benchmark Transition Start Date.

(b)      Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make

Conforming Changes (subject to the consent rights of the Borrower set forth in such definition) from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)        <u>Notices; Standards for Decisions and Determinations</u>. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement, (ii) the effectiveness of any Conforming Changes, (iii) the removal or reinstatement of any tenor of a Benchmark and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or the Borrower as expressly set forth in this <u>Section 2.11</u> and the defined terms used herein, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.11</u>.

(d)        <u>Unavailability of Tenor of Benchmark</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate and EURIBOR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may, with the consent of the Borrower (such consent not to be unreasonably withheld), modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may, with the consent of the Borrower (such consent not to be unreasonably withheld), modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)        <u>Benchmark Unavailability Period</u>. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a Term SOFR Borrowing to be made, conversion to or continuation of Term SOFR Loans, to be made, converted or continued during any Benchmark Unavailability Period denominated in the applicable currency and, failing that, in the case of any request for any affected Term SOFR Borrowing, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans and (ii) during the continuance of any Benchmark Unavailability Period, any outstanding affected Term SOFR Loans will be deemed to have been converted to Base Rate Loans at the end of the applicable Interest Period.

Section 2.12.    <u>Increased Costs</u>.

(a)        If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by or participated in, any Lender;

(ii)  impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement; or

(iii)  impose on any Recipient any Taxes (other than Indemnified Taxes, Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes, or Tax described in clauses (b) through (d) of the definition of "Excluded Taxes"), on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto,

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Term Loan (or of maintaining its obligation to make any such Term Loan) or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)  If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital or liquidity of such Lender's holding company, if any, as a consequence of this Agreement, the New Money Term Loan Commitments hereunder or the New Money Term Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  A certificate of a Lender setting forth in reasonable detail the circumstance giving rise to the increased cost incurred by such Lender and the amount or amounts necessary to compensate such Lender or its respective holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided, further*, that, if the Change in Law giving rise to such increased costs or reductions is retroactive (or has retroactive effect), then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13.    [Reserved].

Section 2.14.    Taxes.

42

(a)    Any and all payments by or on account of any obligation of each applicable Loan Party under any Loan Document, any Fee Letter shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by each applicable Loan Party shall be increased as necessary so that, after making such deduction or withholding (including such deductions and withholdings applicable to additional sums payable under this Section), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, each applicable Loan Party shall (i) timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law or (ii) at the option of any Agent, timely reimburse such Agent for any payment of such Other Taxes.

(c)    Each applicable Loan Party shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes payable or paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    (i)    Any Lender that is entitled to an exemption from, or reduction of, withholding Tax with respect to payments made under this Agreement or any other Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.14(e)(ii)(1), 2.14(e)(ii)(2), and 2.14(e)(ii)(4)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(1)    Any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax.

(2)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(A)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States of America is a party, (x) with respect to payments of interest under this Agreement or any other Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any other Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)    executed copies of IRS Form W-8ECI;

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit I-1 to the effect that such Foreign Lender is not (I) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (II) a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (III) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "Portfolio Interest Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(D)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a Portfolio Interest Certificate substantially in the form of Exhibit I-2 or Exhibit I-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a Portfolio Interest Certificate substantially in the form of Exhibit I-4 on behalf of each such partner.

(3)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from, or a reduction in, U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(4)      If a payment made to a Lender under this Agreement or any other Loan Document would be subject to U.S. federal withholding Tax imposed pursuant to FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.14(e)(ii)(4), "FATCA" shall include any amendments made to FATCA after the Effective Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand thereof, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.4(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case that are payable or paid by the Administrative Agent in connection with this Agreement or any other Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent pursuant to this paragraph (f).

(g)      If any Lender or the Administrative Agent determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided, however*, that (i) any Lender or the Administrative Agent may determine, in its sole discretion exercised in good faith consistent with the policies of such Lender or the Administrative Agent, whether to seek a refund for any Taxes; (ii) any Taxes that are imposed on a Lender or the Administrative Agent as a result of a disallowance or reduction of any Tax refund with respect to which such Lender or the Administrative Agent has made a payment to the indemnifying party pursuant to this Section shall be treated as an Indemnified Tax for which the indemnifying party is obligated to indemnify such Lender or the Administrative Agent pursuant to this Section; (iii) nothing in this Section shall require the Lender or the Administrative Agent to disclose its Tax returns or any other information that it deems confidential to a Loan Party or any other Lender (including its tax returns); and (iv) neither any Lender nor the Administrative Agent shall be required to pay any

amounts pursuant to this Section for so long as an Event of Default exists. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g), the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(h)    For purposes of this Section 2.14, the term "applicable law" includes FATCA.

(i)    Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the New Money Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under this Agreement and the other Loan Documents.

Section 2.15.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.12, Section 2.13 or Section 2.14, or otherwise) prior to 12:00 noon, New York City time, in each case on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent and except that payments pursuant to Section 2.12, Section 2.13, Section 2.14 and Section 10.3 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment or performance hereunder shall be due on a day that is not a Business Day, the date for payment or performance shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)    If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (as in effect from time to time) (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans to any assignee or participant, other than to the Borrower or any Subsidiary of the Borrower or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(c)      Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may (but shall not be obligated to) assume that the Borrower has made such payment on such date in accordance herewith and may in its sole discretion, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(d)      If any Lender shall fail to make any payment required to be made by it pursuant to <u>Section 2.4(b)</u> or paragraph (b) of this Section, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.16.      <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)      If any Lender requests compensation under <u>Section 2.12</u>, or if any of the Loan Parties are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.14</u>, then such Lender shall (if requested by the relevant Loan Party) use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 2.12</u> or <u>Section 2.14</u>, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      If (i) any Lender requests compensation under <u>Section 2.12</u>, (ii) any of the Loan Parties is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.14</u>, (iii) any Lender is a Defaulting Lender or a Non-Consenting Lender or (iv) [reserved], then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 10.4</u>), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (1) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (2) such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (3) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.14</u>, such assignment will result in a reduction in such compensation or payments, (4) such assignment does not conflict with applicable law and (5) in the case of any assignment resulting from a Lender becoming a Non- Consenting Lender, (x) the applicable assignee shall have consented to, or shall consent to, the applicable amendment, waiver or consent and (y) the Borrower exercises its rights pursuant to this clause (b) with respect to all Non-Consenting Lenders relating to the applicable amendment, waiver or consent.  A Lender shall not be required to make any such

assignment or delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation have ceased to apply.

(c)     Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto in order for such assignment and delegation to be effective and shall be deemed to have consented to and be bound by the terms thereof; *provided* that, following the effectiveness of any such assignment and delegation, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender; *provided* that any such documents shall be without recourse to or warranty by the parties thereto.

Section 2.17.     <u>Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations</u>. The priority of the Collateral Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Final DIP Order (and, for the avoidance of doubt, are subject to the Carve-Out). Subject to the terms of the Final DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without application to or order of the Bankruptcy Court.

Section 2.18.     [Reserved].

Section 2.19.     <u>Defaulting Lenders</u>.

(a)     Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and in <u>Section 10.2</u>;

(ii)     any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Section 8.1</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 10.8</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Term Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Term Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (A) such payment is a payment of the principal amount of any Term Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (B) such Term

Loans were made when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Term Loans of all Non- Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Term Loans of such Defaulting Lender until such time as all Term Loans are held by the Lenders *pro rata* in accordance with their respective Applicable Percentages.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto; and

(b)     If the Borrower and the Administrative Agent each agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Term Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Term Loans to be held on a *pro rata* basis by the Lenders in accordance with their respective Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.20.     Escrow Tail Agreement.  The Borrower and the Administrative Agent (at the direction of the Required Lenders) shall (a) negotiate the Escrow Tail Agreement in good faith and (b) on or before 30 days (or such later date as the Borrower and the Administrative Agent may agree in their reasonable discretion) after the Effective Date, cause to be delivered to each other a fully-executed copy of the Escrow Tail Agreement.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders and each Agent that:

Section 3.1.     Organization; Powers.  Each of the Borrower and its Subsidiaries is an entity duly organized or incorporated, validly existing and in good standing (or equivalent status in the relevant jurisdiction to the extent the concept is applicable in such jurisdiction) under, and by virtue of, the applicable laws of the place of its incorporation or establishment and subject to any restriction on account of the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing (or equivalent status in the relevant jurisdiction to the extent the concept is applicable in such jurisdiction) in, every jurisdiction where such qualification is required, in each case (other than with respect to the due organization of, valid existence of, and good standing under the laws of the jurisdiction of its organization of, the Borrower and each Subsidiary), except where the failure to do so does not currently have and would not reasonably be expected to result in a Material Adverse Effect.

Section 3.2.     Authorization; Enforceability.  Subject to the entry of the Final DIP Order and the terms thereof, each Loan Party has all requisite corporate power and authority to enter into, execute, deliver and perform its obligations under each of the Loan Documents to which it is or will be a party and to consummate the transactions contemplated thereunder (including the Transactions).  All corporate actions on the part of each Loan Party necessary for the authorization, execution and delivery of the Loan Documents to which it is or will be a party and the performance of all its obligations thereunder (including any board or shareholder approval, as applicable) have been taken.  Each Loan Document to which a Loan Party is or will be a party is, or when executed by the other parties thereto, will be, valid and legally binding

49

obligations of such Loan Party, enforceable against such Loan Party in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other applicable laws now or hereafter in effect of general application affecting enforcement of creditors' rights generally, and (b) as limited by applicable laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, regardless of whether considered in a proceeding in equity or at law.

Section 3.3.    <u>Governmental Approvals; No Conflicts</u>.    The valid execution, delivery and performance of each Loan Document by each Loan Party and the consummation by such Loan Party of the transactions contemplated thereby (including the Transactions):

(a) do not require any filings, notifications, notices, submissions, applications or consents from or with, or any other action by, any Governmental Authority or any other Person, except (i) such as have been obtained or made and are in full force and effect, and (ii) those filings, notifications, notices, submissions, applications or consents the failure of which to be obtained or made does not currently have and would not reasonably be expected to have a Material Adverse Effect, and

(b) will not (i) result in any violation of, be in conflict with, or constitute a default under, require any consent under, or give any Person rights of termination, amendment, acceleration (including acceleration of any obligation of the Borrower or any of its Subsidiaries) or cancellation under, (1) any applicable order of any Governmental Authority, (2) any provision of the organizational documents or constitutional documents (as applicable) of the Borrower or any of its Subsidiaries, or any shareholders' agreement entered into with respect to the Borrower, (3) any applicable law, rule, or regulation, or (4) any indenture, agreement or other instrument (other than the agreements and instruments referred to in the foregoing sub-clause (2)) binding upon the Borrower or any of its Subsidiaries or its assets, or (ii) result in the creation of any Lien upon any of the properties or assets of the Borrower or any of its Subsidiaries (other than the Liens created pursuant to the Collateral Documents), except in the case of the foregoing sub-clauses (1), (3), and (4) of clause (i), as does not currently have and would not reasonably be expected to have a Material Adverse Effect.

Section 3.4.    <u>Financial Condition; No Material Adverse Change</u>.

(a)    [Reserved].

(b)    Since the Reference Date, no event, development or circumstance exists or has occurred that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.5.    <u>Title</u>.

(a)    Except where the failure to have title or other interest does not currently have and would not reasonably be expected to have a Material Adverse Effect, each of the Borrower and its Subsidiaries has good and valid title to, or valid leasehold interests in or rights to use, all the assets owned by it (including Equity Interests, but excluding Intellectual Property), whether tangible or intangible (including those reflected in any financial statements in respect of the Borrower delivered to the lenders under Indebtedness for borrowed money of the Borrower existing as of the date hereof, together with all assets acquired thereby since the Reference Date, but excluding any tangible or intangible assets that have been Disposed of since the Reference Date in the ordinary course of business), and in each case free and clear of all Liens, other than (i) Permitted Encumbrances, (ii) Liens arising by operation of law, (iii) Liens permitted by <u>Section 6.2</u>

and (iv) minor defects in title that do not materially interfere with the ability of the Borrower and its Subsidiaries to conduct their businesses.

Section 3.6.    <u>Litigation and Environmental Matters</u>.

(a)    Except for the Chapter 11 Case and the Litigation Claims, or as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) there is no Action by or before any arbitrator or Governmental Authority pending, or to the knowledge of the Borrower, threatened in writing, against or affecting any of the Borrower or its Subsidiaries or any of their respective officers, directors or commissioners with respect to their respective businesses or proposed business activities of the Borrower and its Subsidiaries, or any officers, directors or commissioners of any of the Borrower or its Subsidiaries in connection with such Person's respective relationship with the Borrower or its Subsidiaries and (ii) there is no judgment or award unsatisfied against the Borrower or any of its Subsidiaries nor is there any order of any Governmental Authority in effect and binding on the Borrower or any of its Subsidiaries or their respective assets or properties.

(b)    There are no Actions by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its Subsidiaries that involve this Agreement, any other Loan Document or the Transactions.

(c)    Except with respect to any other matters that do not currently have and would not reasonably be expected to have a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, or (iii) has received written notice of any claim with respect to any Environmental Liability.

Section 3.7.    <u>Compliance with Laws and Agreements</u>.

(a)    Except (x) as does not currently have and would not reasonably be expected to have a Material Adverse Effect and (y) as stated in filed pleadings or other documentation in connection with the Litigation Claims, (i) each of the Borrower and its Subsidiaries is in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property (including any Intellectual Property owned by it); and (ii) none of the Borrower or its Subsidiaries is, to the knowledge of the Borrower, under investigation with respect to a violation of any applicable law or is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, domestic or foreign.

(b)    No Default or Event of Default has occurred and is continuing.

(c)    Since the Reference Date, none of the Borrower or its Subsidiaries has received any letter or other written communication from, and, to the knowledge of the Borrower, there has not been any public notice of a type customary as a form of notification of such matters in the jurisdiction by, any Governmental Authority threatening or providing notice of (i) the revocation or suspension of any Required Governmental Authorizations issued to the Borrower or any of its Subsidiaries or (ii) the need for compliance or remedial actions in respect of the activities carried out by such Person, which revocation, suspension, compliance or remedial actions (or the failure of the Borrower or any of its Subsidiaries to undertake them) currently has or would reasonably be expected to have a Material Adverse Effect.

Section 3.8.      Investment Company Status.  No Loan Party is or is required to be registered as an "investment company" under the Investment Company Act.

Section 3.9.      [Reserved].

Section 3.10.      U.S. Plans and Non-U.S. Plans.

(a)      Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) each of the U.S. Plans has been operated and administered in accordance with its terms, and is in compliance with all applicable laws, rules, regulations and orders, and all contributions to, and payments for each such U.S. Plan have been timely made, and no event, transaction or condition has occurred or exists that would result in any liability or obligation to any of the Borrower or its Subsidiaries under such U.S. Plan; (ii) there are no pending or, to the knowledge of the Borrower, threatened Actions involving any U.S. Plan (except for routine claims for benefits payable in the normal operation of any U.S. Plan) and no facts or circumstances exist that could give rise to any such Actions; (iii) no U.S. Plan is under investigation or audit by any Governmental Authority and, to the knowledge of the Borrower, no such investigation or audit is contemplated or under consideration; and (iv) each U.S. Plan which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is composed of a master or prototype plan that has received a favorable opinion letter from the IRS, and, to the knowledge of the Borrower, nothing has occurred since the date of such determination that would adversely affect such determination.  No ERISA Event, either alone or in the aggregate, has occurred, or is reasonably expected to occur, other than as does not currently have and would not reasonably be expected to have a Material Adverse Effect.  There exists no Unfunded Pension Liability with respect to any Pension Plan, except as would not reasonably be expected to have a Material Adverse Effect.  As of the Effective Date, there are no U.S. Plans except as set forth in Schedule 3.10(a).

(b)      Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, (i) each of the Non-U.S. Plans has been operated and administered in accordance with its terms, and is in compliance with all applicable laws, rules, regulations and orders, and all contributions to, and payments for each such Non-U.S. Plan have been timely made, and no event, transaction or condition has occurred or exists that would result in any liability or obligation to any of the Borrower or its Subsidiaries under such Non-U.S. Plan; (ii) there are no pending or, to the knowledge of the Borrower, threatened Actions involving any Non-U.S. Plan (except for routine claims for benefits payable in the normal operation of any Non-U.S. Plan) and no facts or circumstances exist that could give rise to any such Actions; (iii) no Non-U.S. Plan is under investigation or audit by any Governmental Authority and, to the knowledge of the Borrower, no such investigation or audit is contemplated or under consideration; and (iv) each of the Borrower or its Subsidiaries is in compliance with all applicable laws and binding contractual obligations relating to its provision of any form of Social Insurance, and has paid, or made provision for the payment of, all Social Insurance contributions required under applicable law and binding contractual obligations.

