## Exhibit A

**Proposed Intercreditor Amendment Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Case No. 24-10140 (JTD) |
| | ) | |
| Debtor. | ) | **Re: Docket No. __** |
| | ) | |

## ORDER AUTHORIZING THE DEBTOR TO AMEND THE
## INTERCREDITOR AGREEMENT AND GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtor (the "Debtor") for entry

of an order (this "Order") authorizing the Debtor to (a) enter into the DIP Amendment and (b) enter

into the Intercreditor Amendment, all as more fully set forth in the Motion; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent

with Article III of the United States Constitution; and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on

the Motion were appropriate and no other notice need be provided under the circumstances; and

this Court having reviewed the Motion; and this Court having entered the Interim DIP Order and

the Final DIP Order; and it appearing that the Debtor's proposed entry into the Intercreditor

---

[1]   The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address is 16192 Coastal Highway, Lewes, Delaware 19958.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Amendment is a sound and prudent exercise of the Debtor's business judgment; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED, AND ADJUDGED, that:

1.    *Disposition.*  The relief requested in the Motion is GRANTED in accordance with the terms of this Order.

(a)    *The Intercreditor Amendment.*  The Intercreditor Amendment, substantially in the form attached hereto as **Exhibit 1**, is authorized and approved, subject to the terms and conditions set forth in the Intercreditor Amendment, this Order, and the Final DIP Order (as modified by this Order).  References to the "Intercreditor Agreement" in the DIP Loan Documents shall be deemed to refer to the Intercreditor Agreement as amended and restated by the Intercreditor Amendment.

(b)    Any and all objections to the Motion with respect to the entry of this Order that have not been withdrawn, waived, settled, or resolved and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Order shall become effective immediately upon its entry.

2.    *The Final DIP Order.*  The terms of the Final DIP Order are incorporated herein and made part of this Order.  Except as expressly modified by this Order, the Final DIP Order shall remain unchanged and in full force and effect.  All factual and other findings and conclusions of law contained in the Final DIP Order shall remain fully applicable, including with respect to the Upsize Loans, except to the extent specifically modified herein.  In the event of any inconsistency

among the provisions of this Order and the Final DIP Order, the provisions of the Final DIP Order shall govern, except as expressly modified by this Order.

3.      *Rights of DIP Secured Parties*.  For the avoidance of doubt, nothing in this Order or the Intercreditor Amendment is intended to nor shall alter, impair, or otherwise affect the claims, liens, and security interests, or the priority thereof, or the other rights and interests of the DIP Secured Parties under the Final DIP Order, the DIP Loan Documents, or the Prepetition Secured Parties under the Final DIP Order and the Prepetition Term Loan Documents.

4.      *Binding Effect; Successors and Assigns*.  The provisions of this Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including, without limitation, the DIP Secured Parties, any statutory or non-statutory committees appointed or formed in this Chapter 11 Case, the Debtor and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Secured Parties and the Debtor and their respective successors and assigns.

5.      *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Order.

6.      *Effectiveness*.  This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

7.      *Retention of Jurisdiction*.    The Court shall retain jurisdiction to implement, interpret, and enforce the provisions of this Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtor notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

## Exhibit 1

**Form of Intercreditor Amendment**

**AMENDED AND RESTATED SUBORDINATION AND INTERCREDITOR AGREEMENT**

THIS AMENDED AND RESTATED SUBORDINATION AND INTERCREDITOR AGREEMENT (this "Agreement") is entered into as of [●], 2024, by and among GLAS TRUST COMPANY LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as administrative agent and collateral agent for Alpha First Priority Lenders party to the Alpha First Priority Credit Agreement (in such capacities and together with any successor or assigns, the "Alpha First Priority Agent"), GLAS TRUST COMPANY LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as administrative agent and collateral agent for Epic! First Priority Lenders party to the Epic! First Priority Credit Agreement (in such capacities and together with any successor or assigns, the "Epic! First Priority Agent"), GLAS TRUST COMPANY LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as administrative agent and collateral agent for Second Priority Lenders party to the Second Priority Credit Agreement (in such capacities and together with any successor or assigns, the "Second Priority Agent"), GLAS TRUST COMPANY LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as Collateral Agent (as defined herein), and acknowledged by BYJU'S ALPHA, INC., a Delaware corporation ("Alpha Borrower"), Claudia Z. Springer, as Chapter 11 Trustee of Epic! Creations, Inc. ("Epic"), on behalf of the Estate of Debtor Epic! Creations, Inc., Claudia Z. Springer, as Chapter 11 Trustee of Neuron Fuel, Inc. ("Neuron"), on behalf of the Estate of Debtor Neuron Fuel, Inc., and Claudia Z. Springer, as Chapter 11 Trustee of Tangible Play, Inc. ("Tangible", and together with Epic and Neuron, collectively the "Epic Debtors", and each an "Epic Debtor"), on behalf of the Estate of Debtor Tangible Play, Inc. (Claudia Z. Springer as chapter 11 trustee of the estates of each Epic Debtor, the estates of each Epic Debtor, and the Epic Debtors, collectively, "Epic! Borrowers").

PRELIMINARY STATEMENT

Reference is made to (i) the Credit and Guaranty Agreement dated as of November 24, 2021, by and among BYJU'S ALPHA, INC., Think and Learn Private Limited, a company established under the laws of India with corporate identification number U80903KA2011PTC061427, the Lenders party thereto (as defined therein) and the Second Priority Agent (as amended from time to time, including as amended by that certain Amendment to Credit Agreement, dated as of October 4, 2022, that certain Amendment No. 2 to Credit Agreement, dated as of October 12, 2022, that certain Amendment No. 3 to Credit Agreement, dated as of November 24, 2022, that certain Amendment No. 4 to Credit Agreement, dated as of December 13, 2022, that certain Amendment No. 5 to Credit Agreement, dated as of December 20, 2022, that certain Amendment No. 6 to Credit Agreement, dated as of December 28, 2022, and that certain Amendment No. 7 to Credit Agreement and Forbearance Agreement, dated as of January 6, 2023, that certain Amendment No. 8 to Credit Agreement, dated as of January 12, 2023, that certain Amendment No. 9 to Credit Agreement, dated as of January 30, 2024, and that certain Amendment No. 10 to Credit Agreement, dated as of April 9, 2024, the "Existing Credit Agreement"), (ii) the Onshore Guarantee Deed (as defined in the Second Priority Credit Agreement), (iii) the Security Agreements (as defined in the Second Priority Credit Agreement) (hereinafter, the "Second Priority Security Agreements"), (iv) the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement dated as of April 9, 2024, by and among the Alpha Borrower, certain subsidiaries of the Alpha Borrower, each lender from time to time party thereto, and the Alpha First Priority Agent (as amended, restated, amended and restated, supplemented or modified or Refinanced in any manner (whether upon or after termination or otherwise) in whole or in part from time to time, the "Alpha First Priority Credit Agreement"), (v) the Security Agreements (as defined in the Alpha First Priority Credit Agreement) (hereinafter, the "Alpha First Priority Security Agreements"), (vi) the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement dated as of [●], 2024, by and among the Epic! Borrowers, each lender from time to time party thereto, and the Epic! First Priority Agent (as amended, restated, amended and restated, supplemented or modified or Refinanced in any manner (whether upon or after termination or otherwise) in whole or in part from time to time, the "Epic! First

Priority Credit Agreement") and (vii) the Security Agreements (as defined in the Epic! First Priority Credit Agreement) (hereinafter, the "Epic! First Priority Security Agreements").

RECITALS

A.      The Second Priority Loan Parties (as defined below), Second Priority Agent and Second Priority Lenders have entered into the Second Priority Credit Agreement, pursuant to which, among other things, Second Priority Lenders have agreed, subject to the terms and conditions set forth in the Second Priority Credit Agreement, to make certain loans and financial accommodations to the Second Priority Loan Parties.  The obligations under the Second Priority Credit Agreement are secured, among other things, by liens on and security interests in certain assets as set forth in the Onshore Guarantee Deed and in the Second Priority Security Agreements.

B.      The Alpha First Priority Loan Parties (as defined below), the Alpha First Priority Agent and Alpha First Priority Lenders have entered into that certain Alpha First Priority Credit Agreement, dated as of April 9, 2024, pursuant to which the Alpha First Priority Lenders have agreed to make loans, other extensions of credit accommodations to the Alpha Borrower or such other Alpha First Priority Loan Party subject to the Alpha First Priority Credit Agreement.  The obligations under the Alpha First Priority Credit Agreement are secured among other things by liens on and security interests in certain assets as set forth in the Alpha First Priority Security Agreements.

C.      In connection with and as one of the conditions precedent to the Alpha First Priority Credit Agreement, the Alpha First Priority Agent, the Second Priority Agent and the Alpha Borrower have entered into a Subordination and Intercreditor Agreement dated as of April 9, 2024 (the "Existing Intercreditor Agreement") to set forth the relative rights and priorities of Alpha First Priority Lenders and Second Priority Lenders under the Loan Documents (as defined in the Alpha First Priority Credit Agreement or Second Priority Credit Agreement, as applicable).

D.      The Epic! First Priority Loan Parties (as defined below), the Epic! First Priority Agent and Epic! First Priority Lenders have agreed to execute that certain Epic! First Priority Credit Agreement, dated as of [●], 2024, pursuant to which the Epic! First Priority Lenders have agreed to make loans and other extensions of credit accommodations to the Epic! Borrowers or such other Epic! First Priority Loan Party subject to the Epic! First Priority Credit Agreement.  The obligations under the Epic! First Priority Credit Agreement are secured among other things by liens on and security interests in certain assets as set forth in the Epic! First Priority Security Agreements.

E.      In connection with and as one of the conditions precedent to the Epic! First Priority Credit Agreement, the Epic! First Priority Agent and the Epic! First Priority Lenders have required the execution and delivery of this Agreement by the Epic! First Priority Agent, Alpha First Priority Agent, Second Priority Agent, Alpha Borrower and Epic! Borrowers in order to set forth the relative rights and priorities of Alpha First Priority Lenders, Epic! First Priority Lenders and Second Priority Lenders under the Loan Documents (as defined in the Alpha First Priority Credit Agreement, Epic! First Priority Credit Agreement or Second Priority Credit Agreement, as applicable).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.      **Definitions**.  The following terms shall have the following meanings in this Agreement:

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning set forth in the preamble.

"Alpha Borrower" has the meaning set forth in the preamble.

"Alpha Collateral" shall mean all of the existing or hereafter acquired property, whether real, personal or mixed, of each Alpha First Priority Loan Party, as to which a lien has been granted or purported to be granted under any Security Agreements (as defined in Alpha First Priority Credit Agreement) to the collateral agent to secure (or to purportedly secure) any or all of the Alpha First Priority Obligations.

"Alpha Final DIP Order" shall mean "Final DIP Order" as defined in the Alpha First Priority Credit Agreement.

"Alpha First Priority Credit Agreement" has the meaning set forth in the preliminary statement.

"Alpha First Priority Lenders" shall mean lenders in respect of the Alpha First Priority Obligations under the Alpha First Priority Credit Agreement from time to time.

"Alpha First Priority Loan Documents" shall mean any "Loan Documents" as defined in the Alpha First Priority Credit Agreement, including any corresponding documents entered into in any Refinancing of the Alpha First Priority Credit Agreement.

"Alpha First Priority Loan Parties" shall mean "Loan Parties" as defined in the Alpha First Priority Credit Agreement.

"Alpha First Priority Obligations" shall mean collectively, Alpha New Money First Priority Obligations and Alpha Roll-Up First Priority Obligations.

"Alpha First Priority Secured Parties" shall mean the Alpha First Priority Agent and the Alpha First Priority Lenders.

"Alpha First Priority Security Agreements" has the meaning set forth in the preliminary statement.

"Alpha New Money First Priority Obligations" shall mean all "Obligations" (as defined in the Alpha First Priority Credit Agreement) in respect of New Money Term Loans (for the avoidance of doubt, including New Commitment New Money Term Loans, Bridge Loans New Money Term Loans and Prepetition Reimbursement New Money Term Loans) (as each such term is defined in the Alpha First Priority Credit Agreement), including obligations, liabilities and indebtedness of every nature of the Alpha First Priority Loan Parties from time to time owed to Alpha First Priority Agent or any Alpha First Priority Secured Party under the Alpha First Priority Loan Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, whether primary, secondary, direct, contingent, fixed or otherwise,

heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with any interest and fees accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest and fees are allowed, in each case, in respect of New Money Term Loans (for the avoidance of doubt, including New Commitment New Money Term Loans, Bridge Loans New Money Term Loans and Prepetition Reimbursement New Money Term Loans) (as each such term is defined in the Alpha First Priority Credit Agreement).

