## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Case No. 24-10140 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on September 16, 2025, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered an order [D.I. 478] (the "**Disclosure Statement Order**"): (a) authorizing the above-captioned debtor (the "**Debtor**") to solicit votes on the chapter 11 plan (the "**Plan**") contained in the *Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [D.I. 470] (as modified, amended, or supplemented from time to time, the "**Combined Plan and Disclosure Statement**");[2] (b) conditionally approving the disclosure statement (the "**Disclosure Statement**") contained in the Combined Plan and Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the Solicitation Packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** on September 16, 2025, the Debtor filed the *Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [D.I. 475] (the "**Amended Plan**").

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated under the Plan and the Disclosure Statement Order, the Debtor filed the Plan Supplement on October 14, 2025. The Plan Supplement, as defined in the Plan, means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtor no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) Identity of the Plan Administrator; (b) the Plan Administrator Agreement; (c) Identity of the members of the Wind-Down Debtor Oversight Committee; (d) the Wind-Down Financing Facility Term Sheet; (e) Schedule of Retained Causes of Action; and (f) Schedule of Excluded Parties. The

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is 1007 N. Market St. Ste. G20 452, Wilmington, DE 19801.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Plan [D.I. 475].

Debtor or the Wind-Down Debtor, as applicable, reserves all rights, subject to all applicable consultation, approval, and/or consent rights of any applicable counterparties contained or contemplated under the Plan, to amend, modify, revise, or supplement all of the documents included herein in accordance with the terms of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence on **October 29, 2025, at 11:00 a.m., prevailing Eastern Time**, subject to the Court's availability, before the Honorable Brendan L. Shannon, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, Sixth Floor, Courtroom 1, Wilmington, DE 19801.

**PLEASE TAKE FURTHER NOTICE THAT** you may obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents free of charge by contacting Young Conaway Stargatt & Taylor, LLP at (302) 571-7791, or by email at bwalters@ycst.com.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov.

---

YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND VOTING AGENT.**

---

Dated: October 14, 2025
Wilmington, Delaware

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
Jianjian Ye (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

*Counsel for the Debtor*

*/s/ Kenneth J. Enos*
**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

*Counsel for the Debtor*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BYJU'S ALPHA, INC.,[1] | ) | Case No. 24-10140 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## PLAN SUPPLEMENT FOR THE
## CHAPTER 11 PLAN OF BYJU'S ALPHA, INC.

This Plan Supplement contains current drafts of the following documents, each of which remain subject to ongoing review and negotiations among the Debtor and interested parties pursuant to the terms of the Plan, as may be modified, amended, or supplemented from time to time.[2]

## TABLE OF CONTENTS

| **Exhibit** | **Document** |
|---|---|
| A | Identity of the Plan Administrator |
| B | Plan Administrator Agreement |
| C | Identity of the members of the Wind-Down Debtor Oversight Committee |
| D | Wind-Down Financing Facility Term Sheet |
| E | Schedule of Retained Causes of Action |
| F | Schedule of Excluded Parties |

---

[1]     The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is BYJU's Alpha, Inc. (4260).  The location of the Debtor's service address for purposes of this Chapter 11 Case is 1007 N. Market St. Ste. G20 452, Wilmington, DE 19801.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Plan [D.I. 475].

## Exhibit A

### Identity of the Plan Administrator

As of the Effective Date, Timothy R. Pohl shall serve as the Plan Administrator.[1] The Plan Administrator's compensation shall consist of a Cash payment, to be made by the Wind-Down Debtor following the Effective Date, consisting of a monthly fee of $75,000, which shall be payable in advance of each month beginning with the first full month following the Effective Date.

---

[1] Capitalized terms used but not otherwise defined in this **Exhibit A** shall have the meanings ascribed to them in the Plan Administrator Agreement.

**<u>Exhibit B</u>**

**Plan Administrator Agreement**

## PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (this "<u>Agreement</u>") is made this [●] day of [●], 2025, by and among the Chapter 11 Trustee, on behalf of the Estates of Saga Formations, Inc. (f/k/a Epic! Creations, Inc.), Pajeau, Inc. (f/k/a Neuron Fuel, Inc.), and Tangible Play, Inc. (collectively, the "<u>Epic Debtors</u>"), BYJU's Alpha, Inc. ("<u>Alpha</u>" and, together with the Epic Debtors, the "<u>Debtors</u>" or the "<u>Wind-Down Debtors</u>," as applicable), and Timothy R. Pohl (the "<u>Plan Administrator</u>"), in accordance with the *Second Amended Combined Disclosure Statement and Chapter 11 Plan for the Estates of Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc.* [Epic Docket No. [●]] (the "<u>Epic Plan</u>") and the *Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [Alpha Docket No. 475] (the "<u>Alpha Plan</u>" and, together with the Epic Plan, the "<u>Plans</u>") as each may from time to time be amended, supplemented, or otherwise modified in accordance with the terms thereof.[1]

## RECITALS

WHEREAS, Alpha filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on February 1, 2024 (the "<u>Alpha Petition Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") thereby commencing the chapter 11 case of Alpha (the "<u>Alpha Case</u>");

WHEREAS, GLAS and certain Prepetition Term Loan Lenders party to the Prepetition Credit Agreement (the "<u>Petitioning Creditors</u>") filed involuntary petitions against Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc. under chapter 11 of the Bankruptcy Code on June 4–5, 2024 (the "<u>Epic Petition Date</u>") in the Bankruptcy Court;

WHEREAS, on September 16, 2024 (the "<u>Order for Relief Date</u>"), the Bankruptcy Court entered the *Order for Relief in Involuntary Cases and Appointing Chapter 11 Trustee* [Epic Docket No. 147] (the "<u>Order for Relief</u>") granting the relief requested by the Petitioning Creditors and commencing the chapter 11 cases of the Epic Debtors (the "<u>Epic Cases</u>" and, together with the Alpha Case, the "<u>Chapter 11 Cases</u>");

WHEREAS, pursuant to the Order for Relief and upon the *Application of the United States Trustee for Entry of an Order Approving the Appointment of Claudia Z. Springer as Chapter 11 Trustee* [Epic Docket No. 151] (the "<u>Trustee Application</u>") the Bankruptcy Court entered the *Order Approving the Appointment of Claudia Z. Springer as Chapter 11 Trustee* [Epic Docket No. 180] (the "<u>Trustee Order</u>");

WHEREAS, on May 20, 2025, the Bankruptcy Court entered the *Order (I) Approving the Sale of Neuron Fuel, Inc.'s Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [Epic Docket No. 723] (the "<u>Neuron Fuel Sale Order</u>"), and the *Order (I) Approving the Sale of Epic! Creations, Inc.'s Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the*

---

[1] Capitalized terms used but not otherwise defined herein have the meaning set forth in the Epic Plan or the Alpha Plan, as applicable.

*Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [Epic Docket No. 724] (the "Epic Sale Order");

WHEREAS, the Plans contemplate that a Plan Administrator will be appointed as of the Effective Date (as defined below) to administer the Plans in accordance with the terms of the Plans and this Agreement and to take such other actions as may be authorized under the Plans and this Agreement;

WHEREAS, the Plans provide that the Plan Administrator will, among other things, retain, preserve, liquidate, and distribute the Retained Assets and pursue, enforce, and litigate the Retained Causes of Action for the benefit of the Holders of certain Claims, as further set forth in the Plans;

WHEREAS, on [●] [●], 2025, the Bankruptcy Court entered an order confirming the Epic Plan [Epic Docket No. [●]] (the "Epic Confirmation Order"), and on [●] [●], 2025, the Bankruptcy Court entered an order confirming the Alpha Plan [Alpha Docket No. [●]] (the "Alpha Confirmation Order" and, together with the Epic Confirmation Order, the "Confirmation Orders");

WHEREAS, pursuant to the Plans and the Confirmation Orders, the Plans became effective on [●] [●], 2025 (the "Effective Date");

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of, the Plans; and

WHEREAS, Timothy R. Pohl has agreed to serve as the Plan Administrator in accordance with this Agreement and the Plans.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, as well as the relevant provisions of the Plans, the parties hereto agree as follows:

## ARTICLE I

## ACCEPTANCE AND APPOINTMENT; FIDUCIARY STATUS

**Section 1.1      Acceptance and Appointment**.  Timothy R. Pohl hereby (a) accepts appointment as the Plan Administrator as of the Effective Date and (b) agrees to observe and perform all duties and obligations imposed upon the Plan Administrator under the Plans, this Agreement, orders of the Bankruptcy Court, and applicable law, in each case, on and after the Effective Date.  Other than the duties and obligations of the Plan Administrator specifically set forth in this Agreement, the Plans, or the Confirmation Orders, the Plan Administrator shall have no duties or obligations of any kind or nature with respect to his or her position as such.

**Section 1.2      Fiduciary**.  On and after the Effective Date, the Plan Administrator shall, subject to the powers and authority of the Wind-Down Debtors Oversight Committee, act as the sole director and sole officer of each of the Wind-Down Debtors and the exclusive representative of the Estates of the Wind-Down Debtors.  The Plan Administrator shall perform its obligations consistent with the Plans, this Agreement and applicable orders of the Bankruptcy Court.

Pursuant to the Plans, the Plan Administrator shall act in a fiduciary capacity on behalf of the interest of all Holders of Claims that will receive distributions pursuant to the Plans.

## ARTICLE II

## GENERAL POWERS, RIGHTS AND OBLIGATIONS
## OF THE PLAN ADMINISTRATOR

**Section 2.1    General Powers**.  On and after the Effective Date, subject in each instance to the terms and conditions of the Plans, the Confirmation Orders and any further order of the Bankruptcy Court, the Plan Administrator shall have the following rights, powers, duties and responsibilities:

(a)    Except as otherwise provided in the Plans, the Confirmation Orders or in this Agreement, the Plan Administrator shall control and exercise authority over the Wind-Down Debtor Assets, over the acquisition, management and disposition thereof and over the management and conduct of the affairs of the Wind-Down Debtors.  The Plan Administrator will be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  To the extent necessary, on and after the Effective Date, the Plan Administrator, in its capacity as Plan Administrator, shall be deemed to be a judicial substitute for the applicable Debtors as the party in interest in the Chapter 11 Cases, under the Plans, or in any judicial proceeding or appeal to which any of the Debtors is a party. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the powers and authority of the Plan Administrator shall in all respects be subject to the terms of the Plans and the Confirmation Orders.  The Plan Administrator shall execute all agreements and other documents on behalf of the Wind-Down Debtors with the signature "as Plan Administrator".

(b)    The Plan Administrator shall have control over the day-to-day decisions and operations of the Wind-Down Debtors except as specifically provided for in the Plans, the Confirmation Orders or this Agreement.  To the extent the Wind-Down Debtors Oversight Committee and Plan Administrator disagree regarding a proposed action by, or course of conduct for, the Wind-Down Debtors that is expressly subject to the consent of the Wind-Down Debtors Oversight Committee, the Wind-Down Debtors Oversight Committee shall control; *provided, however*, the Plan Administrator retains the right to challenge the ultimate decision(s) of the Wind-Down Debtors Oversight Committee in the event that the Plan Administrator reasonably believes such action or course of conduct would amount to a violation of his or her duties or obligations hereunder by motion to the Bankruptcy Court.  The Plan Administrator, in seeking such Bankruptcy Court determination, shall certify that the parties met and conferred (or the Plan Administrator unsuccessfully pursued a meet and confer) regarding such proposed action or course of conduct in good faith and were unable to reach resolution.  The Bankruptcy Court shall retain jurisdiction regarding any such dispute.

