## EXHIBIT A

**Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BYJU'S ALPHA, INC.[1] | Case No. 24-10140 (BLS) |
| Debtor. |  |

## AMENDED COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLAN OF BYJU'S ALPHA, INC.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
Jianjian Ye (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

*Counsel for the Debtor*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

*Counsel for the Debtor*

Dated: September 16, 2025
Wilmington, Delaware

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number is BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is 1007 N. Market St. Ste. G20 452, Wilmington, DE 19801.

# TABLE OF CONTENTS

**Page**

DISCLAIMERS RELATED TO DISCLOSURE STATEMENT ..................................................1

ARTICLE I : INTRODUCTION AND IMPORTANT DATES ...................................................2

    **A.** Introduction..............................................................................................................2

    **B.** Important Dates.........................................................................................................2

ARTICLE II : DEFINED TERMS AND RULES OF INTERPRETATION .................................3

    **A.** Defined Terms. .........................................................................................................3

    **B.** Rules of Interpretation. ...........................................................................................19

ARTICLE III : DISCLOSURE STATEMENT ........................................................................21

    **A.** General Background ...............................................................................................21

        1. The Debtor's Formation And Entry Into $1.2 Billion Prepetition Term Loan Facility ...........................................................................................21

        2. The Debtor Promptly Defaults Under The Prepetition Term Loan Facility ...............22

        3. The Prepetition Term Loan Lenders' Exercise Of Remedies .....................................22

        4. The Delaware Court Of Chancery Action To Validate Mr. Pohl's Appointment And Receipt Of The Debtor's Bank Account Records ........................23

        5. Discovery Of The Debtor's Mid-2022 Transfers To Camshaft Fund ..........................24

        6. The Debtor Commences The Chapter 11 Case And Commences The Camshaft Adversary ....................................................................................................24

        7. Camshaft Adversary Summary Judgment ................................................................25

        8. Raveendran Adversary................................................................................................26

        9. OCI Adversary ..........................................................................................................27

        10. Claims Review and Reconciliation Process................................................................27

    **B.** Summary of Treatment of Claims and Interests Under the Plan ......................................28

        1. Claims and Interests ..................................................................................................29

**C.** Retained Causes of Action ................................................................................29

**D.** Certain Federal Income Tax Consequences ........................................................31

    1.  Tax Consequences to U.S. Holders of Claims ..............................................32

    2.  Tax Consequences to the Debtor ..................................................................33

        a.  Cancellation of Indebtedness Income and Guaranty Claims ................33

        b.  Importance of Obtaining Professional Tax Assistance .........................33

**E.** Certain Risk Factors to be Considered ................................................................34

**F.** Cramdown ............................................................................................................35

**G.** Feasibility ............................................................................................................35

**H.** Best Interests Test and Alternatives to the Plan ................................................35

**I.** Releases ................................................................................................................37

**J.** Administrative Claims ..........................................................................................37

**K.** DIP Facility Claims ..............................................................................................38

**L.** Professional Fee Claims .......................................................................................39

**M.** Priority Tax Claims ..............................................................................................39

**N.** Statutory Fees ......................................................................................................40

ARTICLE IV : CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .....40

**A.** Classification of Claims and Interests .................................................................40

    1.  Class Identification .......................................................................................40

        a.  Claims and Interests ............................................................................40

**B.** Treatment of Claims and Interests ......................................................................41

    1.  Treatment of Claims and Interests ...............................................................41

        a.  Class 1 – Other Secured Claims ..........................................................41

        b.  Class 2 – Other Priority Claims ...........................................................41

        c.  Class 3 – Prepetition Term Loan Claims .............................................42

       d.  Class 4 – General Unsecured Claims ........................................................43

       e.  Class 5 – Intercompany Claims ............................................................43

       f.   Class 6 – Section 510(b) Claims ..........................................................44

       g.  Class 7 – Interests ................................................................................44

**C.**  Impaired Claims and Equity Interests ...........................................................45

**D.**  Confirmation Pursuant to Sections 1129(a)(10) of the Bankruptcy Code .........45

**E.**  No Unfair Discrimination ..............................................................................45

**F.**  Elimination of Vacant Classes ......................................................................45

**G.**  Subordinated Claims .....................................................................................45

ARTICLE V : THE WIND-DOWN DEBTOR ...........................................................45

**A.**  Establishment of the Wind-Down Debtor ......................................................45

**B.**  Vesting of the Wind-Down Debtor Assets in the Wind-Down Debtor .............46

**C.**  Wind-Down Debtor's Rights with Respect to Disputes and Litigation .............46

**D.**  Governance of the Wind-Down Debtor ..........................................................46

**E.**  The Wind-Down Debtor's Transfer of Privileges ...........................................47

**F.**  Bankruptcy Rule 2004 ..................................................................................47

**G.**  Cooperation with the Plan Administrator; Books and Records .........................47

**H.**  Vesting of Wind-Down Debtor's Assets ........................................................47

**I.**  Expenses of Wind-Down Debtor ...................................................................48

**J.**  Wind-Down Financing Facility .....................................................................48

   1.  New Money Wind-Down Financing Facility ................................................48

   2.  Wind-Down Financing Facility Roll-Over Term Loans ..................................49

   3.  Indemnity Facility ......................................................................................49

**K.**  Selection of Wind-Down Debtor Oversight Committee ...................................49

   1.  Rights, Powers, Duties, and Responsibilities of the Wind-Down Debtor
      Oversight Committee ..................................................................................49

**L.** Manner of Wind-Down Distributions ..................................................................50

**M.** Termination of the Wind-Down Debtor .........................................................50

**N.** Distribution of Excess Reserves by the Wind-Down Debtor ...........................51

ARTICLE VI : PLAN ADMINISTRATOR..................................................................51

**A.** Plan Administrator Agreement .....................................................................51

**B.** Appointment of the Plan Administrator..........................................................51

**C.** The Term of the Plan Administrator ...............................................................51

**D.** Plan Administrator Rights and Powers ..........................................................51

**E.** Plan Administrator Responsibilities ...............................................................52

**F.** Plan Administrator Exculpation, Indemnification, Insurance, and Liability
Limitation.........................................................................................................55

ARTICLE VII : CONFIRMATION PROCEDURES ..................................................55

**A.** Confirmation Procedures ................................................................................55

1. Combined Hearing ................................................................................55

2. Procedure for Objections ......................................................................55

3. Requirements for Confirmation ............................................................55

**B.** Solicitation and Voting Procedures ................................................................56

1. Eligibility to Vote on the Plan ..............................................................56

2. Solicitation Package..............................................................................56

3. Voting Procedures and Voting Deadline ..............................................56

4. Presumed Acceptance and Deemed Rejection......................................57

5. Acceptance by Impaired Classes ..........................................................57

ARTICLE VIII : IMPLEMENTATION AND EXECUTION OF THE PLAN ............57

**A.** Effective Date .................................................................................................57

**B.** Establishment and Funding of Plan Reserves .................................................58

**C.** Wind-Down Transactions ...............................................................................58

**D.** Corporate Action..................................................................................................58

**E.** Exemption from Certain Taxes and Fees...........................................................58

**F.** Provisions Governing Distributions Under the Plan..........................................59

    1. Dates of Distributions .................................................................................59

    2. Delivery of Distribution on Prepetition Term Loan Claims ......................59

    3. Distributable Proceeds ...............................................................................60

    4. De Minimis Distributions; Rounding of Payments.....................................60

    5. Compliance with Tax Requirements/Allocations .......................................60

**G.** Resolution of Disputed Claims .........................................................................61

    1. Allowance of Claims ..................................................................................61

    2. Prosecution of Objections to Claims .........................................................61

    3. Deadline to File Objections to Claims .......................................................61

    4. Amendments to Claims...............................................................................61

**H.** Disallowance of Certain Claims Subject to Avoidance or Recovery ...............61

    1. The Alpha Funds Judgment Order..............................................................62

    2. The Camshaft Complaint ............................................................................62

    3. The Raveendran Complaint ........................................................................63

    4. The OCI Complaint.....................................................................................63

ARTICLE IX : TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................................................................................................................................63

**A.** Rejection of Executory Contracts and Unexpired Leases .................................63

**B.** Assumption of D&O Insurance Policies............................................................63

**C.** Rejection Damages Bar Date .............................................................................64

**D.** Indemnification Obligations ..............................................................................64

ARTICLE X : EXCULPATION, RELEASES, AND INJUNCTIONS .......................65

**A.** Exculpation ........................................................................................................65

**B.** Plan Injunction .................................................................................................65

**C.** Injunction Related to Releases and Exculpation .................................................66

**D.** Debtor's and Estate's Releases ...........................................................................66

**E.** Compromises and Settlements ............................................................................67

**F.** Preservation of Causes of Action.......................................................................67

**G.** No Discharge of Debtor or Wind-Down Debtor.................................................68

ARTICLE XI : CONDITIONS PRECEDENT TO CONSUMMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT .................................................69

**A.** Conditions Precedent to the Effective Date ........................................................69

**B.** Waiver of Conditions...........................................................................................69

**C.** Effect of Failure of All Conditions .....................................................................69

ARTICLE XII : RETENTION OF JURISDICTION ....................................................70

ARTICLE XIII : MISCELLANEOUS PROVISIONS....................................................71

**A.** Immediate Binding Effect....................................................................................71

**B.** Reservation of Rights...........................................................................................72

**C.** Modification, Withdrawal, or Revocation of the Combined Plan and Disclosure Statement...............................................................................................72

**D.** Exhibits/Schedules...............................................................................................72

**E.** Plan Supplement ..................................................................................................73

**F.** Filing of Additional Documents ..........................................................................73

**G.** Successors and Assigns .......................................................................................73

**H.** Governing Law ....................................................................................................73

**I.** Time .....................................................................................................................73

**J.** Term of Injunctions or Stays ...............................................................................73

**K.** Severability ..........................................................................................................73

**L.** Votes Solicited in Good Faith..............................................................................74

**M.** Revocation ................................................................................................74

**N.** Conflicts ...................................................................................................74

**O.** No Admissions............................................................................................74

**P.** Reservation of Rights....................................................................................74

**Q.** Compromise of Controversies ..........................................**Error! Bookmark not defined.**

## DISCLAIMERS RELATED TO DISCLOSURE STATEMENT

THE DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED IN THE DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE ESTATE, THE DEBTOR, OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE ESTATE, THE DEBTOR, OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS HEREIN ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN THAT WHICH IS CONTAINED HEREIN. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF THE ESTATE HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B), AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. SEE ARTICLE III.E "CERTAIN RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CONSIDERATIONS IN CONNECTION WITH A DECISION TO VOTE TO ACCEPT THE PLAN.

## ARTICLE I: INTRODUCTION AND IMPORTANT DATES

A.      **Introduction**[2]

The Debtor, BYJU's Alpha, Inc., proposes this *Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* (the "**Combined Plan and Disclosure Statement**" or "**Plan**" or "**Disclosure Statement**" as the context indicates) pursuant to sections 105, 1125, and 1129 of the Bankruptcy Code for the disposition of the Estate's remaining assets and Distribution of the proceeds of the assets to the Holders of Allowed Claims against the Debtor as set forth herein.

**Copies of this Combined Plan and Disclosure Statement and all other documents related to the Chapter 11 Case are available for a fee at http://ecf.deb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at http://pacer.psc.uscourts.gov). Alternatively, you may request that a copy of the Combined Plan and Disclosure Statement be mailed to you by contacting Young Conaway Stargatt & Taylor, LLP at (302) 571-7791, or by email at bwalters@ycst.com.**

Each Holder of a Claim against the Debtor entitled to vote to accept or reject the Plan is encouraged to read the Combined Plan and Disclosure Statement in its entirety before voting.

Subject to the restrictions on modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Plan, the Debtor expressly reserves the right to alter, amend, or modify the Plan one or more times before its substantial consummation.

B.      **Important Dates**

| PROPOSED CONFIRMATION SCHEDULE | |
| --- | --- |
| **Event** | **Date** |
| Voting Procedures Hearing Objection Deadline | September 15, 2025, at 4:00 p.m. (prevailing Eastern time) |
| Voting Procedures and Interim Disclosure Statement Hearing | September 22, 2025, at 11:00 a.m. (prevailing Eastern time) |
| Voting Record Date | September 22, 2025 |
| Deadline to transmit (i) Combined Notice and (ii) Solicitation Packages | September 24, 2025 |
| Publication Deadline | September 29, 2025 |
| Deadline to File Plan Supplement | October 12, 2025 |
| Voting Deadline | October 19, 2025 at 4:00 p.m. (prevailing Eastern Time) |

---

[2]     Capitalized terms used in this Article I shall have the meaning ascribed to them in Article II hereof.

| PROPOSED CONFIRMATION SCHEDULE | |
|---|---|
| **Event** | **Date** |
| Objection Deadline | October 22, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to file Voting Tabulation Affidavit | October 27, 2025 at 12:00 p.m. (ET) |
| Deadline to file: (i) Confirmation Brief; (ii) Reply to any Objections to the Confirmation of the Plan and/or final approval of the adequacy of the Disclosure Statement; and (iii) proposed order approving Disclosure Statement on a final basis and confirming the Plan | October 27, 2025 at 12:00 p.m. (ET) |
| Combined Hearing | October 29, 2025 at 11:00 a.m. (ET) |

## ARTICLE II: DEFINED TERMS AND RULES OF INTERPRETATION

### A.     Defined Terms.

As used in this Combined Plan and Disclosure Statement, the following terms have the following meanings. All capitalized terms not defined herein shall have the meaning ascribed to them in the Bankruptcy Code or Bankruptcy Rules as applicable.

1.     "**Administrative Claim**" means a Claim for costs and expenses of administration of the Estate under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estate; (b) Allowed Professional Fee Claims in the Chapter 11 Case; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

2.     "**Administrative Claims Amount**" means an amount equal to the Debtor's good-faith estimate of the aggregate Allowed Administrative Claims, which estimate the Debtor shall deliver to counsel to the DIP Agent and counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

3.     "**Administrative Claims Bar Date**" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be the later of (i) thirty (30) days after the Effective Date or (ii) in the event an Executory Contract is rejected following the Effective Date, solely as to Administrative Claims related to such rejected Executory Contract, thirty (30) days after notice to the counterparty to such rejected Executory Contract; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

4.    "**Administrative Claims Reserve**" means the reserve for the Allowed Administrative Claims established by the Debtor in an amount equal to the Administrative Claims Amount.

5.    "**Adversary Proceedings**" means the Camshaft Adversary, the Raveendran Adversary, the OCI Adversary, and any other adversary proceedings commenced by the Debtor before the Effective Date.

6.    "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code. "**Affiliated**" has a correlative meaning.

7.    "**Allowed**" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in the foregoing clauses (a) and (b), such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there may be deducted therefrom an amount equal to the amount of any Claim that the Debtor may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable Law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed. For the avoidance of doubt:  (x) a Proof of Claim Filed after the Claims Bar Date is deemed Disputed; (y) a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Administrative Claim or agreement in writing by the Debtor or Wind-Down Debtor, as applicable, and the Holder of such late-Filed Administrative Claim; and (z) the Debtor or Wind-Down Debtor, as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "**Allow**" and "**Allowing**" shall have correlative meanings.

8.    "**Alpha Funds**" means the approximately $533,000,000 in aggregate funds transferred by BYJU's Alpha to Camshaft Capital Fund, LP in or around April 2022 and July 2022, and the proceeds thereof.

9. **"Avoidance Actions"** means any and all avoidance, recovery, subordination, or other Causes of Action, Claims, actions, or remedies that may be brought by or on behalf of the Debtor or the Estate or other authorized parties in interest under the Bankruptcy Code or applicable non bankruptcy law, including Causes of Action, Claims, actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

10. **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

11. **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the United States District Court for the District of Delaware.

12. **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case, as now in effect or hereafter amended.

13. **"Bar Date"** means, with respect to any particular Claim, the specific date established by the Bankruptcy Court as the last day for filing Proofs of Claim against the Debtor.

14. "**Bar Date Order**" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. §§ 507(a)(3) through (a)(10) and 503(b)(9), (II) Approving the Form for Filing Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [D.I. 338].

15. **"Business Day"** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16. **"BYJU's Alpha"** means BYJU's Alpha, Inc.

17. "**Camshaft Adversary**" means the adversary proceeding captioned *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP et al.*, Adv. No. 24-50013 (Bankr. D. Del.).

18. **"Camshaft Claims"** means, collectively, any Claims Filed or otherwise asserted by or on behalf of any Camshaft Entity, or any Affiliate or Related Party thereof, including, without limitation (a) the Camshaft Indemnification Counterclaim, and (b) any Claim for indemnification or reimbursement resulting from, arising out of, relating to, or otherwise in connection with any side letter, subscription agreement, or other agreements entered into or purportedly entered into by and between any Camshaft Entity and the Debtor, or otherwise imposing or purporting to impose any obligations on the Debtor.

19. **"Camshaft Entities"** means, collectively, Camshaft Capital Fund, LP, Camshaft Capital Management, LLC, Camshaft Capital Advisors, LLC, and any Affiliate or Related Party thereof, including, without limitation, William Cameron Morton.

20. "**Camshaft Indemnification Counterclaim**" means that certain counterclaim asserted by Camshaft Capital Fund LP in the Camshaft Adversary in its *Amended Answer of Camshaft Defendants to Second Amended Complaint* [Camshaft Adv. D.I. 403].

21. "**Cash**" means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

22. "**Cause of Action**" or "**Causes of Action**" means any Claim, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, interest, damage, remedy, cause of action, proceeding, agreement, cross claim, counterclaim, contribution, suit, class action, third-party claim, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, direct or indirect, choate or inchoate, Disputed or undisputed, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, in tort, at Law, in equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign Law, or breach of any duty imposed by Law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) Claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (f) the Adversary Proceedings; and (g) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer Laws.

23. "**Chapter 11 Case**" means the chapter 11 case for the Debtor: *BYJU's Alpha, Inc.* (Case No. 24-10140) (BLS).

24. "**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor.

25. "**Claims Objection Deadline**" means the date that is sixty (60) days after the Effective Date, unless otherwise extended by the Bankruptcy Court.

