## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BYJU'S ALPHA, INC.,<br><br>          Debtor | Chapter 11<br><br>Case No. 24-10140 (BLS) |
| BYJU'S ALPHA, INC.,<br>              Plaintiff,<br>   v.<br><br>BYJU RAVEENDRAN, DIVYA<br>GOKULNATH, and ANITA KISHORE,<br>          Defendants. | Adv. Pro. No. 25-50526 (BLS)<br><br>Re: Adv. D.I.  77, 78, 93, 116, 140 |

## AMENDED OPINION DENYING THE MOTION TO DISMISS
## FILED BY DEFENDANT BYJU RAVEENDRAN[1]

This adversary proceeding is part of the Debtor's ongoing efforts to unravel a series of fraudulent transfers that stripped the Debtor of its assets (including the $533 million Alpha Funds (as defined below) and the proceeds thereof), by placing those assets beyond the reach of the Debtor and its creditors and concealing their whereabouts. On February 27, 2025, this Court issued a Memorandum Opinion in a separate adversary proceeding that granted partial summary judgment on claims of actual fraudulent transfer.[2]  The Debtor has filed this adversary proceeding to "hold

---

[1] This Court has subject matter jurisdiction to decide the Motion to Dismiss pursuant to 28 U.S.C. § 157 and § 1334(b).

[2] *See Byju's Alpha, Inc. v. Camshaft Cap. Fund L.P. (In re Byju's Alpha, Inc.)*, Adv. Pro. No. 24-50013, Docket No. 383 (Bankr. D. Del. Feb. 27, 2025) (Memorandum Opinion (the "MSJ Mem. Op.") granting the Debtor's motion for partial summary judgment on various claims, including

three powerful BYJU's executives accountable for having purposefully caused the Debtor to fraudulently transfer an asset valued at over half a billion dollars for no consideration."[3]

The Complaint asserts claims for breach of fiduciary duties, aiding and abetting breach of fiduciary duties, accounting, conversion, and civil conspiracy. The Summons was issued on April 9, 2025, the same day the Complaint was filed.

Defendant Raveendran has filed a Motion to Dismiss the Complaint, on three separate grounds: first, that the Debtor has failed to properly serve him with the Summons and Complaint; second, that the Court lacks personal jurisdiction over him; and finally, that the Complaint fails to state valid claims against him.[4]  The Plaintiffs filed a response opposing the Motion to Dismiss[5] and the Defendant timely filed a Reply brief.[6]  The Court held a hearing to consider the Motion to Dismiss on September 9, 2025.  For the reasons set forth herein, Raveendran's Motion to Dismiss the Complaint will be denied.

<u>ALLEGATIONS</u>

The Complaint alleges the following:

Debtor Byju's Alpha, Inc. was formed as a Delaware corporation on September 27, 2021, as a special purpose financing vehicle for its former Indian

---

claims of actual fraudulent transfer, against Defendants Camshaft Capital Fund LP, Camshaft Capital Management LLC, Think and Learn Private Limited and Riju Ravindran (the "Camshaft Adversary Defendants")).   The Court determined that between April 2022 and July 2022, the Debtor made a series of wire transfers to Camshaft Capital Fund LP, a small unknown hedge fund, totaling $533 million (the "Alpha Funds").

[3] Adv. D.I. 1 (the "Compl.") ¶ 1.
[4] Adv. D.I.s 77, 78, 79, 80 (the "Motion to Dismiss").
[5] Adv. D.I.s 93, 94.
[6] Adv. D.I. 116.

ultimate corporate parent, Think & Learn Pvt. Ltd. ("T&L").[7]  T&L was co-founded by Raveendran and Gokulnath who both served, along with Byju's younger brother Riju Ravindran,[8] as T&L directors at all relevant times, until their roles were suspended in July 2024, when T&L was involuntarily placed into an insolvency proceeding in India.[9]

The Complaint alleges that the Debtor never had any material active business operations.[10]  From its formation until March 3, 2023, Riju served as an officer and sole director of the Debtor.[11]  The Complaint further alleges that Raveendran also served as an officer of the Debtor (namely, CEO) for an indeterminate period of time.[12]  On March 3, 2023, Timothy R. Pohl became the Debtor's sole director and sole officer, and he has remained in those roles through the present.[13]

This Court has found that there is "extensive evidence" suggesting that the Debtor was formed "to perpetrate a fraud."[14]   On November 24, 2021, the Debtor borrowed $1.2 billion under a Credit Agreement from a consortium of Lenders, with GLAS Trust Company LLC ("GLAS") serving as Administrative and Collateral Agent.[15]  Within months of executing the Credit Agreement, the Debtor defaulted by

---

[7] Compl. ¶ 23.  Capitalized terms not defined herein have the meanings given to them in the Complaint.

[8] To distinguish between the brothers, Riju Ravindran is referred to herein by his first name, Riju.

[9] Compl. ¶¶ 24, 25.

[10] Compl. ¶ 23.

[11] Compl. ¶ 23.

[12] *Id.*

[13] *Id.*

[14] Compl. ¶ 19, n. 11 (citing the MSJ Mem. Op. at 21).

[15] Compl. ¶ 27.

failing to comply with financial reporting and guarantee covenants, permitting the Lenders to accelerate the loans and exercise available remedies, which they ultimately did.[16]

On April 27-28, 2022, the Debtor (through Riju acting as the Debtor's sole director and - - as he later testified during depositions - - taking direction from the T&L Board) initiated three wire transfers totaling $318,000,000 to Camshaft Capital Fund, L.P., a Delaware limited partnership ("Camshaft Fund") for the purported purpose of subscribing for a limited partnership interest.[17]  On July 12-13, 2022, the Debtor initiated three additional transfers to Camshaft Fund in the total amount of $215,000,000 from another checking account of the Debtor.[18]  In total, the Debtor transferred $533,000,000 to Camshaft Fund in exchange for limited partnership interests in Camshaft Fund (the "Camshaft LP Interest") pursuant to two sets of subscription agreements and corresponding side letters.[19]

The Complaint alleges that there was no legitimate reason for the Debtor to allegedly "invest" over half a billion dollars in Camshaft Fund, which at the time had under $10 million in assets under management, particularly after the Debtor's multiple loan defaults under the Credit Agreement.[20]  The Complaint claims that it has since become well publicized that Camshaft Fund was an unproven, fly-by-night hedge fund founded in August 2020 by William Morton - - then, a 23-year old with

---

[16] Compl. ¶¶ 33-35.  The defaults included failure by T&L to provide quarterly financial statements and failure by an affiliate (Whitehat India) to provide a required guarantee. *Id.*
[17] Compl. ¶39.
[18] *Id.*
[19] *Id.*  These transfers are referred to as the "First Fraudulent Transfer."  Compl. ¶ 42.
[20] Compl. ¶ 43.