Section 3.11.      [Reserved].

Section 3.12.      Subsidiaries.

(a)      To the Borrower's knowledge, Schedule 3.12 sets forth as of the Effective Date a list of all Subsidiaries and the percentage ownership (directly or indirectly) of the Borrower therein.

(b)      To the Borrower's knowledge, except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, the shares of capital stock or other ownership interests of

52

all Subsidiaries of the Borrower have been duly authorized and validly issued and are fully paid and non-assessable and are owned by the Borrower (other than minority interests held by other Persons that do not violate any provision of this Agreement), directly or indirectly, free and clear of all Liens other than Liens permitted under Section 6.2.

Section 3.13.    Anti-Terrorism Laws; USA Patriot Act.  To the extent applicable, the Borrower and each Subsidiary of the Borrower is in compliance, in all material respects, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (b) the USA Patriot Act.  To the knowledge of the Borrower, none of the Loan Parties or their Subsidiaries is the subject of any action or investigation by any Governmental Authority with respect to any actual or alleged violation of the USA Patriot Act.

Section 3.14.    Anti-Corruption Laws and Sanctions.

(a)    The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Loan Parties and their respective Subsidiaries and their respective directors, officers, commissioners, employees and agents (or others acting for or on behalf of them) with Anti-Corruption Laws and applicable Sanctions, and each Loan Party, its Subsidiaries and its and their respective directors, officers, commissioners, employees, and, to the knowledge of the Borrower, its and their respective agents (or others acting for on behalf of them), are in compliance and have for the past five years been in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

(b)    None of the Loan Parties or their respective Subsidiaries or, to the knowledge of the Borrower, their respective directors, commissioners, officers, employees, agents or others acting for or on behalf of them is engaged in or subject to any proceedings, demands, inquiries, indictments, or hearings or, to the knowledge of the Borrower, investigations, by or before any court, statutory or governmental body, department, board or agency relating to applicable Anti-Corruption Laws or Sanctions, and, to the knowledge of the Borrower, no such proceeding, demand, inquiry, investigation or hearing has been threatened in writing.

(c)    None of the Loan Parties or their respective Subsidiaries or, to the knowledge of the Borrower, their respective directors, commissioners or officers has ever been found by a Governmental Authority to have violated any Anti-Corruption Law.

(d)    None of (i) the Borrower or any Subsidiary of the Borrower or any of its or their respective directors or officers, or (ii) to the knowledge of the Borrower, any commissioner, employee or agent of (or others acting for or on behalf of) the Borrower or any Subsidiary of Borrower that will act in any capacity in connection with or benefit from the New Money Term Loan Facility is a Sanctioned Person.

(e)    No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

Section 3.15.    Margin Stock.

(a)    None of the Borrower or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock.

(b)    No part of the proceeds of any Term Loan will be used to purchase or carry any Margin Stock or to extend credit for the purposes of purchasing or carrying Margin Stock in violation of the

provisions of the Regulations of the Federal Reserve Board, including Regulation T, U or X, or any substantially equivalent law or regulation in effect in any other applicable jurisdiction.

Section 3.16.    [Reserved].

Section 3.17.    [Reserved].

Section 3.18.    Insurance Matters.  Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect, all insurance policies and all self-insurance programs and arrangements relating to the business, assets, Business Liabilities, operations and directors, commissioners and officers (if any) of each Loan Party are in full force and effect, no written notice of cancellation or modification has been received, and, to the knowledge of the Borrower, there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default, by any insured thereunder.  Such insurance policies are with reputable insurance carriers and provide coverage against such risks and in such amounts and with such deductibles as are customary for businesses of that size in businesses generally comparable to the business of the Borrower.

Section 3.19.    Material Contracts.  Except as does not currently have and would not reasonably be expected to have a Material Adverse Effect: (i) each agreement to which the Borrower or any of its Subsidiaries is a party is a valid and binding agreement of such Person, the performance of which by such Person does not violate any applicable law, rule, regulation or order of any Governmental Authority, and each such agreement is in full force and effect and enforceable against such Person in accordance with its terms, except (1) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (2) as may be limited by laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies, regardless of whether considered in a proceeding in equity or at law; and (ii) each of the Borrower and its Subsidiaries has duly performed all of its obligations under each agreement to which it is a party to the extent that such obligations to perform have accrued, and no breach or default, alleged breach or alleged default, or event which would (with the passage of time, notice or both) constitute a breach or default thereunder by such Person with respect thereto, or, to the knowledge of the Borrower, any other party or obligor with respect thereto, has occurred.

Section 3.20.    Collateral Documents.  Subject to the entry of the Final DIP Order, the Liens granted by the Collateral Documents constitute valid and perfected Liens on the properties and assets covered by the Collateral Documents, to the extent required by the Loan Documents and subject to no prior or equal Lien except those Liens permitted to be prior or equal by Section 6.2.

Section 3.21.    Employee Matters.  Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected to result in a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Subsidiaries, (c) to the knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Subsidiaries and (d) to the knowledge of the Borrower, no union organization activity that is taking place, except, with respect to any matter specified in clause (a), (b), (c) or (d) above, that would not reasonably be expected to result in a Material Adverse Effect.

Section 3.22.   <u>Pari Passu Ranking</u>.   The obligations evidenced by each Loan Document constitute direct and unconditional general obligations of the Loan Parties, and rank in right of payment and otherwise at least *pari passu* with all other senior unsecured and unsubordinated Indebtedness of the Loan Parties, except for obligations mandatorily preferred by applicable law, and have the ranking and priority provided for in the Final DIP Order and Intercreditor Agreement.

Section 3.23.   <u>Status as Senior Indebtedness</u>. The Obligations constitute "senior indebtedness," "senior debt," "guarantor senior debt" or "senior secured financing" (or any comparable term) as defined in any applicable Junior Financing Documentation.

Section 3.24.   <u>Security Documents</u>. Subject to the entry of the Final DIP Order and the terms thereof, the Collateral Documents shall be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid, enforceable, perfected and (if applicable) unavoidable Liens on and security interests in the Collateral as set forth in Section 3.22 and as further set forth in the Final DIP Order. The Loan Parties shall have delivered UCC financing statements, in suitable form for filing, and shall have made arrangements for the filing thereof that are reasonably acceptable to the Administrative Agent.

Section 3.25.   <u>Approved Budget</u>. The initial Approved Budget attached hereto as <u>Exhibit C</u> and each subsequent Approved Budget delivered in accordance with Section 5.16 has been or will be prepared in good faith, with due care and based upon assumptions the Borrower believes to be reasonable on the date of delivery of the then-applicable Approved Budget. To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) could reasonably be expected to result in any material change in the Approved Budget, other than those disclosed to the Lenders and its advisors.

Section 3.26.   <u>Bankruptcy Matters</u>.

(a)   The Chapter 11 Case was commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given. Proper notice was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the Final DIP Order and (y) the hearing for the approval of the Final DIP Order.

(b)   After entry of the Final DIP Order and pursuant to and to the extent provided in the Final DIP Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out and subject to the priorities set forth in the Final DIP Order.

(c)   The Final DIP Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Administrative Agent's and the Required Lenders' consent.

For the sole purpose of this <u>Article III</u>, any reference to "material" means a matter that is quantifiable in monetary terms in the sum of $250,000 or more or which currently has or would reasonably be expected to be materially adverse to the Borrower and its Subsidiaries, the Administrative Agent or the Lenders.

ARTICLE IV
CONDITIONS

Section 4.1.   <u>The Effective Date</u>. The obligations of the Lenders to make Term Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 10.2</u>):

(a)     The Administrative Agent shall have received from each party to this Agreement, the Intercreditor Agreement and each other Loan Document to be entered into on the Effective Date, in each case, signed on behalf of such party.

(b)     The Final DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent or the Collateral Agent, respectively).

(c)     The Administrative Agent shall have received (i) copies of the organizational documents or constitutional documents (as applicable), resolutions of the board of directors of the Borrower and each other Loan Party (as applicable) approving the terms of, and the transactions contemplated by, the Loan Documents to which it is a party and the execution and delivery of such Loan Documents to be delivered by the Borrower and the other Loan Parties on the Effective Date and all documents evidencing other necessary corporate (or other applicable organizational) action, governmental approvals and registrations, if any, with respect to the Loan Documents and (ii) all other documents reasonably requested by the Administrative Agent relating to the organization, existence and good standing (or the equivalent) of each Loan Party and authorization of the transactions contemplated hereby.

(d)     The Administrative Agent and the Collateral Agent shall have received an incumbency certificate of a Responsible Officer, a manager, a director, the company secretary or an assistant secretary of each Loan Party certifying the names and true signatures of the officers, managers, directors or other authorized signatories of such Loan Party authorized to sign the Loan Documents to which it is a party, to be delivered by each Loan Party on the Effective Date and the other documents to be delivered hereunder on the Effective Date.

(e)     [Reserved].

(f)     [Reserved].

(g)     The Administrative Agent shall have received a certificate, dated as of the Effective Date and signed on behalf of the Borrower by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (k) and (l) of Section 4.1 as of the Effective Date.

(h)     The Administrative Agent and the Collateral Agent, as applicable, shall have received (i) all fees required to be paid by the Borrower on the Effective Date and (ii) all expenses required to be reimbursed by the Borrower for which invoices have been presented at least three (3) Business Days prior to the Effective Date, in each case, on or before the Effective Date.

(i)     The Administrative Agent shall have received the results of recent Uniform Commercial Code (or other applicable law), tax and judgment Lien searches with respect to each of the Loan Parties, and such results shall not reveal any material judgment or any Lien on any of the assets of the Loan Parties except for Liens permitted under Section 6.2 or Liens to be discharged on or prior to the Effective Date.

(j)     In order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority security interest in the Collateral, each Loan Party shall have delivered to the Collateral Agent (with a copy to the Administrative Agent):

(i)     (1) subject to Section 5.13, the certificates (if any) representing the Equity Interests (to the extent certificated) required to be pledged pursuant to any Security Agreement (or, if applicable in

56

any local jurisdiction, certified copies of the registers or extracts thereof), together with, as applicable, an irrevocable power of attorney, an undated stock power or similar instrument of transfer for each such certificate endorsed in blank by a duly authorized officer of the pledgor thereof, (2) each instrument evidencing any Indebtedness which is required to be pledged and delivered to the Collateral Agent pursuant to any Security Agreement endorsed (without recourse) in blank (or accompanied by a transfer form endorsed in blank) by the pledgor thereof and (3) all notices required to be signed and delivered by any Loan Party on or prior to the Effective Date pursuant to any Security Agreement; and

(ii)     (1) Uniform Commercial Code (or similar) financing statements naming the Borrower and each Guarantor as debtor and the Collateral Agent as secured party, in appropriate form for filing, registration or recordation in the jurisdiction of incorporation or organization of each such Loan Party, and (2) subject to Section 5.13, each other collateral document and filing as the Administrative Agent may deem necessary or advisable under applicable law and in any applicable jurisdiction to create and perfect a security interest in the Collateral.

(k)     The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties shall be true and correct in all respects) on and as of the Effective Date, except that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in such manner as of such earlier date;

(l)     As of the Effective Date and immediately after giving effect to the Transactions, no Default or Event of Default shall have occurred and be continuing.

(m)     [Reserved].

(n)     (i) The Administrative Agent shall have received, at least three (3) Business Days prior to the Effective Date, all documentation and other information regarding the Borrower and the Guarantors requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act, to the extent requested in writing of the Borrower at least five (5) Business Days prior to the Effective Date, and (ii) to the extent a Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least three (3) Business Days prior to the Effective Date, any Lender that has requested, in a written notice to the Borrower at least five (5) Business Days prior to the Effective Date, a Beneficial Ownership Certification in relation to such Loan Party shall have received such Beneficial Ownership Certification.

For purposes of determining compliance with the conditions specified in this Section 4.1 and Section 4.2 as of the Effective Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

Section 4.2.     Tranche 1 Funding Conditions.  The obligation of each Lender to make a Tranche 1 New Money Term Loan is subject to the satisfaction of the following conditions (the "Tranche 1 Funding Conditions"):

(a)     The Administrative Agent shall have received a fully executed Borrowing Request;

(b)    The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the applicable Borrowing Date; *provided* that (A) in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or for the respective period, as the case may be and (B) if any representation and warranty is qualified by or subject to a "material adverse effect", "material adverse change" or similar materiality term or qualification, such representation and warranty shall be true and correct in all respects;

(c)    At the time of and immediately after giving effect to such Tranche 1 New Money Term Loan, no Default or Event of Default shall have occurred and be continuing;

(d)    The Final DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent or the Collateral Agent, respectively);

(e)    Delivery of an updated Approved Budget as of the Borrowing Date of the Tranche 1 New Money Term Loans;

(f)    The Loan Parties shall be in compliance with all In-Court Milestones applicable as of the Borrowing Date of the Tranche 1 New Money Term Loans; and

(g)    The Borrower shall have established or designated the Funding Account and shall have delivered an executed copy of the Escrow Agreement.

Section 4.3.    Tranche 2 Funding Conditions. The obligation of each Lender to make a Tranche 2 New Money Term Loan is subject to the satisfaction of the following conditions (the "Tranche 2 Funding Conditions"):

(a)    If the Borrowing Date of the Tranche 2 New Money Term Loans occurs on any date after the Effective Date and prior to the Final Notice Date,

(i)    The Final DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent or the Collateral Agent, respectively);

(ii)    The Administrative Agent shall have received a fully executed Borrowing Request;

(iii)    The Borrower shall have established or designated the Indemnity Escrow Account and shall have delivered an executed copy of the Indemnity Escrow Agreement; and

(iv)    The Administrative Agent shall have received a certificate in the form of Exhibit J hereto executed by a Responsible Officer of the Borrower certifying that the Borrower has received a bona fide request in good faith from Pohl for indemnification under the Indemnification Obligations, (y) the request is for bona fide indemnifiable amounts determined in good faith under the Indemnification Obligations (the "Indemnification Payment") and (z) the amount of such request (such notice an "Indemnification Notice"); or

(b)        If the Borrowing Date of the Tranche 2 New Money Term Loans occurs on any date from and after the Final Notice Date until the Maturity Date,

(i)        The Final DIP Order shall have been entered by the Bankruptcy Court and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent or the Collateral Agent, respectively);

(ii)        The Administrative Agent shall have received a fully executed Borrowing Request;

(iii)        The Borrower shall have established or designated the Indemnity Escrow Account and shall have delivered an executed copy of the Indemnity Escrow Agreement; and

(iv)        The Administrative Agent shall have received a certificate executed by a Responsible Officer of the Borrower certifying that the Borrower has received a bona fide request in good faith from Pohl to fund Tranche 2 New Money Term Loans for purposes of payment of future indemnification obligations.

Section 4.4.        Conditions to Withdrawals from Funding Account. Any Withdrawal from the Funding Account is subject to satisfaction of the following conditions precedent prior to or substantially concurrently with the applicable withdrawal:

(a)        The Administrative Agent (for distribution to the Lenders via posting on Debtdomain) shall have received an executed Withdrawal Notice, executed by the Borrower requesting the proposed Withdrawal thereunder by no later than 2:00 p.m. three (3) Business Days prior to the proposed Withdrawal Date;

(b)        The representations and warranties contained in the Loan Documents shall be true and correct in all material respects on and as of the applicable Withdrawal Date; provided that (A) in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or for the respective period, as the case may be and (B) if any representation and warranty is qualified by or subject to a "material adverse effect", "material adverse change" or similar materiality term or qualification, such representation and warranty shall be true and correct in all respects;

(c)        No Event of Default or Default shall have occurred and be continuing on the Withdrawal Date;

(d)        No motion, pleading or application seeking relief affecting the provision of financing under this Agreement in a manner reasonably expected to have a Material Adverse Effect shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Required Lenders;

(e)        The Borrower shall be in compliance in all respects with the In-Court Milestones (subject to any extensions, waivers, or grace or cure periods);

(f)        The Loan Parties shall be in compliance with the Approved Budget in all respects and the proceeds of the Term Loans shall be used as set forth in the Approved Budget;

(g)       Solely to the extent the intended use of proceeds for any such Withdrawal is not accounted for in the then-effective Approved Budget, the Required Lenders shall have determined in their commercial business judgment that such withdrawal is necessary or desirable to enhance the likelihood of repayment of the Obligations.