"<u>Alpha Roll-Up First Priority Obligations</u>" shall mean all "Obligations" (as defined in the Alpha First Priority Credit Agreement) in respect of Roll-Up Loans (as defined in the Alpha First Priority Credit Agreement), including obligations, liabilities and indebtedness of every nature of the Alpha First Priority Loan Parties from time to time owed to Alpha First Priority Agent or any Alpha First Priority Secured Party under the Alpha First Priority Loan Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after filing of a Proceeding under the Bankruptcy Code together with any interest and fees accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest and fees are allowed, in each case, in respect of Roll-Up Loans (as defined in the Alpha First Priority Credit Agreement).

"<u>Bankruptcy Code</u>" shall mean Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Collateral</u>" shall mean all of the existing or hereafter acquired property, whether real, personal or mixed, of each Company.

"<u>Collateral Agent</u>" has the meaning set forth in Section 11.

"<u>Company</u>" shall mean each of the Alpha Borrower, each of the entities whose estates the Epic! Borrowers represent as a chapter 11 trustee pursuant to this agreement and any other Person that is a Guarantor (as defined in the Second Priority Credit Agreement).  As of the date hereof, a list of each Company is set forth in <u>Schedule 1</u> hereto.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"<u>Controlling First Priority Agent</u>" means, (a) prior to and until the Payment in Full of both Alpha New Money First Priority Obligations and Epic! New Money First Priority Obligations, (i) Alpha First Priority Agent if the amount of outstanding Alpha New Money First Priority Obligations is no less than the amount of outstanding Epic! New Money First Priority Obligations and (ii) Epic! First Priority Agent otherwise and (b) upon the Payment in Full of Alpha New Money First Priority Obligations and Epic! New Money Priority Obligations, prior to and until the Payment in Full of both Alpha First Priority Obligations and Epic! First Priority Obligations, (i) Alpha First Priority Agent if amount of outstanding Alpha First Priority Obligations is no less than the amount of outstanding Epic! First Priority Obligations and (ii) Epic! First Priority Agent otherwise and (c) upon the Payment in Full of First Priority Obligations, the Second Priority Agent.

"DIP Orders" shall mean collectively, the Alpha Final DIP Order, the Epic! Interim DIP Order and the Epic! Final DIP Order.

"Disposition" shall mean, with respect to any interest in property, the sale, lease, license or other disposition of such interest in such property.

"Distribution" shall mean, with respect to any indebtedness or obligation, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness or obligation, or (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person; provided that, any conversion of obligations under the Existing Credit Agreement to Roll-Up Loans (as defined in and pursuant to Alpha First Priority Credit Agreement or Epic! First Priority Credit Agreement) does not constitute "Distribution".

"Enforcement Action" shall mean (a) to take from or for the account of any Company, by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by any Company with respect to the Second Priority Obligations, (b) to initiate or participate with others in any suit, action or proceeding against any Company to (i) to sue for or enforce payment of the whole or any part of the Second Priority Obligations, (ii) commence or join with other Persons to commence a Proceeding with respect to any Company or any guarantor, or (iii) commence judicial enforcement of any of the rights and remedies under the Second Priority Loan Documents or applicable law with respect to the Second Priority Obligations, (c) to accelerate the Second Priority Obligations with respect to any Company (provided that, Second Priority Agent will be permitted to accelerate the Second Priority Obligations for the sole purpose of implementing default rate interest to the extent set forth in the Second Priority Loan Documents as in effect on the date hereof), (d) to take any action to enforce any rights or remedies with respect to the Second Priority Obligations with respect to any Company (provided that, subject to Section 2.2(c) below, the filing of a proof of claim by Second Priority Agent in a Proceeding involving any Company shall not be deemed an Enforcement Action), (e) to exercise any put option or to cause any Company to honor any redemption or mandatory prepayment obligation under any Second Priority Loan Document or (f) to exercise any rights or remedies of a secured party under the Second Priority Loan Documents or applicable law or take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of any Company.

"Epic! Borrowers" has the meaning set forth in the preamble.

"Epic! Collateral" shall mean all of the existing or hereafter acquired property, whether real, personal or mixed, of each Epic! First Priority Loan Party, as to which a lien has been granted or purported to be granted under any Security Agreements (as defined in Epic! First Priority Credit Agreement) to the collateral agent to secure (or to purportedly secure) any or all of the Epic! First Priority Obligations.

"Epic! Final DIP Order" shall mean "Final DIP Order" as defined in the Epic! First Priority Credit Agreement.

"Epic! First Priority Credit Agreement" has the meaning set forth in the preliminary statement.

"<u>Epic! First Priority Lenders</u>" shall mean lenders in respect of the Epic! First Priority Obligations under the Epic! First Priority Credit Agreement from time to time.

"<u>Epic! First Priority Loan Documents</u>" shall mean any "Loan Documents" as defined in the Epic! First Priority Credit Agreement, including any corresponding documents entered into in any Refinancing of the Epic! First Priority Credit Agreement.

"<u>Epic! First Priority Loan Parties</u>" shall mean "Loan Parties" as defined in the Epic! First Priority Credit Agreement.

"<u>Epic! First Priority Obligations</u>" shall mean collectively, Epic! New Money First Priority Obligations and Epic! Roll-Up First Priority Obligations.

"<u>Epic! First Priority Secured Parties</u>" shall mean the Epic! First Priority Agent and the Epic! First Priority Lenders.

"<u>Epic! Interim DIP Order</u>" shall mean "Interim DIP Order" as defined in the Epic! First Priority Credit Agreement.

"<u>Epic! First Priority Security Agreements</u>" has the meaning set forth in the preliminary statement.

"<u>Epic! New Money First Priority Obligations</u>" shall mean all "Obligations" (as defined in the Epic! First Priority Credit Agreement) in respect of New Money Term Loans (as defined in the Epic! First Priority Credit Agreement), including obligations, liabilities and indebtedness of every nature of the Epic! First Priority Loan Parties from time to time owed to Epic! First Priority Agent or any Epic! First Priority Secured Party under the Epic! First Priority Loan Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with any interest and fees accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest and fees are allowed, in each case, in respect of New Money Term Loans (as defined in the Epic! First Priority Credit Agreement).

"<u>Epic! Roll-Up First Priority Obligations</u>" shall mean all "Obligations" (as defined in the Epic! First Priority Credit Agreement) in respect of Roll-Up Loans (as defined in the Epic! First Priority Credit Agreement), including obligations, liabilities and indebtedness of every nature of the Epic! First Priority Loan Parties from time to time owed to Epic! First Priority Agent or any Epic! First Priority Secured Party under the Epic! First Priority Loan Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with any interest and fees accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest and fees are allowed, in each case, in respect of Roll-Up Loans (as defined in the Epic! First Priority Credit Agreement).

"Existing Credit Agreement" has the meaning set forth in the preliminary statement.

"First Priority Agents" shall mean collectively, the Alpha First Priority Agent and the Epic! First Priority Agent, in their respective capacities.

"First Priority Lenders" shall mean collectively, the Alpha First Priority Lenders and Epic! First Priority Lenders.

"First Priority Loan Documents" shall mean collectively, the Alpha First Priority Loan Documents and the Epic! First Priority Loan Documents.

"First Priority Loan Parties" shall mean collectively, the Alpha First Priority Loan Parties and the Epic! First Priority Loan Parties.

"First Priority Obligations" shall mean collectively, the Alpha First Priority Obligations and the Epic! First Priority Obligations.

"First Priority Secured Parties" shall mean collectively, the Alpha First Priority Secured Parties and Epic! First Priority Secured Parties.

"Paid in Full," "Payment in Full," shall mean, as of any date of determination with respect to the First Priority Obligations, that all of such First Priority Obligations (other than contingent indemnification obligations not yet due and payable or with respect to which a claim has not been asserted) has been paid in accordance with the First Priority Loan Documents and Second Priority Loan Documents respectively.

"Parties" shall mean each First Priority Agent, First Priority Loan Parties, Second Priority Agent, Second Priority Loan Parties and Collateral Agent.

"Permitted Refinancing" shall mean any refinancing or replacement of the First Priority Obligations under the First Priority Loan Documents.

"Person" shall mean any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other entity, whether acting in an individual, fiduciary or other capacity.

"Proceeding" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of a Person.

"Recovery" has the meaning set forth in Section 5 below.

"Refinance" means, with respect to any indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, discharge or retire, or to issue other indebtedness in exchange or replacement for, such indebtedness, in each case in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Second Priority Agent" has the meaning set forth in the preamble.

"Second Priority Credit Agreement" shall mean the Existing Credit Agreement, as amended, restated, modified, Refinanced in any manner (whether upon or after termination or otherwise), in whole or in part, from time to time.

"Second Priority Lenders" shall mean lenders under the Second Priority Credit Agreement from time to time.

"Second Priority Loan Documents" shall mean any "Loan Documents" as defined in the Second Priority Credit Agreement, including any corresponding documents entered into in any Refinancing of the Second Priority Credit Agreement.

"Second Priority Loan Parties" shall mean "Loan Parties" as defined in the Second Priority Credit Agreement.

"Second Priority Obligations" shall mean all indebtedness and other Obligations as defined in the Second Priority Credit Agreement.

"Second Priority Secured Parties" shall mean the Second Priority Agent and the Second Priority Lenders.

"Second Priority Security Agreements" has the meaning set forth in the preliminary statement.

"Secured Parties" shall mean First Priority Secured Parties and Second Priority Secured Parties.

"Shared Collateral" shall mean any Collateral other than Alpha Collateral and Epic! Collateral.

2.   **Subordination**.

2.1.   Subordination of Second Priority Obligations to First Priority Obligations.  Each First Priority Loan Party covenants and agrees, and Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) covenants and agrees, notwithstanding anything to the contrary contained in any of the Second Priority Loan Documents, that the payment of any and all of the Second Priority Obligations by any Company shall be subordinate and subject in right and time of payment, to the extent and in the manner hereinafter set forth, to the prior Payment in Full of the First Priority Obligations, regardless of whether the First Priority Obligations or any lien securing the First Priority Obligations are declared or ruled to be invalid, unenforceable, subordinated, void or not allowed by court of competent jurisdiction and regardless of any action taken or not taken by First Priority Agents with respect to any document (including any financing statement) required to be executed or filed for the perfection of any such lien securing the First Priority Obligations.  Each holder of First Priority Obligations, whether now outstanding or hereafter created, incurred, assumed or guaranteed, shall be deemed to have acquired First Priority Obligations in reliance upon the provisions contained in this Agreement.

2.2.   Liquidation, Dissolution, Bankruptcy.

(a)   All First Priority Obligations shall first be Paid in Full before any Distribution, whether in cash, securities or other property, shall be made to any Second Priority Secured Parties on account of or in respect of any claim related to any Second Priority Obligations.

(b)     Any Distribution from any Company, whether in cash, securities or other property which would otherwise, but for the terms hereof, be payable or deliverable in respect of the Second Priority Obligations shall be paid or delivered directly to First Priority Agents (to be held and/or applied by First Priority Agents in accordance with the terms of this Agreement and the First Priority Loan Documents) until all First Priority Obligations are Paid in Full. Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator or other Person having authority, to pay or otherwise deliver all such Distributions to First Priority Agents. Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) also irrevocably authorizes and empowers First Priority Agents, in the name of Second Priority Secured Parties, to demand, sue for, collect and receive any and all such Distributions. Until the First Priority Obligations are Paid in Full, the Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) hereby agrees that any Distribution with respect to the Second Priority Obligations received by any Second Priority Secured Parties shall be immediately turned over to the Collateral Agent (for distribution to the First Priority Lenders in accordance with the terms of this Agreement and the First Priority Loan Documents) for application against the First Priority Obligations.

(c)     Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees to execute, verify, deliver and file any proofs of claim in respect of the Second Priority Obligations of any Company requested by either First Priority Agent in connection with any such Proceeding and hereby irrevocably authorizes, empowers and appoints such First Priority Agent, its agent and attorney-in-fact to (i) execute, verify, deliver and file such proofs of claim upon the failure of Second Priority Agent promptly to do so prior to 30 days before the expiration of the time to file any such proof of claim and (ii) vote such claim in any such Proceeding upon the failure of Second Priority Agent to do so prior to 15 days before the expiration of the time to vote any such claim; provided, First Priority Agents shall have no obligation to execute, verify, deliver, file and/or vote any such proof of claim. In the event that First Priority Agents vote any claim in accordance with the authority granted hereby, neither Second Priority Agent nor other Second Priority Secured Parties shall be entitled to change or withdraw such vote.