(c)    In connection with the management of the Wind-Down Debtors and implementation of the Plans on behalf of the Wind-Down Debtors, the duties and powers of the Plan Administrator shall include any and all powers and authority to implement the Plans and to make distributions thereunder and Wind-Down the business and affairs of the Wind-Down

Debtors, all without the need for further order of the Bankruptcy Court, in each case subject to the consent of the Wind-Down Debtors Oversight Committee to the extent such consent is required pursuant to the Plans, the Confirmation Orders, or this Agreement, including, but not limited to:

(i)     implementing the Wind-Down and making distributions contemplated by the Plans;

(ii)     marshalling, collecting, marketing for sale, liquidating and winding down any of the Debtors' assets constituting the Wind-Down Debtor Assets;

(iii)     overseeing the accounts of the Debtors and the Wind-Down Debtors and the Wind-Down and dissolution of the Debtors and the Wind-Down Debtors;

(iv)     implementing, pursuing, and adhering to the terms of the Plans, the Confirmation Orders, any Purchase Agreement and Sale Order, and any related documents;

(v)     receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and, where appropriate, causing the Wind-Down Debtors to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtors to invest any moneys held as Wind-Down Debtor Assets;

(vi)     opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtors, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors;

(vii)     establishing a Liquidating Trust or similar vehicle to the extent that the Plan Administrator, in consultation with the Wind-Down Debtors Oversight Committee, deems it to be reasonably necessary or beneficial in effectuating the Wind-Down;

(viii)     entering into any agreement or executing any document or instrument required by or consistent with the Plans or the Confirmation Orders, and performing all obligations thereunder;

(ix)     protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Retained Causes of Action) vested in the Wind-Down Debtors by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(x)      reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(xi)     seeking the examination of any Person or Entity pursuant to Federal Rule of Bankruptcy Procedure 2004 or otherwise;

(xii)    entering into a financing facility, including the Wind-Down Financing Facility, to fund the pursuit of the Retained Causes of Action or otherwise facilitate the Wind-Down;

(xiii)   retaining professionals, disbursing agents, and other agents, independent contractors, and third parties on behalf of the Wind-Down Debtors, the Plan Administrator and/or the Wind-Down Debtors Oversight Committee, and paying the reasonable compensation thereof;

(xiv)    paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets;

(xv)     investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Retained Causes of Action;

(xvi)    reviewing and compelling turnover of the Debtors' or the Wind-Down Debtors' property;

(xvii)   calculating and making all distributions to the Holders of Allowed Claims against each Debtor, as provided for in, or contemplated by, the Plans;

(xviii)  withholding from the amount distributable to any Person or Entity the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of its agents or professionals, may be required to be withheld from such distribution under the income tax or other Laws of the United States or of any state or political subdivision thereof;

(xix)    in reliance upon the Debtors' Schedules, the official register of Claims maintained in the Chapter 11 Cases, and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and

administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtors;

(xx)    making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtors, and filing tax returns for the Debtors, the Wind-Down Debtors, or the Liquidating Trust (if applicable) pursuant to and in accordance with the Plans, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtors, as applicable; *provided, however*, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(xxi)    abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(xxii)    seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(xxiii)    establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtors as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtors;

(xxiv)    purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(xxv)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtors', the Liquidating Trust's (if applicable), or the Plan Administrator's duties under the Plans, including reporting and making required payments of Statutory Fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(xxvi)     retaining, terminating, appointing, hiring, or otherwise employing employees, personnel, management, and directors at any of the Wind-Down Debtors to the extent necessary to carry out the purposes of the Plans, including, without limitation, to address any disputes between the Wind-Down Debtors;

(xxvii)     exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plans, the Confirmation Orders, any Purchase Agreement, and this Agreement; and

(xxviii)     taking all other actions consistent with the provisions of the Plans, the Confirmation Orders, and this Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtors.

(d)     All Cash or other property held or collected by the Wind-Down Debtors shall be used solely for the purposes contemplated by the Plans and this Agreement.

(e)     The Plan Administrator shall not authorize the Wind-Down Debtors to enter into or engage in any trade or business or use or dispose of any Wind-Down Debtor Assets in furtherance of any trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the Plans.

(f)     From and after the Effective Date, the Plan Administrator, on behalf of the Wind-Down Debtors, shall be solely authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Bankruptcy Court order, to review, and where appropriate, allow or object to Claims and (if applicable) Interests, and supervise and administer the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtors. Pursuant to the Plans, the Wind-Down Debtors reserve the right to seek an order of the Bankruptcy Court extending any Claims Objection Deadline.

(g)     When all Disputed Claims have become Allowed or Disallowed, all Retained Causes of Action have been pursued, settled, resolved or abandoned, and all remaining Cash has been distributed in accordance with the Plans (or the Plan Administrator otherwise determines in its reasonable business judgment that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete its duties), the Plan Administrator (with the consent of the Wind-Down Debtors Oversight Committee) shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules. Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plans and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of

state for the state in which each Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors.

**Section 2.2    Pursuit and Resolution of Causes of Action.**    Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Wind-Down Debtors shall, with the consent of the Wind-Down Debtors Oversight Committee, have the right to investigate, pursue or not pursue, compromise, or settle any dispute with respect to the Wind-Down Debtor Assets (including the Retained Causes of Action).  On and after the Effective Date, the Wind-Down Debtors may, without further Bankruptcy Court approval but with the consent of the Wind-Down Debtors Oversight Committee, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Debtor Assets, or rights to payment or Claims that belong to each Debtor as of the Effective Date, or are instituted by the Wind-Down Debtors on or after the Effective Date, except as otherwise expressly provided herein or in the Plans.  The Wind-Down Debtors shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.  In pursuing any Claim, right, or Cause of Action, including the Retained Causes of Action, the Wind-Down Debtors (and any Liquidating Trust, as applicable) shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which a Cause of Action may be brought under section 546 of the Bankruptcy Code.  For the avoidance of doubt, the Plan Administrator may seek (but is not required to seek or obtain) Bankruptcy Court approval of any settlement of any Retained Causes of Action.

**Section 2.3    Retention of Attorneys and Other Professionals by Plan Administrator**.  The Plan Administrator shall have the right to retain the services of attorneys, accountants, consultants, financial advisors and other professionals that, in the discretion of the Plan Administrator, with the consent of the Wind-Down Debtors Oversight Committee, are necessary to assist the Plan Administrator in the performance of his or her duties, including any professional employed by the Debtors, the Chapter 11 Trustee, the Prepetition Agent, the DIP Agent, the DIP Lenders, the Prepetition Term Loan Lenders or other parties in interest in the Chapter 11 Cases, without notice or approval of the Bankruptcy Court.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors upon the submission of statements to the Plan Administrator without notice or approval of the Bankruptcy Court.  Effective as of the Effective Date, Quinn Emanuel Urquhart & Sullivan, LLP and Young Conaway Stargatt & Taylor, LLP shall be counsel to the Plan Administrator.

**Section 2.4    Privileges**.  On the Effective Date, any attorney client privilege, work product protections, or other privilege or immunity held by any of the Debtors, including any predecessors, committee or sub-committees, or other designated Entities or Persons (including, for the avoidance of doubt, the Chapter 11 Trustee) shall vest in and be succeeded to by the Wind-Down Debtors.  The Plan Administrator, on behalf of the Wind-Down Debtors and with the consent of the Wind-Down Debtors Oversight Committee, shall have exclusive authority to waive or not waive the Debtors' and Wind-Down Debtors' privileges.  For the avoidance of doubt, the Plan Administrator's receipt of such information (or the transfer of any privileged books and records provided to the Plan Administrator) shall not waive any privileges and such privileges are fully preserved.  Nothing herein or in the Plans shall preclude the Wind-Down Debtors Oversight Committee from obtaining information reasonably necessary to perform its obligations set forth

8

in the Plans or this Agreement, nor shall the Wind-Down Debtors Oversight Committee's receipt of privileged information from the Plan Administrator be deemed to waive any privilege otherwise applicable and belonging to the Plan Administrator and/or the Wind-Down Debtors. The Chapter 11 Trustee, the Prepetition Agent, the DIP Agent, the DIP Lenders, the Prepetition Term Loan Lenders, and the professionals of any of the foregoing shall be permitted to share any work product, analysis or discovery obtained relating to the Retained Causes of Action or other matters relevant to the Wind-Down with the Plan Administrator, the Wind-Down Debtors Oversight Committee, and its and their respective advisors, without waiver of any privileges.

 **Section 2.5 Cooperation and Access to Information**.  On and after the Effective Date, the Wind-Down Debtors shall maintain documents in accordance with the Debtors' standard document retention policies, if any, as such policies may be altered, amended, modified, or supplemented by the Wind-Down Debtors, subject to the approval of the Wind-Down Debtors Oversight Committee.  The Debtors and the Chapter 11 Trustee, and any directors and officers that are Released Parties, as applicable, shall use their commercially reasonable best efforts to provide cooperation necessary to maximize the value of the Retained Causes of Action and any Claims or Causes of Action, including, without limitation (a) providing (or directing third parties to provide) the Plan Administrator and its professionals, or other parties and their professionals at the direction of the Plan Administrator, with full access to the Debtors' and Wind-Down Debtors' books, records, and other documents that are relevant to the Retained Causes of Action or other matters relevant to the Wind-Down (including privileged documents and materials insofar as such documents and materials are relevant to the Retained Causes of Action or other maters relevant to the Wind-Down), (b) providing the Plan Administrator and its professionals with reasonable access to employees and agents of the Debtors and Wind-Down Debtors (including, for the avoidance of doubt, the commercially reasonable best efforts from any directors or officers that are "Released Parties" under the Plans to cooperate), as applicable, for fact finding, consultation, interviews, and as witnesses (including as needed to authenticate documents where appropriate) that are relevant to the Retained Causes of Action or other matters relevant to the Wind-Down, (c) taking commercially reasonable measures to retain documents relevant to the Retained Causes of Action, consistent with the "Cooperation" provisions in the Plans, and (d) providing commercially reasonable assistance to maximize the value of the Retained Causes of Action and Claims and Causes of Action against any parties that are not "Released Parties," including, for the avoidance of doubt, the Excluded Parties, as reasonably determined by the Wind-Down Debtors Oversight Committee, the Plan Administrator, or any of their respective professionals.

 In connection with this engagement, upon reasonable request, the Plan Administrator shall have complete and full access to all relevant information that the Plan Administrator deems appropriate.  It is understood that the Plan Administrator (a) is relying solely upon the information supplied by the Debtors, the Chapter 11 Trustee, and their respective representatives without assuming any responsibility for independent investigation or verification thereof, and (b) shall have the absolute and unconditional right to rely on the information provided by the Debtors, the Chapter 11 Trustee, and their respective representatives and shall not incur any liability by relying on such information.

 The Plan Administrator shall be permitted, in his or her discretion, with the consent of the Wind-Down Debtors Oversight Committee, to abandon, destroy or otherwise dispose of any books

and records of the Debtors and/or Wind-Down Debtors that the Plan Administrator deems not necessary for the continued administration of the Plans or the Wind-Down, or required to be retained under applicable law, without the need for any order of the Bankruptcy Court, and shall have no liability for same.