26. "**Class**" means a class of Claims or Interests as set forth in Article IV hereof pursuant to section 1122(a) of the Bankruptcy Code.

27. "**Combined Hearing**" means the hearing held by the Bankruptcy Court to consider (a) approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

28. "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

29. "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "**Consent of the Agents**" means the prior written consent of: (a) the DIP Agent, at the direction of the Required Lenders, solely to the extent that (i) the DIP Claims have not already been paid in full in Cash and (ii) the action that requires consent may adversely affect the Holders of DIP Claims; and (b) the Prepetition Agent, at the direction of the Prepetition Required Lenders, solely to the extent that (i) the Prepetition Term Loan Claims have not already been paid in full in Cash and (ii) the action that requires consent may adversely affect the Holders of Prepetition Term Loan Claims.

31. "**Consummation**" means the occurrence of the Effective Date.

32. "**Creditor**" means any Person that is the Holder of a Claim against the Debtor.

33. "**D&O Liability Insurance Policies**" means all directors and officers liability insurance contracts (including any "tail policy") issued or providing coverage at any time to the Debtor, any of its predecessors, and/or any of its current or former subsidiaries for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments relating thereto.

34. "**Debtor Release**" means the release set forth in Article X.D hereof.

35. "**Debtor**" means BYJU's Alpha, Inc.

36. "**DIP Agent**" means GLAS in its capacity as administrative and collateral agent under the DIP Facility.

37. "**DIP Claims**" means any and all Claims arising under, derived from, or based upon the DIP Credit Agreement or the DIP Facility including all Claims for principal amounts outstanding, interest, fees, expenses, costs indemnification, obligations, reimbursement obligations, and other charges of the DIP Agent and the DIP Lenders arising under or related to the DIP Credit Agreement or the DIP Facility.

38. "**DIP Commitments**" means the Initial New Money Term Loan Commitments.

39. "**DIP Credit Agreement**" means that certain senior secured superpriority debtor-in-possession credit and guaranty agreement, dated as of April 3, 2024, among the Debtor, as borrower, the DIP Agent, and certain lenders and guarantors thereto (as amended by the First DIP Amendment, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

40. "**DIP Facility**" means that certain senior-secured multiple-draw term loan facility in the aggregate principal amount of up to $282,004,830.23 (including the Roll-Up Loans), entered into pursuant to the DIP Credit Agreement, the Final DIP Order, and the First DIP Amendment Order.

41. "**DIP Lenders**" means, collectively, the lenders from time to time under the DIP Facility.

42. "**DIP Motion**" means the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Debtor to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [D.I. 5].

43. "**DIP Obligations**" has the meaning ascribed to the term "Obligations" in the DIP Credit Agreement.

44. "**DIP Term Loans**" has the meaning ascribed to the term "Term Loans" in the DIP Credit Agreement.

45. "**Director Indemnity Agreement**" means that certain indemnity agreement, dated as of March 3, 2023, by and between the Prepetition Collateral Agent as the sole stockholder of the Debtor and Timothy R. Pohl as the proposed sole director of the Debtor.

46. "**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Plan, the Bankruptcy Code, applicable law, or by Final Order.

47. "**Disputed**" means, with respect to any Claim or an Interest (or portion thereof): (a) that is not yet Allowed; (b) that is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment without any further notice to or action, order, or approval of the Bankruptcy Court.

48. "**Distributable Cash**" means all the Cash of the Debtor or the Wind-Down Debtor, on the Effective Date, after giving effect to the funding of the Plan Reserves; *provided* that any proceeds of the DIP Facility shall not be considered Distributable Cash and shall be Retained Assets.

49. "**Distributable Proceeds**" means all Cash on hand of the Plan Administrator and the Wind-Down Debtor, including all Cash proceeds generated from the use, sale, lease, liquidation, or other disposition of the Wind-Down Debtor Assets and the prosecution, enforcement, settlement, or other monetization or disposition of the Retained Causes of Action, in each case regardless of whether such proceeds are collateral of any Holder of a Secured Claim; *provided* that all distributions of the Distributable Proceeds shall be subject to the terms of the Plan, the Confirmation Order, and the Plan Administrator Agreement, including, for the avoidance of doubt, the requirement to pay or reserve for the expenses of the Plan Administrator or the Wind-Down Debtor, including amounts outstanding under the Wind-Down Financing Facility, in advance of making any distribution. For the avoidance of doubt, any proceeds distributed from the Distributable Cash on or prior to the Effective Date shall not be considered Distributable Proceeds.

50. **"Distribution"** means any transfer of Cash or other property or instruments to a Holder of an Allowed Claim pursuant to the Combined Plan and Disclosure Statement.

51. **"Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Plan on account of Allowed Claims, which date shall be (a) as to the Distributable Cash, the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Bankruptcy Court order and (b) as to the Distributable Proceeds, such date determined by the Plan Administrator and the Wind-Down Debtor Oversight Committee.

52. **"Effective Date"** means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date have been satisfied or waived, and (c) the Plan is declared effective by the Debtor (with the Consent of the Agents).

53. **"Effective Date Distributions"** means all the Distributions required to be made on the Effective Date of the Plan to the Holders of Claims that are Allowed as of the Effective Date.

54. **"Entity"** shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

55. **"Estate Professionals"** means the Professionals of BYJU's Alpha.

56. **"Estate"** means the estate created in this Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57. **"Excess Reserves"** means any excess amounts remaining in any of the Plan Reserves after the final Distribution has been made to the Holders of Allowed Claims entitled to receive a Distribution from such Plan Reserve, which amounts shall immediately vest in the Wind-Down Debtor and be considered Retained Assets and Distributable Proceeds.

58. **"Excluded Parties"** means all parties that are not "Released Parties," as defined herein, including, without limitation: (1) The immediate and mediate transferees of the Alpha Funds and the proceeds thereof except for those parties that are expressly identified as Released Parties; (2) Think and Learn Private Ltd; (3) Think & Learn, Inc.; (4) BYJU's Pte. Ltd; (5) BYJU's Inc.; (6) BYJU's K3 Education Pvt Ltd; (7) Byju's S.A. de C.V.; (8) BYJU's Alpha, Inc.; (9) BYJU's Beta, Inc.; (10) BYJU'S Learning Company FZCO Dubai; (11) BYJU'S Tecnologia Educational Ltda; (12) Codr, Inc.; (13) Whitehat Education Technology Pvt. Ltd; (14) Whitehat Education Technology, LLC; (15) Great Learning Education Pte Ltd; (16) Inspilearn LLC; (17) Aakash Educational Services Ltd; (18) Specadel Technologies Pvt Ltd; (19) Span Thoughtworks Pvt. Ltd; (20) Topper Technologies Pvt Ltd; (21) Grade Stack Learning Private Ltd; (22) Aakash Edutech Pvt Ltd; (23) Haygot Services Private Ltd; (24) Digital Aristotle Pvt Ltd; (25) GeoGebra GmbH; (26) all other non-Debtor current and former direct and indirect subsidiaries and Related Parties of Think and Learn Private Ltd; (27) Byju Raveendran and Byju Ravindran; (28) Riju Raveendran and Riju Ravindran; (29) Divya Gokulnath; (30) Anita Kishore; (31) Aaron Kornblum; (32) Roshan Thomas; (33) S. Hari; (34) Elvis Mookken; (35) all other current and former directors, officers, and managers of Think

and Learn Private Ltd and each of its non-Debtor current and former direct and indirect subsidiaries except for those parties that are expressly identified as Released Parties; (36) all current and former directors and officers of the Debtor except for those parties that are expressly identified as Released Parties (*i.e.*, Timothy R. Pohl), including but not limited to Vinay Ravindra, Jonathan Naseath, Cherian Thomas, Mark Solomon, Pramod Sharma, Katherine Xu, Srikanth Chinmay, Ranjit Pawar, Jerome Scholler, Suren Markosian, Kevin Donahue, and Guillaume Poncin; (37) Camshaft Capital Fund, LP; (38) Camshaft Capital Management, LLC; (39) Camshaft Capital Advisors, LLC; (40) William Cameron Morton; (41) OCI Ltd; (42) Apex Fund Services, Inc.; (43) the Voizzit Entities; (44) all current and former directors and officers of the Voizzit Entities included but not limited to Rajendaran Vellapalath; (45) Sandeep Vellapalath; (46) Arkishnan Nair Vellapalath; (47) Rahul Rajendran Vellapalath; (48) Bisy Philip Vellapalath; (49) the MCA Lenders; (50) Praveen Prakash; (51) Sharath Kumar; (52) Shaji Puthalath; (53) Ranjan Pai; (54) Manipal Education and Medical Group; (55) Oliver Chapman; (56) Rupin Banker; (57) Aswanit Nambarambath; (58) John Coyne; (59) Margot Herman; (60) Arjun Mohan; (61) Taejoon Park; (62) Maneesh Arora; (63) Heidi Walas; (64) Nirav Shah; (65) Joe Mixon; (66) Saiprasad Palekar; (67) Aranjith Pawar; (68) Nathin Golani; (69) Will Hailer; (70) Joe Isaacof; (71) Rao Nagam; (72) Utsav Wgoswami; (73) Jennifer Kajisa; (74) Thuy Do; (75) Karan Bajaj; (76) Sajid Shariff; (77) Marc Jacobson; (78) Trupti Mukker; (79) Hiruth Haile; (80) Raghav Jain; (81) Abhishek Dugar; (82) Pradeepta Pradham; (83) Prashant Marwaha; (84) Yifat Schnur; (85) Nawab Nasrat; (86) Hardik Bhatia; (87) Santosh Kumar; (88) Mandar Patil; (89) Adler Martins; (90) Markus Hohenwarter; (91) Rose Acre; (92) BDO International; (93) MSKA & Associates; (94) Deloitte; (95) Suri & Co.; (96) Ernst & Young; (97) YLVS ESQ LLC; (98) DLA Piper LLP; (99) Kasowitz Benson Torres LLP; (100) Pankaj Srivastava; (101) Google LLC; (102) Stripe, Inc.; (103) Wells Fargo Bank, National Association; (104) Hogan Lovells US LLP and Hogan Lovells International LLP; (105) Jino Joseph & Associates; and (106) every current and former Affiliate and Related Party of each Person or Entity in clauses (1) through (105) that is not a Released Party. Notwithstanding anything herein to the contrary, no Excluded Party shall be considered a Released Party or an Exculpated Party in any capacity hereunder and all Claims and Causes of Action against each Excluded Party shall be preserved and shall not be released. The term "Excluded Parties" shall be deemed to control over the term "Released Parties," such that if an Entity would be considered both an Excluded Party and a Released Party, such Entity shall be deemed an Excluded Party and not a Released Party for all purposes hereunder.

59. **"Exculpated Claim"** means any Claim related to any act taken or omitted to be taken in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Combined Plan and Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement, the preparation, filing or administration of the Chapter 11 Case, the pursuit of Confirmation, and the administration and implementation of the Combined Plan and Disclosure Statement, including the Distribution of property under the Combined Plan and Disclosure Statement or any other agreement.

60. **"Exculpated Parties"** means, to the extent that they are estate fiduciaries, and in each case solely in their capacities as such on or after the Petition Date through and including

the Effective Date, the Debtor, any of the Debtor's current officers and directors (*i.e.*, Timothy R. Pohl), and the Estate Professionals.

61. "**Executory Contract**" means a contract to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

62. "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

63. "**Final DIP Order**" means the *Final Order (I) Authorizing the Use of Cash Collateral, (II) Authorizing the Debtor to Obtain Postpetition Financing, (III) Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [D.I. 160].

64. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other United States court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay, and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

65. "**First DIP Amendment**" means that certain Amendment No. 1 to the DIP Credit Agreement, dated as of December 18, 2024.

66. "**First DIP Amendment Order**" means the *Order Authorizing the Debtor to Amend the DIP Credit Agreement and Granting Related Relief* [D.I. 290].

67. "**General Bar Date**" means April 29, 2025.

68. "**General Unsecured Claim**" means any Claim, other than a Secured Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, (c) an Other Secured Claim, (d) an Other Priority Claim, (e) a DIP Claim, (f) an Intercompany Claim, or (g) a Section 510(b) Claim.

69. "**GLAS**" means GLAS Trust Company LLC, in its capacity as Prepetition Administrative Agent, Prepetition Collateral Agent, or DIP Agent, as applicable.

70. "**Governmental Bar Date**" means April 29, 2025.

71. **"Holder"** means any Entity that is the legal or beneficial holder of a Claim or Interest.

72. **"Impaired"** means, with respect to any Class, a Class that is impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

73. **"Intercompany Claim"** means any Claim held by an Affiliate of the Debtor against the Debtor.

74. **"Intercompany Interest"** means any Interest held by the Debtor in a non-Debtor subsidiary or Affiliate.

75. **"Intercreditor Agreement"** means that certain Amended and Restated Subordination and Intercreditor Agreement, dated as of October 31, 2024 (as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and between GLAS, as administrative agent and collateral agent for the Epic! First Priority Lenders party to the Epic! First Priority Credit Agreement (both as defined in the Intercreditor Agreement), GLAS, as administrative agent and collateral agent for the DIP Lenders party to the DIP Credit Agreement, and GLAS, as administrative agent and collateral agent for the Prepetition Term Loan Lenders party to the Prepetition Credit Agreement.

76. **"Interests"** means any equity interest in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor.

77. **"Interim Approval and Procedures Order"** means the *Order (I) Approving the Combined Plan and Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; and (VI) Granting Related Relief* [D.I. [●]].

80. **"Law"** means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

81. **"Lien"** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

82. **"Liquidating Trust"** means a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, which may be established by the Wind-Down Debtor for the purpose of facilitating the Wind-Down.

83. **"Local Rules"** means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

84.  "**Initial New Money Term Loan Commitment**" has the meaning ascribed to it in the DIP Credit Agreement.

85.  "**OCI Adversary**" means the adversary proceeding captioned *BYJU's Alpha, Inc. v. OCI Ltd. and Rupin Banker*, Adv. No. 25-50822 (Bankr. D. Del.).

86.  "**OCI Claims**" means, collectively, any Claims Filed or otherwise asserted by or on behalf of the OCI Entities, or any Affiliate or Related Party of any of the foregoing, including, without limitation, any Claim or request for reimbursement of fees or costs in connection with Claim No. KF-2024-003996 in the High Court of Justice, King's Bench Division.

87.  "**OCI Entities**" means, collectively, OCI Limited and any of its Affiliates or subsidiaries, Rupin Banker, and Oliver Chapman.

88.  "**Other Priority Claim**" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Case.

89.  "**Other Priority Claims Amount**" means an amount equal to the Debtor's good-faith estimate of the aggregate Allowed Other Priority Claims, which estimate the Debtor shall deliver to counsel to the DIP Agent and counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

90.  "**Other Priority Claims Reserve**" means the reserve for the Allowed Other Priority Claims established by the Debtor in an amount equal to the Other Priority Claims Amount.

91.  "**Other Secured Claim**" means any Secured Claim, other than the Prepetition Term Loan Claims.

92.  "**Other Secured Claims Amount**" means an amount equal to the Debtor's good-faith estimate of the aggregate Allowed Other Secured Claims, which estimate the Debtor shall deliver to counsel to the DIP Agent and counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

93.  "**Other Secured Claims Reserve**" means the reserve for the Allowed Other Secured Claims established by the Debtor in an amount equal to the Other Secured Claims Amount.

94.  "**Person**" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

95.  "**Petition Date**" means February 1, 2024, the date on which the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

96.  "**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended,

modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtor no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.

97. "**Prepetition Administrative Agent**" means GLAS, in its capacity as the administrative agent under the Prepetition Credit Agreement.

98. "**Prepetition Agent**" means GLAS, in its capacities as administrative agent and collateral agent under the Prepetition Term Loan Facility.

99. "**Prepetition Collateral Agent**" means GLAS, in its capacity as the collateral agent under the Prepetition Credit Agreement.

100. "**Prepetition Credit Agreement**" means that certain credit and guaranty agreement dated November 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

101. "**Prepetition Required Lenders**" has the meaning ascribed to the term "Required Lenders" in the Prepetition Credit Agreement.

102. "**Prepetition Security Agreement**" means that certain Pledge and Security Agreement dated as of November 24, 2021.

103. "**Prepetition Term Loans**" means loans, including fees and expenses, outstanding under the Prepetition Credit Agreement.

104. "**Prepetition Term Loan Claims**" means any Claims arising under, derived from, or based upon the Prepetition Credit Agreement, including but not limited to Claims Secured by the Prepetition Term Loan Lenders' liens granted by the Prepetition Security Agreement on substantially all of the Debtor's assets, including all causes of action, and the Prepetition Term Loan Lenders' liens on Avoidance Actions to the extent of diminution of value granted by the Final DIP Order.

105. "**Prepetition Term Loan Effective Date Distribution**" means the payment in Cash on the Effective Date from Distributable Cash, up to the aggregate amount of Prepetition Term Loan Claims outstanding as of the Effective Date.

106. "**Prepetition Term Loan Facility**" means that certain secured term loan facility arising under the Prepetition Credit Agreement.

107. "**Prepetition Term Loan Lenders**" means, collectively, the lenders from time to time under the Prepetition Credit Agreement.

108. "**Priority Tax Claim**" means any Claim which, if Allowed, would be entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

109. **"Priority Tax Claim Amount"** means an amount equal to the Debtor's good-faith estimate of the aggregate Allowed Priority Tax Claims, which estimate the Debtor shall deliver to counsel to the DIP Agent and counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

110. **"Priority Tax Claim Reserve"** means the reserve for the Allowed Priority Tax Claims established by the Debtor in an amount equal to the Priority Tax Claims Amount.

111. **"*pro rata*"** means, for purposes of distributions under the Plan, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

112. **"Professional"** means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

113. **"Professional Fee Claim"** means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Case on or after each Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

114. **"Professional Fee Escrow Account"** means an interest-bearing escrow account to be funded by the Debtor, with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

115. **"Professional Fee Escrow Amount"** means the aggregate amount of the Professional Fee Claims and other unpaid fees and expenses the Debtor's Professionals estimate they have incurred or will incur in rendering services to the Debtor prior to and as of the Effective Date, which estimates such Professionals shall deliver to the Debtor, counsel to the DIP Agent, and counsel to the Prepetition Administrative Agent as soon as reasonably practicable.