no formal training in investing or money management, and no apparent qualification to manage a hedge fund.[21]  On federal and state regulatory filings, Camshaft Fund listed the address of an International House of Pancakes in the Little Havana neighborhood of Miami as its principal place of business.[22] Accordingly, the Complaint alleges the Camshaft Fund was a complete sham and Morton was an inexperienced and highly unqualified manager.[23]

The Complaint further alleges that the transfers to Camshaft Fund rendered the Debtor insolvent, if it was not already so.[24]  Specifically, the Debtor's liabilities (approximately $1.194 billion in outstanding principal on the defaulted loans as of July 12-13, 2022) far exceeded the Debtor's liquid assets (around $131 million in available funds), and the Debtor had no meaningful active operations capable of generating income.[25]  The Court found that Riju breached his fiduciary duties by authorizing these transfers.[26]  To conceal the movement of money from the Lenders, T&L's unaudited financial statements continued to report that the Debtor held over $500 million in "Cash and Bank."[27]

As defaults continued to mount, by the end of September 2022, an *ad hoc* group of Lenders engaged advisors and contacted the Debtor's representatives, including Raveendran, Divya Gokulnath, and Riju, to resolve the outstanding

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Compl. ¶ 42.
[25] *Id.*
[26] Compl. ¶ 97; MSJ Mem. Op. at 38-39.
[27] Compl. ¶¶ 50, 53, 68.

defaults and restructure the term loans.[28]  On October 4, 2022, the parties entered into the first of what would become seven more amendments to the Credit Agreement.[29]  Unbeknownst to the Lenders, around October 2022, the Debtor "started the process" of transferring the Camshaft LP Interest to affiliate Inspilearn, LLC ("Inspilearn").[30]

After months of fruitless negotiations, on Friday, March 3, 2023, GLAS, acting at the Lenders' direction, exercised remedies, including accelerating over $1.2 billion in principal and outstanding interest and fees owed under the Credit Agreement.  GLAS took control of the pledged shares in the Debtor and, as the Debtor's sole shareholder, GLAS appointed Pohl as the Debtor's sole director, who then appointed himself as the Debtor's sole officer.[31]  As this Court would later find, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor."[32]

But on Monday, March 6, 2023, before Pohl was able to secure actual control of the Debtor's assets, the Complaint alleges that Kishore emailed Camshaft's founder (copying Raveendran) seeking to resume the process of transferring the Camshaft LP Interest to Inspilearn.[33]   On March 31, 2023, the Debtor, Inspilearn, and Camshaft executed the Transfer Agreement and Subscription Agreement, among other documentation, resulting in the Debtor having "zero remaining

---

[28] Compl. ¶¶ 36-37, 45.
[29] Compl. ¶ 46.
[30] Compl. ¶¶ 4, 46.
[31] Compl. ¶¶ 55, 64.
[32] Compl. ¶ 11, MSJ Memo. Op. at 42.
[33] Compl. ¶¶ 2, 57.  This Court previously found that "Inspilearn is T&L's alter ego as a matter of law."  MSJ Mem. Op. at 16.

interest in the Transferred Interest," (*i.e.*, the Camshaft LP Interest).[34]  Raveendran

signed the Transfer Agreement on behalf of the Debtor, as "CEO," and falsely

represented that he, on behalf of the Debtor, had "all requisite power and authority

to execute, deliver, and perform this agreement."[35]  Riju signed the Transfer

Agreement on behalf of Inspilearn and later testified that he "just took direction

from the parent company," - - meaning T&L and, more specifically, his brother Byju,

and sister-in-law, Gokulnath.[36]  In exchange for the transfer of the Camshaft LP

Interest (contemporaneously valued at $540,647,102.29), the Debtor received no

consideration whatsoever.[37]

Pohl did not learn about the Transfer Agreement until 2024, when he

received a copy of it during discovery in this bankruptcy proceeding.[38]  The

Complaint alleges that the Defendants' motive for the Second Fraudulent Transfer

was to conceal the asset from the Debtor's creditors and to frustrate their rights to

exercise remedies under the Credit Agreement and applicable law.[39]  Raveendran

conceded as much during a call in May 2023 with the Lenders' U.S.-based financial

advisor and with Raveendran's General Counsel on the line, admitting "the money

is someplace the Lenders will never find it."[40]  This Court found: "[i]t is difficult to

---

[34] Compl. ¶¶ 59-60 (quoting the Transfer Agreement).  The "Transferred Interest" was defined in the Transfer Agreement as "100% of the Interest," referring to the Debtor's "total Capital Commitment to [Camshaft Fund] in the amount of $533,000,000.00."  Compl. ¶ 60, n. 18.  This transfer is referred to as the "Second Fraudulent Transfer."

[35] Compl. ¶ 61.

[36] Compl. ¶¶ 61, 63.

[37] Compl. ¶¶ 2, 65.

[38] Compl. ¶ 9.

[39] Compl. ¶ 64.

[40] Compl. ¶ 72.

imagine a single combination of words to demonstrate actual fraudulent intent more clearly."[41]

The Complaint describes details the actions of Raveendran, Gokulnath, Kishore, Riju, and other business associates to continuously conceal the $533 million, including T&L's falsified financials,[42] backdating the Transfer Agreement,[43] and prepetition and post-petition misrepresentations about the $533 million.[44]   The Complaint also alleges that a third fraudulent transfer occurred on the date the Debtor filed for bankruptcy (February 1, 2024), when the Defendants and Riju caused Inspilearn to transfer the Camshaft LP Interest to an offshore trust, which purportedly redeemed it for cash.[45]

The Debtor alleges that its former management and T&L have refused to provide Pohl with the Debtor's books and records, despite Riju's testimony that T&L maintained those records.[46]  The Complaint alleges that the whereabouts of the Alpha Funds remains unknown.[47]  Six parties, including both Raveendran brothers, have been held in contempt rather than cooperate.[48]

---

[41] *BYJU's Alpha, Inc. v. Camshaft Capital Fund, LP (In re BYJU's Alpha, Inc.)*, 661 B.R. 109, 123 (Bankr. D. Del. 2024).
[42] Compl. ¶¶ 26, 68.
[43] Compl. ¶ 73
[44] Compl. ¶¶ 77-79; 80-82.
[45] Compl. ¶¶ 2, 80.
[46] Compl. ¶¶ 38, 74, 118.
[47] Compl. ¶ 87.
[48] Adv. D.I. 66; Camshaft Adv. No. 24-50013, D.I. 80, 204, 313.