Upon receipt of the Withdrawal Notice and satisfaction of the conditions set forth in Section 4.4, the Administrative Agent shall promptly direct the Escrow Agent to disburse funds from the Funding Account by 2:00 p.m. on the applicable Withdrawal Date; provided that, if the Required Lenders determine (which determination may be communicated via a direction of the Required Lenders) that the Borrower has failed to satisfy the conditions precedent set forth in this Section 4.4 for a Withdrawal Notice and so advise the Administrative Agent in writing (directly or through a direction of the Required Lenders) prior to the Escrow Agent disbursing the Withdrawal, the Administrative Agent shall decline to authorize such Withdrawal and shall communicate the same to the Escrow Agent.

Other than with respect to amounts to fund the Carve-Out, in accordance with the Final DIP Order, on any date on which the Term Loans are accelerated, the Administrative Agent may apply any amounts remaining in the Funding Account to reduce the Term Loans then outstanding. None of the Loan Parties shall have (and each Loan Party hereby affirmatively waives) any right to withdraw, claim, or assert any property interest in any funds on deposit in the Funding Account upon the occurrence and during the continuance of any Default or Event of Default (except to fund the Carve-Out). It is understood and agreed that the Administrative Agent may not deliver a "Termination Notice" (or any such similar term as defined and under the Escrow Agreement) unless and until an Event of Default has occurred and is continuing.

The acceptance by the Borrower of a Withdrawal shall conclusively be deemed to constitute a representation by the Borrower that each of the conditions precedent set forth in Section 4.4 shall have been satisfied in accordance with its respective terms or shall have been irrevocably waived by the applicable relevant Person; provided, that the making of any such Term Loans or Withdrawal (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Agents, any Lender or other Secured Party of the provisions of this Article 4 on such occasion or on any future occasion or operate as a waiver of (i) the right of the Administrative Agent and the Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of any Agent or any Lender as a result of any such failure of the Loan Parties to comply.

Section 4.5.       Conditions to Withdrawals from Indemnity Escrow Account.  Any Withdrawal from the Indemnity Escrow Account is subject to the Administrative Agent (for distribution to the Lenders) having received an executed Withdrawal Notice, executed by the Borrower describing the intended Withdrawal thereunder by no later than 2:00 p.m. three (3) Business Days prior to the intended Withdrawal Date.

Upon receipt of the Withdrawal Notice, the Administrative Agent shall promptly direct the Indemnity Escrow Agent to disburse funds from the Indemnity Escrow Account by 2:00 p.m. on the applicable Withdrawal Date.

ARTICLE V
AFFIRMATIVE COVENANTS

Until the New Money Term Loan Commitments have expired or been terminated and all Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash, each Loan Party covenants and agrees with the Lenders that:

Section 5.1.     Financial Statements; Other Information.   The Borrower will furnish to the Administrative Agent (for distribution to each Lender):

(a)     [reserved];

(b)     [reserved];

(c)     within five (5) Business Days after the end of each fiscal month, a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit F attached hereto (a "Compliance Certificate") certifying as to whether a Default has occurred and is continuing as of the date thereof and, if a Default has occurred and is continuing as of the date thereof, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(d)     [reserved];

(e)     [reserved];

(f)     [reserved];

(g)     (i) such other information regarding the financial condition, business and operations of the Borrower or any of its subsidiaries as the Lenders may reasonably request and (ii) any information regarding Collateral required pursuant to the Collateral Documents; and

(h)     [reserved];

No Agent shall have any obligation to request the delivery or to maintain copies of the documents referred to herein, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 5.2.     Notices of Material Events.   The Borrower will furnish to the Administrative Agent (for distribution to each Lender) prompt written notice of the following:

(a)     the occurrence of any Default;

(b)     the filing or commencement of any Proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Subsidiary of the Borrower thereof that would reasonably be expected to result in a Material Adverse Effect;

(c)     any other development that becomes known to any officer of the Borrower or any of its Subsidiaries that results in, or would reasonably be expected to result in, a Material Adverse Effect;

(d)     any change in the information provided in the Beneficial Ownership Certification delivered to any Lender that would result in a change to the list of beneficial owners identified in such certification;

(e)     any notice of any Asset Sale or other event or action which will require a mandatory prepayment under this Agreement;

(f)     the occurrence of or forthcoming occurrence of any ERISA Event that would result in a Material Adverse Effect;

(g)    (A) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and (B) any remedial action taken by the Borrower or any of its Subsidiaries in response to (1) any Hazardous Materials Activities the existence of which could reasonably be expected to result in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(h)    Copies of any notices of default or acceleration (howsoever described) provided to the Borrower or of any of its Subsidiaries in connection with any Indebtedness pursuant to the terms of any Junior Financing Documentation, if any, in each case in a principal amount in excess of $500,000 and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 5.2.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.3.    Existence; Conduct of Business.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that (a) the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.3 and (b) none of the Borrower or any of its Subsidiaries shall be required to preserve, renew or keep in full force and effect its rights, licenses, permits, privileges or franchises where failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 5.4.    Payment of Obligations.  Subject to any limitations arising as a result of the filing of the Chapter 11 Case and the Approved Budget, the Borrower will, and will cause each of its Subsidiaries to, pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves are being maintained for those Taxes and the costs required to contest them, which have been disclosed in the latest financial statements of the Borrower or such Subsidiary, as applicable, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.5.    Maintenance of Properties; Insurance.  Subject to any limitations arising as a result of the filing of the Chapter 11 Case and the Approved Budget, the Borrower will, and will cause each of its Subsidiaries to, (a) keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear and casualty and condemnation events excepted, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect, and (b) maintain insurance with financially sound and reputable insurance companies or through self-insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 5.6.    Books and Records; Inspection Rights, Monthly Investor Calls.

(a)    The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which entries full, true and correct in all material respects are made and are sufficient to prepare financial statements in accordance with GAAP.  The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent (pursuant to the request made through the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition

with its officers and independent accountants (*provided* that the Borrower or such Subsidiary shall be afforded the opportunity to participate in any discussions with such independent accountants), all at such reasonable times and as often as reasonably requested (but no more than once annually if no Event of Default exists).  Notwithstanding anything to the contrary in this Agreement (including in this <u>Section 5</u>), none of the Borrower or any of its Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable law or any third-party consent legally binding on the Borrower or its Subsidiaries or (c) is subject to attorney, client or similar privilege or constitutes or includes attorney work-product (the foregoing, the "<u>Confidentiality Restrictions</u>").

(b)      The Borrower will hold a telephone meeting for the Lenders (which shall include the attendance of a Financial Officer of the Borrower) regarding the on-going business and financial performance of Borrower and its Subsidiaries once per fiscal month at a reasonable time selected by the Borrower (on no less than three (3) Business Days' notice to the Administrative Agent).

Section 5.7.      <u>Compliance with Laws and Agreements</u>.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws (including Environmental Laws), rules, regulations (including applicable foreign currency regulations and the Investment Company Act) and orders of any Governmental Authority applicable to it or its property, and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  The Borrower currently has, and will maintain in effect and enforce, policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and its and their respective directors, commissioners, officers, employees, agents (and others acting for or on behalf of them) of the foregoing with Anti-Corruption Laws and applicable Sanctions.

Section 5.8.      <u>Use of Proceeds</u>.

(a)      The proceeds of the Tranche 1 New Money Term Loans will be used solely to fund (x) bankruptcy-related professionals in connection with a bankruptcy filing for the Borrower and its Subsidiaries, (y) the reasonable and documented expected fees and expenses of Pohl, in his capacity as director and officer of the Borrower, and (z) other ordinary and customary fees and expenses in connection with the administration of the Borrower in the Chapter 11 Case, including, without limitation, the ordinary fees and expenses of any claims agents.

(b)      The proceeds of Tranche 2 New Money Term Loans will be used solely to provide funding to Borrower to pay Borrower's indemnification obligations owed to Pohl in his capacity as the director and officer of the Borrower solely to the extent the Borrower has received such requests for indemnification and otherwise met the Tranche 2 Funding Conditions.

(c)      The Borrower will not request any Borrowing, and will not use, and the Borrower shall procure that none of it, its Subsidiaries (whether acting via their employees, agents or any other third party) nor any of its or their respective directors and officers shall not use, the proceeds of any Borrowing, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.9.      [Reserved].

Section 5.10.    Further Assurances; Other Collateral Matters.    Subject to any applicable limitations and exceptions of the Collateral and Guarantee Requirement or otherwise any applicable limitations set forth in any Security Agreement or any other Loan Document, each Loan Party shall execute any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Collateral and Guarantee Requirement continues to be satisfied.

Section 5.11.    [Reserved].

Section 5.12.    [Reserved].

Section 5.13.    Post-Closing Obligations.    As promptly as practicable, and in any event within the time periods following the Effective Date specified in Schedule 5.13 or such later date as the Administrative Agent agrees to in writing, the Borrower and each other applicable Loan Party shall deliver the documents or take the actions specified in Schedule 5.13, to the extent any such document is not delivered or any such action is not taken on or prior to the Effective Date.

Section 5.14.    Designated Account.    Maintain any proceeds of the Tranche 1 New Money Term Loans in the Funding Account and maintain any proceeds of Tranche 2 New Money Term Loans in the Indemnity Escrow Account.

Section 5.15.    Environmental Matters.    Promptly take any and all actions necessary and required under Environmental Laws to (a) cure any violation of applicable Environmental Laws by the Borrower or its Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (b) respond to any Environmental Claim against the Borrower or any of its Subsidiaries and discharge any legally binding obligations it may have to any Person thereunder, in each case, where failure to do so would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.16.    Approved Budget.

(a)    The use of Tranche 1 New Money Term Loans and other credit extensions by the Borrower under this Agreement and the other Loan Documents shall be consistent with the Approved Budget.  The initial Approved Budget shall be in the form attached hereto as Exhibit C for the portion of the current fiscal quarter from the Effective Date until March 31, 2024, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders) (it being acknowledged and agreed that the initial Approved Budget attached hereto as Exhibit C is approved by and reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders)).

(b)    Following the Effective Date, the Borrower shall deliver an updated budget to the Administrative Agent and the Lenders two (2) Business Days prior to the last Business Day of each fiscal quarter ending after the Effective Date.  Any amendments, supplements, or modifications to the Approved Budget and any updated budgets shall be subject to the prior written approval of the Administrative Agent (at the direction of the Required Lenders) prior to the implementation thereof; provided that (x) if the Administrative Agent (at the direction of the Required Lenders) has not objected, in writing, to such proposed updated, modified or supplemented budget within three (3) Business Days after the Administrative Agent's receipt of such proposed updated, modified or supplemented budget, such proposed updated, modified or supplemented budget shall be deemed acceptable to and approved by the Administrative Agent (at the direction of the Required Lenders) and (y) in the event the Administrative

Agent (at the direction of the Required Lenders), on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect, with details for any periods after the initial fiscal quarter to be derived in a manner reasonably satisfactory to the Administrative Agent (at the direction of Required Lenders) from the initial Approved Budget prepared by Borrower; provided, further, that if an updated budget is not approved by the Administrative Agent (at the direction of Required Lenders), the most recently approved budget shall remain the Approved Budget.

(c)      Each Approved Budget shall be prepared in good faith, with reasonable due care and based upon assumptions which the Borrower believes to be reasonable at the time of delivery thereof.

(d)      The Administrative Agent and the Lenders (i) may assume that the Borrower will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral or otherwise) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or any of the borrowing restrictions or other lending limits set forth therein.

Section 5.17.      In-Court Milestones. The Loan Parties shall ensure that the following milestone (the "***In-Court Milestone***") is achieved in accordance with the applicable timing referred to below (or by such later time as approved in writing by the Administrative Agent (at the direction of the Required Lenders)), on or before the date falling 60 days after the Petition Date, the Final DIP Order shall have been entered by the Bankruptcy Court.

Section 5.18.      [Reserved].

Section 5.19.      Management of the Borrower.  The Borrower shall not permit any officer or director other than Pohl to be appointed to any position with the Borrower, unless the Administrative Agent (at the direction of the Required Lenders) has consented in writing to such appointment.

ARTICLE VI
NEGATIVE COVENANTS

Until the New Money Term Loan Commitments have expired or been terminated and all Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash, each Loan Party covenants and agrees with the Lenders that:

Section 6.1.      Indebtedness. No Loan Party shall, nor shall it permit any of its Subsidiaries to, create, incur or assume, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except, in each case:

(a)      the Obligations;

(b)      [reserved];

(c)      [reserved];

(d)      [reserved];

(e)      [reserved];

(f)      Indebtedness in connection with (i) treasury or cash management or custodial agreements, netting services, overdraft protections and otherwise similarly in connection with deposit accounts and Indebtedness in connection with depository, credit card, debit card, purchasing cards, electronic funds transfer or other similar cards or payment processing services; and (ii) endorsements for collection, deposit or negotiation and warranties of products or services, in each case, incurred in the ordinary course of business;

(g)      [reserved];

(h)      Indebtedness existing on the Effective Date and described in <u>Schedule 6.1</u>;

(i)      [reserved];

(j)      [reserved];

(k)      [reserved];

(l)      [reserved];

(m)      [reserved];

(n)      [reserved];

(o)      [reserved];

(p)      [reserved];

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      [reserved];

(u)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(v)      [reserved];

(w)      [reserved];

(x)      [reserved];

(y)      [reserved];

(z)      [reserved];

(aa)      [reserved];

(bb)      [reserved]; and

(cc)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and contingent interest on obligations described in the foregoing.

Accrual of interest (including capitalized or paid-in-kind interest and any applicable interest on any capitalized or paid-in-kind amounts), the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 6.1.

Section 6.2.     Liens.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, create, grant, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it except:

(a)     Permitted Encumbrances;

(b)     any Lien on any property or asset of the Borrower, the Borrower or any Subsidiary existing on the Effective Date and set forth in Schedule 6.2(b) and any modifications, renewals and extensions thereof and any Lien granted as a replacement or substitute therefor; *provided* that (i) such modification, replacement, renewal or extension Lien shall not apply to any other property or asset of the Borrower or any Subsidiary other than (1) improvements thereon or proceeds thereof and (2) after-acquired property that is affixed or incorporated into the property covered by such Lien and (ii) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.1;

(c)     [reserved];

(d)     [reserved];

(e)     [reserved];

(f)     [reserved];

(g)     [reserved];

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     bankers' Liens, rights of set-off and other similar Liens existing solely with respect to cash and cash equivalents or other securities on deposit in one or more accounts maintained by the Borrower or any Subsidiary of the Borrower, in each case granted in the ordinary course of business in favor of the bank or banks, securities intermediaries or other depository institutions with which such accounts are maintained, securing amounts owing to institutions with respect to cash management operating account arrangements and similar arrangements;

(l)     [reserved];

(m)     Liens securing the Obligations pursuant to any Loan Document;

(n)     [reserved];

(o)     [reserved];

67

(p)      [reserved];

(q)      [reserved];

(r)      [reserved]; and

(s)      [reserved].

Notwithstanding anything to the contrary in any Loan Document, if any security interest purported to be granted by any Loan Party under any Collateral Document with respect to any asset constituting Collateral is not perfected (or such equivalent concept under applicable local law), then such Loan Party will not take any consensual action to affirmatively perfect (or such equivalent concept under applicable local law) a security interest in such asset in favor of any Person (other than the Secured Parties) unless and until the security interest with respect to such asset granted by such Loan Party under such Collateral Document is perfected (or such equivalent concept under applicable local law).

Section 6.3.      Fundamental Changes; Assets Sales; Changes in Business.

(a)      No Loan Party shall, nor shall it permit any of its Subsidiaries to, (x) merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, (y) sell, transfer, lease, enter into any sale and leaseback transactions with respect to, or otherwise Dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Borrower and its Subsidiaries, taken as a whole, or all or substantially all of the Equity Interests of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or (z) liquidate or dissolve.

(b)      No Loan Party shall, nor shall it permit any of its Subsidiaries to, consummate any Asset Sale.

(c)      No Loan Party shall, nor shall it permit any of its Subsidiaries to, engage to any extent in any business other than businesses of the type conducted by the Loan Parties and its Subsidiaries on the Effective Date, and businesses reasonably related or ancillary thereto.