(d)     (i) Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that it will take direction from Alpha First Priority Agent in respect of any consent to or objection to any use of cash collateral or any financing provided to Alpha Borrower (collectively, "Alpha DIP Financing"). Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that it will be deemed to have consented to, will consent to, and will not object to or oppose, a sale or other disposition of any property free and clear of security interests, liens or other claims of Second Priority Agent under the Bankruptcy Code, including Sections 363, 365 and 1129 of the Bankruptcy Code, if Alpha First Priority Agent has directed the Second Priority Agent to consent to such sale or disposition. Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees not to assert any right it may have in any Proceeding arising from Alpha Borrower's use, sale or other disposition of Collateral and agrees that it will not seek (or support any other Person seeking) to have any stay, whether automatic or otherwise, lifted with respect to any Collateral without the prior written consent of Alpha First Priority Agent. Second Priority Agent agrees that Second Priority Agent will not, and will not permit, any of its Affiliates to, directly or indirectly provide, participate in or otherwise support, any financing in a Proceeding to Alpha Borrower without the prior written consent of Alpha First Priority Agent. Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) further agrees that it shall not, without Alpha First Priority Agent's prior written consent, (a) propose or

vote in favor of any plan of reorganization, arrangement or proposal in respect of Alpha or file any motion, pleading or material in support of any motion or plan of reorganization, arrangement or proposal in respect of Alpha Borrower that is not supported by Alpha First Priority Agent or (b) oppose any plan of reorganization or liquidation in respect of Alpha Borrower that is supported by Alpha First Priority Agent.

(ii) Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that it will take direction from Epic! First Priority Agent in respect of any consent to or objection to any use of cash collateral or any financing provided to Epic! Borrowers (collectively, "Epic! DIP Financing").  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that it will be deemed to have consented to, will consent to, and will not object to or oppose, a sale or other disposition of any property free and clear of security interests, liens or other claims of Second Priority Agent under the Bankruptcy Code, including Sections 363, 365 and 1129 of the Bankruptcy Code, if Epic! First Priority Agent has directed the Second Priority Agent to consent to such sale or disposition.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees not to assert any right it may have in any Proceeding arising from Epic! First Priority Loan Parties' use, sale or other disposition of Collateral and agrees that it will not seek (or support any other Person seeking) to have any stay, whether automatic or otherwise, lifted with respect to any Collateral without the prior written consent of Epic! First Priority Agent.  Second Priority Agent agrees that Second Priority Agent will not, and will not permit, any of its Affiliates to, directly or indirectly provide, participate in or otherwise support, any financing in a Proceeding to Epic! Borrowers without the prior written consent of Epic! First Priority Agent.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) further agrees that it shall not, without Epic! First Priority Agent's prior written consent, (a) propose or vote in favor of any plan of reorganization, arrangement or proposal in respect of Epic! Borrowers or file any motion, pleading or material in support of any motion or plan of reorganization, arrangement or proposal in respect of Epic! Borrowers that is not supported by the First Priority Agent or (b) oppose any plan of reorganization or liquidation in respect of Epic! Borrowers supported by Epic! First Priority Agent.

(iii) Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that it will take direction from Controlling First Priority Agent in respect of any consent to or objection to any use of cash collateral or any financing provided to the Company (other than Alpha Borrower and Epic! Borrowers) (collectively, "Other DIP Financing" and collectively with any Alpha DIP Financing and Epic! DIP Financing, a "DIP Financing").  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that it will be deemed to have consented to, will consent to, and will not object to or oppose, a sale or other disposition of any property of any Company (other than Alpha Borrower and Epic! Borrowers) free and clear of security interests, liens or other claims of Second Priority Agent, if the Controlling First Priority Agent has directed the Second Priority Agent to consent to such sale or disposition.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees not to assert any right it may have in any Proceeding arising from any Company's (other than Alpha Borrower's and Epic! Borrowers') use, sale or other disposition of Collateral (other than Collateral of Alpha Borrower and Epic! First Priority Loan Parties) and agrees that it will not seek (or support any other Person seeking) to have any stay, whether automatic or otherwise, lifted with respect to any Collateral (other than Collateral of Alpha Borrower and Epic! Borrowers) without the prior written consent of Controlling First Priority Agent.  Second Priority Agent agrees that Second Priority Agent will not, and will

not permit, any of its Affiliates to, directly or indirectly provide, participate in or otherwise support, any financing in a Proceeding to the Company (other than Alpha Borrower or Epic! Borrower) without the prior written consent of the Controlling First Priority Agent. Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) further agrees that it shall not, without the Controlling First Priority Agent's prior written consent, (a) propose or vote in favor of any plan of reorganization, arrangement or proposal in respect of the Company (other than Alpha Borrower and Epic! Borrowers) or file any motion, pleading or material in support of any motion or plan of reorganization, arrangement or proposal in respect of the Company (other than Alpha Borrower and Epic! Borrowers) that is not supported by the Controlling First Priority Agent or (b) oppose any plan of reorganization or liquidation in respect of the Company (other than Alpha Borrower and Epic! First Priority Loan Parties) supported by the Controlling First Priority Agent.

(e) The First Priority Obligations shall continue to be treated as First Priority Obligations and the provisions of this Agreement shall continue to govern the relative rights and priorities of First Priority Secured Parties and Second Priority Secured Parties even if all or part of the First Priority Obligations or the security interests securing the First Priority Obligations are subordinated, set aside, avoided, invalidated or disallowed in connection with any such Proceeding.

2.3.   Second Priority Obligations Payment Restrictions.  Notwithstanding the terms of the Second Priority Loan Documents, until the First Priority Obligations are Paid in Full, the Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) hereby agrees that it will exclusively accept any Distribution with respect to the Second Priority Obligations for purposes of immediately turning over (and shall so immediately turn over any such Distribution) to the Collateral Agent (for distribution to the First Priority Lenders in accordance with the terms of this Intercreditor Agreement and the First Priority Loan Documents) for application against the First Priority Obligations.

2.4.   Second Priority Obligations Standstill Provisions.  Until the First Priority Obligations are Paid in Full, Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) shall not, without the prior written consent of respective First Priority Agents, take any Enforcement Action with respect to the Second Priority Obligations or under the Second Priority Loan Documents against any First Priority Loan Party or any asset of a First Priority Loan Party.  Subject to the foregoing sentence in this Section 2.4, until the First Priority Obligations have been Paid in Full, the First Priority Secured Parties shall have the exclusive right to take Enforcement Actions against the respective First Priority Loan Parties without any consultation with or consent of Second Priority Secured Parties.  In connection with any Enforcement Action with respect to the Collateral owned by any First Priority Loan Party, the First Priority Secured Parties may enforce the provisions of the respective First Priority Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) shall not take any action that would restrain, hinder, limit, delay or otherwise interfere with any Enforcement Action by any First Priority Agent or any other First Priority Secured Party. Any Distributions or other proceeds of any Enforcement Action obtained by any Second Priority Secured Party (including in respect of any Company that is not a First Priority Loan Party) shall in any event be held in trust by it for the benefit of First Priority Agents and First Priority Lenders and promptly paid or delivered to First Priority Agents for the benefit of the First Priority Lenders in the form received until the First Priority Obligations are Paid in Full.  Subject to the immediately preceding sentence and this Agreement, until the First Priority Obligations are Paid in Full, Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) may, unless otherwise instructed by either First Priority Agent, take any Enforcement Action with respect to the Second Priority Obligations or under the Second Priority Loan Documents against any Company or any asset of a Company (in each case, other than a First Priority Loan Party, which such Enforcement Actions shall be governed by the previous sentences in this Section 2.4).

2.5.    <u>Incorrect Payments</u>.  If any Distribution from any Company on account of the Second Priority Obligations not permitted to be accepted by any Second Priority Secured Party under this Agreement is received by such Second Priority Secured Party, such Distribution shall not be commingled with any of the assets of such Second Priority Secured Party, shall be held in trust by such Second Priority Secured Party for the benefit of First Priority Secured Parties and shall be promptly paid over to First Priority Agents for application (in accordance with this Agreement and the First Priority Loan Documents) to the payment of the First Priority Obligations then remaining unpaid, until all of the First Priority Obligations are Paid in Full.

2.6.    [Reserved].

2.7.    <u>Replacement of Second Priority Agent</u>.

(a)    Second Priority Agent shall not resign or otherwise be replaced by any replacement agent or subagent (a "<u>Replacement Second Priority Agent</u>") unless prior to the consummation of any such action, the transferee thereof shall execute and deliver to First Priority Agents an agreement joining such Replacement Second Priority Agent as a party to this Agreement as a Second Priority Agent or an agreement substantially identical to this Agreement, providing for the continued subordination of the Second Priority Obligations to the First Priority Obligations as provided herein and for the continued effectiveness of all of the rights of First Priority Agents and First Priority Lenders arising under this Agreement.

(b)    Notwithstanding the failure of any Replacement Second Priority Agent to execute or deliver a joinder hereto or an agreement substantially identical to this Agreement, the subordination effected hereby shall survive any resignation or replacement or sub-delegation by the Second Priority Agent and any other sale, assignment, pledge, disposition or other transfer of all or any portion of the Second Priority Obligations, and the terms of this Agreement shall be binding upon the successors and assigns of Second Priority Agent and any future Second Priority Secured Parties, as provided in Section 9 hereof.

2.8.    <u>Obligations Hereunder Not Affected</u>.  All rights and interest of First Priority Secured Parties hereunder, and all agreements and obligations of Second Priority Secured Parties and Companies hereunder, shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any document evidencing any of the First Priority Obligations;

(b)    any change in the time, manner or place of payment of, or any other term of, all or any of the First Priority Obligations, or any other permitted amendment or waiver of or any release or consent to departure from any of the First Priority Loan Documents;

(c)    any exchange, subordination, release or non-perfection of any collateral for all or any of the First Priority Obligations;

(d)    any failure of any First Priority Secured Party to assert any claim or to enforce any right or remedy against any other party hereto under the provisions of this Agreement or any First Priority Loan Document other than this Agreement;

(e)    any reduction, limitation, impairment or termination of the First Priority Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the First Priority Loan Parties and any Second Priority

-12-

Secured Party hereby waive any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, non-genuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any First Priority Obligations; and

(f)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Companies in respect of the First Priority Obligations or Second Priority Obligations in respect of this Agreement.

Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) acknowledges and agrees that First Priority Secured Parties may in accordance with the terms of the First Priority Loan Documents, without notice or demand and without affecting or impairing Second Priority Secured Parties' obligations hereunder, (i) modify the respective First Priority Loan Documents as permitted by Section 3.1; (ii) take or hold security for the payment of the respective First Priority Obligations and exchange, enforce, foreclose upon, waive and release any such security; (iii) apply such security and direct the order or manner of sale thereof as respective First Priority Agents and respective First Priority Lenders in their sole discretion, may determine; (iv) release and substitute one or more endorsers, warrantors, borrowers or other obligors; and (v) exercise or refrain from exercising any rights against any Company or any other Person. The First Priority Obligations shall continue to be treated as First Priority Obligations and the provisions of this Agreement shall continue to govern the relative rights and priorities of First Priority Secured Parties and Second Priority Secured Parties even if all or part of the First Priority Obligations or the security interests securing the First Priority Obligations are subordinated, set aside, avoided, invalidated or disallowed.

2.9.    Marshaling; Additional Waiver.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) hereby waives any rights it may have under applicable law to assert the doctrine of marshaling or to otherwise require any First Priority Secured Party to marshal any property of any Company or of any guarantor or other obligor of the First Priority Obligations for the benefit of Second Priority Agent.  Second Priority Agent expressly waives all notice of the acceptance by First Priority Agents or First Priority Secured Parties of the subordination and other terms and provisions of this Agreement and all the notices whatsoever not specifically required pursuant to the terms of this Agreement or under the Uniform Commercial Code in connection with any foreclosure on or sale of any property or assets of any Company, and Second Priority Agent expressly consents to reliance by First Priority Secured Parties upon the subordination and other terms and provisions of this Agreement.

2.10.    Application of Proceeds.  The Collateral Agent shall apply all proceeds of the Collateral (including insurance proceeds) as follows:

(a) With respect to Shared Collateral and proceeds thereof:

first, to (i) the Alpha First Priority Agent for the payment of all Alpha New Money First Priority Obligations described in clauses *first* to *fourth* of Section 8.2 of the Alpha First Priority Credit Agreement and (ii) the Epic! First Priority Agent for the payment of all Epic! New Money First Priority Obligations described in clauses *first* to *fourth* of Section 8.2 of the Epic! First Priority Credit Agreement, in each case, ratably based on the aggregate outstanding amounts of Alpha New Money First Priority Obligations and Epic! New Money First Priority Obligations under the provisions of the Alpha First Priority Credit Agreement and the Epic! First Priority Credit Agreement;

second, with respect to the remaining proceeds of the Shared Collateral, if any, after giving effect to clause *first* above, to (i) the Alpha First Priority Agent for the payment of all Alpha

Roll-Up First Priority Obligations described in clause *fifth* to *sixth* of Section 8.2 of the Alpha First Priority Credit Agreement and (ii) the Epic! First Priority Agent for the payment of all Epic! Roll-Up First Priority Obligations described in clauses *fifth* to *sixth* of Section 8.2 of the Epic! First Priority Credit Agreement, in each case, ratably based on the aggregate outstanding amounts of Alpha Roll-Up First Priority Obligations and Epic! Roll-Up First Priority Obligations under the provisions of the Alpha First Priority Credit Agreement and the Epic! First Priority Credit Agreement;

third, with respect to the remaining proceeds of the Shared Collateral, if any, after giving effect to clause *second* above, to the Second Priority Agent for the payment of all Second Priority Obligations (in the order provided for in the Second Priority Credit Agreement);

fourth, with respect to the remaining proceeds of the Shared Collateral, if any, after giving effect to clause *third* above, to the respective Company or as otherwise required by applicable law.