To the extent that the Wind-Down Debtors or the Plan Administrator request cooperation from the Chapter 11 Trustee or a Professional after the Effective Date that will cause such Professional or the Chapter 11 Trustee to expend more than a de minimis amount of time or to incur out-of-pocket costs to comply with such request, such Professional or the Chapter 11 Trustee shall not be required to provide the requested cooperation without compensation at such Professional's standard hourly rates and reimbursement for such actual expenses.

Section 2.6    **Potential Conflicts**.  Should the Plan Administrator perceive or any party in interest assert that the Plan Administrator holds a conflict of interest with regard to the performance of any aspect of their duties under this Agreement, the issue shall first be brought to the attention of the Wind-Down Debtors Oversight Committee, and then to the Bankruptcy Court for consideration, if bringing to the Bankruptcy Court's attention is deemed appropriate by the Wind-Down Debtors Oversight Committee.

Section 2.7    **Liquidating Trust**.  The Plan Administrator, in his or her discretion (subject to the terms of the Plans and the Confirmation Orders and with the prior consent of the Wind-Down Debtors Oversight Committee) shall have the right to establish a Liquidating Trust to the extent the Plan Administrator determines that a Liquidating Trust would more efficiently Wind-Down the Estates, or otherwise maximize value for the Holders of Claims entitled to distributions from the Wind-Down Debtors under the Plans.  The rights of the Wind-Down Debtors Oversight Committee shall equally apply with respect to a Liquidating Trust in the event a Liquidating Trust is formed.

## ARTICLE III

## THE WIND-DOWN DEBTORS OVERSIGHT COMMITTEE[2]

Section 3.1    **Formation and Membership of the Wind-Down Debtors Oversight Committee**.  An oversight committee (the "Wind-Down Debtors Oversight Committee") shall be formed as of the Effective Date to oversee the Wind-Down (including certain actions of the Plan Administrator) as set forth in and pursuant to the terms of the Plans and this Agreement.  The initial Wind-Down Debtors Oversight Committee shall consist of five voting members and one non-voting observational member to be identified in the Plan Supplement prior to the Effective Date and appointed as follows:

> (i)    two (2) voting members appointed by Affiliates of Redwood Capital Management (each, a "Redwood Nominee");

---

[2]    [**NTD**: Governance structure subject to ongoing review/discussion.]

   (ii)  one (1) voting member appointed by Affiliates of Veritas Capital (the "<u>Veritas Nominee</u>");

   (iii)  one (1) voting member appointed by Affiliates of HG Vora Capital Management (the "<u>HG Vora Nominee</u>");

   (iv)  one (1) voting member appointed by the Holders of Allowed Prepetition Term Loan Claims representing more than 50% of the aggregate amount of all Allowed Prepetition Term Loan Claims held by members of the SteerCo (as defined below) who do not at such time have an initial appointment right pursuant to Sections 3.1(i)–(iii) (the "<u>SteerCo Nominee</u>"); and

   (v)  one (1) non-voting member appointed by the Prepetition Agent (the "<u>Agent Nominee</u>").

  **Section 3.2  Appointment Rights; Vacancies on the Wind-Down Debtors Oversight Committee**. Vacancies on the Wind-Down Debtors Oversight Committee shall be filled by a Person designated by the applicable nominating party(ies) (*e.g.*, if a Redwood Nominee resigns from the Wind-Down Oversight Committee, such vacancy shall be filled by Affiliates of Redwood Capital Management), subject to the following:

   (i)  in the event that any of Redwood Capital Management, Veritas Capital or HG Vora Capital Management reduces its Position to less than one-half (1/2) of its Position as of the Effective Date, then one (1) appointee of such institution shall be automatically removed from the Wind-Down Debtors Oversight Committee;

   (ii)  in the event that Redwood Capital Management further reduces its Position to less than one-quarter (1/4) of its Position as of the Effective Date, then the second Redwood Nominee shall be automatically removed from the Wind-Down Debtors Oversight Committee;[3] and

   (iii)  in the event that GLAS Trust Company, LLC, or any of its affiliates, is terminated or replaced as the Prepetition Agent, the Agent Nominee shall be replaced by any successor agent.

Any vacancy resulting from Sections 3.2(i)–(ii) shall be filled by a new member appointed by the Holders of Allowed Prepetition Term Loan Claims representing more than 50% of the aggregate amount of all Allowed Prepetition Term Loan Claims held by Affiliates of Redwood Capital

---

[3] For purposes of this Section 3.2, "Position" shall mean, as a percentage of the total amount of Prepetition Term Loan Claims currently outstanding as of any given date, the cumulative amount held by any such institution and any affiliate(s) thereof.

Management, Veritas Capital, HG Vora Capital Management, Värde Partners, Silver Point Capital, and HPS Investment Partners (collectively, the "SteerCo") that do not maintain an individual appointment right pursuant to Sections 3.1 and 3.2 hereof,[4] except that to the extent only one Redwood Nominee remains, also including in the aggregate amount of Allowed Prepetition Term Loan Claims held by Redwood Capital Management in excess of one-quarter (1/4) of its Position as of the Effective Date; *provided*, *however*, that in the event the aggregate Position of the SteerCo is reduced to less than one-quarter (1/4) of all Allowed Prepetition Term Loan Claims, then any vacancy shall be filled by majority vote of the Holders of Allowed Prepetition Term Loan Claims. No reduction in Position as set forth in this Section 3.2 shall be deemed to occur solely on account of a distribution pursuant to the Plans. The Plan Administrator and the Wind-Down Debtors Oversight Committee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtors Oversight Committee for cause or an order otherwise reconstituting the Wind-Down Debtors Oversight Committee for cause.

**Section 3.3    Term of Service**.  Upon the earlier to occur of (a) the completion of all the Plan Administrator's duties, responsibilities and obligations under the Plans and this Agreement, and (b) dissolution of all of the Wind-Down Debtors in accordance with the Plans, the Wind-Down Debtors Oversight Committee shall be automatically disbanded and its members shall have no further duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plans and their implementation.

**Section 3.4    General Oversight and Consent of the Wind-Down Debtors Oversight Committee**.  On and after the Effective Date, subject in each instance to the terms and conditions of the Plans, the Confirmation Orders and any further order of the Bankruptcy Court, the Wind-Down Debtors Oversight Committee shall function analogous to a board of directors (or other comparable governing body) with the rights, powers, duties and responsibilities to oversee the Plan Administrator and the Wind-Down of the Wind-Down Debtors.  The Wind-Down Debtors Oversight Committee shall stay informed (through any means determined to be appropriate by the Wind-Down Debtors Oversight Committee in coordination with the Plan Administrator and any professionals of each of the foregoing) regarding the administration of the Wind-Down and shall assist the Plan Administrator in developing a strategy to maximize the value of the Wind-Down Debtor Assets for the benefit of the Holders of Claims entitled to distributions from the Wind-Down Debtors under the Plans.  All privileges, immunities, and protections afforded a board of directors (or other comparable governing body), including without limitation, the attorney-client privilege, work-product doctrine, and director or fiduciary indemnities, are expressly preserved.

The Wind-Down Debtors Oversight Committee shall maintain an affirmative consent right over any final decisions or actions that the Wind-Down Debtors Oversight Committee and/or the Plan Administrator determine to be material to the administration of the Wind-Down, including,

---

[4]    By way of illustration, if the Veritas Nominee is removed from the Wind-Down Debtors Oversight Committee pursuant to Section 3.2(i) hereof, but the HG Vora Nominee and at least one Redwood Nominee have not been removed from the Wind-Down Debtors Oversight Committee, then the vacancy resulting from the Veritas Nominee's removal would be filled by the Holders of Allowed Prepetition Term Loan Claims representing more than 50% of the aggregate amount of all Allowed Prepetition Term Loan Claims held by Affiliates of Veritas Capital, Värde Partners, Silver Point Capital, and HPS Investment Partners.

for the avoidance of doubt, (a) making any material distributions to the Holders of Claims (including any reserves withheld from such distribution), (b) determining to prosecute, enforce, settle or abandon any material Retained Causes of Action, (c) determining to sell, otherwise monetize, or abandon any material Wind-Down Debtor Assets (other than the Retained Causes of Action), (d) establishing any Liquidating Trust or similar vehicle, and (e) entering into any financing arrangement (other than the Wind-Down Financing Facility, but including any incremental borrowing thereunder). Except as provided otherwise by this Agreement, the Wind-Down Debtors Oversight Committee shall act by majority vote. For the avoidance of doubt, the Plan Administrator shall have the sole discretion to make decisions or take actions with respect to any immaterial or *de minimis* Retained Causes of Action and other Wind-Down Debtor Assets; *provided* that the Wind-Down Debtors Oversight Committee may determine in its sole discretion to require its consent or otherwise issue a direction with respect to any matters relevant to the Wind-Down.

Section 3.5    **Reporting to the Wind-Down Debtors Oversight Committee**. After the Effective Date, and until the Wind-Down Debtors Oversight Committee is disbanded, the Plan Administrator shall provide the Wind-Down Debtors Oversight Committee with any reports and other information reasonably requested by the Wind-Down Debtors Oversight Committee from time to time (including any reports that are filed with the Bankruptcy Court on behalf of the Wind-Down Debtors). Nothing herein or in the Plans shall preclude the Wind-Down Debtors Oversight Committee from requesting additional information from the Plan Administrator in the exercise of the Wind-Down Debtors Oversight Committee's duties under the Plans or this Agreement.

Section 3.6    **Fiduciary Responsibilities**. The voting members of the Wind-Down Debtors Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator.

Section 3.7    **The Chapter 11 Trustee; Control Rights**. Notwithstanding anything to the contrary in the Plans or the Confirmation Orders, for so long as the Chapter 11 Trustee remains a defendant or plaintiff in any lawsuit related to the Epic Debtors, the Epic Wind-Down Debtors, or the Epic Estates, including the India Lawsuit, the Chapter 11 Trustee, with the advice of her counsel, shall have the right to control the defense or prosecution of such lawsuit; *provided that*, on and after the Effective Date of the Epic Plan, the Plan Administrator and the Wind-Down Debtors Oversight Committee shall have the right to co-control the defense or prosecution of such lawsuit with the Chapter 11 Trustee, with all decisions being made with the agreement of both the Chapter 11 Trustee and the Plan Administrator. The Chapter 11 Trustee, the Plan Administrator, and the Wind-Down Debtors Oversight Committee agree to coordinate and cooperate in good faith with respect to any actions or inactions to be taken in such lawsuit, and to the extent of any disagreement with respect to such actions or inactions, upon motion by the Chapter 11 Trustee or the Plan Administrator, the Chapter 11 Trustee and the Plan Administrator agree to allow the Bankruptcy Court to decide the dispute. For the avoidance of doubt, the reference to the Chapter 11 Trustee continues to refer to Ms. Springer following the Effective Date.