116. **"Proof of Claim"** means the proof of Claim filed by a Holder on account of such Claim.

117. **"Raveendran Adversary"** means the adversary proceeding captioned *BYJU's Alpha, Inc. v. Byju Raveendran et al.*, Adv. No. 25-50526 (Bankr. D. Del.).

118. **"Reinstate," "Reinstated," or "Reinstatement"** means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

119. "**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees, each in their capacities solely as such.

120. "**Released Parties**" means (a) the current Prepetition Term Loan Lenders; (b) the Prepetition Agent; (c) the DIP Lenders; (d) Timothy R. Pohl; (e) the DIP Agent and each of their Related Parties and any other related Persons, but solely in their capacity as such.

121. "**Rejection Bar Date**" means the deadline by which a counterparty to a rejected Executory Contract or Unexpired Lease of the Debtor must file a Proof of Claim for damages resulting from the rejection of such Executory Contract or Unexpired Lease by the Debtor, which deadline shall be the later of: (a) the General Bar Date; (b) thirty (30) days after the entry of an order by the Bankruptcy Court authorizing such rejection; or (c) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection.

122. "**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code by the Debtor, as limited, in the case of a rejected Unexpired Lease, by section 502(b)(6) of the Bankruptcy Code.

123. "**Required Lenders**" has the meaning ascribed to the term "Required Lenders" in the DIP Credit Agreement.

124. "**Retained Assets**" means those assets vesting in the Wind-Down Debtor upon or after the Effective Date; *provided* that the Plan Reserves shall not be designated as Retained Assets except to the extent of any excess funds in any such reserve. For the avoidance of doubt, the Retained Assets shall exclude any assets abandoned or otherwise disposed of pursuant to the Plan or any Final Order of the Bankruptcy Court.

125. "**Retained Causes of Action**" means all Claims and Causes of Action (including, for the avoidance of doubt, the Adversary Proceedings and the Avoidance Actions) belonging to the Debtor, or the Estate, including, but not limited to, all Causes of Action enumerated on the Schedule of Retained Causes of Action which shall be filed with the Plan Supplement, all of which shall vest in the Wind-Down Debtor pursuant to the terms of the Plan and be deemed an integral part thereof. For the avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action against the Excluded Parties, whether or not listed on the Schedule of Retained Causes of Action. For the further avoidance of doubt, Retained Causes of Action shall include all Claims and Causes of Action arising out of or in connection with: (a) the efforts

of Byju Raveendran, Riju Ravindran, the Camshaft Entities, William Cameron Morton, OCI Limited, Oliver Chapman, Rupin Banker, Divya Golkunath, Anita Kishore, or the Debtor's insiders, or any of their respective Affiliates or associates, to transfer or take the Debtor's assets either before the Petition Date or during the Chapter 11 Case, (b) the efforts of Byju Raveendran, Riju Ravindran, the Camshaft Entities, William Cameron Morton, OCI Limited, Oliver Chapman, Rupin Banker, Divya Golkunath, Anita Kishore, or the Debtor's insiders, or any of their respective Affiliates or associates, to disrupt or impair the Chapter 11 Case, (c) the Alpha Funds, including the transfer of some or all of those funds from the Camshaft Entities, OCI Limited, and other successor transferees, and (d) any breach of fiduciary duties by the Debtor's former directors or officers, with the exception of any individual appointed as a director or officer by the Prepetition Agent, including, for the avoidance of doubt, Timothy R. Pohl. Retained Causes of Action shall not include any Causes of Action that are settled, released, or exculpated under the Plan.

126. "**Roll-Up Claims**" means any Claim arising under or relating to the Roll-Up Loans (as defined in the DIP Credit Agreement).

127. "**Schedule of Assumed Executory Contracts and Unexpired Leases**" means that certain schedule, if any, Filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be assumed by the Debtor pursuant to the Plan as such schedule may be amended, modified, or supplemented from time to time by the Debtor.

128. "**Schedule of Excluded Parties**" means that certain schedule Filed with the Plan Supplement of a non-exhaustive list of Excluded Parties.

129. "**Schedule of Retained Causes of Action**" means that certain schedule Filed with the Plan Supplement of a non-exhaustive list of Claims and Causes of Action of the Debtor and the Estate that are not released, waived, or transferred, other than to the Wind-Down Debtor, pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time. For the avoidance of doubt, the failure to list a Claim or Cause of Action on the Schedule of Retained Causes of Action shall not affect such Claim or Cause of Action being a Retained Cause of Action.

130. "**Scheduled**" means that a Claim is specifically acknowledged in the Schedules.

131. "**Schedules**" means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs Filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto, if any.

132. "**Second Amended Complaint**" means the *Second Amended Complaint for Avoidance and Recovery of Fraudulent Transfers, Breach of Fiduciary Duties, Aiding and Abetting Breach of Fiduciary Duties, Accounting, Declaratory Judgment, Turnover of Property, Conversion, and Violation of Automatic Stay* [Camshaft Adv. D.I. 151].

133. "**Secured**" means when referring to a Claim:  (a) secured by a Lien on property in which the Debtor has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant

to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

134. "**Security**" means any security, as defined in section 2(a)(1) of the Securities Act.

135. "**Solicitation Package**" means the packages to be distributed to Creditors for solicitation of votes on this Plan.

136. "**Statutory Fees**" means all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable.

137. "**T&L**" means Think & Learn Pvt. Ltd d/b/a BYJU's.

138. "**Unexpired Lease**" means a lease to which one or more of the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

139. "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

140. "**U.S. Trustee**" means the United States Trustee for the District of Delaware.

141. "**U.S. Trustee Fees**" means fees arising under 28 U. S. C. § 1930(a)(6).

142. "**Voizzit Entities**" means Voizzit India and Voizzit UAE, and any Affiliate or Related Party thereof, including, without limitation, Rajendran Vellapalath.

143. "**Voizzit India**" means Voizzit Technology Private Ltd.

144. "**Voizzit UAE**" means Voizzit Information Technology LLC.

145. "**Voting Deadline**" means October 19, 2025, at 4:00 p.m. (prevailing Eastern Time).

146. "**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

147. "**Wind-Down**" means, the wind-down, dissolution, and liquidation of the Debtor's Estate after the Effective Date.

148. "**Wind-Down Debtor Assets**" means, on the Effective Date, all assets of the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan, which shall in any event include, without limitation:  (a) all Retained Causes of Action, (b) all Retained Assets; (c) the Excess Reserves (if any); and (d) the proceeds of any of the foregoing.

149. "**Wind-Down Debtor**" means the Debtor, or any successor thereto, by merger, consolidation, or otherwise on or after the Effective Date.

150. "**Wind-Down Debtor Oversight Committee**" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and Plan Administrator Agreement.

151. "**Wind-Down Financing Facility Lenders**" means, collectively, the Wind-Down Financing Facility New Money Lenders and the Wind-Down Financing Facility Roll-Over Lenders.

152. "**Wind-Down Financing Facility New Money Commitments**" means the commitments made by the Wind-Down Financing Facility New Money Lenders in connection with the Wind-Down Financing Facility and pursuant to the terms of the Definitive Documentation.

153. "**Wind-Down Financing Facility New Money Lenders**" means, collectively, those lenders providing the Wind-Down Financing Facility New Money Term Loans.

154. "**Wind-Down Financing Facility New Money Term Loans**" means the term loans made by the Wind-Down Financing Facility New Money Lenders in respect of the Wind-Down Financing Facility New Money Commitments and in accordance with this Plan and the Definitive Documentation.

155. "**Wind-Down Financing Facility Roll-Over Lenders**" means, collectively, those Holders of Allowed DIP Claims receiving Wind-Down Financing Facility Rollover Term Loans in exchange for their Allowed DIP Claims.

156. "**Wind-Down Financing Facility Roll-Over Term Loans**" means the term loans converted from, or issued in exchange for, the Allowed DIP Claims in accordance with the DIP Credit Agreement, this Plan, and the Definitive Documentation.

157. "**Wind-Down Financing Facility Term Loans**" means, collectively, the Wind-Down Financing Facility New Money Term Loans and the Wind-Down Financing Facility Roll-Over Term Loans.

158. "**Wind-Down Transactions**" means any mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, formations, dissolutions or other corporate transactions described in, approved by, contemplated by, or undertaken to implement the Wind-Down pursuant to the Plan.

**B.     Rules of Interpretation.**

1.     **Bankruptcy Code Section 102.** The rules of construction in section 102 of the Bankruptcy Code apply to this Combined Plan and Disclosure Statement to the extent not inconsistent with any other provision of this Article II.B.

2.   **Undefined Terms.** Any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

3.   **Combined Plan and Disclosure Statement Definitions Control.** The definition given to any term or provision in the Combined Plan and Disclosure Statement supersedes and controls any different meaning that may be given to that term or provision in the Bankruptcy Code, the Bankruptcy Rules, or the Disclosure Statement.

4.   **Include and Including.** The terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to."

5.   **Plural and Singular Terms.** Whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine.

7.   **References to Court Filings.** Unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules.

9.   **Inclusion of Amended Agreements.** Any reference in the Combined Plan and Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented.

11.   **Exhibits.** Unless otherwise specified, all references in the Combined Plan and Disclosure Statement to "Articles," "Sections," "Exhibits" and "Schedules" are references to Articles, Sections, Exhibits and Schedules of or to the Combined Plan and Disclosure Statement. Unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions.

13.   **Herein/Hereof/Hereto.** The words "herein," "hereof," and "hereto" refer to the Combined Plan and Disclosure Statement in its entirety rather than to a particular portion of the Combined Plan and Disclosure Statement.

15.   **Headings.** Captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Combined Plan and Disclosure Statement or otherwise affect the interpretation of the Combined Plan and Disclosure Statement.

17.   **Interpretation.** Any effectuating provisions may be interpreted by the Debtor in such a manner that is consistent with the overall purpose and intent of the Combined Plan and Disclosure Statement all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control.

19.   **Merger.** The Combined Plan and Disclosure Statement supersedes all prior plans, drafts of plans, and all prior negotiations, agreements, and understandings with respect to the

33521563.3

plan, evidence of which shall not affect the interpretation of any provision of the Combined Plan and Disclosure Statement.

21. **Reference to Monetary Figures**. All references in the Combined Plan and Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

23. **Computation of Time.** Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Combined Plan and Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

25. **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Combined Plan and Disclosure Statement, any agreements, documents, instruments, or contracts executed or entered into in connection with the Combined Plan and Disclosure Statement (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

## ARTICLE III: DISCLOSURE STATEMENT[3]

**A.     General Background**

**1.      The Debtor's Formation And Entry Into $1.2 Billion Prepetition Term Loan Facility**

The Debtor was incorporated in Delaware on September 27, 2021 as a special purpose vehicle whose purpose is understood to be for raising funds for the overseas expansion of BYJU's, a corporate conglomerate indirectly owned by Think & Learn, based in India.  The Debtor has never had any material business operations.

Until March 3, 2023, the Debtor was an indirect subsidiary of T&L, owned by its intermediate corporate parent BYJU's Pte. Ltd, a Singapore entity.

On November 24, 2021, the Debtor borrowed $1.2 billion in five-year term loans (*i.e.*, the Prepetition Term Loans) from the Prepetition Term Loan Lenders in accordance with, and governed by, various loan documents, including the Prepetition Credit Agreement.  GLAS was appointed and continues to serve as the Prepetition Administrative Agent and Prepetition Collateral Agent.

---

[3]     The disclosures contained herein reflect the Debtor's compliance with 11 U.S.C. § 1106(a)(3) and (4) and constitute its report for purposes of §1106(a)(4).

In exchange for the $1.2 billion of proceeds from the Prepetition Term Loans, the Debtor and its affiliated guarantors, including its ultimate corporate parent, T&L (collectively, the "**Loan Parties**"), agreed to several material covenants, which included certain financial reporting and guarantee obligations.

### 2.    The Debtor Promptly Defaults Under The Prepetition Term Loan Facility

Within months of executing the Prepetition Credit Agreement, in March and April 2022, the Loan Parties failed to satisfy at least two of the loan covenants.  Specifically, (i) on March 16, 2022, T&L failed to furnish required unaudited consolidated financial statements for Q1 FY 2021-2022, and (ii) the Debtor's then-affiliate, Whitehat Education Technology Private Limited ("**Whitehat**") failed to guaranty the Prepetition Term Loans by its April 1, 2022 deadline.

Thereafter, on September 13, 2022, T&L failed to furnish comparative figures for the Q1 FY 2022-2023 quarterly period.  Then, T&L failed to deliver audited financial statements for FY 2021-2022 as of the September 27, 2022.

Between October 2022 and January 2023, T&L, on behalf of all Loan Parties (including the Debtor), entered into a series of amendments to the Prepetition Credit Agreement while negotiating with the Prepetition Term Loan Lenders.  In these amendments, the parties memorialized the Loan Parties' acknowledgement that the four aforementioned reporting and guarantee breaches, defined under Amendment No. 2 as "Specified Defaults," matured into "Events of Default" following T&L's failure to cure them within a 45-day cure period, ending November 24, 2022.

Under Amendment No. 7 to the Credit Agreement, dated as of January 6, 2023, the Prepetition Term Loan Lenders agreed to forbear from exercising remedies, including accelerating the Prepetition Term Loans, until no later than February 10, 2023, so that the parties could continue efforts to restructure the Prepetition Terms Loans.  On February 10, 2023, the forbearance period under Amendment No. 7 expired by its own terms.  There were no further forbearance agreements.

### 3.    The Prepetition Term Loan Lenders' Exercise Of Remedies

On March 3, 2023, the Prepetition Agent, at the Prepetition Term Loan Lenders' direction, gave formal notice of Events of Default and accelerated the Prepetition Term Loans.  In the same notice, the Prepetition Agent also made a demand for immediate payment of the accelerated Prepetition Term Loans.

Under the Loan Documents (as defined in the Prepetition Credit Agreement), 100% of the common stock of the Debtor had been pledged to the Prepetition Collateral Agent as loan collateral.  The Prepetition Agent, acting at the Prepetition Term Loan Lenders' direction, effectuated a change of control of the Debtor by taking control of the pledged stock and its voting rights.

Through an Action by Written Consent of the Sole Stockholder, the Prepetition Agent removed Riju Ravindran, who had been the Debtor's sole director, and appointed Timothy R. Pohl, an experienced restructuring professional, as the Debtor's sole director, and amended the Debtor's bylaws to provide that the board and any officer designated by the board would control the

Debtor's accounts.  In Mr. Pohl's capacity as the Debtor's sole director, and consistent with the Prepetition Agent's directions, Mr. Pohl executed a Written Consent of the board to immediately remove all existing officers and appoint himself to serve as the CEO and Secretary of the Debtor. Mr. Pohl retained Quinn Emanuel Urquhart & Sullivan, LLP to represent the Debtor in its efforts to locate and secure the Debtor's assets and to provide general legal advice.

In mid-March 2023, T&L furnished to the Prepetition Agent, for distribution to the Prepetition Term Loan Lenders, unaudited quarterly financial statements for the period ending December 31, 2022.  Those unaudited financials reported the amount (in Rupees) of "Cash and Bank" balances for T&L and each of its subsidiaries, including the Debtor.  They showed that, as of December 31, 2022, the Debtor had an amount of Rupees equivalent to over US$500 million (based on prevailing currency exchange rates) in "Cash and Bank."

  **4.**  **The Delaware Court Of Chancery Action To Validate Mr. Pohl's Appointment And Receipt Of The Debtor's Bank Account Records**

On May 3, 2023, the Prepetition Agent and Mr. Pohl filed a lawsuit in the Delaware Court of Chancery seeking a declaration that, pursuant to Delaware General Corporation Law, 8 *Del. C.* § 225, Mr. Pohl had been validly appointed as the Debtor's director and officer, among other related relief.  *GLAS Tr. Co. LLC v. Ravindran*, C.A. No. 2023-0488-MTZ (Del. Ch. 2023) (the "**225 Action**").

Mr. Pohl sought to obtain control of the Debtor's accounts and assets during the pendency of the 225 Action under a *Status Quo* Order.  At the time, Mr. Pohl believed that the Debtor had a material amount of cash in its bank accounts (over which he did not yet have control).

On May 22, 2023, the Delaware Court of Chancery in the 225 Action entered a *Status Quo* Order, authorizing Mr. Pohl to remain in control of the Debtor as sole director and sole officer, pending a final decision of the merits.  As part of the Order, the Court of Chancery required Mr. Ravindran (the Debtor's former officer and sole director) to immediately provide Mr. Pohl with access to and exclusive control over the Debtor's accounts, documents, and information.

On May 24, 2023, Mr. Pohl received some, but not all, of the Debtor's account numbers from Mr. Ravindran's counsel.  After months of diligent investigation, Mr. Pohl identified additional Debtor bank accounts in or around July 2023 that Mr. Ravindran had failed to disclose.

On November 2, 2023, the Delaware Court of Chancery orally announced its decision in the 225 Action.  Based on Whitehat's failure to procure the required guarantee, the Delaware Court of Chancery found that there was at least one valid Event of Default outstanding as of March 3, 2023, then granted virtually all of the relief the Prepetition Agent and Mr. Pohl had requested. It specifically declared that the enforcement steps on March 3, 2023 were valid and effective as to the removal of Mr. Ravindran as the Debtor's preexisting director and officer.  The Court of Chancery also declared that Mr. Pohl was properly put in place as the sole director and sole officer of the Debtor.

### 5.    Discovery Of The Debtor's Mid-2022 Transfers To Camshaft Fund

As noted, in July 2023, based upon Mr. Pohl's review of the Debtor's bank account records, it was preliminarily determined that across six transfers from two of the Debtor's accounts in April and July 2022, the Debtor had transferred approximately $533 million (*i.e.*, the Alpha Funds) to a hedge fund located in Miami, Florida called Camshaft Capital Fund, LP ("**Camshaft Fund**") in exchange for a limited partnership interest therein (the "**Camshaft LP Interest**").  There was, and is, no evidence of the Debtor ever receiving any return on this purported investment in Camshaft Fund.