## DISCUSSION

1.    Whether the Debtor properly served the Complaint and Summons upon
Defendant Raveendran.

Raveendran moves to dismiss the Complaint under Fed.R.Civ.P. 12(b)(5) for

insufficient service of process.  The Debtor asserts that Raveendran was served with

the Summons and Complaint through the Delaware Officer Consent Statute on

April 10, 2025,[49] and Raveendran was served in the United Arab Emirates on May

14, 2025, pursuant to Fed.R.Civ.P. 4(f)(2)(A) and the laws of the United Arab

Emirates.[50]

"In the absence of service of process or a waiver of service by the defendant,

due process will not permit a court to exercise power over a party named as

defendant in the complaint."[51]  "In resolving a motion under Rule 12(b)(5), the party

making service has the burden of demonstrating its validity when an objection to

service is made."[52]  "This burden can be met by a preponderance of the evidence

using affidavits, depositions, and oral testimony."[53]

Here, the Debtor argues that it properly served Raveendran under the

Delaware Consent Statute and under Federal Rule of Civil Procedure 4(f)(2).

Raveendran argues that he cannot be served under the Delaware Consent Statute

because there is no evidence that he was formally appointed as the CEO of the

---

[49] Adv. D.I. 6.
[50] Adv. D.Is 35-36.
[51] *Mills v. Ethicon, Inc.*, 406 F.Supp.3d 363, 391-92 (D. N.J. 2019) (citing *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999)).
[52] *Chow v. Canyou Bridge Cap. Partners, LLC*, 2024 WL 3510917, *4 (D. Del. July 22, 2024) (quoting *Martin v. OSHA*, 2017 WL 1326212, *2 (E.D.Pa. Apr. 11, 2017)).
[53] *Mills*, 406 F.Supp.3d at 392.

Debtor.  Further, Raveendran argues that the Debtor's attempt at service in the United Arab Emirates ("UAE") under Rule 4(f)(2) did not comply with the laws for service in that country.

    (a)    <u>The Delaware Consent Statute</u>

The Delaware Consent Statute, 10 Del. C. § 3114, provides that nonresidents of the State of Delaware who serve as officers and directors of a Delaware corporation are deemed to have consented to service of process upon the corporation's registered agent for civil actions brought in Delaware against the corporation or against the officer or director for a violation of their duties.[54] Raveendran argues that the statute cannot apply to him because, he claims, there is no evidence that he was ever officially appointed as an officer of the Debtor. Raveendran relies upon the statute's definition of "officer" as an officer of the corporation who:

(1) Is or was the president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer of the corporation at any time during the course of conduct alleged in the action or proceeding to be wrongful;

(2) Is or was identified in the corporation's public filings with the United States Securities and Exchange Commission because such person is or was 1 of the most highly compensated executive officers of the corporation at any time during the course of conduct in the action or proceeding to be wrongful; or

(3) Has, by written agreement with the corporation, consented to be identified as an officer for purposes of this section.[55]

---

[54] 10 Del. C. § 3114(b).
[55] 10 Del. C. § 3114(b).

Raveendran claims that numbers (2) and (3) above clearly do not apply to him, and he further argues that (1) does not apply because he was not actually appointed as CEO of the Debtor.[56]

The Debtor argues, however, that the full text of § 3114(b) plainly states that the Consent Statute applies to any nonresident of Delaware who "after January 1, 2004, accepts election or appointment as an officer of a corporation organized under the laws of this State or *who after such dates serves in such capacity ….*"[57]  The Debtor asserts that Raveendran clearly served as the Debtor's CEO by signing documents with that title (particularly, the Transfer Agreement), and based on the testimony of Riju that Raveendran was the true decision-maker for the Debtor.

The Delaware Court of Chancery squarely considered this issue in *Harris v. Harris* and held:

> Addressing an issue of first impression, this decision holds that the Officer Consent Statute can be used to serve process on a person who serves in the role of president, chief executive officer, chief operation officer, chief financial officer, chief legal officer, controller, treasurer or

---

[56] Raveendran also argues that the Plaintiffs conceded in their Complaint that Riju was the sole director and officer of the Debtor.  However, a full reading of paragraph 93 of the Complaint shows that it alleges Riju was the sole director and officer of the Debtor "*at the time . . . Riju caused the Debtor to transfer the Alpha Funds to Camshaft Fund.*"  This is not inconsistent with other allegations - - made at least ten times throughout the Complaint - - that Raveendran was acting as the Debtor's CEO when signing the Transfer Agreement and initiating the Second Fraudulent Transfer.  Raveendran further asserts that the Court made findings in its Summary Judgment Opinion that Raveendran "was not employed by the Debtor in any capacity" (MSJ Mem. Op. at 40) or that Riju was the sole director and officer of the Debtor (*Id*. at 15-16, 19).  Raveendran argues the Plaintiffs are estopped from arguing otherwise.  The Plaintiffs argue that Raveendran's references are cherry-picked and taken out of context when considered in a full reading of the Summary Judgment Opinion. This Court agrees. In the Summary Judgment Opinion, the Court determined that Raveendran had no authority to effectuate a transfer *after* GLAS exercised its remedies and appointed Pohl as the Debtor's sole director and officer. (*Id*. at 40).  It is also noteworthy that in the Summary Judgment Opinion, the Court determined that Raveendran was "the Debtor's founder, and self-appointed CEO."  (*Id*. at 6).

[57] *Id*. (emphasis added).

chief accounting officer of the corporation even if the person does not hold the formal officer position.[58]

The Court explained that the plain meaning of "serves" extends "to someone who fills a role and performs the duties of an office, without formally accepting the position."[59]  The *Harris* Court determined that the list of officer positions in § 3114(b)(1) "designates roles, not titles" and offered the following examples:

> The top executive at a company who uses the title "Grand Poobah" is still subject to service of process under Section 3114(b)(1) as the president or chief executive officer.  A real-world example is Jack Dorsey of Block, Inc. who holds the title of "Chief Blockhead."  He remains subject to service of process under Section 3114(b)(1).  And when Elon Musk re-designated himself as "Chief Twit," he did not fall out of the ambit of Section 3114(b)(1).[60]

The *Harris* Court found it "likely that the drafters of Section 3114(b) expected the statute to reach the individuals who perform the duties, fill the roles, and act in substance as the top executives at private companies, regardless of Formal Officer status."[61]  The Court also warned that limiting the Consent Statute to only formal officers could render it ineffective and enable individuals to exploit gaps in coverage to "evade service of process, whether by inadvertence or design."[62]

Raveendran argues that the *Harris* decision is overbroad and should not be followed, noting that it was a matter of first impression for the Court.  Instead, Raveendran relies upon the Delaware Court of Chancery opinion in

---

[58] *Harris v. Harris*, 289 A.3d 310, 316 (Del. Ch. 2023).
[59] *Id.* at 328.
[60] *Id.* at 329.
[61] *Id.* at 335.
[62] *Id.* at 333.