Section 6.4.      Restricted Payments and Restricted Debt Payments.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment or Restricted Debt Payment except:

(a)      [reserved];

(b)      any Subsidiary of the Borrower may declare and pay dividends or make other Restricted Payments to any Loan Party.

Section 6.5.      Restrictive Agreements.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party to create, grant, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations, (b) [reserved], or (c) the ability of any Subsidiary of the Borrower to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Loan Party or of any Subsidiary of the Borrower to Guarantee Indebtedness of the Borrower or any other Loan Party under the Loan Documents.

Section 6.6.    <u>Transactions with Affiliates</u>.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (other than between or among Borrower, any other Loan Party and its respective Subsidiaries and not involving any other Affiliate, or as otherwise permitted hereunder), except (a) on terms and conditions not less favorable to the Borrower or such Subsidiary (taken as a whole) than could be obtained on an arm's-length basis from unrelated third parties as determined in good faith by the Board of Directors or two or more Responsible Officers of the Borrower or any of its Subsidiaries (as applicable), (b) payment of customary directors' fees, customary out-of- pocket expense reimbursement, indemnities (including the provision of directors and officers insurance) and employment and compensation (including bonus) and severance arrangements for members of the board of directors, members of the board of commissioners, officers, employees or other providers of services of the Borrower or any of its Subsidiaries, (c) [reserved] and (d) any transaction permitted by <u>Section 6.3</u>, <u>6.4</u> or <u>6.7</u>.

Section 6.7.    <u>Investments</u>.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(a)    Investments in Cash and Cash Equivalents and Marketable Securities;

(b)    [reserved];

(c)    [reserved];

(d)    loans and advances in respect of payroll payments made by the Borrower or its Subsidiaries in the ordinary course of its business to an employee, director or officer of the Borrower or such Subsidiary;

(e)    Investments existing on the Effective Date and described in <u>Schedule 6.7</u>;

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(j)    Investments consisting of negotiable instruments held for collection in the ordinary course of business and lease, utility and other similar deposits in the ordinary course of business;

(k)    [reserved];

(l)    [reserved];

(m)    [reserved];

(n)    [reserved];

(o)    [reserved];

(p)        [reserved];

(q)        [reserved];

(r)        [reserved];

(s)        Investments consisting of Equity Interests of any Loan Party directly or indirectly owned by the Borrower;

(t)        [reserved];

(u)        [reserved];

(v)        [reserved];

(w)        [reserved]; and

(x)        to the extent constituting Investments, deposit and securities accounts maintained in the ordinary course of business and in compliance with the provisions of the Loan Documents.

Section 6.8.        [Reserved]

Section 6.9.        Amendments or Waivers of Organizational Documents; Amendments of Junior Financing Documentation.

(a)        No Loan Party shall, nor shall it permit any of its Subsidiaries to, enter into any amendment, supplement or modification to, or waive any of its rights under, any of its respective organizational documents or constitutional documents (as applicable).

(b)        No Loan Party shall, nor shall it permit any of its Subsidiaries to, agree to any amendment, supplement or modification to, or waive any of its rights under any other Indebtedness in any respect without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed).

Section 6.10.        Fiscal Year.  No Loan Party will change its fiscal year-end without the prior written consent of the Administrative Agent, except to change such fiscal year-end to December 31 or any other fiscal year-end reasonably acceptable to the Administrative Agent.

Section 6.11.        Accounting Policies.  No Loan Party shall, nor will it permit any Subsidiary to, change its accounting treatment or reporting practices in any material respect, except as required or permitted by GAAP or as required by applicable law, in each case, without the prior written consent of the Administrative Agent.

Section 6.12.        Anti-Terrorism Laws.

(a)        No Loan Party shall engage in any transaction that violates any of the applicable prohibitions set forth in any terrorism law described in Section 3.13.

(b)        None of the funds or assets of any Loan Party that are used to repay the Term Loans shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Sanctioned Person.

70

(c)        No Sanctioned Person shall have any direct or indirect interest in such Loan Party that would constitute a violation of any terrorism laws described in <u>Section 3.13</u>.

(d)        No Loan Party shall, and each Loan Party shall procure that none of its Subsidiaries will, fund all or part of any payment under this Agreement out of proceeds derived from transactions that violate the prohibitions set forth in any terrorism law described in <u>Section 3.13</u>.

ARTICLE VII
GUARANTY

Section 7.1.        <u>Guaranty of the Obligations</u>.   The Guarantors jointly and severally hereby irrevocably and unconditionally guaranty the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) or any comparable concept under any other applicable laws relating to a Bankruptcy Event) (collectively, the "<u>Guaranteed Obligations</u>").

Section 7.2.        <u>Payment by the Guarantors</u>.   The Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower or any other Guarantor to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, the Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of the Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower becoming the subject of a case under the Bankruptcy Code or any other applicable laws relating to a Bankruptcy Event, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Beneficiaries as aforesaid.

Section 7.3.        <u>Liability of Guarantors Absolute</u>.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.   In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)        this Guaranty is a guaranty of payment when due and not of collectability and this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)        the Administrative Agent may enforce this Guaranty during the continuation of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)        the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower, any such other guarantor or any other Person and whether or not the Borrower, any such other guarantor or any other Person is joined in any such action or actions;

71

(d)        payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)        any Beneficiary, upon such terms as it deems appropriate under the relevant Loan Document, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Loan Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)        this Guaranty and the obligations of the Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than Unasserted Contingent Obligations)), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the change, reorganization or termination of

the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations, whether or not consented to by any Beneficiary; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations, or failure to obtain approval of any Governmental Authority for enforcement thereof, as applicable; (vii) any defenses, set-offs or counterclaims which the Borrower or any other Person may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Anything contained in this Agreement to the contrary notwithstanding, the obligations of each Guarantor in respect of its Guaranty shall be limited to an aggregate amount equal to the largest amount that would not render its obligations under this Agreement subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code of the United States of America or any comparable provisions of any similar federal, state or other applicable law.

Section 7.4.     Waivers by Guarantors.  Each Guarantor hereby waives, for the benefit of the Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Beneficiary in favor of any Loan Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) any rights to set-offs, recoupments and counterclaims, (iii) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto, and (iv) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in Section 7.3 and any right to consent to any thereof; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof, in each case other than the indefeasible payment in full of the Guaranteed Obligations.

Section 7.5.     Guarantors' Rights of Subrogation, Contribution, Etc.  Until the Guaranteed Obligations shall have been paid in full in cash (other than Unasserted Contingent Obligations) and the New Money Term Loan Commitments shall have terminated, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including, (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower

with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been paid in full in cash (other than Unasserted Contingent Obligations) and the New Money Term Loan Commitments shall have terminated, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than Unasserted Contingent Obligations) shall not have been paid in full in cash, such amount shall be held in trust for the Administrative Agent on behalf of the Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of the Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 7.6.    <u>Subordination of Other Obligations</u>.  Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "<u>Obligee Guarantor</u>") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of the Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of the Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 7.7.    <u>Continuing Guaranty</u>.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash and the New Money Term Loan Commitments shall have terminated.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 7.8.    <u>Authority of Guarantors or the Borrower</u>.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 7.9.    <u>Financial Condition of the Borrower</u>.  Any Term Loan may be made to the Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower or any other Loan Party at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower or any other Loan Party.  Each Guarantor has adequate means to obtain information from the Borrower and the other Loan Parties on a continuing basis concerning the financial condition of the Borrower and the other Loan Parties and their respective ability to perform their obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and each other Loan Party and of all circumstances bearing upon the risk of non-payment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any

Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower or any other Loan Party now known or hereafter known by any Beneficiary.

Section 7.10.     Bankruptcy, Etc.

(a)      So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Administrative Agent (acting pursuant to the instructions of the Required Lenders), commence or join with any other Person in commencing any case or proceeding constituting a Bankruptcy Event against any other Loan Party (it being acknowledged and agreed, for the avoidance of doubt, that, subject to Section 8.1, this sentence shall not prohibit any Guarantor or other Loan Party from commencing any such action, case or proceeding with respect to itself).  The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving a Bankruptcy Event in respect of the Borrower or any other Loan Party or by any defense which the Borrower or any other Loan Party may have by reason of the order, decree or decision of any court or administrative body resulting from any such case or proceeding.

(b)      Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and the Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower or any other Loan Party of any portion of such Guaranteed Obligations.  Guarantors will permit any trustee in bankruptcy, receiver, judicial manager, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)      In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the Borrower or any Subsidiary of the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

ARTICLE VIII
EVENTS OF DEFAULT

Section 8.1.     Events of Default.  If any of the following events (each, an "Event of Default") shall occur:

(a)      the Borrower shall fail to pay any principal of any Term Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period of five (5) Business Days;

(b)      the Borrower shall fail to pay any interest on any Term Loan or any fee or any other amount (other than an amount referred to in Section 8.1(a)) payable under any of the Loan Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days;

(c)      any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary of the Borrower in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representation or warranty shall prove to have been incorrect in any respect);

(d)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Article V or Article VI and such failure is not cured within three (3) Business Days after the earlier of (i) the Loan Parties having knowledge thereof and (ii) receiving notice thereof from the Administrative Agent;

(e)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any of the Loan Documents (other than those specified in Section 8.1(a), 8.1(b) or 8.1(d)), and such failure shall continue unremedied for a period of five (5) days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f)      the Borrower or any Subsidiary of the Borrower shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure shall have continued after the applicable grace period, if any;

(g)      (i) the removal of Pohl as the sole director of the Borrower or (ii) the appointment of any director or officer in addition to Pohl as a director or officer of the Borrower, in each case, without the express prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(h)      other than the Chapter 11 Case, (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking liquidation, provisional liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or other relief in respect of the Borrower, any of its Subsidiaries or its debts, or of a substantial part of its assets, under any Debtor Relief Law or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator or provisional liquidator, judicial manager or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered, or (iii) any writ or warrant of attachment or similar process shall be entered or filed against any Subsidiary or for a substantial part of its assets or property (taken as a whole), and shall remain undischarged, unvacated, unbonded or unstayed (or an action of similar effect in any jurisdiction outside the U.S.) for a period of 60 days;

(i)      [reserved];

(j)      other than the Chapter 11 Case, (i) the Borrower or any Subsidiary of the Borrower shall (1) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), judicial management or other relief under any Debtor Relief Law, (2) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 8.1(h), (3) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator, judicial manager or similar official for the Borrower or any Subsidiary of the Borrower or for a substantial part of its assets, (4) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (5) make a general assignment for

76

the benefit of creditors or (6) pass a resolution or take any formal corporate action for the purpose of approving and effecting any of the foregoing actions referred to herein (as authorized by the Board of Directors of such Person), or (ii) the shareholders of the Borrower or any Subsidiary of the Borrower shall pass a resolution to have the Borrower or any Subsidiary of the Borrower wound up on a voluntary basis, in each case, other than in accordance with Section 5.3;

(k)      the Borrower or any Subsidiary of the Borrower shall become unable, admit in writing its inability or fail generally to pay its debts as they become due (other than any debts arising prior to the commencement of the Chapter 11 Case);

(l)      one or more judgments for the payment of money in excess of $250,000 in the aggregate shall be rendered against the Borrower, any Subsidiary of the Borrower or any combination thereof (to the extent not paid or covered by (x) a reputable and solvent independent third-party insurance company which has not disputed coverage or (y) an enforceable indemnity to the extent that such Loan Party or Subsidiary shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed (or an action of similar effect in any jurisdiction outside the U.S.), or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary of the Borrower to enforce any such judgment and such action shall not be stayed (or an action of similar effect in any jurisdiction outside the U.S.);

(m)      (i) an ERISA Event shall occur that would reasonably be expected to result in a Material Adverse Effect, or (ii) any condition or event shall occur with respect to any Non-U.S. Plan that would reasonably be expected to result in a Material Adverse Effect;

(n)      (i) any Loan Document, at any time after its execution and delivery and for any reason other than (A) as expressly permitted hereunder or thereunder, (B) as a result of acts or omissions by the Administrative Agent, Collateral Agent or any other Secured Party, or (C) as a result of satisfaction in full of all the obligations (other than Unasserted Contingent Obligations) hereunder or thereunder) ceases to be in full force and effect; or any Loan Party contests in writing in any manner the validity or enforceability of any Loan Document, (ii) subject to Section 5.13, the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any material portion of the Collateral purported to be covered by the Final DIP Order with the priority required by the Final DIP Order for any reason (other than (A) pursuant to the terms thereof including as a result of a transaction permitted (or not expressly prohibited) under the Loan Documents, (B) as a result of satisfaction in full of all the obligations (other than Unasserted Contingent Obligations), or (C) as a result of acts or omissions by the Administrative Agent, Collateral Agent or any other Secured Party including any loss thereof which results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates delivered to it representing securities pledged under the Collateral Documents, or (iii) any Loan Party shall contest in any manner the validity or perfection of any Lien in any material portion of the Collateral purported to be covered by the Collateral Documents; or

(o)      there shall have occurred any of the following in the Chapter 11 Case:

(i)      the failure to meet the In-Court Milestone set forth herein unless (x) such failure is solely the result of any act, omission, or delay on the part of any of the Agents or any of the Lenders seeking termination or (y) such In-Court Milestone is waived or extended by the Required Lenders in writing;

(ii)      the Loan Parties propose, support, or file any plan of liquidation, asset sale of all or any material portion of the Loan Parties' assets or plan of reorganization other than what is considered, in the Required Lenders' sole discretion, to be an acceptable plan of liquidation or reorganization (an

77

"Acceptable Plan") or an acceptable sale of assets (an "Acceptable Sale"); provided that, an Acceptable Plan and Acceptable Sale shall include any plan of reorganization or asset sale that provides for the indefeasible payment in full in cash of the Obligations and Prepetition Obligations on the effective date thereof;

(iii)     the Loan Parties fail to provide the Lenders with draft copies of any material motions, notices, statements, schedules, applications, reports and other papers the Loan Parties intend to file with the Bankruptcy Court (including any of the foregoing in connection with the plan or sale process within a reasonable period of time prior to the date such party intends to file any of the foregoing or fail to consult in advance in good faith with the Lenders regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(iv)     the Loan Parties file any document necessary to effectuate an Acceptable Plan or Acceptable Sale without the prior approval of the Required Lenders;

(v)     any Loan Party or any of its officers publicly announces, or communicates in writing to any other Person (other than the Administrative Agent, the Lenders and their respective Affiliates and representatives), its intention not to support or pursue an Acceptable Plan or an Acceptable Sale;

(vi)     the Bankruptcy Court enters an order, or any Loan Party files any motion or any request for relief (other than with the consent of the Lenders) that seeks, to (a) dismiss the Chapter 11 Case, (b) convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (c) appoint a trustee or examiner with expanded powers beyond those set forth in section 1106 of the Bankruptcy Code; or (d) terminate the Borrower's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(vii)     the Borrower files a pleading seeking to amend, vacate or modify any of the Loan Documents or the Final DIP Order over the objection of the Administrative Agent or the Administrative Agent at the direction of the Required Lenders;

(viii)     entry of an order without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) amending, supplementing or otherwise modifying the Final DIP Order;

(ix)     any reversal, vacatur or stay of the effectiveness of the Final DIP Order, which continues for five (5) Business Days;

(x)     the Bankruptcy Court enters an order granting relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to authorize any party to proceed against any material asset of the Loan Parties or in such a manner that would adversely affect the Loan Parties' ability to operate their businesses in the ordinary course or that would be adverse to the interests of the Lenders;

(xi)     the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of an executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease, other than an assumption or rejection that is consented to in writing by the Lenders;

(xii)     after entry by the Bankruptcy Court of the Final DIP Order, Cash Management Order, or an order approving a sale of any Collateral, such order is reversed, stayed, dismissed, vacated,

reconsidered, modified or amended, in each case, in a manner materially inconsistent with the terms set forth herein or without the consent of the Lenders;

(xiii)    the imposition of any material award, claim, fine, penalty, or other monetary judgment by any governmental entity, including the Bankruptcy Court, against any Loan Party that would not be dischargeable pursuant to the Bankruptcy Code, the Cash Management Order or any other order of the Bankruptcy Court;

(xiv)    the failure of the Borrower to comply with the Final DIP Order, including failure to make adequate protection payments when due, which remains uncured for a period of five (5) Business Days after the receipt of written notice of such event or is not otherwise waived in accordance with the terms thereof;