(b) With respect to Alpha Collateral and proceeds thereof:

first, to the Alpha First Priority Agent for the payment of all Obligations (as defined in the Alpha First Priority Credit Agreement) described in (and in the order provided for in) clauses *first* to *sixth* of Section 8.2 of the Alpha First Priority Credit Agreement;

second, with respect to the remaining proceeds of the Alpha Collateral, if any, after giving effect to clause *first* above, to the Epic! First Priority Agent for the payment of all Epic! First Priority Obligations described in (and in the order provided for in) clauses *first* to *sixth* of Section 8.2 of the Epic! First Priority Credit Agreement;

third, with respect to the remaining proceeds of the Alpha Collateral, if any, after giving effect to clause *second* above, to the Second Priority Agent for the payment of all Second Priority Obligations;

fourth, with respect to the remaining proceeds of the Alpha Collateral, if any, after giving effect to clause *third* above, to Alpha Borrower or as otherwise required by applicable law.

(c) With respect to Epic! Collateral and proceeds thereof:

first, to the Epic! First Priority Agent for the payment of all Obligations (as defined in the Epic! First Priority Credit Agreement) described in (and in the order provided for in) clauses *first* to *sixth* of Section 8.2 of the Epic! First Priority Credit Agreement;

second, with respect to the remaining proceeds of the Epic! Collateral, if any, after giving effect to clause *first* above, to the Alpha First Priority Agent for the payment of all Alpha First Priority Obligations described in (and in the order provided for in) clauses *first* to *sixth* of Section 8.2 of the Alpha First Priority Credit Agreement;

third, with respect to the remaining proceeds of the Epic! Collateral, if any, after giving effect to clause *second* above, to the Second Priority Agent for the payment of all Second Priority Obligations;

**fourth**, with respect to the remaining proceeds of the Epic! Collateral, if any, after giving effect to clause *third* above, to the respective Epic! Borrowers or as otherwise required by applicable law.

Unless otherwise agreed by the applicable Secured Parties, if any portion of the proceeds of the Collateral is in the form of cash, then such cash shall be applied pursuant to the priorities set forth in this Section 2.10 before any non-cash proceeds are applied pursuant to the priorities set forth in this Section 2.10.

If any Secured Party collects or receives any amounts or obtains any payment (whether voluntary, involuntary, through the exercise of any right of set off or otherwise) on account of the "Obligations" (as defined in the Alpha First Priority Credit Agreement, Epic! First Priority Credit Agreement or Second Priority Credit Agreement), to which it is not entitled under or in excess of the amount it would be entitled under this Section 2.10, such Secured Party shall hold the same in trust for the applicable Secured Parties entitled thereto and shall forthwith deliver the same to the Collateral Agent for the account of Secured Parties, to be applied in accordance with this Section 2.10, in each case until the prior Payment in Full of the applicable Obligations, as applicable, of such Secured Parties.

2.11.   Rights Relating to First Priority Agents' Actions with respect to the Collateral. Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) hereby waives, to the extent permitted by applicable law, any rights which it may have to enjoin or otherwise obtain a judicial or administrative order preventing First Priority Secured Parties from taking, or refraining from taking, any action (or directing the Second Priority Agent to take or refrain from taking any action) with respect to all or any part of the Collateral.

2.12.   Insurance Proceeds.  Until the First Priority Obligations have been Paid in Full, the Collateral Agent (at the direction of the Controlling First Priority Agent) shall have the sole and exclusive right, as against Second Priority Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of such Collateral.  All proceeds of such insurance shall inure to First Priority Secured Parties, to the extent of the First Priority Obligations, and Second Priority Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds to the holders of First Priority Obligations (or any representative thereof).  In the event the requisite holders of First Priority Obligations (or any representative thereof), in their or its sole discretion or pursuant to agreement with any Company, permits such Company to utilize the proceeds of insurance, the consent of the holders of First Priority Obligations (or any representative thereof) shall be deemed to include the consent of Second Priority Agent.

3.   **Modifications**.

3.1.   Modifications to First Priority Loan Documents.  First Priority Lenders may at any time and from time to time without the consent of or notice to Second Priority Secured Parties, without incurring liability to Second Priority Secured Parties and without impairing or releasing the obligations of Second Priority Agent under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the First Priority Obligations, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to the First Priority Obligations.

3.2.   Modifications to Second Priority Loan Documents.   Until the First Priority Obligations have been Paid in Full, and notwithstanding anything to the contrary contained in the Second Priority Loan Documents, Second Priority Agent shall not, without the prior written consent of each First Priority Agent, amend, modify or supplement the Second Priority Loan Documents in any manner adverse

to the First Priority Lenders, as determined in good faith by the First Priority Lenders and First Priority Agents.

4.     **Representations and Warranties**.

4.1.     <u>Representations and Warranties of Second Priority Agent</u>.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) hereby represents and warrants to each First Priority Agent and First Priority Lenders that as of the date hereof:  (a) Second Priority Agent has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (b) the execution of this Agreement by Second Priority Agent will not violate or conflict with the organizational documents of Second Priority Agent, any material agreement binding upon Second Priority Agent or any law, regulation or order or require any consent or approval which has not been obtained and (c) this Agreement is the legal, valid and binding obligation of Second Priority Agent, enforceable against Second Priority Agent in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles.

4.2.     <u>Representations and Warranties of First Priority Agents</u>.  Each First Priority Agent hereby represents and warrants to Second Priority Agent that as of the date hereof:  (a)  such First Priority Agent has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; (b) the execution of this Agreement by such First Priority Agent will not violate or conflict with the organizational documents of First Priority Agents, any material agreement binding upon such First Priority Agent or any law, regulation or order or require any consent or approval which has not been obtained; and (c) this Agreement is the legal, valid and binding obligation of such First Priority Agent, enforceable against such First Priority Agent in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

5.     **Subrogation; Recovery**.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) will not exercise (i) any right of subrogation that it may now or hereafter have or obtain in respect of the rights of either First Priority Agent or any other First Priority Secured Party against any Company, any guarantor of any of the First Priority Obligations or any of the Collateral or (ii) any right to participate in any claim or remedy of either First Priority Agent and any other First Priority Secured Party against any Company, any guarantor of any of the First Priority Obligations or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, in each case until all of the "Obligations" (as defined in the First Priority Loan Documents) have been Paid in Full.  If either First Priority Agent or any First Priority Lender is required to disgorge any proceeds of Collateral, payment or other amount received by such Person (whether because such proceeds, payment or other amount is invalidated, declared to be fraudulent or preferential or otherwise) or turn over or otherwise pay any amount (a "<u>Recovery</u>") to the estate or to any creditor or representative of a Company or any other Person, then the First Priority Obligations shall be reinstated (to the extent of such Recovery) as if such First Priority Obligations had never been paid and to the extent any Second Priority Secured Party has received proceeds, payments or other amounts to which Second Priority Secured Party would not have been entitled under this Agreement had such reinstatement occurred prior to receipt of such proceeds, payments or other amounts, such Second Priority Secured Party shall turn over such proceeds, payments or other amounts to First Priority Agents for reapplication to the First Priority Obligations.  A Distribution made pursuant to this Agreement to either First Priority Agent or First Priority Lenders which otherwise would have been made to Second Priority Secured Party (or that is turned over by a Second Priority Secured Party

to a First Priority Secured Party) is not, as between the Companies and Second Priority Secured Party, a payment by the Companies to or on account of the First Priority Obligations.

6.    **Modification**.  Notwithstanding anything to the contrary in the First Priority Loan Documents and the Second Priority Loan Documents, any modification or waiver of any provision of this Agreement, or any consent to any departure by any party from the terms hereof, shall be effective with the written consent of Alpha First Priority Agent, Epic! First Priority Agent and Second Priority Agent. Any such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Any notice to or demand on any party hereto in any event not specifically required hereunder shall not entitle the party receiving such notice or demand to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

7.    **Further Assurances**.  Each party to this Agreement promptly will execute and deliver such further instruments and agreements and do such further acts and things as may be reasonably requested in writing by any other party hereto that may be necessary or desirable in order to effect fully the purposes of this Agreement.

8.    **Notices**.  Unless otherwise specifically provided herein, any notice delivered under this Agreement shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied or sent by overnight courier service or certified or registered United States mail and shall be deemed to have been given (a) if delivered in person, when delivered; (b) if delivered by telecopy, on the date of transmission if transmitted on a business day before 4:00 p.m. (Chicago time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, one business day after delivery to such courier properly addressed; or (d) if by United States mail, four business days after deposit in the United States mail, postage prepaid and properly addressed.  Notices shall be addressed as follows:

If to Alpha First Priority Agent or Epic! First Priority Agent:

GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, NJ 07311
Attention: Transaction Management
Facsimile 212-202-6246
Email: clientservices.americas@glas.agency; tmgus@glas.agency

If to Second Priority Agent:

GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, NJ 07311
Attention: Transaction Management
Facsimile 212-202-6246
Email: clientservices.americas@glas.agency; tmgus@glas.agency

If to Alpha Borrower:

BYJU's Alpha, Inc.
2045 N. Freemont
Chicago, IL 60614

Attention: Timothy R. Pohl
Email: timrpohl@gmail.com


If to Epic! Borrowers:
c/o Novo Advisors
401 N. Franklin St., Suite 4 East
Chicago, Illinois 60654
Attention: Claudia Z. Springer
Email: cSpringer@novo-advisors.com


If to Collateral Agent:


GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, NJ 07311
Attention: Transaction Management
Facsimile 212-202-6246
Email: clientservices.americas@glas.agency; tmgus@glas.agency

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section 8.

9. **Successors and Assigns; Permitted Refinancing**.  This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of First Priority Secured Parties, Second Priority Secured Parties and the Companies.  To the extent permitted under the First Priority Loan Documents, First Priority Lenders may, from time to time, without notice to Second Priority Agent, assign or transfer any or all of the First Priority Obligations or any interest therein to any Person and, notwithstanding any such assignment or transfer, or any subsequent assignment or transfer, the First Priority Obligations shall, subject to the terms hereof, be and remain First Priority Obligations for purposes of this Agreement, and every permitted assignee or transferee of any of the First Priority Obligations or of any interest therein shall, to the extent of the interest of such permitted assignee or transferee in the First Priority Obligations, be entitled to rely upon and be the third party beneficiary of the subordination provided under this Agreement and shall be entitled to enforce the terms and provisions hereof to the same extent as if such assignee or transferee were initially a party hereto.  Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) agrees that any party that consummates a Permitted Refinancing may rely on and enforce this Agreement.  Second Priority Agent further agrees that it will, at the request of the applicable First Priority Agent, enter into an agreement, in the form of this Agreement, mutatis mutandis, with the party that consummates the Permitted Refinancing; provided, that the failure of Second Priority Agent to execute such an agreement shall not affect such party's right to rely on and enforce the terms of this Agreement.  To the extent permitted under the Second Priority Loan Documents, Second Priority Lenders may, from time to time, without notice to either First Priority Agent, assign or transfer any or all of the Second Priority Obligations or any interest therein to any Person and, notwithstanding any such assignment or transfer, or any subsequent assignment or transfer, the Second Priority Obligations shall, subject to the terms hereof, be and remain Second Priority Obligations for purposes of this Agreement, and every permitted assignee or transferee of any of the Second Priority Obligations or of any interest therein shall, to the extent of the interest of such permitted assignee or transferee in the Second Priority Obligations, be subject to the subordination and other provisions provided under this Agreement to the same extent as if such assignee or transferee were initially a party hereto or were a Second Priority Secured Party as of the date hereof.

10.     **Relative Rights**. This Agreement shall define the relative rights of First Priority Secured Parties and Second Priority Secured Parties. Nothing in this Agreement shall (a) impair, as among the Companies and First Priority Secured Parties and as between the Companies and Second Priority Secured Parties, the obligation of the Companies with respect to the payment of the First Priority Obligations and the Second Priority Obligations in accordance with their respective terms or (b) affect the relative rights of First Priority Secured Parties or Second Priority Secured Parties with respect to any other creditors of any Company.