Section 3.8    **Potential Conflicts.** In the event that any matter under review or consideration by the Wind-Down Debtors Oversight Committee may involve a conflict of interest with respect to any member of the Wind-Down Debtors Oversight Committee, such member shall

disclose to the other members such potential conflict and either (a) voluntarily recuse itself from participating in discussions and voting on the matter, or (b) be excluded from voting on such matter by a unanimous vote of the other members.  In the event there is a disagreement regarding whether a matter involves a conflict of interest, such disagreement may be brought to the Bankruptcy Court for resolution by any member of the Wind-Down Debtors Oversight Committee.

Section 3.9      **No Compensation**.  Members of the Wind-Down Debtors Oversight Committee shall receive no compensation from the Wind-Down Debtors or the Plan Administrator on account of their membership on the Wind-Down Debtors Oversight Committee except for reimbursement of their reasonable and documented out of pocket expenses (which, for the avoidance of doubt, shall not include the fees or expenses of any professionals retained by any individual member of the Wind-Down Debtors Oversight Committee to represent such individual member).

Section 3.10    **Professionals.**  The Wind-Down Debtors Oversight Committee shall be entitled to retain professionals (without further notice or approval by the Bankruptcy Court), paid by the Wind-Down Debtors (without further notice or approval by the Bankruptcy Court), to advise the Wind-Down Debtors Oversight Committee, which professionals may be Professionals or other advisors who previously advised the Chapter 11 Trustee, the Debtors, the Prepetition Agent, the DIP Agent, the DIP Lenders, and/or the Prepetition Term Loan Lenders.

Section 3.11    **Common Interest**.    The Plan Administrator and Wind-Down Debtors Committee acknowledge and agree that they share a common legal interest with respect to the implementation of the Plans.  The Parties further agree that any communications, documents, or information exchanged between them falling within the scope of this common interest shall be protected by all applicable privileges and protections, including as set forth in Section 3.4 of this Agreement.    For the avoidance of doubt, the Wind-Down Debtors Oversight Committee's retention of professionals, including counsel, shall not on its own be construed as creating an adversarial relationship with the Wind-Down Debtors or the Plan Administrator.

## ARTICLE IV

## TERM OF SERVICE, RESIGNATION AND REMOVAL OF THE PLAN ADMINISTRATOR; APPOINTMENT OF SUCCESSOR; STANDARD OF CARE; COMPENSATION OF PLAN ADMINISTRATOR AND PROFESSIONALS

Section 4.1      **Term of Service**.  The Plan Administrator shall serve in such capacity through the earlier of (a) the date on which the Wind-Down Debtors are dissolved and (b) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve.

Section 4.2      **Resignation of the Plan Administrator**.  The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Wind-Down Debtors Oversight Committee and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Wind-Down Debtors Oversight Committee in accordance with this Agreement.

**Section 4.3     Removal of Plan Administrator**.   The Wind-Down Debtors Oversight Committee shall have the authority to remove the Plan Administrator at any time, with or without cause.  During the pendency of any dispute before the Bankruptcy Court regarding removal of the Plan Administrator, the Plan Administrator shall continue to discharge its rights, obligations, and duties set forth in the Plans and this Agreement.

**Section 4.4     Continuity; Appointment of a Successor Plan Administrator**.

(a)     The death, incapacity, dissolution, resignation, or removal of the Plan Administrator shall not operate to terminate any agency or employment created by this Agreement or invalidate any action theretofore taken by the Plan Administrator.  In the event of a vacancy by reason of death, incapacity, dissolution, resignation or removal of the Plan Administrator or prospective vacancy by reason of resignation or removal, the Wind-Down Debtors Oversight Committee shall appoint a successor Plan Administrator and the Wind-Down Debtors shall file a notice with the Bankruptcy Court with respect to any successor Plan Administrator.

(b)     If the Wind-Down Debtors Oversight Committee has not appointed a successor Plan Administrator within thirty (30) days of the occurrence or effectiveness, as applicable, of the prior Plan Administrator's death, incapacity, dissolution, resignation or removal, then the Bankruptcy Court, upon the motion of counsel to the Plan Administrator or another party in interest, shall approve a successor to serve as the Plan Administrator.

(c)     A successor Plan Administrator, without any further action or approval, shall (i) become fully vested with all the rights, powers, duties, and obligations of the Plan Administrator and (ii) become the sole director and sole officer of each of the Wind-Down Debtors; *provided*, *however*, that no Plan Administrator shall be liable for the acts or omissions of any prior or subsequent Plan Administrator.

**Section 4.5     Standard of Care**.   None of the Plan Administrator, members of the Wind-Down Debtors Oversight Committee, their respective affiliates and agents, professionals or any of their respective officers, directors and employees to the fullest extent permitted by applicable law, shall be personally liable to any Person or Entity for actions taken under or pursuant to this Agreement or the Plans, except to the extent that its, his, or her own acts constitutes criminal behavior, gross negligence, fraud, or willful misconduct. For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the Plans, the Plan Administrator and the members of the Wind-Down Debtors Oversight Committee, each in their capacities as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

**Section 4.6     Indemnification**.

(a)     The Wind-Down Debtors shall indemnify and hold harmless (a) the Plan Administrator (in his or her capacity as such and as sole officer and sole director of each of the Wind-Down Debtors and representative of the Estates), (b) the members of the Wind-Down Debtors Oversight Committee, and (c) all professionals retained by the Wind-Down Debtors or Wind-Down Debtors Oversight Committee, each in their capacities as such (collectively, the

"Indemnified Parties" and each, an "Indemnified Party"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to costs and expenses of investigating, analyzing and responding to claims, and attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's criminal behavior, gross negligence, fraud or willful misconduct, with respect to the Wind-Down Debtors or the implementation or administration of the Plans or this Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to such Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced by the Wind-Down Debtors (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined through a Final Order that such Indemnified Party is not entitled to be indemnified therefore). The indemnification provisions of the Plans or this Agreement shall remain available to and be binding upon any former Plan Administrator or former member of the Wind-Down Debtors Oversight Committee (or the estate of any decedent Plan Administrator or member of the Wind-Down Debtors Oversight Committee) and shall survive the termination of this Agreement. For the avoidance of doubt, the Wind-Down Debtors shall be jointly and severally liable for any indemnification obligations provided for herein or in the Plan.

(b)     For the avoidance of doubt, the Wind-Down Debtors will also be subject to the terms of that indemnification commitment outlined in Article V.J of the Epic Plan.

**Section 4.7     Exculpation**. Neither the Plan Administrator, the members of the Wind-Down Debtors Oversight Committee, nor any professionals retained by the Wind-Down Debtors or Wind-Down Debtors Oversight Committee, each in its capacity as such (collectively, the "Exculpated Parties" and each, an "Exculpated Party") shall be liable for any losses, claims, damages, liabilities, obligations, settlements, proceedings, suits, judgments, causes of action, litigation, actions, investigations (whether civil or administrative and whether sounding in tort, contract or otherwise), penalties, costs, and expenses, including reasonable fees and disbursements incurred, caused by, relating to, based upon, or arising out of (directly or indirectly) the Exculpated Party's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties, and obligations under this Agreement, the Plans, the Confirmation Orders, any other order of the Bankruptcy Court or applicable law or as may arise by reason of any action, omission or error of an Exculpated Party, and Persons dealing or having any relationship with the Wind-Down Debtors and/or the Estates shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred in carrying out the terms of the Plans and this Agreement, and the Exculpated Parties shall not have any personal obligation to satisfy any such liability; *provided*, *however*, that the foregoing limitations shall not apply to any acts or omissions ultimately and finally determined by a final and non-appealable order of a court of competent jurisdiction to be the direct result of such Exculpated Party's criminal behavior, gross negligence, fraud or willful misconduct. None of the Exculpated Parties is deemed to be responsible for any other Exculpated Party's actions or inactions. The Exculpated Parties may, in connection with the performance of their functions hereunder and under the Plans, and in their sole and absolute discretion, consult with professionals and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals or any order of the Bankruptcy Court. Notwithstanding such authority, such Exculpated Parties shall

not be under any obligation to consult with any professionals and their determination not to do so shall not result in the imposition of liability, unless such determination is based upon criminal behavior, gross negligence, fraud or willful misconduct as determined by a final and non-appealable order of a court of competent jurisdiction; *provided* that in no event will any such person be liable for punitive, exemplary, consequential, or special damages under any circumstances. Any action taken or omitted to be taken by the Exculpated Parties after the Effective Date on the advice of counsel or with the approval of the Bankruptcy Court will conclusively be deemed not to constitute criminal behavior, gross negligence, fraud, or willful misconduct. The foregoing indemnification and exculpation with respect to any Exculpated Party shall survive the termination of such Exculpated Party from the capacity for which it was deemed indemnified and exculpated and the termination or modification of this Agreement.

Section 4.8    **Insurance**. The Plan Administrator is authorized (but not required) to obtain and pay at the expense of the Wind-Down Debtors all reasonably necessary insurance coverage for itself, the Wind-Down Debtors and the Wind-Down Debtors Oversight Committee and its members, and their respective agents, representatives, and employees or independent contractors, in connection with the Chapter 11 Cases and the Wind-Down of the Wind-Down Debtors (in the form of any errors and omissions policy or otherwise), including, but not limited to, coverage with respect to commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors, which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator, in consultation with the Wind-Down Debtors Oversight Committee, after the termination of this Agreement.

Section 4.9    **Burden of Proof**. In any proceeding brought by the Wind-Down Debtors, any member of the Wind-Down Debtors Oversight Committee (whether current or former), or any other Person who is bound by this Agreement challenging any action, determination or failure to act of the Plan Administrator or the Wind-Down Debtors Oversight Committee in the Plan Administrator's or Wind-Down Debtors Oversight Committee's discharge of its respective duties under this Agreement, the Person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act constituted criminal behavior, gross negligence, fraud or willful misconduct.

Section 4.10    **Reliance by the Plan Administrator and Wind-Down Debtors Oversight Committee**. The Plan Administrator and the Wind-Down Debtors Oversight Committee (the "Reliance Parties" and each, a "Reliance Party") may absolutely rely on, and shall be fully protected in acting or refraining from acting if it relies upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that each of them, as applicable, has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt. In the absence of criminal behavior, gross negligence, fraud, or willful misconduct in respect of the Reliance Parties' duties as found by a final and non-appealable court of competent jurisdiction, or material breach of this Agreement, each of them, as applicable, may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting (or, if

17

applicable, not acting) thereon.  The Reliance Parties may consult with counsel and other professionals with respect to matters the Reliance Parties reasonably believe to be in their area of expertise, and any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or not taken by a Reliance Party.  A Reliance Party shall be entitled to rely upon the advice of such professionals in acting or failing to act, and shall not be liable for any act taken or not taken in reliance thereon.  The Reliance Parties shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Agreement, the Plans or any other document executed in connection therewith, and the Reliance Parties shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

Section 4.11    **Reliance by Entities Dealing with the Plan Administrator**.  In the absence of actual knowledge to the contrary, any Person or Entity dealing with the Wind-Down Debtors shall be entitled to rely on the authority of the Plan Administrator to act on behalf of the Wind-Down Debtors, and shall have no obligation to inquire into the existence of such authority.

Section 4.12    **Compensation of Plan Administrator and Professionals**.

(a)    For its services, the Plan Administrator shall receive fair and reasonable compensation by way of a monthly fee in the amount of $75,000 per month.  Such monthly fee shall be payable in advance on the first day of each month beginning with the first full month following the Effective Date.