Based upon an investigation undertaken by the Prepetition Agent, as well as discovery conducted by the Debtor's counsel, the Debtor learned that Camshaft Fund was founded by an individual named William Cameron Morton, then 23 years old with no apparent formal training in investing and money management and no apparent qualification to manage a hedge fund with hundreds of millions of dollars of assets under management.

In August 2023, Mr. Pohl shared the discovery of the Debtor's transfers of the Alpha Funds to Camshaft Fund with the Prepetition Agent's counsel.  On September 5, 2023, the Prepetition Agent commenced a lawsuit against Camshaft Fund and two of its affiliates (collectively, "**Camshaft**") in state court in Miami, seeking to avoid the $533 million in transfers, among other relief.  *See GLAS Tr. Co. LLC v. Camshaft Cap. Fund, LP*, Case No. 2023-022640-CA-01 (Fla. 11th Cir. Ct. 2023) (the "**Florida Action**").

In multiple filings in the Florida Action, Camshaft suggested that the Debtor had invested $533 million in Camshaft Fund and that the Debtor continued to hold that investment.  Thereafter, Mr. Pohl requested from Camshaft records of the Debtor's purported interest in the Camshaft Fund.  On December 4, 2023, Camshaft's counsel responded and, contrary to earlier representations in the Florida Action, stated that the Debtor was a former limited partner of Camshaft Fund, and that the Debtor now had a zero-balance capital account.

### 6.    The Debtor Commences The Chapter 11 Case And Commences The Camshaft Adversary

The Debtor filed its voluntary petition under chapter 11 of title 11, United States Code, on February 1, 2024. (the "**Petition Date**").  As of the Petition Date, the outstanding principal amount of the Prepetition Term Loans was approximately $1,189,513,685 and the outstanding accrued and unpaid premium, interest, fees, and expenses was approximately $267,548,427.  Meanwhile, the Debtor had less than $4 million of cash on the Petition Date.

On February 2, 2024, the Debtor filed the *Declaration of Timothy R. Pohl, Director, CEO and Secretary of BYJU's Alpha, Inc., In Support of the Debtor's Chapter 11 Petition* [D.I. 3].  Also on February 2, 2024, the Debtor filed various motions for relief, including the DIP Motion [D.I. 5].  The DIP Motion was granted on an interim basis on February 8, 2024 [D.I. 56] and on a final basis on April 8, 2024 [D.I. 160].

Also on February 2, 2024, the Debtor filed an adversary proceeding complaint against Camshaft, initiating the Camshaft Adversary.

On February 16, 2024, the Court ordered expedited discovery from Camshaft.  On February 23, 2024, Camshaft disclosed that, on March 1, 2023, a 100% transfer was processed from the Camshaft Fund capital account of the Debtor to Inspilearn, LLC ("**Inspilearn**") a U.S. entity and 100% T&L subsidiary.  Inspilearn was not a guarantor of the Prepetition Term Loan Facility.  Subsequent discovery from Camshaft's fund administrator and books and records custodian, Apex Fund Services ("**Apex**"), revealed that the transfer actually was made on March 31, 2023.  On February 28, 2024, the Debtor amended its complaint in the Camshaft Adversary to add Mr. Ravindran and Inspilearn as defendants [Camshaft Adv. D.I. 30].  On March 1, 2024, the Court granted the Prepetition Agent's motion to intervene in the Camshaft Adversary [Camshaft Adv. D.I. 48].

According to his declaration filed on March 5, 2023 [Camshaft Adv. D.I. 59], Mr. Ravindran resigned as sole manager of Inspilearn on February 14, 2024.  In his declaration, Mr. Ravindran swore that he had no knowledge as to the whereabouts of the funds transferred from the Debtor's Camshaft Fund capital account.  Based upon a press release issued by T&L, Mr. Ravindran said that the funds had been transferred away from Inspilearn to a "non-US based 100% subsidiary of BYJU's."

On March 14, 2024, in addition to holding Camshaft and Mr. Morton in contempt of court for failing to comply with their discovery obligations, the Bankruptcy Court granted the Debtor's request for a preliminary injunction.  On March 18, 2024, the Bankruptcy Court entered the *Order Granting Debtor's Motion for a Preliminary Injunction* [Camshaft Adv. D.I. 84] (the "**Preliminary Injunction Order**").  In the Preliminary Injunction Order, the Court enjoined Camshaft, Mr. Ravindran, and Inspilearn, along with Byju Raveendran (T&L's eponymous founder, CEO, and board member) and his wife and T&L co-founder and board member, Divya Gokulnath, from taking any steps to spend, transfer, exchange, convert, dissipate, liquidate, or otherwise move or modify any rights related to the Alpha Funds.  The Court also required Mr. Ravindran to, among other things, take all necessary steps to determine the location, amount, and composition of the Alpha Funds.  Mr. Ravindran did not take all necessary steps, and, on May 28, 2024, the Court held Mr. Ravindran in contempt for failing to comply with the Preliminary Injunction Order [Camshaft Adv. D.I. 204].

On April 24, 2024, the Debtor filed the Second Amended Complaint [Camshaft Adv. D.I. 151] (the "**SAC**") to, among other things, add T&L as a defendant.

7.    **Camshaft Adversary Summary Judgment**

As noted, Apex produced documents to the Debtor in connection with the Camshaft Adversary.  The Debtor learned from this production that the Alpha Funds were promptly transferred from Camshaft Fund after their receipt from the Debtor to OCI pursuant to several Promissory Notes and that the Debtor's former management had executed side letters acknowledging that the funds would be loaned to OCI.  To the Debtor's knowledge and based upon its investigation, OCI has never made any repayments on these Promissory Notes.

Based upon discovery received in the Camshaft Adversary, including from Camshaft and Apex, as well as Mr. Ravindran's answer to the SAC [Camshaft Adv. D.I. 179], on July 8, 2024, the Debtor and Prepetition Agent (together, "**Plaintiffs**"), filed a *Motion for Partial Summary*

*Judgment on Counts I, II, IV, VIII, and X of the Second Amended Complaint* [Camshaft Adv. D.I. 275] (the "**Summary Judgment Motion**").

On February 27, 2025, the Bankruptcy Court issued its *Memorandum Opinion* [Camshaft Adv. 383] (the "**SJ Memorandum Opinion**") granting the Plaintiffs' Summary Judgment Motion. Also on that date, the Bankruptcy Court denied T&L's motion to dismiss the SAC [Camshaft Adv. D.I. 382].

On March 14, 2025, the Bankruptcy Court entered the *Judgment Order* in the Camshaft Adversary [Camshaft Adv. D.I. 388] (the "**Alpha Funds Judgment Order**"), adjudging, among other things: (i) the transfer of the Alpha Funds to Camshaft Fund an actual fraudulent transfer and avoided under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code; (ii) Camshaft Fund is liable to the Debtor and the Prepetition Agent in the amount of $533,000,000.00 million, plus interest and costs; (iii) the Debtor's transfer of the Camshaft LP Interest to Inspilearn, for the benefit of T&L, was an actual fraudulent transfer and is avoided under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code; (iv) Inspilearn and T&L are jointly and severally liable to the Debtor and the Prepetition Agent in the amount of $540,647,109.20, plus interest and costs; (v) Riju Ravindran breached his fiduciary duties to the Debtor by authorizing the transfer to Camshaft Fund and the subsequent transfer to Inspilearn;  (vi) Riju Ravindran is liable to the Debtor and the Prepetition Agent in the amount of $540,647,109.20, plus interest and costs; (vii) Riju Ravindran and T&L are each liable for the conversion of the Camshaft LP Interest; and (viii) Ravindran is liable to the Debtor and Prepetition Agent in the amount of  $540,647,109.20, plus interest and costs.

Camshaft and Mr. Ravindran have filed appeals of the SJ Memorandum Opinion and the Alpha Funds Judgment Order to the District Court for the District of Delaware.  *BYJU's Alpha Inc. v. Camshaft Capital Fund, LP*, Case No. 25-322 (MN), Case No. 25-854 (MN).

### 8.    Raveendran Adversary

On April 9, 2025, the Debtor initiated the Raveendran Adversary against Byju Raveendran (former self-appointed CEO of the Debtor and co-founder and former CEO and board member of T&L), Divya Gokulnath (wife of Raveendran and co-founder and former director of T&L), and Anita Kishore (Chief Strategy Officer and *de facto* CFO of T&L) in connection with their involvement in the illegal transfers of the Alpha Funds and Camshaft LP Interest.  Specifically, the Debtor brought claims for (1) aiding and abetting Riju Ravindran's breaches of fiduciary duty against Mr. Raveendran and Ms. Gokulnath, (2) a principal claim of breach of fiduciary duty against Mr. Raveendran, (3) aiding and abetting Mr. Raveendran's breach of fiduciary duty against Ms. Kishore, (4) accounting against all defendants, and (5) conversion against all defendants.  The Prepetition Agent filed a motion to intervene on April 21, 2025, which was granted on May 7, 2025.  On May 9, 2025, the Bankruptcy Court granted the Debtor's Motion for Limited Expedited Discovery of Mr. Raveendran, and, on June 30, 2025, subsequently held Mr. Raveendran in contempt for failing to comply with this and a related discovery order.  Mr. Raveendran moved to have the Bankruptcy Court reconsider its contempt order between July 14 and 15, 2025.  All three defendants moved to dismiss the complaint against them between July 25 and 26, 2025.  The Debtor and the Prepetition Agent moved for default judgment against Mr. Raveendran on August 11, 2025.  Oral argument on all of these outstanding motions is scheduled for September 9, 2025.

9.      **OCI Adversary**

On May 5, 2025, the Debtor initiated the OCI Adversary against OCI and Rupin Banker. OCI was the subsequent transferee of the mid-2022 transfer of the Alpha Funds, which have been avoided under the Alpha Funds Judgment Order. Therefore, the Debtor seeks to recover from OCI under section 550 of the Bankruptcy Code. The Debtor has also asserted claims against both OCI and Mr. Banker for aiding and abetting Camshaft, T&L, and Mr. Ravindran's breaches of their fiduciary duties. The Prepetition Agent filed a motion to intervene as a plaintiff on May 27, 2025, which was granted on July 8, 2025. OCI filed a motion to dismiss the complaint on July 14, 2025. That motion is fully briefed, and is currently scheduled to be argued before the Bankruptcy Court on September 22, 2025. The Plaintiffs expect Banker to file his own motion to dismiss imminently.

10.      **Claims Review and Reconciliation Process**

On March 10, 2025, the Debtor filed the *Debtor's Motion for an Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. §§ 507(a)(3) through (a)(10) and 503(b)(9), (II) Approving the Form and Manner for Filing Proof of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [D.I. 335]. On March 27, 2025, the Bankruptcy Court entered the Bar Date Order [D.I. 338] establishing April 29, 2025 as the General Bar Date and the Governmental Bar Date and setting additional Bar Dates.

Unless otherwise set forth in the Bar Date Order, all Creditors holding or wishing to assert unsecured or Secured, priority or nonpriority Claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtor or the Debtor's Estate, accruing prior to the Petition Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code, were required to File a separate, completed, and executed Proof of Claim form on account of each such Claim, together with accompanying documentation by the General Bar Date. Governmental Units, as defined by section 101(27) of the Bankruptcy Code, were required to submit Claims by the Governmental Bar Date.

The Debtor and its Professionals have commenced the Claims review and reconciliation process. A total of four Proofs of Claim were Filed prior to the General Bar Date:

a.    On April 25, 2025, the Prepetition Agent, on behalf of the Prepetition Term Loan Lenders, filed a master Proof of Claim asserting a Secured Claim in the amount of $1,431,981,651.04 and reserving all rights to assert an unsecured Claim upon the determination of any deficiency Claim or to otherwise amend or supplement its Proof of Claim.[4] In addition, pursuant to the Final DIP Order, the Debtor stipulated that:

As of the Petition Date, the Debtor was justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, counterclaim, or

---

[4]    For the avoidance of doubt, pursuant to the Final DIP Order, "[n]either the Prepetition Agent, the Prepetition Secured Parties, the DIP Agent, nor the DIP Secured Parties will be required to file proof of claim in the Chapter 11 Case, and the Debtor's Stipulations shall be deemed to constitute a timely filed proof of claim against the Debtor. Final DIP Order, ¶ 36. Nonetheless, the Prepetition Agent filed the Proof of Claim out of an abundance of caution.

offset of any kind, in the aggregate amount of not less than $1,189,513,685.0 attributable to principal of loans outstanding under the Prepetition Credit Agreement, plus approximately $267,548,427.0 in outstanding accrued and unpaid premium, interest, fees, and expenses, and other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the Prepetition Credit Agreement or the Loan Documents (as defined in the Prepetition Credit Agreement) . . . . Final DIP Order, ¶ E(ii).

The Debtor believes that the only claimants holding a valid and Allowed Secured Claim in this Chapter 11 Case are the Holders of Class 3 Prepetition Term Loan Claims.

b.  On February 16, 2024, the State of California Franchise Tax Board Bankruptcy Section (the "**California Franchise Tax Board**") filed a Proof of Claim in the amount of $0 with the Claim type "to be determined." The California Franchise Tax Board reserved the right to amend its Claim in accordance with applicable law, or upon receipt of a tax return for the 2024 tax year. Absent further information from the California Franchise Tax Board, the Debtor cannot determine the validity of the Proof of Claim and reserves all rights with respect thereto.

c.  On August 8, 2024, Daniel J. Edelman, Inc. ("**Edelman**") filed a Proof of Claim in the amount of $808,067.23 for media relations support and account management services provided to certain of the Debtor's former Affiliates pursuant to a letter of agreement entered into between Edelman and the Debtor. Edelman asserts there are unpaid fees in connection with work performed and is seeking to collect from the Debtor. The Debtor is continuing to assess the validity of the Proof of Claim and reserves all rights with respect thereto.

d.  On July 22, 2024, Lion Business Funding LLC ("**Lion Business**") filed a Proof of Claim for $2,280,805.00 and asserts that this Claim is Secured by substantially all of the Debtor's assets. The Lion Business Claim stems from a factoring agreement dated August 3, 2023 entered into by Riju Ravindran, purportedly on behalf of the Debtor, at a time when Riju Ravindran had been removed as an officer and director of the Debtor and was not authorized to act on behalf of the Debtor. The Debtor also understands Lion Business filed its UCC-1 on June of 2024, and therefore any security interest purportedly held by Lion Business was not perfected prior to the Petition Date. Accordingly, the Debtor intends to object to the Lion Business Proof of Claim and reserves all rights with respect thereto.

The Debtor's Claims review is ongoing, and its assessments are subject to change.

## B.    Summary of Treatment of Claims and Interests Under the Plan

The following chart summarizes the classification and treatment of the Classes of Claims and Interests:

1.      **Claims and Interests**

| span | | | | |
|---|---|---|---|---|
| **In re BYJU's Alpha, Inc.** | | | | |
| **Class** | **Claims and Interests** | **Status** | **Voting Rights** | **Estimated Recovery to Holders of Allowed Claims** |
| Class 1 | Other Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) | 100% |
| Class 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) | 100% |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote | Unknown |
| Class 4 | General Unsecured Claims | Impaired | Not entitled to vote (deemed to reject) | 0% |
| Class 5 | Intercompany Claims | Impaired | Not entitled to vote (deemed to reject) | 0% |
| Class 6 | 510(b) Claims | Impaired | Not entitled to vote (deemed to reject) | 0% |
| Class 7 | Interests | Impaired | Not entitled to vote (deemed to reject) | 0% |

## C.      Retained Causes of Action

The Bankruptcy Code preserves the Debtor's rights to prosecute Claims and Causes of Action that exist outside of bankruptcy and empowers the Debtor to prosecute certain Claims that are established by the Bankruptcy Code, including Claims to, inter alia, avoid and recover certain preferential transfers and fraudulent conveyances. The Plan provides for all Retained Causes of Action to vest in the Wind-Down Debtor.

The vesting of the Retained Causes of Action in the Wind-Down Debtor, and the Plan Administrator's investigation and prosecution of the Retained Causes of Action, is a critical and integral component of the Plan. The Retained Causes of Action, which are set forth in greater detail in the Schedule of Retained Causes of Action in the Plan Supplement, include the Adversary Proceedings and Causes of Action against T&L, Byju Raveendran, Riju Ravindran, Divya Gokulnath, Anita Kishore, and other T&L insiders, OCI Limited, Rupin Banker, the Voizzit Entities, including Rajendran Vellapalath, and insiders of the Debtor, including but not limited to

the list of individuals and Entities that comprise the Excluded Parties. The Retained Causes of Action relate to, among other things, (i) the fraudulent conduct and siphoning of assets that led to the filing of the voluntary chapter 11 petition and continued to occur during this Chapter 11 Case, which have been investigated by the Debtor and the Prepetition Agent during the Chapter 11 Case, and (ii) the Alpha Funds, and there is a close nexus between the Retained Causes of Action and the implementation, consummation, execution, and administration of this Plan. **SPECIFICALLY, AS SET FORTH IN THE DEFINITION OF RETAINED CAUSES OF ACTION, THE RETAINED CAUSES OF ACTION INCLUDE CAUSES OF ACTION ARISING OUT OF OR IN CONNECTION WITH: (A) THE EFFORTS OF BYJU RAVEENDRAN, RIJU RAVINDRAN, DIVYA GOKULNATH, ANITA KISHORE, THE CAMSHAFT ENTITIES, INCLUDING WILLIAM CAMERON MORTON, OCI LIMITED, OLIVER CHAPMAN, RUPIN BANKER, THE VOIZZIT ENTITIES, INCLUDING RAJENDRAN VELLAPALATH, OR THE DEBTOR'S INSIDERS, OR ANY OF THEIR RESPECTIVE AFFILIATES OR ASSOCIATES, TO (I) TRANSFER OR TAKE THE DEBTOR'S ASSETS EITHER BEFORE THE PETITION DATE OR DURING THE CHAPTER 11 CASE OR (II) DISRUPT OR IMPAIR THE CHAPTER 11 CASE; (B) THE ALPHA FUNDS, INCLUDING THE TRANSFER OF SOME OR ALL OF THOSE FUNDS FROM THE CAMSHAFT ENTITIES, OCI LIMITED, AND OTHER SUCCESSOR TRANSFEREES; (C) ANY BREACH OF FIDUCIARY DUTIES BY THE DEBTOR'S CURRENT OR FORMER DIRECTORS OR OFFICERS; OR (D) AID AND ABET BREACHES OF FIDUCIARY DUTIES BY THE DEBTOR'S CURRENT OR FORMER DIRECTORS OR OFFICERS**. The circumstances underlying the aforementioned Retained Causes of Action are partially set forth in Article III.A.6-7, *supra*.