*HMG/Courtland Properties, Inc. v. Gray*, in which the Court rejected the theory of applying the implied consent provisions of § 3114 to a director's agents or alter ego.[63]  But the Complaint here does not allege that Raveendran acted as an agent or alter ego - - it alleges that Raveendran acted in the role of CEO of the Debtor by signing various documents in that capacity and, according to the testimony of Riju, by making decisions in that capacity.

This Court finds that the thorough analysis and rationale of *Harris* is applicable here.  The Complaint alleges that Raveendran served in the officer role of CEO to the Debtor, and the Transfer Agreement supports those allegations.[64] Accordingly, the Debtor has met its burden of demonstrating that Raveendran is subject to the Delaware Consent Statute of 10 Del. C. § 3114 and service of process upon Raveendran is proper in this matter.

---

[63] *HMG/Courtland Prop., Inc. v. Gray*, 729 A.2d 300, 305 (Del. Ch. 1999). The *HMG* Court decided that the public policy interest in holding agents or alter egos who work with Delaware directors to breach the rights of Delaware corporations is protected by Delaware's long-arm statute, 10 Del. C. § 3104(c).  *Id.* at 306-07.

[64] Raveendran also argues that his designation as CEO on the Transfer Agreement was a clerical error made by Camshaft Fund's William Morton, who allegedly prepared the document, and Raveendran only added his electronic signature.  This unsupported assertion belies the plain language of the Transfer Agreement and Riju's testimony that Raveendran was the decision-maker for the Debtor. On this record, the Court finds that Raveendran executed the Transfer Agreement as the Debtor's CEO.

(b)    Service under Fed.R.Civ.P. 4(f)(2) in the United Arab Emirates

The Debtor also contends that it properly served the Complaint and
Summons on Raveendran in the United Arab Emirates ("UAE") under Rule 4(f).[65]

Federal Rule of Civil Procedure 4(f), made appliable hereto by Federal Rule of
Bankruptcy Procedure 7004, governs service of an individual in a foreign country.[66]
Rule 4(f)(1) authorizes service on individuals by "any internationally agreed means
of service that is reasonably calculated to give notice."[67]    When there is no
internationally agreed means of service (such as the Hague Service Convention or
other treaty), as is the case for the UAE,[68] then Rule 4(f)(2) applies allowing the
Debtor to serve Raveendran "by a method that is reasonably calculated to give
notice as prescribed by the foreign country's law for service in that country in an
action in its courts of general jurisdiction."[69]

The Debtor provided a declaration from the Debtor's Emirati counsel to
describe the steps taken to serve the Defendants under UAE law.[70]    The Debtor
asserts that Raveendran twice evaded in-person service at his home in Dubai, with
his security guards falsely claiming that he did not live there.[71]    The Debtor
obtained permission from Dubai Courts to apply to the Immigration Office to

---

[65] Adv. D.I. 35.
[66] Fed.R.Civ.P. 4(f).
[67] Fed.R.Civ.P. 4(f)(1).
[68] *See Color Switch LLC v. Fortafy Games DMCC*, 2018 WL 2298401, *3 (E.D. Ca. May 21,
2018) ("[T]he United Arab Emirates is 'not a party to the Hague Service Convention or any treaty
related to service of process.'"); *Celgene Corp. v. Blanche Ltd.*, 2017 WL 1282200, *3 (D. N.J. Mar. 10,
2017) ("[T]he UAE … is not a signatory of the Hague Convention or, apparently, any other applicable
international agreement.").
[69] Fed.R.Civ.P. 4(f)(2)(A) (citation modified).
[70] Adv. D.I. 93, Ex. A.
[71] Adv. D.I. 93, ¶¶ 16, 19.

investigate the registered address and contact details of Raveendran and, as permitted, served the documents to Raveendran's cellular phone number on file via SMS.[72]

Raveendran, however, argues that part of the Debtor's steps to serve him did not comply with UAE law and supplied a declaration from his Emirati counsel to support his arguments.[73]  For example, Raveendran argues that, although he is not an Arabic speaker, the Summons and Complaint should have been translated into Arabic, but the Debtor argues that relevant UAE law only requires that the "process" (or legal notice) be served in Arabic-English bilingual text, which was done.  Raveendran also asserts that service must be through a court-appointed bailiff, while the Debtor claims that Dubai Courts presently contract through private parties to take on the role of bailiff.  The Debtor points out that a follow-up declaration by the Defendants' counsel acknowledged that "the court bailiff role was [deputized] years ago by the Dubai Courts to external service providers."[74]  Finally, there is also a dispute over whether the telephone number used to serve Raveendran over text was his current number.  The Debtor asserts that Raveendran provided that phone number to the UAE Immigration Office and that he was obligated to keep that number current.

While the opinions of both UAE counsel vary, the Debtor contends that its service under UAE law followed the similar steps as those found to be sufficient

---

[72] *Id.* ¶¶ 20-25.
[73] Adv. D.I. 78, Ex. 22.
[74] Adv. D.I. 83, ¶ 9.

under Rule 4(f)(2) and UAE law in the case *Pliteq, Inc. v. Mostafa.*[75]  Moreover,

there is no dispute that Raveendran had actual notice of the Complaint.  "Once a

defendant has actual notice of the pendency of an action, the requirements of

Fed.R.Civ.P. 4 are to be liberally construed."[76]  The record before the Court

demonstrates that the Debtor's service substantially complied with UAE law and

was reasonably calculated to (and did) provide notice to Raveendran.  Raveendran's

motion to dismiss the Complaint under Rule 12(b)(5) will be denied.

2.    <u>Whether this Court has personal jurisdiction over Defendant Raveendran.</u>

Raveendran also seeks to dismiss the Complaint for lack of personal

jurisdiction under Fed.R.Civ.P. 12(b)(2) claiming he does not have sufficient

contacts with the State of Delaware because he never stepped foot in Delaware and

never transacted business there.  He argues that the Court's exercise of jurisdiction

over him would not comport with constitutional standards of fair play or substantial

justice.  Raveendran again asserts that he was never formally appointed as an

officer of the Debtor.

In response, the Debtor argues that the Court has multiple bases for

exercising personal jurisdiction over Raveendran, specifically under the traditional

"minimum contacts" test, the "effects test" involving intentional torts, and the

conspiracy theory of jurisdiction.