(xv)    (a) the Loan Parties engage in or publicly support any challenge to the validity, security, perfection, priority, extent or enforceability of the Loan Documents, the Obligations, the Liens securing the Obligations, the Prepetition Term Loan Documents or the Liens securing Prepetition Term Loan Obligations, including without limitation seeking to equitably subordinate, invalidate, disallow, avoid, recharacterize, limit or otherwise impair such liens or claims, or (b) the Borrower engages in any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against any of the Lenders or the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Lenders;

(xvi)    the entry of a judgment or order by the Bankruptcy Court sustaining any defense, objection or challenge to the validity, security, perfection, priority, extent or enforceability of the Loan Documents, the Obligations, the Liens securing the Obligations or the Prepetition Term Loan Documents or the Liens securing Prepetition Indebtedness or (ii) invalidating, disallowing avoiding, subordinating, recharacterizing, limiting or otherwise impairing any of the Obligations, DIP Super-Priority Claims, any Liens securing the Obligations or the Prepetition Term Loan Obligations;

(xvii)    the entry of any order in the Chapter 11 Case surcharging any of the Collateral or Prepetition Collateral with respect to the Lenders, the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Lenders, as applicable, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xviii)    the consensual use of prepetition cash collateral is terminated, or the entry of an order by the Bankruptcy Court terminating or modifying the use of cash collateral, in each case, without the prior written consent of the Lenders;

(xix)    the reversal or modification of any order entered in the Chapter 11 Case approving the conversion of the Bridge Loans, Prepetition Reimbursements, or Roll-Up Loans provided for hereunder by the Bankruptcy Court without the consent of the Lenders; and

(xx)    subject to the Final DIP Order then in effect, the Loan Parties fail to pay upon demand any of the fees and expenses of the professionals retained by the Agents or the Lenders as and when due pursuant to the terms of any applicable engagement letters, fee reimbursement letters, the Bankruptcy Code, or any orders of the Bankruptcy Court and such failure to pay is not cured within five (5) Business Days after the Loan Parties receive notice hereof from the Administrative Agent or any Lender; and

(xxi)    the modification of the Approved Budget in a manner not acceptable to the Required Lenders in their sole discretion;

then, and in every such event, and at any time thereafter during the continuance of such event, but in all events subject to the Final DIP Order then in effect, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to the Collateral Documents in addition to any other remedies available under the Loan Documents or applicable law, including the right to direct the delivery of any notice of exclusive control with respect to any deposit account or securities account constituting Collateral and subject to a control agreement or similar documentation and (ii) declare the Tranche 1 New Money Term Loans then-outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Tranche 1 New Money Term Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; *provided, however*, in case of any event with respect to the Borrower described in Section 8.1(h) or 8.1(j), the principal of the Tranche 1 New Money Term Loans then-outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Notwithstanding any provisions of this Agreement to the contrary, the occurrence of an Event of Default, the exercise of any remedies of any Agent or the Lenders under any Loan Documents, and the occurrence of the Commitment Termination Date, the Lenders, subject to satisfaction of Tranche 2 Funding Conditions agree to fund in accordance with Section 2.4, as applicable, any Borrowing Request to fund Tranche 2 New Money Term Loans delivered by Borrower on or prior to the Maturity Date.

Section 8.2.    Application of Funds.  Subject to any Additional Agreement (including the Intercreditor Agreement) to the extent then in effect and the Final DIP Order, after the exercise of remedies provided for in Section 8.1 (or after the Term Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to each of the Agents and amounts payable under Article II, Article IX and Article X) payable to (a) the Collateral Agent and (b) the Administrative Agent, each in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article II), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the New Money Term Loans and other Obligations (other than any amounts attributable to the Roll-Up Loans), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the New Money Term Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Roll-Up Loans, ratable among the Lenders in proportion to the respective amounts described in this clause Fifth payable to them;

Sixth, to the payment of that portion of the Obligations constituting unpaid principal of the Roll-Up Loans, ratable among the Lenders in proportion to the respective amounts describe in this clause Sixth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full in cash, to the Borrower or as otherwise required by applicable law.

ARTICLE IX
THE AGENTS

Section 9.1.    Agents.  Each of the Lenders and Secured Parties hereby irrevocably appoints GLAS Trust Company LLC as the Administrative Agent and Collateral Agent (and GLAS Trust Company LLC hereby accepts such appointment) and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf and to exercise all rights, powers and remedies as are delegated to the Administrative Agent and the Collateral Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.  Except, in each case, as set forth in the sixth paragraph of this Article IX, the provisions of this Article IX are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this Article IX.

The Person serving as the Agent (which for purposes of this Article IX shall mean each of the Administrative Agent and the Collateral Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates are authorized to accept deposits from, lend money to and generally engage in any kind of banking, trust or other business with the Borrower or any Subsidiary of the Borrower or other Affiliate thereof as if it were not the Agent hereunder and without any duty to account therefor to the Lenders.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent: (a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) is not obliged to expend or risk its own funds or otherwise (c) shall not incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it, and (d) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.2 or in the other Loan Documents); *provided* that the Agent shall not be required to take, or omit to take, any action (i) unless upon demand in the case of the Collateral Agent, the Collateral Agent receives an indemnification satisfactory to it from the Lenders against all Liabilities that, by reason of such action or omission may be imposed on, incurred by or asserted against the Collateral Agent or any Agent-Related Person thereof or (ii) that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including any action that may be in violation of the automatic stay under any Debtor Relief Law or

81

that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.

The Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity.  The Agent shall not be liable for any action taken or not taken by it in connection with any Loan Document (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.2) or (ii) in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The Administrative Agent may at any time request instructions from the Required Lenders (or, if the relevant Loan Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Administrative Agent may refrain from acting unless and until it receives those written instructions or that clarification.  In the absence of written instructions, Administrative Agent may act (or refrain from acting) as it considers to be in the best interests of the Lenders and/or use its reasonable discretion in considering whether to act (or refrain from acting) and the Lenders hereby authorize the Administrative Agent to do so. Whether or not the Administrative Agent makes such a request, at all times except with respect to an express obligation set forth herein, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders, and the Administrative Agent shall not incur liability to any Person by reason of so refraining.  If, in performing its duties under this Agreement, the Administrative Agent is required to decide between alternative courses of action or has received conflicting directions or any other directions from Required Lenders who do not satisfy the definition of Required Lenders, the Administrative Agent may refrain from taking any action until it receives instructions from the Required Lenders.

The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (2) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or the occurrence of any Default, (4) the due execution, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Agent's reliance on any Electronic Signature transmitted by emailed pdf or any other electronic means that reproduces an image of an actual executed signature page), or (5) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.  Whenever in the administration of the Loan Documents the Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Agent (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its party, may conclusively rely upon the instructions from the Required Lenders.  Each Secured Party waives and shall not assert any right, claim or cause of action it might have against any Agent based thereon.  Nothing in this Agreement shall require the Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

In no event shall the Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, pandemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

The Agent shall not (i) be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Term Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing, or (ii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided) *provided* that the Agent may exercise discretionary action, rights and powers contemplated hereby without instructions from any Lender to the extent provided hereunder or under any Loan Document (including, without limitation, the discretion accorded to the Agent as described in the definition of "Collateral and Guarantee Requirement", Section 2.11, Section 5.9, Section 5.10 and Section 10.2), and each Lender hereby authorizes the Agent to do so without further instructions.

The Agent shall not be responsible for any unsuitability, inadequacy, expiration or unfitness of any security interest created hereunder or pursuant to any other Loan Documents pertaining to this matter nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other Loan Document pertaining to this matter.

In no event shall the Agent be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.

Beyond the exercise of reasonable care in the custody thereof, the Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords similar collateral and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee.

The Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens on any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Agent shall have no duty to ascertain or inquire as to or monitor the performance or observance of any of the terms of the Loan Documents by any other Person.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Term Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Term Loan.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Agent may perform any and all of its duties and exercise its rights, powers and remedies under, or any other action with respect to, any Loan Document by or through any one or more trustees, co-agents, employees, attorneys-in-fact or any other Person (including any Secured Party) (each, a "Sub-Agent") appointed by the Agent.  The Agent and any such Sub-Agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of this Article IX shall apply to any such Sub-Agent and to the Related Parties of the Agent and any such Sub-Agent, and shall apply to their respective activities in connection with the syndication of the New Money Term Loan Facility as well as activities as Agent.

The Administrative Agent shall have the right to resign at any time by giving prior written notice thereof to the Lenders and the Borrower.  The Administrative Agent shall have the right to appoint a successor to act as the Administrative Agent and/or the Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Required Lenders, and the Administrative Agent's resignation shall become effective on the earliest of (a) 30 days after delivery of the notice of resignation, (b) the acceptance of such successor Administrative Agent by the Borrower and the Required Lenders or (c) such other date, if any, agreed to by the Borrower and the Required Lenders.  Upon any such notice of resignation, if a successor Administrative Agent has not already been appointed by the retiring Administrative Agent, the Required Lenders shall have the right to appoint a successor Administrative Agent that is reasonably satisfactory to the Borrower.  If neither the Required Lenders nor the Administrative Agent have appointed a successor Administrative Agent, the Required Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; *provided* that, in the event the Administrative Agent and the Collateral Agent are the same Person, until a successor Administrative Agent is so appointed by the Required Lenders or the Administrative Agent, any collateral security held by the Administrative Agent in its role as the Collateral Agent on behalf of the Secured Parties under any of the Loan Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed.  Any successor Administrative Agent shall be a bank with an office in the United States of America or an Affiliate of any such bank with an office in the United States of America.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums, securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, and (ii) execute and deliver to such successor Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the security interests created under the Collateral Documents, whereupon such retiring Administrative Agent shall be discharged from its duties and obligations

hereunder.  Except as provided above, any resignation of GLAS Trust Company LLC or its successor as the Administrative Agent pursuant to this <u>Article IX</u> shall also constitute the resignation of GLAS Trust Company LLC or its successor as the Collateral Agent (to the extent GLAS Trust Company LLC or its successor is serving as Collateral Agent at such time).  After any retiring Administrative Agent's resignation hereunder as Administrative Agent or Collateral Agent, the provisions of this <u>Article IX</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent or Collateral Agent hereunder and while it continues to hold any collateral security as nominee until a successor Collateral Agent is appointed.

Each Lender represents and warrants to each Agent and acknowledges that (a) the Loan Documents set forth the terms of a commercial lending facility, (b) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such Lender in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender agrees not to assert a claim in contravention of the foregoing), (c) it has, independently and without reliance upon the Agent, any Lender or any of their respective Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and (d) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent, any Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Anything herein to the contrary notwithstanding, none of the Lenders shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, Collateral Agent or a Lender hereunder.

Each Secured Party hereby authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents and any Additional Agreement to the extent then in effect.  Subject to <u>Section 10.2</u>, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (a) in connection with a sale or Disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other Disposition of assets or to which Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.2</u>) have otherwise consented or (b) release any Guarantor from the Guaranty pursuant to <u>Section 10.17</u> or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.2</u>) have otherwise consented.

Anything contained in any of the Loan Documents to the contrary notwithstanding, each Loan Party, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty; *provided* that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other Disposition, the Collateral Agent or any Lender may be the purchaser or licensor of

any or all of such Collateral at any such sale or other Disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.

Notwithstanding anything to the contrary contained herein or any other Loan Document, each Lender hereby consents and directs that when all Obligations (other than Unasserted Contingent Obligations) have been paid in full in cash, all New Money Term Loan Commitments have terminated or expired, upon request of the Borrower, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all Guaranties provided for in any Loan Document.  Any such release of any Guaranty shall be deemed subject to the provision that such Guaranty shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon a Bankruptcy Event in respect of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee, judicial manager or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Each Lender hereby irrevocably directs and authorizes the Administrative Agent, at its option and in its discretion, to direct the Collateral Agent to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.2.

Each Lender hereby irrevocably authorizes each Agent to, and each Agent will at the request and cost of the Borrower, enter into an intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent with respect to Indebtedness that is (a) required or permitted to be incurred hereunder and for which accession to such an intercreditor agreement is required or (b) secured by Liens and which Indebtedness contemplates an intercreditor, subordination or collateral trust agreement (any such intercreditor, subordination or collateral trust agreement, an "Additional Agreement"), and the Secured Parties party hereto hereby acknowledge that any Additional Agreement is binding upon them.  Each Secured Party hereby agrees that it will be bound by, and will not take any action contrary to, the provisions of any Additional Agreement and each Lender hereby authorizes and instructs the Agents to enter into any Additional Agreement and to subject the Liens securing the Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower, and the Secured Parties are intended third-party beneficiaries of such provisions and the provisions of any Additional Agreement.

The Secured Parties (other than the Collateral Agent) hereby irrevocably authorize the Collateral Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Collateral Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Collateral Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent

interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Collateral Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Collateral Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Collateral Agent with respect to such acquisition vehicle or vehicles, including any Disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.2 of this Agreement), (iv) the Collateral Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties *pro rata* with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Collateral Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

In addition, unless sub-clause (i) in the immediately preceding paragraph is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding paragraph, such Lender further (a) represents and warrants, as of the date such Person became a Lender party hereto, to, and (b) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents, the other Lenders and their respective Affiliates, and not to or for the benefit of the Borrower or any other Loan Party, that none of the Agents or any other Lenders or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agents under this Agreement, any Loan Document or any documents related to hereto or thereto).

Each Agent hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (a) may receive interest or other payments with respect to the Term Loans, the New Money Term Loan Commitments, this Agreement and any other Loan Documents, (b) may recognize a gain if it extended the Term Loans or the New Money Term Loan Commitments for an amount

less than the amount being paid for an interest in the Term Loans or the New Money Term Loan Commitments by such Lender or (c) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 9.2.    <u>Collateral Agent</u>.  Under the Loan Documents, the Collateral Agent (i) is acting solely on behalf of the Secured Parties, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Collateral Agent" and "collateral agent" and similar terms in any Loan Document to refer to Collateral Agent, which terms are used for title purposes only; (ii) is not assuming any obligation under any Loan Document or any role as agent, fiduciary or trustee of or for any Lender or any other Person, in each case, other than as expressly set forth therein; and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Collateral Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

The Collateral Agent and its Related Parties shall not be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party hereby waives and shall not assert any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of the Collateral Agent or, as the case may be, such Related Party (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, the Collateral Agent:  (i) shall not be responsible to the Secured Parties or otherwise incur liability to the Secured Parties for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Parties selected with reasonable care (other than employees, officers and directors of the Collateral Agent, when acting on behalf of the Collateral Agent); (ii) shall not be responsible to any Lender or other Person for the preparation, filing or recording or any instrument, document or financing statement or the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection, maintenance or priority of any security interest or any Lien created or purported to be created under or in connection with, any Loan Document; (iii) makes no warranty or representation, and shall not be responsible, to any Secured Party for any statement, document, information, representation or warranty made or furnished by or on behalf of any Loan Party or any Related Party of any Loan Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Loan Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by the Collateral Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Collateral Agent in connection with the Loan Documents; and (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Loan Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower or any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Collateral Agent shall promptly give notice of such receipt to all Lenders); and, for each of the items set forth in clauses (i) through (iv) above, each Secured Party hereby waives and agrees not to assert any right, claim or cause of action it might have against the Collateral Agent based thereon.

Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by the Collateral Agent in accordance with the provisions of the Loan Documents, (ii) any action taken by the Collateral Agent in reliance upon the instructions of the Administrative Agent, Required Lenders or, where so required, such greater proportion of the Lenders and (iii) the exercise by the Collateral Agent of the powers set forth herein or therein shall be authorized and binding upon all of the Secured Parties.

The Collateral Agent may resign at any time by giving prior written notice thereof to the Lenders and the Loan Parties.  The Administrative Agent shall have the right to appoint a successor Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Required Lenders, and the Collateral Agent's resignation shall become effective on the earliest of (a) 30 days after delivery of the notice of resignation, (b) the acceptance of such successor Collateral Agent by the Borrower and the Required Lenders or (c) such other date, if any, agreed to by the Required Lenders and the Borrower.  Upon any such notice of resignation, if a successor Collateral Agent has not already been appointed by the retiring Administrative Agent, the Required Lenders shall have the right, upon five (5) Business Days' notice to the Administrative Agent, to appoint a successor Collateral Agent that is reasonably satisfactory to the Borrower.  If, after 30 days after the date of the retiring Collateral Agent's notice of resignation, no successor Collateral Agent has been appointed by the Administrative Agent or the Required Lenders in consultation with the Borrower, then the retiring Collateral Agent may, on behalf of the Lenders, appoint a successor Collateral Agent from among the Lenders.  Until a successor Collateral Agent is so appointed by the Required Lenders, the Administrative Agent or the Collateral Agent, as the case may be, any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Loan Documents shall continue to be held by the retiring Collateral Agent as nominee until such time as a successor Collateral Agent is appointed.  Upon the acceptance of any appointment as the Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Agreement and the Collateral Documents, and the retiring Collateral Agent under this Agreement shall, at the cost of the Borrower, as soon as reasonably practicable (i) transfer to such successor Collateral Agent all sums, securities and other items of Collateral held hereunder or under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Collateral Agent under this Agreement and the Collateral Documents, and (ii) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring Collateral Agent shall be discharged from its duties and obligations under this Agreement and the Collateral Documents.  After any retiring Collateral Agent's resignation hereunder as the Collateral Agent, the provisions of this Agreement and the Collateral Documents shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the Collateral Documents while it was the Collateral Agent hereunder and while it continues to hold any collateral security as nominee until a successor Collateral Agent is appointed.