11.     **Appointment of Collateral Agent**. Each of Alpha First Priority Agent (on behalf of itself and other Alpha First Priority Secured Parties), Epic! First Priority Agent (on behalf of itself and other Epic! First Priority Secured Parties) and Second Priority Agent (for itself and on behalf of the other Second Priority Secured Parties) irrevocably appoints GLAS TRUST COMPANY LLC to act on its and their behalf as agent and trustee (the "Collateral Agent") in connection with and under this Agreement, the First Priority Loan Documents and the Second Priority Loan Documents and authorizes the Collateral Agent to take such actions on its and their behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto (including, without limitation, the execution, delivery and performance of obligations under this Agreement and the First Priority Loan Documents and the Second Priority Loan Documents). The provisions of this Section 11 are solely for the benefit of the Collateral Agent, Alpha First Priority Agent, Epic! First Priority Agent and Second Priority Agent and none of Epic! Borrowers, Alpha Borrower, other First Priority Loan Parties and Second Priority Loan Parties shall have rights as a third party beneficiary of any of such provisions or any obligations with respect thereto.

12.     **Conflict**. In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Second Priority Loan Documents, the provisions of this Agreement shall control and govern.

13.     **Headings**. The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof.

14.     **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.     **Severability**. In the event that any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

16.     **Continuation of Subordination; Termination of Agreement**. This Agreement shall be applicable both before and after the commencement of any Proceeding and all converted or succeeding cases in respect thereof. Accordingly, the provisions of this Agreement are intended to be and shall be enforceable as a subordination agreement within the meaning of Section 510 of the Bankruptcy Code. This Agreement shall remain in full force and effect until the Payment in Full of the First Priority Obligations after which this Agreement shall terminate without further action on the part of the parties hereto; provided, that if any payment is, subsequent to such termination, recovered from any holder of First Priority Obligations, this Agreement shall be reinstated; provided, further that a Permitted Refinancing shall not be deemed to be Payment in Full of the First Priority Obligations.

17. **APPLICABLE LAW.** THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK. EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT, NOTWITHSTANDING THE GOVERNING LAW PROVISIONS OF ANY APPLICABLE FIRST PRIORITY LOAN DOCUMENT OR SECOND PRIORITY LOAN DOCUMENT, ANY CLAIMS BROUGHT AGAINST FIRST PRIORITY AGENTS OR THE SECOND PRIORITY AGENT BY ANY FIRST PRIORITY LENDER OR ANY SECOND PRIORITY LENDER RELATING TO THIS AGREEMENT, ANY OTHER FIRST PRIORITY LOAN DOCUMENT, SECOND PRIORITY LOAN DOCUMENT, THE COLLATERAL OR THE CONSUMMATION OR ADMINISTRATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

18. **CONSENT TO JURISDICTION**.

18.1.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION, THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN (OR IF SUCH COURT LACKS SUBJECT MATTER JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN), AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER APPLICABLE FIRST PRIORITY LOAN DOCUMENT, SECOND PRIORITY LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY (AND ANY SUCH CLAIMS, CROSS-CLAIMS OR THIRD-PARTY CLAIMS BROUGHT AGAINST FIRST PRIORITY AGENTS, SECOND PRIORITY AGENT OR ANY OF THEIR RELATED PARTIES MAY ONLY) BE HEARD AND DETERMINED IN SUCH FEDERAL (TO THE EXTENT PERMITTED BY LAW) OR NEW YORK STATE COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER FIRST PRIORITY LOAN DOCUMENT OR SECOND PRIORITY LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY FIRST PRIORITY SECURED PARTIES, OR ANY SECOND PRIORITY SECURED PARTIES MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY FIRST PRIORITY LOAN PARTY, SECOND PRIORITY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

18.2.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER APPLICABLE FIRST PRIORITY LOAN DOCUMENT OR SECOND PRIORITY LOAN DOCUMENT IN ANY COURT REFERRED TO IN SECTION 18.1 OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

18.3.    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

18.4.    EACH FIRST PRIORITY LOAN PARTY AND SECOND PRIORITY LOAN PARTY HEREBY APPOINTS THE ALPHA BORROWER AND EPIC! CREATION AS ITS AUTHORIZED AGENT ("AUTHORIZED AGENT") UPON WHOM PROCESS MAY BE SERVED IN ANY PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN WHICH MAY BE INSTITUTED IN THE BANKRUPTCY COURT, AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION, THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN OR ANY APPELLATE COURT FROM ANY THEREOF.  SERVICE OF PROCESS UPON THE AUTHORIZED AGENT SHALL BE DEEMED, IN EVERY RESPECT, EFFECTIVE SERVICE OF PROCESS UPON EACH APPLICABLE FIRST PRIORITY LOAN PARTY OR SECOND PRIORITY LOAN PARTY.

19.    **WAIVER OF JURY TRIAL**.  SECOND PRIORITY AGENT, EACH FIRST PRIORITY LOAN PARTY AND EACH FIRST PRIORITY AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE SECOND PRIORITY LOAN DOCUMENTS OR ANY OF THE FIRST PRIORITY LOAN DOCUMENTS.  EACH OF SECOND PRIORITY AGENT, EACH FIRST PRIORITY LOAN PARTY AND FIRST PRIORITY AGENT ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE FIRST PRIORITY LOAN DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH OF SECOND PRIORITY AGENT, EACH COMPANY AND FIRST PRIORITY AGENT WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

20.    **Additional Company.**  Companies shall cause any Person that becomes a "Borrower" or "Guarantor" under the Alpha First Priority Credit Agreement or Epic! First Priority Credit Agreement to execute a joinder (in form and substance satisfactory to First Priority Agent) to this Agreement to bind such Person to this Agreement as a Company.

21.    **Loan Document**.  For avoidance of doubt, this Agreement is a "Loan Document" as such term is defined in the Alpha First Priority Credit Agreement, Epic! First Priority Credit Agreement and Second Priority Credit Agreement.

22.    **Amendment and Restatement**.  This Agreement is an amendment and restatement of the Existing Intercreditor Agreement and, except as noted hereafter, supersedes the Existing Intercreditor Agreement in its entirety and (a) all references to the Existing Intercreditor Agreement in any Loan Document (other than this Agreement) shall be deemed to refer to the Existing Intercreditor Agreement as amended and restated hereby, (b) all references to any section of the Existing Intercreditor Agreement in any Loan Document (other than this Agreement) shall be amended to be, *mutatis mutandis*, references to the corresponding provisions of this Agreement.  This Agreement is not intended to constitute, and does not constitute, a novation of the obligations and liabilities under the Existing Intercreditor Agreement. By executing this agreement, each Party hereto agrees that this Agreement shall constitute its prior written

consent, to the extent required, for each other party hereto to enter into this Agreement and to amend and restate the Existing Intercreditor Agreement as set forth herein.

       *23.*    **DIP Order**.  First Priority Agents, the Second Priority Agent, Alpha Borrower and the Epic! Borrowers hereby expressly agree that in the event of any conflict between (i) the Alpha First Priority Credit Agreement and this Agreement, this Agreement shall control, (ii) the Epic! First Priority Credit Agreement and this Agreement, this Agreement shall control, (iii) the Second Priority Credit Agreement and this Agreement, this Agreement shall control and (iii) this Agreement and the DIP Orders, the DIP Orders shall control.

*[signature pages follow]*

IN WITNESS WHEREOF, Second Priority Agent, Collateral Agent, the First Priority Loan Parties, Alpha First Priority Agent, and Epic! First Priority Agent have caused this Agreement to be executed as of the date first above written.

ALPHA FIRST PRIORITY AGENT:

GLAS TRUST COMPANY LLC

By: _____
Name:  Katie Fischer
Title:  Vice President


EPIC! FIRST PRIORITY AGENT:

GLAS TRUST COMPANY LLC

By: _____
Name:  Katie Fischer
Title:  Vice President


SECOND PRIORITY AGENT:

GLAS TRUST COMPANY LLC

By: _____
Name:  Katie Fischer
Title:  Vice President

COLLATERAL AGENT:

GLAS TRUST COMPANY LLC

By: _____
Name:  Katie Fischer
Title:  Vice President

ACKNOWLEDGMENT

Each of Alpha Borrower and Epic! Borrowers hereby acknowledges that they have received a copy of this Agreement as in effect on the date hereof and consent thereto, agree to recognize all rights granted thereby to the First Priority Agent, the Second Priority Agent, the First Priority Lenders and the Second Priority Lenders and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement as in effect on the date hereof.  Each of Alpha Borrower and Epic! Borrowers further acknowledges and agrees that (except as set forth in Section 9 hereof) it is not an intended beneficiary or third party beneficiary under this Agreement and (i) as between the Alpha First Priority Agent and the Alpha Borrower, the Alpha First Priority Loan Documents remain in full force and effect as written and are in no way modified hereby, (ii) as between the Epic! First Priority Agent and the Epic! Borrowers, the Epic! First Priority Loan Documents remain in full force and effect as written and are in no way modified hereby and (iii) as between the Second Priority Agent and the Alpha Borrower, the Second Priority Loan Documents remain in full force and effect as written and are in no way modified hereby.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**ALPHA BORROWER**:

BYJU'S ALPHA, INC.

By:_____

Name:  Timothy R. Pohl
Title:  Chief Executive Officer and Secretary

**EPIC! BORROWERS**:


_____

Claudia Z. Springer, as Chapter 11 Trustee of Epic!
Creations, Inc., on behalf of the Estate of Debtor Epic!
Creations, Inc.


_____

Claudia Z. Springer, as Chapter 11 Trustee of Neuron Fuel,
Inc., on behalf of the Estate of Debtor Neuron Fuel, Inc.


_____

Claudia Z. Springer, as Chapter 11 Trustee of Tangible Play,
Inc., on behalf of the Estate of Debtor Tangible Play, Inc.

Schedule 1

| Entity | Company | Jurisdiction |
|---|---|---|
| BYJU's Alpha, Inc. | Borrower | Delaware |
| Tangible Play, Inc. | Guarantor | Delaware |
| EPIC! Creations, Inc. | Guarantor | Delaware |
| Neuron Fuel, Inc. | Guarantor | Delaware |
| Think and Learn Private Limited | Guarantor | India |
| Byju's Pte. Ltd. | Guarantor | Singapore |
| Great Learning Education Pte. Ltd. | Guarantor | Singapore |

## Exhibit B

**Proposed DIP Amendment Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Case No. 24-10140 (JTD) |
| | ) | |
| Debtor. | ) | **Re: Docket No. __** |
| | ) | |

## ORDER AUTHORIZING THE DEBTOR TO AMEND THE
## DIP CREDIT AGREEMENT AND GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtor (the "Debtor") for entry

of an order (this "Order") authorizing the Debtor to (a) enter into the DIP Amendment and (b) enter

into the Intercreditor Amendment, all as more fully set forth in the Motion; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent

with Article III of the United States Constitution; and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on

the Motion were appropriate and no other notice need be provided under the circumstances; and

this Court having reviewed the Motion; and this Court having entered the Interim DIP Order and

the Final DIP Order; and it appearing that the Debtor's proposed entry into the DIP Amendment

---

[1]     The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address is 16192 Coastal Highway, Lewes, Delaware 19958.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

is a sound and prudent exercise of the Debtor's business judgment; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED, AND ADJUDGED, that:

1.      *Disposition.*  The relief requested in the Motion is GRANTED in accordance with the terms of this Order.

(a)     *The DIP Amendment*.  The DIP Amendment, substantially in the form attached hereto as **Exhibit 1**, is authorized and approved, subject to the terms and conditions set forth in the DIP Amendment, this Order, and the Final DIP Order (as modified by this Order).

(b)     Any and all objections to the Motion with respect to the entry of this Order that have not been withdrawn, waived, settled, or resolved and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Order shall become effective immediately upon its entry.

2.      *Approval of the DIP Amendment.*

(a)     The Debtor is authorized to incur an additional $3,250,352.64 in aggregate principal postpetition financing (the "Upsize Loans"), consisting of (a) $1,083,450.88 of Prepetition Reimbursements (the "Prepetition Reimbursement Upsize Loans") that shall be deemed converted into postpetition DIP Loans effective as of April 9, 2024, and shall accrue interest, as applicable, effective as of such date, and (b) $2,166,901.76 of additional Roll-Up Loan capacity to accommodate the DIP Lenders' rights to roll-up some or all of their respective allocation of the Prepetition Reimbursement Upsize Loans.  The Upsize Loans shall be treated in

accordance with the terms of the DIP Credit Agreement and the DIP Amendment, in each case subject to this Order and the Final DIP Order (as modified by this Order).

(b)     The Debtor is authorized to make the technical modifications to the Roll-Up Loans.  To the extent that a DIP Lender elects to deliver a Roll-Up Notice, the Prepetition Secured Obligations of such DIP Lender rolled up in connection therewith shall be deemed to apply in accordance with and in the order set forth in Section 8.2 of the Prepetition Credit Agreement (Application of Funds).  No reduction of the Prepetition Secured Obligations of a lower priority set forth in Section 8.2 of the Prepetition Credit Agreement owing to such DIP Lender shall be deemed to have occurred until all Prepetition Secured Obligations of a higher priority owing to such DIP Lender have been rolled up in full.  For the avoidance of doubt, the Loan Documents and the Prepetition Secured Obligations owed thereunder continue in full force and effect.