(b)    In addition to the fees describe above, the Plan Administrator shall be entitled to reimbursement of all reasonable and documented costs and expenses.

(c)    The Plan Administrator's compensation structure may be modified from time to time by agreement between the Plan Administrator the Wind-Down Debtors Oversight Committee.

(d)    All professionals retained by the Wind-Down Debtors or Wind-Down Debtors Oversight Committee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses reasonably incurred in rendering such services.  Such professionals shall deliver to the Plan Administrator (and the Wind-Down Debtors Oversight Committee if requested) reasonably detailed monthly invoices or fee statements.

(e)    The payment of the fees and expenses of the Plan Administrator and professionals retained by the Wind-Down Debtors or the Wind-Down Debtors Oversight Committee shall be paid from the Wind-Down Debtor Assets in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

Section 4.13    **Information and Reporting.**  In its discretion or at the request of the Wind-Down Debtors Oversight Committee, from time to time the Plan Administrator may file with the Bankruptcy Court a statement describing the progress of the Wind-Down and the activities of the Wind-Down Debtors, in such detail and covering such matters as the Plan Administrator determines is appropriate in its discretion (in consultation with the Wind-Down Debtors Oversight Committee).

## ARTICLE V

## TERMINATION

**Section 5.1      Termination**.  This Agreement shall terminate upon the dissolution of the Wind-Down Debtors and the entry of an order by the Bankruptcy Court closing the Chapter 11 Cases.  All provisions of this Agreement that expressly survive by their terms shall remain in effect in accordance with their terms.  All of the protective provisions contained in ARTICLE IV of this Agreement shall survive the termination of this Agreement and the death, dissolution, resignation or removal, as may be applicable, of the Plan Administrator, the Indemnified Parties, the Exculpated Parties, and the Reliance Parties and shall inure to the benefit of their respective heirs and assigns.

**Section 5.2      Obligations of the Plan Administrator Upon Termination**.  Upon or as soon as practicable after termination of this Agreement, the Plan Administrator shall (solely at the expense of the Wind-Down Debtors and with the consent of the Wind-Down Debtors Oversight Committee) (a) file a certificate or other document with the Bankruptcy Court stating that (i) the assets of the Wind-Down Debtors have been exhausted and final distributions of Cash have been made under the Plans or (ii) the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to continue the Wind-Down process, and (b) be deemed to have resigned as the sole officer, and sole director of each of the Wind-Down Debtors. Upon the filing of certificate(s) described in clause (a) of the preceding sentence, the relevant Debtors and/or Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Wind-Down Debtors or payments to be made in connection therewith.

**Section 5.3      No Other Duties or Obligations**.  The Plan Administrator shall have no duties or obligations under law or otherwise except as set forth in this Agreement and pursuant to the Plans.  Except as otherwise specifically provided herein, after the termination of this Agreement pursuant to the terms hereof, the Plan Administrator shall have no further duties or obligations hereunder and pursuant to the Plans.

## ARTICLE VI

## DISTRIBUTIONS

**Section 6.1      Reserves**.  Before making distributions to any to Holders of Claims, the Plan Administrator shall, in his or her reasonable discretion, ensure there are reserves in an amount sufficient to meet any and all accrued expenses and obligations of the Wind-Down Debtors, including amounts owing under the Wind-Down Financing Facility and near-term anticipated fees and expenses of the Wind-Down Debtors, including professional fees and expenses, and fees owed to the U.S. Trustee, in each case as applicable and in accordance with the Plans and the Confirmation Orders.

**Section 6.2**    **Distributions Under the Plans**.

(a)    Any Distributions for the benefit of Holders of Allowed Prepetition Term Loan Claims shall be made to the Prepetition Agent to be applied in accordance with the Intercreditor Agreement and the Prepetition Credit Agreement.

(b)    Distributions shall be made in accordance with the Plans and the Confirmation Orders.  With respect to all payments and distributions made under the Plans, the Plan Administrator shall cause the Wind-Down Debtors to comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority and, in the event the Plan Administrator retains accountants or other professionals, shall have the right to rely on the advice of such in connection with all tax and reporting matters.

(c)    Any party entitled to receive any property or distribution under the Plans shall, upon request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator, Form W-9 or, if the payee is a foreign Person, an applicable Form W-8, unless such Person is exempt under the internal revenue code and so notifies the Plan Administrator.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the Claim Holder fails to comply within ninety (90) days after the request, the amount of such distribution shall irrevocably revert to the Wind-Down Debtors and any Claim in respect of such distribution shall be expunged without need of further order of the Bankruptcy Court and the Holder thereof shall be forever barred from asserting such Claim against any Debtor and their respective assets and property.  The Plan Administrator may, but is not required to, file a notice with the Bankruptcy Court indicating which Claims are to be expunged for failure to comply with such requests for tax information or on account of being unclaimed distributions.  If such information is requested, the request shall be sent to the address provided in proofs of claim submitted or, if no such form has been provided, to the last known address for such entity provided by the Debtors to the Plan Administrator.

## ARTICLE VII

## MISCELLANEOUS PROVISIONS

**Section 7.1**    **Descriptive Headings**.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 7.2**    **Amendment and Waiver**.  This Agreement may be amended or modified by the Plan Administrator with the consent of the Wind-Down Debtors Oversight Committee in any way that is not inconsistent with the Plans or the Confirmation Orders and that is necessary to implement the provisions of the Plans and to facilitate the Wind-Down and maximize the value of the Wind-Down Debtor Assets (including to clarify any ambiguity or inconsistency or render the Agreement in compliance with its stated purposes).

**Section 7.3**    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the rules of conflict of laws of the State of Delaware or any other jurisdiction.

**Section 7.4     Counterparts; Effectiveness**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same agreement.  Executed copies of this Agreement may be delivered by facsimile, electronic mail, PDF or other electronic means and shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 7.5     Severability; Validity**.  If any provision of this Agreement or the application thereof to any Entity or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Entities or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.

**Section 7.6     Notices**.  Any notice or other communication hereunder shall be deemed given upon (a) confirmed delivery by a standard overnight carrier or when delivered by hand, or (b) the expiration of five (5) Business Days after the date mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice), and in all instances shall include a concurrent copy via e-mail to the e-mail addresses set forth below:

> **If to the Plan Administrator**:
>
> Timothy R. Pohl
> Attn: [●]
> [ADDRESS]
> [ADDRESS]
> Tel: [●]
> Email: [●]
>
> with a copy to counsel:
>
> Quinn Emanuel Urquhart & Sullivan, LLP
>
> Attn: Susheel Kirpalani (susheelkirpalani@quinnemanuel.com), Benjamin Finestone (benjaminfinestone@quinnemanuel.com), Daniel Holzman (danielholzman@quinnemanuel.com), and Jianjian Ye (jianjianye@quinnemanuel.com);
>
> and
>
> Young Conaway Stargatt & Taylor, LLP
>
> Attn: Robert S. Brady (rbrady@ycst.com), Kenneth J. Enos (kenos@ycst.com), Jared W. Kochenash (jkochenash@ycst.com) and Timothy R. Powell (tpowell@ycst.com).
>
> **If to the Wind-Down Debtors Oversight Committee**:
>
> [●]

with a copy to counsel for the Prepetition Agent:

Kirkland & Ellis, LLP

Attn: Patrick J. Nash, Jr. (patrick.nash@kirland.com), Brian Schartz (bschartz@kirkland.com), and Jordan Elkin (jordan.elkin@kirkland.com)

and

Reed Smith LLP

Attn: Nicholas Vislocky (nvislocky@reedsmith.com)

**Section 7.7     Change of Address**.  Any entity may change the address at which it is to receive notices under this Agreement by furnishing written notice to the parties listed in Section 7.6 of this Agreement in the manner set forth therein.  Such change of address shall be effective ten (10) Business Days after service of such notice.

**Section 7.8     Relationship to Plans**.  The principal purpose of this Agreement is to aid in the implementation of the Plans and, therefore, this Agreement incorporates and is subject to the provisions of the Plans and Confirmation Orders.  To that end, the Plan Administrator, with the oversight of the Wind-Down Debtors Oversight Committee, shall have full power and authority to take any action consistent with the purpose and provisions of the Plans and Confirmation Orders, whether or not such action is specified in this Agreement.  In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plans or Confirmation Orders, the provisions of the Plans and Confirmation Orders control.

**Section 7.9     Meaning of Terms**.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, and words importing the singular number include the plural number and vice versa.

**Section 7.10     Retention of Jurisdiction**.  As provided in Article XII of the Plans, the Bankruptcy Court shall retain jurisdiction over the Wind-Down Debtors, including, but not limited to, for the purpose of interpreting and implementing the provisions of this Agreement; provided, however, that nothing in this Section or Article XII of the Plans shall prevent the Plan Administrator or the Wind-Down Debtors from pursuing the Retained Causes of Action in jurisdictions other than the Bankruptcy Court.

**Section 7.11     Assignment**.  Neither this Agreement nor any of the rights, duties or obligations of any of the parties hereto may be assigned without Bankruptcy Court approval; provided that, for the avoidance of doubt, this Section shall not be deemed to restrict trading of the Prepetition Term Loan Facility, the Wind-Down Financing Facility or any other credit facility.

**Section 7.12     Successors and Assigns; No Third-Party Beneficiaries**.  This Agreement shall be binding on and shall inure to the benefit of each of the parties and their respective successors and assigns, except as otherwise provided herein.  No party may assign, transfer, hypothecate or otherwise convey its respective rights, benefits, obligations or duties hereunder without the prior express written consent of the other parties and any such purported

assignment, transfer, hypothecation, or other conveyance by any party without the prior express written consent of the other parties shall be null and void and of no force or effect; provided that, for the avoidance of doubt, this Section shall not be deemed to restrict trading of the Prepetition Term Loan Facility, the Wind-Down Financing Facility or any other credit facility.  .  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the parties with respect to the transactions contemplated hereby and no Entity shall be a third-party beneficiary of any of the terms and provisions of this Agreement unless specifically set forth in this Agreement.

Section 7.13    **Effective Date**.  This Agreement shall become effective on the Effective Date; *provided*, *however*, that to the extent the Epic Plan and the Alpha Plan become effective on different days, (a) this Agreement shall only become legally binding upon the Epic Debtors upon the Effective Date of the Epic Plan and (b) this Agreement shall only become binding upon Alpha upon the Effective Date of the Alpha Plan.

[*Remainder of page intentionally left blank.*]

**IN WITNESS WHEREOF,** the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers or representatives, all as of the date first above written and effective as of the Effective Date.

ON BEHALF OF THE ESTATES OF
SAGA FORMATIONS, INC., PAJEAU,
INC., AND TANGIBLE PLAY, INC.

By: _____

Name: _____

Title: _____


ON BEHALF OF THE ESTATE OF
BYJU'S ALPHA, INC.

By: _____

Name: _____

Title: _____


AS PLAN ADMINISTRATOR ON
BEHALF OF THE WIND-DOWN
DEBTORS

By: _____

Name: _____

Title: _____

**Exhibit C**

**Identity of the members of the Wind-Down Debtor Oversight Committee**

In accordance with the Plan, as of the Effective Date, the Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the oversight of the Wind-Down Debtor Oversight Committee.[6]  [●], [●], [●], [●], and [●] shall serve as the initial members of the Wind-Down Debtor Oversight Committee.