The Retained Causes of Action and related rights constitute substantially all the Retained Assets that will be vested in the Wind-Down Debtor for the benefit of Holders of Allowed claims entitled to the Distributable Proceeds. It is expected that the Holders of Allowed Class 3 Claims would not vote in favor of the Plan absent the Plan Administrator's express responsibility and authority to investigate and pursue any and all such Retained Causes of Action in order to facilitate and maximize Distributions to Holders of such Claims. It is understood that the Holders of Allowed Class 3 Claims believe that the Plan Administrator will have the right under applicable Third Circuit law to pursue the Retained Causes of Actions, including, without limitation, the specifically-identified Retained Causes of Action, in front of the Bankruptcy Court. **SIGNIFICANTLY, IT IS ANTICIPATED THAT ADDITIONAL LITIGATION WILL BE BROUGHT AGAINST THE SUCCESSOR TRANSFEREES OF THE ALPHA FUNDS, ONLY SOME OF WHOM ARE KNOWN AT THIS TIME, AND THE AFOREMENTIONED RETENTION OF THE BANKRUPTCY COURT'S JURISDICTION IS UNDERSTOOD TO BE A MATERIAL COMPONENT OF THE PLAN, GIVEN THE BANKRUPTCY COURT'S FAMILIARITY WITH THE LITIGATION SURROUNDING THE ALPHA FUNDS.** It is the Debtor's understanding that this Article III.C, including the Bankruptcy Court's retention of jurisdiction with respect to the Retained Causes of Action, will be a material inducement for the Holders of Allowed Class 3 Claims to vote in favor of the Plan, particularly in light of the Bankruptcy Court's familiarity with the facts and circumstances giving rise to the Retained Causes of Action. As such, the Plan Administrator's ability to pursue the Retained Causes of Action is fundamental to the implementation of the Plan and administration of the Estate.

For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior Final Order of the Bankruptcy Court or the Plan, the Wind-Down Debtor (including the Plan Administrator and the Wind-Down Debtor Oversight Committee) specifically retain and reserve the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date (and whether or not listed on the Schedule of Retained Causes of Action), and all proceeds of the foregoing. All Claims and Causes of Action against Excluded Parties are expressly preserved, are not released, and are an integral part of this Plan.

## D.     Certain Federal Income Tax Consequences

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and to U.S. Holders of Claims and Equity Interests. This discussion is based on the relevant provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the applicable Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service ("**IRS**"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each U.S. Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the U.S. Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the U.S. Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to U.S. Holders of Claims who did not acquire such Claims at the issue price on

original issue and U.S. Holders that do not hold Claims or Equity Interests as a "capital asset" within the meaning of Section 1221 of the Tax Code. No aspect of foreign, state, local, or estate and gift taxation is addressed.

For purposes of this discussion, the term "**U.S. Holder**" means a Holder of a Claim or (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Tax Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U. S. person for U. S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U. S. federal income tax purposes regardless of its source.

In the case of a Holder that is classified as a partnership for U. S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.

**EACH U.S. HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH U.S. HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

### 1.    Tax Consequences to U.S. Holders of Claims

A creditor that receives a distribution in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss. Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the distribution in income when received. A Holder of a Claim may defer losses until the resolution of all contingencies relating to its Claim, including the liquidation of the Debtor.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE PLAN.

### 2.     Tax Consequences to the Debtor

#### a.     Cancellation of Indebtedness Income and Guaranty Claims

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD Income**") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code or the taxpayer is insolvent at the time the COD Income arises.

Where COD Income is excluded from taxable income IRC Section 108 requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer or, in the case of a pass-through entity, the owner of such entity if such owner is insolvent and permitted to exclude such COD Income from taxable income. The tax attributes of the taxpayer or, in the case of a pass-through entity, the owner of such entity, that may be subject to reduction include the net operating losses and net operating loss carryovers (collectively, "**NOLs**"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction. Alternatively, where a corporate taxpayer makes a payment on account of a guaranty entered into in the course of a trade or business, the corporate taxpayer generally does not realize COD Income but instead recognizes a worthless debt deduction in the amount of the payment.

Under the Plan, Holders of certain Allowed Claims are expected to receive less than full payment in respect of their Claims, and Holders of General Unsecured Claims, subordinated Claims, and Disallowed Claims are expected to receive no payment. The Debtor's discharge of Allowed Claims that are in the nature of guaranty claims are expected to give rise to a worthless debt deduction for the Debtor. The Debtor's satisfaction of its own liabilities (not as guarantors) to the Holders of Claims in excess of the amount satisfied by Distributions under the Plan will be canceled, and therefore is expected to result in COD Income to the Debtor.

#### b.     Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS: (I) INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN; (II) NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; AND (III) FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES TO EACH HOLDER ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

**ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT WITH SUCH HOLDERS' TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

E.     **Certain Risk Factors to be Considered**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THERE ARE MANY RISK FACTORS DISCUSSED BELOW, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

1.     **The Debtor May Not Be Able to Secure Confirmation of the Plan**.

There is risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires that (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. While the Debtor cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtor believes that the Plan will satisfy the statutory requirements for confirmation and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised (either in whole or in part). The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.

Further, if the Plan is not confirmed by the requisite majorities in number and amount as required by section 1126 of the Bankruptcy Code, or if any of the other Confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Case may not have sufficient funding to proceed, which may result in conversion to a case under Chapter 7 of the Bankruptcy Code or dismissal.

2.     **Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims**. While the Debtor has undertaken its best efforts to estimate the amount of Claims

in each Class correctly, the estimate of Allowed Claims and recoveries for Holders of Allowed Claims are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

3.      **Distributions from Retained Causes of Action Are Not Guaranteed**. Pursuant to the Plan, all Retained Causes of Action that have not been previously released will vest in the Wind-Down Debtor. The Retained Causes of Action include Causes of Action which are not released or waived pursuant to the Plan or otherwise. The Plan does not guaranty any Distributions to Creditors from Retained Causes of Action.

**F.      Cramdown**

Pursuant to section 1129(a)(10) of the Bankruptcy Code, the Debtor intends to seek confirmation of the Plan pursuant to the provisions of section 1129(b) of the Bankruptcy Code with respect to those Classes of Claims that are deemed to reject the Plan.

**G.      Feasibility**

Under Section 1129(a)(11) of the Bankruptcy Code, in order for a plan to be confirmed, the Bankruptcy Court must find that Confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the Debtor unless contemplated by the plan.

Here, the Plan provides for the liquidation and Distribution of the proceeds of the Debtor's remaining assets. Accordingly, the Debtor believes all Chapter 11 plan obligations will be satisfied without the need for further reorganization of the Debtor.

**H.      Best Interests Test and Alternatives to the Plan**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Debtor liquidated under chapter 7 of the Bankruptcy Code.

The Debtor believes that a liquidation under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims as compared to Distributions contemplated under the Plan. Consequently, the Debtor believes that confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors'

claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

The Retained Causes of Action are expected to comprise substantially all of the remaining assets of the Debtor's Estate. The Plan provides for the vesting of the Retained Causes of Action in the Wind-Down Debtor so that the Plan Administrator can pursue and liquidate the Retained Causes of Action for the benefit of Holders of Allowed Claims entitled to the Distributable Proceeds. The Debtor believes that any recoveries from the Retained Causes of Action are speculative and understands that substantial new money funding will be required to pursue, reduce to judgment, and recover proceeds on account of the Retained Causes of Action. It is anticipated that any such recoveries will not be sufficient to satisfy the Allowed Class 3 Claims in full.

Based on its investigation, the Debtor believes that the only other material asset of the Debtor is its 50% ownership stake in GeoGebra, which the Debtor believes to be *de minimis* in relation to the quantum of Allowed Class 3 Claims. Additionally, GeoGebra is 50% owned by T&L, which is subject to an insolvency proceeding in India. The Debtor therefore believes that a chapter 7 trustee would encounter substantial delay and difficulties in attempting to liquidate GeoGebra at this time and would likely incur costs that outweigh any benefit to the Estate.

The Debtor believes that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation. Liquidating the Debtor's Estate under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee and its professionals. The appointment of a chapter 7 trustee would potentially delay Distributions to Creditors and reduce the present value of any recovery for Holders of Allowed Claims. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtor's Estate would continue to be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

A conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtor could materially increase, thereby further reducing Creditor recoveries versus those available under the Plan.

The Debtor also believes that, given the history of this Chapter 11 Case and related cases, it is unlikely that the chapter 7 trustee would be able to efficiently step into the shoes of the Debtor, which has been litigating several of the Retained Causes of Action for well over a year. The delay and cost resulting from the chapter 7 trustee getting up to speed would be likely to substantially impair the value of the Retained Causes of Action and may jeopardize the ability to timely pursue certain of the Retained Causes of Action. Moreover, due to the complex nature of the litigation in this Chapter 11 Case and the related proceedings across the globe, and the substantial time and

funding that will be required to continue such proceedings, the value of the Retained Causes of Action to any prospective purchaser is likely to be substantially less than the perceived value to the Holders of Allowed Claims.

In light of the foregoing, the Debtor submits that a chapter 7 liquidation would result in reduced recoveries, increased expenses, delayed Distributions, and the prospect of additional Claims that were not asserted in the Chapter 11 Case. Accordingly, the Debtor believes that the Plan provides an opportunity to bring the highest return for Creditors.

## I.  Releases

Article X of this Plan contains certain releases, exculpations, and injunctions. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regards to the Debtor.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article VII of this Plan, the Debtor believes that these releases, exculpations, and injunctions are considered consensual under applicable bankruptcy law.

The Plan provides for releases by the Debtor and the Estate in favor of the Released Parties. The Debtor is not aware of any potential Claims or Causes of Action against the Released Parties or any of their respective firms, direct and indirect current and former Affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives, each in their capacity as such.

Under the releases set forth in this Plan, the Debtor and the Estate are providing releases in favor of the Released Parties: (a) the current Prepetition Term Loan Lenders; (b) the Prepetition Agent; (c) the DIP Lenders; (d) the DIP Agent and each of their Related Parties, but solely in their capacity as such.

## J.  Administrative Claims

Proofs of Claim requesting payment of Administrative Claims must be filed no later than the Administrative Claims Bar Date. Holders of Administrative Claims that do not file Proofs of Claim requesting the allowance and payment thereof on or before the applicable Administrative Claims Bar Date shall permanently be barred from asserting such Administrative Claims against the Debtor, the Wind-Down Debtor, or the Estate. This provision does not apply to 28 U.S.C. § 1930 obligations, including U.S. Trustee fees and court costs, which are payable as a condition to Confirmation.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, to the extent an Allowed Administrative Claim was not otherwise paid in full or satisfied during the Chapter 11 Case, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) shall, in full and final satisfaction of its Allowed Administrative Claim, receive an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:

    a.  if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter);

    b.  if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter;

    c.  if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim;

    d.  at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtor or the Wind-Down Debtor, as applicable; or

    e.  at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

## K.    DIP Facility Claims

The DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding as of the Effective Date under the DIP Credit Agreement and the Final DIP Order, including principal, interest, fees, costs, other charges, and expenses.

On the Effective Date, or such earlier date that is agreed between the DIP Agent (at the Direction of the Required Lenders) and the Debtor, and notwithstanding anything in the Final DIP Order or the DIP Credit Agreement to the contrary, each Holder of DIP Claims eligible to exercise a roll-up under the DIP Facility shall be deemed to have exercised such roll-up to the fullest extent allowable pursuant to the terms of the Final DIP Order and the DIP Credit Agreement, without the need for any such Holder to submit a Roll-Up Notice (as defined in the DIP Credit Agreement) to the DIP Agent; *provided, however*, that any Holder of DIP Claims may decline to have all or any portion of its Prepetition Term Loans rolled-up by providing written notice (email sufficient) to the DIP Agent at least five (5) days prior to the effectuation thereof.

On the Effective Date, the DIP Term Loans and DIP Obligations giving rise to Allowed DIP Claims shall be converted on a dollar-for-dollar cashless basis into Wind-Down Financing Facility Roll-Over Term Loans in accordance with this Plan, the DIP Credit Agreement, and the Definitive Documentation, and all collateral that secures the DIP Obligations under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all obligations under the

Wind-Down Financing Facility, subject to the priorities of liens and payment set forth in the Definitive Documentation (including the Intercreditor Agreement), *provided* that the assets of the Debtor's Estate comprising such collateral are vested in the Wind-Down Debtor. On the Effective Date, the unfunded DIP Commitments, if any, shall be deemed terminated and extinguished with no further force or effect in accordance with the terms of the DIP Credit Agreement.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in exchange for each Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive its *pro rata* share of the Wind-Down Financing Facility Roll-Over Term Loans under the Wind-Down Financing Facility.

**L.     Professional Fee Claims**

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other Entity for making a substantial contribution in the Chapter 11 Case) shall file an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date.

The objection deadline for final fee applications will be twenty-one (21) days after they are filed and a final fee hearing to determine the allowance of Professional Fee Claims (the "**Final Fee Hearing**") shall be held as soon as practicable after such objection deadlines pass. Debtor's counsel shall file a notice of the Final Fee Hearing. Such notice shall be served upon counsel for the Prepetition Term Loan Lenders, the Prepetition Agent, all Professionals, the U.S. Trustee, and all parties on the Bankruptcy Rule 2002 service list.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtor or the Wind-Down Debtor, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court.

Until payment of all Allowed Professional Fee Claims, the Professional Fees Escrow Account shall not be considered Wind-Down Debtor Assets or otherwise property of the Wind-Down Debtor, the Debtor, or the Estate. The Professional Fees Escrow Account shall be treated as a trust account for the benefit of Holders of Professional Fee Claims and for no other parties until all Allowed Professional Fee Claims to have been paid in full. No other liens, claims, or interests shall encumber the Professional Fees Escrow Account. When all Allowed Professional Fee Claims have been paid in full, any amounts remaining in the Professional Fees Escrow Account, if any, shall become Retained Assets and Distributable Proceeds to be distributed by the Wind-Down Debtor in accordance with the terms of the Plan and the Plan Administrator Agreement.

**M.     Priority Tax Claims**

All final requests for payment of Priority Tax Claims must be Filed no later than the applicable Claims Bar Date.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, to the extent an Allowed Priority Tax Claim was not otherwise paid in full or satisfied during the Chapter 11 Case, each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction of its Allowed Priority Tax Claim, be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

The Debtor is unaware of any Allowed Priority Tax Claims.

**N.      Statutory Fees**

Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Wind-Down Debtor shall be liable to pay any and all Statutory Fees when due and payable. The Debtor shall file all monthly operating reports relating to the time period prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Wind-Down Debtor, or the Plan Administrator on behalf of the Wind-Down Debtor, shall file with the Bankruptcy Court UST Form 11-PCR reports when they become due. The Wind-Down Debtor shall remain obligated to pay Statutory Fees to the office of the U.S. Trustee until the earliest of the Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Proof of Claim in the case and shall not be treated as providing any release under the Plan.

**ARTICLE IV: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.      Classification of Claims and Interests**

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to sections 1122 and 1123 of the Bankruptcy Code.

**1.      Class Identification**

The classification of Claims and Interests against the Debtor pursuant to the Combined Plan and Disclosure Statement is as follows:

**a.      Claims and Interests**

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Not entitled to vote (deemed to reject) |
| Class 5 | Intercompany Claims | Impaired | Not entitled to vote (deemed to reject) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 6 | 510(b) Claims | Impaired | Not entitled to vote (deemed to reject) |
| Class 7 | Interests | Impaired | Not entitled to vote (deemed to reject) |

**B.     Treatment of Claims and Interests**

**1.     Treatment of Claims and Interests**

**a.     Class 1 – Other Secured Claims**

i.    *Classification*: Class 1 consists of all Other Secured Claims. The Debtor is unaware of any Other Secured Claims.

ii.   *Allowance*: Notwithstanding anything in the Combined Plan and Disclosure Statement to the contrary, an Other Secured Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court.

iii.  *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtor or Wind-Down Debtor, as applicable, with the Consent of the Agents: (a) payment in full in Cash of its Allowed Other Secured Claim; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

iv.   *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**b.     Class 2 – Other Priority Claims**

i.    *Classification:* Class 2 consists of all Other Priority Claims, if any. The Debtor is unaware of any Other Priority Claims.

ii.   *Treatment:* Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor, as applicable, with the Consent of the Agents: (a) payment in full in Cash of its Allowed

Other Priority Claim; or (b) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

    iii.    *Voting:* Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**c.**    **Class 3 – Prepetition Term Loan Claims**

    i.    *Classification*: Class 3 consists of all Prepetition Term Loan Claims.

    ii.    *Allowance*: The Prepetition Term Loan Claims shall be deemed Allowed in the aggregate principal amount of $1,189,513,685.00, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Prepetition Credit Agreement.

    iii.    *Treatment*: On the Effective Date, each Holder of an Allowed Prepetition Term Loan Claim shall receive (a) its *pro rata* share of the Prepetition Term Loan Effective Date Distribution, if any, and (b) its *pro rata* share of the Distributable Proceeds, in each case up to the Allowed amount of such Holder's Prepetition Term Loan Claims until such Claims are paid in full in Cash; *provided* that any Prepetition Term Loan Effective Date Distribution and any Distributable Proceeds available on account of the Prepetition Term Loan Claims shall be distributed to the Prepetition Agent, which shall further distribute such amounts in accordance with the terms of the Intercreditor Agreement. Unless and until all Allowed Prepetition Term Loan Claims have been paid in full in Cash, and notwithstanding anything to the contrary herein, the Prepetition Term Loan Facility shall be deemed to remain an outstanding obligation of the Debtor or the Wind-Down Debtor, as applicable, for all purposes, including Distributions to be made on account of such Claims hereunder and in accordance with the Intercreditor Agreement.

    iv.    *Claims Against Non-Debtor Guarantors*: For the avoidance of doubt, notwithstanding the treatment of Class 3 Prepetition Term Loan Claims hereunder, no Claims or Causes of Action against any non-Debtor (including, for the avoidance of doubt, T&L, Byju's Pte. Ltd, Great Learning Education Pte Ltd, Saga Formations, Inc. (f/k/a Epic! Creations, Inc.), Pajeau, Inc. (f/k/a Neuron Fuel, Inc.), and Tangible Play, Inc.) shall be deemed discharged, released, satisfied, settled, or otherwise extinguished, and, for the avoidance of doubt, the Prepetition Credit Agreement, the Onshore Guarantee Deed (as

defined in the Prepetition Credit Agreement), the Prepetition Security Agreement, any related loan documents and ancillary documents, and all of the rights and obligations thereunder shall survive post-Effective Date, and nothing herein, including, without limitation, the dissolution of the Debtor or the Wind-Down Debtor, as applicable, shall be construed as discharging, satisfying, reducing, limiting, modifying, or otherwise affecting the liability of any non-Debtor party thereto or obligor thereunder, including, for the avoidance of doubt, the liability of any non-Debtor Guarantor (as defined in the Prepetition Credit Agreement); *provided*, that the guarantees arising under the Onshore Guarantee Deed (as defined in the Prepetition Credit Agreement) shall be reduced on a dollar-for-dollar basis only to the extent of any Cash Distributions actually received by Holders of Allowed Class 3 Prepetition Term Loan Claims pursuant to the terms of the Plan and as applied in accordance with the priority set forth in the Prepetition Credit Agreement.

v.  *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Prepetition Term Loan Claims are entitled to vote to accept or reject the Plan.