---

[75] *Pliteq, Inc. v. Mostafa*, 2024 WL 3070171 (S.D. Fla. Jun. 20, 2024).
[76] *Id.* at *11 (quoting *Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F.Supp.2d 1273, 1281 (S.D. Fla. 1999).

"[O]nce a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper."[77]  "A plaintiff may meet this burden by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum.'"[78]  "In bankruptcy cases, the forum is the United States in general, not the particular forum state."[79]  Therefore, the Court will consider Raveendran's contacts on a national level, rather than the state of Delaware level, to determine whether this Court's exercise of *in personam* jurisdiction is proper.[80]

(a)    <u>The Minimum Contacts Test</u>

To meet Fifth Amendment due process concerns, courts "impose a general fairness test incorporating *International Shoe's* requirements that 'certain minimum contacts' exist between the non-resident defendant and the forum 'such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[81]  A non-resident defendant's contacts with the forum may give rise to either "general" or "specific" jurisdiction.  "General jurisdiction" occurs when a defendant's activities within the forum are so continuous and systematic that the

---

[77] *Alameda Research Ltd. v. Platform Life Sciences Inc.*, 2023 WL 8814216, *1 (Bankr. D. Del. Dec. 20, 2023) (citing *Gurmessa v. Genocide Prevention in Eth., Inc.*, Civ. Action No. 21-869-RGA, 2022 WL 608924, *1 (D. Del. Feb. 23, 2022)).  Here, the Plaintiffs have submitted an affidavit with copies of documents and correspondence to support their argument that jurisdiction over Raveendran is proper due to sufficient contacts with the United States.  Adv. D.I. 94.

[78] *Id.* (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

[79] *Astropower Liquidating Trust v. Xantrex Tech., Inc. (In re Astropower Liquidating Trust)*, 2006 WL 2850110, *3 (Bankr. D. Del. Oct. 2, 2006).

[80] *Astropower Liquidating Trust v. Xantrex Tech., Inc. (In re Astropower Liquidating Trust)*, 335 B.R. 309, 317 (Bankr. D. Del. 2005). Accordingly, Raveendran's citations to the Delaware long-arm statute and related case law are not relevant to the analysis.

[81] *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985) (*superseded in part by rule* as recognized in *In re Paques, Inc.*, 277 B.R. 615 (Bankr. E.D.Pa. 2000) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

defendant could reasonably anticipate being subject to jurisdiction there, even if the cause of action does not arise from or relate to the activities.[82] "Specific jurisdiction" is found when a non-resident defendant purposefully directs activities at residents of the forum, and the litigation results from alleged injuries arising out of or relating to those activities.[83] A single transaction, so long as it creates a substantial connection with the forum, can suffice.[84]

The "constitutional touchstone" of personal jurisdiction is whether the defendant purposefully established "minimum contacts" with the forum.[85] Courts may exercise jurisdiction over non-residents who purposefully direct activities toward forum residents or who purposefully avail themselves of the privilege of conducting activities in the forum, thus invoking the benefits and protections of its laws.[86] "[T]he foreseeability that is critical to due process analysis … is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."[87] "The 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts."[88]

(i) *Byju Raveendran – the Transfer Agreement*

---

[82] *Alameda Research*, 2023 WL 8814216, *2; *Astropower*, 2006 WL 2850110, *3 (citations omitted)

[83] *Astropower*, 2006 WL 2850110, *3 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

[84] *Burger King*, 471 U.S. at 475 n. 18 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

[85] *Burger King*, 471 U.S. at 474 (citing *Int'l Shoe*, 326 U.S. at 316).

[86] *Burger King*, 471 U.S. at 473-75

[87] *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

[88] *Burger King*, 471 U.S. at 475 (citations omitted).

18

The Plaintiffs argue that Raveendran is subject to this Court's jurisdiction by virtue of his execution of documents, including the Transfer Agreement, as CEO of the Debtor.  They claim this was a purposefully-directed activity resulting in a U.S.-centered transfer (*i.e.*, causing a Delaware corporation (the Debtor) to transfer a Delaware limited partnership interest (the Camshaft LP Interest) to a Delaware limited liability corporation (Inspilearn)).  Further, the Plaintiffs assert that Raveendran's execution of the Transfer Agreement resulted in the principal event underlying Counts I, II, and V of the Complaint.[89]

Raveendran, however, argues that executing the Transfer Agreement as the Debtor's CEO - - and not in his individual capacity - - is a single attenuated contact with the United States, not based on his connections to the forum, but based on the happenstance that the Debtor-Plaintiff is incorporated in Delaware.  He relies upon the case *Walden v. Fiore*,[90] in which the Supreme Court held that a Georgia officer's actions in a Georgia airport toward plaintiffs,[91] who were Nevada residents, did not create sufficient contacts to subject the officer to jurisdiction in Nevada.[92]  There, the Supreme Court decided that "the plaintiff cannot be the only link between the defendant and the forum."[93]

But, in *Walden*, the Supreme Court further explained: "Rather, it is the defendant's conduct that must form the necessary connection with the forum State

---

[89] Those Counts are aiding and abetting Riju's breach of fiduciary duty, breach of fiduciary duty and conversion.

[90] *Walden v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014).

[91] The officer in *Walden* seized cash suspected to be involved with drug-related activity from the plaintiffs, then helped draft a false probable cause affidavit.  *Walden*, 571 U.S. at 280-81.

[92] *Walden*, 571 U.S. at 284-86.

[93] *Walden*, 571 U.S. at 285.

that is the basis for its jurisdiction over him."[94]  Here, Raveendran's action as an officer of a Delaware corporation establishes the necessary connection to the United States to provide jurisdiction.  By signing the Transfer Agreement as the Debtor's CEO, Raveendran purposefully availed himself of the privilege of conducting business in the United States.[95]

Further, Raveendran should have anticipated that he could be haled into a Delaware court for executing the Transfer Agreement, thus the exercise of jurisdiction does not offend notions of fair play and substantial justice.  As noted by the Delaware Court of Chancery, a corporate officer "doubtless anticipated – and in any event should have anticipated – that she could face litigation in Delaware over her actions as a senior officer of a Delaware entity."[96]  The timing of the Transfer Agreement further supports this.  Knowing GLAS had accelerated a $1.2 billion debt, Raveendran could foresee that his action was escalating an already contentious situation by moving the Debtor's sole remaining asset.

To summarize, Raveendran's execution of the Transfer Agreement as CEO of a Delaware corporation is a substantial forum contact that stripped the Debtor of assets and ensured those assets were beyond the reach of the Debtor and its

---

[94] *Id.*, 571 U.S. at 285-86.