The Collateral Agent may at any time request instructions from the Required Lenders (or, if the relevant Loan Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) or the Administrative Agent (acting for and on behalf of the Required Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Collateral Agent may refrain from acting unless and until it receives those written instructions or that clarification.  In the absence of written instructions, Collateral Agent, as applicable, may act (or refrain from acting) as it considers to be in the best interests of the Lenders.  Whether or not the Collateral Agent makes such a request, at all times except with respect to an express obligation set forth herein, the Collateral Agent shall be entitled to refrain from such act or taking such action unless and until the Collateral Agent shall have received instructions from the Required Lenders or the

Administrative Agent (acting for and on behalf of the Required Lenders), and the Collateral Agent shall not incur liability to any Person by reason of so refraining.  If, in performing its duties under this Agreement, the Collateral Agent is required to decide between alternative courses of action or has received conflicting directions or any other directions from Required Lenders who do not satisfy the definition of Required Lenders, the Collateral Agent may refrain from taking any action until it receives instructions from the Required Lenders or the Administrative Agent (acting for and on behalf of the Required Lenders).

Section 9.3.    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the New Money Term Loan Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of, and performance of the Term Loans, the New Money Term Loan Commitments and this Agreement,

(iii)    such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer, and perform the Term Loans, the New Money Term Loan Commitments and this Agreement, (C) the entrance into, participation in, administration of, and performance of the Term Loans, the New Money Term Loan Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of, and performance of the Term Loans, the New Money Term Loan Commitments and this Agreement, or

(iv)    such other representation, warranty, and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in Section 9.3(a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in Section 9.3(a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of, and performance of the Term Loans, the New Money Term Loan Commitments and this Agreement (including in connection with the reservation or exercise of

90

any rights by the Administrative Agent under this Agreement, any Loan Document, or any documents related hereto or thereto).

ARTICLE X

MISCELLANEOUS

Section 10.1.    Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing in English and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email (or other facsimile transmission or, subject to clause (b) below, other electronic image scan transmission (*e.g.*, pdf via email)), as follows:

(i)    if to any Loan Party, to it at:

Byju's Alpha, Inc.
2045 N. Fremont Street
Chicago, IL 60614
Attention:  Tim Pohl
Email: timrpohl@gmail.com

with copies (which shall not constitute notice) to

Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Attention: Benjamin Finestone and Daniel Holzman
Email: benjaminfinestone@quinnemanuel.com and
    danielholzman@quinnemanuel.com

and

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N King Street
Wilmington, DE 19801
Attention:  Robert S. Brady and Kenneth Enos
Email:  rbrady@ycst.com
    kenos@ycst.com

(ii)    if to the Administrative Agent or the Collateral Agent, to it at:

GLAS Trust Company LLC,
3 Second Street, Suite 206
Jersey City, NJ 07311
Attention:  Transaction Management;
Facsimile 212-202-6246;
Email:  clientservices.americas@glas.agency, TMGUS@glas.agency; and

with a copy (which shall not constitute notice) to

Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Attention: David Pisciotta, Nicholas Vislocky
Email: DPisciotta@reedsmith.com; Nvislocky@reedsmith.com
Telephone: (212) 549-0260, (212) 549-4743

and

Kirkland & Ellis LLP,
601 Lexington Avenue
New York, NY 10022
Attention: Brian Schartz, P.C., Patrick Nash, P.C., Mary Kogut, P.C.
Email: bschartz@kirkland.com; patrick.nash@kirkland.com;
mary.kogut@kirkland.com
Telephone: (212) 446-5932; (312) 862-2290; (713) 836-3650

(iii)    if to any other Lender, to it at its address or email (or other facsimile transmission number) set forth in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by email (or other facsimile transmission) shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b). All documents provided under or in connection with any Loan Document shall be in English or, if so required by any Lender, accompanied by a certified English translation; *provided* that any such translation will prevail and may be conclusively relied upon unless the corresponding document is a constitutional, statutory or other official document issued by a Governmental Authority.

(b)    Notices and other communications to any Loan Party and the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent and/or any Loan Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or email (or other facsimile transmission) number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

The Borrower agrees that the Administrative Agent may make the Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, IntraLinks, Syndtrak, ClearPar, the Internet or another similar electronic system chosen by the Administrative Agent to be its electronic transmission system (the "Platform"). THE PLATFORM IS PROVIDED "AS IS" AND "AS

AVAILABLE." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications effected thereby (the "Communications"). No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") be responsible or liable for damages arising from the use by others of information or other materials (including any personal data) obtained through electronic, telecommunications or other information transmission systems (including through the Platform) or otherwise via the Internet, except to the extent that such damages have resulted from the willful misconduct or gross negligence of such Agent Party (as determined in a final, non-appealable judgment by a court of competent jurisdiction).

Section 10.2.    Waivers; Amendments.

(a)    No failure or delay by any Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any Subsidiary therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Term Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Except as expressly provided in this Agreement, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; *provided, however*, that no such amendment, waiver or consent shall:

(i)    extend or increase the New Money Term Loan Commitment of any Lender without the written consent of such Lender (or make any changes to the definition of "Applicable Percentage") (it being understood that a waiver of any condition precedent or of any Default, mandatory prepayment or mandatory reduction of the New Money Term Loan Commitments shall not constitute an extension or increase of any New Money Term Loan Commitment of any Lender);

(ii)    reduce the principal amount of any Term Loan, reduce the rate of interest thereon, or reduce any premium or fees payable hereunder, without the written consent of each Lender directly affected thereby;

(iii)    postpone the scheduled date of payment of the principal amount of any Term Loan, or any interest thereon, or any premium or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any New Money Term Loan Commitment, without the written consent of each Lender directly affected thereby; *provided* that the waiver (or amendment to the terms of) any mandatory prepayment of the Term Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(iv)    [reserved];

(v)      [reserved]; or

(vi)      change <u>Section 8.2</u> without the written consent of each Lender directly affected thereby.

(vii)      Notwithstanding anything to the contrary herein:

(1)      no such agreement shall amend, modify or otherwise affect the rights or adversely affect the duties of any Agent hereunder without the prior written consent of such Agent;

(2)      no Defaulting Lender or Affiliated Lender (in its capacity as a Lender) shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders and Affiliated Lenders), except that (x) the New Money Term Loan Commitment of any Defaulting Lender or Affiliated Lender may not be increased or the termination thereof extended without the consent of such Lender, (y) the principal amount of any Defaulting Lender's or Affiliated Lender's Term Loan, or the interest rate thereon or any fees payable hereunder to any Defaulting Lender or Affiliated Lender may not be reduced without the consent of such Lender and (z) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender or Affiliated Lender (in its capacity as a Lender) more adversely than other affected Lenders shall require the consent of such Defaulting Lender or Affiliated Lender, as applicable;

(3)      [reserved];

(4)      any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent (without the need to obtain the consent of any other party to any Loan Document) to (y) effect any Ministerial Amendments, so long as, in each case, the Lenders shall have received at least five (5) Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment, or (z) grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property constituting Collateral; and

(5)      any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Term Loans or New Money Term Loan Commitments of a particular Class (but not the Lenders holding Term Loans or New Money Term Loan Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower, and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time.

(c)      Without the written consent of all Lenders (other than, in the case of clauses (iv) and (v), a Defaulting Lender), no amendment, modification, termination or waiver of any term or condition of any Loan Document, or consent to any departure by any Loan Party therefrom, shall:

(i)      change <u>Section 2.15(b)</u>, <u>Section 8.2</u> or any other Section hereof or of any Loan Document providing for the ratable treatment of the Lenders, in each case in a manner that would alter the *pro rata* sharing of payments required thereby;

(ii) change any of the provisions of this Section or the percentage referred to in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder;

(iii) change the definition of "Pro Rata Share"

(iv) amend, modify, terminate or waive any term or condition of this Agreement or any other Loan Document that expressly provides that the consent of all Lenders is required;

(v) release all or substantially all of the value of any Guaranty or the Collateral except to the extent the release of any Guarantor or any Collateral is permitted under this Agreement;

(vi) subordinate the Obligations in right of payment, or the priority of the Liens securing the Obligations, to any other Indebtedness (it being understood that this clause (vi) shall not apply to any debtor-in-possession financing and use of cash collateral in compliance with any customary intercreditor agreements); and

(vii) consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document (except as expressly provided in the Loan Documents).

The Collateral Documents and related documents in connection with this Agreement and the other Loan Documents may be in a form reasonably determined by the Administrative Agent (or Collateral Agent, acting on the instructions of the Administrative Agent) and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent (or Collateral Agent, acting on the instructions of the Administrative Agent) at the request of the Borrower without the need to obtain the consent of any other Secured Party if such amendment, supplement or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) effect any Ministerial Amendments, (iii) to cause such Collateral Documents or other document to be consistent with this Agreement and the other Loan Documents (including any updates, imported definitions or conforming changes contemplated by paragraphs (x) or (y) above), (iv) [reserved], or (v) grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property constituting Collateral.

Section 10.3. Expenses; Limitation of Liability; Indemnity, Etc.

(a) Expenses.  The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Agents, including the reasonable and documented out-of-pocket fees, disbursements and other charges of two firms of counsel for the Agents, taken as a whole, of a single local counsel and any specialist counsel in each relevant material jurisdiction and in the case of an actual or potential conflict of interest where any Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel per applicable material jurisdiction for such affected Persons taken as a whole) in connection with the preparation, negotiation, execution, delivery, analysis and administration of this Agreement, any other Loan Document or any amendments, modifications or waivers of the provisions hereof or thereof, and (ii) all reasonable and documented expenses incurred by the Agents, including the reasonable and documented out-of-pocket fees, disbursements and other charges of two firms of counsel for the Agents and the Lenders, taken as a whole, of a single local counsel and any specialist counsel in each relevant material jurisdiction and in the case of an actual or potential conflict of interest where any Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel per applicable material jurisdiction for such affected Persons taken as a whole), in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights

under this Section, or in connection with the Term Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Term Loans. For the avoidance of doubt, except as otherwise expressly set forth herein or in any other Loan Document, any action taken by any Loan Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Agents or Required Lenders, shall be at the expense of such Loan Party, and neither the Agents nor any other Secured Party shall be required under any Loan Document to reimburse such Loan Party or any of its subsidiaries for any such expenses.

(b)    Limitation of Liability.  To the extent permitted by applicable law (i) no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Agent and any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any Liabilities arising from the use by others of information or other materials (including any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Platform or otherwise via the Internet), other than Liabilities that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Lender-Related Person (it being understood that all information and materials so transmitted shall continue to be subject to the confidentiality provisions set forth herein and in the Platform), and (ii) no party hereto shall assert, and each such party hereby waives, any Liabilities against any other party hereto, on any theory of liability, for special, indirect, exemplary, punitive or consequential damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions or any Term Loan or the use of the proceeds thereof; *provided* that nothing in this Section 10.3(b) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in Section 10.3(c), against any special, indirect, exemplary, punitive or consequential damages (including any loss of profits, business or anticipated savings) asserted against such Indemnitee by a third party.

(c)    Indemnity.  Each Loan Party shall indemnify each Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all Liabilities and related reasonable and documented expenses, including the reasonable and documented out-of-pocket fees, charges and disbursements of one firm of counsel for the Indemnitees, taken as a whole, of a single local counsel and any specialist counsel in each relevant material jurisdiction and in the case of an actual or potential conflict of interest where any Person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel per applicable material jurisdiction for such affected Persons taken as a whole), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Term Loan or the use of the proceeds thereof, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability of the Borrower or any of its Subsidiaries, or (iv) any actual or prospective Proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such Proceeding is initiated by a third party or the Borrower or any Affiliate of the Borrower); *provided* that such indemnity shall not, as to any Indemnitee, be available (1) with respect to Taxes (and amounts relating thereto), the indemnification for which shall be governed solely and exclusively by Sections 2.12 and 2.14, other than any Taxes that represent losses, claims or damages arising from any non-Tax claim or (2) to the extent that such Liabilities or related reasonable and documented expenses (A) are determined by a court

of competent jurisdiction by final and non-appealable judgment to have resulted from (I) the gross negligence or willful misconduct of such Indemnitee, (II) with respect to any Indemnitee other than the Collateral Agent or any of its Related Parties, a material breach by such Indemnitee or one of its Affiliates of its express obligations under this Agreement or any other Loan Document, or (III) with respect to any Proceeding brought by the Borrower or the Borrower against the Collateral Agent or any of its Affiliates, a material breach by the Collateral Agent or any of its Affiliates of its express obligations under this Agreement or any other Loan Document, or (B) arise from any dispute between and among Indemnitees that does not involve an act or omission by the Borrower, the Borrower or any of its Subsidiaries (other than any proceeding against any Agent in such capacity); *provided* that any such Liabilities or related reasonable and documented expenses incurred by the Collateral Agent acting in such capacity in connection with any such dispute shall not be excluded pursuant to this clause (B).

(d)     Each Lender severally agrees to pay any amount required to be paid by the Borrower under paragraphs (a), (b) or (c) of this Section 10.3 to each Agent and each Related Party of such Agent (each, an "Agent-Related Person") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Applicable Percentage in effect on the date on which such payment is sought under this Section (or, if such payment is sought after the date upon which the New Money Term Loan Commitments shall have terminated and the Term Loans shall have been paid in full in cash, ratably in accordance with such Applicable Percentage immediately prior to such date), from and against any and all Liabilities and related reasonable and documented expenses, including the fees, charges and disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loans) be imposed on, incurred by or asserted against such Agent-Related Person in any way relating to or arising out of the New Money Term Loan Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent-Related Person under or in connection with any of the foregoing; *provided* that the unreimbursed Liability or related reasonable and documented expense, as the case may be, was incurred by or asserted against such Agent-Related Person in its capacity as such; *provided, further,* that no Lender shall be liable for the payment of any portion of such Liabilities, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent-Related Party's gross negligence or willful misconduct.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

(e)     Payments.  All amounts due under this Section 10.3 shall be payable promptly after written demand therefor.

Section 10.4.     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower, without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (but not to the Borrower or an Affiliate of the Borrower or any Defaulting Lender or any

natural person) all or a portion of its rights and obligations under this Agreement (including all or a portion of its New Money Term Loan Commitment and the Term Loans at the time owing to it) with the prior written consent of:

(1)     the Borrower; *provided* that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; *provided, further*, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

(2)     the Administrative Agent (such consent not to be unreasonably withheld or delayed) unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, in each case which consent shall not be required.

(ii)     Assignments shall be subject to the following additional conditions:

(1)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's New Money Term Loan Commitment or Term Loans, (A) the amount of the New Money Term Loan Commitment or Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $100,000 unless each of the Borrower and the Administrative Agent otherwise consent; *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (B) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; *provided* that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of New Money Term Loan Commitments or Term Loans;

(3)     (x) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $4,500; *provided* that the Administrative Agent may, in its sole discretion, elect to reduce or waive such processing and recordation fee in the case of any assignment, and (y) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent;

(4)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax forms required by <u>Section 2.14(e)</u> and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal, state and foreign securities laws;

(5)     no such assignment shall be made to (I) the Borrower or any Affiliate of the Borrower or (II) any Defaulting Lender or any of its subsidiaries, Affiliates or equity holder thereof, or any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (II);

(6)        in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable Pro Rata Share of Term Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (I) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon), and (II) acquire (and fund as appropriate) its full Pro Rata Share of all Term Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs; and

(7)        the assignee shall not be entitled to receive any greater payment under Section 2.12 or Section 2.14, with respect to any assignment, than its assigning Lender was entitled to receive.