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to enter into the DIP Amendment.

3.     *Findings Regarding the DIP Amendment.*

(a)     Good and sufficient cause has been shown for the entry of this Order.

(b)     The terms of the DIP Amendment are fair and reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

(c)     The terms of the DIP Amendment have been negotiated in good faith and at arm's length among the Debtor and the  DIP Secured Parties, and all parties' obligations and indebtedness arising under, in respect of, or in connection with the DIP Amendment shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by

3

section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof, solely in their capacity as such) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

4.    *Privileges and Protections*.   All liens, security interests, priorities and other rights, remedies, benefits, privileges, and protections provided to the DIP Secured Parties in the Final DIP Order and the DIP Loan Documents with respect to or relating to the DIP Facility shall apply with equal force and effect with respect to the Upsize Loans and all obligations in connection therewith or related thereto.   In furtherance of the foregoing, except as modified by this Order, for all purposes under the Final DIP Order the defined terms "DIP Loans" and "DIP Facility" shall include the Upsize Loans.

5.    *The Final DIP Order*.   The terms of the Final DIP Order are incorporated herein and made part of this Order.   Except as expressly modified by this Order, the Final DIP Order shall remain unchanged and in full force and effect.   All factual and other findings and conclusions of law contained in the Final DIP Order shall remain fully applicable, including with respect to the Upsize Loans, except to the extent specifically modified herein.   In the event of any inconsistency among the provisions of this Order and the Final DIP Order, the provisions of the Final DIP Order shall govern, except as expressly modified by this Order.

6.    *Rights of DIP Secured Parties*.   For the avoidance of doubt, nothing in this Order or the DIP Amendment is intended to nor shall alter, impair, or otherwise affect the claims, liens, and security interests, or the priority thereof, or the other rights and interests of the DIP Secured Parties under the Final DIP Order, the DIP Loan Documents, or the Prepetition Secured Parties under the Final DIP Order and the Prepetition Term Loan Documents.

4

7. *Binding Effect; Successors and Assigns*. The provisions of this Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including, without limitation, the DIP Secured Parties, any statutory or non-statutory committees appointed or formed in this Chapter 11 Case, the Debtor and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Secured Parties and the Debtor and their respective successors and assigns.

8. *Liens*. All liens and priority granted to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, pursuant to this Order shall be deemed effective and perfected upon the date of this Order and without the necessity of the execution, recordation, or filing by any DIP Secured Party or any other party of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Secured Parties of, or over, any DIP Collateral.

9. *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Order.

10. *Effectiveness*. This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

11.    *Retention of Jurisdiction*.    The Court shall retain jurisdiction to implement, interpret, and enforce the provisions of this Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtor notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

## Exhibit 1

**Form of DIP Amendment**

**AMENDMENT NO. 1 TO**
**SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**

[___], 2024

This AMENDMENT NO. 1 TO SUPERPRIORITY CREDIT AND GUARANTY AGREEMENT, dated as of the date hereof (this "**Amendment**"), by and among BYJU's ALPHA, INC., a Delaware corporation (the "**Borrower**"), the Amendment No. 1 New Money Lenders (as defined herein), GLAS TRUST COMPANY LLC, as Administrative Agent (in such capacity, the "**Administrative Agent**") and Collateral Agent, which amends that certain SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of April 9, 2024 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Existing Credit Agreement**"; and as amended by this Amendment, the "**Credit Agreement**"), by and among the Borrower, the Administrative Agent, the Collateral Agent and each Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to them in the Credit Agreement.

WHEREAS, pursuant to Section 10.2(b) of the Existing Credit Agreement, the Borrower has requested that a portion of certain Lenders' outstanding prepetition reimbursements that were not previously converted into Prepetition Reimbursement New Money Term Loans immediately prior to the Amendment No. 1 Effective Date in an aggregate principal amount equal to $1,083,450.88 shall be deemed to be "Prepetition Reimbursements" as of the Effective Date, and pursuant to Section 2.1(a)(iii) of the Credit Agreement, shall be deemed converted on a cashless basis into "Prepetition Reimbursement New Money Term Loans" as of the Effective Date (such loans, the "**Amendment No. 1 New Money Term Loans**"; and such lenders, the "**Amendment No. 1 New Money Lenders**").

WHEREAS, in consideration for the Amendment No. 1 New Money Lenders to convert on a cashless basis such Amendment No. 1 New Money Lender's prepetition reimbursements into Amendment No. 1 New Money Term Loans, each Amendment No. 1 New Money Lender shall have the right to roll-up Prepetition Term Loans for Roll-Up Loans in accordance with Section 2.1(b) of the Credit Agreement, in an aggregate principal amount equal to the product of the applicable Roll-Up Multiple and the amount of the Amendment No. 1 New Money Term Loans (i.e. $2,166,901.76).

WHEREAS, the Borrower, the Administrative Agent (at the direction of the Required Lenders) and the Amendment No. 1 New Money Lenders have agreed to make certain amendments to the Existing Credit Agreement on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree to enter into this Amendment.

1.      *Amendment No. 1 New Money Term Loans*.

(a)      Upon satisfaction or waiver of the conditions set forth in Section 3 below, certain outstanding prepetition reimbursements of Amendment No. 1 New Money Lenders in the principal amount set forth opposite each such Amendment No. 1 New Money Lender's name under the column "Amendment No. 1 New Money Term Loans" on Schedule 2.1 (as amended by this Amendment) shall be deemed to be "Prepetition Reimbursements" as of the Effective Date, and pursuant to Section 2.1(a)(iii) of the Credit Agreement, shall be deemed converted on a cashless dollar-for-dollar basis into "Prepetition Reimbursement New Money Term Loans" as of the Effective Date. Except as set forth in this Amendment

1

or the Credit Agreement, the Amendment No. 1 New Money Term Loans shall have the same terms as the Prepetition Reimbursement New Money Term Loans, and the Amendment No. 1 New Money Term Loans and the Prepetition Reimbursement New Money Term Loans will collectively comprise a single Class of Term Loans. The Amendment No. 1 New Money Term Loans will have the same Interest Period as the outstanding Prepetition Reimbursement New Money Term Loans, with an effective date as of April 9, 2024.

(b)      Subject to the terms and conditions set forth herein, effective as of the Amendment No. 1 Effective Date, for all purposes of the Credit Agreement and the Loan Documents, each Amendment No. 1 New Money Term Loan constitutes a "Prepetition Reimbursement New Money Term Loan" and each Amendment No. 1 New Money Lender constitutes a "Lender" and "New Money Term Loan Lender" and shall have all the rights and obligations of a Lender holding New Money Term Loans (including, without limitations, the right to roll-up additional Prepetition Term Loans pursuant to section 2.1(b)).

(c)      Without limiting the generality of the foregoing and except as may otherwise be set forth in this Amendment or the Credit Agreement, the Amendment No. 1 New Money Term Loans shall: (i) constitute "Obligations" and have all of the benefits thereof, (ii) have terms, rights, remedies, privileges and protections identical to those applicable to the Prepetition Reimbursement New Money Term Loans under the Credit Agreement and each of the other Loan Documents and (iii) be secured by the Liens granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Agreements and each other Collateral Document.

2.      *Amendments to the Existing Credit Agreement*. Effective as of the Amendment No. 1 Effective Date:

(a)      The second paragraph of the recitals is hereby amended and restated as follows:

**WHEREAS**, the Borrower has requested that the Lenders provide a senior secured superpriority debtor-in-possession term loan credit facility of up to an aggregate principal amount of up to $282,004,830.23, consisting of: (i) a new money term loan in an aggregate principal amount not to exceed $20,000,000 and (ii) term loans resulting from the exchange of certain Prepetition Obligations for term loans under this Agreement, in each case subject to the conditions set forth herein and in the Final DIP Order.

(b)      Section 1.1 of the Existing Credit Agreement is hereby amended to include the following definitions in applicable alphabetical order therein:

"Amendment No. 1" means that certain Amendment No. 1 to Superpriority Debtor-In-Possession Credit and Guaranty Agreement, dated as of the Amendment No. 1 Effective Date, by and among the Borrower, the Administrative Agent, the Amendment No. 1 New Money Lenders (as defined therein) and the other Lenders (as defined therein) party thereto.

"Amendment No. 1 Effective Date" means [___], 2024.

(c)      Section 1.1 of the Existing Credit Agreement is hereby amended by amending and restating the following definition:

"Maximum Roll-Up Amount" means, (i) as of the Effective Date, an amount up to $228,476,093.11 and (ii) as of the Amendment No. 1 Effective Date, $230,642,994.87.

2

(d)        Section 2.1(b)(ii) of the Existing Credit Agreement is hereby amended and restated as follows:

"The maximum amount of Prepetition Term Loans eligible to be rolled-up by each New Money Term Loan Lender will be based on the Roll-Up Multiple applicable to the Type of New Money Term Loans held by such New Money Term Loan Lender on the date such Lender submits a Roll-Up Notice. Any Prepetition Term Loans rolled-up pursuant to a Roll-Up Notice shall be converted on a dollar-for-dollar cashless basis into Roll-Up Loans deemed funded on the Roll-Up Effective Date (as defined below), without constituting a novation. For the avoidance of doubt, a New Money Term Loan Lender may submit a Roll-Up Notice on more than one occasion as long as the aggregate principal amount of Prepetition Term Loans subject to all such Roll-Up Notices does not exceed the Applicable Roll-Up Amount of such New Money Term Loan Lender as of the date of such Roll-Up Notice. The Roll-Up Loans will constitute Term Loans under this Agreement and all other Loan Documents."

(e)        Section 2.1(b)(iv) of the Existing Credit Agreement is hereby amended and restated as follows:

"Any reduction of the Prepetition Term Loan Obligations of any Lender as a result of the roll-up election pursuant to this Section 2.1(b) shall be applied to the Prepetition Term Loan Obligations of such Lender in the order provided for in Section 8.2 of the Prepetition Term Loan Credit Agreement. Unless designated otherwise in the applicable Roll-Up Notice, the amount of Prepetition Term Loans designated as being rolled up pursuant to such Roll-Up Notice will be debited on a pro rata basis among the Prepetition Term Loans held by the New Money Term Loan Lender and any of its Affiliates or Approved Funds on the Roll-Up Effective Date."

(f)        Schedule 2.1 to the Existing Credit Agreement is hereby amended to include the Amendment No. 1 New Money Term Loans set forth on Annex A attached hereto.

3.        *Conditions of Effectiveness*. This Amendment, and the obligation of each Amendment No. 1 New Money Lender to make its Amendment No. 1 New Money Term Loan to be made by it pursuant to Section 1 of this Amendment, shall become effective on the date (the "**Amendment No. 1 Effective Date**") on which each of the following conditions shall have been satisfied (or waived by the Amendment No. 1 New Money Lenders):

(a)        the Administrative Agent (or its counsel) shall have received:

(i)        executed counterparts of this Amendment signed by or on behalf of the Borrower, the Amendment No. 1 New Money Lenders and the Administrative Agent;

(ii)        (i) copies of the organizational documents or constitutional documents (as applicable), resolutions of the board of directors of the Borrower approving the terms of, and the transactions contemplated by, this Amendment and the execution and delivery of this Amendment to be delivered by the Borrower on the Amendment No. 1 Effective Date and all documents evidencing other necessary corporate (or other applicable organizational) action, governmental approvals and registrations, if any, with respect to this Amendment and (ii) all other documents reasonably requested by the Administrative

3

Agent relating to the organization, existence and good standing (or the equivalent) of the Borrower and authorization of the transactions contemplated hereby.

(b)      the representations and warranties of the Borrower set forth in Section 4 of this Amendment shall be true and correct in all material respects (or, in the case of any such representation or warranty that is qualified by or subject to "materiality", a "Material Adverse Effect" or similar term or qualification, in all respects after giving effect to such qualification);

(c)      no Event of Default shall exist immediately prior to or after giving effect (including giving effect on a pro forma basis) to the transactions contemplated herein;

(d)      an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required Lenders (and, with respect to any provisions that affect the rights or duties of the Administrative Agent or the Collateral Agent, in form and substance reasonably satisfactory to the applicable Agent) that, among other matters, authorizes the Borrowers and the other Loan Parties to execute and perform under the terms of this Amendment shall have been entered by the Bankruptcy Court in the Chapter 11 Case and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent or the Collateral Agent, in form and substance reasonably satisfactory to the applicable Agent); and

(e)      the Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower certifying that the conditions set forth in clauses (b) through (d) above are satisfied and that the Amendment No. 1 New Money Term Loans (after giving effect to this Amendment and the incurrence of the Amendment No. 1 New Money Term Loans) constitute Prepetition Reimbursement New Money Term Loans (under and as defined in the Credit Agreement).