---

[6]    Capitalized terms used but not otherwise defined in this **Exhibit C** shall have the meanings ascribed to them in the Plan Administrator Agreement.

**Exhibit D**

**Wind-Down Financing Facility Term Sheet**

**SAGA FORMATIONS, INC. (F/K/A EPIC! CREATIONS, INC.), PAJEAU, INC. (F/K/A NEURON FUEL, INC.), TANGIBLE PLAY, INC., AND BYJU'S ALPHA, INC.**
**SUMMARY OF TERMS AND CONDITIONS FOR**
**WIND-DOWN FINANCING FACILITY**[1]

**[●], 2025**

| | |
|---|---|
| **BORROWERS:** | Pajeau, Inc. (f/k/a Neuron Fuel, Inc.), Tangible Play, Inc., Saga Formations, Inc. (f/k/a Epic! Creations, Inc.), BYJU's Alpha, Inc. ("<u>Byju's</u>"), each a Delaware corporation (each, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"). |
| **AGENT:** | GLAS Trust Company LLC will act as the administrative agent and the collateral agent for the Wind-Down Financing Facility (the "<u>Wind-Down Financing Agent</u>"). |
| **LENDERS:** | The Wind-Down Financing Facility shall be provided by certain members of the ad hoc group of lenders under the Prepetition Credit Agreement (as defined below) (in their capacity as lenders under the Wind-Down Financing Facility, the "<u>Wind-Down Financing Lenders</u>"). |
| | [Certain Prepetition Lenders (and/or any of their affiliates or related funds, accounts, vehicles or other entities that are managed, advised or sub-advised by any of the foregoing) (the "<u>Backstop Lenders</u>") will commit to fund their *pro rata* share (calculated based on such Backstop Lender's commitments under the New Money Term Loan Facility as at the time of entry into the relevant backstop arrangements) of any commitments under the Wind-Down Financing Facility that are not subscribed for by other lenders under the Wind-Down Financing Facility (such commitments, the "<u>Backstop Commitments</u>").][2] |
| **WIND-DOWN FINANCING FACILITY:** | Senior secured wind-down financing facility (the "<u>Wind-Down Financing Facility</u>" and any loans made thereunder, the "<u>Term Loans</u>", together with any obligations arising thereunder, the "<u>Obligations</u>") which shall consist of: (i) delayed draw first-out "new money" term loans in an aggregate principal amount equal to $[●][3] and (the "<u>New Money Term Loan Facility</u>" and any term loans made thereunder, the "<u>New Money Term Loans</u>"), (ii) roll-over second-out term loans in an aggregate principal amount up to $[●] in respect of all outstanding obligations under the Alpha DIP Credit Agreement on a dollar-for-dollar basis (the "<u>Roll-Over Term Loans</u>"), (iii) [a delayed draw second- |

---

[1]    Capitalized terms used but not defined herein shall have the meaning set forth in the *Second Amended Combined Disclosure Statement and Chapter 11 Plan for the Estates of Saga Formations, Inc., Pajeau, Inc., and Tangible Play, Inc.* [Epic Docket No. [●]] (the "<u>Epic Plan</u>") or the *Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [Alpha Docket No. 475] (the "<u>Alpha Plan</u>" and, together with the Epic Plan, the "<u>Plans</u>"), as applicable.

[2]    Backstop arrangement to be determined.

[3]    The total amount of the New Money Term Loan Facility shall be confirmed prior to the Effective Date based upon the total new money funding that the Borrowers, in consultation with the Wind-Down Financing Agent and the Prepetition Agent at the direction of the Prepetition Required Lenders, determine to be necessary or desirable for the Plan Administrator to investigate, pursue, litigate, or settle the Retained Causes of Action and effectuate the Wind-Down.

1

out term loan in an aggregate principal amount equal to $10.0 million][4] (the "Director Indemnity Term Loan Facility" and any term loans made thereunder, the "Director Indemnity Term Loans") and (iv) a delayed draw second-out term loan in an aggregate principal amount equal to $500,000 (the "Trustee Indemnity Term Loan Facility" and any term loans made thereunder, the "Trustee Indemnity Term Loans"; the Director Indemnity Term Loan Facility and the Trustee Indemnity Term Loan Facility, the "Indemnity Term Loan Facilities"; the Director Indemnity Term Loans and the Trustee Indemnity Term Loans, the "Indemnity Term Loans").

The Borrowers shall be able to draw on the commitments of the New Money Term Loan Facility until the earlier to occur of (i) the date on which the maximum amount of such commitments has been drawn, (ii) the date on which all the commitments for the New Money Term Loans have been terminated in accordance with the Credit Documentation, and (iii) the date that is [●] years after the date of the Closing Date.

The Borrowers shall be able to draw on the commitments of the Director Indemnity Term Loan Facility until the earlier to occur of (i) the date on which the maximum amount of such commitments has been drawn and (ii) the Director Indemnification Termination Date (as defined below).

The Borrowers shall be able to draw on the commitments of the Trustee Indemnity Term Loan Facility until the earlier to occur of (i) the date on which the maximum amount of such commitments has been drawn and (ii) the Trustee Indemnification Termination Date (as defined below).

Amounts borrowed under the Wind-Down Financing Facility that are repaid or prepaid may not be re-borrowed.

**INCREMENTAL FACILITY:**   The Credit Documentation (as defined below) will permit the Borrowers to add one or more incremental term loan facilities (which may take form of delayed draw term loan commitments) to the Wind-Down Financing Facility and/or to increase the Term Loans, subject to terms to be agreed by the Borrowers and the Wind-Down Financing Lenders.

**CHAPTER 11 CASES:**   On February 1, 2024, BYJU's Alpha, Inc. commenced a voluntary case (the "Alpha Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended, in the United States Bankruptcy Court for the District of Delaware.  On September 16, 2024, the Bankruptcy Court entered the *Order for Relief in Involuntary Cases and Appointing Chapter 11 Trustee* [Epic Docket No. 147] (the "Order for Relief") commencing the chapter 11 cases of Saga Formations, Inc. (f/k/a Epic! Creations, Inc.), Pajeau, Inc. (f/k/a Neuron Fuel, Inc.), and Tangible Play, Inc. (the "Epic Cases" and, together with the Alpha Case, the "Chapter 11 Cases").

**PREPETITION CREDIT AGREEMENT:**   That certain Credit and Guaranty Agreement, dated as of November 24, 2021 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Think and Learn Private Limited, a company established under the laws of India with corporate identification number U80903KA2011PTC061427 (the "Parent Guarantor"), Byju's Alpha, Inc., certain subsidiaries of the Parent Guarantor, each lender from time to time

---

[4]   Assuming the Alpha DIP Tranche 2 Term Loans are not drawn prior to the Effective Date. Otherwise it will be part of the Roll-Over Term Loans.

2

party thereto (the "<u>Prepetition Lenders</u>"), and GLAS Trust Company LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, as administrative agent and as collateral agent, the "<u>Prepetition Agent</u>").

**DIP CREDIT AGREEMENT:** That certain Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement, dated as of April 9, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Alpha DIP Credit Agreement</u>"), by and among Byju's Alpha, Inc., the other guarantors, the lenders party thereto from time to time (the "<u>Alpha DIP Lenders</u>") and GLAS Trust Company LLC, as administrative agent and collateral agent (the "<u>Alpha DIP Agent</u>").

**MATURITY DATE:** The New Money Term Loans and Roll-Over Term Loans will mature on the date which is the later of (i) [●] years following the date of the first draw of the New Money Term Loans thereunder.  The Director Indemnity Term Loans will mature on the Director Indemnification Termination Date.  The Trustee Indemnity Term Loans will mature on the Trustee Indemnification Termination Date.

**USE OF PROCEEDS:** The New Money Term Loan Facility may be drawn by the Plan Administrator with the consent of the Wind-Down Debtors Oversight Committee to fund the administration of the Borrowers, including for the payment of the ongoing fees of the Plan Administrator, the Plan Administrator's counsel, the Wind-Down Debtors Oversight Committee's counsel (if any), and other professionals retained by the Borrowers, the Plan Administrator, or the Wind-Down Debtors Oversight Committee from time to time (if any) as well as litigation and other expenses necessary or advisable to pursue the Retained Causes of Action or otherwise effectuate the Wind-Down.

The Director Indemnity Term Loan Facility may be drawn by the Plan Administrator, which shall not require the consent of the Wind-Down Debtors Oversight Committee. The proceeds of Director Indemnity Term Loans, if any, will be used solely to provide funding to the Borrowers to pay the Borrowers' indemnification obligations owed to Timothy R. Pohl ("<u>Pohl</u>") in his capacity as the director and officer of the Borrowers solely to the extent any Borrower has received such requests for indemnification and otherwise met the funding condition of the Director Indemnity Term Loans.  To the extent any proceeds of Director Indemnity Term Loans have not been utilized for the purposes described herein on the date that is the later to occur of (i) the date that is [six (6) years] following the end of the Borrower's chapter 11 case (the "<u>Tail Date</u>") and (ii) the date of any final and binding resolution of any litigation pending against Pohl prior to the Tail Date for which he is entitled to indemnification under any of (a) that certain Independent Director Agreement, dated as of March 3, 2023, by and between the Byju's and Pohl, (b) that certain Certificate of Incorporation of Byju's, filed on September 27, 2021, as amended by that certain Certificate of Amendment of Certificate of Incorporation of Byju's filed on May 10, 2023, (c) those certain Bylaws of Byju's adopted on September 29, 2021, or (d) the Plan Administrator Agreement contemplated to be entered into with Pohl in connection with the consummation of the Plans, each of the foregoing as may be amended from time to time (such later date, the "<u>Director Indemnification Termination Date</u>"), the applicable Borrower shall promptly return all such proceeds to the Wind-Down Financing Agent for application against *first*, the obligations under the Director Indemnity Term Loan Facility and *second*, the obligations under the Wind-Down Financing Facility.

The Trustee Indemnity Term Loan Facility shall be unfunded but fully committed and available until the later of (i) six years after the closing of the Chapter 11 Cases and

(ii) the date of any final and binding resolution of the India Lawsuit (such later date, the "Trustee Indemnification Termination Date").  The Chapter 11 Trustee will be entitled to draw on that commitment to satisfy any judgment against her and to pay her reasonable out-of-pocket expenses including attorney's fees and all other defense costs in the following circumstances: (x) a judgment is entered in the India Lawsuit against her personally and a Person moves to recognize or enforce that judgment against the Chapter 11 Trustee's personal property wherever located; (y) the Chapter 11 Trustee in her sole discretion determines to bring an action in the Bankruptcy Court to enforce the terms of this Plan or the Confirmation Order against a Person seeking to bring claims or causes of action against her individually related to her service as the Chapter 11 Trustee; or (z) to defend against any action brought against the Chapter 11 Trustee whether in the Bankruptcy Court or in any court asserting claims or causes of action based in whole or in part on the allegations set forth in the India Lawsuit. To the extent any proceeds of Trustee Indemnity Term Loans have not been utilized for the purposes described herein by the Trustee Indemnification Termination Date, the applicable Borrower shall promptly return all such proceeds to the Wind-Down Financing Agent for application against _first_, the obligations under the Trustee Indemnity Term Loan Facility and _second_, the obligations under the Wind-Down Financing Facility.