**d.  Class 4 – General Unsecured Claims**

i.  *Classification*: Class 4 consists of all General Unsecured Claims.

ii.  *Treatment*: On the Effective Date, all Allowed General Unsecured Claims shall not receive any Distribution on account of such Claims.

iii.  *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**e.  Class 5 – Intercompany Claims**

i.  *Classification:* Class 5 consists of all Intercompany Claims.

ii.  *Treatment*: On the Effective Date, all Allowed Intercompany Claims shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such Claims. For the avoidance of doubt, the treatment of Class 5 Intercompany Claims under the Plan pertains only to Intercompany Claims against the Debtor and shall in no way release, alter, impair, or otherwise impact the vesting of all Avoidance Actions and other Retained Causes of Action (including all Claims and Causes of Action that a Debtor may have against a non-Debtor Affiliate) in the Wind-Down Debtor, which shall be entitled to pursue such Claims

and Causes of Action against any current or former non-Debtor Affiliate of the Debtor or the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement.

iii.    *Voting:* Class 5 is Impaired under the Plan. Holders of Allowed Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**f.    Class 6 – Section 510(b) Claims**

i.    *Classification*: Class 6 consists of all Section 510(b) Claims.

ii.    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

iii.    *Treatment*: On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such Claims.

iv.    *Voting*: Class 6 is Impaired under the Plan. Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**g.    Class 7 – Interests**

i.    *Classification*: Class 7 consists of all Interests.

ii.    *Treatment*: On the Effective Date, all Interests (including Intercompany Interests) shall be cancelled, released, and extinguished, and will be of no further force or effect, without any distribution on account of such Claims. For the avoidance of doubt, the treatment of Class 7 Interests under the Plan pertains only to any Interest in the Debtor and shall in no way release, alter, impair, or otherwise impact the vesting of all Retained Assets in the Wind-Down Debtor, which shall be entitled to retain ownership of, dispose of, or otherwise monetize such Retained Assets, including any Interest that the Debtor has in any non-Debtor, as set forth elsewhere herein and in the Plan Administrator Agreement.

iii.    *Voting*: Class 7 is Impaired under the Plan. Holders of Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

### C.    Impaired Claims and Equity Interests

Under the Plan, Holders of Claims in Classes 3, 4, 5, 6, and 7 of the Debtor are the Impaired Classes pursuant to section 1124 of the Bankruptcy Code because the Plan alters the legal, equitable, or contractual rights of the Holders of such Claims treated in such Class.

### D.    Confirmation Pursuant to Sections 1129(a)(10) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Combined Plan and Disclosure Statement by an Impaired Class of Claims.

### E.    No Unfair Discrimination

The Debtor believes the treatment of Claims and Interests described in this Plan is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within their respective Class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

### F.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero ($0) dollars as of the date of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### G.    Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Wind-Down Debtor reserves the right to seek to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### ARTICLE V: THE WIND-DOWN DEBTOR

### A.    Establishment of the Wind-Down Debtor

The Wind-Down Debtor shall be established, formed, and merged on the Effective Date. The Wind-Down Debtor shall be the successor in interest to the Debtor, and the Wind-Down Debtor shall be the successor to the Debtor and its Estate's right, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtor's Estate. The Wind-Down Debtor shall be managed by the

Plan Administrator and shall be subject to the oversight of the Wind-Down Debtor Oversight Committee. The Wind-Down Debtor shall be administered in accordance with the terms of the Plan and the Plan Administrator Agreement. The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

**B.      Vesting of the Wind-Down Debtor Assets in the Wind-Down Debtor**

Prior to the Effective Date, any and all of the Debtor's assets shall remain assets of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall irrevocably vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior Final Order of the Bankruptcy Court or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date (and whether or not listed on the Schedule of Retained Causes of Action), and all proceeds of the foregoing, subject to the terms of the Plan. For the avoidance of doubt, nothing in this section shall limit the transfer of the Retained Causes of Action to the Wind-Down Debtor.

**C.      Wind-Down Debtor's Rights with Respect to Disputes and Litigation**

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor shall, with the consent of the Wind-Down Debtor Oversight Committee, have the right to pursue or not to pursue, compromise, or settle any dispute with respect to the Wind-Down Debtor Assets. On and after the Effective Date, the Wind-Down Debtor may, without further Bankruptcy Court approval but with the consent of the Wind-Down Debtor Oversight Committee, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Debtor Assets or rights to payment or Claims that belong to the Debtor or the Estate as of the Effective Date or are instituted by the Wind-Down Debtor on or after the Effective Date, except as otherwise expressly provided herein. Holders of Allowed Class 3 Claims expect that the Wind-Down Debtor will investigate and pursue the Retained Causes of Action, including, without limitation, the specifically-identified Retained Causes of Action in the definition thereof. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtor and the Estate, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtor in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtor and the Plan Administrator shall have established the Wind-Down Debtor pursuant hereto.

**D.      Governance of the Wind-Down Debtor**

On the Effective Date, the terms of the Debtor's existing boards of directors or managers, if any, shall expire, and the Debtor's directors and officers shall be discharged. The Plan Administrator shall be immediately and automatically deemed appointed by the Debtor or the Wind-Down Debtor, as applicable, as the sole director and the sole officer of each of the Wind-

Down Debtor, and the Plan Administrator shall succeed to the powers of the Debtor's directors and officers. Without limitations on the foregoing, the Plan Administrator shall have the sole authority to act on behalf of the Wind-Down Debtor subject to coordination with and, where applicable, consent of the Wind-Down Debtor Oversight Committee.

### E.     The Wind-Down Debtor's Transfer of Privileges

For the avoidance of doubt, any attorney-client privilege, work-product privilege, joint interest privilege, or other privilege or immunity attaching to any documents or communications that belonged to the Debtor, was invoked by the Debtor, or otherwise operated for the benefit of the Debtor or the Estate before the Effective Date (including, for the avoidance of doubt, those relating to the Retained Causes of Action) shall vest in the Wind-Down Debtor.

### F.     Bankruptcy Rule 2004

For the avoidance of doubt, from and after the Effective Date, the Wind-Down Debtor shall be vested with the Debtor's rights, as such rights existed before the Effective Date, to conduct discovery and oral examinations (including document discovery and depositions) of any party under Bankruptcy Rule 2004 against any Person or Entity in furtherance of the Wind-Down, including the investigation or prosecution of actual or potential Causes of Action, including the Retained Causes of Action, and, for the avoidance of doubt, the collectability of damages for such Causes of Action, and the Bankruptcy Court shall retain jurisdiction to order examinations (including examinations under Bankruptcy Rule 2004) against any Person or Entity, and to hear all matters with respect to the same.

### G.     Cooperation with the Plan Administrator; Books and Records

The Debtor, any and all parties previously in control of the Debtor or the Wind-Down Debtor, and the advisors to any of the foregoing, as applicable, shall, upon reasonable notice, cooperate with the Plan Administrator and the Wind-Down Debtor Oversight Committee in the administration of the Wind-Down Debtor, including, but not limited to providing the Plan Administrator and its advisors reasonable access to personnel and books and records and former employees or Professionals hired by the Debtor, to the extent the Debtor has such information and/or documents, to enable the Plan Administrator to perform its duties under the Plan and the Plan Administrator Agreement. Such access and documents shall be provided to the Wind-Down Debtor and Plan Administrator without charge.

The books and records maintained by the Plan Administrator and any records of the Debtor or Wind-Down Debtor may be disposed of by the Plan Administrator at the later of (i) such time as the Plan Administrator determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Wind-Down, (ii) upon the termination and completion of the Wind-Down, or (iii) as otherwise required under applicable Law.

### H.     Vesting of Wind-Down Debtor's Assets

Except as otherwise provided in the Confirmation Order, or the Plan, and notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, pursuant to sections 1141(b)

and (c) of the Bankruptcy Code, all property of the Estate, all Retained Causes of Action, and any property retained by the Debtor pursuant to the Plan shall irrevocably vest in and be granted and assigned to the Wind-Down Debtor, as applicable, free and clear of all Liens, Claims, charges, other encumbrances, and Interests for the purposes of winding down the Wind-Down Debtor, subject only to the Allowed Claims as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Supplement. Thereupon, the Debtor shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

On and after the Effective Date, any Final Order entered in conjunction with the Plan, the Wind-Down Debtor (subject to the rights and approval of the Wind-Down Debtor Oversight Committee where applicable), as applicable, may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or outside of the ordinary course of business, and execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

## I.    Expenses of Wind-Down Debtor

The expenses of the Wind-Down Debtor shall be paid from the Wind-Down Debtor Assets, including the Wind-Down Financing Facility, without further notice or approval from the Bankruptcy Court.

## J.    Wind-Down Financing Facility

On or after the Confirmation Date, the Plan Administrator shall be authorized to (i) enter into a financing facility comprised of (a) the New Money Wind-Down Financing Facility, (b) the Wind-Down Financing Facility Roll-Over Term Loans, and (c) the Indemnity Facility (collectively, the "**Wind-Down Financing Facility**"), and (ii) enter into the documents memorializing the terms of the Wind-Down Financing Facility (the "**Definitive Documentation**"), which shall be Filed with the Plan Supplement.

### 1.    New Money Wind-Down Financing Facility

On or after the Confirmation Date, the Plan Administrator shall be authorized to enter into a new money financing facility to be used to fund the Wind-Down, including, for the avoidance of doubt, the pursuit of the Retained Causes of Action (the "**New Money Wind-Down Financing Facility**"), and incur the Wind-Down Financing Facility New Money Term Loans provided for thereunder.

The Plan Administrator may draw upon the New Money Wind-Down Financing Facility to fund the administration of the Wind-Down Debtor, including for the payment of certain fees and expenses in accordance with the Plan Administrator Agreement as well as for any expenses incurred in connection with both the pursuit of the Retained Causes of Action and the effectuation of the Wind-Down.

### 2. Wind-Down Financing Facility Roll-Over Term Loans

On the Effective Date, the DIP Term Loans giving rise to Allowed DIP Claims shall roll-over into the Wind-Down Financing Facility and be deemed converted on a dollar-for-dollar cashless basis into Wind-Down Financing Facility Roll-Over Term Loans in accordance with this Plan, the DIP Credit Agreement, and the Definitive Documentation. All collateral that secures the DIP Obligations under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all obligations under the Wind-Down Financing Facility, subject to the priorities of liens and payment set forth in the Definitive Documentation (including the Intercreditor Agreement), *provided* that the assets of the Debtor's Estate comprising such collateral are vested in the Wind-Down Debtor.

### 3. Indemnity Facility

The Wind-Down Financing Facility shall include a delayed draw term loan facility in an aggregate principal amount equal to $10 million (the "**Indemnity Facility**" and any term loans made thereunder, the "**Indemnity Term Loans**").

The proceeds of Indemnity Term Loans, if any, will be used solely to provide funding to the Wind-Down Debtor to pay the Debtor's or the Wind-Down Debtor's, as applicable, indemnification obligations owed to Timothy R. Pohl in his capacity as the director and officer of the Debtor, and solely to the extent the Debtor or the Wind-Down Debtor has received such requests for indemnification and otherwise met the funding conditions of the Indemnity Term Loans.

## K. Selection of Wind-Down Debtor Oversight Committee

The members of the Wind-Down Debtor Oversight Committee shall be identified in the Plan Supplement. The Wind-Down Debtor Oversight Committee shall be entitled to retain professionals, paid by the Wind-Down Debtor, to advise the Wind-Down Debtor Oversight Committee, which professionals may be Professionals or other advisors who previously advised the Debtor, the Prepetition Agent, and/or the Prepetition Term Loan Lenders.

### 1. Rights, Powers, Duties, and Responsibilities of the Wind-Down Debtor Oversight Committee

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator (and the Liquidating Trust, if formed) with respect to the liquidation and distribution of the Wind-Down Debtor Assets in accordance with the Plan, the Plan Administrator Agreement, and the Confirmation Order.

On and after the Effective Date, subject in each instance to the terms and conditions of the Plan, the Confirmation Order and any further order of the Bankruptcy Court, the Wind-Down Debtor Oversight Committee shall have the rights, powers, duties and responsibilities to oversee the Plan Administrator and the Wind-Down of the Wind-Down Debtor. The Wind-Down Debtor Oversight Committee shall stay informed (through any means determined to be appropriate by the Wind-Down Debtor Oversight Committee in coordination with the Plan Administrator and any professionals of each of the foregoing) regarding the administration of the Wind-Down and shall

assist the Plan Administrator in developing a strategy to maximize the value of the Wind-Down Debtor Assets for the benefit of the Holders of Claims entitled to distributions from the Wind-Down Debtor under the Plan. The Wind-Down Debtor Oversight Committee shall maintain an affirmative consent right over any final decisions or actions that the Wind-Down Debtor Oversight Committee and/or the Plan Administrator determine to be material to the administration of the Wind-Down, including, for the avoidance of doubt, (a) making any material distributions to the Holders of Claims (including any reserves withheld from such distribution), (b) determining to prosecute, enforce, settle or abandon any material Retained Causes of Action, (c) determining to sell, otherwise monetize, or abandon any material Wind-Down Debtor Assets, (d) establishing any Litigation Trust or similar vehicle, and (e) entering into any financing arrangement. For the avoidance of doubt, the Plan Administrator shall have the sole discretion to make decisions or take actions with respect to any immaterial or *de minimis* Retained Causes of Action and other Wind-Down Debtor Assets; *provided* that the Wind-Down Debtor Oversight Committee may determine in its sole discretion to require its consent or otherwise issue a direction with respect to any matters relevant to the Wind-Down.

**L.      Manner of Wind-Down Distributions**

After the Effective Date, the Plan Administrator shall make distributions on account of the Holders of Allowed Claims entitled to the Distributable Proceeds in accordance with the Plan and the Plan Administrator Agreement; *provided, however*, that prior to making any such distribution, the Plan Administrator shall, after consultation with the Wind-Down Debtor Oversight Committee, and taking into account the availability, where applicable, of Cash already on hand or scheduled to be received, determine such amounts that are (a) necessary to satisfy current accrued fees and expenses of the Wind-Down Debtor, (b) necessary to satisfy near-term anticipated fees and expenses of the Wind-Down Debtor, and (c) required to satisfy amounts outstanding under the Wind-Down Financing Facility, if applicable. With respect to all payments and distributions made under the Plan, the Plan Administrator shall cause the Wind-Down Debtor to comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority and, in the event the Plan Administrator retains accountants or other professionals, shall have the right to rely on the advice of such in connection with all tax and reporting matters.

Distributable Proceeds distributed for the benefit of the Holders of DIP Claims shall be made to the DIP Agent, and Distributable Proceeds distributed for the benefit of the Holders of Class 3 Prepetition Term Loan Claims shall be made to the Prepetition Agent. The DIP Agent and the Prepetition Agent, as applicable, shall apply any such proceeds in accordance with the Intercreditor Agreement.

**M.      Termination of the Wind-Down Debtor**

The Wind-Down Debtor will terminate on the earlier of the date that: (a)(i) the final liquidation, administration, and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan, and the full performance of all other duties and functions as set forth in the Plan and the Plan Administrator Agreement has occurred; and (ii) the Chapter 11 Case of the Debtor has been closed; or (b) the Plan Administrator determines in its reasonable judgment (with the consent of the Wind-Down Debtor Oversight Committee) that the Wind-Down Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties

and powers assigned to the Plan Administrator under the Plan and the Confirmation Order. After (x) the final distributions pursuant to the Plan, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**N.      Distribution of Excess Reserves by the Wind-Down Debtor**

Once all applicable Claims or other amounts have been paid in full, the Excess Reserves shall become Retained Assets and Distributable Proceeds to be distributed by the Wind-Down Debtor in accordance with the terms of this Plan and the Plan Administrator Agreement.

### ARTICLE VI: PLAN ADMINISTRATOR

**A.      Plan Administrator Agreement**

The powers, rights, and duties of the Plan Administrator shall be memorialized in the Plan Administrator Agreement, which shall be filed with the Plan Supplement.

**B.      Appointment of the Plan Administrator**

The Plan Administrator shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall serve as a representative of the Estate under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to the Estate.

**C.      The Term of the Plan Administrator**

The Plan Administrator shall serve in such capacity through the earlier of (a) the date on which the Wind-Down Debtor is dissolved and (b) the date on which the Plan Administrator resigns, is terminated, or is otherwise unable to serve. The terms and conditions surrounding the resignation or termination of the Plan Administrator and appointment of an interim and permanent Plan Administrator shall be set forth in the Plan Administrator Agreement to be Filed with the Plan Supplement.