[95] The Delaware Court of Chancery determined that a defendant who assumed the powers and duties as general counsel and chief legal officer of a Delaware entity "consented implicitly to jurisdiction" in Delaware for claims involving her actions.  *In re P3 Health Grp. Holdings, LLC*, 282 A.3d 1054, 1072 (Del. Ch. 2022).  *See also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 293-94 (Del. 2016) (A non-resident (Canadian) director and officer of a Delaware corporation "purposefully availed himself of certain duties and protections under our law," and could not fairly say that "he did not foresee that he would be subject to litigation in Delaware over his conduct in connection with negotiating the Change of Control Agreements.").

[96] *P3 Health Grp.*, 282 A.3d at 1072.

creditors.  This purposefully directed action resulted in alleged harms underlying the claims in the Complaint.   Accordingly, this Court has specific *in personam* jurisdiction over Raveendran.

(ii) *Byju Raveendran – Control over the Debtor*

The Plaintiffs also contend that Raveendran purposefully directed and controlled the Debtor's activities since its formation, including the transfer of $533 million of the Debtor's assets into the Camshaft Fund.[97]  The Complaint alleges Raveendran participated in negotiations with the U.S. Lenders to try to resolve the Debtor's defaults under the Credit Agreement.[98]  These activities were purposefully directed at the Debtor, a Delaware corporation, and the U.S.-based Lenders, and the litigation here arises from those actions.  As explained by the Supreme Court:

> A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.  Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.  And because modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.[99]

---

[97] *See* Compl. ¶¶ 2, 11, 98 – 102.  In support of these allegations, the Plaintiffs rely on the sworn testimony of Riju Ravindran at the hearing on March 14, 2024 in adversary proceeding no. 24-50013.  Compl. ¶ 41.

[98] Compl. ¶ 45.

[99] *Burger King*, 471 U.S. at 473-74 (internal citations and punctuation omitted).

The Court's reasoning equally applies to international activities that inflict injury upon U.S. entities, such as the alleged activities by Raveendran, and supports the exercise of personal jurisdiction over them for the claims arising from those activities.

Raveendran also argues that his purposeful contacts – directing the fraudulent transfers of the Debtor's assets – cannot form the basis of the minimum contacts required for jurisdiction since those acts were undertaken as directors of T&L, and he is only 1 member of a 6-member board.  He claims he is not responsible for the actions of T&L or other foreign subsidiaries that were shareholders of the Debtor.  But "when evaluating under the Due Process Clause an individual's contacts with the forum state, courts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer.  Contacts are contacts and must be counted."[100]  The Complaint's allegations, based on the testimony of Riju, assert that Raveendran directed the Debtor's fraudulent acts.  Raveendran knew or should have known that he could be haled into court in the United States based on these acts.

(b) The Effects Test

Alternatively, the Plaintiffs argue that this Court has personal jurisdiction over Raveendran under the "effects test"[101] since the Complaint asserts intentional

---

[100] *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 46 (D.C. Cir. 2020).

[101] *See Calder v. Jones*, 465 U.S. 783, 789-90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (deciding that defendants who wrote and edited an article from their place of business in Florida had sufficient minimum contacts to be subject to jurisdiction in California when their intentional actions were expressly aimed at a resident of California and they knew the effect of their actions would be felt by the plaintiff in California, where the paper had its largest circulation.  Under such circumstances,

tort claims.   Raveendran argues in response that the Third Circuit recognizes that the "effects test" did not "carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state;"[102] instead, a defendant must "manifest behavior intentionally targeted at and focused on the forum."[103]   Raveendran claims the Plaintiffs have not shown that he intentionally targeted activities at the forum (here, the United States).

Courts have determined that a non-resident defendant has the required minimum contacts for personal jurisdiction when he or she commits an intentional tort outside the forum, "the unique effects of which caused damage to the plaintiff within the forum."[104]   The Third Circuit will consider three factors to determine whether personal jurisdiction under this theory is proper:

(i)      defendant must have committed an intentional tort;

(ii)     the plaintiff must have felt the brunt of the harm caused by that tort in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff; and

(iii)    the defendant must have expressly aimed his tortious conduct at the forum, such that the forum can be said to the focal point of the tortious activity.[105]

In *Gambone*, the plaintiff discovered post-judgment that the defendants were transferring assets for no value to thwart plaintiff's recovery.   The Third Circuit

---

the defendants must "reasonably anticipate being haled into court there" to answer for the truth of the statements in their article.).

[102] *IMO Indus. Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998)

[103] *Id.*

[104] *Gambone v. Lite Rock Drywall*, 288 Fed. App'x 9, 14 (3d Cir. 2008) (citing *IMO Indus. Inc. v. Kiekert AG*, 155 F.3d 254, 256 (3d Cir. 1998)).

[105] *Id.*

determined that the Pennsylvania court had personal jurisdiction over a former board member of the defendant who resided outside the state because he (i) participated in a fraudulent conveyance, "which is a species of the intentional tort of fraud," (ii) for the purpose of preventing the plaintiffs, who are Pennsylvania creditors, from collecting on a judgment rendered in their favor by a Pennsylvania court, (3) and thus, "expressly aimed" his conduct at the forum.[106]

Raveendran argues that Plaintiffs cannot simply rely on the fact that the Debtor was a U.S. corporation to support jurisdiction.  However, the Plaintiffs here have presented numerous facts to support application of the effects test here:

(i)    The Complaint asserts claims that are intentional torts: aiding and abetting a breach of fiduciary duty (Count I), breach of fiduciary duty (Count II), Conversion (Count V), and civil conspiracy (Count VI).[107]

(ii)    Raveendran directed and implemented the fraudulent transfer of assets from one Delaware entity to another harming U.S.-based creditors by preventing them from exercising remedies and collecting the debt from the Delaware corporation (so that the brunt of the Plaintiffs' harm was felt in the United States); and

---

[106] *Id.*

[107] *See, e.g., Wolstenholme v. Bartels*, 511 F. App'x 215, 219 (3d Cir. 2013) (applying the effects test to a breach of fiduciary duty claim); *Kyko Global, Inc. v. Prithvi Info. Sol. Ltd.*, 2020 WL 1159439, *10, *30-*31 (W.D. Pa. Mar. 10, 2020) (applying the effects test to claims for aiding and abetting breach of fiduciary duty and conversion); and *MaxLite, Inc. v. ATG Elec., Inc.*, 193 F.Supp.3d 371, 390 (D. N.J. 2016) (applying the effects test to claim for civil conspiracy).

(iii)    Raveendran expressly aimed his tortious activity at the United States by intentionally and fraudulently using Delaware entities to move assets and harm U.S.-based creditors.

Accordingly, this Court may exercise personal jurisdiction against Raveendran for the intentional tort claims under the effects test.