(iii)        Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.13, Section 2.14 and Section 10.3); *provided* that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)        The Administrative Agent, acting solely for this purpose as an non-fiduciary agent of the Borrower shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the New Money Term Loan Commitment of, and principal amounts (and stated interest) of the Term Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  The Register is intended to establish that each New Money Term Loan Commitment, Term Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or any amended or successor version).  The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 10.4(b)(iv),

99

except to the extent that such losses, claims, damages or liabilities are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent.  The Term Loans (including principal and interest) are registered obligations and the right, title, and interest of any Lender or its assigns in and to such Term Loans shall be transferable only upon notation of such transfer in the Register.

(v)    Upon its (1) receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by <u>Section 2.14(e)</u> (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section and (2) completion of all "know your customer" or similar processes required under applicable law and regulation, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to <u>Section 2.4(b)</u>, <u>Section 2.15(c)</u> or <u>Section 10.3(d)</u>, the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (but not to (I) the Borrower or an Affiliate of the Borrower, (II) any Defaulting Lender or any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (II), (III) [reserved], or (IV) any natural Person) (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its New Money Term Loan Commitment and the Term Loans owing to it); *provided* that (1) such Lender's obligations under this Agreement shall remain unchanged, (2) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (3) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to <u>Section 10.2(b)</u> that adversely affects such Participant (except with respect to any matters that require only the affirmative vote of the Required Lenders).  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Section 2.12</u>, <u>Section 2.13</u> and <u>Section 2.14</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 2.14(e)</u>; *provided* that the documentation required under <u>Section 2.14(e)</u> shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant agrees to be subject to the provisions of <u>Section 2.16</u> as if it were an assignee under paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.8</u> as though it were a Lender; *provided* that such Participant agrees to be subject to <u>Section 2.15(b)</u> as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under <u>Section 2.12</u> or <u>Section 2.14</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any New Money Term Loan Commitments, Term Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such New Money Term Loan Commitment, Term Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  The Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the Bank of England or the European Central Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 10.5.    Survival.  All covenants, agreements, representations and warranties made by any Loan Party herein, in any other Loan Document or in any certificate or other instrument delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Term Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the New Money Term Loan Commitments have not expired or terminated.  The provisions of Section 2.12, Section 2.13, Section 2.14 and Section 10.3 and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Term Loans, the resignation of any Agent, the replacement of any Lender, or the termination of this Agreement or any provision hereof.

Section 10.6.    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall be deemed an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 10.7.    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity,

illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.8.    Right of Set-off.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other amounts at any time held, and other obligations (in whatever currency) at any time owing, by such Lender or Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such obligations; *provided* that, in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions hereof and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of set-off) which such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such set-off and application; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

Section 10.9.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

(b)    Each of the Lenders, the Administrative Agent and the Collateral Agent hereby irrevocably and unconditionally agrees that, notwithstanding the governing law provisions of any applicable Loan Document, any claims brought against the Administrative Agent or the Collateral Agent by any Secured Party relating to this Agreement, any other Loan Document, the Collateral or the consummation or administration of the transactions contemplated hereby or thereby shall be construed in accordance with and governed by the law of the State of New York.

(c)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, solely to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other applicable Loan Document or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third-party claims brought against the Administrative Agent or any of its Related Parties may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court.  Each of the parties

hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that any Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Loan Party or its properties in the courts of any jurisdiction.

(d)        Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other applicable Loan Document in any court referred to in paragraph (c) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)        Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.1.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(f)        Each Loan Party hereby appoints the Borrower as its authorized agent ("Authorized Agent") upon whom process may be served in any Proceeding arising out of or based upon this Agreement or the transactions contemplated herein which may be instituted in the Bankruptcy Court, and, solely to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the United States District Court for the Southern District of New York sitting in the Borough of Manhattan, the Supreme Court of the State of New York sitting in the Borough of Manhattan or any appellate court from any thereof. Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon each Loan Party.

Section 10.10.    Waiver of Jury Trial.  **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 10.11.    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12.    Confidentiality.

(a)        Each of the Agents and the Lenders agrees to (i) maintain the confidentiality of the Information, (ii) not disclose, divulge, transfer, exchange, assign, license or grant access to any Information to any individual or organization, either internally or externally, without the prior written consent of the Borrower, and (iii) not use the Information for any purpose except in connection with the Loan Documents, except that Information may be

(1) disclosed, divulged or accessed to or by its and its Affiliates' directors, officers, employees, other providers of services and agents, including auditors, accountants, legal counsel and other advisors, or to any credit insurance provider relating to any Loan Party and its obligations (collectively, "Representatives"), in each case on a "need-to-know" basis in connection with this Agreement and the transactions contemplated hereby; *provided* that the applicable Agent or Lender disclosing to any such Person pursuant to this clause (1) shall ensure (excluding the need to take any legal action) that such Person is aware of and complies with the confidentiality and non-disclosure obligations contained in this Section 10.12 and such Agent or Lender, as applicable, shall be responsible to the Borrower for any breach of this Section 10.12 by such Person (except that the Collateral Agent shall only be responsible to the Borrower for any such breach by its or any of its Affiliates' directors, officers or employees), unless such Person has entered into one or more confidentiality agreements with or for the benefit of the Borrower or any of its Affiliates on substantially similar terms as this Section 10.12,

(2) disclosed to the extent compelled by any Governmental Authority (including the Bankruptcy Court and including any self-regulatory authority, such as the National Association of Insurance Commissioners and including the Bankruptcy Court) or required by applicable laws or regulations or by any subpoena or similar legal process (in which case such Agent or such Lender, as applicable, agrees, except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority, to the extent reasonably practicable and permitted by applicable law (A) to provide the Borrower reasonable written notice thereof prior to the disclosure of the same to the extent reasonable and not prohibited by law or any applicable Governmental Authority, (B) to disclose only the Information which it is compelled to disclose and (C) to exercise its reasonable efforts to inform the relevant party so requesting or requiring disclosure that the Information is confidential and should be treated accordingly),

(3) disclosed to any other party to this Agreement,

(4) disclosed in connection with establishing a "due diligence" defense or the exercise of any remedies hereunder or under any Loan Document or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder or under any Loan Document,

(5) disclosed subject to an agreement containing provisions substantially the same as those of this Section 10.12 or such other terms as are reasonably acceptable to the Borrower and the Administrative Agent, including as agreed in marketing materials in accordance with customary market standards for dissemination of such type of information or pursuant to customary "click-through" procedures or other affirmative action reasonably acceptable to the Borrower to access the Information and acknowledge the confidentiality obligations in respect thereof, to or by (A) any permitted assignee of any of its rights or obligations under this Agreement or any permitted Participant, (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or the Borrower and their respective obligations, (C) any rating agency in connection with rating the Borrower or its Subsidiaries or the New Money Term Loan Facility or (D) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of identification numbers with respect to the New Money Term Loan Facility,

(6) disclosed to the extent such Information (A) is expressly approved for release by written authorization of the Borrower prior to such disclosure, (B) is already in the public domain or becomes so through no fault of any of the Agents, the Lenders or any of their respective Related Parties or Representatives, (C) is received by any Agent, any Lender or any of their respective Related Parties or Representatives from a third party that such Agent, Lender, Related Party or

Representative does not know to have violated, or to have obtained such Information in violation of, any confidentiality obligation to the Borrower with respect to such Information, or (D) is independently developed by any Agent, Lender or their respective Affiliates without reference to any Information and without breach of this <u>Section 10.12</u>,

(7) in respect to any order of any court or other Governmental Authority (including the Bankruptcy Court) or as may otherwise be required pursuant to any law or if requested or required to do so in connection with any litigation or similar proceeding, or

(8) in connection with the exercise of any remedy hereunder or under any other Loan Document.

Any Person required to maintain the confidentiality of Information as provided in this <u>Section 10.12</u> shall be considered to have complied with its obligation to do so if such Person has used the same means such Person uses to protect similar types of confidential information which such Person receives in connection with the evaluation or consummation of transactions similar to the Transactions, but in any event not less than reasonable means (excluding the need to take any legal action) to prevent the disclosure of Information to third parties in breach of this <u>Section 10.12</u>. Nothing in this Agreement shall require any Agent, any Lender or any of their respective Representatives to take any action which could expose any such Person to any legal sanction or penalty, or to take or initiate any legal action or proceeding.

(b)    [Reserved].

(c)    [Reserved].

(d)    Each Beneficiary shall notify the Borrower promptly upon discovery of any unauthorized use or disclosure of the Information in breach of this <u>Section 10.12</u>, or any other breach of this <u>Section 10.12</u> by such Beneficiary, and will use reasonable efforts (excluding the need to take any legal action) to cooperate with the Borrower to help the Borrower regain possession of the Information and prevent its further unauthorized use in breach of this <u>Section 10.12</u>.

(e)    EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS AGREEMENT) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL, STATE AND FOREIGN SECURITIES LAWS.

(f)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY OR ON BEHALF OF THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND ITS RELATED PARTIES OR ITS SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.13.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Term Loan, together with all fees, charges and other amounts which are treated as interest on such Term Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Term Loan in accordance with applicable law, the rate of interest payable in respect of such Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Term Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Term Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by such Lender.

Section 10.14.    No Advisory or Fiduciary Responsibility.

(a)    In connection with all aspects of each Transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its subsidiaries' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's length commercial transactions between such Loan Party and its Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, (B) none of the Agents and the Lenders is advising any Loan Party as to any legal, tax, investment, accounting regulatory or any other matters, and such Loan Party has consulted its own advisors to the extent it has deemed appropriate, and (C) such Loan Party is responsible for and capable of independently evaluating, and understands and accepts, the terms, risks and conditions of the Transactions contemplated hereby and by the other Loan Documents, and none of the Agents and the Lenders shall have any responsibility or liability to any Loan Party with respect thereto; (ii) (A) each of the Agents and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its subsidiaries, or any other Person and (B) none of any Agent or any Lender has any obligation to any Loan Party or any of its Affiliates with respect to the Transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Loan Party and its Affiliates, and none of any Agent or any Lender has any obligation to disclose any of such interests to such Loan Party or its Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases, and agrees that it will not assert, any claims that it may have against any of the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

(b)    Each Loan Party further acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that each of the Agents and the Lenders, together with their respective Affiliates, is or may be a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services.  In the ordinary course of business, any of the Agents and the Lenders may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, the Loan Parties and other companies with which a Loan Party may have commercial or other relationships.  With respect to any securities and/or financial instruments so held by any of the Agents and the Lenders or any of its respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

Section 10.15.   Electronic Execution of Assignments and Certain Other Documents.  Delivery of an executed counterpart of a signature page of (a) this Agreement, (b) any other Loan Document and/or (c) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 10.1), certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each, an "Ancillary Document") that is an Electronic Signature transmitted by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart or this Agreement, such other Loan Document or such Ancillary Document, as applicable.  The words "execution", "signed", "signature", "delivery", and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; *provided* that nothing herein shall require any Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it (it being understood and agreed that each Agent accepts, consents and approves of transmission through electronic means of any Electronic Signature that is a reproduction of an image of an actual executed signature page); *provided, further*, without limiting the foregoing, (i) to the extent an Agent has agreed to accept any Electronic Signature, the Agents and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic signature and (ii) upon the request of any Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, each Loan Party hereby (1) agrees that, for all purposes, including in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Agents, the Lenders, and the Loan Parties, Electronic Signatures transmitted by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (2) agrees that each of the Agents and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (3) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (4) waives any claim against any Lender-Related Person for any Liabilities arising solely from any Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by email, emailed pdf or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature, except to the extent such Liabilities are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Lender-Related Person (it being understood and agreed that all Electronic Signatures and materials so transmitted shall continue to be subject to the terms of the confidentiality provisions set forth herein).

Section 10.16.   USA Patriot Act; Beneficial Ownership Regulation.  Each Lender that is subject to the requirements of the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lenders) hereby notifies each Loan Party that, pursuant to the requirements of the USA Patriot Act, it

is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act. Each Loan Party shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Beneficial Ownership Regulation.

Section 10.17.    <u>Release of Liens and Guarantors</u>.

(a)    [Reserved].

(b)    [Reserved].

(c)    [Reserved].

(d)    [Reserved].

(e)    Upon termination of the aggregate New Money Term Loan Commitments and payment in full in cash of all Obligations (other than Unasserted Contingent Obligations) under any Loan Document, all obligations under the Loan Documents and all security interests created by the Collateral Documents shall be automatically released.

(f)    In connection with any termination or release pursuant to this <u>Section 10.17</u>, the Administrative Agent or the Collateral Agent, as the case may be, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Borrower or the applicable Loan Party shall have provided the Administrative Agent or the Collateral Agent, as the case may be, such certifications or documents as the Administrative Agent or the Collateral Agent, as the case may be, shall reasonably request in order to demonstrate compliance with this Agreement.

(g)    Each of the Lenders irrevocably consents, authorizes and directs the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release or termination contemplated by this <u>Section 10.17</u>.

(h)    [Reserved].

Section 10.18.    <u>Acknowledgment and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any parties hereto, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.19.   <u>DIP Order</u>.  The Loan Parties, the Administrative Agent and the Lenders hereby expressly agree that in the event of any conflict between (i) this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall control, (ii) this Agreement and the Final DIP Order, the Final DIP Order shall control and (iii) the Intercreditor Agreement and the Final DIP Order, the Final DIP Order shall control.

*[Signature pages follow]*

109

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

BYJU's ALPHA, INC., as Borrower

By: _____
Name:
Title:

[●], as Lender


By: _____
Name:
Title:

GLAS TRUST COMPANY LLC, as
Administrative Agent


By:    _____
Name:
Title:

GLAS TRUST COMPANY LLC, as Collateral
Agent

By: _____
Name:
Title:

**[FORM OF]**
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [NAME OF ASSIGNOR] (the "Assignor") and [NAME OF ASSIGNEE] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit and Guaranty Agreement identified below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor:                         _____

                                      [Assignor [is] [is not] a Defaulting Lender]

2.  Assignee:                         _____

                                      [and is an Affiliate/Approved Fund of [identify Lender]]

3.  Borrower:                         Byju's Alpha, Inc. (the "Borrower")

4.  Administrative Agent:             GLAS Trust Company LLC as the administrative agent under the Credit Agreement

5.  Credit Agreement:                 Credit and Guaranty Agreement, dated as of April 3, 2024 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

6.  Assigned Interest:

| Facility Assigned | Type of New Money Term Loans Assigned | Aggregate Amount of Term Loans for all Lenders | Amount of Term Loans Assigned | Percentage Assigned of Term Loans[1] | Roll-Up Notice Exercised |
|---|---|---|---|---|---|
| New Money Term Loans | New Commitment New Money Term Loans and/or New Money Term Loan Commitments | $ | $ | % | [Yes / No] |
| | Bridge Loans | | | | [Yes / No] |
| | Prepetition Reimbursements | | | | [Yes / No] |
| Roll-Up Loans | | | | | N/A |

Effective Date:_____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By: _____
Name:
Title:

---

[1]    Set forth, to at least 9 decimals, as a percentage of the Term Loans of all Lenders thereunder.

Exhibit A-1

ASSIGNEE

[NAME OF ASSIGNEE]

By: _____
Name:
Title:

Consented to and Accepted:

[_____], AS THE ADMINISTRATIVE AGENT

By: _____
Name:
Title:

[Consented to:
[Borrower]

By: _____
Name:
Title:][2]

---

[2]    To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

CREDIT AGREEMENT

Standard Terms and Conditions for
Assignment and Assumption

1.    Representations and Warranties.

1.1    Assignor. The Assignor: (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, (iv) any requirements under applicable law for the Assignee to become a lender under the Credit Agreement or to charge interest at the rate set forth therein from time to time, or (v) the performance or observance by the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee. The Assignee: (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and under applicable law, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent, the Assignor or any other Lender or any of their respective Related Parties, and (vi) attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; (b) agrees that it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (c) appoints and authorizes each of the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to or otherwise conferred upon the Administrative Agent or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind and after the Effective Date to the Assignee.

3.      <u>Effect of Assignment</u>. Upon the delivery of a fully executed copy hereof to the Administrative Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent of the Assigned Interest and as provided in this Assignment and Assumption, have the rights and obligations of a Lender thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent as provided in this Assignment and Assumption, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents to the extent of the Assigned Interest.