4.      *Representations and Warranties of the Loan Parties*. The Borrower hereby represents and warrants as follows:

(a)      The Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and, subject to Bankruptcy Court approval, has the full power and authority to execute, deliver and perform this Amendment. Subject to Bankruptcy Court approval, the Borrower has taken, or on the Amendment No. 1 Effective Date will have taken, all necessary action to execute, deliver and perform this Amendment, and has, or on the Amendment No. 1 Effective Date will have, validly executed and delivered this Amendment. Subject to Bankruptcy Court approval, this Amendment constitutes, upon execution and delivery hereof, the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing.

(b)      The execution, delivery and performance by the Borrower of this Amendment, and compliance by it with the terms hereof, do not and will not (i) violate any provision of the organization documents of the Borrower, (ii) subject to Bankruptcy Court approval, contravene any material applicable law (except to the extent such contravention would not reasonably be expected to have a Material Adverse Effect) or (iii) conflict with, result in a breach of or constitute (with due notice, lapse of time or both) a default under any material agreement to which it is a party, except in each case of clause (iii), to the extent such conflict, breach or default would not reasonably be expected to have a Material Adverse Effect.

(c)      As of the date hereof, no Event of Default exists immediately prior to or after giving effect to this Amendment and the transactions contemplated herein.

5.       *Reference to and Effect on the Existing Credit Agreement*.

(a)       On and after the Amendment No. 1 Effective Date, each reference in the Existing Credit Agreement to "*hereunder*", "*hereof*", "*Agreement*", "*this Agreement*" or words of like import and each reference in the other Loan Documents to "*Credit Agreement*", "*thereunder*", "*thereof*" or words of like import shall, unless the context otherwise requires, mean and be a reference to the Existing Credit Agreement as amended by this Amendment. From and after the Amendment No. 1 Effective Date, this Amendment shall be a Loan Document under the Credit Agreement.

(b)       The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Lenders or the Administrative Agent under any Loan Document, nor constitute a waiver of any provision of any of the Loan Documents.

6.       *Governing Law and Waiver of Jury Trial*. The parties hereto agree that the provisions of Sections 10.9 and 10.10 of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis*.

7.       *Headings*. The headings of the various articles, sections and subsections of this Amendment have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.

8.       *Counterparts; Electronic Execution*. This Amendment may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by telecopier or electronic ("*.pdf*" or "*.tiff*") format shall be effective as delivery of a manually executed counterpart to this Amendment. This Amendment shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by the Administrative Agent and the Borrower of written or telephonic notification of such execution and authorization of delivery thereof. The words "execution", "signed", "signature" and words of like import in this Amendment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

9.       *No Novation*. Neither the execution, delivery and acceptance of this Amendment nor any of the terms, covenants, conditions or other provisions set forth herein are intended, nor shall they be deemed or construed, to effect a novation of any liens or Obligations under the Existing Credit Agreement or to pay, extinguish, release, satisfy or discharge (a) the Obligations under the Existing Credit Agreement, (b) the liability of the Loan Parties under the Existing Credit Agreement or the other Loan Documents executed and delivered in connection therewith or any Obligations or other obligations evidenced thereby, or (c) any mortgages, deeds of trust, liens, security interests or contractual or legal rights securing all or any part of such Obligations.

10.       *Reaffirmation*. The Borrower expressly acknowledges the terms of this Amendment and reaffirms that the Existing Credit Agreement, the Collateral Documents and each other Loan Document, as specifically amended by this Amendment, are and shall continue to be in full force and effect and are hereby in all respects ratified, reaffirmed and confirmed, and the respective prior guarantees, pledges, grants of security interests and other agreements, as applicable, under each of the Collateral Documents, notwithstanding the consummation of the transactions contemplated hereby, and all Liens thereunder, shall continue to be in full force and effect and shall accrue to the benefit of the Secured Parties under the Existing

Credit Agreement and the Secured Parties under the Credit Agreement as amended by this Amendment. Without limiting the generality of the foregoing, the Borrower, on behalf of itself and the other Loan Parties, expressly reaffirms that the Collateral Documents and all of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Loan Documents, as amended by this Amendment.

11.      *Amendments; Severability*. This Amendment may not be amended nor may any provision hereof be waived except pursuant to a writing signed by the Loan Parties, the Administrative Agent and the Amendment No. 1 New Money Lenders. To the extent any provision of this Amendment is prohibited by or invalid under the applicable law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Amendment in any jurisdiction.

12.      *Conflicts*. In the event of any conflict between the terms of this Amendment and the terms of the Credit Agreement or any of the other Loan Documents, the terms of this Amendment shall govern.

[Signature Pages Follow]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

**BYJU's ALPHA, INC.,**
as the Borrower

By:_____
Name:
Title:

**GLAS TRUST COMPANY LLC**,
as Administrative Agent


By:_____
Name:
Title:

**[LENDER]**,
as [Amendment No. 1 New Money Lender]


By:_____
Name:
Its:

Annex A

Amendment No. 1 New Money Term Loans

| Amendment No. 1 New Money Lenders | Amendment No. 1 New Money Term Loans | Applicable Roll-Up Amounts |
|---|---|---|
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| [__] | $[__] | $[__] |
| **Total** | **$1,083,450.88** | **$2,166,901.76** |

**<u>Exhibit C</u>**

**10/7/2024 Status Conference Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 11 |
| IN RE: | . | |
| | . | Case No. 24-11161(JTD) |
| EPIC! CREATIONS, INC., | . | |
| et al, | . | |
| | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| Debtors. | . | |
| . . . . . . . . . . . . . | . | Monday, October 7, 2024 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Chapter 11
Trustee:                          Henry J. Jaffe, Esq.
                                  Joseph C. Barsalona, II, Esq.
                                  Alexis R. Gambale, Esq.
                                  PASHMAN STEIN WALDER HAYDEN, PC
                                  1007 North Orange Street
                                  Fourth Floor, Suite 183
                                  Wilmington, Delaware 19801

                                  Melissa Root, Esq.
                                  JENNER & BLOCK, LLP
                                  335 North Clark Street
                                  Chicago, Illinois 60654

For the U.S. Trustee:             Linda Casey, Esq.
                                  OFFICE OF THE U.S. TRUSTEE
                                  844 King Street, Suite 2207
                                  Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:                   Electronically Recorded by
                                  Ashley Alexander, ECRO

Transcription Company:            Reliable
                                  1007 N. Orange Street
                                  Wilmington, Delaware 19801
                                  (302)654-8080
                                  Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For the Petitioning
Lenders:                        Jack M. Dougherty, Esq.
                                COLE SCHOTZ, PC
                                500 Delaware Avenue, Suite 1410
                                Wilmington, Delaware 19801

For GLAS Trust Company,
LLC:                            James E. O'Neill, Esq.
                                PACHULSKI, STANG, ZIEHL
                                 & JONES, LLP
                                919 North Market Street
                                17th Floor
                                Wilmington, Delaware 19899

                                Jordan E. Elkin, Esq.
                                Ryan Comkie, Esq.
                                KIRKLAND & ELLIS, LLP
                                601 Lexington Avenue
                                New York, New York 10022

                                Ravi S. Shankar, Esq.
                                KIRKLAND & ELLIS, LLP
                                333 West Wolf Point Plaza
                                Chicago, Illinois 60654

For Conscious Content
Media, Inc. d/b/a Begin:        Daniel N. Brogan, Esq.
                                BENESCH, FRIEDLANDER, COPLAN
                                 & ARONOFF, LLP
                                1313 North Market Street
                                Suite 1201
                                Wilmington, Delaware 19801

Also Appearing:                 Claudia Z. Springer, Chapter 11
                                 Trustee
                                Jacob Grall
                                NOVO ADVISORS

APPEARANCES VIA ZOOM:  (On the Record)

For the Chapter 11
Trustee:                        Catherine Steege, Esq.
                                JENNER & BLOCK, LLP
                                335 North Clark Street
                                Chicago, Illinois 60654

<u>INDEX</u>

<u>PAGE</u>

<u>APPLICATION OF THE UNITED STATES TRUSTEE FOR ENTRY OF</u>          4
<u>AN ORDER APPROVING THE APPOINTMENT OF CLAUDIA Z. SPRINGER</u>
<u>AS CHAPTER 11 TRUSTEE</u>

<u>STATUS CONFERENCE</u>                                               5

<u>CHAPTER 11 TRUSTEE'S APPLICATION TO EMPLOY AND RETAIN</u>          16
<u>KURTZMAN CARSON CONSULTANTS, LLC d/b/a VERITA GLOBAL AS</u>
<u>CLAIMS AND NOTICING AGENT EFFECTIVE AS OF THE APPOINTMENT</u>
<u>DATE</u>

1          (Proceedings commence at 1:30 p.m.)

2          (Call to order of the Court)

3          THE COURT:  Please be seated.  Good afternoon.  Mr.

4     Barsalona, good to see you.

5          MR. BARSALONA:  Good afternoon, Your Honor.  For

6     the record, Joe Barsalona from Pashman Stein Walder Hayden on

7     behalf of Claudia Springer, the Chapter 11 Trustee in this

8     case.

9          THE COURT:  Very good.

10          MR. BARSALONA:  With me at counsel table is my co-

11     counsel Ms. Melissa Root --

12          THE COURT:  Welcome.

13          MR. BARSALONA:  -- from Jenner & Block.  Also on

14     Zoom is Cathy Steege, who you'll be hearing from later in the

15     case.

16          THE COURT:  Very good.

17          MR. BARSALONA:  Your Honor, we have a very short

18     agenda today and I'm going off of the amended agenda filed at

19     Docket 174.

20          The first one, Your Honor, is just an

21     administrative matter.  The order appointing Ms. Springer has

22     actually not been entered yet.

23          THE COURT:  Oh, okay.

24          MR. BARSALONA:  And I know Ms. Casey did submit

25     that order to chambers, but we placed that --

1          THE COURT:  I have no --

2          MR. BARSALONA:  -- on the agenda.

3          THE COURT:  -- issues with the order, I thought it

4     was entered, so we'll go ahead -- that will get in this

5     afternoon.  I apologize for any heartburn over there.

6          MR. BARSALONA:  No, not at all, Your Honor.

7          THE COURT:  Ms. Springer, good to see you.

8     Welcome.

9          MR. BARSALONA:  And Your Honor, we're going to take

10    this a little bit out of order.

11         THE COURT:  That's fine.

12         MR. BARSALONA:  We're going to go with the status

13    conference first and have Ms. Springer introduce herself,

14    tell her where -- tell us where we're going; and then,

15    afterwards, we'll do the claims agent retention after that.

16         THE COURT:  That sounds fine.

17         MR. BARSALONA:  With that, Your Honor, I will hand

18    the podium over to Ms. Springer.

19         THE COURT:  Very good.

20         Ms. Springer, good to see you.

21         MS. SPRINGER:  Good afternoon.  Good to see --

22         THE COURT:  Good afternoon.

23         MS. SPRINGER:  -- you, Your Honor.  I haven't seen

24    you in a long time, so it's nice to be back.

25         Well, I'd like to give the Court a little bit of an

1    update on what we've been doing since I was appointed on

2    September 23rd.  It's really been a whirlwind of activity

3    because we really don't have a lot of books and records and

4    the things that you would ordinarily have.

5              THE COURT:  That does seem to be a theme in this

6    case.

7              MS. SPRINGER:  Yes.  So we've had to build them

8    from the bottom up, that's the current theme here.

9              THE COURT:  Uh-huh.

10             MS. SPRINGER:  The first thing I did was retain

11   counsel.  I've retained Jenner & Block --

12             THE COURT:  Good.

13             MS. SPRINGER:  -- Pashman Stein, and also Quinn

14   Emanuel.  Quinn Emanuel will be really focusing on things

15   that happened in the past that we think were untoward and

16   need to be corrected.

17             THE COURT:  Uh-huh.

18             MS. SPRINGER:  And hopefully, we'll be able to, you

19   know, get back some of the money that we believe was

20   wrongfully taken from these companies over the years.

21             In terms -- and I've also retained NOVO Advisors,

22   my own firm, to be the financial advisor in the case.

23             And we'll also be using FTI --

24             THE COURT:  Okay.

25             MS. SPRINGER:  -- that has boots on the ground in

1    India, to help us in India, again, to recover, hopefully,

2    some of the assets that were taken from us.

3         We have -- the first thing we did is try to find

4    the money that still exists.  We found bank accounts at Wells

5    Fargo, at Relay Bank and Chase Bank, and we secured those

6    accounts, and I am now the signatory on those accounts.

7         THE COURT:  Okay.

8         MS. SPRINGER:  We made payroll for a couple -- all

9    three of the companies are current with their payroll, as far

10   as the time period that I've been engaged.  There is some --

11   allegedly some payroll that still has not been made for pre-

12   trustee --

13        THE COURT:  Uh-huh.

14        MS. SPRINGER:  -- periods, but we're going to see

15   about fixing that.

16        We've interviewed numerous employees at the

17   companies about things that are going on currently and

18   deficiencies in the personnel of the companies.