Notwithstanding anything to the contrary, the Indemnity Term Loans shall not be used for any payment of interest or fees.

| | |
|---|---|
| **ECONOMICS:** | [Interest, fees, premium, multiple on invested capital and other economics to be determined.] |
| **SECURITY AND RANKING:** | The obligations of the Borrowers shall be (i) secured by: a perfected first-priority security interest (subject to permitted liens and other exceptions to be set forth in the Credit Documentation) in substantially all of each Borrower's and guarantor's tangible and intangible assets now owned or hereafter acquired on a senior basis to the loans under the Prepetition Credit Agreement, including, without limitation, all rights, interests and obligations in and to any cause of action of the Borrowers with respect to fraud, fraudulent conveyance, or breach of fiduciary duties, and any other Retained Causes of Action, and any proceeds thereof (collectively, the "Litigation Claims") and (ii) unconditionally guaranteed by each other Borrower and/or guarantor. |
| | The Term Loans (and related Obligations) shall benefit from payment priority and turn-over rights (and related rights) in respect of any recovery received from or in respect of any guarantor under the Prepetition Credit Agreement that is not a Borrower pursuant to an intercreditor arrangement to be entered into by and between the Wind-Down Financing Agent and the Prepetition Agent (the "Intercreditor Agreement"). |
| | The New Money Term Loans shall rank senior on a payment basis to (i) the Roll-Over Term Loans and (ii) the Indemnity Term Loans (except with respect to repayment or prepayment from any proceeds in the Director Indemnity Escrow Account and the Trustee Indemnity Escrow Account, respectively). |
| **CONDITIONS PRECEDENT:** | The effectiveness of the Wind-Down Financing Facility shall be subject to the satisfaction or waiver by the Wind-Down Financing Lenders of the following conditions (in addition to other customary conditions) (the date on which such conditions are satisfied or waived, the "Closing Date"): |

4

(a) the Credit Documentation (for the avoidance of doubt, including the Intercreditor Agreement), in form and substance reasonably acceptable to the Wind-Down Financing Agent and the Prepetition Agent at the direction of the Prepetition Required Lenders, shall have been approved by order of the Bankruptcy Court (such approval via the Confirmation Orders (as defined below) being sufficient) and executed and delivered by all parties thereto and shall be in full force and effect, and no amendment, supplement or modification thereof shall have been entered into without the Consent of the Agents;

(b) the accuracy in all materials respects of all representations and warranties in the Credit Documentation;

(c) no default or event of default exists or would exist after giving effect thereto;

(d) delivery of a customary borrowing notice at least two (2) business days prior to the requested funding date;

(e) the Bankruptcy Court shall have entered (i) the Confirmation Order approving the Alpha Plan (the "Alpha Confirmation Order"), and (ii) the Confirmation Order approving the Epic Plan (the "Epic Confirmation Order" and, together with the Alpha Confirmation Order, the "Confirmation Orders"), in each case in form and substance reasonably acceptable to the Wind-Down Financing Agent and the Prepetition Agent at the direction of the Prepetition Required Lenders, and such Confirmation Orders shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed and shall not be subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order or to challenge the relief provided for in such orders;

(f) each Effective Date shall have occurred or shall occur concurrently with the entry into the Wind-Down Financing Facility; and

(g) the Wind-Down Debtor Assets shall have vested in the Borrowers.

**FUNDING CONDITIONS:** With respect solely to the New Money Term Loans, the obligation of each Wind-Down Financing Lender to make a New Money Term Loan is subject to the satisfaction of the following conditions: (i) there shall exist no default or an event of default under the Credit Documentation, (ii) the representations and warranties of the applicable Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the making of such Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, and (iv) delivery of a customary borrowing notice at least three (3) business days prior to the requested funding date.

With respect solely to the Director Indemnity Term Loans, the obligation of each Wind-Down Financing Lender to make a Director Indemnity Term Loan is subject to the satisfaction of the following conditions: delivery to the Wind-Down Financing Agent the following (the "Director Indemnification Borrowing Conditions"): (i) delivery of a borrowing notice (the "Director Indemnification Borrowing Request") at least three (3) days prior to the requested funding date, stating (a) the business day of the proposed borrowing (b) the aggregate principal amount of the proposed borrowing, and (c) the

proposed borrowing is a Director Indemnity Term Loan; and (ii) a certificate signed by a responsible officer of the applicable Borrower certifying that such Borrower has received a bona fide request in good faith from Pohl to fund the Director Indemnity Term Loans for purposes of payment of current or future indemnification or reimbursement obligations.

With respect solely to the Trustee Indemnity Term Loans, the obligation of each Wind-Down Financing Lender to make a Trustee Indemnity Term Loan is subject to the satisfaction of the following conditions: delivery to the Wind-Down Financing Agent the following (the "Trustee Indemnification Borrowing Conditions"): (i) delivery of a borrowing notice (the "Trustee Indemnification Borrowing Request") at least three (3) days prior to the requested funding date, stating (a) the business day of the proposed borrowing (b) the aggregate principal amount of the proposed borrowing, and (c) the proposed borrowing is a Trustee Indemnity Term Loan; and (ii) a certificate signed by a responsible officer of the applicable Borrower certifying that such Borrower has received a bona fide request in good faith from the Trustee to fund the Trustee Indemnity Term Loans for purposes of payment of current or future indemnification or reimbursement obligations.

|  |  |
|---|---|
| **WITHDRAWALS FROM ESCROW ACCOUNT:** | The proceeds of New Money Term Loans will be funded into an escrow account of the applicable Borrower with the Wind-Down Financing Agent that is subject to a first priority lien in favor of the Wind-Down Financing Agent for the benefit of the Wind-Down Financing Lenders (including any existing secured credit facilities) (the "Escrow Account") and, for the avoidance of doubt, shall accrue interest from the date of such funding. Any withdrawal from the Escrow Account will be subject to the following conditions: (i) there shall exist no default or an event of default under the Credit Documentation, (ii) the representations and warranties of each Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, and (iii) the Wind-Down Financing Agent (for distribution to the Wind-Down Financing Lenders) having received a withdrawal notice, executed by the applicable Borrower requesting the proposed withdrawal thereunder by no later than three (3) business days prior to the proposed withdrawal date, (a) requesting the amount and date of the withdrawal and (b) listing the use of the net proceeds of the withdrawal. Upon receipt of a withdrawal notice, the Wind-Down Financing Agent shall promptly direct the escrow agent to disburse funds from the Escrow Account on the applicable withdrawal date; provided that, if the Required Lenders determine (which determination may be communicated via a direction of the Required Lenders) that the applicable Borrower has failed to satisfy the conditions precedent set forth in the Credit Documentation for a withdrawal notice and so advise the Wind-Down Financing Agent in writing (directly or through a direction of the Required Lenders) prior to the escrow agent disbursing the withdrawal, the Wind-Down Financing Agent shall decline to authorize such withdrawal and shall communicate the same to the escrow agent. |

Subject to the Director Indemnification Borrowing Conditions, the proceeds of the Director Indemnity Term Loans will be funded into an escrow account of the applicable Borrower with the Wind-Down Financing Agent that is subject to a first priority lien in favor of the Wind-Down Financing Agent for the benefit of the Lenders of the Director Indemnity Term Loan Facility (including any existing secured credit facilities) (the "Director Indemnity Escrow Account") and, for the avoidance of doubt, shall accrue interest from the date of such funding. Any withdrawal from the Director

Indemnity Escrow Account will be subject to the Wind-Down Financing Agent (for distribution to the Wind-Down Financing Lenders) having received a withdrawal notice, executed by the applicable Borrower describing the intended withdrawal thereunder by no later than three (3) business days prior to the intended withdrawal date, stating the amount and date of the withdrawal. Upon receipt of a withdrawal notice, the Wind-Down Financing Agent shall promptly direct the indemnity escrow agent to disburse funds from the Director Indemnity Escrow Account on the applicable withdrawal date. Notwithstanding anything to the contrary, any undrawn or unused amount of the Director Indemnity Term Loans will remain available to be drawn and used until the Director Indemnification Termination Date.

Subject to the Trustee Indemnification Borrowing Conditions, the proceeds of the Trustee Indemnity Term Loans will be funded into an escrow account of the applicable Borrower with the Wind-Down Financing Agent that is subject to a first priority lien in favor of the Wind-Down Financing Agent for the benefit of the Lenders of the Trustee Indemnity Term Loan Facility (including any existing secured credit facilities) (the "Trustee Indemnity Escrow Account") and, for the avoidance of doubt, shall accrue interest from the date of such funding. Any withdrawal from the Trustee Indemnity Escrow Account will be subject to the Wind-Down Financing Agent (for distribution to the Wind-Down Financing Lenders) having received a withdrawal notice, executed by the applicable Borrower describing the intended withdrawal thereunder by no later than three (3) business days prior to the intended withdrawal date, stating the amount and date of the withdrawal. Upon receipt of a withdrawal notice, the Wind-Down Financing Agent shall promptly direct the indemnity escrow agent to disburse funds from the Trustee Indemnity Escrow Account on the applicable withdrawal date. Notwithstanding anything to the contrary, any undrawn or unused amount of the Trustee Indemnity Term Loans will remain available to be drawn and used until the Trustee Indemnification Termination Date.

| | |
|---|---|
| **DOCUMENTATION PRINCIPLES:** | The definitive financing documentation for the Wind-Down Financing Facility (the "Credit Documentation") shall contain the terms set forth in this term sheet and, to the extent any other terms are not expressly set forth in this term sheet, will (i) be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date and (ii) contain such other terms as the Borrowers and the holders of majority outstanding principal amount of commitments (the "Required Lenders") shall reasonably agree; it being understood and agreed that the Credit Documentation shall be substantially consistent with the Alpha DIP Credit Agreement, as modified by the terms herein (collectively, the "Documentation Principles"). |
| **REPRESENTATIONS AND WARRANTIES:** | Appropriate and customary for credit facilities of this type, and in accordance with the Documentation Principles. |
| **AFFIRMATIVE COVENANTS:** | Appropriate and customary for credit facilities of this type, and in accordance with the Documentation Principles. |
| **NEGATIVE COVENANTS:** | Appropriate and customary for credit facilities of this type, and in accordance with the Documentation Principles. |
| **EVENTS OF DEFAULT:** | Appropriate and customary events of default ("Event of Default") for credit facilities of this type and in accordance with the Documentation Principles. Notwithstanding anything to the contrary, the occurrence of an Event of Default, the exercise of any remedies, and the occurrence of the commitment termination date, the Wind-Down |

7

Financing Lenders, subject to satisfaction of Indemnification Borrowing Conditions, will fund any Director Indemnification Borrowing Request to fund Director Indemnity Term Loans delivered by the applicable Borrower on or prior to the Director Indemnification Termination Date.

**WAIVER OF JURY TRIAL, GOVERNING LAW:** Waiver of jury trial, submission to jurisdiction in Delaware before the Bankruptcy Court. Delaware law (without reference to choice of law provisions) to govern.

**MISCELLANEOUS:** This summary of terms and conditions does not purport to summarize all the conditions, covenants, representations, warranties and other provisions which would be contained in the definitive Credit Documentation for the Wind-Down Financing Facility contemplated hereby.

**Exhibit E**

**Schedule of Retained Causes of Action**

The Plan defines the Retained Causes of Action as "all Claims and Causes of Action (including, for the avoidance of doubt, the Adversary Proceedings and the Avoidance Actions) belonging to the Debtor, or the Estate, including, but not limited to, all Causes of Action enumerated on the Schedule of Retained Causes of Action which shall be filed with the Plan Supplement, all of which shall vest in the Wind-Down Debtor pursuant to the terms of the Plan and be deemed an integral part thereof. For the avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action against the Excluded Parties, whether or not listed on the Schedule of Retained Causes of Action. For the further avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action arising out of or in connection with: (a) the efforts of Byju Raveendran, Riju Ravindran, the Camshaft Entities, William Cameron Morton, OCI Limited, Oliver Chapman, Rupin Banker, Divya Golkunath, Anita Kishore, or the Debtor's insiders, or any of their respective Affiliates or associates, to transfer or take the Debtor's assets either before the Petition Date or during the Chapter 11 Case, (b) the efforts of Byju Raveendran, Riju Ravindran, the Camshaft Entities, William Cameron Morton, OCI Limited, Oliver Chapman, Rupin Banker, Divya Golkunath, Anita Kishore, or the Debtor's insiders, or any of their respective Affiliates or associates, to disrupt or impair the Chapter 11 Case, (c) the Alpha Funds, including the transfer of some or all of those funds from the Camshaft Entities, OCI Limited, and other successor transferees, and (d) any breach of fiduciary duties by the Debtor's former directors or officers, with the exception of any individual appointed as a director or officer by the Prepetition Agent, including, for the avoidance of doubt, Timothy R. Pohl. Retained Causes of Action shall not include any Causes of Action that are settled, released, or exculpated under the Plan." For the avoidance of doubt, nothing in this Plan Supplement modifies this definition in the Plan.

Pursuant to the Plan, on the Effective Date, the Wind-Down Debtor Assets shall be transferred to and irrevocably vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior Final Order of the Bankruptcy Court or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date (and whether or not listed on the Schedule of Retained Causes of Action). The Wind-Down Debtor shall likewise retain all proceeds of the foregoing, subject to the terms of the Plan.

The Retained Causes of Action include, among other things, all of the Debtor's claims (as defined in section 105(5) of the Bankruptcy Code) and Causes of Action (including defenses, counter-claims, and other rights), in each case, relating to the following:

1.      All Causes of Action related in any way to Rajendran Vellapalath, Voizzit Technology Private Ltd, or Voizzit India (as defined in the Combined Plan and Disclosure Statement) and their respective affiliates.

2.      All causes of Action against the Debtor's insiders, including but not limited to, Byju Raveendran, Riju Ravindran, Anita Kishore, Divya Gokulnath, and their respective affiliates, except to the extent such Entity is a Released Party, particularly in connection

with (but not in any way limited to) (i) the actual or attempted transfer or taking of the Debtor's assets either before the Petition Date or during the Chapter 11 Cases; (ii) any actual or attempted effort to disrupt or impair the Chapter 11 Cases; and (iii) any and all violations of the Bankruptcy Court's orders or the Bankruptcy Code.

3.  All Causes of Action related in any way to the Alpha Funds and the proceeds thereof, including (i) the transfers of the Alpha Funds and the proceeds thereof and (ii) Causes of Action against any and all immediate and mediate transferees, whether presently known or unknown, of the Alpha Funds and the proceeds thereof.

4.  The Adversary Proceedings (as defined in the Plan).

5.  Avoidance Actions arising under applicable state law and Chapter 5 of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 502, 510, 542, 544, 547 through 553 and 724(a), against any Person or Entity who is not a Released Party, including, without limitation, those Persons or Entities identified in the Plan or the Schedule of Excluded Parties.

6.  All Causes of Action related to breach of fiduciary duties by any current or former directors or officers, with the exception of Timothy R. Pohl.

7.  All Causes of Action related in any way to the events leading to the insolvency and subsequent bankruptcy of the Debtor.

8.  All Causes of Action relating to any and all insurance contracts and insurance policies to which the Debtor is a party or pursuant to which the Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. Without limiting the generality of the foregoing, the Debtor expressly reserves all Causes of Action relating to the D&O Liability Insurance Policies.

9.  All Causes of Action relating to any and all tax obligations to which the Debtor is a party or pursuant to which the Debtor has any rights whatsoever, including, without limitation, against or related to all entities that owe or that may in the future owe money related to tax refunds to the Debtor, regardless of whether such entity is specifically identified herein. Without limiting the generality of the foregoing, the Debtor expressly reserves all Causes of Action, including potential tax refund, reimbursement of overpayments resulting from ordinary course payments or payments of any filed proofs of claim, and any rights arising under section 505 of the Bankruptcy Code, against the Department of Treasury—Internal Revenue Service and all state and local taxing authorities.

10.  All Causes of Action against or related to all Persons or Entities (other than Released Parties) that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, regardless of whether such entity is

2

specifically identified in the Plan, except to the extent such Person or Entity is a Released Party.

11.    All Causes of Action against or related to all Entities (other than Released Parties) that owe or that may in the future owe money to the Debtor, regardless of whether such Entity is expressly identified in the Plan except to the extent such Entity is a Released Party. The Debtor or the Wind-Down Debtor, as applicable, expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtor or Wind-Down Debtor owe money to them.  The claims and Causes of Action reserved include, without limitation, Causes of Action against vendors, suppliers of goods and services, customers, or any other parties, except to the extent such party is a Released Party, for:

   a.  overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; and

   b.  (i) wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (ii) for failure to fully perform or to condition performance on additional requirements under contracts with the Debtor before the assumption or rejection, if applicable, of such contracts; (iii) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (iv) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by the Debtor; (v) for counter-claims and defenses related to any contractual obligations; (vi) for any turnover actions arising under Bankruptcy Code sections 542 or 543; and (vii) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

12.    All Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.

3

**Exhibit F**

**Schedule of Excluded Parties**

The Schedule of Excluded Parties (as defined in the Plan) shall include, without limitation:

1.  The immediate and mediate transferees of the Alpha Funds and the proceeds thereof, and those representatives of such transferees who facilitated such transfers in any way, except for those parties that are expressly identified as Released Parties;

2.  Think & Learn Private Ltd;

3.  Think & Learn, Inc.;

4.  BYJU's Pte. Ltd;

5.  BYJU's Inc.;

6.  BYJU's K3 Education Pvt Ltd;

7.  Byju's S.A. de C.V.;

8.  BYJU's Alpha, Inc.;

9.  BYJU's Beta, Inc.;

10. BYJU'S Learning Company FZCO Dubai;

11. BYJU'S Tecnologia Educational Ltda;

12. Codr, Inc.;

13. Whitehat Education Technology Pvt. Ltd;

14. Whitehat Education Technology, LLC;

15. Great Learning Education Pte Ltd;

16. Inspilearn LLC;

17. Aakash Educational Services Ltd;

18. Specadel Technologies Pvt Ltd;

19. Span Thoughtworks Pvt. Ltd;

20. Topper Technologies Pvt Ltd;

21. Grade Stack Learning Private Ltd;

22. Aakash Edutech Pvt Ltd;

23. Haygot Services Private Ltd;

24. Digital Aristotle Pvt Ltd;

25. Geogebra GMBH;

26. All other non-Debtor current and former direct and indirect subsidiaries and Related Parties of Think and Learn Private Ltd;

27. Byju Raveendran and Byju Ravindran;

28. Riju Raveendran and Riju Ravindran;

29. Divya Gokulnath;

30. Anita Kishore;

31. Aaron Kornblum;

32. Roshan Thomas;

33. S. Hari;

34. Elvis Mookken;

35. All other current and former directors and officers of Think and Learn Private Ltd and each of its non-Debtor current and former direct and indirect subsidiaries except for those parties that are expressly identified as Released Parties;

36. All current and former directors and officers of the Debtor except for those parties that are expressly identified as Released Parties (*i.e.,* Timothy R. Pohl), including but not limited to Vinay Ravindra, Jonathan Naseath, Cherian Thomas, Mark Solomon, Pramod Sharma, Katherine Xu, Srikanth Chinmay, Ranjit Pawar, Jerome Scholler, Suren Markosian, Kevin Donahue, Guillaume Poncin;

37. Camshaft Capital Fund, LP;

38. Camshaft Capital Management, LLC;

39. Camshaft Capital Advisors, LLC;

40. William Cameron Morton;

41. OCI Ltd;

42. Apex Fund Services, Inc.;

43.    Voizzit Technology Private Ltd and Voizzit Information Technology LLC (the "Voizzit Entities," as defined in the Combined Plan and Disclosure Statement);

44.    All current and former directors and officers of the Voizzit Entities included but not limited to Rajendaran Vellapalath;

45.    Sandeep Vellapalath;

46.    Arkishnan Nair Vellapalath;

47.    Rahul Rajendran Vellapalath;

48.    Bisy Philip Vellapalath;

49.    the MCA Lenders (as defined in the Plan);

50.    Praveen Prakash;

51.    Sharath Kumar;

52.    Shaji Puthalath;

53.    Ranjan Pai;

54.    Manipal Education and Medical Group;

55.    Oliver Chapman;

56.    Rupin Banker;

57.    Aswanit Nambarambath;

58.    John Coyne;

59.    Margot Herman;

60.    Arjun Mohan;

61.    Taejoon Park;

62.    Maneesh Arora;

63.    Heidi Walas;

64.    Nirav Shah;

65.    Joe Mixon;

66.    Saiprasad Palekar;

3

67.    Aranjith Pawar;

68.    Nathin Golani;

69.    Will Hailer;

70.    Joe Isaacof;

71.    Rao Nagam;

72.    Utsav Wgoswami;

73.    Jennifer Kajisa;

74.    Thuy Do;

75.    Karan Bajaj;

76.    Sajid Shariff;

77.    Marc Jacobson;

78.    Trupti Mukker;

79.    Hiruth Haile;

80.    Raghav Jain;

81.    Abhishek Dugar;

82.    Pradeepta Pradham;

83.    Prashant Marwaha;

84.    Yifat Schnur;

85.    Nawab Nasrat;

86.    Hardik Bhatia;

87.    Santosh Kumar;

88.    Mandar Patil;

89.    Adler Martins;

90.    Markus Hohenwarter;

91.    Rose Acre;

92.    BDO International;

93.    MSKA & Associates;

94.    Deloitte;

95.    Suri & Co.;

96.    Ernst & Young;

97.    YLVS ESQ LLC;

98.    DLA Piper LLP;

99.    Kasowitz Benson Torres LLP;

100.    Pankaj Srivastava;

101.    Google LLC;

102.    Stripe, Inc.;

103.    Wells Fargo Bank, National Association;

104.    Hogan Lovells US LLP and Hogan Lovells International LLP;

105.    Jino Joseph & Associates; and

106.    Every current and former Affiliate and Related Party of each Person or Entity in the Schedule of Excluded Parties that is not a Released Party.

For the avoidance of doubt, no Excluded Party shall be considered a Released Party or an Exculpated Party in any capacity under the Plan and all Claims and Causes of Action against each Excluded Party shall be preserved and shall not be released.

The term "Excluded Parties" shall be deemed to control over the term "Released Parties," such that if an Entity would be considered both an Excluded Party and a Released Party, such Entity shall be deemed an Excluded Party and not a Released Party for all purposes hereunder.