If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of counsel to the Plan Administrator or another party in interest, shall approve a successor to serve as the Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further action or approval, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtor shall be terminated.

**D.      Plan Administrator Rights and Powers**

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan and as otherwise provided in the Confirmation

Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtor for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator's authority shall be subject to the Wind-Down Debtor Oversight Committee, to the extent set forth in the Plan Administrator Agreement. The Plan Administrator and members of the Wind-Down Debtor Oversight Committee shall make themselves reasonably available for consultation by the Holders of Claims entitled to the Distributable Proceeds.

## E.    Plan Administrator Responsibilities

Responsibilities of the Plan Administrator shall include, but are not limited to (all without further order of the Bankruptcy Court), in each case subject to the consent of the Wind-Down Debtor Oversight Committee to the extent such consent is required pursuant to the Plan, the Confirmation Order, or the Plan Administrator Agreement:

1.    implementing the Wind-Down and making distributions contemplated by the Plan;

2.    marshalling, collecting, marketing for sale, liquidating and winding down the Debtor's assets constituting the Wind-Down Debtor Assets;

3.    overseeing the accounts of the Debtor and the Wind-Down Debtor and the Wind-Down and dissolution of the Debtor and the Wind-Down Debtor;

4.    implementing, pursuing, and adhering to the terms of the Plan, the Confirmation Order, and any related documents;

5.    receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

6.    opening and maintaining bank accounts on behalf of or in the name of the Debtor or the Wind-Down Debtor;

7.    establishing a Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Plan Administrator Agreement, to the extent that the Plan Administrator, with the consent of the Wind-Down Debtor Oversight Committee, deems it to be reasonably necessary or beneficial in effectuating the Wind-Down;

8.    entering into any agreement or executing any document or instrument required by or consistent with the Plan or the Confirmation Order, and performing all obligations thereunder;

9.    protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Retained Causes of Action) vested in the Wind-Down Debtor by any method

deemed appropriate, including, without limitation, by judicial proceedings, including before the Bankruptcy Court, or otherwise;

10. reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

11. seeking the examination of any Person or Entity pursuant to Federal Rule of Bankruptcy Procedure 2004;

12. entering into a financing facility, including the Wind-Down Financing Facility, to pursue the Retained Causes of Action, including, without limitation, the specifically-identified Retained Causes of Action, or otherwise facilitate the Wind-Down;

13. retaining professionals, disbursing agents, and other agents, independent contractors, and third parties on behalf of the Wind-Down Debtor, the Plan Administrator and/or the Wind-Down Debtor Oversight Committee, and paying the reasonable compensation thereof;

14. paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets;

15. investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Retained Causes of Action;

16. reviewing and compelling turnover of the Debtor or the Wind Down Debtor's property;

17. calculating and making all distributions to the Holders of Allowed Claims against the Debtor, as provided for in, or contemplated by, the Plan;

18. withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of its agents or professionals, may be required to be withheld from such distribution under the income tax or other Laws of the United States or of any state or political subdivision thereof;

19. in reliance upon the Debtor's Schedules, the official register of Claims maintained in the Chapter 11 Case, and the Debtor's filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and Interests required to be administered by the Wind-Down Debtor;

20. making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtor or the

Wind-Down Debtor, and filing tax returns for the Debtor, the Wind Down Debtor, or the Liquidating Trust (if applicable) pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtor or the Wind-Down Debtor, as applicable; *provided, however*, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtor's income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

21. abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

22. seeking a determination of tax liability or refund under Bankruptcy Code section 505;

23. establishing reserves for taxes, assessments, and other expenses of administration of the Debtor or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtor or the Wind Down Debtor;

24. purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

25. undertaking all administrative functions remaining in the Chapter 11 Case to the extent necessary to carry out the Debtor's, the Wind-Down Debtor's, the Liquidating Trust's (if applicable), or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Case;

26. retaining, terminating, appointing, hiring, or otherwise employing employees, personnel, management, and directors at any of the Wind-Down Debtor to the extent necessary to carry out the purposes of the Plan, including, without limitation, to address any disputes between the Wind-Down Debtor;

27. invoking any attorney-client privilege, work-product privilege, joint interest privilege, or other privilege or immunity attaching to any documents or communications that belong to the Wind-Down Debtor;

28. exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

29. taking all other actions consistent with the provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtor and the Wind-Down Debtor.

**F.      Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for actual fraud, willful misconduct, or gross negligence, in all respects by the Debtor. The Plan Administrator may obtain, at the expense of the Debtor or the Wind-Down Debtor, commercially reasonable liability or other appropriate insurance. The Plan Administrator may rely upon written information previously generated by the Debtor. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtor.

## ARTICLE VII: CONFIRMATION PROCEDURES

**A.      Confirmation Procedures**

**1.      Combined Hearing**

The Combined Hearing before the Bankruptcy Court has been scheduled for **October 29, 2025 at 11:00 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court, 824 North Market Street, Wilmington, Delaware 19801 to consider (a) approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing or via a notice Filed on the docket.

**2.      Procedure for Objections**

Any objection to approval or confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (c) state the name and address of the objecting party and the amount and nature of their Claim or Interest, (d) state with particularity the legal and factual basis for such objection, and, if practicable, a proposed modification to the Plan that would resolve such objection. Any such objection must be filed by **October 22, 2025 at 4:00 p.m. (prevailing Eastern Time)** with the Bankruptcy Court and served on counsel to the Debtor, counsel to the DIP Agent, counsel to the Prepetition Administrative Agent and the Prepetition Collateral Agent, the U.S. Trustee, and all parties who have filed a request for notice in these cases. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

**3.      Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if the requirements of section 1129 of the Bankruptcy Code are met. As set forth in this Plan, the Debtor believes that the Plan: (a) meets the cramdown requirements; (b) meets the feasibility requirements for a chapter 11 plan of liquidation; (c) is in the best interests of Creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code. Additionally,

pursuant to section 1126 of the Bankruptcy Code, under the Plan, only Holders of Claims in Impaired Classes are entitled to vote.

**B.      Solicitation and Voting Procedures**

**1.      Eligibility to Vote on the Plan**

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Class 3 for the Debtor may vote on the Plan pursuant to section 1126 of the Bankruptcy Code. To vote on the Plan, a Holder must hold a Claim in Class 3 that is identified on the Debtor's Schedules and is not listed as Disputed, unliquidated, or contingent.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 FOR THE DEBTOR.**

**2.      Solicitation Package**

Accompanying the Plan for the purposes of soliciting votes on the Plan is the Solicitation Package, which contains a copy of each of the following: (a) the form of ballot substantially in one of the forms attached to the Interim Approval and Procedures Order as Exhibit 2; (b) the Combined Notice substantially in the form attached to the Interim Approval and Procedures Order as Exhibit 1; (c) either a paper copy or a copy in "pdf" format on flash drive of the Combined Plan and Disclosure Statement (fully compiled with all exhibits attached, at the Debtor's discretion); (d) either a paper copy or a copy in "pdf" format on flash drive of the Interim Approval and Procedures Order without exhibits; (e) any other documents and materials that the Debtor deem appropriate; and (f) such other information as the Bankruptcy Court may direct or approve.

Holders of Claims in non-Voting Classes will receive packages consisting of the Combined Notice substantially in the form attached to the Interim Approval and Procedures Order as Exhibit 1, setting forth: (a) the non-Voting Classes; (b) a summary of the treatment of Claims and Interests under the Plan; (c) the date and time of the Combined Hearing; (d) the deadline and procedures for filing objections; and (e) the deadline for filing Administrative Claims set forth in the Plan; and (f) information regarding where to obtain a copy of the Combined Plan and Disclosure Statement.

**3.      Voting Procedures and Voting Deadline**

The Voting Record Date for determining which Holders of Claims in Class 3 may vote on the Plan is the date of entry of the Interim Approval and Procedures Order.

The Voting Deadline by which the Debtor must **RECEIVE** original Ballots by mail, overnight delivery, hand delivery, or for electronic Ballots, the deadline by which such electronic Ballots must be submitted, is **October 19, 2025 at 4:00 p.m. (prevailing Eastern Time)**.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Plan; and (b) signing and returning the Ballot to the Debtor. If you are a member

of a Voting Class and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Debtor's counsel.

The following Ballots will not be counted or considered: (a) any Ballot received after the Voting Deadline, unless the Debtor or the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot; (b) any Ballot that is illegible or contains insufficient information; (c) any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class; (d) any Ballot cast for a Claim designated as unliquidated, contingent, or Disputed or as zero (0) or unknown in amount; (e) any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan; (f) simultaneous duplicative Ballots voted inconsistently; (g) Ballots partially rejecting and partially accepting the Plan; (h) any Ballot received other than the official form sent by the Debtor; (i) any unsigned Ballot; or (j) any Ballot that is submitted by facsimile.

### 4.    Presumed Acceptance and Deemed Rejection

Holders of Claims in Classes 1 and 2 are Unimpaired, thus under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to have accepted the Plan, and the votes of the Holders of such Claims shall not be solicited.

Holders of Claims in Class 3 are Impaired and entitled to vote to accept or reject the Plan.

Holders of Claims in Classes 4, 5, 6, and 7 are not entitled to receive any Distribution under the Plan and thus, pursuant to section 1126(g) of the Bankruptcy Code, Classes 4, 5, 6, and 7 Claims are conclusively deemed to have rejected the Plan and the votes of these Holders therefore shall not be solicited.

### 5.    Acceptance by Impaired Classes

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one (1) Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. The Debtor urges that you vote to accept the Plan.

**YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR E-MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

### ARTICLE VIII: IMPLEMENTATION AND EXECUTION OF THE PLAN

### A.    Effective Date

The Effective Date shall not occur until the conditions for the Effective Date set forth in Article XI hereof are satisfied or otherwise waived in accordance with the terms of this Plan. Upon occurrence of the Effective Date, the Wind-Down Debtor shall file the Notice of Effective Date.

## B.    Establishment and Funding of Plan Reserves

As soon as practical following Confirmation and no later than the Effective Date, the Debtor or the Wind-Down Debtor (as applicable) shall establish the following reserves (the "**Plan Reserves**"), with the Consent of the Agents, and solely to the extent of any estimated amounts owing in connection therewith:  (a) the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount; (b) the Administrative Claims Reserve with Cash equal to the Administrative Claims Amount; (c) the Priority Tax Claims Reserve with Cash equal to the Priority Tax Claims Amount; (d) the Other Secured Claims Reserve with Cash equal to the Other Secured Claims Amount; and (e) the Other Priority Claims Reserve equal to the Other Priority Claims Amount.

## C.    Wind-Down Transactions

Upon the entry of the Confirmation Order, the Debtor and the Plan Administrator, in consultation with the Prepetition Administrative Agent, without further order of the Bankruptcy Court, are authorized to take all actions as may be necessary or appropriate to effect any Wind-Down Transactions and all other transactions described in, approved by, contemplated by, or necessary to effectuate or in connection with the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (d) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state Law.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including any Wind-Down Transactions.

## D.    Corporate Action

On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the Debtor shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the Debtor.

## E.    Exemption from Certain Taxes and Fees

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, any related documentation, or pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## F.  Provisions Governing Distributions Under the Plan

### 1.  Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Effective Date Distribution that the Plan provides for such Claims and in the manner provided herein from the Debtor, the Wind-Down Debtor, or the Plan Administrator, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan set forth in Article VIII.F. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

Upon the Effective Date, all debts and obligations of the Debtor, the Estate, and the Wind-Down Debtor shall be deemed fixed and adjusted pursuant to the Plan and the Debtor and Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Confirmation Order.

### 2.  Delivery of Distribution on Prepetition Term Loan Claims

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed Prepetition Term Loan Claims shall be governed by the Intercreditor Agreement and shall be deemed completed when made to the Prepetition Administrative Agent, which shall be deemed the Holder of their respective portion of the Allowed Prepetition Term Loan Claims, solely for purposes of distributions to be made hereunder. The Prepetition Administrative Agent shall hold or direct such distributions for the benefit of the respective Holders of Allowed Prepetition Term Loan Claims or other applicable parties pursuant to the Intercreditor Agreement. As soon as practicable following compliance with the requirements set forth in this Article VIII.F, the Prepetition Administrative Agent shall arrange to deliver or direct the delivery of such distributions in accordance with the terms and provisions of the Intercreditor Agreement.

3.      **Distributable Proceeds**

Any Distributions from the Distributable Proceeds provided for under the Plan shall be made in accordance with the terms and provisions of the Plan Administrator Agreement.

4.      **De Minimis Distributions; Rounding of Payments**

Whenever payment or distribution of a fraction of a dollar of value in the form of Cash would otherwise be called for, the actual payment or distribution may, in the discretion of the Plan Administrator, reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one-half of one dollar and a rounding up of such fraction to the nearest whole dollar if the amount is one-half or more of one dollar. Notwithstanding anything herein to the contrary, the Plan Administrator shall not be required to make a Distribution if the amount to be distributed is or has an economic value of less than one hundred dollars ($100). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.

5.      **Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Wind-Down Debtor shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Wind-Down Debtor and Plan Administrator shall be entitled to deduct any U.S. or non-U.S. federal, state or local withholding taxes from any payments made with respect to Allowed Claims, as appropriate. A Holder of an Allowed Claim entitled to receive a Distribution pursuant to the Plan may not receive any Distribution under the Plan unless such Holder has provided to the Plan Administrator such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Wind-Down Debtor to comply with applicable tax reporting and withholding laws (including an IRS Form W-9 or (if the holder is a non-U.S. Person) an appropriate IRS Form W-8 (unless such Person is exempt from information reporting requirements under the Tax Code)) and so notifies the Plan Administrator. If such Holder does not provide such taxpayer identification number and such other information within the time and in the manner reasonably required by the Plan Administrator, such Holder may forfeit its interest in any Distribution and may not receive any Distribution under the Plan. Any amounts withheld pursuant hereto may be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with any Distribution under the Plan, the Wind-Down Debtor and Plan Administrator may take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations.

Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

33521563.3

### G.      Resolution of Disputed Claims

#### 1.      Allowance of Claims

After the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately before the Effective Date.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed or listed at zero or any other Claim for which a Proof of Claim was required to be timely filed pursuant to the Bar Date Order, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order is Disputed and subject to Disallowance after notice and an opportunity for hearing.

To the extent not Disallowed pursuant to section 502(d) of the Bankruptcy Code, the Camshaft Claims and any OCI Claims shall be deemed Disputed, notwithstanding whether a written objection has been Filed as of the Claims Objection Deadline with respect to such Claims.

#### 2.      Prosecution of Objections to Claims

The Debtor (prior to the Effective Date with the Consent of the Agents) and the Wind-Down Debtor (following the Effective Date), shall have the authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of (x) the Effective Date, or (y) the applicable Claims Bar Date are deemed Disputed.

#### 3.      Deadline to File Objections to Claims

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Combined Plan and Disclosure Statement, all objections to Claims and Interests must be filed by the Claims Objection Deadline; *provided* that no such objection may be filed with respect to any Claim after a Final Order has been entered Allowing such Claim.

#### 4.      Amendments to Claims

Any amendment to a proof of Claim filed after the Effective Date shall be subject to disallowance by objection after notice and an opportunity for hearing.

### H.      Disallowance of Certain Claims Subject to Avoidance or Recovery

Any Claims held by Persons or Entities from which property is recoverable under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code or Persons or Entities that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Wind-Down Debtor, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such

time as such Causes of Action the Estate or Wind-Down Debtor hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtor or Wind-Down Debtor, as applicable.

### 1.    The Alpha Funds Judgment Order

Pursuant to the Alpha Funds Judgment Order, it was adjudged that, among other things: (i) the transfer of the Alpha Funds to Camshaft Capital Fund, LP ("**Camshaft Fund**") was an actual fraudulent transfer and avoided under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code; (ii) Camshaft Fund is liable to the Debtor and GLAS in the amount of $533 million, plus interest and costs; (iii) the transfer of the limited partnership interest in Camshaft Fund to Inspilearn LLC ("**Inspilearn**"), for the benefit of T&L, was an actual fraudulent transfer and is avoided under sections 544(b) and 548(a)(1)(A) of the Bankruptcy Code; (iv) Inspilearn and T&L are jointly and severally liable to the Debtor and GLAS in the amount of $540,647,109.20, plus interest and costs; (v) Riju Ravindran breached his fiduciary duties to the Debtor by authorizing the transfer to Camshaft Fund and the subsequent transfer to Inspilearn;  (vi) Riju Ravindran is liable to the Debtor and GLAS in the amount of $540,647,109.20, plus interest and costs; (vii) Riju Ravindran and T&L are each liable for the conversion of the Camshaft LP Interest; and (viii) Ravindran is liable to the Debtor and Prepetition Agent in the amount of  $540,647,109.20, plus interest and costs. ¶¶  2– 4, 6 Judgment Order.

For the avoidance of doubt, the Camshaft Indemnification Counterclaim, as well as any Claims Filed or otherwise asserted by or on behalf of Camshaft Fund, Inspilearn, and T&L shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims shall not receive any Distributions on account of such Claims until such time as all sums due to the Estate by any such Entity pursuant to the Alpha Funds Judgment Order, or otherwise, have been turned over or paid to the Debtor or Wind-Down Debtor, as applicable, and such other Causes of Action the Estate or Wind-Down Debtor holds or may hold against that Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered.

### 2.    The Camshaft Complaint

Pursuant to the Second Amended Complaint, the Debtor asserted claims for constructive fraudulent transfer against Camshaft Capital Advisors, LLC ("**Camshaft Advisors**") and Camshaft Capital Management, LLC ("**Camshaft Management**") related to the fraudulent transfer of the Alpha Funds (the "**Camshaft Complaint**"). For the avoidance of doubt, Camshaft Advisors and Camshaft Management shall not receive any Distributions pursuant to the Plan or on account of any Allowed Claim until such time as the Camshaft Complaint or such other Causes of Action the Estate or Wind-Down Debtor holds or may hold against any such Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtor or Wind-Down Debtor, as applicable.

### 3. The Raveendran Complaint

On April 9, 2025, the Debtor filed its *Complaint* in the Raveendran Adversary [Raveendran Adv. D.I. 1–2] (the "**Raveendran Complaint**") against Byju Raveendran, Divya Gokulnath, and Anita Kishore asserting tort claims based on conduct that caused or aided the repeated fraudulent transfer of the Alpha Funds. For the avoidance of doubt, Byju Raveendran, Divya Gokulnath, and Anita Kishore shall not receive any Distributions pursuant to the Plan or on account of any Allowed Claim until such time as the Raveendran Complaint or such other Causes of Action the Estate or Wind-Down Debtor holds or may hold against any such Person have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Person have been turned over or paid to the Debtor or Wind-Down Debtor, as applicable.

### 4. The OCI Complaint

On May 5, 2025, the Debtor filed its *Complaint* in the OCI Adversary [OCI Adv. D.I. 1] (the "**OCI Complaint**") against OCI Limited for, *inter alia*, avoidance of the fraudulently transferred Alpha Funds pursuant to section 550 of the Bankruptcy Code and asserting tort claims against OCI Limited and Rupin Banker based on conduct which caused or aided the repeated fraudulent transfer of the Alpha Funds. For the avoidance of doubt, OCI Limited and Rupin Banker shall not receive any Distributions pursuant to the Plan or on account of any Allowed Claim until such time as the OCI Complaint or such other Causes of Action the Estate or Wind-Down Debtor holds or may hold against such Person or Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Person or Entity have been turned over or paid to the Debtor or Wind-Down Debtor, as applicable.

## ARTICLE IX:
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, each Executory Contract or Unexpired Lease shall be deemed automatically rejected by the Debtor unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are otherwise provided for in the Plan, such as being specifically assumed in connection with confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed, assumed and assigned, or rejected by the Debtor pursuant to any Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; or (d) are a contract, release, or other agreement or document entered into in connection with the Plan.

### B. Assumption of D&O Insurance Policies

The Debtor shall be deemed to have assumed all of the D&O Liability Insurance Policies, pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date (whether or not such policies are listed on the Schedule of Assumed Executory Contracts and Unexpired Leases), and coverage for defense and indemnity under any of the D&O Liability Insurance

Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in a Final Order, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed; *provided, however*, that the Holder(s) of a Claim for an indemnity obligation shall look only to the D&O Liability Insurance Policies for recovery and not the Debtor, the Estate, or the Wind-Down Debtor.

**C.      Rejection Damages Bar Date**

If the rejection of an Executory Contract pursuant to Article IX.A gives rise to a Claim by the other party or parties to such Executory Contract or Unexpired Lease, such Claim shall be deemed Disputed unless a Proof of Claim is filed with the Bankruptcy Court and served on the Plan Administrator by the Rejection Bar Date.

**D.      Indemnification Obligations**

Except for any indemnification obligations of the Debtor pursuant to the Director Indemnity Agreement, any obligations of the Debtor pursuant to its organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtor's organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any Claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for, or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtor shall not survive confirmation of the Plan; *provided, however*, that nothing impairs the right of any Person with a right to indemnity, reimbursement, or limitation of liability as set forth above to pursue any available insurance, although the Debtor is not aware of any that would apply to such obligations.

Except for any indemnification obligations of the Debtor pursuant to the Director Indemnity Agreement, any Claim based on the Debtor's indemnification obligations shall be a Disputed Claim and subject to any objection under section 502(e)(1)(B) of the Bankruptcy Code. The Debtor's indemnification obligations shall not apply to or cover any Claims, suits, or actions against a Person that result in a Final Order determining that such Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

For the avoidance of doubt, any indemnification obligations of the Debtor arising under the Director Indemnity Agreement shall survive confirmation of the Plan and become obligations of the Wind-Down Debtor as of the Effective Date.

## ARTICLE X:
## EXCULPATION, RELEASES, AND INJUNCTIONS

### A.     Exculpation

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable Law, none of the Exculpated Parties shall have or incur any liability for any Exculpated Claim, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Case, including, without limitation (1) the negotiation, formulation, or preparation of the Combined Plan and Disclosure Statement or any contract, instrument, document, or other agreement entered into pursuant thereto, (2) any Distributions made pursuant to or in accordance with the Combined Plan and Disclosure Statement, (3) the exercise of their respective business judgment and the performance of their respective fiduciary obligations, (4) the administration of the Estate, and (5) the pursuit of confirmation of the Plan; *provided* that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, actual fraud, or gross negligence. Notwithstanding anything to the contrary contained herein, nothing in this Article X.A shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date or after the Effective Date.

### B.     Plan Injunction

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable Law, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan or are exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Estate, the Debtor, the Wind-Down Debtor, the Plan Administrator, or the Exculpated Parties, or their respective property (collectively, the "**Enjoined Actions**"): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claim or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such entities on account of or in connection with or with respect to any such released, compromised, settled, or exculpated Claims or Interests unless such entity has timely filed a Proof of Claim with the Bankruptcy Court preserving such right of setoff, subrogation, or recoupment; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such released, compromised, settled, or Exculpated Claims or Interests; *provided* that the foregoing injunction does not enjoin any

**actions to enforce obligations arising on or after the Effective Date under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**C.      Injunction Related to Releases and Exculpation**

**To the maximum extent permitted under applicable Law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including, without limitation, the Causes of Action released or exculpated in this Plan.**

**D.      Debtor's and Estate's Releases**

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed to be, conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtor, the Estate, and the Wind-Down Debtor, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action derivatively, by, through, or for, the foregoing Entities, from any and all Claims, and Causes of Action, including any derivative claims asserted by or assertable on behalf of the Debtor, the Estate, or the Wind-Down Debtor, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, contingent or noncontingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise that, the Debtor, the Estate, or the Wind-Down Debtor would have been legally entitled to assert in its own right or otherwise or on behalf of the Holder of any Claim or Interest based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtor, the Debtor's in- or out-of-court restructuring efforts, any Avoidance Actions, the Chapter 11 Case, and any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Disclosure Statement, the Plan Administrator Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities and any beneficial trust interests pursuant to the Plan, or the distribution of property under the Plan (including the Retained Assets and Distributable Proceeds) or any other related agreement, or upon any act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claims or Causes of Action included in the Schedule of Retained Causes of Action, or (c) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. For the avoidance of doubt, the Debtor Release does not release any Excluded Party from any Claim or Cause of Action of any kind whatsoever (including the Retained Causes of Action) whether arising before or after the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) essential to the Confirmation of the Plan; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iv) in the best interests of the Debtor, the Estate, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after reasonable investigation by the Debtor, and after due notice and opportunity for a hearing; and (vii) a bar to the Debtor, the Wind-Down Debtor, or the Debtor's Estate asserting any Claim or Cause of Action released pursuant to the Debtor Release.

For the avoidance of doubt, unless expressly released pursuant to the terms of the Plan, nothing herein shall discharge, release, or otherwise modify the liability of any non-Debtor party for any obligations of any kind whatsoever whether arising before or after the Effective Date.

## E.     Compromises and Settlements

Pursuant to Bankruptcy Rule 9019(a), the Debtor may compromise and settle (i) Claims against the Debtor and (ii) Claims that the Estate has against other Persons or Entities. The Debtor expressly reserves the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against the Debtor or the Estate and Claims that the Estate may have against other Persons and Entities at any time up to and including the Effective Date. After the Effective Date, the Wind-Down Debtor and the Plan Administrator, as applicable, may compromise and settle any Claims without needing to obtain Bankruptcy Court approval pursuant to Bankruptcy Rule 9019(a).

## F.     Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Estate hold or may hold against any Entity shall vest upon the Effective Date in the Wind-Down Debtor.

Unless a Cause of Action against a Holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan and/or any Final Order (including the

Confirmation Order), the Wind-Down Debtor and the Plan Administrator expressly reserve such Retained Causes of Action for later investigation and/or adjudication by the Plan Administrator (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtor may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Wind-Down Debtor and the Plan Administrator expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtor is a defendant or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtor have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtor or a transfer or money or property of the Debtor, or that has transacted business with the Debtor, or that has leased property from the Debtor, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Plan Administrator subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a Proof of Claim against the Debtor in the Chapter 11 Case; (ii) the Debtor has objected to any such Entity's Proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtor has objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtor as Disputed, contingent, or unliquidated; or (vi) the Debtor has identified any potential Claim or Cause of Action against such Entity herein.

## G.    No Discharge of Debtor or Wind-Down Debtor

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan will not provide for discharge of the Debtor or the Wind-Down Debtor. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtor. As such, no Person or Entity holding a Claim against the Debtor may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person or Entity under the Plan. All parties are precluded from asserting against any property to be distributed under the Plan, including any Distributions from the Wind-Down Debtor, any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

## ARTICLE XI:
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT

**A.      Conditions Precedent to the Effective Date**

It shall be a condition precedent to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

2.      all documents necessary to consummate the Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date) contained therein shall have been satisfied or waived in accordance therewith;

3.      the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.      the Plan Reserves (including the Professional Fee Escrow Account) shall have been established and funded;

5.      the Plan Administrator Agreement and all other documents necessary to effectuate the Wind-Down shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date) contained therein shall have been satisfied or waived in accordance therewith; and

6.      the Definitive Documentation related to the Wind-Down Financing Facility shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date) contained therein shall have been satisfied or waived in accordance therewith.

**B.      Waiver of Conditions**

The conditions to the Effective Date set forth in this Article XI may be waived or extended only by the Debtor, with Consent of the Agents, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or Consummate the Plan.

**C.      Effect of Failure of All Conditions**

If the Effective Date does not occur, the Combined Plan and Disclosure Statement shall be null and void in all respects, and nothing contained in the Combined Plan and Disclosure Statement shall:  (i) constitute a waiver or release of any claims by  the Debtor, any Holders of Claims or Interests, or any other Entity; (ii) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE XII: RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order, substantial consummation of the Plan, and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Plan, the Plan Administrator Agreement, and the Wind-Down to the fullest extent permitted by law, including, among other things, jurisdiction:

1. To the extent not otherwise determined by the Plan, to determine (a) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to file an objection, or (b) the validity, extent, priority, and non-avoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estate, and the Wind-Down Debtor Assets;

2. To protect the assets or property of the Estate, the Wind-Down Debtor Assets, including Causes of Action, from Claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estate or the Wind-Down Debtor Assets;

3. To approve, as may be necessary or appropriate, any Claims settlement entered into or setoff exercised by the Plan Administrator;

4. To resolve any dispute or matter arising under or in connection with the Plan Administrator Agreement;

5. To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

6. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

7. To issue such orders in aid of execution and Consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8. To consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

9. To hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code;

10. To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

11. To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12.      To hear any other matter not inconsistent with the Bankruptcy Code;

13.      To enter a final decree;

14.      To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and Plan Administrator Agreement;

15.      To decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

16.      To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

17.      To determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Plan;

18.      To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

19.      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

20.      To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Bar Date, or the Combined Hearing; and

21.      To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

Notwithstanding anything else in the Plan, the Bankruptcy Court shall retain jurisdiction over all Retained Causes of Action, including, without limitation, the specifically-identified Retained Causes of Action, and any cases, controversies, suits, disputes, or Causes of Action that may arise in connection therewith; *provided*, for the avoidance of doubt, the Wind-Down Debtor and the Plan Administrator shall have the power and authority to bring any action in any court of competent jurisdiction to prosecute any Retained Causes of Action.

## ARTICLE XIII: MISCELLANEOUS PROVISIONS

### A.      Immediate Binding Effect

Subject to Article XI hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Combined Plan and Disclosure Statement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Estate, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are presumed to have accepted or deemed to have rejected the

Combined Plan and Disclosure Statement), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Combined Plan and Disclosure Statement, each Entity acquiring property under the Combined Plan and Disclosure Statement, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

## B.    Reservation of Rights

Except as expressly set forth in the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur, and none of the Filing of the Combined Plan and Disclosure Statement, any statement or provision contained in the Combined Plan and Disclosure Statement, or the taking of any action by the Debtor with respect to the Combined Plan and Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

## C.    Modification, Withdrawal, or Revocation of the Combined Plan and Disclosure Statement

The Debtor reserves the right, in accordance with the Bankruptcy Code to amend, modify, or withdraw this Combined Plan and Disclosure Statement prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtor may, upon order, amend, or modify this Combined Plan and Disclosure Statement in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Combined Plan and Disclosure Statement in such manner as may be necessary to carry out the purpose and intent of this Combined Plan and Disclosure Statement. The Debtor reserves the right to revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date and to file subsequent plans of liquidation. If the Debtor revokes or withdraws the Combined Plan and Disclosure Statement, or if Confirmation or Consummation does not occur, then: (i) the Combined Plan and Disclosure Statement shall be null and void in all respects; (ii) any settlement or compromise embodied in the Combined Plan and Disclosure Statement (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Combined Plan and Disclosure Statement, and any document or agreement executed pursuant to the Combined Plan and Disclosure Statement, shall be deemed null and void; and (iii) nothing contained in the Combined Plan and Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Estate, the Debtor, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## D.    Exhibits/Schedules

All exhibits and schedules to this Plan are incorporated into and are part of the Plan as if set forth in full herein.

E.    **Plan Supplement**

The Debtor will file the Plan Supplement at least seven (7) days before the Voting Deadline. The Plan Supplement will contain, among other things, any other disclosures as required by the Bankruptcy Code.

F.    **Filing of Additional Documents**

On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

G.    **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.    **Governing Law**

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

I.    **Time**

To the extent that any time for the occurrence or happening of an event as set forth in this Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day

J.    **Term of Injunctions or Stays**

Unless otherwise provided in the Combined Plan and Disclosure Statement or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Combined Plan and Disclosure Statement or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Combined Plan and Disclosure Statement or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.    **Severability**

Should any provision of this Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

### L.   Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Combined Plan and Disclosure Statement in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code.

### M.   Revocation

The Debtor reserves the right to revoke and withdraw the Plan prior to the entry of the Confirmation Order. If the Debtor revokes or withdraws the Plan, the Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtor.

### N.   Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, any related documents (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall be construed to amend, modify, or abrogate any prior Final Order of the Bankruptcy Court in this Chapter 11 Case.

### O.   No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

### P.   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date shall occur. None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims, or Holders of Interests before the Effective Date.

### Q.   Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan that incorporate mutually agreed settlements shall constitute a good-faith compromise and settlement of all Claims or controversies resolved pursuant to those provisions and in this Chapter 11 Case. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing

33521563.3

compromises or settlements, and all other compromises and settlements provided for in the applicable Plan provisions and this Chapter 11 Case, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, its Estate and all Holders of Claims and Interests against the Debtor. Notwithstanding any other provision in the Plan, the settlements are approved among the parties that have agreed to them (among any other party who has expressly entered into a written settlement), and the treatment of Claims and Interests is being afforded pursuant to confirmation of the Plan by satisfying the requirements of section 1129 of the Bankruptcy Code.

Dated: September 15, 2025     Respectfully Submitted,
   Wilmington, Delaware

           */s/ Timothy R. Pohl*
           Timothy R. Pohl
           Director, CEO, and Secretary
           BYJU's Alpha, Inc.

# **EXHIBIT B**

**Notice of Effective Date**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BYJU'S ALPHA, INC.[1] | Case No. 24-10140 (BLS) |
| Debtor. | Re: D.I. [●] |

## NOTICE OF (I) ENTRY OF CONFIRMATION ORDER,
## (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES

**PLEASE TAKE NOTICE THAT** on [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") confirmed the *Amended Combined Disclosure Statement and Chapter 11 Plan of BYJU's Alpha, Inc.* [D.I. 475] (the "**Plan**"), which was attached as **Exhibit A** to the *Findings of Fact, Conclusions of Law, and Order Confirming the Amended Combined Disclosure Statement and Chapter 11 Plan for Byju's Alpha, Inc.* [Docket No. [●]] (the "**Confirmation Order**").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Effective Date, as defined in the Plan, occurred on [●]**, 2025**.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Plan, unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court by the Rejection Bar Date, which shall be the *later* of (a) the General Bar Date; (b) thirty (30) days after the entry of an order by the Bankruptcy Court authorizing such rejection; or (c) such other date, if any, as the Bankruptcy Court may fix in the order authorizing such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Estate, the Wind-Down Debtor, or their property without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory

---

[1]     The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number is BYJU's Alpha, Inc. (4260). The location of the Debtor's service address for purposes of this Chapter 11 Case is 1007 N. Market St. Ste. G20 452, Wilmington, DE 19801.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Confirmation Order.

Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

**PLEASE TAKE FURTHER NOTICE THAT**, unless otherwise provided by a Final Order of the Bankruptcy Court, and with the exception of 28 U.S.C. § 1930 obligations, including U.S. Trustee fees and court costs, which are payable as a condition to Confirmation, the deadline for filing requests for payment of Administrative Claims shall be no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor, the Wind-Down Debtor, or its Estate, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**PLEASE TAKE FURTHER NOTICE THAT** all final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than [●], 2025.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan and its provisions are binding on the Debtor, the Wind-Down Debtor, any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, and whether or not such Holder or Entity voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan, the Confirmation Order, and other documents and materials filed in the Chapter 11 Case may be obtained for a fee via PACER at: http://www.deb.uscourts.gov.  Alternatively, you may request that a copy of the Combined Plan and Disclosure Statement be mailed to you by contacting Young Conaway Stargatt & Taylor, LLP at (302) 571-7791, or by email at bwalters@ycst.com.

*[Remainder of page intentionally left blank.]*

Dated:  Dated: October , 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ *draft*
Robert S. Brady (Del. No. 2847)
Kenneth J. Enos (Del. No. 4544)
Jared W. Kochenash (Del. No. 6557)
Timothy R. Powell (Del. No. 6894)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com
jkochenash@ycst.com
tpowell@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Benjamin Finestone (admitted *pro hac vice*)
Daniel Holzman (admitted *pro hac vice*)
Jianjian Ye (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
susheelkirpalani@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
danielholzman@quinnemanuel.com
jianjianye@quinnemanuel.com

*Co-Counsel to the Debtor*