(c) <u>The Conspiracy Theory Test</u>

The Plaintiffs also assert that Raveendran is subject to personal jurisdiction before this Court under the conspiracy theory test. Raveendran argues that the Plaintiffs offer no compelling evidence of a conspiracy nor evidence that Raveendran "knew" his alleged acts would have an effect in the United States.

The conspiracy theory expands the contacts prong of a personal jurisdiction analysis "by imputing the contacts of resident coconspirators to foreign coconspirators."[108]  Generally, courts considering conspiracy theory jurisdiction require a plaintiff to prove that a resident coconspirator (i) performed substantial acts in furtherance of the conspiracy within the forum, and (ii) the foreign coconspirator was or should have been aware of those acts.[109]

---

[108] *Kyko Global*, 2020 WL 1159439 at *31.

[109] *Kyko Global*, 2020 WL 1159439 at *32.  *See also Levin v. Javeri (In re Firestar Diamond, Inc.)*, 654 B.R. 836, 902 (Bankr. S.D.N.Y. 2023).  Delaware courts have articulated a five factor test for conspiracy theory jurisdiction:  (i) a conspiracy to defraud existed, (ii) the defendant was a member of that conspiracy, (iii) a substantial act or substantial effect in furtherance of conspiracy occurred in the forum state, (iv) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state, and (v) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.  *Dan Dee Int'l, LLC v. Global New Ventures Grp., LC*, 2024 WL 3043430, *4 (D. Del. Jun. 18, 2024) (citing *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982)).  The main thrust of the two tests is similar:  a substantial act in furtherance of the conspiracy occurred in or had an effect on the forum, and the foreign coconspirator knew or should have known about the act.

Here, the Complaint alleges a conspiracy between Raveendran, Riju, Gokulnath and Kishore to defraud U.S. creditors by using the Debtor to fraudulently transfer the Alpha Funds and the Camshaft LP Interest.[110]  Riju testified that Raveendran was a decision-maker directing the fraudulent transfers.[111]  The substantial acts (i.e., the fraudulent transfers) and the effects of those acts were directed through and at Delaware entities.  Therefore, even if Raveendran was located outside of the United States, the Plaintiffs have shown that he conspired to defraud creditors with coconspirators who had substantial contacts with this forum by directing fraudulent activity using Delaware entities and harming U.S. creditors. Accordingly, Raveendran is also subject to personal jurisdiction under the conspiracy theory test.

3.    Whether the Complaint states viable claims against Raveendran to withstand a motion to dismiss under Rule 12(b)(6).

Raveendran also asserts that the claims against him should be dismissed under Fed.R.Civ.P. 12(b)(6), made applicable hereto by Fed.R.Bankr.P. 7012. When considering a motion to dismiss under Rule 12(b)(6), a Court should accept well-pleaded factual allegations as true and determine whether they plausibly support an entitlement to relief.[112]  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the

---

[110] Compl. ¶¶ 19, 132.
[111] Compl. ¶¶ 41, 120.
[112] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011).

26

defendant is liable for the misconduct alleged."[113]  This determination is a context specific task, drawing on the reviewing court's judicial experience and common sense.[114]

(a) <u>Count I –Aiding and Abetting Riju Ravindran's Breach of Fiduciary Duties</u>

To support a claim against Raveendran for aiding and abetting Riju's breach of fiduciary duties, the Complaint must plead: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach.[115] This Court has previously determined that Riju Ravindran is liable for breaching his fiduciary duties.[116]  The only factor in dispute is Raveendran's "knowing participation" in that breach.

"'Knowing participation' requires a showing that the defendant both (1) participated in the breach and (2) knew at the time that the conduct assisted constituted a breach of fiduciary duty."[117]  "To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[118]

---

[113] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).
[114] *Ashcroft*, 556 U.S. at 679.
[115] *Cred Inc. Liquidation Trust v. Uphold HQ Inc. (In re Cred Inc.)*, 650 B.R. 803, 820 (Bankr. D. Del. 2023).
[116] MSJ Mem. Op. at 35-39.
[117] *Miller v. American Capital, Ltd. (In re NewStarcom Holdings, Inc.)*, 547 B.R. 106, 119 (Bankr. D. Del. 2016) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).
[118] *Id*. (citing *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862-63 (Del. 2015)).

Raveendran argues that the Complaint cannot support a claim against him for aiding and abetting Riju's breach of fiduciary duty because he was only one member of T&L's Board and did not have authority to direct Riju.  He also argues that T&L owned the Debtor through a subsidiary, thereby further distancing T&L and Raveendran from the authority to direct Riju.[119] But the Complaint alleges sufficient facts from which the Court can infer that Raveendran knowingly participated in the breach of fiduciary duties, including that (i) Riju, although the Debtor's sole director, testified that he made no decisions on his own,[120] including decisions related to the First and Second Fraudulent Transfers,[121] and (ii) when asked who specifically at T&L directed his actions, Riju identified Raveendran and Gokulnath.[122]

Furthermore, "knowing participation" can be inferred from a variety of circumstances, including when the terms of the transaction are so egregious as to be inherently wrongful.[123]  The Complaint alleges that there was no legitimate reason for Raveendran to direct Riju to make the First and Second Fraudulent Transfers, which transferred $533 million from the Debtor to a sham hedge fund when the Debtor had substantial monetary obligations to fulfill under the Credit Agreement.[124]  The Complaint contains sufficient detailed factual allegations to

---

[119] As pointed out by Plaintiffs in their briefing, Raveendran's own declaration contradicting the allegations by claiming he did not direct Riju to do anything (despite Riju's testimony under oath to the contrary) are factual assertions to be tested with discovery later in this proceeding.
[120] Compl. ¶¶ 41, 99.
[121] Compl. ¶¶ 41, 63.
[122] Compl. ¶ 41.
[123] *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, *17 (Del. Ch. Dec. 19, 2018).
[124] Compl. 93-94, 100.

support the claim that Raveendran aided and abetted Riju's breach of fiduciary duty.

(b) <u>Count II – Claim against Byju Raveendran for Breach of Fiduciary Duties</u>

A claim for breach of fiduciary duty must allege (i) that a fiduciary duty existed, and (ii) that the defendant breached that duty.[125]  Raveendran argues that he had no fiduciary duty to the Debtor because he was never formally appointed as an officer or director of the Debtor.  Further Raveendran argues that the transfer of the Camshaft LP Interest was a "permitted intercompany activity" under the Credit Agreement.  The Plaintiffs disagree.

Count II of the Complaint alleges that Raveendran, while holding himself out as the Debtor's CEO, caused the Debtor to transfer the Camshaft LP Interest to a non-guarantor affiliate (Inspilearn) for no consideration.[126]  Allegations that Raveendran signed the Transfer Agreement as the Debtor's CEO provide sufficient facts from which the Court may infer that he was serving as CEO and owed fiduciary duties to the Delaware corporation.[127]  Likewise, the Complaint contains sufficient factual allegations to support an inference that the Transfer Agreement's purpose (*i.e.,* to conceal the Debtor's assets at a time when the Debtor needed money to meet its legal and contractual obligations) was in breach of those fiduciary

---

[125] *Bond v. Rosen (In re NSC Wholesale Holdings, LLC)*, 637 B.R. 71, 85 (Bankr. D. Del. 2022) (citing *Palmer v. Reali*, 211 F.Supp.3d 655, 666 (D. Del. 2016)).

[126] Compl. ¶ 104.

[127] *See Harris v. Harris*, 289 A.3d 310, 331 (Del. Ch. 2023) ("[F]ormality is not required for fiduciary status."); *cf. WaveDivision Holdings, LLC v. Milennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, *3 (Del. Ch. Sept. 17, 2010) (an individual who was not a formal manager, officer or employee of an LLC nevertheless acted as a manager of the LLC and owed fiduciary duties in that capacity.)

obligations.[128]    Whether the transfer was permissible under Credit Agreement is in dispute[129] and, in any event, irrelevant under the factual allegations pled here.

(c) <u>Count IV – Accounting</u>

Count IV seeks "a full and accurate accounting of the Debtor's Alpha Funds, and any proceeds thereof."[130]   Raveendran argues that an accounting claim must be made against Riju, as the Debtor's officer and director, or against the Debtor's parent, Byju's Singapore.

The Plaintiffs seek the accounting from Raveendran, as the Debtor's CEO, and as a director of T&L because, according to Riju's deposition, "to the extent the Debtor has books and records, they were maintained by or in the custody of T&L."[131]

"An accounting is not so much a cause of action as it is a form of relief."[132] Generally, an accounting claim will not be dismissed when there is properly pled claim for breach of fiduciary duty.[133]   Here, there are valid claims for breach of fiduciary duty and for aiding and abetting Riju's breach of fiduciary duty.   The Complaint alleges sufficient facts to support an accounting claim against Raveendran.

(d) <u>Count V – Conversion</u>

"To state a claim for conversion, a party must allege that (i) it has a property interest in the allegedly converted property; (ii) it had a right to possession of the

---

[128] Compl. ¶¶ 108-11.
[129] The Plaintiffs argue the Second Fraudulent Transfer violated the covenant requiring compliance with applicable laws, citing Finestone Decl. (Adv. D.I. 94), Ex. 1 § 5.7.
[130] Compl. ¶ 124.
[131] Compl. ¶ 74.  *See also* Compl. ¶¶ 118,
[132] *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736, *11 (Del. Ch. July 11, 2007).
[133] *Id.*; *see also Scott v. Vantage Corp.*, 2017 WL 3485818, *6 (D. Del. Aug. 15, 2017).

property; and (iii) the defendants wrongfully possessed or disposed of such property as if it were their own."[134]

The Complaint alleges that the Debtor had an interest in the Camshaft LP Interest as of March 31, 2023, but that Raveendran unlawfully converted the Debtor's interest by directing and causing its transfer to Inspilearn at a time when only Pohl had such decision-making authority.[135]

Raveendran argues for dismissal of the conversion claim because the Lenders had no property interest in the Camshaft LP Interest or the monies lent to the Debtor once the funds were provided to the Debtor.  This argument is irrelevant to the conversion claim, which asserts that the *Debtor* held an interest in the Camshaft LP Interest which was wrongfully transferred.  Similarly, Raveendran's argument that the transfer was permitted under the Credit Agreement fails because the Complaint alleges that Raveendran had no right or authority to cause the transfer the Camshaft LP Interest after Pohl was appointed as the Debtor's sole officer and director.  Raveendran also asserts that the Plaintiffs cannot prove damages from the conversion because the Plaintiffs received guarantees from the Debtor's affiliates.  This argument also fails as irrelevant since the Complaint

---

[134] *ESG Capital Partners II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, *15 (Del. Ch. Dec. 16, 2015).

[135] Compl. ¶¶ 126-29.  As mentioned earlier, the Complaint also alleges that on March 3, 2023, GLAS took control of the pledged shares in the Debtor and, as the Debtor's sole shareholder, GLAS appointed Pohl as the Debtor's sole director, who then appointed himself as the Debtor's sole officer.  Compl. ¶ 55.  As this Court would later find, "as of March 3, 2023, Pohl was the only party with corporate authority to direct the use, possession, transfer, or disposition of the property of the Debtor." Compl. ¶ 11, MSJ Memo. Op. at 42.

alleges that Raveendran wrongfully deprived the Debtor of its property interest in the Camshaft LP Interest, which is required for the conversion claim.

(e) <u>Count VI – Claim against Raveendran for Civil Conspiracy</u>

Civil conspiracy is an independent wrong that occurs when there is: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) actual damage."[136]  Raveendran arguse that this claim should be dismissed because the Complaint fails to allege any meetings or communications among the Defendants demonstrating a meeting of the minds about an unlawful act.

However, plaintiffs do "not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators.  And to survive a motion to dismiss, all that is needed is a reasonable inference that [the defendant in question] was part of the conspiracy."[137]  The Complaint here alleges that Raveendran acted with Riju and others to deprive the Debtor and the Lenders of the Alpha Funds and then the Camshaft LP Interest.[138] The Complaint alleges that Raveendran has continued to actively conceal and provide misleading information about the Debtor's assets post-bankruptcy.[139]  There are sufficient factual allegations in the Complaint to infer that Raveendran (with

---

[136] *In re American Int'l Grp., Inc.*, 965 A.2d 763, 805 (Del. Ch. 2009).
[137] *CMS Inv. Holdings, LLC v. Castle*, 2015 WL 3894021, *22 (Del. Ch. June 23, 2015) (quoting *American Int'l Grp.*, 965 A.2d at 806)).
[138] Compl. ¶¶ 41, 63-64.
[139] Compl. ¶¶ 120, 132.

32

Riju and others) participated in the unlawful acts that harmed the Debtor and its creditors.

## CONCLUSION

For the reasons set forth above, the Court concludes that: (i) the Debtor properly served the Summons and Complaint upon Raveendran; (ii) this Court may exercise personal jurisdiction over Raveendran for the claims in the Complaint; and (iii) the Complaint adequately states claims against Raveendran for aiding and abetting breach of fiduciary duty, breach of fiduciary duty, accounting, conversion, and civil conspiracy.

An appropriate Order will be entered denying Raveendran's Motion to Dismiss.

FOR THE COURT:

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: (Amended) December 8, 2025