4.      <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. This Assignment and Assumption incorporates herein the electronic execution provisions set forth in the Credit Agreement as if such provisions were set forth herein, *mutatis mutandis*. THIS ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Annex I to Exhibit A-1

EXHIBIT B

**[FORM OF]**
**BORROWING REQUEST**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement, dated as of April 3, 2024 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent and the Collateral Agent. The Borrower hereby gives irrevocable notice, pursuant to Section 2.3 of the Credit Agreement, that it requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.3 of the Credit Agreement:

(i)      The Business Day of the Proposed Borrowing is [●], 20__.[1]

(ii)     The aggregate principal amount of the Proposed Borrowing is [_____][2].

(iii)    The Proposed Borrowing consists of [Tranche 1][Tranche 2] New Money Term Loans.

If the Proposed Borrowing consists of Tranche 1 New Money Term Loans, the undersigned hereby certifies that the following statements will be true on the date of the Proposed Borrowing:

(A)      the representations and warranties of the Loan Parties set forth in the Credit Agreement and in the other Loan Documents are true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties are true and correct in all respects) on and as of the date of the Proposed Borrowing, except that to the extent that such representations and warranties specifically refer to an earlier date, they were true and correct in all material respects (other than to the extent qualified by materiality or "Material Adverse Effect", in which case, such representations and warranties were true and correct in all respects) as of such earlier date; and

---

[1]      Shall be a Business Day at least two (2) Business Days after the date hereof, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) on such day.

[2]      Such amount to be stated in Dollars.

(B)      at the time of and immediately after giving effect to the Proposed Borrowing, no Default or Event of Default has occurred and is continuing.

[Signature Page Follows]

The Borrower has caused this Borrowing Request to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU's Alpha, Inc.


By: _____
Name:
Title:

EXHIBIT C

**FORM OF APPROVED BUDGET**
[Attached]

Exhibit C

<u>EXHIBIT D</u>

**[FORM OF]**
**ROLL-UP NOTICE**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement, dated as of April 3, 2024 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "<u>Credit Agreement</u>"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent and the Collateral Agent. The undersigned Lender and any of its Affiliates signatory hereto (collectively, the "<u>Exercising Lender</u>") hereby gives irrevocable notice, pursuant to <u>Section 2.1</u> of the Credit Agreement, that it elects to exercise its option to roll-up the amount of Prepetition Term Loans set forth below.

    (i)  As of the date hereof, the Exercising Lender owns:

        a.  $_____ of Prepetition Term Loans

        b.  $_____ of New Money Term Loans and such New Money Term Loans consist of:

            i.  $_____ of Bridge Loan New Money Term Loans

            ii.  $_____ of Prepetition Reimbursement New Money Term Loans

            iii.  $_____ of New Commitment New Money Term Loans

    (ii)  As of the Effective Date, the Exercising Lender has previously rolled up $_____ of Prepetition Term Loans to Roll-Up Loans pursuant to the prior Roll-Up Notice(s) dated [●] and thereby exercised its options to roll-up rights on account of the following New Money Term Loans:

        a.  $_____ of Bridge Loan New Money Term Loans

        b.  $_____ of Prepetition Reimbursement New Money Term Loans

        c.  $_____ of New Commitment New Money Term Loans

(iii) As of the Effective Date, the right to exercise an option to roll-up Prepetition Term Loans has previously been exercised by an assigning lender, in respect of the amounts and Types of New Money Term Loans owned by the Exercising Lender as of the date hereof as set forth below and as set forth in the Assignment and Assumption agreement(s) dated [●] by and between [●], as Assignor, and the Exercising Lender, as Assignee:

    a.  $_____ of Bridge Loan New Money Term Loans

    b.  $_____ of Prepetition Reimbursement New Money Term Loans

    c.  $_____ of New Commitment New Money Term Loans

(iv) The effective date of this roll-up election shall be [●][1] (the "Effective Date").

(v) As of the Effective Date, the Exercising Lender intends to roll $_____[2] of the Prepetition Term Loans owned by the Exercising Lender on the date hereof into Roll-Up Loans in the amount of $_____ pursuant to the terms and conditions of the Credit Agreement on account of the following New Money Term Loans:

    a.  $_____ of Bridge Loan New Money Term Loans [3]

    b.  $_____ of Prepetition Reimbursement New Money Term Loans [4]

    c.  $_____ of New Commitment New Money Term Loans [5]

(vi) As of the Effective Date, the Exercising Lender owns the Prepetition Term Loans identified in clause (i)(a) [as a lender of record][as a participant, and the lender of record is [●]][6].

(vii)     [The Roll-Up Loans will be held by the Exercising Lender in the amounts set forth below:][7]

| Lender | Roll-Up Loan Allocation |
|---|---|
|  |  |

---

[1] Shall be a Business Day at least three (3) Business Days after the date hereof, *provided* that any such notice shall be deemed to have been given on a certain day only if given not later than 12:00 p.m. (New York City time) on such day.

[2] Such amount shall not exceed the lesser of the amount set forth in (i)(a) or in (i)(b)

[3] Such amount shall not exceed the difference resulting from subtracting the amounts in (ii)(a) and (iii)(a) from the amount in (i)(b)(i)

[4] Such amount shall not exceed the difference resulting from subtracting the amounts in (ii)(b) and (iii)(b) from the amount in (i)(b)(ii)

[5] Such amount shall not exceed the difference resulting from subtracting the amounts in (ii)(c) and (iii)(c) from the amount in (i)(b)(iii)

[6] For any Exercising Lender who holds Prepetition Term Loans being rolled up on the Effective Date by participation, such Exercising Lender must also deliver evidence that the lender of record has consented to the corresponding reduction in the prepetition term loan claims held by such lender of record.

[7] To be included if there is more than one Exercising Lender and/or the Exercising Lender intends to allocate any amount of its Roll-Up Loans to a non-lender affiliate.

Exhibit B

|  |  |
|---|---|
|  |  |

[Signature Page Follows]

The undersigned has caused this Roll-Up Notice to be executed and delivered by its duly authorized signatory as of the date first written above.

Very truly yours,

[●].

By: _____
Name:
Title:

<u>EXHIBIT E</u>

**[FORM OF]**
**WITHDRAWAL NOTICE**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency

[Date]

Ladies and Gentlemen:

Reference is hereby made to the Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement, dated as of April 3, 2024 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "<u>Credit Agreement</u>"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent and the Collateral Agent.

The undersigned hereby [requests][informs the Administrative Agent of] a Withdrawal from the [Funding Account][Indemnity Escrow Account] in the amount of $_____ on _____[1].

[The net proceeds of the Withdrawal shall be used as set forth on the funds flow attached as <u>Exhibit A</u> hereto.][2]

---

[1]    To be a Business Day at least three (3) Business Days after the date hereof.

[2]    To be used only for Withdrawals from the Funding Account.

Exhibit E

The Borrower has caused this Withdrawal Notice to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU's Alpha, Inc.


By: _____
Name:
Title:

<u>EXHIBIT A</u>

Exhibit E

<u>EXHIBIT F</u>

**[FORM OF]**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate is delivered to you pursuant to <u>Section 5.1(c)</u> of the Credit and Guaranty Agreement, dated as of April 3, 2024 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "<u>Credit Agreement</u>"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), by and among BYJU's Alpha, Inc as the Borrower, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

1. I am the duly elected, qualified and acting [Officer] of the Borrower.

2. I have reviewed and am familiar with the contents of this Compliance Certificate. I am providing this Compliance Certificate solely in my capacity as an officer of the Borrower.

3. No Default has occurred and is continuing as of the date hereof[, except for _____]¹.

---

¹ Specify the details of any Default, if any, and any action taken or proposed to be taken with respect thereto.

IN WITNESS WHEREOF, I have executed this Compliance Certificate as of the date first written above.

BYJU'S ALPHA, INC.


By: _____
Name:
Title:

EXHIBIT G

**[FORM OF]**
**COUNTERPART AGREEMENT**

This Counterpart Agreement, dated [      ] (this "Counterpart Agreement") is delivered pursuant to that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of April 3, 2024 (as it may be amended, restated, amended and restated, modified, extended and/or supplemented from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), by and among BYJU's Alpha, Inc. as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

**Section 1.** Pursuant to Section 5.9 of the Credit Agreement, the undersigned (the "New Guarantor") hereby:

(a)      agrees that this Counterpart Agreement may be attached to the Credit Agreement and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Credit Agreement and agrees to be bound by all of the terms thereof with the same force and effect as if originally named therein as a Guarantor; and

(b)      represents and warrants that each of the representations and warranties set forth in the Credit Agreement (other than such representations and warranties that relate solely to facts and conditions as of the Effective Date) and applicable to the undersigned is true and correct in all material respects as of the date hereof; *provided* that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or "Material Adverse Effect" in the text thereof.

**Section 2.** Neither this Counterpart Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Counterpart Agreement) against whom enforcement of such change, waiver, discharge or termination is sought. Any notice or other communication herein required or permitted to be given shall be given to the Borrower in accordance with Section 10.1 of the Credit Agreement. In case any provision in or obligation under this Counterpart Agreement shall be invalid or unenforceable in any jurisdiction, the validity and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK. THE TERMS AND PROVISIONS OF SECTION 10.9(B) OF THE CREDIT AGREEMENT ARE INCORPORATED BY REFERENCE HEREIN AS IF FULLY SET FORTH HEREIN.**

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the undersigned has caused this Counterpart Agreement to be duly executed and delivered by its duly authorized officer as of the date above first written.

**[NAME OF NEW GUARANTOR]**

By: _____
Name:
Title:

ACKNOWLEDGED AND ACCEPTED, as of the date above first written:

GLAS TRUST COMPANY LLC,
as the Administrative Agent

By_____
Name:
Title:

Exhibit G

<u>EXHIBIT H</u>

**[RESERVED]**

EXHIBIT I-1

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of April 3, 2024 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By _____
Name:
Title:

Date:    __, 20[____]

Exhibit I-1

<u>EXHIBIT I-2</u>

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Participants That Are Not Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of April 3, 2024 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of <u>Section 2.14(e)</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By _____
Name:
Title:

Date:    __, 20[____]

Exhibit I-2

<u>EXHIBIT I-3</u>

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Participants That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of April 3, 2024 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of <u>Section 2.14(e)</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8 IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By _____
Name:
Title:

Date:    __, 20[____]

Exhibit I-3

EXHIBIT I-4

**[FORM OF]**
**PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Partnerships for U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit and Guaranty Agreement, dated as of April 3, 2024 (as amended, restated, amended and restated, supplemented, extended and/or otherwise modified from time to time, the "Credit Agreement"), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent.

Pursuant to the provisions of Section 2.14(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Term Loan(s) (as well as any Term Loan Note(s) evidencing such Term Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By _____
Name:
Title:

Date:    __, 20[____]

Exhibit I-4

**[FORM OF]**
**INDEMNIFICATION NOTICE**

GLAS Trust Company LLC as the Administrative Agent
for the Lenders party to the Credit Agreement referred to below

Address: 3 Second Street, Suite 206, Jersey City, NJ 07311
Attention: Transaction Management
Facsimile: 212-202-6246
Email: clientservices.americas@glas.agency; TMGUS@glas.agency [Date]

Ladies and Gentlemen:

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of April 3, 2024 (as it may be modified, supplemented, extended, amended, restated or amended and restated from time to time, the "Credit Agreement"; capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement), among BYJU's Alpha, Inc., as the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and GLAS Trust Company LLC as the Administrative Agent and the Collateral Agent. The Borrower hereby gives notice that:

(i)   it has received a request in good faith from Pohl for indemnification under the Indemnification Obligations;

(ii)  the request is for bona fide indemnifiable amounts determined in good faith under the Indemnification Obligations;

(iii) the amount of such indemnification request is $_____; and

(iv)  a reasonably detailed description of such request is attached as Exhibit A hereto.

[Signature Page Follows]

The Borrower has caused this Indemnification Notice to be executed and delivered by its duly authorized Responsible Officer as of the date first written above.

Very truly yours,

BYJU'S ALPHA, INC.

By:  _____
Name:
Title:

**<u>Exhibit B</u>**

**Publication Notice of Unknown Creditor**
**Challenge Period Termination Date**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) |
| BYJU'S ALPHA, INC.,[1] | ) Case No. 24-10140 (JTD) |
| | ) |
| Debtor. | ) |
| | ) |

**NOTICE OF FINAL ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (III) GRANTING SENIOR POSTPETITION SECURITY INTERESTS, AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(C) AND 364(D) OF THE BANKRUPTCY CODE, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that, on March 26, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered its *Final Order (i) Authorizing the Use of Cash Collateral, (ii) Authorizing the Debtor to Obtain Postpetition Financing, (iii) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, and (vi) Granting Related Relief* [Docket No. []] (the "Final DIP Order").[2]

**PLEASE TAKE FURTHER NOTICE**, that the Final DIP Order contains certain stipulations, admissions, waivers, and releases that were binding on the Debtor, its estate, and any of its respective successors in all circumstances and for all purposes, and the Debtor was deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date; *provided, however*, that the Debtor's stipulations, admissions, agreements, releases, and waivers contained in the Final DIP Order shall not apply to a chapter 7 or chapter 11 trustee until the Known Creditor Challenge Period Termination Date (defined below). The stipulations, admissions, and waivers contained in the Final DIP Order, including the Debtor's Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtor's estate, unless and to the extent that a party in interest with proper standing granted by order of the Court, has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (a) seeking to avoid, object to, or otherwise challenge the findings or the Debtor's Stipulations, including regarding: (i) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any of the Prepetition Secured Parties; (ii) the validity, enforceability, allowability, priority, secured status, or amount of the Obligations; (iii) asserting or prosecuting any so-called "lender liability" claims, avoidance actions, or any other claim, counter claim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law, or otherwise, against any of the Prepetition Secured Parties or their

---

[1]    The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address for purposes of this chapter 11 case is: 1007 N. Market St. Ste. G20 452, Wilmington, DE 19801..

[2]    Capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Final DIP Order.

respective representatives (any such claim, a "Challenge") and (b) in which the Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed Challenge.

With respect to parties that were previously served with a copy of the Final DIP Order, and any Committee, a Challenge must be filed on or prior to 75 days following entry of the Interim Order (the "Known Creditor Challenge Period" and the date of expiration of the Known Creditor Challenge Period, the "Known Creditor Challenge Period Termination Date").  With respect to parties that were not served with a copy of the Final DIP Order, a Challenge must be filed on or prior to [May [], 2024] (the "Unknown Creditor Challenge Period" and the date of expiration of the Unknown Creditor Challenge Period, the "Unknown Creditor Challenge Period Termination Date").[3]

Upon the occurrence of the Challenge Period Termination Dates without the filing of a Challenge (or if any such Challenge is withdrawn or filed and overruled):  (w) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in the Chapter 11 Case, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (x) the Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Chapter 11 Case and any Successor Case; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected liens and security interests, not subject to recharacterization, subordination, or avoidance; and (z) all of the Debtor's stipulations and admissions contained in the Final DIP Order, including the Debtor's Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in the Final DIP Order shall be of full force and effect and forever binding upon the Debtor, the Debtor's estate, and all creditors, interest holders, and other parties in interest in the Chapter 11 Case and any Successor Case.  Furthermore, if any such Challenge is timely and properly filed under the Bankruptcy Rules then (a) any claim or action that is not brought shall forever be barred and (b) the stipulations and admissions contained in the Final DIP Order, including the Debtor's Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such Challenge prior to the Challenge Period Termination Dates (and solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, any other party in interest).  Nothing in the Final DIP Order vests or confers on any person (as defined in section 101 of the Bankruptcy Code), including any Committee appointed in the Chapter 11 Case, standing or authority to pursue any cause of action belonging to the Debtor or its estates, including any challenges (including a Challenge) with respect to the Prepetition Liens and the Obligations, and a separate order of the Court conferring such standing on any Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party in interest; *provided*, *however*, that nothing herein prohibits the Prepetition Secured Parties from contesting any request to obtain standing on any other grounds permitted by applicable law.  For the avoidance of doubt, the roll up under the DIP Credit Agreement is subject in its entirety to the Challenge.

A copy of the Final DIP Order is may be downloaded from the Court's website at http://www.deb.uscourts.gov/.  A login and password to the Bankruptcy Court's Public Access to Electronic

---

[3]   The Known Creditor Challenge Period, together with the Unknown Creditor Challenge Period, shall collectively be referred to as the "Challenge Periods."   The Known Creditor Challenge Period Termination Date, together with the Unknown Creditor Challenge Period Termination Date, shall collectively be referred to as the "Challenge Period Termination Dates."

Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.gov.

Dated: March [], 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
Jianjian Ye (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10019
Tel.: (212) 849 7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

*Counsel for the Debtor*