19        One of the things that happened here is, especially

20   with Epic!, Epic! was largely managed by India, and there

21   were numerous employees of the parent company that were

22   supporting Epic!, in terms of engineering support, creativity

23   support, all the rest.  But those people have not been paid

24   in four months and they went on a work stoppage, which is

25   understandable.  And one of things we are looking into is

1   rehiring them through an intermediary to work exclusively for

2   Epic! going forward because Epic! was really in dire straits,

3   in terms of manpower.  So that's something else we have --

4   we've done.

5        Another thing that we found out is that the Indian

6   parent largely controls the things that -- things like Apple

7   and Google and all of the platforms --

8        THE COURT:  Uh-huh.

9        MS. SPRINGER:  -- that are vital to these

10  companies, that are online learning companies.  It's very

11  difficult to find human beings to talk to at those

12  businesses, so we are -- we're probably going to come into

13  court sometime next week, if not this week, on an emergency

14  motion to order them to work with us to change the

15  administrator on these accounts, so that we're not relying on

16  the management in India, which does not seem to want to

17  respond to us at all.  We've tried to reach out to them and

18  without success.

19        THE COURT:  Okay.

20        MS. SPRINGER:  We have also Jacob Grall who's here

21  today from NOVO, went to Mountain View, California last week

22  to meet with people from Neuron Fuel, which is also known as

23  "Tynker."  Of the three companies, Tynker is probably in the

24  best condition because it really didn't have a lot of

25  oversight from the Indian parent.  So Jacob met with

1    management at Tynker.

2           And I think that's a company that, unless we want

3    to market all three companies at the same time, we can

4    probably set that up for a sale pretty quickly.

5           THE COURT:  Okay.

6           MS. SPRINGER:  The other two are going to take a

7    little bit more time to get them under control and get them

8    back to hopefully being profitable.

9           And we've had dialogues with all key

10   constituencies.  The main one is in court today, the lender

11   group that put the companies into a Chapter 11.  We've kept

12   them up to date by giving them reports of our activity.  And

13   also, we have given them a proposed DIP request, and we

14   expect to have conversations with them starting tomorrow

15   regarding that request and how we came, you know, to the

16   amounts that we're requesting.

17          So, having said all of that, I welcome any

18   questions that Your Honor has at this point.

19          THE COURT:  No, I don't think I have questions.

20          I very much appreciate the status conference.  I

21   mean, a lot of status conference are rote.  This case is

22   coming in in, to my experience, a unique way, and I wanted

23   the opportunity to be advised by the parties and particularly

24   by the trustee, now appointed, about the current state of

25   play.

1          I am certainly aware of the concerns about

2    competing jurisdictions.  But this matter is -- an order for

3    relief has been entered, this is a case pending in front of

4    me, and I will be guided by the parties.

5          You advised about a number of steps coming, some of

6    which may come in a hurry.  As a general proposition, I'm

7    sure co-counsel has told you, you should expect that the

8    Court will be a willing participant in the scheduling or

9    resources that you need.  And again, I certainly appreciate

10   that you are endeavoring to get your arms around the process,

11   so far.

12         So I don't have questions at this point, I'm --

13   other than I'm pleased to hear that you are going at it full

14   tilt.

15         MS. SPRINGER:  Thank you, Your Honor, I am and I

16   intend to keep continuing at that pace.

17         THE COURT:  Very good.

18         MS. SPRINGER:  So I appreciate this very much.

19         THE COURT:  Counsel?

20         MR. ELKIN:  Good afternoon, Your Honor.

21         THE COURT:  Welcome.

22         MR. ELKIN:  Jordan Elkin with Kirkland & Ellis on

23   behalf of GLAS Trust Company --

24         THE COURT:  Good to see you.

25         MR. ELKIN:  -- the administrative and collateral

1    agent under the term loan facility.

2          Your Honor, I'll start with a quick fun fact.  My

3    first time ever appearing in court was in front of you in the

4    Destination Maternity case --

5          THE COURT:  Oh, okay.

6          MR. ELKIN:  -- virtually.  So it's good to be back

7    and good to see you in person.

8          Your Honor, one quick housekeeping matter.  I want

9    to note my motion for admission *pro hac vice* was filed --

10         THE COURT:  We'll take care of that.

11         MR. ELKIN:  Thank you very much.

12         So I will be brief, Your Honor, but I would like to

13   provide some context on GLAS and the lender group's views of

14   these cases and the path forward in Chapter 11.  And I won't

15   go through the unfortunate series of events leading us to

16   this point, but I do at least want to note the time line.

17         GLAS, at the direction of the lender group,

18   accelerated the term loan in March of 2023, and that was

19   after they negotiated by BYJU's for a year in the hopes of

20   reaching a consensual resolution.

21         We now know, Your Honor, more than a year later,

22   that, while the lenders were negotiating in good faith,

23   insiders of the company were taking steps to ensure that

24   assets were fraudulently moved outside of the grasp of the

25   lenders.

1          Once accelerated, BYJU's Alpha, the borrower, and

2     each guarantor, including the three debtors in these cases,

3     was immediately obligated to repay the term loan in full, in

4     cash.  It has been more than 19 months since the term loan

5     was accelerated and the lender group has not seen a cent.

6     There is currently more than $1.5 billion outstanding under

7     the term loan facility and fees and interest grow each day.

8     Meanwhile, BYJU's continues to take every measure possible to

9     delay recovery and deflect responsibility.

10          Your Honor, at least as to these three entities,

11     our hope is that the buck now stops here.  This Court's entry

12     of the order for relief and the appointment of Ms. Springer

13     as Chapter 11 Trustee marks a hopeful new phase in the BYJU's

14     saga.  We are grateful to Ms. Springer and her team for the

15     hard work they have undertaken in short order to stabilize

16     these businesses.

17          As part of those stabilization efforts and as you

18     heard from Ms. Springer, additional bank accounts have been

19     discovered, and Ms. Springer is assessing transfers of cash

20     therefrom.  As we continue to learn more, there is no doubt

21     that these cases belong in Chapter 11 and that the

22     appointment of a Chapter 11 Trustee was absolutely necessary

23     under the circumstances.

24          Your Honor, it's important that we remember just

25     what these businesses do.  They provide accessible education

1    services for millions of children.  And the lender group is

2    here to help ensure that these services continue to be

3    provided and that these companies can grow and flourish.  To

4    that end, we have begun to engage with the trustee on a DIP

5    financing package that will support ordinary course

6    operations, fund the administration of these Chapter 11

7    cases, and bridge the companies to a value-maximizing sale or

8    other restructuring transaction.

9        But I would like to make clear, Your Honor, the

10   lender group has already expended tens of millions of dollars

11   on their worldwide enforcement efforts.  Each dollar expended

12   under the DIP is yet another dollar out of the pockets of the

13   lenders, with no recovery to show for it to date and, each

14   day we spend in bankruptcy, the fees and expenses only grow.

15       We hope and expect the trustee will acknowledge

16   this important context and work with GLAS and the lender

17   group, by far the largest stakeholders in these cases, to

18   establish an efficient case time line supported by an

19   appropriately tailored DIP and access to cash collateral.  We

20   look forward to working with Ms. Springer's team and expect

21   to be back to Your Honor soon with more details on that go

22   forward proposal.

23       THE COURT:  Very good.  Thank you, Mr. Elkin.

24       MR. ELKIN:  Thank you, Your Honor.

25       THE COURT:  All right.  Before we turn to the

1    motions, does anyone else wish to be heard?

2          (No verbal response)

3              THE COURT:  Very good.

4              Before we turn to the motions, let me make one

5    observation, and I will be entirely candid with the parties.

6    Procedurally, as I mentioned, I have entered the order for

7    relief, I have no reservations about administrating this

8    case.  And as I've said, I will be a partner with the debtor,

9    to the extent appropriate, with respect to scheduling needs

10   and, indeed, expedited scheduling, if necessary.

11             I mentioned that this case arrived in a unique

12   format, and I would be guided by the parties.  I see nothing

13   in this proceeding so far, as to the extent that I have

14   visibility into it, that would limit or complicate my

15   administration of this case.

16             Obviously, there are pending proceedings in front

17   of Judge Dorsey.  I have not had the opportunity to speak

18   with Judge Dorsey about this.  I picked this matter up as a

19   matter of convenience because of scheduling and I have

20   announced that I am prepared to continue to administer it.

21   But I would be advised by the parties, if need be, if it

22   makes sense to try to coordinate between this Court and Judge

23   Dorsey.  Again, we have not had any discussions about this.

24             This is kind of an unusual format and, again, the

25   way that it arrived was hardly typical.  It is my intention

1   and expectation to administer this case.  But if I can be of

2   assistance and if -- the last thing I would want is people

3   coming in for a hearing in front of Dorsey on Tuesday and in

4   front of me on Thursday.  If stuff should or needs to be

5   coordinated, we can do that, and I would just leave that as

6   an offer out there to the parties.

7           I'm -- you know, we've had cases that were strongly

8   related or involved in litigation from one end of the hall to

9   the other, and they do sometimes require, not necessarily

10  substantive coordination, but scheduling at a minimum.  So

11  that -- we would be open to that discussion, if need be.  I -

12  - again, I make no comment about whether there will be

13  overlap.  But again, the last thing I would want is a lack of

14  efficiency, given the circumstances counsel has described.

15  So that offer remains out there.  And again, I would be

16  guided particularly by the trustee in that respect.

17          Shall we turn to the motions?

18          MR. BARSALONA:  Yes, Your Honor.  And thank you for

19  that.  We will make sure to cooperate and coordinate with

20  both sets of chambers as we move forward.

21          THE COURT:  Sure.

22          MR. BARSALONA:  With that, I will hand the podium

23  over to Ms. Gambale for the Verita retention app.

24          THE COURT:  Very good.

25          MS. GAMBALE:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          MS. GAMBALE:  Alexis Gambale, Pashman Stein Walder

3    Hayden, on behalf of the Chapter 11 Trustee Claudia Z.

4    Springer.

5          THE COURT:  Welcome.

6          MS. GAMBALE:  Thank you.

7          I will be addressing Item Number 2 on the amended

8    agenda that was filed on Friday, and that is the application

9    to retain Verita Global as the claims agent in this -- these

10   Chapter 11 cases.

11         In support of the application, the trustee submits

12   the declaration of Evan Gershbein that was attached to the

13   application at Exhibit B, as well as the supplemental

14   declaration of Evan Gershbein that was filed --

15         THE COURT:  I have both of them.

16         MS. GAMBALE:  Perfect.

17         Here, because there will be 200 or more parties to

18   be noticed in the case, the trustee submits that the

19   appointment of a claims agent is, therefore, required for

20   Local Rule 2002-1(f), as it would be in the best interests of

21   the debtors' estates and their creditors.

22         In light of the claims agent protocol, the trustee

23   solicited engagement proposals from at least two other court-

24   appointed -- court-approved -- I'm sorry -- claims agents,

25   and she reviewed those proposals, as well.  But after

1    reviewing them, she determined that Verita was the best

2    option, in terms of their rates, as being both competitive

3    and reasonable, in light of their services that they would

4    provide.

5           Also, the last thing I'd like to note is that the

6    trustee did receive comments, informal comments, from the

7    U.S. Trustee as it relates to the order.  Those have since

8    been resolved and reflected in the revised order that was

9    filed at Docket I.D. 173.

10          THE COURT:  Very good.  I did see the revised

11   order, I recognize Ms. Casey's handwriting.

12          MS. GAMBALE:  Yeah.

13      (Laughter)

14          MS. GAMBALE:  But with that, unless you have any

15   other questions, Your Honor --

16          THE COURT:  I do not have questions.

17          I would ask if anyone wishes to be heard with

18   respect to the request to engage Verita as the debtors'

19   claims and noticing agent.

20      (No verbal response)

21          THE COURT:  Very well.

22          I'm going to grant the application.  As counsel

23   noted, in a case such as this, our local rules do require

24   that a debtor promptly engage the services of a claims and

25   noticing agent.

1           The Court is certainly familiar with Verita through

2    KCC, and I have no reservations about their experience and

3    resources necessary to provide the services that are outlined

4    in the application.

5           I did have an opportunity to review both of the

6    declarations, as well as the application and the terms of the

7    engagement.  I'm satisfied that they are compliant with our

8    local rules and established practice.

9           The motion is granted and the order will issue.

10          MS. GAMBALE:  Perfect.  Thank you so much, Your

11   Honor.

12          THE COURT:  Very good.

13          Mr. Barsalona, do we have anything else this

14   afternoon?

15          MR. BARSALONA:  That's it, Your Honor.  And we will

16   see you on Halloween.

17       (Laughter)

18          THE COURT:  Don't threaten me, Mr. Barsalona.

19       (Laughter)

20          THE COURT:  All right.  With that, we are

21   adjourned.  Again, I appreciate everyone's time.  We stand in

22   recess.

23       (Proceedings concluded at 1:47 p.m.)

24                           * * * * *

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.


_____          October 8, 2024

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable