## EXHIBIT B

1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                      .  Chapter 11
                                 .  Case No. 23-11069 (CTG)
4    YELLOW CORPORATION,         .
     *et al.,*                   .  (Jointly Administered)
5                                .
                                 .
6                                .  Courtroom No. 7
                                 .  824 North Market Street
7           Debtors.            .  Wilmington, Delaware 19801
                                 .
8                                .  Tuesday, August 6, 2024
     . . . . . . . . . . . . . . .  10:00 a.m.
9

10                        TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE CRAIG T. GOLDBLATT
11                   UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12

13   For the Debtors:           Michael Slade, Esquire
                                KIRKLAND & ELLIS LLP
                                KIRKLAND & ELLIS INTERNATIONAL LLP
14                               333 West Wolf Point Plaza
                                Chicago, Illinois 60654
15

16   For Central States:        Brad Berliner, Esquire
                                CENTRAL STATES FUNDS
                                8647 W. Higgins Road
17                               Chicago, Illinois 60631

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Jadon Culp, ECRO

21   Transcription Company:     Reliable
                                The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

1    <u>APPEARANCES (CONTINUED)</u>:

2    For the MEPP Pension
     Funds:                      Edward Meehan, Esquire
3                                GROOM LAW GROUP
                                 1701 Pennsylvania Avenue, N.W.
4                                Washington, DC 20006

5    For MFN Partners LP:        Eric Winston, Esquire
                                 QUINN EMANUEL URQUHART
6                                  & SULLIVAN LLP
                                 865 S. Figueroa Street
7                                10th Floor
                                 Los Angeles, California 90017
8
     For the Ad Hoc
9    Equity Committee:           Gabriel Sasson, Esquire
                                 PAUL HASTINGS
10                               200 Park Avenue
                                 New York, New York 10166
11
     For the PBGC:               Benjamin Kelly, Esquire
12                               John Ginsberg, Esquire
                                 PENSION BENEFIT GUARANTY
13                                 CORPORATION
                                 445 12th Street SW
14                               Washington, DC 20024

15

16

17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2    <u>ORAL ARGUMENT</u>:                                    <u>PAGE</u>

3    Agenda
     Item 1: Central States Pension Fund's Motion for        4
4            Partial Summary Judgment [Filed 6/8/24]
             (D.I. 3803)
5
     Agenda
6    Item 2: [Filed Under Seal] Motion for Summary
             Judgement Filed by Certain Pension Funds
7            [Filed 6/8/24] (D.I. 3805)

8    Agenda
     Item 3: [Filed Under Seal] Central States Pension
9            Fund's Response to Debtor's Motion for
             Withdrawal Liability Claims [Filed 7/3/24]
10           (D.I. 3825)

11   Agenda
     Item 4: Pension Benefit Guaranty Corporation's
12           Motion for Partial Summary Judgment and
             Opposition to Summary Judgment for Debtors
13           [Filed 7/1/24] (D.I. 3882)

14           Court's Ruling:                                167

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 10:00 a.m.)

2           THE COURT:  Please be seated.  So good morning.

3  We are here in re Yellow Corporate, et al., which is Case No.

4  23-11069.  Done a lot of reading.  I've done my best to keep

5  it all in my head, though I confess every time I look at

6  something new, something else falls out.  So I ask for

7  everyone's patience as we work our way through the issues

8  this morning.

9           But happy to hear from counsel to take us through

10  the agenda.  I don't know if the parties have spoken about an

11  order of proceeding or the like.  Mr. Slade.

12           MR. SLADE:  Good morning, Your Honor.  Mike Slade

13  for the debtors.  We are going to go first and then cede the

14  podium to my friends on the other side.

15           THE COURT:  Okay.  And you say go first, you mean

16  go first with respect to which of the motions?

17           MR. SLADE:  Well, I think they're all presenting

18  the same issues.

19           THE COURT:  Okay.

20           MR. SLADE:  I expected to cover all of the issues,

21  unless Your Honor wanted to stop me at any point --

22           THE COURT:  No, that's --

23           MR. SLADE:  -- and then --

24           THE COURT:  That's -- it's fine with me for you to

25  go first with respect to all of the issues and then allow all

1   of the other parties -- is there anyone who objects to

2   proceeding in that fashion?  Okay.  So that's fine with me.

3              Road maps as you go from point to point would be

4   helpful, just for my -- you will not insult me by assuming

5   that I need extra remedial help in connection with this.

6              MR. SLADE:  I think I join Your Honor in that and

7   happy to proceed.  I'm going to try to roadmap everything.

8              THE COURT:  Terrific.  Okay.  So Mr. Slade, you

9   can proceed.

10             MR. SLADE:  Yes.  I have some slides I think will

11  help.  This worked earlier, so hopefully, it will work now.

12  And I have provided copies for my friends on both sides if

13  you guys want some.  And I handed one up to --

14             THE COURT:  Oh terrific.  There it is.  Got it.

15             MR. SLADE:  -- you earlier.

16             THE COURT:  Thank you very much.  Thank you very

17  much.

18             MR. SLADE:  Mostly, Your Honor, these are just the

19  actual sections of the various ERISA points because I think

20  it's super helpful when you're talking through them to

21  actually have them in front of you.  I've personally found it

22  very helpful.  There are a lot of statutory rules to walk

23  through.

24             Also thank you and good morning, Your Honor.  I'm

25  Mike Slade for the debtors.  Your Honor, the --

1          THE COURT:  Life is that way.

2          MR. SLADE:  It is, Your Honor.  All right, Your

3   Honor, there are four questions of law that we think are ripe

4   for summary judgment.  And Your Honor, this first slide is

5   how we characterize the questions, although everybody can

6   answer them, ask them different ways.

7          The first question, in our view, is whether the

8   SFA funds are assets that you have to account for in

9   calculating UVBs, regardless of the PBGC's instructions to

10  the contrary.

11         The second question is, assuming that there are

12  UVBs to allocate to the withdrawing employer, is our

13  liability capped at what would be 20 years of annual

14  payments?

15         The third question is, when you're doing the

16  allocation, whether two of the particular funds can do the

17  allocation with reference to contribution rates we never paid

18  and CBUs that we -- our employees never accrued.

19         And the fourth legal question, we believe, is

20  whether you have to discount the payment stream to present

21  value, assuming that they are limited to 20 years of annual

22  payments.

23         Now, obviously, Your Honor, there are a lot of

24  subsidiary questions within each one of these points --

25         THE COURT:  Understand.

1          MR. SLADE:  -- but in our view, these are the four

2    questions that we are asking you to answer as a matter of law

3    which will really drive the claims of these particular funds

4    in the cases.

5          THE COURT:  Got it.

6          MR. SLADE:  And our view, Your Honor, is that

7    Congress answered the first three of these questions in

8    ERISA, and it answered the fourth one in Section 502 of the

9    Bankruptcy Code.

10          A lot of the briefing I view on the other side is

11   focused on isolated passages within ERISA and within ARPA,

12   which Congress passed a couple of years ago, which, in part,

13   amends ERISA.  And what I'm going to do this morning is to

14   try to just walk Your Honor through the entire statute,

15   because I think that's what the Court's job is, to read the

16   entire and interpret the entire statute as a whole, including

17   where there are particular parts of the statute at issue in

18   this dispute fit.  We want the Court to focus on the

19   statutory language because we think we win if you do that.

20   And that is all we are asking Your Honor to do in our motion.

21          So I want to start with the plain language of

22   1381(a) of ERISA, because we think this is the key section

23   that answers many of the questions.  And the language here is

24   clear.  And Congress has presented like a four-step

25   walkthrough for how you calculate withdrawal liability.  And

1   the Supreme Court described what the statute requires in the

2   Gray case, which came out right after this was passed.

3           So in Gray, people challenged the imposition of

4   withdrawal liability, you know, under the Fifth Amendment.

5   That was the argument that employers, before this was passed,

6   okay, could walk away under certain circumstances and not pay

7   withdrawal liability.  And they relied on that.  And the

8   argument was that when Congress passed the statute

9   retroactively imposing withdrawal liability, it was a

10  violation of the Constitution.

11          And the Supreme Court rejected that argument and

12  described what Congress was doing.  And what the Supreme

13  Court said was withdrawal liability is the employer's

14  proportionate share of the plan's unfunded vested benefits,

15  calculated as the difference between the present value of

16  vested benefits and the current value of the plan's assets.

17  It was a very clear statement of how the Supreme Court

18  interpreted this portion of ERISA.

19          And the Third Circuit, for the curious, reiterated

20  this exact same point just a couple of weeks ago in the

21  Allied Painting case.

22          THE COURT:  Okay, so the language you just

23  pointed, it's now the 1393(c) language, right?

24          MR. SLADE:  Yes.  We're going to get there.

25          THE COURT:  But first, back up.  The language you

1   just read to me.  I just want to orient myself.  I just read

2   language that -- just back me up.

3             MR. SLADE:  So when the Supreme --

4             THE COURT:  That was from Gray.

5             MR. SLADE:  That was from the Supreme Court case

6   in Gray.

7             THE COURT:  Okay.

8             MR. SLADE:  So what that exact sentence that I

9   read to you is in the Supreme Court's case, and the Supreme

10  Court cite right after that is C. 29 USC 1381 and 1391.

11            THE COURT:  Got it.

12            MR. SLADE:  That is what the Supreme Court is

13  saying in the Gray case.  And it was exactly the same thing

14  that the Third Circuit reiterated a few weeks ago in Allied

15  Painting.

16            THE COURT:  Right.  Okay.  Yep.

17            MR. SLADE:  So, you know, Your Honor, a few things

18  from the language, you know, from the beginning, from 1980

19  through today, Congress never said or did anything to

20  dissuade employers from withdrawing from fully funded plans.

21  In 1981, if a plan was fully funded and an employer withdrew,

22  there was no withdrawal liability because there were no

23  unfunded vested benefits.

24            The purpose of the statute was to stop employers

25  from walking away when things were bad because that's what

1  they were allowed to do before the statute was passed.

2  Congress never gave the PBGC or the plans options for

3  determining whether or not an employer had unfunded vested

4  benefits or withdrawal liability.  Instead, it provided a

5  formula for determining that.  And Congress provided that

6  withdrawal liability is the portion of the UVBs that are

7  applicable to the withdrawing employer as adjusted by the

8  provisions below, 29 USC 1381(b).  There are those four --

9  (b)(1) A through D.

10           And so if a plan put in place in its plan document

11  that we don't want people to withdraw, so we're going to

12  impose a penalty of a million dollars per employee if you

13  withdraw, that would violate ERISA.  If PBGC were to pass a

14  regulation that said, we don't want people to withdraw, so

15  irrespective of the fund's UVBs, we're going to impose a

16  penalty of a million dollars per employee if you withdraw it,

17  that would violate ERISA.

18           And the language is very clear.  And our view is,

19  to calculate withdrawal liability, all the Court should do is

20  follow the formula set forth in 1381.

21           And so you start, of course, with whether or not

22  you have unfunded vested benefits.  And that is defined in

23  1393(c).  It's a defined term.  And the title of the section

24  is a dead giveaway, Your Honor, the title of the section --

25  determination of amount of unfunded vested benefits.  I don't

1  think you can get any -- in the ERISA world, there's no way

2  to get any clearer than that.

3        And this language confirms what I argued

4  previously.  If you read the different sections of ERISA

5  together, Congress did not anticipate assessing withdrawal

6  liability where the value of the plan's assets exceeds the

7  amount of non-forfeitable benefits.  And doing that would be

8  inconsistent with the various portions of ERISA, including

9  1381 and 1393.

10       THE COURT:  Can I stop you for a second?

11       MR. SLADE:  Yes, sir.

12       THE COURT:  Now, let's talk about this language.

13  In the world before the American Rescue Plan, there are some

14  set of rules, right, about, like, let's say, what counts as

15  an asset?  Does the future receivable from other employee --

16  from other employers count as an asset?  What on your books

17  counts as an asset?  Right.  There's been a determination

18  that some other employer owes unfunded vested benefits.  Do

19  we count that?  What's the source of those rules?

20       MR. SLADE:  Some of them are in ERISA.  There is a

21  section that has a set of actuarial assumptions.  Some of

22  them the PBGC has prescribed by regulation.

23       THE COURT:  Okay.  So I guess here's my next

24  question.  The source -- forget about the American Rescue

25  Plan for a moment.  What is the statutory source?  Is there

1 some organic statutory provision that says that the PBGC may,

2 generally speaking, issue regulations to implement or carry

3 out the terms of ERISA?

4          MR. SLADE:  It's not quite that broad, but I think

5 the one that my friends on the other side would point to

6 would be within 1391.  And what it says is that for actuarial

7 assumptions, there is a delegation to PBGC 2, and I want to

8 be precise.

9          THE COURT:  Right so we're --

10          MR. SLADE:  And we're going to get to this within

11 --

12          THE COURT:  Right.

13          MR. SLADE:  -- my presentation, maybe it's good to

14 wait for that.  But there are a series of assumptions,

15 actuarial assumptions, that the PBGC is given authority to

16 put into place, of course, with the overall requirement that

17 all assumptions have to be reasonable, and they have to be

18 based on the experience and expectations of the plan.  And

19 this is within, among other places, 29 USC 1401(a)(3)(B).

20 Okay.

21          And so, you know, with specific reference to that,

22 I think it's hard to say that anything, no matter how you

23 characterize it, telling plans that they should ignore a lump

24 sum cash payment that the government is required by law to

25 provide to them, they should ignore it.  It's hard to say

1  that that sort of statement, regardless of what you say it

2  is, is reasonable or consistent with anybody's expectations

3  since you are 100 percent sure you're going to be receiving

4  the money.

5           THE COURT:  Where in 1391 is the -- I know there

6  are a number of places in the statute where the statute says,

7  you know, the corporation made by regulation, do X, Y, or Z.

8           MR. SLADE:  Yeah, I apologize.  It's 1393 is the

9  actuarial assumptions.

10          THE COURT:  Got it.  All right.  Hold on one

11 moment.

12          MR. SLADE:  And so there you have -- it's (a),

13 (b), and (c).  (c) is what I just cited to Your Honor.

14          THE COURT:  1393.

15          MR. SLADE:  The definition of unfunded, vested

16 benefits.

17          THE COURT:  Right.

18          MR. SLADE:  And (a) is what delegates some

19 authority to the PBGC to prescribe actuarial assumptions --

20          THE COURT:  And -- okay, and so I understand.  So

21 I understand we're going to have a conversation about the

22 delegation contained --

23          MR. SLADE:  Yes.

24          THE COURT:  -- in the American Rescue Plan.  But I

25 want to, for a moment, think about the world without that.

1          MR. SLADE:  Yes.

2          THE COURT:  And so I take it your position --

3  well, this is just a question.  Is it your position that the

4  word "actuarial assumptions", when used in 1393(a) is about,

5  essentially, the liability side of the equation?  Right.  I

6  mean, in order to decide what's unfunded, you've got to make

7  assumptions how long the employees are going to live.  And is

8  that what you think is the most natural use of the term

9  "actuarial assumptions" there?  Or does this -- do the

10 actuarial assumptions include assumptions about the asset

11 side of the ledger?

12         MR. SLADE:  So, I think maybe 99 percent of it

13 relates, for sure, to the liability side of the equation.

14 That's what actuaries are actually doing.  I mean, I guess

15 you could have, if it was a particularly strange asset, if it

16 was a life insurance policy on somebody, you could see there

17 being some actuarial assumption that could come into play on

18 the asset side.  But that's not what is at issue here,

19 really, at all.  So we don't think this is an assumption.

20 It's not an --

21         THE COURT:  So, imagine one of the assets provides

22 for a stream of payments over time.  Would you think of

23 valuing that as an actuarial assumption?

24         MR. SLADE:  I think you could.  It's possible.

25         THE COURT:  Okay.

1          MR. SLADE:  I mean, but it's not normally or

2   naturally what an actuary would do.  But I think it --

3          THE COURT:  I'm sorry to take you off.

4          MR. SLADE:  No, no.  I want to be responsive to

5   questions.  I think, like the 1393(a) issue, I think, is

6   covered in some of the hundreds of pages that Your Honor was

7   reading through.

8          A couple things I would say about that.  One is

9   all assumptions, it's clear in ERISA, they have to be

10  reasonable and consistent with the plan's experience.

11  Ignoring a massive asset, which is cash the government's

12  required to pay, doesn't qualify.  And I do think it's

13  important that within the same section, Section C, right

14  below Section A, is the one that tells you what unfunded

15  vested benefits are.

16          And so, Your Honor, in our view, the definition of

17  unfunded vested benefits is very clear.  It's on the screen.

18  There's no gap to be filled by administrative agency.

19  Congress has already answered this question.

20          So, Your Honor asked me about the portions of that

21  formula.  You know, what is an asset?  What is a liability?

22  Congress actually tells you that gives you a definition of

23  the liability side, what is a non-forfeitable benefit?  And

24  this is on the screen now.  1301(a)(8).  I think they made it

25  a lot more complicated than it needed to be.  But basically,

1   it is a vested benefit.

2           THE COURT:  Right.  And I'm sure -- there's

3   nothing in front of me today -- there may be later -- but I

4   take it there's nothing in front of me today that there's a

5   dispute about what's the benefit?  The concern is really

6   about the asset.

7           MR. SLADE:  I don't think that's a question that's

8   in the parties' summary judgments present to Your Honor.

9           THE COURT:  Right. Got it.  Okay.

10          MR. SLADE:  All right.  So, unfortunately, Your

11  Honor, the word asset, it's not a defined term within ERISA.

12  It is a common sense term.  I think a few things are clear

13  about the word "asset" as it's defined in ERISA.

14          If you have the right to receive something, it's

15  an asset.  In my view, it's not all that different from what

16  Your Honor would be evaluating under 541 of the Bankruptcy

17  Code if a MEP was in bankruptcy.  And the question was

18  whether it's right under ARPA to receive the SFA was property

19  of the estate.  Of course, Your Honor would answer that

20  question "yes".

21          Perhaps more applicable here, if something is or

22  should be on your balance sheet, it is an asset.  If it's an

23  account receivable, it's an asset, unless it's not

24  collectible.  So if you have a withdrawal liability claim

25  against some defunct employer that doesn't have any money to

1  pay you, it's an asset.  But it might be worth zero on your

2  balance sheet.

3           THE COURT:  Right, but we have disputes all the

4  time about how to value particular assets.  And the question,

5  right, is, does the PBGC have authority to issue regulations

6  that tell us how to value things?

7           MR. SLADE:  Yeah, we're certainly going to get to

8  that and discuss it in detail.  And I think, actually, ARPA

9  answers that question.

10          THE COURT:  Okay.  Okay.

11          MR. SLADE:  So I think my first, more general

12 point is this is a -- Congress passed the law requiring to

13 make these payments in a lump sum to the funds, and the PBGC

14 has approved the applications.  And at that point, I don't

15 think any reasonable entity could call it non-collectible,

16 even by 1 percent, it's money --

17          THE COURT:  I understand that this is -- I mean, I

18 get the sort of common sense, right.  If a fund has a six-

19 month treasury note on its books, that's an asset that you

20 have to value.  You know, you may not get paid cash until it

21 matures, but we understand how to value that.

22          And you, I get the sense in which once Congress

23 has passed a law that says you -- or at least once the PBGC

24 has granted the funds, what you've got is something that in

25 common -- so I get -- I'm with you there.

1          Look, let me just put my cards a little bit on the

2    table to the extent it's helpful to the parties.  I'm really

3    leaning straight up on this case.  So you should -- so what

4    you do here is going to -- I really want to get it right, and

5    I'm really asking for help.

6          Look, just to be blunt, I'm persuaded by the

7    common sense proposition.  This is inconsistent with your

8    view, Mr. Slade.  But I am moved by the notion that when

9    Congress put billions of dollars to reinforce the pension

10   system, it didn't mean that money to go to the withdrawing

11   employers.  It meant that money to go to the funds.

12          Whether the words that the statute does accomplish

13   that objective, fairly read, strikes me as a fairly debatable

14   question.  And I'm struggling.  So just so you understand

15   where my head is, that's where I am.

16          MR. SLADE:  There's no question the money is going

17   to go to funds, and they're using it to pay benefits.  And

18   the question is what impact, if any, does that have on --

19          THE COURT:  No, I understand, but the notion that

20   that would reduce the withdrawal liability, there is

21   something counterintuitive.  I understand your statutory

22   argument, and I want to probe it.  But I start with the

23   proposition, at least, that it's not the most commonsensical

24   way of thinking about congressional purpose.

25          MR. SLADE:  I think I understand where Your Honor

1   is going, and we're going to walk through exactly what

2   Congress did.  And I do want to walk through some provisions

3   of ARPA at this point --

4             THE COURT:  Okay.

5             MR. SLADE:  -- which I put up on the screen.  And

6   I don't think these are debatable things.  ARPA is very

7   clear.  If you're a multi-employer plan in critical status

8   and if you apply, you're going to get the money.  Congress

9   was very clear on what you get and how you get it.  You get

10  the cash in a lump sum, there's no cap, you don't have to pay

11  the money back, and you get all sums sufficient to pay all

12  benefits through at least 2051.

13            I think the key point for purposes of this part of

14  my presentation is in 1432(l), where Congress, we believe,

15  said that the SFA is a plan asset when it told the funds that

16  they have to segregate the SFA from other plan assets.

17  Because SFA funds, like everything else, are plan assets.  I

18  don't think there's any other way to read this particular

19  language.

20            Plus, Your Honor, we know that when the SFA grants

21  were made by the PBGC, these particular funds put the grant

22  on their balance sheet, which is what anybody would do when a

23  federal agency authorizes a payment to them, whether or not

24  they receive the money.

25            And so I'm going to go on to the particular

1    sections that Your Honor was focused on.  But when you go

2    back to the formula in 1381, the first step, you calculate

3    the unfunded vested benefits.  We think it's clear from the

4    language that you can't ignore your largest assets to create

5    unfunded vested benefits if you have none.

6              If you do have unfunded vested benefits, then you

7    go on to allocate what portion of them are attributable to

8    you as the employer.  And that's within 1391 of ERISA.  Okay.

9              So there's a couple points about 1391 that I think

10   are germane and cement the points that we're trying to make.

11   And again, if you just look at the title of the various

12   subsections, which are telling you what to do within these

13   pretty complicated formulas, the titles of the sections alone

14   tell you that what they are about is determine the amount of

15   the unfunded vested benefits that are allocable to a

16   particular employer that has withdrawn.  Of course, that

17   means that if there are no unfunded vested benefits, there is

18   nothing to allocate.

19             So I think also, Your Honor, this particular

20   provision, 1391(c)(5), is very telling.  And Your Honor asked

21   about some delegations that were made in ERISA to the PBGC.

22   So here Congress is saying that PBGC can promulgate

23   regulations to help a multi-employer plan determine what

24   share of its unfunded vested benefits can be allocable to a

25   withdrawing employer.

1          And I think this is getting at one of the first

2     questions Your Honor asked me.  And again, this relates only

3     to how portions of your unfunded vested benefits can get

4     allocated.  But nothing here suggests that PBGC can change

5     the way you calculate your unfunded vested benefits or to

6     create unfunded vested benefits that within the plain

7     definition of 1393(c) means that there are none.

8          So ERISA also tells you, Your Honor, that when

9     Congress wanted to change the formula for unfunded vested

10    benefits, it knows how to do that.  And sometimes in the past

11    it has.  And so here, Your Honor, I'm referring to Section

12    1085.

13          And so, just to step back, this was put in in 2014

14    as part of a different piece of legislation that helped out

15    failing funds.  And Congress passed detailed rules that,

16    among other things, permitted the funds, if they were in a

17    certain status to reduce and suspend some benefits.  And it

18    explicitly described at the same time the impact that those

19    modifications would have for unfunded vested benefits and the

20    calculation of withdrawal liability.

21          And again, the title of the section, I guess, you

22    know, when Congress was drafting ERISA and making it insanely

23    complicated, they also wanted to have headings that were very

24    plain spoken, which at least let me understand what they were

25    talking about.

1          The title of the section here, adjustments

2  disregarded and withdrawal liability determination.  And then

3  Congress walked through the various adjustments that it had

4  passed in 2014, which would be disregarded in determining a

5  plan's unfunded vested benefits for purposes of that

6  calculation.

7          And so it is very detailed.  You know, surcharges

8  that were allowed are disregarded.  Contribution increases

9  are disregarded.  Again, these sections are clear.

10          THE COURT:  I take it your point about these is

11  there's a negative inference.  Congress knew when it wanted

12  to disregard something how to tell you that, and it didn't do

13  that with respect to ARPA.  That's the gist of your point?

14          MR. SLADE:  That's the gist.

15          THE COURT:  Okay.

16          MR. SLADE:  Congress knows how to modify the

17  withdrawal liability formula when it wants to do so.  And it

18  also knows, Your Honor, that unfunded vested benefits and

19  withdrawal liability are not the same thing.  Withdrawal

20  liability is the end output of the entire formula.  Unfunded

21  vested benefits are the beginning of the formula, without

22  which you don't get to the rest of the formula.

23          So let's just talk about ARPA now, because that

24  the question is -- and I have a very similar approach to what

25  Your Honor said.  The question in my mind is, did ARPA change

1   anything?  Right.  And the way I look at it is, did ARPA

2   change withdrawal liability calculation, the calculation of

3   unfunded vested benefits, or allow the PBGC to do the same

4   thing?  And I think the answer to that is no.

5           So ARPA did amend ERISA in a number of respects,

6   but you have to look at the whole statute.  And so I'm going

7   to walk through each of the pieces, and I'm starting at the

8   beginning where I talked a little bit earlier.

9           So Congress required the payment of SFA to all

10  eligible plans with clear eligibility criteria.  Every fund

11  knew if it was eligible and knew generally what it was going

12  to get if it was eligible.

13          And the next part of the section described what

14  the MEPs would get and how they would get the money.

15  Congress required the PBGC to make a single lump sum payment

16  to each MEP in an amount needed to make all benefit payments

17  through 2051.

18          Now, Your Honor asked a little bit about what was

19  delegated and what was not.  Congress provided within ARPA

20  some specific assumptions that had to be used when you were

21  calculating how much money you would receive.  What is it

22  that will get you to full funding through at least 2051?

23          Your Honor, if we had a trial and we were to talk

24  about detail about the underlying assumptions, we would prove

25  to you that the amount of money these funds got as SFA is

1  going to fund them way past 2051.  The assumptions were

2  incredibly conservative, and we think they are good for life

3  based on what Congress did and the PBDC awarded.

4          But a lot of these are detailed in ARPA, and

5  that's described in these particular sections of the statute.

6  And in the very next sections of ARPA that were added to

7  ERISA, Congress added two things: restrictions on the use of

8  SFA -- that's Section (l) -- and the conditions on plans

9  receiving special financial assistance.  That's (m).  And I

10 think that is the section that Your Honor has been focused

11 on.

12         THE COURT:  Yeah.

13         MR. SLADE:  Okay, so let's start with (l).  This

14 is what I mentioned earlier.  It provides that SFA may be

15 used to pay benefits and expenses, has to be segregated and

16 invested conservatively, either in investment grade bonds or

17 something else that's approved by the PBGC.

18         This was a reaction to a historical situation

19 where these particular funds had mismanaged plan assets.

20 Now, Your Honor, there are many multi-employer plans out

21 there that are fully funded, okay?  There are a lot of well-

22 run, well-managed, multi-employer plans that are fully

23 funded, and employers are not fleeing from them.  All right?

24 There's no historical example cited by anyone of an employer

25 leaving a multi-employer plan because it was fully funded and

1   in great shape.  No historical examples.

2          What was happening here is that Congress was doing

3   things in (l) and (m) to try to make sure these particular

4   plans did not mismanage the funds that they were receiving.

5   So (l) is part of that.  And the second part is (m).

6          So (m) is conditions on plan that are receiving

7   special financial assistance.  Okay.  This does not refer to

8   conditions on participants.  It doesn't say conditions on

9   employers.  This is conditions on the MEPs who will be

10  receiving SFA.

11         THE COURT:  Let me ask you my -- what is it?  Some

12  level in my head, my punchline question.  So I understand

13  your notion that, look, when Congress is giving out federal

14  funds, and either it imposes a condition or it authorizes an

15  agency to impose a condition, what it's mostly doing is it's

16  imposing a condition on the recipient of the funds.

17         It's offering them a deal.  Here's the money.  If

18  you take the money, you've got to agree to the following,

19  take it or leave it.  And I get the notion that there's

20  something counterintuitive about treating an imposition of

21  additional liability on the employer as a condition on the

22  plan.  I get your point that that seems funny.

23         On the other hand, the grant of authority to

24  impose conditions goes on expressly to include withdrawal

25  liability.  So if you're reading -- if my first view, which

1    is the view you set out in your brief about why the agency's

2    construction is incorrect, right?  Assuming that you're right

3    about what it means to impose a condition on the recipient of

4    funds, that that's on the recipient, not on third parties,

5    what was Congress doing when it included withdrawal liability

6    in that list in 1432(m)(1)?

7              MR. SLADE:  So let's walk through the whole list,

8    and I think that tells you what was trying -- Congress trying

9    to do when it passed this exact situation.

10              So again, this is Congress' effort to police the

11   MEPs that are getting the money.  And so it says you can

12   impose some conditions on the grant and you can't impose

13   other conditions on the grant.  And so two are the conditions

14   that you can't impose on the grant of the money.  These are

15   things that would otherwise be permitted by ERISA.  The PBGC

16   could impose these various conditions on the grant.  And

17   Congress is saying, well, you can't impose these, but the

18   ones in (a), in number one, you can impose.

19              And so my friends on the other side read this very

20   broadly to give the PBGC license to make any changes that it

21   wants to the withdrawal liability formula.  But I don't think

22   that's fair, because let's just parse through the language.

23   PBGC, in consultation with the Treasury, can impose by

24   regulation or other guidance reasonable conditions on an

25   eligible MEP that receives SFA relating to a list of things:

1   future increases in accrual rates and retroactive benefit

2   improvements, allocation of plan assets, and the various

3   things.  What was it doing in each one of that list of items?

4   Again, it was trying to make sure that the plans did not

5   abuse the money that they received.

6           So it said the PBGC can impose rules saying that

7   if you get the SFA, you can't use the money to increase

8   accrual rates or improve benefits retroactively.  You can't

9   allocate plan assets to permit paying employee bonuses rather

10  than paying benefits.  You can't divert your contributions

11  because now you're fully funded, you don't need any money.

12  You can't divert these contributions to related health and

13  welfare funds because a lot of these MEPs, you know, Central

14  States and others, have a related health and welfare fund

15  that would otherwise maybe compete for the same dollars.

16          And so Congress is saying, PBGC, as a condition of

17  the grant, you can impose condition that the plan cannot

18  divert money to the health and welfare funds.  And our view

19  is you can't abuse the withdrawal liability that you have the

20  right to collect and do collect.  That is a different thing

21  than changing the withdrawal liability formula.

22          Again, Your Honor, withdrawal liability is a

23  calculation that's provided by statute.  It's the end result

24  of the calculation.

25          THE COURT:  So I'm listening carefully what you're

1  saying, but I'm stuck on a question about how to parse this

2  sentence to make sure I'm understanding your position.

3          So reading the relevant provision, the

4  corporation, in consultation with the Secretary of Treasury,

5  may impose by regulation or other guidance reasonable

6  conditions on an eligible multi-employer pension plan that

7  receives special financial assistance relating to.  Okay.

8  And that's where the list begins, right, after the word

9  "relating to"?

10          MR. SLADE:  Yes.  Yes.

11          THE COURT:  And there are a list of things.  Now

12  do you read this to say that relating to withdrawal

13  liability, or do you read this to say relating to diversions

14  of contributions to and allocations of expenses to other

15  benefit plans?  And with -- I guess the comma suggests it's

16  the latter, right?

17          MR. SLADE:  Yes.

18          THE COURT:  The reference to withdrawal liability

19  isn't about diversion of contributions and allocations of

20  expenses.  It's its own standalone thing.  That is one of the

21  list of things.

22          MR. SLADE:  Yeah, I think that's right.

23          THE COURT:  Okay.  All right.  So I just want to

24  make sure I was following.  So when we talk about imposing

25  conditions relating to withdrawal liability, I think that has

1  to have given the agency some authority.  Right?

2              MR. SLADE:  I agree.

3              THE COURT:  Okay.  What?

4              MR. SLADE:  One of the things that PBGC did that

5  we think it had authority to do was to say that if a MEP is

6  going to settle a withdrawal liability claim that's worth

7  more than $50 million, it has to get the PBGC's approval.

8              We think what Congress was doing with adding

9  withdrawal liability to the end of that sentence was it was

10  telling the PBGC that it could pose conditions on withdrawal

11  liability once it is calculated.  The PBGC could say, you

12  can't just waive withdrawal liability claims because we've

13  just given you all this money and you're fully funded.  Okay.

14              And the PBGC actually did pass that one regulation

15  that I mentioned that said they need to approve all

16  settlements for claims that are above $50 million.  I think,

17  like, there's a lot of reasons that that's the right way to

18  read that part of the statute.

19              One is, as I mentioned, again, withdrawal

20  liability is the end result of the calculation that's

21  described in the statute.  It's not the inputs into the

22  formula.  And if Congress wanted to say, you can change

23  withdrawal liability formula, it would have said that.  And

24  it knew how to say that.  In fact, they had just done that

25  the last time they passed these rules --

1          THE COURT:  The 2014 rules in Section 1030,

2    whatever, that you were telling me before?

3          MR. SLADE:  Yeah.  1085 --

4          THE COURT:  Okay.

5          MR. SLADE:  -- (g)(15).  And in that section,

6    okay, the last one of the list of items, 1085, it says that

7    the PBGC can prescribe reasonable ways to calculate quick

8    withdrawal liability based on these changes.  So if Congress

9    wanted to give the PBGC authority, it would have done exactly

10   what it did in 2014.  But it didn't do that.

11         THE COURT:  In any statutory case where the

12   statute is amenable to more than one reading, both sides have

13   the ability to get up and say, if Congress wanted to do what

14   the other side says, it could have done it clearly and it

15   knew how to write and it didn't do it.  So I view that type

16   of argument as fundamentally battling to a draw.  We've got

17   the language we've got.

18         MR. SLADE:  I think here, we also have the added

19   point, which makes it even more interesting that the draft of

20   the law passed by the House of Representatives actually had

21   this provision --

22         THE COURT:  No, I understand that.  And there's

23   also the age old debate about, right, what role unenacted

24   proposals have in statutory construction.  And that's a

25   philosophical debate that I don't think we're going to

1 | resolve in this resolve here.

2 |         MR. SLADE:  Yeah, I think you're 100 percent right

3 | about that, Your Honor.

4 |         So just so we're clear, you know, we agree that

5 | once withdrawal liability is determined, the PBGC has

6 | authority under (m)(1) to place conditions on MEPs relating

7 | to it, and it has, by limiting a MEP's ability to settle the

8 | claims without authority.  That is a different thing, Your

9 | Honor.

10 |         THE COURT:  Okay, I understand.  I understand your

11 | position.  You're saying that the words "withdrawal

12 | liability" at the end of (m) have some meaning, but they have

13 | -- the antecedent to it is sort of fully calculated

14 | withdrawal liability.  And that's sort of implicit from the

15 | context because otherwise it doesn't make sense as a whole.

16 |         MR. SLADE:  Yeah.  Withdrawal liability is what it

17 | is.  It's the end product of the calculation.  And so I think

18 | like an additive to the same argument would be anything they

19 | do, it's got to be reasonable.  I mean, the stated purpose of

20 | withdrawal liability from 1980 through today was to

21 | discourage withdrawal from poorly functioning plans.  Never,

22 | ever has Congress ever discouraged withdrawal from fully

23 | funded plans.  You were 100 percent able to do that in 1981,

24 | 1985, 1995. if you wanted to.

25 |         THE COURT:  Right.  But I mean, look, a role of

1  the imposition of withdrawal liability is to discourage

2  withdrawals, but isn't just as a matter of common sense,

3  another purpose to sort of ensure that the MEPs themselves

4  are made whole and that if there is a withdrawal, it receives

5  a payment in turn that keeps it fully funded?  Now, I

6  understand your argument.  Well, what's fully funded.

7           MR. SLADE:  I was going to say hold for what?

8           THE COURT:  But the notion should be, you know,

9  right -- no, I understand.  And that gives rise to the

10  question of, right, what did Congress want these taxpayer

11  dollars used for?

12           MR. SLADE:  And actually, I actually understand

13  the argument that you want to discourage voluntary withdrawal

14  from plans, even if the result would be goosing up plan

15  assets over and above full funding.  I can understand that

16  goal to make sure that they, you know, if something bad

17  happens to the funds, there's excess to cover the gap.  But

18  that is not -- that rationale is not applicable in a scenario

19  where you are not voluntarily withdrawing from a plan.

20           THE COURT:  No, I understand, but even when

21  someone goes out of business, I mean, imagine a solvent

22  entity that goes out of business and has the wherewithal to

23  pay money back into the fund to make sure that the fund

24  remains viable and can meet its future arising obligations,

25  you still have this question.

1        MR. SLADE:  Yeah.  You have the question of how to
2   allocate limited resources in a pool.
3        THE COURT:  Right.
4        MR. SLADE:  And where did Congress anticipate it
5   going?  Do you want money to go -- I mean, here we have two
6   groups of multi-employer plans.  We have multi-employer plans
7   that were just fully funded with this bailout.  And we have
8   multi-employer plans who were not and --
9        THE COURT:  Right.
10       MR. SLADE:  -- actually do have unfunded vested
11  benefits.  They're going to get almost nothing if we lose
12  this particular --
13       THE COURT:  I understand that.  That's the nature
14  of bankruptcy.
15       MR. SLADE:  It is what it is.
16       THE COURT:  Right.
17       MR. SLADE:  And so I guess once you get through
18  the statutory question, you know, of whether or not this is
19  within the delegation of authority, I think within that comes
20  the legal arguments about what has to be proven.  And there's
21  like a lot of recent case law that's relevant to that
22  question.
23       I think, you know, what we take away from the
24  Loper line of authority is that there has to be, at a
25  minimum, a plain statement.  It has to be clear that this was

1  delegated to them.  If Your Honor were to find that this is a

2  major question under the case law, there actually is a

3  presumption against delegation to the agency.

4        We actually think there's a strong argument that

5  it falls within the line of major questions, given that it

6  involves a significant sum of money.  This was a grant of

7  more than $100 billion of taxpayer funds to pension plans,

8  and there was a robust political debate.

9        And then even if they were able to navigate those

10  two issues, then you get to the question of whether it's

11  arbitrary and capricious under the APA.  And there, we are

12  literally telling plans that when they're calculating

13  withdrawal liability, when they look at the first input into

14  the calculation, unfunded vested benefits, they have to

15  ignore this massive set of assets that they just received.

16  And so we don't think this satisfies any of the portions of

17  the administrative law portion of the question that Your

18  Honor would have to answer.

19        And so I don't know how Your Honor wants to handle

20  this.  I would move now to the other questions, unless you

21  want my friends on the other side to focus on this one.

22  Unless you -- or unless Your Honor has any questions for me.

23        THE COURT:  No, you've answered the questions that

24  I have on this part.  As to whether we should hear more on

25  this part and move on to other sections, whatever the parties

1  think makes sense.  If you think it makes sense to continue,

2  I do think I can hold this in my head.  I mean, I either can

3  or can't, but we raise that risk, if they get up and talk

4  about it now anyway, that it would have fallen out.  I'm not

5  sure it moves the needle much to continue to the other three

6  issues.

7          MR. SLADE:  Sure, that's fine.  I think the other

8  three issues are much more straightforward.  And sure --

9          THE COURT:  And though I still struggle, I still

10  have questions about those two.

11          MR. SLADE:  Sure.  Let's go to the 20-year cap,

12  which I think is the next on my list.

13          THE COURT:  Right.

14          MR. SLADE:  And so, again, we start with the

15  formula, you know, 1381, which is on slide 21 in the hard

16  copy.  I handed it to Your Honor and the parties.

17          And so, again, this is the formula.  What you do

18  is you take unfunded vested benefits, you determine what is

19  applicable to the employer, and you make the adjustments in

20  (b)(1)(A) through (D) and (c) is you make adjustments to the

21  extent necessary to reflect the limitation on annual payments

22  under Section 1399(c)(1)(B) of that title.

23          And so that takes us to 1391(c)(1)(B), which is

24  the next slide.  And so it's pretty clear, in any case in

25  which the amortization period described in (a) exceeds 20

1   years, the employer's liability shall be limited to the first

2   20 annual payments determined under subsection (c).

3            THE COURT:  Right.

4            MR. SLADE:  Now, there's a couple of cases that I

5   think answer the question for the Court.  The Supreme Court

6   in the Milwaukee case that has Schlitz in the title, that's

7   how I remember the Schlitz case, you know, says, citing this

8   exact provision, that what the statute does is it forgives

9   all debt outstanding after 20 years.

10           So you make payment.  There's a payment stream

11  that gets you to your total allocated withdrawal liability.

12  It's basically calculated to try to continue the payments you

13  have been making before your withdrawal.  And so if after 20

14  years, you haven't paid enough to exhaust what you would

15  otherwise owe, you're good, you don't have to pay anymore.

16           And the Supreme Court said that in the Milwaukee

17  case, and the Second Circuit in the F.W. Honerkamp case says

18  the same thing.  Their quote is, "The statute limits the

19  employer's obligation to make these payments to 20 years,

20  even if it would take more than 20 payments for the employer

21  to pay its full withdrawal."

22           THE COURT:  Okay, so I'm with you that far.  And

23  where my question is, I don't know where you're going to get

24  to next, so why don't I let you continue?

25           MR. SLADE:  Sure.

1           THE COURT:  So there's the -- okay, so I get that.

2    I get the idea that we calculate the liability, that there's

3    a mechanism for determining how long it runs.  But no matter

4    how long it runs, we cap it at 20 years, and you have to make

5    these payments over 20 years, and we stop it at 20 years.  I

6    get that.

7           Then there's this exception.  There's this other

8    thing that happens in the event of default.  So tell me about

9    that.

10           MR. SLADE:  Here's this, next slide, Your Honor.

11    I anticipated your question, maybe for the first time.  Okay,

12    1399 --

13           THE COURT:  That's not something to be proud of,

14    means your brain is working in unfortunate ways.

15           MR. SLADE:  1399(c)(5).  The question is, what is

16    accelerated?  Okay.  In the case of default.  And what's

17    accelerated is the outstanding amount of your withdrawal

18    liability.

19           THE COURT:  So.  Okay, so let's back up.  This is

20    where it's not obvious to me, so help me.  1399(c)(5) begins

21    in the event of a default.  And my question, I mean, plainly

22    put, is default on what?  Like, does that mean if the

23    employer had defaulted on its payments to the MEP before

24    withdrawing, then we live here?  Or does it mean if you

25    default on the 20-year payments, then those payments are

1  accelerated?

2        MR. SLADE:  Yeah.  So I would say the parties have

3  a disagreement about whether default occurred here, but

4  that's not relevant to the summary judgment questions in

5  front of Your Honor.

6        THE COURT:  Right.

7        MR. SLADE:  So default is defined right on the

8  same thing.  So it's up on the screen right now.  What it

9  means is if you don't make a payment when due and didn't cure

10 within 60 days or any other event defined in rules that are

11 adopted by the plan, which indicates a substantial likelihood

12 that you won't be able to pay (inaudible) --

13       THE COURT:  All right, so let's back up.

14       MR. SLADE:  -- liability --

15       THE COURT:  Slow down a second.  Default means the

16 failure of an employer to make, when due, any payment under

17 this section.  So is your ordinary payments due to the MEP of

18 payment under this section, or is it only the withdrawal

19 liability payment that's a payment under this?  What is the

20 section?  What's the antecedent section?

21       MR. SLADE:  Yeah, I would say it is only the

22 withdrawal liability payments.  My friends on the other side

23 may disagree and read it to be broader, but even if you did,

24 we didn't have a failure to cure within 60 days because we

25 were in bankruptcy, you know, way before 60 days.  So that

 1  wouldn't apply.

 2          I think the more natural reading is that this

 3  section refers to the withdrawal liability section.  But I

 4  think the broader issue that we would have if this question

 5  were debated is the (b), because the plans -- I don't want to

 6  say all of them --

 7          THE COURT:  I see.

 8          MR. SLADE:  -- but enough of them have put rules

 9  in place that basically say if you're in bankruptcy, there's

10  a substantial likelihood you wouldn't have the ability to

11  pay.

12          THE COURT:  Okay.  And are those rules enforceable

13  under as --

14          MR. SLADE:  It's probably an ipso facto.

15          THE COURT:  Ipso facto provisions?

16          MR. SLADE:  It's probably an ipso facto clause.

17  So you know this -- the answer to this question may not be

18  germane if later Your Honor were to determine that there was

19  no default.  Okay.  We actually thought the more obvious

20  question to put in front of Your Honor was whether -- what is

21  accelerated?

22          THE COURT:  Well, that's -- maybe I'm thinking

23  about this the wrong way, but to me, when I -- look, we

24  should allow you to continue walking me through the statutory

25  language.  When I looked at the language, it wasn't obvious

1  to me if what this said is there's the ability to require an

2  immediate payment if, on the one hand, the employer is in

3  default at the time of withdrawal or, B, if it defaults under

4  its obligation to make withdrawal payments.

5           And I think there's an important difference

6  between the two, because if it's the latter, then in

7  calculating the withdrawal obligations, there hasn't yet been

8  a default in terms of making the withdrawal payments.  And

9  then I understand your argument for saying, and look, it's a

10 20 year payment period and we NPV that.  So I understand

11 that.

12          On the other hand, if you read this language to

13 say an employer that comes, that withdraws after having

14 defaulted on an obligation to a MEP, if in that case, this

15 whole 20-year thing goes out the window and there's just an

16 immediate payment of the total obligation, that's a very

17 different thing.  And that's why I'm struggling on the what

18 is the antecedent default?  And I guess it's, what is this

19 section.

20          At least, by the way, that's at least how I'm

21 thinking about it.  So tell me what I've gone wrong.

22          MR. SLADE:  One other thing I think is

23 illustrative on the answer to that question is after the

24 phrase after withdrawal liability, it says, plus accrued

25 interest on the total outstanding liability from the due date

1  of the first payment, which was not timely made.  And to me,

2  that suggests that what is being referred here is a missed

3  withdrawal liability --

4         THE COURT:  It was withdrawal liability.

5         MR. SLADE:  -- payment.

6         THE COURT:  And that just makes this sort of like

7  an ordinary commercial term.  Right?  An ordinary loan, if

8  you default on the loan, we accelerate the loan.  That is

9  like a commercially standard thing to do.

10        MR. SLADE:  That's right.  And I think what's

11 happening here is that what the funds are saying is that

12 because you're in bankruptcy, our rules say that we are

13 allowed to accelerate your 20 years' payment stream of

14 withdrawal liability.  And they're saying that they're

15 allowed to do that because of 29 USC 1399(c)(5).

16        If there's a default, I think that that's correct.

17 And then the answer is what is accelerated?  And what the

18 statute says is what is accelerated is your withdrawal

19 liability?  And then you get back to what does that mean?

20 And that is 1381(a), (b), the formula.  And the withdrawal

21 liability is after the limitation of 1391(c)(1)(B).

22        So what is accelerated?  What is accelerated is

23 the total amount that you would owe, which is just the 20

24 years' worth of payments, and you NPV them.  That's our

25 argument, Your Honor.  And I do think it's supported by the

1  Supreme Court's case in Milwaukee, the Schlitz case, and also

2  the Second Circuit decision in Honerkamp.

3          THE COURT:  Okay.

4          MR. SLADE:  And so, I guess now, Your Honor, I

5  would turn to the third issue on my list is when you're

6  calculating the annual payment stream that the debtors have

7  to pay, how do you do that?  And this requires a little more

8  granularity and a risk.

9          THE COURT:  It's just about several of the funds,

10  right?

11         MR. SLADE:  Yeah, it's about two of them.

12         THE COURT:  Right.  Okay.

13         MR. SLADE:  It's about two of them.  And just a

14  little bit of background on, like, the allocation

15  methodology.

16         These two funds, the New York Teamsters and the

17  Western Pennsylvania Teamsters, they use what's known as the

18  presumptive method of allocating withdrawal liability.  It

19  takes 20 years' worth of the status of the fund, and it gives

20  the most important to the most recent year.  And then it goes

21  -- let gets less and less important by 5 percent until you

22  get to 20 years ago.  And so the question is, what was your

23  share of the unfunded vested benefits in each one of those

24  years?

25         And so when you're calculating your share, there's

1  a numerator and denominator.  This is simplifying the

2  calculation.  So I would -- I am simplifying.  The

3  simplification would be your total contributions in a year

4  and the total contributions of all employers.

5          So if you made 5 percent of the contributions to

6  the fund in that year, you would have -- you would eat 5

7  percent of the UVBs for that particular year.

8          And so what these funds did, a long time ago, they

9  entered into an agreement with Yellow as part of deferring

10 some contributions that were owed and later were paid.  And

11 part of the contract says, you're going to come back into our

12 fund, you're going to pay a lower contribution rate, and

13 you're going to your employees are going to accrue less in

14 benefits.  They're going to accrue benefits commensurate with

15 what you're paying, which is fair.

16         But the other part of the contract that they

17 forced Yellow to agree to, and it really didn't have a

18 choice, it had to agree, was that in the case you withdraw,

19 then we're going to calculate your withdrawal liability as if

20 that never happened, and as if you were paying what other

21 employees were paying, you had contributed what other

22 employers had contributed.

23         And so the question is, can you do that under

24 ERISA?  We don't think you can.  1391 talks about the

25 different allocation methodologies that you can choose.

 1  There's various choices.  One of the options is you can

 2  basically make changes if you get the approval of the PBGC.

 3          So I believe that if they had chosen this

 4  methodology in this agreement and they had gotten the PBGC to

 5  sign off on it at the time, it probably would be okay under

 6  1391.  But they agreed that they did not do that.  And so the

 7  question is, can contract overcome --

 8          THE COURT:  This is just to see this through the

 9  lens of a bankruptcy lawyer.  You're saying that there's like

10  an implicit ipso facto provision in ERISA that you can't game

11  around the ERISA withdrawal liability process, that it's

12  based on the actual amounts.  You can't say, if we withdraw,

13  then we've got a special set of rules that we've just made up

14  that are different from the actual underlying economic

15  reality.

16          MR. SLADE:  Yeah, that's what --

17          THE COURT:  And that that's implicit in ERISA in

18  the way, even though there's not a 365 or 541 provision of

19  ERISA that expressly invalidates sort of gaming around what

20  happens in the event of a withdrawal.

21          MR. SLADE:  Yeah.  Otherwise, why would there be a

22  requirement that you get PBGC's approval for a different

23  method?  You would just do it.  Right.

24          THE COURT:  Yeah, I hear you.

25          MR. SLADE:  Yeah.  So the other point I would make

 1  on that particular issue is that one of the PBGC regulations

 2  does say that you can't over allocate UVBs to a particular

 3  employer upon, no matter what method you choose, you can't

 4  over allocate UVBs to a particular employer when they

 5  withdraw.  This would do that.  And frankly, their most

 6  recent regulation would triply or quadruply do that.

 7         THE COURT:  And does the relevant regulations you

 8  can't do that mean even with the consent of the employer?

 9         MR. SLADE:  Well, I think what that would mean, it

10  doesn't say that --

11         THE COURT:  Right.

12         MR. SLADE:  -- but I think what that would mean is

13  if we were in an arbitration, for example, we were

14  challenging the calculation, one of our arguments would be

15  that you can't over allocate UVBs.  This agreement did that -

16  -

17         THE COURT:  Okay.

18         MR. SLADE:  -- and you can't enforce it under

19  ERISA.  So that's the gist of our third argument, Your Honor.

20         THE COURT:  Okay.  Okay.  I understand.

21         MR. SLADE:  And the last argument, I think, is

22  pretty straightforward.  If they're limited to a stream of

23  payments, the question is how do you create that in a claim,

24  as of in US Dollars as of the petition date, and we would be

25  paying a 20-year stream of payments.  Our view is that you

1  just figure out what is that worth today.

2          And so you have to figure out what is the right

3  discount rate.  And this, in our view, comes from the Supreme

4  Court case in Till (phonetic) on down.  You just have to --

5  we have to have a trial about what the right discount is.

6          THE COURT:  What's the right discount rate.

7          MR. SLADE:  And that's going to be, I think,

8  pretty fiercely debated.  The parties have exchanged expert

9  reports on that topic.  But I do think that there's a debate

10  on my colleagues on the other side.  They don't think you

11  discount it at all.

12          THE COURT:  Discount it at all.  Right.  No, I

13  understand.  And I know one thing.  I don't think that what

14  the Supreme Court said about a pickup truck is really the

15  governing standard for this.  But I understand the question

16  that if it's a 20-year stream of payments, if the obligation

17  outside of bankruptcy is an obligation that runs over 20

18  years, then we have to -- then under the Bankruptcy Code, we

19  have to figure out what is the right of payment as of the

20  petition date, implicitly requires a present discounting.

21          MR. SLADE:  Yeah, I think we've all been arguing

22  the pickup truck case for many, many, many years.  And I'm

23  sure we still will.

24          THE COURT:  Well, I've stopped arguing it,

25  thankfully, but I understand.

1          MR. SLADE:  That's fair.

2          THE COURT:  Okay.  I think I understand your

3    position.  This was very helpful.  I really appreciate it.

4          MR. SLADE:  Okay.  Thank you, Your Honor.  Unless

5    you have any other questions for me, I'll cede the podium.

6          THE COURT:  I'm happy to hear from whoever is

7    logically next, and if there's a dispute about who's

8    logically next, I'm prepared to resolve it.

9          MR. SLADE:  Oh, Your Honor, actually, the MFN

10   folks want to speak as well.  It might be logical for them to

11   go first before the --

12         THE COURT:  That strikes me as logical.  Unless

13   someone wants to make a contrary argument.  Okay, let me hear

14   from MFN.

15         MR. WINSTON:  Good morning, Your Honor.  Eric

16   Winston of Quinn Emanuel, on behalf of MFN Partners.  Mr.

17   Slade and I had discussed this beforehand.  I'm certainly not

18   going to duplicate any of his arguments.  There is one issue

19   that he briefly touched upon, but he was going to leave it to

20   me to develop a little bit more.

21         THE COURT:  Okay.

22         MR. WINSTON:  And that goes to the arbitrary and

23   capricious nature of the PBGC regulations.  I do just want to

24   speak for a few minutes.  I won't take very long, in part,

25   because Your Honor doesn't even need to reach this.  And you

1  can ignore everything I'm saying if you agree with Mr. Slade

2  on the issues of how to construct the statute.

3          But assuming that, for whatever reason, we get to

4  these issues, we want to point out that even if we accept how

5  they're interpreting the statute, the regulations themselves

6  are arbitrary and capricious as applied to a fact pattern

7  like Yellow, which is an involuntary withdrawal of a company

8  that's either in liquidation or in bankruptcy.

9          The Third Circuit stated in Christ the King

10  manner, 730 F.3d. 291, that an agency action is arbitrary and

11  capricious if "the agency relied on factors which Congress

12  has not intended it to consider, entirely failed to consider

13  an important aspect of the problem, offered an explanation

14  for its decision that runs counter to the evidence before the

15  agency, or is so implausible that it could not be ascribed to

16  a difference of view or a product of the agency expertise".

17          THE COURT:  Um-hum.

18          MR. WINSTON:  A few years ago, the Third Circuit

19  made a similar point in the Sierra Club case, noting that an

20  agency cannot make vague allusions to its expertise, offer

21  conclusory statements, and cite no data.

22          THE COURT:  Right.  So this is just ordinary State

23  Farm, arbitrary and capricious, right?

24          MR. WINSTON:  Totally.  Totally.  Absolutely.

25          THE COURT:  Okay.  All right, so I get that.  So

1   tell me what's arbitrary and capricious.

2          MR. WINSTON:  So, in addition to the circumstance

3   of relying on factors Congress did not authorize, that's Mr.

4   Slade's argument.  The entire failure to consider an

5   important aspect of the problem of failing funds and offering

6   an explanation that runs counter to the evidence before it

7   are implicated in the case of involuntary withdrawals.

8          The entire administrative record makes no mention

9   of the need to address involuntary withdrawals.  And there

10  certainly is no discussion in the administrative record of

11  the creditors and other stakeholders and employers forced to

12  withdraw and who are in bankruptcy and who will receive less

13  recovery if SFA is excluded from the calculation of unfunded

14  vested benefits.

15         The agency, the PBGC, actually acknowledges this,

16  but says that's okay because MPPAA itself does not

17  distinguish between voluntary and involuntary withdrawals for

18  purposes of determining calculating withdrawal liability.

19         But no one is disputing what that 1980 statute

20  provides.  Indeed, that 1980 statute does not impose

21  withdrawal liability as a penalty if a pension fund has no

22  UVBs.  Mr. Slade commented on this.

23         The issue here is what ARPA did.  ARPA was a

24  bailout of failing pension funds.  In order to qualify for

25  the fund, you had to be either insolvent or in critical

1  status, effectively in real financial distress.  But not

2  every fund that could qualify has taken SFA funds.  Some have

3  not.  Some have applied for it much later than others, and

4  they didn't actually have to ask for the maximum amount.

5  Logically, they would if they could.

6          So if the PBGC had the power under ARPA to impact

7  the calculation of unfunded vested benefits, which we

8  obviously dispute, then it should have considered that there

9  is a massive difference between an employer voluntarily

10  withdrawing from a fund that has decided to apply for SFA and

11  got taxpayer money for free, versus the employer who's

12  involuntarily kicked out, particularly one in the

13  circumstances here.

14          THE COURT:  Why?  Explain to me why.  So I have

15  two questions.

16          MR. WINSTON:  Yes.

17          THE COURT:  First of all, this is subject to

18  ordinary notice and comment review.  And any -- were there

19  comments made with respect to this question that the agency

20  disregarded?

21          MR. WINSTON:  There were no comments, as far as I

22  know, in the record either way, and I think I was going to

23  cover that.  I'll jump to it right now.  I think that's

24  actually of no moment, because it goes to one of the problems

25  of the Bankruptcy Code.  It's very rare for people to

1  advocate for debtors.

2          THE COURT:  No, I okay, I'm with you there, but

3  explain to me -- so explain to me why, from first principles,

4  the question of how to calculate withdrawal liability should

5  be different for -- forget solvency for a second, but

6  voluntary versus involuntary withdrawals from the fund.

7          MR. WINSTON:  So from first principles, we think

8  that if you calculate unfunded vested benefits, if there are

9  none, it shouldn't ever make a difference.

10          THE COURT:  I understand that.

11          MR. WINSTON:  I'm living in the world where there

12  are.

13          THE COURT:  Which there are.  Right, exactly.

14          MR. WINSTON:  So we then asked the question,

15  what's the purpose of ARPA?  Which was to bail out the

16  quality -- bail out the failing funds.

17          THE COURT:  Right.

18          MR. WINSTON:  They got tax payer money for free,

19  no recourse.  And the question is, do the conditions that

20  were imposed on the plans, were they reasonably related to

21  withdrawal liability?  And the argument that has been posited

22  is to discourage withdrawals.  Okay, let's accept that's a

23  rational purpose.  Let's accept that we've gone through all

24  the various arguments.

25          THE COURT:  See, let me push back on that for a

1  second.  So one theory might be to discourage voluntary

2  withdrawals, but it seems to me that there's a common sense

3  to imposing withdrawal liability as essentially a make-whole

4  remedy, appreciating that in the event of someone's

5  insolvency, it won't be perfect.  But that's the work done by

6  bankruptcy law.

7        From the perspective of ERISA, the idea that if

8  someone walks away and there are unfunded vested benefits,

9  that the fund get its pro rata share, at least, of what that

10 employer would have been required to pay had it not

11 withdrawn, seems like just a sensible way to ensure the

12 viability of the pension system, which is what ARPA was

13 designed to accomplish.

14        MR. WINSTON:  And ARPA does accomplish that by

15 saying, if you've asked for this money and you've otherwise

16 qualified, you get sufficient funds to cover your unfunded

17 vested benefits to make yourself fully funded by 2015.

18        THE COURT:  But we're past that argument.

19        MR. WINSTON:  But it has nothing to do with

20 employers or their constituents, because it's not -- it has

21 no impact on the decision to withdraw.  An employer has no

22 incentive to withdraw from a fully funded plan, and there's

23 nothing in the record, administrative record, plus years and

24 years and years of case law and statutory fixes to ERISA that

25 suggests that.  Mr. Slade made that point.  He's correct.

1    There is almost no examples.

2              THE COURT:  But don't we solve that problem

3    because -- well, look, I understand you, I understand this

4    gets a little circular, but if you withdraw -- the notion of

5    creating, using withdrawal liability to affect incentives to

6    withdraw from a fully funded plan is sort of a null set,

7    because by definition, if the plan is fully funded, there's

8    no withdrawal liability.

9              MR. WINSTON:  Correct.  Yes, I totally agree with

10   that.  There is a sense of -- I don't know if you'd say

11   circularity or absurdity here, because that's why I think the

12   regulation is unreasonable.  It doesn't achieve the purpose

13   for which it's been offered.  It doesn't disincentivize

14   withdrawal liability because the funds are fully funded.

15             But it's even more painful in the case of the

16   involuntary withdrawal because they have no choice.  This

17   isn't a question of someone -- of an employer making the

18   calculated decision saying, you know what, I want to get out.

19   I'll pay my freight.  Oh great, the government just bailed

20   out the funds.  Now I don't have to pay my freight.  I'm

21   going to be savvy about that.

22             Accepting the premise that the PBGs have the

23   authority to regulate that kind of conduct, which we don't

24   think is the case.  But assuming that's the case, it doesn't

25   apply in the case of involuntary withdrawals.

1          And going back to the commentary, nobody talked

2     about this in the administrative record.  Nobody.  Why?

3     Because no employer ever says, hey, guess what?  Please deal

4     with the fact I may go bankrupt.  The funds have every

5     incentive, since this rule is in their favor, to not press

6     that.

7          THE COURT:  No, I get the notion that there's not

8     much of a constituency for people who are unable to pay their

9     debts and that it's easy to sweep that aside.  So I

10    understand that point.

11         But even taking all of that for what it's worth,

12    aren't there cases?  Maybe this case is -- maybe it is, maybe

13    it isn't -- one of them in which you've got a judgment call

14    whether to exceed to economic forces and decide, I'm going to

15    withdraw involuntarily or not, and trying to affect that

16    decision if your ability to continue as a going concern is a

17    close question, why isn't the fact that we might at the

18    margins affect those decisions sufficient to take it out of

19    arbitrary and capricious?  If that question makes any sense

20    at all.

21         MR. WINSTON:  I think it does.  And I mean, that's

22    not the fact pattern here.  In fact, the PBGC in their papers

23    have tried to limit it to this fact pattern.

24         THE COURT:  No, I understand.

25         MR. WINSTON:  And I think that's important because

1  Yellow, just to play this string out, after ARPA and after

2  it's really Central States that got the lion's share, Yellow

3  didn't withdraw.  Yellow had no desire to withdraw.  In fact,

4  we all know what happened to Yellow.  It was fighting very

5  hard to save itself, and then it got kicked out.

6          And now we have a situation where this issue, this

7  sole issue is the difference between, you know, pennies on

8  the dollar versus what we will believe will be payment in

9  full.

10          When the PBGC considered this issue, it didn't

11  consider this aspect of the problem.  And when the Third

12  Circuit and State Farm have said, consider an important

13  aspect of the problem, the notion between voluntary

14  involuntary seems quite important because voluntary is the

15  rationale.  But yet no one's talking about involuntary.

16          And I go to the Trenton Threatened Skies case from

17  2014 where the Third Circuit said it's the agency's job to do

18  the hard look.  And in that case, they didn't.  They

19  actually, that was a case where they did a very hard look.

20  They actually really went through the exercise of Mercer

21  County Airport's Expansion, really thinking it through.

22          That didn't happen here.  And in the cases where

23  the Third Circuit has rejected the agency's decision,

24  sometimes there's a very extensive administrative record,

25  there's a lot of data, but they just ignore it.  And then

1  they offer the rationale.  Which is why the Third Circuit in

2  Sierra Club said, your conclusory statement ain't good

3  enough.  That's the circumstance here.

4           And if we work our way through the analysis, and

5  at the end of the day, Your Honor is here, which I actually

6  would prefer you just to completely ignore me it is the case

7  of arbitrary and capriciousness in a case like this.

8           THE COURT:  Okay.

9           MR. WINSTON:  That's all I have to say, Your

10  Honor.

11           THE COURT:  I thank you, Mr. Winston.  I

12  appreciate the (inaudible).

13           MR. WINSTON:  Thank you so much.

14           THE COURT:  Thank you very much.  Okay, so who, as

15  a matter of logic, is next?

16           MALE VOICE:  I am, Your Honor.

17           MR. SASSON:  Sorry, just one second.  Gabriel

18  Sasson from Paul Hastings on behalf of the ad hoc group of

19  equity holders, I'll be very brief.  I don't mean to

20  duplicate the arguments of the debtors or MFN here, but I

21  just did want to rise and let Your Honor know that we're

22  here.

23           We obviously support the debtors and MFN in their

24  arguments.  We're very concerned about the potential windfall

25  that would accrete to the pensions in this case, if you were

1  to find in their favor.  Equity is obviously paying very

2  close attention to this.  And with that, Your Honor, I'll sit

3  down unless there are any other questions.

4        THE COURT:  Okay, very well.  Thank you very much.

5  I appreciate it.  Okay.

6        MR. BERLINER:  Your Honor, would it be

7  inappropriate for me to ask for a couple minutes' recess?

8        THE COURT:  That would not be inappropriate at

9  all.  So it's 11:10.  So I guess what I propose, my day is

10  open today.  I don't think we need to go all day, but I want

11  to make sure I've heard everyone who wants to be heard,

12  within reason.  So why don't we break to until, say, 11:25,

13  and plan on going till a little bit afternoon and then taking

14  a lunch break and returning afterwards?  Does that make sense

15  to folks, or should we power through?  What's the preference?

16  Just so we can plan.

17        MR. SLADE:  I think it depends on how much they

18  got to say.

19        MR. BERLINER:  I anticipate that I'll probably be

20  up here for a similar time.

21        THE COURT:  All right.  And there's going to be

22  rebuttal.  So why don't we plan on breaking and coming back?

23  I do want to -- there is a point at which I'll encourage

24  folks along.  We won't be filibustering forever, but I do

25  want to make sure everyone has a chance to be heard of.  So

1   why don't we -- how long do you need now?

2             MR. BERLINER:  Five minutes.

3             THE COURT:  All right, you know what?  Why don't I

4   give you ten?  So it's now 11:15.  I'll come back on at

5   11:25, and then we'll plan on breaking at a logical point

6   around noon or so.

7             MR. BERLINER:  Okay.  Thank you, Your Honor.

8             THE COURT:  Thank you all until -- we are now in

9   recess.

10            (Off the record at 11:14 a.m.)

11            (On the record at 11:26 a.m.)

12            COURT OFFICER:  All rise.

13            THE COURT:  Be seated.  Okay.

14            MR. BERLINER:  Thank you, Your Honor.  Good

15   morning.  I think we're still morning.  Brad Berliner.  For

16   the record, I represent Central States Pension Fund.

17            Your Honor, when we began this morning, you asked

18   the question of -- you were discussing the statute, and you

19   indicated the purpose appears clear.  But you were

20   questioning whether Congress went about this the right way

21   with the regular -- I hope I stated that correctly.

22            THE COURT:  Yeah.  Look, I mean, I -- what I mean

23   to say, I don't -- I don't mean -- I'm not one of these

24   judges who thinks I get to criticize Congress for not

25   accomplishing its purposes correctly.  So I don't mean it

1 that way.

2         I do think, however, that I get in your briefs and

3 in the agency's briefs, the public policy point about ARPA,

4 you know, intending to ensure that funds stay in the pension

5 system to deal with problems.  I get that policy argument and

6 assume at some, to the extent congressional intent is a thing

7 that can be discerned, start with the proposition that, you

8 know, was an animating concern behind ARPA.

9         But I don't -- I'm a judge who lives in this

10 generation and thinks my obligation is to give the words the

11 best meaning I can.  And it's not obvious to me.  Again, I

12 think my have views.  I think they're reflected in my

13 questions.  I'm not hiding the ball.

14         People say I have a terrible poker face, and I try

15 to call it transparency, but the question I have is, given

16 the language we've got, is that the best way to read it?  And

17 I'm candidly struggling for largely the reasons we talked

18 about.

19         MR. BERLINER:  Thank, Your Honor.  And I'm going

20 to explain to you why the PBQC was authorized to issue the

21 regulations they did.  I think it's important to keep in

22 perspective, however, that what we're looking at is not --

23 and what we're asking is not whether this was the absolute

24 best means for the PBGC to regulate --

25         THE COURT:  I understand.

1          MR. BERLINER:  -- and really whether what they did

2     was reasonable, as instructed by Congress.  I'd like to start

3     with 1432 and what it did.  1432 -- through 1432, Congress

4     instructed the PBGC to grant special financial assistance,

5     SFA, to a number of struggling multi-employer pension plans.

6     The eleven that are at subject in this particular dispute are

7     really just a subset of the pension funds around the country

8     that have been saved by virtue of this provision.

9          In instructing the PBGC to grant the special

10    financial assistance, the Congress made clear that the SFA

11    could be used for two, and only two, purposes, paying pension

12    benefits and paying plans' administrative expenses.

13         The Congress also instructed the PBGC that they

14    were authorized to impose reasonable conditions on multi-

15    employer plans that receive SFA relating to, among other

16    things, withdrawal liability.

17         THE COURT:  Okay, so let's stop there.  You agree

18    that the conditions are conditions to be imposed on the

19    plans, right?

20         MR. BERLINER:  No dispute.

21         THE COURT:  So help me understand.  I understand

22    that the way I think about this, your best argument is the

23    inclusion of the words withdrawal liability at the end of the

24    list in 1432(m).  And that's got to mean something.  And Mr.

25    Slade has an argument for it meaning something, but you think

1   it means more than that.  And that it means, essentially,

2   regulations that relate to the calculation or determination

3   of withdrawal liability.

4          And where I'm stuck is that I think he's got a

5   good argument, at least a colorable argument, that the

6   calculation of withdrawal liability, which is the amount the

7   employer needs to pay, isn't a condition that's being imposed

8   on the fund.  That's where I'm stuck.  So help me with that.

9   Does my question make sense?

10          MR. BERLINER:  Yes, it does.  And I'll explain a

11  few things, a few reasons why it is such a condition.  First

12  of all, you know, one of the cases debtors have relied

13  extensively upon is this recent Third Circuit case, the

14  Allied Painters case.

15          THE COURT:  Yeah.  Judge Matey's decision.

16          MR. SASSON:  The key in there is the key in from

17  that -- the key takeaway from that case is that 1399 requires

18  multi-employer plans to assess withdrawal liability to send

19  the plans, excuse me --

20          THE COURT:  On a timely basis.

21          MR. BERLINER:  Right.

22          THE COURT:  And that was the problem.  That was

23  the problem there.  Right.

24          MR. BERLINER:  As soon as practicable.

25          THE COURT:  Right.

1          MR. BERLINER:  And that is a condition.  It's a

2    prerequisite to collecting the liability.  If you don't send

3    the employer the notice and demand, or you don't do it as

4    soon as practicable, that's a justification for the Court to

5    strike down the demand for withdrawal liability.  That's

6    exactly what the Court, the Third Circuit, did in Allied

7    Painters.  It said to the plan that you did not fulfill this

8    statutory prerequisite.

9          THE COURT:  But the grant of authority in Allied

10   Painters wasn't 1432.  Right.  That wasn't an MPA.  That

11   wasn't a ARPA case.

12         MR. BERLINER:  Correct.

13         THE COURT:  Okay.

14         MR. BERLINER:  Correct.  But nonetheless, that

15   condition, that prerequisite to collecting withdrawal

16   liability is that it -- is that the plan send the employer a

17   demand, calculate the liability, and attempt to collect the

18   liability as soon as practicable.  It's a prerequisite.  It's

19   a condition.

20         THE COURT:  Okay.

21         MR. BERLINER:  And therefore, in authorizing the

22   PBGC to impose conditions upon plans, it's every bit as much

23   a condition as telling a plan that you have to collect the

24   liability.  You have to do it as soon as practicable.  I know

25   these don't seem like typical conditions on plans because

1   it's beneficial to the plan.

2             THE COURT:  Right.  That's where I'm stuck.

3             MR. BERLINER:  But that's in the same way as the

4   prohibited transaction rule of ERISA that says that plans

5   can't give their money to employers.  Again, it's axiomatic

6   that a plan wouldn't intend to do that.  There's no benefit

7   to the plan or its participants.

8             THE COURT:  Right.  But that doesn't regulate the

9   conduct of imposed liability on a third party.  So let me --

10  here's where I'm struggling.  Let me just try to make this

11  concrete.

12            Imagine you've got a statute that gives HHS the

13  authority to allocate money to hospitals, right.  And impose

14  conditions on the hospitals who receive this HHS money.  And

15  HHS -- there's a hospital that's having a dispute with a

16  vendor.  Vendor says it's owed $11, and the hospital says it

17  only owes 10.

18            Could HHS say to the vendor, say to the hospital,

19  it's a condition on your receipt of these funds that the

20  vendor only take $10 when the vendor thinks it's owed 11, and

21  the hospital's delighted because it would rather pay less

22  than more, and it says, yes, I'll take the funds, and, yes,

23  I'll agree.  I only owe the vendor 10, not 11.  The vendor

24  sues for 11, and the hospital says, but I took these funds,

25  and the condition of it was that I only owe you 10, so you

1  lose.

2          Isn't that essentially this case?  And isn't that

3  kind of weird as a condition being imposed on the recipient

4  of federal funds?

5          MR. BERLINER:  Your Honor, I would also explain

6  that in formulating these regulations, as the PBGC explained,

7  they had to undergo a very careful balancing act.  When the

8  SFA was first proposed, as we all know, Congress had not a

9  phase-in but an exclusionary rule.  And the PBGC said they

10 needed to strike an appropriate balance because they didn't

11 want to be overly punitive with respect to employers.

12         In your example, I would argue that with respect

13 to the contractor who's getting paid less than what he or she

14 expected to receive, that contractor has the option of

15 perhaps not doing business with --

16         THE COURT:  Imagine it's for an event that took

17 place -- well, I certainly understand if it's a go-forward.

18         MR. BERLINER:  Either with respect to this

19 contractor or knowing that if you do business with this

20 hospital, by the way, they're not going to pay you what's

21 full.  It is still a condition upon them, and if they accept

22 the grant money and comply with it, they're still required to

23 do it.  There may be reasons --

24         THE COURT:  So I'm with you.  To the extent we're

25 governing forward looking conduct of the other party.  Okay,

1   I hear you.  It's helpful.  I find this to be hard.

2          MR. BERLINER:  Okay.  But I would assert it's

3   still a condition.  There's nothing in the prohibited

4   transaction rule prohibiting a pension fund from giving an

5   employer money that could possibly benefit an employer.  And

6   yet Congress thought enough to put that restriction in, and

7   it is just like the obligation to collect withdrawal

8   liability and to notify the employer.  It's a requirement

9   that the pension fund has to abide by.

10          THE COURT:  To the extent that's the best analogy,

11  help me with it further.  So the prohibited, the restrict --

12  walk me through that again.

13          MR. BERLINER:  Prohibited transaction.

14          THE COURT:  The prohibited transaction rule is

15  agency regulation.

16          MR. BERLINER:  No, it's a US Code Section.

17          THE COURT:  Okay, what section?

18          MR. BERLINER:  I believe is it 1032.  I apologize,

19  Your Honor.

20          THE COURT:  No, no worries.  We're all doing our

21  best.  And it basically -- I'm not going to ask you to quote

22  the language, but in substance, what does it do?

23          MR. BERLINER:  In substance, it prohibits plans

24  from making -- performing a transaction or giving a benefit

25  to parties, among other parties, employers, parties in

1  interest.

2          THE COURT:  Okay.  So that feels like an ordinary

3  condition on funds, right?  You know, it's saying, we're

4  giving you this money.  If you're taking our money, you're

5  agreeing to spend it the way we want you to spend it.  And it

6  doesn't change, it doesn't reduce the -- to the extent

7  there's a legal obligation -- a pre-existing legal obligation

8  to pay an employer for something, it doesn't make it go away.

9  It just says going forward, if you've received our funds,

10  you're going to have to use -- you're going to have to agree

11  to follow our rules if you're going to take our money.

12          And that feels to me like an ordinary condition on

13  the receipt of federal funds.  And the agency's reading of

14  this feels like an unusual restriction on the use of funds.

15  And to the extent there's an example of any federal program

16  that imposes a condition on the receipt of funds, and the

17  consequence of that is that it alters the legal rights of a

18  third party, I'd be interested in understanding that, and if

19  -- I'm happy to get things afterwards.  This is not meant to

20  be a pop quiz.

21          MR. BERLINER:  Sure.

22          THE COURT:  But I -- this is sufficiently unusual

23  that it's given me pause.

24          MR. BERLINER:  A couple of brief comments.  The

25  mere fact that it requires the employer to pay withdrawal

1 liability, again, I'll go back to the prohibited transaction

2 rule, but I'm also going to note that multi-employer plans

3 are made up of joint boards of trustees, made up of employers

4 and representative employers and representatives of laborers.

5 It's not clear cut that the only interests here are labor.

6 That's one thing.

7        The other point is that employers may have partial

8 withdrawals, not complete withdrawals.  They may be remaining

9 in the pension fund.  There may be an incentive of the

10 pension fund to work favorably with an employer to secure

11 their future participation in a case where that employer has

12 incurred a partial withdrawal.

13        And there may be an incentive as a result to give

14 the employer a discount on its partial withdrawal liability

15 to encourage that employer to remain a contributing employer.

16 Pension fund -- excuse me, a pension fund doesn't have that

17 option now with this PBGC regulation.

18        Now, it may seem obvious that the pension fund is

19 turning away money in doing so.  And maybe the pension fund

20 is looking at this employer and saying, yeah, but we've done

21 the dollars and cents analysis, and what they would owe us in

22 withdrawal liability is paling in comparison to what they're

23 going to owe us over the next 40 years.  And this is a

24 partial withdrawal.  Partial withdrawal doesn't signify that

25 the employer is in trouble.  It's going to go out of

1  business.

2          THE COURT:  I hear.  So just another word on where

3  I'm stuck.  So you're reading of the provision would be more,

4  to be consonant with the language, if the underlying

5  withdrawal liability, if the definition of withdrawal

6  liability were tied to how you keep your own books and

7  records.  Right?

8          Because if that were the case, if the withdrawal

9  liability were calculated by virtue of how you keep your

10  books and records, and they said by taking these funds you

11  agree to keep your books and records in this way, then it

12  would tie together and work.  But I don't think that the

13  actual definition of withdrawal liability has that.  It's

14  about actual economic facts.  It's about what the value of

15  your assets are, not what your books show the value of your

16  assets to be.  So that -- do you see where I'm stuck?

17          MR. BERLINER:  I'm not sure I'm following this

18  latest --

19          THE COURT:  All right.  All right, I'll let you

20  continue.

21          MR. BERLINER:  Okay.  Let me also note that there

22  are a couple cases that dealt with grants to cities and the

23  government attempting to limit the application of grant money

24  by applying certain immigration conditions.  One of those

25  cases we cited was City of Philadelphia versus the US

1    Attorney General.

2            In that case, the Court analyzed a grant and

3    looked at the condition on immigration and said, well, this

4    is too narrow.  Congress knows how to regulate broadly.  And

5    they did so by using words "reasonable conditions" as having

6    granted broad discretionary authority.

7            THE COURT:  But there were all restrictions on the

8    grant recipient, though, right?

9            MR. BERLINER:  Well, that is -- certainly, it's a

10   condition on the grant recipient, but I would argue, again,

11   that this is a condition on Central States.  The fact that it

12   has some -- but in any grant or in any condition, there are

13   always going to be ancillary parties that are affected by a

14   grant of money.

15           THE COURT:  I understand the ancillary effects.

16   So if you don't have money -- if the grant -- if by taking

17   this, you agree not to pay somebody and they don't have a

18   legal -- separate legal right to payment, then they're

19   affected, and that's life.

20           MR. BERLINER:  Right.

21           THE COURT:  What I'm stuck on is the authority as

22   a condition to receive money to reduce someone else's legal

23   rights.  That's where it's not -- I can't think of another

24   case in which a statute does that.

25           MR. BERLINER:  Sitting here at this moment, I'm

1   not aware, but I also haven't --

2          THE COURT:  Right.  I understand, and this is not

3   meant to be a quiz, and I appreciate whatever help you can

4   give me.

5          MR. BERLINER:  Okay.  Okay.  I'd like to turn to

6   the fact that the condition has to be relating to withdrawal

7   liability.  Obviously, we've learned from Morales versus TWA

8   that relating to is very broad, deliberately expansive, and

9   broadly worded.

10         The question in this respect is only whether it

11  has some connection or reference to withdrawal liability.

12  Obviously it does.  And that's why the Sixth Circuit, albeit

13  in dicta, said that ARPA explicitly authorized the PBGC to

14  impose conditions related to withdrawal liability.

15         Yellow talked about the fact that -- or debtors

16  spoke about the fact that there were four restrictions on

17  what the PBGC could not regulate and how that supported their

18  argument that regulating the phase-in wasn't appropriate.

19  They said these are four conditions that the PBGC could have

20  done absent these restrictions, but the same is true with

21  respect to the phase-in.  And there are a couple different

22  reasons for this.

23         First of all, in 1393, we've spoken at length this

24  morning about 1393 and the ability to regulate assumptions.

25  But 1393 deals with both the PBGC's authority with respect to

1  both assumptions and methods, not just assumptions.

2         THE COURT:  All right, so let's back up, because I

3  am -- look, I have, as I think I've made clear, concerns and

4  I think -- I think it's a close -- I think that the question

5  of whether the regulation is consistent with 1430 is a close

6  question.  And to the extent there's another grant of

7  authority that would authorize the two regulations in

8  question, right, the phase-in and the like, I'm interested in

9  understanding that.  So point me -- what's the language

10 you're pointing me to?

11        MR. BERLINER:  So first of all, let me -- let me

12 back up a second and talk about 1302.  One of the things that

13 Central States has cited in its brief and has really not made

14 its way into debtor's briefs is 1302(b)(3).  And let me start

15 there before I move on to 1393.

16        1302(b)(3) -- 1302, in general, is where Congress

17 created the PBGC, and it created the PBGC and invested them

18 with the mandate to encourage participation in private

19 pension plans, like these multi-employer plans, and to ensure

20 the uninterrupted payment of pension benefits.

21        In 1302(b)(3), Congress gave the PBGC the power to

22 adopt, amend, repeal regulations as may be necessary to carry

23 out the purposes of the subchapter.  It's important to

24 recognize this subchapter 1302 is the same subchapter that

25 includes 1432 ARPA.

1            THE COURT:  Okay, that's helpful.  So this is the

2   grant of organic regulatory authority to the PBGC to

3   basically regulate to carry out the pension system.

4            MR. BERLINER:  Correct.  Correct.

5            THE COURT:  Okay.

6            MR. BERLINER:  And it's part of the same sub

7   chapter as ARPA.  And we can't extricate from this discussion

8   the PBGC's continuing mandate from Congress to encourage the

9   continuation of these private pension plans and to also

10  ensure the uninterrupted payment of pensions --

11           THE COURT:  In adopting the two regulations at

12  issue, did the PBGC invoke the powers of 1302(b)(3), or did

13  it only invoke 1432(m)?

14           MR. BERLINER:  I honestly don't know if they

15  invoked that --

16           THE COURT:  Okay.

17           MR. BERLINER:  -- but I also would say --

18           THE COURT:  It doesn't matter.

19           MR. BERLINER:  It doesn't matter.

20           THE COURT:  Okay.

21           MR. BERLINER:  Because they've been vested with

22  that authority and I think, and we would --

23           THE COURT:  Under State Farm, is there an

24  obligation, when you talk about reasonable regulations, to

25  point to the source, the actual source of authority?  I don't

1  know the answer.  I'm asking.  I'm not the world's leading

2  administrative law expert.  I'm just trying to puzzle through

3  this.

4            MR. BERLINER:  They certainly -- they certainly

5  cited to the most contemporaneous authorization, the

6  authorization to enact reasonable regulations related to

7  withdrawal liability.  And we would argue that that, too,

8  obviously -- we're simply saying that they always had this

9  authority under 1302.

10            THE COURT:  Okay, that's helpful.

11            MR. BERLINER:  Also, I'd like to turn to 1393.

12  Now, one thing I do want to make clear, earlier this morning,

13  we were talking about section headings.  The section headings

14  are not from Congress.

15            THE COURT:  I understand that.

16            MR. BERLINER:  But there's a distinction between

17  1391 and 1390.  1391 is where you allocate UVBs, unfunded

18  vested benefits, to an employer.  1391 presumes that you've

19  already calculated the UVBs pursuant to 1393.  1393,

20  actuarial assumptions, allows -- let me back up one step.

21            When we talk about actuarial assumptions.  You

22  kind of -- you started to touch upon this this morning, too,

23  in terms of, is it liabilities?  Is it assets?

24            THE COURT:  Right.

25            MR. BERLINER:  Well, assumptions are things like

1  mortality assumption.

2              THE COURT:  Right.

3              MR. BERLINER:  Maybe how long people are going to

4  work, retirement dates.

5              THE COURT:  Right.  Okay.  And that all affects

6  the liability side.

7              MR. BERLINER:  But it also affects your -- it also

8  affects -- okay, you have these assets.  Let's look at your

9  investments.  What do you expect to earn on these

10 investments?

11             THE COURT:  Okay, that's my question.  Are those

12 actuarial assumptions?

13             MR. BERLINER:  Yes.

14             THE COURT:  Okay.

15             MR. BERLINER:  That is part of every plan's

16 actuarial assumption is determining what discount rate to

17 apply.  It's a critical part of the statute because each fund

18 will have its own investment strategy based upon various

19 factors that I just mentioned -- mortality, future

20 contributions, likelihood of retirement, and retirement

21 dates, things of that nature.

22             And so when you apply a discount rate, the actuary

23 is formulating the discount rate based upon what the actuary

24 understands the plan's investment strategy to be.

25             THE COURT:  Okay.  So, and I'm sorry for this

1 really elementary help, but in a normal calculation of

2 unfunded vested benefits, are there occasions where you have

3 assets on the books where there's a question of how we value

4 them?  I guess that the assets are all held in by -- separate

5 statutory provision requires that they all be held

6 essentially in bonds, right?

7          MR. BERLINER:  Well, no, I mean, some are held in

8 equities.

9          THE COURT:  Okay.

10          MR. BERLINER:  Some are -- there's -- I mean, the

11 securities lending occasionally.  I mean, there are all sorts

12 of compositions of assets, but they still need to be valued.

13          THE COURT:  Okay.  And so when you have --

14 presumably, when you have something that trades on a public

15 market value, it is pretty easy.  Do you have occasions where

16 there are assumptions that need to be made in order -- like

17 because I'm a bankruptcy judge, right, we deal with this kind

18 of problem all the time.

19          When you've got a valuation dispute, you have to

20 make some assumption to how you value some asset.  And is

21 there a regulatory authority that tells you what assumptions

22 to make for that purpose?

23          MR. BERLINER:  Well, that's within the actuary's

24 domain and actuarial standards of practice.  However, it's

25 important to note that we've just covered one part of 1393,

1   and 1393 makes clear in 1393(a) that withdrawal liability

2   under this part shall be determined by each plan on the basis

3   of, one, actuarial assumptions and methods, which in the

4   aggregate are reasonable and which in combination offer the

5   actuary's best estimate of anticipated experience of the

6   plan.

7          We've talked about that section.  We haven't

8   talked about (a)(2), which is actuarial assumptions and

9   methods set forth in the corporations.  That's the PBGCs.

10  The corporations' regulations for purposes of determining

11  employers' withdrawal liability.

12         Now, counsel for debtors this morning explained

13  well, under 1401(b)(3) those need to be reasonable too.  But

14  you have to reconcile this language with 1401(b)(3), and

15  there is no way that actuarial assumptions and methods set

16  forth by the PBGC could be reasonable, because PBGC would be

17  regulating with respect to hundreds, thousands of multi-

18  employer plans, regardless of investment strategy, regardless

19  of mortality assumptions, there's no way those could be

20  reasonable.

21         So if you read 1401(b)(3) as requiring that the

22  assumptions be reasonable, even if the PBGC mandated them,

23  then a pension plan could never prevail in an arbitration

24  under that provision.  And there's no way that a court should

25  read that language as finding that confusing.  You have to

1  resolve that ambiguity.

2          So the key takeaway here, however, is that, excuse

3  me, PBGC has always had that delegation from Congress in

4  1393(a)(2) to prescribe assumptions and methods in

5  regulations for purposes of determining an employer's

6  withdrawal liability.  Now --

7          THE COURT:  And so the phase-in regulation and the

8  no receivable regulation, you think they are supported as

9  regulations that were enacted under the authority granted to

10  the agency in 1393(a)?

11          MR. BERLINER:  Correct.  And they were certainly

12  enacted within Congress's express and broad delegation in

13  1432.  They are reasonable regulations.  They're obviously

14  related to withdrawal liability because the heart of

15  withdrawal liability is UVBs.

16          THE COURT:  But assume that I agree with you about

17  that.  And that where I'm stuck is whether they are a

18  regulation on the plan.  That's the problem that I'm stuck

19  with, with respect to 1432.  And to the extent there are

20  other statutory authorities that don't present that

21  difficulty, that give the agency that authority that -- look,

22  I'm not saying my mind is made up on 1432, but I am stuck on

23  that problem.  And so I am also interested in other sources

24  of authority.

25          MR. BERLINER:  At the same time, I would come back

1 to the fact that condition is synonymous with prerequisite.

2 You have to do A before you can get B.  You have to send the

3 employer a notice and demand.  You have to do it as soon as

4 practicable.  If you don't do that, you don't pass it.

5           THE COURT:  I understand.  And the notion that you

6 suffer some consequence if you fail to abide by the

7 regulation --

8           MR. BERLINER:  Correct.

9           THE COURT:  -- makes eminent sense.  The notion

10 that somebody else suffers an adverse consequence if you

11 don't buy -- if you don't follow the regulation makes less

12 sense.  I'm not saying it's impossible, but it's less

13 intuitive.

14           MR. BERLINER:  I can't think of a particular

15 regulation, one way or the other, quite frankly, that acts in

16 the same way.  But I don't think it's -- but it's not unusual

17 that somebody has a prerequisite to doing something where if

18 they don't meet that condition, somebody else may be harmed

19 by it.

20           THE COURT:  Might be harmed, but alter a legal

21 entitlement is a different thing.

22           MR. BERLINER:  I understand, but I would come back

23 to the fact that it's still a prerequisite.  But in any

24 event, we obviously assert that the PBGC had the right to

25 enact the regulation under 1432.  And we assert that it's

1  also within the domain under 1302 and also 1393.

2              THE COURT:  Okay.  That's helpful.

3              MR. BERLINER:  And we've talked about actuarial

4  assumptions.  We haven't talked about methods.  Methods are

5  not assumptions.  Methods are things such as smoothing of

6  assets or phasing in.  It's a method.  Debtors --

7              THE COURT:  And the word "method" is a 1302(b)(3)

8  word?

9              MR. BERLINER:  It's a 1391 -- excuse me, 1393.

10  And it says that the PBGC withdrawal liability under this

11  part shall be determined by each plan on the basis of two --

12  says actuarial.  One is the part we covered where the plan --

13              THE COURT:  Oh, I see.

14              MR. BERLINER:  -- does the assumptions and

15  methods.  Two is the part where the assumptions and/or

16  methods are set forth in the PBGC's regulation.

17              THE COURT:  Got it.

18              MR. BERLINER:  So the PBGC always had that

19  authority to do so here.  Obviously, their primary reliance

20  is upon the contemporary grant set forth in 1432.  Debtors

21  have argued that the reference to methods in 1393 is really a

22  reference to the allocation methods in 1391.  There's no

23  support for that assertion.  They're completely different

24  sections.  Again, 1391 is how you allocate the UVBs once

25  they've already been determined under 1393.

1          You know, one of the critical notes in relying

2    upon 1302 here is that one part of the condition is, in

3    getting back to this condition, it's all tied up in the sense

4    that Congress instructed the PBGC to give plans money.

5    That's only intended to last through 2051.

6          I know we've heard a suggestion that maybe it'll

7    last longer, but it's intended to last at least through 2051.

8    There's no suggestion that the money should run out then.

9    But there are two aspects of it.

10          1302, the PBGC is still vested with the mandate to

11    encourage participation and ensure payments.  But the PBGC

12    also has to make sure in administering this program that the

13    money is used for the express purposes permitted by 1432, and

14    that's paying pension benefits and plan administrative

15    expenses.

16          If you assume that before this bankruptcy was

17    filed, all these pension funds were running the risk of

18    insolvency and would not have had the money to pay these

19    promised benefits, then the special financial assistance

20    accomplishes just that.  It allows them to pay the benefits

21    and plan expenses through 2051.

22          But if you start diverting that money to other

23    uses, such as this employer gets a reduction in its

24    withdrawal liability, you're instantly taking money that

25    Congress set forth for two purposes and only two purposes and

1   diverting it.  So I would argue that that's contrary to the

2   express language in the statute.

3          THE COURT:  Well, you know, you have the problem

4   of dollars being fungible, right?  And so whether these -- I

5   mean, can I ask you this?  I'm interested in your high level

6   reaction to the guts of what I understand the debtor -- the

7   debtor's high level, sort of common sense level argument is

8   the whole statutory scheme provides that employers who

9   withdraw from unfunded pension plans have to pay in their

10  share of the unfunded vested benefits.

11         The billions of dollars that Congress provided

12  left these funds fully funded.  So there are no unfunded

13  benefits, and therefore it doesn't make sense to ask the

14  question, what is their share, because they're fully funded.

15  So what's your like high level common sense response to that

16  common sense argument?

17         MR. BERLINER:  My high level?  First of all, let

18  me start with the premise that the assumption that the plans

19  are fully funded is wrong, and there's no support for that.

20  Let me start with there.  But the high level response would

21  be that that is one particular entity's approach that would

22  run counter to not only the understandings of the multi-

23  employer pension plans, but also to the employers that

24  continue to participate in these plans and want to make sure

25  that their contribution rates remain steady, that somehow

1  they don't become liable for the unvested benefits of

2  somebody else's employees in unusual proportion down the

3  road.

4         You know, it's important, you know, we've spent a

5  lot of time this morning discussing they're fully funded.

6  They've got lots of money, no more problems.  You know, let's

7  compare the type of plan, you know, we cited to the GAO

8  report in our brief, which talked about Central States

9  problems and the problems of other SFA MEPs are probably very

10 similar.

11        This is not a pension plan that's run for

12 electricians that where you're always going to have

13 electricians and they're always going to be unionized.  So a

14 lot of the plans that have struggled are pension plans that

15 covered a lot of employers in the trucking industry,

16 particularly over the road.

17        And so what you see is these plans have a very few

18 number of active participants, people on whose behalf they're

19 receiving contributions, and a dramatically higher number of

20 people on whose behalf they're paying benefits.

21        So the idea that you're fully funded today and

22 you're going to remain perpetually so ignores the fact that

23 where's the future funding going to come from.  If you have

24 an electrician's pension fund or another fund that's in a

25 heavily unionized industry that looks like it's going to

1   remain unionized, sure, you're green and the employers aren't

2   going to fear the future, but if you're in a plan with

3   historic, historic negative flows, where there are fewer and

4   fewer persons actively participating in plan and a greater

5   number, increasing number of retirees of those plans, you're

6   going to start to fear it.

7          And the minute the UVBs start to go up, there's

8   going to be that mass exodus that Congress explicitly relied

9   upon the PBGC to resolve.  For the very same reason when

10  Congress said, we want you to provide the payment through

11  2051, that everyone understood, including debtors, that

12  wasn't a permanent fix.  Debtor's own internal correspondence

13  explained, it's not a permanent fix, and it says expressly in

14  the statute through 2051.

15         In other words, somebody who's 30 years old today,

16  in 2052, 28 years from now, is going to be 58 years old, and

17  they're going to be wondering, okay, what about me?  And one

18  of the things that debtors identified in their papers, too,

19  is this thought that maybe younger workers won't bargain for

20  continued participation and may be willing to leave these

21  plans because of that very concern.

22         And so we argue that this should be interpreted in

23  accordance with the obvious objective Congress sought which

24  is to fund these plans through 2051, but without removing

25  that mandate to the PBGC to keep the good fight going, to

1   ensure that -- to encourage participation and to ensure

2   uninterrupted payment of benefits even beyond 2051.

3            So another aspect -- let me briefly mention one

4   other -- you know, I talked about 1393, and I'm sorry to jump

5   around here a little bit.

6            THE COURT:  No.  No one has to apologize to me for

7   jumping around, because I do that to all of you, like every

8   day of the week and twice on Sundays, so.

9            MR. BERLINER:  Okay, I hopefully won't do it more

10  than that.  In 1393(a)(2), when Congress gave the PBGC the

11  right to impose regulations or methods, that's also been

12  endorsed by the Supreme Court in the Concrete Pipe and

13  Products of California case where they said that the

14  regulation -- excuse me, the assumptions and methods must be

15  reasonable in the absence of PBGC regulations.

16           Not only that, but going back to 1393 and

17  distinguishing (a)(1) from (a)(2), (a)(1) points to a

18  reasonableness standard if the assumptions and methods are

19  determined by the plan's actuary.  (a)(2) does not have that

20  same mention of the word reasonableness.  And obviously it

21  couldn't because you'd be -- because the PBGC would be

22  applying these assumptions across a broad spectrum of pension

23  plans.

24           The key here is under the APA, the regulation is

25  presumed valid unless it's arbitrary and capricious.  And I

1   think a few things we need to focus on here.  I've explained

2   to the Court why the regulations fulfill the intent of

3   Congress both under 1302, 1393, and also specifically 1432.

4        But I think it's also important to note that the

5   PBGC engaged in -- and what the courts have required --

6   reasoned decision making.  In terms of reasonable, though,

7   I'd like to come back to Loper Bright, which the Supreme

8   Court just came out with in the last couple of months.

9        What the Court said in Loper Bright is some

10  statutes empower an agency to prescribe rules to, one, fill

11  up the details of a statutory scheme.  Debtors have focused

12  heavily on this first part, but it also says, or two, to

13  regulate subject to the limits imposed by a term or phrase

14  that leaves agencies with flexibility, such as reasonable.

15       And so that's exactly what the PBGC did here, is

16  they enacted conditions that are reasonable, and they did so

17  via the process of reasoned decision making.  This isn't a

18  case where the PBGC took a look at ARPA and within a week

19  came out with a regulation.  And that was the end of the

20  question.

21       They had a final rule, preliminary final rule.

22  They had -- they had multiple rounds of notice of comment.

23  They heard from maybe 100 different parties, including

24  representatives of pension plans, employers, including

25  employers that understood that if they were going to remain

1  in the plan, it's important to remove the disincentive to

2  withdraw from these plans.  And again, I come back to the

3  fact that --

4          THE COURT:  So I'm just interested in -- what's

5  your response to Mr. Winston's point that the failure to

6  distinguish between voluntary and involuntary withdrawals

7  renders it arbitrary and capricious?

8          MR. BERLINER:  Well, it does not.  And I'll

9  explain a few different reasons.  One is, nobody presented

10  that argument to the PBGC, and so the PBGC was not required

11  to consider that issue.  That's the first issue.

12          Second, let me back up even before that, there is

13  no evidence that this withdrawal was involuntary.  Now, I

14  know debtors are going to say, well, we were kicked out, or

15  this pension plan evicted us.  Something of that nature.

16          If you don't pay contributions and you do so

17  willingly, you may have an intent to get thrown out.  Doesn't

18  make it involuntary.  But even if it was involuntary, we're

19  focused -- first of all, as we've explained in our briefing,

20  Congress rejected, specifically rejected any request to make

21  withdrawals conditioned upon the withdrawal being voluntary.

22  That's the first part of it.  Second --

23          THE COURT:  Congress rejected that where?

24          MR. BERLINER:  Yes.

25          THE COURT:  What part of the statute?

1          MR. BERLINER:  I would have to get a case cite for

2  you.

3          THE COURT:  Okay.  Feel free to either let me know

4  later today or send a letter or what have you.

5          MR. BERLINER:  Okay.  But case -- I recognize that

6  Congress rejected that.

7          THE COURT:  Okay.

8          MR. BERLINER:  The other aspect of it is that even

9  if the withdrawal is involuntary, why distinguish between --

10  there's no basis to distinguish between the two.  If that

11  means that Congress's objectives, requirements, actually,

12  that the money be used solely to pay pension benefits and

13  plan expenses cannot be fulfilled, whether the withdrawal is

14  voluntary or involuntary doesn't mean that, okay, now the

15  money is going to be safe to pay pension benefits and plan

16  expenses.  It doesn't make any difference.  Either way,

17  you're interfering.

18          So on one hand, their suggestion is, well, okay,

19  we've solved the part about withdrawal being a preventative

20  measure, a deterrence, because, hey, this withdrawal, we had

21  no choice.  It was involuntary.  But that's not the only

22  reason -- the only statutory objective that needs to be

23  fulfilled is collecting withdrawal liability and deterring

24  withdrawal in the first place.

25          We still have the other objectives, continuing

1    these pension plans, ensuring the uninterrupted payment of

2    pension benefits, and most contemporaneously, the requirement

3    of 1432, that this money be used for only two reasons.  And

4    whether it's voluntary or involuntary doesn't affect that

5    condition being met.

6          Back to -- in terms of the conditions, however, in

7    terms of the PBGC's decision making, as the Court in FCC

8    versus Prometheus said, the FCC did not have to have perfect

9    empirical or statistical data.  And again, in this particular

10   case, the PBGC did not need to have the perfect solution.

11         The PBGC had to start with at a place where there

12   had been some discussion about potentially excluding the

13   contribution history altogether.  Instead, what they decided

14   and what makes this more complicated than looking at a simple

15   rule like in 1085, where you have pension benefits, where you

16   could simply say, hey, if there are benefit cuts, don't take

17   those into account for UVBs.

18         This is far more complicated.  And the reason it's

19   far more complicated is because Central States might run out

20   of its SFA in 10 years or 15 years.  Or another plan may run

21   out of it in three years, another plan may run out of in five

22   years.

23         And so, and again, remember that the SFA is not

24   every penny that every one of these plans have.  They do have

25   other sources of income, withdrawal liability, contributions.

1   And when determining the amount of SFA for which plans would

2   be entitled, the PBGC took those amounts into account.

3          So it's going to be a different -- so the SFA was

4   received by different plans and different amounts.  It's

5   going to evaporate on different dates.  And so the idea that

6   you can have a simple rule of five years or ten years or

7   anything like that is not as simple.  And it doesn't make

8   sense to have a one-size-fits-all rule to statutory enactment

9   or to regulatory decision making.

10          And so, as the PBGC explained, they focused on the

11   time period during which the SFA would be spent by the plans,

12   and decided to use that as the appropriate phase-in.

13          They engaged in multiple rounds of notice and

14   comment, had conducted a listening tour where they listened

15   to employers' perspectives, and as they explained, most

16   respondents indicated the concern that if the SFA was to be

17   phased in immediately, you would be encouraging employer

18   withdrawals.  That is, the PBGC did not have to conduct a

19   more significant study than that.

20          This is already expressed congressional finding.

21   We cited the ample legislative history in our papers, direct

22   statements from Congress, including the House and Means

23   Committee, explaining that the purpose of this withdrawal

24   liability is to deter withdrawals.  And that is the

25   objective.

1          And so if you phase in this withdrawal liability

2    immediately, and employers have this window where they see

3    they can withdraw without penalty, and most of them may think

4    that if we stay in for another 15, 20 years or so, it's not

5    going to be that good, they're going to run for the exits.

6    And that's the entire problem with this belief that you can

7    look at certain green zone plans of the PPA.  One of the

8    amendments to ERISA separated plans into different zones

9    based upon funding levels.

10          They're comparing these red zone maps, like

11   Central States and the like, to these green zone plans that,

12   like I described earlier, in industries that don't see the

13   same employee exit to mean that, well, nobody's withdrawing

14   from them, but it's all about forecasting and projection and

15   predicting what the future holds.

16          Debtors have also spoken to the PBGC, you know,

17   not enacting conditions related to contribution rates.  I

18   don't think the question is what conditions the PBGC did not

19   enact.  The question is the condition they did enact.  And

20   the only question is whether it's reasonable.  And as we know

21   from the case law, reasonable is extraordinarily broad.  It's

22   both related to and reasonable are extremely broad grants of

23   congressional authority.

24          Unless Your Honor has questions on these topics,

25   I'd like to move on briefly to major questions doctrine.

1          THE COURT:  Okay.  I mean, this has been helpful.
2   I'm happy to hear about majority questions.
3          MR. BERLINER:  So this morning, my colleague said
4   that, you know, one of the reasons that their major questions
5   doctrine would apply is because there was robust political
6   debate.  I'm not aware of any robust political debate.  I
7   haven't seen any reference in any of the papers to any robust
8   political debate.  In fact, what I did see in the papers is
9   an acknowledgment by debtors that this actually had
10  bipartisan support.
11         But I think it's important to consider the fact
12  that, absent this regulation, let's suppose that ARPA never
13  came about and Central States was sitting here without the
14  special financial assistance, the taxpayer funded special
15  financial assistance, then there'd be no debate that Yellow
16  would owe this money.
17         They're not being asked to make, to make any
18  payment that they had not previously been asked to make.
19  This isn't a matter of -- this isn't anything like the EPA
20  case, where there was robust political debate on an issue,
21  and businesses were being potentially asked to spend millions
22  or billions of dollars in the future that they had not
23  previously had to pay.
24         I'll go a step beyond that and say that beyond
25  maintaining the status quo, here, the major questions

1  doctrine simply doesn't apply because you have that clear

2  congressional authorization to enact reasonable conditions

3  related to withdrawal liability.  And we just heard from the

4  Court in Loper just in the last couple of months that such

5  grants of authority are brought, and they are permissive, as

6  the Court recognized there.

7       THE COURT:  So look, I could be thinking about

8  this wrong, the way I think -- what I think the major

9  questions doctrine says is that if you've got a grant of

10 general authority to an agency, you shouldn't assume that

11 Congress, when it gave someone a general authority, meant to

12 give that agency the power to do something big and

13 surprising.

14       If they're going to do something big and

15 surprising, they would tell you that in English.  It wouldn't

16 be part of an ordinary, organic grant of regulatory power.

17 And so I think you could argue whether that's just a canon of

18 construction, a way to make sense of ambiguous language.  You

19 could argue that it reflects a separation of powers concerns

20 about policymaking happening in Congress, not in agencies.

21 Hold that aside.  I think it's clear that it's just about

22 saying we don't read a grant of general organic authority to

23 be a big, surprising, sweeping -- the ability to do something

24 big in sweeping on the great questions of our day, that if

25 Congress is going to do that, it's going to tell you that in

1  English.

2         It seems to me to the extent that the major

3  questions doctrine has any application here at all, it would

4  be with respect to the construction of either 1302(b)(3) or

5  1392, which predate --

6         MR. BERLINER:  I believe you mean 1390 --

7         THE COURT:  93(a)(2).  I'm sorry.  You're right.

8         MR. BERLINER:  Right.

9         THE COURT:  Thank you.  Right.  Because those are

10 grants of just regular organic authority to the PBGC to

11 regulate in the ordinary course to serve the purposes of

12 ERISA.  I don't think that it speaks at all to the 1432,

13 because in the context of creating ARPA, there's nothing

14 surprising about the regulation.

15        So the way I'm thinking about it, and tell me if

16 I'm wrong, for 1432, I don't think I've got a major questions

17 concern.  I've got concern we've talked a lot about.  Right.

18 About condition, whether it's a condition on the plan.

19        The argument of it being a major question is

20 perhaps more applicable to the other sources of authority,

21 though even there, it's not obvious to me that the actuarial

22 assumptions or the methods that are being used qualify under

23 this principle as a major question.  But I guess that's how

24 I'm thinking.  Am I thinking about that the wrong way?

25        MR. BERLINER:  Well, I think you're thinking about

 1   this correctly.  And I'd also note that where the Court has

 2   traditionally, where the Supreme Court has traditionally

 3   found an issue with the major questions doctrine, it is where

 4   an agency is taking an action based upon a statute enacted

 5   years ago and exercising authority in a way in which they've

 6   never exercised that authority or as contemplated.  And we

 7   don't have that here.

 8            THE COURT:  Okay.  All right.

 9            MR. BERLINER:  And we don't have that here because

10   one of the express grant in 1432, but also consistent,

11   really, with the PBGC's creation in 1974.

12            THE COURT:  Okay, so I think I understand your

13   point on major questions.  What else do I need to understand

14   to not make a mess?

15            MR. BERLINER:  I'd like to talk about the 20-year

16   cap issue.  First thing I'd like --

17            THE COURT:  You know what?  This is a complicated

18   question that I do want to make sure I get right, and I think

19   this might be a logical breaking point if it doesn't offend

20   you.

21            MR. BERLINER:  Doesn't offend me.

22            THE COURT:  All right, so why don't we then break?

23   Let's pick up on this.  I do want to focus on it.  How about

24   we recess now, return at 1 o'clock, and we go until

25   everyone's been adequately heard?  That agreeable?

1          MR. BERLINER:  Yes.  Also, Your Honor, I do have a

2    couple cites on the voluntary/involuntary, if you'd like me

3    to save them.

4          THE COURT:  Or why don't we pick that up after

5    lunch?

6          MR. BERLINER:  Okay.

7          THE COURT:  So okay.  So with that, we're in

8    recess.  Thank you.

9          MR. BERLINER:  Thank you.

10         (Recess taken at 12:22 p.m.)

11         (Proceedings resumed at 1:08 p.m.)

12             THE COURTROOM DEPUTY:  All rise.

13             THE COURT:  Please be seated.

14         Welcome back.  I think where we were was that, Mr.

15    Berliner, you were about to help me with a 20-year rule.  So,

16    why don't we pick up there.

17         MR. BERLINER:  Thank you, Your Honor.  For the

18    record, again, Brad Berliner on behalf of Central States

19    Pension Fund.

20         Your Honor, if I may, I would like to briefly

21    revisit this issue of conditions upon plans.

22             THE COURT:  I'm sorry, the issue of?

23             MR. BERLINER:  Conditions upon plans.

24             THE COURT:  Okay.  Yes, go ahead.

25             MR. BERLINER:  So, a couple of things.  I wanted

1  to bring this back and contrast it to the issue, the example

2  you gave of the hospital.  What is unusual and what is

3  different about this case is that this statute is merely

4  maintaining the status quo. It is, in other words, in your

5  example, the grant effects what the contractor may have to

6  pay going forward. In this case no employer would be having

7  to pay anything that they had not been obligated to pay

8  before ARPA.  It merely maintains the status quo.

9          Really, if you read the statute the way the

10  debtors have interpreted it, it really reads conditions

11  related to the calculation withdrawal of liability is what

12  would have had to have been included because, otherwise, we

13  have really eliminated every right of a pension fund --

14  excuse me, every right of the PBGC under the, otherwise,

15  broad language of related to withdrawal liability which is

16  much broader.  So, the only condition we have heard of so far

17  is this settlement condition.

18          THE COURT:  Okay.  I understand.

19          MR. BERLINER:  The other thing I would note the

20  way it is a condition upon a plan is that this was a

21  condition that the plans had to agree to, to get the special

22  financial assistance. If the plans did not agree to this

23  condition, they would not get the -- if the plan said they're

24  not going to comply then they are not eligible for the SFA.

25  They have to comply with this condition.

1          THE COURT:  I understand, but you don't -- this

2     just begs the question, right, that you understand what is

3     bugging me.  You don't normally think that A's agreement

4     means B has to pay more to A.

5          MR. BERLINER:  I am not sure if its unusual or

6     that we don't discuss it often because perhaps its no more

7     complex than just recognizing that if something says you have

8     a prerequisite, a condition to do this, you have to do it.

9          THE COURT:  All right.  So, to the extent anyone

10    on your side of this case can give me an example of another

11    statute or regulation in which a Court has upheld a condition

12    in which the recipients acceptance of the condition had a,

13    sort of, direct rather then indirect effect on the legal

14    rights of someone not the recipient that would be helpful for

15    me to understand.

16          MR. BERLINER:  Understood.  We will --

17          THE COURT:  If it doesn't -- look, I hear your

18    point that if it doesn't exist it doesn't answer the

19    question, but it would inform how I think about the question.

20          MR. BERLINER:  Okay. I will further note that the

21    vast majority of -- you know, the vast majority of employers

22    here will benefit. I'm sure everyone in the bankruptcy world

23    has heard for years, especially in the investment community,

24    how increasing withdrawal liability, threats of insolvency

25    and threats of mass withdrawal liability have significantly

1    and adversely effected the ability of employers to get access

2    to capital needed to fund their future performance.

3              The belief here is that ARPA has solved that

4    crisis. It may not fit perfectly within Yellow's narrative,

5    but for the vast majority of participating employers in

6    Central States and the other SFA MEPP's this is a god send

7    for their future, you know, and for all similarly situated

8    employers.

9              If you can excuse me for one minute.

10             THE COURT:  Certainly.

11             MR. BERLINER:  I would now like to move onto the

12   issue of the 20-year cap.

13             THE COURT:  Terrific.

14             MR. BERLINER:  Let me start by noting what we have

15   already seen this morning, what we saw earlier this morning,

16   really, is 1399(c)(1)(a), and it specially says that you

17   calculate -- the language makes clear that the 20 year

18   limitation on payments applies except as provided in

19   Paragraphs 4 and 5.  I think its important to start there

20   with 4 and 5.

21             Now, I noticed in the statutory materials supplied

22   this morning Subparagraph 4 is missing.

23             THE COURT:  Its okay.  I can find my own copy even

24   if a party doesn't give it to me.

25             MR. BERLINER:  Okay.

1          THE COURT:  So, hold on.

2          MR. BERLINER:  And are you prepared for me to --

3          THE COURT:  Just give me a second.  If you are

4   going to refer to language I -- because I'm a nerd, I find it

5   helpful to have the language in front of me.  So, now you are

6   -- so, 1399(c)(1) begins by saying "Except as provided by…"

7   Paragraphs 4 and 5.  You have to tell me what 4 and 5 says.

8          MR. BERLINER:  So, let's talk about 4 and 5.  I

9   think that is really critical for understanding what -- you

10  know, what, I apologize.  Let me back up one step.

11         THE COURT:  Okay.

12         MR. BERLINER:  First of all, we talked about

13  default and I know you had questions about the default

14  provision.

15         THE COURT:  Yeah.

16         MR. BERLINER:  So, there are two types of default

17  and those are set forth in Subparagraph 5.  And these are

18  commonly known.  If you want a perfect case to look at for

19  the explanation of the distinction you can look at the

20  Central States v. O'Neill Bros., Seventh Circuit decision.

21  We cited that in -- actually debtors had cited it.  We cited

22  it.  In that case the Court distinguished between two types

23  of default.  The non-payment default requires the employer to

24  miss a payment, receive a past due notice from the Fund, fail

25  to cure that default, and then the Pension Fund can

1  accelerate the collection.

2          The insecurity default, it states here that any

3  other event defined in rules adopted by the plan, which

4  indicates a substantial likelihood that the employer will be

5  unable to pay its withdrawal --

6          THE COURT:  Can I pause you there for a second.

7          MR. BERLINER:  Sure.

8          THE COURT:  So, I am with you so far.  Is the

9  default that we are talking about the employers default of

10 its obligations to make payments to the Fund before the

11 withdrawal or is it a default under the 20-year payment plan?

12         MR. BERLINER:  So, (c)(5)(a) definitively relates

13 to the employers failure to make the withdrawal liability

14 payments as owed.  (c)(5)(b) is a little bit more generic.

15 Theoretically, at this point, in other words, what can happen

16 is let's say an employer is contributing without interruption

17 and then promptly shuts down operations.  The plan will look

18 at the fact that the employer shut down operations and the

19 employer then has -- excuse me, the plan will look at that

20 shut down and will have the option to advise its board of

21 trustees in conjunction with its plan langue whether that

22 shut down gives grounds to an insecurity default.

23         So, first you have the withdrawal event which is a

24 complete withdrawal occurs either when the employer

25 permanently ceases operations or permanently ceases to have

1    an obligation to contribute to the plan.  Then as the plan is

2    getting ready to asses it has to make the determination.  In

3    the normal course of events the plan is going to, as required

4    by the statute, determine and as soon as practicable after

5    the withdrawal send -- calculate the liability, send the

6    employer the notice and demand, and attempt to collect the

7    liability.  That would be subject to the 20 year limitation

8    of payments in the normal situation.

9              THE COURT:  Okay.  So, in a normal situation the

10   employer writes you a letter that says I'm done, I'm leaving

11   the plan, either I'm shutting down or I just decided I'm

12   done, I have withdrawn, you plan to do your thing.  The plan

13   then goes and does the calculations as provided by statute

14   and as promptly as practicable, whatever the statutory

15   language is, sends a letter to the employe that says here is

16   your withdrawal liability.

17             Now that withdrawal liability, I take it there are

18   circumstances in which that is calculated by reference to

19   this 20-year payment plan?

20             MR. BERLINER:  Correct.

21             THE COURT:  So, the letter that goes to the

22   employer basically says you owe me $5 million a year from

23   today until today plus 20.

24             MR. BERLINER:  Right.  We would identify your

25   required -- I can tell you the standard notice in advance as

1   you are required to pay $10,000 a month beginning the first

2   day of June 2025 and continuing with the last payment due

3   2045.  Assuming that, you know, as is usually the case, that

4   the 20-year limitation on payments applies.

5           THE COURT:  All right.  So, that is how it

6   normally works.  Then there is the question of default.  Now

7   do you ever look at the question of default when sending this

8   initial letter?

9           MR. BERLINER:  Yes.

10          THE COURT:  Okay. Now help me with that.

11          MR. BERLINER:  So, I will give you a few examples.

12  In addition -- in your example, in your addition to the

13  employer saying I am not longer obligated to contribute, the

14  employer advises the plan we have ceased operations and we

15  are preparing to liquidate our assets.  A situation like that

16  would give rise to the trustee's believing that they may not

17  collect the withdrawal liability and they are going to

18  accelerate, right out of the gate, under the insecurity

19  default provision.

20          You cannot accelerate for non-payment if the first

21  payment hasn't come due, if you haven't fulfilled the other

22  condition of sending the employer a past due notice.  So, in

23  other words, if you don't send an employer a past due notice,

24  you can't accelerate under (c)(5)(a) because you haven't

25  fulfilled that condition.

1          THE COURT:  But you can say you are not someone to

2    whom anyone in their right mind would extend credit for 20

3    years and so in your case, under the rule that I had adopted

4    before you signed up to join this plan presumably or,

5    otherwise, adopt it on notice to you, you are required to pay

6    this in a lump sum today.

7          MR. BERLINER:  Correct.

8          THE COURT:  And --

9          MR. BERLINER:  And that could be because of the

10   company is shutting down, the company is in assignment for

11   the benefit of creditors, any circumstance that makes it

12   unlikely. It could come in the case of an employer simply

13   advising the plan of some information, factual information,

14   that would suggest that the employer is unlikely going to be

15   able to satisfy its withdrawal liability obligations.

16         THE COURT:  Okay.  So that is what you think is

17   applicable here.

18         MR. BERLINER:  That is what is -- so, a couple of

19   things.  The Yellow -- you know, we discussed this issue of

20   the voluntary versus involuntary nature of the withdrawal.

21   We have asserted that its voluntary, but even if it was

22   involuntary that would be irrelevant.  In any event, the

23   Central States board of trustees determined that the fund was

24   insecure, that it was unlikely Central States would be able

25   to collect the full withdrawal liability and as a result

1  Central States accelerated under (c)(5)(b).

2          Yellow has not, per say, challenged that.  If they

3  were to do so, you know, as we know under 1401 the plan's

4  determinations are presumed correct. So, they would have to

5  rebut the evidence of --

6          THE COURT:  That acceleration, was that before or

7  after the day of the petition?

8          MR. BERLINER:  Before.

9          THE COURT:  Okay.

10          MR. BERLINER:  If it's okay I would like to

11  transition now to (c)(4) and (c)(5) where we talk about,

12  okay, let's assume that the employer's in default, now what?

13  What is owed?

14          So, we didn't see (c)(4) on the screen this

15  morning and its very important to consider (c)(4) and (c)(5)

16  in their context here.  So, (c)(4) doesn't apply in the event

17  of default.  (c)(4) says the employer shall be entitled to

18  prepay.  So, in other words, in that situation that we just

19  talked about where a pension plan sends an employer a notice

20  in demand for payment or withdrawal liability and its 10 --

21  excuse me, it's a 20 year cap payment schedule, the employer

22  may come to the plan and say, listen, we want to prepay.  It

23  doesn't matter why.  Maybe the employer thinks they can get a

24  great interest rate on a loan and they want to prepay it and

25  they think they can make more in their investments.  In any

1  event, (c)(4) says the employer shall be entitled to prepay

2  and then the key phrase follows "The outstanding amount of

3  the unpaid annual withdrawal liability payments."

4          Now, I know we -- Central States has adopted the

5  authority to bill employers monthly, but the statute talks

6  about annual withdrawal liability of payment.  Now what is

7  key here in (c)(4) is it's a -- the employer can prepay the

8  outstanding amount of the annual withdrawal liability

9  payments. It also says without penalty which is a phrase we

10 commonly hear when we are talking about loan instruments and

11 allowing somebody to pay without having to pay the interest

12 that, otherwise, would have accrued.

13         Let's focus on this phrase outstanding amount of

14 the annual unpaid -- unpaid annual withdrawal liability

15 payments.  Now let's transition with that phrase in mind to

16 (c)(5).  In the event of a default, a plan sponsor may

17 require immediate payment of the outstanding amount of an

18 employer's withdrawal liability.  Nowhere does it mention

19 annual payments there.  So, in (c)(4) we are talking about

20 annual payments. In (c)(5) there is no mention of annual

21 payments.

22         THE COURT:  So, slow down.  (c)(4) says it can

23 prepay the outstanding amount of the unpaid annual withdrawal

24 liability payments.  So, that means let's say liability has

25 been determined, its for 20 years, its $10,000 a month, and I

1   am in year three, I can just cut you a check. I take it the

2   calculation of the 20-year period, am I right, that that

3   basically is all done in nominal dollars.  So, you figure out

4   what is the total amount that is going to be payable over the

5   20-year period.  We just divide it by 20 and then spread it

6   out.

7             MR. BERLINER:  Right.

8             THE COURT:  We don't do anything to make it equal

9   on a time value basis. It's just nominal dollars.

10            MR. BERLINER:  So, its advertised using the

11   assumptions set forth in the plans most recent actuarial

12   report.  So, in other words, you have to look at the Fund's

13   discount rate.

14            THE COURT:  Oh, I see.  You do look at a discount

15   rate to calculate the 20-year stream.

16            MR. BERLINER:  Correct, using the -- right, and

17   the statute provides -- let me show you the language.  So, in

18   (c)(1) it tells you how you calculate the withdrawal

19   liability.  You look at the -- let me just briefly give you a

20   preface to the statutory language.

21            The whole idea that the payments, withdrawal

22   liability payments, is that they were generally intended to

23   roughly mirror what the employer's contribution obligation

24   had been.

25            THE COURT:  Would have been had they stayed in the

1  plan.

2          MR. BERLINER:  Right.

3          THE COURT:  Okay.

4          MR. BERLINER:  And so, you look at the CBU's, you

5  look at the highest contribution rate and then backing up to

6  (c)(1)(a) it talks about advertising it over the -- let's

7  see, bear with me.  Calculated as if the first payment were

8  made on the first day of the plan year following the plan

9  (indiscernible) withdrawal occurs and each subsequent payment

10 were made on the first day of each subsequent plan year.  It

11 says then that the determination of amortization period

12 described in Clause (i), (c)(1)(a)(i), determination of that

13 period shall be based on the assumptions used for the most

14 recent actuarial valuation of the plan.

15          THE COURT:  Okay.

16          MR. BERLINER:  So, that is how it gets amortized.

17          THE COURT:  Okay.

18          MR. BERLINER:  So, turning back to (c)(4) and

19 (c)(5), though, (c)(4), which is the employer that is not in

20 default, that employer gets to prepay the annual payments.

21 Now we don't know in the case -- you know, again, in this

22 case, the case of an employer that has got the capped payment

23 schedule that means they have to only pay those 20 years of

24 payments, but we don't see the annual withdrawal liability

25 payments in (c)(5). It is conspicuously absent.

1        We know from (c)(1) that Congress expressly

2  excluded (c)(4) and (c)(5) when talking about, you know --

3        THE COURT:  I see.  So, your point is, if I'm

4  understanding it correctly, going back to (c)(1), we figure

5  out what the total amount is and how long it would take to --

6  your point is, okay,  let's imagine it would normally

7  amortize over more then 20 years, is that the case here?

8        MR. BERLINER:  Yes.

9        THE COURT:  I see.  So, it would normally amortize

10  for more then 20 years and your position is when we're doing

11  this the normal way that is how you tell them what their

12  payments are over 20 years and after 20 years they can stop

13  making payments. Under (4) they can prepay the 20 years of

14  payments, but in the event of default the reference to an

15  employers withdrawal liability is calculated without

16  reference to the whole 20-year process.

17        MR. BERLINER:  Correct.

18        THE COURT:  That is a reference back to the very

19  beginning under (c)(1) of the first amount before we run this

20  process.

21        MR. BERLINER:  Well, really getting back to 1381

22  because its calculated as the -- well -- I'm sorry, yes,

23  you're correct.

24        THE COURT:  Then let's back up.  How does that

25  make sense in the event of a -- so, let's say I'm in -- I

1  have withdrawn and I owed $10,000 a month for 20 years and I

2  get to year three and I default.  So, what you are saying is

3  what you then can accelerate is not just the remaining 17

4  years of $20 a month, but if it was originally a 27-year

5  amortization period now what we spring back and get the

6  additional seven years of withdrawal liability also.

7          MR. BERLINER:  Right.  Let me explain that.

8  Again, as I explained, one of the purposes or really the

9  purpose behind the calculation is to mirror the employer's

10 contribution obligation. The 20-year cap is, obviously, very

11 similar when you look at it to the rational the PBGC has

12 employed in their 15-year phase.

13         We want to make sure that this money is used to

14 fulfill the purposes of Congress without being overly

15 punitive to employers.  So, the 20-year limitation on

16 payments was Congress's determination that at some point

17 enough is enough because these are -- you know, just because

18 an employer is withdrawn doesn't mean they are out of

19 business.

20         THE COURT:  No, I understand.  You can -- right.

21         MR. BERLINER:  Right.  They could have bargained

22 out of participation as many have done. So, Congress

23 determined not to be overly punitive.

24         The rationale for not being overly punitive does

25 not necessarily apply when you are talking about a company

1   that is in default, that hasn't fulfilled its obligations to

2   begin with. Indeed, in a bankruptcy where the chances of

3   collecting what any portion of liability or significant is

4   generally unheard of, but beyond what the purpose was the key

5   fact here is that Congress wrote (4) and (5) together, right

6   next to one another, and used deliberately different

7   terminology to refer to the obligations of an employer that

8   is voluntarily prepaying an employer that is in default.

9           THE COURT:  Okay.

10          MR. BERLINER:  So, that is the critical language

11  to focus on there.

12          The debtors have talked about the fact that

13  Central States has relied upon merely motions for default

14  judgment.  Indeed, a couple of cases were default judgments

15  from the Central District of California; however, the Courts

16  actually analyzed the statutory language in those cases and

17  as every Court has the obligation to do, the well pleaded

18  facts of a case are presumed true but the parties seeking a

19  default judgment still has to prove up its entitlement to the

20  amount of liability it seeks.

21          So, those were determinations as opposed to the

22  case in the Southern District of New York, I believe it was,

23  the KEY Handling case, that debtors have relied upon where

24  the Pension Fund did not request anything more and so the

25  Court didn't question it -- excuse me, the Pension Fund asked

1  for a full amount, the Court pushed back, the Pension Fund

2  didn't provide any basis under the law for seeking a higher

3  amount then the 20 payments and so that is what it got.

4         I notice in the reply brief debtors cite to, and I

5  think this is an erroneous cite, to KEY Handling from the

6  Second Circuit. I don't believe they intended to do so

7  because there is no Second Circuit case. I think Mr. Slade

8  this morning referred to Honerkamp, and I believe that is the

9  case they intended to refer to.  But, again, in that case, as

10  in many others, the Court is really just repeating the

11  general proposition that withdrawal liability is ordinarily

12  limited to 20 years of payments.

13         THE COURT:  Okay.

14         MR. BERLINER:  The only other point I will make,

15  though, is not all the cases Central States cited were, in

16  fact, default judgments.  In fact, Dworkin v. Central States

17  case was from the Northern District of Illinois and the

18  employer there specifically complained about the fact that in

19  the security default scenario Central States was not seeking

20  the cap payment amount and instead was seeking the uncapped

21  amount.  Judge Chang from the Northern District of Illinois

22  rejected that argument on defendant's motion to dismiss and

23  in turn entered judgment in favor of Central States.  So, you

24  know, in any event I believe the key language to focus on

25  here, again, is that distinction between (c)(4) and (c)(5).

1    Those are the only points I wish to raise on the

2    20-year limitation of payments.  Your Honor, Central States

3    asks that summary judgment be entered for it.  Central States

4    did not move for summary judgment on the issue of the 20-year

5    limitation, debtors did; however, we believe the law is

6    clearly established here that the 20-year limitation would

7    not apply and, therefore, we would ask the Court to grant

8    summary judgment for Central States.  Furthermore, because

9    the statute does not require that the liability be limited to

10   20 years of payments and because the statute does not demand

11   any kind of a present value attached to it there is no need

12   for a trial, there is no need for a discount rate to be

13   applied.

14        Unless Your Honor has further questions, I will

15   cede the podium.

16        THE COURT:  Okay.  That is very helpful. No

17   further questions from me.

18        Happy to hear from, I guess, whoever logically

19   follows.

20        MR. BERLINER:  Thank you, Your Honor.

21        THE COURT:  Thank you, Mr. Berliner.

22        MR. MEEHAN:  Good afternoon, Your Honor.  Edward

23   Meehan from Groom Law Group on behalf of, what we call, the

24   other SFA MEPP's.

25        Having had the benefit of the discussion over the

1  last few hours, I think I can be relatively brief. There is a

2  point of gloss I would point on something that Mr. Berliner

3  went through and then there is one topic that really is

4  unique to my group.

5         THE COURT:  The New York, Pennsylvania issue that

6  only your clients have.

7         MR. MEEHAN:  Correct.

8         THE COURT:  Okay.

9         MR. MEEHAN:  So, on that one I will spend a little

10  bit of time, but to just follow upon a point that was made

11  that the idea is that in (4) and (5), as the language went

12  through, it is our position that -- and I should say I adopt

13  the arguments that have been made for simplicity here that

14  there is not any sort of limitation on the cap. There is not

15  a use of the cap, there is no limitation on withdrawal

16  liability, there is no present value discounting.

17         To the extent there would be any argument or

18  conclusion, Your Honor, to the contrary then I would refer

19  back to one of the cites that came in which was the 29 U.S.C.

20  1399(c)(1)(a)(ii) is just that in setting up the 20 year

21  amortization there is a requirement in the statute that the

22  discount relate to what the employers payment schedule would

23  be.  As a matter of law it would be the same as in the Fund's

24  actuarial valuation.  So, to the extent Your Honor ends up

25  disagreeing with us and believes there is supposed to be a

1  cap and that it needs to be discounted, it would simply be

2  reversing that discount where there is no need for expert

3  testimony in a lot of analysis on hypothetical rates.

4         So, to the issue, Your Honor, that concerns the

5  New York State Teamsters and the Western Pennsylvania

6  Teamsters my theme is no good deed goes unpunished.  What

7  happened here, and Your Honor may be aware from submissions

8  including some documents we attached to a declaration from

9  Mr. Sullivan, that in the discovery that we took, which was

10  very targeted, very limited, one of the things that we did

11  was to take a very brief, I'm thinking, 90 minute or

12  thereabouts deposition from a senior partner at Kirkland &

13  Ellis.  We normally don't like to intrude on, you know,

14  opposing counsel but the issue here was Michelle Kilkenney,

15  who is a senior partner, was also a partner at the firm back

16  during real time on events that bear on this issue.

17         So, we presented it in the papers, but just big

18  picture, Your Honor, roughly speaking in the 2012 to 2014

19  time period Ms. Kilkenney, who is highly regarded and

20  justifiably so from the awards and everything that I could

21  see as a debt finance lawyer, was leading and out of court

22  restructuring on behalf of Yellow.  As part of that, there

23  were negotiations over contributions to be made.  What the

24  papers have referred to as contribution deferral agreements.

25         In essence, to simplify it, the contributions were

1  being lowered with a commensurate lowering of benefits being

2  earned at that time for Yellow's employees and the

3  alternative at that time, frankly, appeared to be bankruptcy

4  but with the cooperation of the New York State Teamsters

5  Fund, Western Pennsylvania, and a variety of others who are

6  not at issue here today, there were accommodations made.

7         One of the provisos for the accommodation of

8  lowering the contribution rates was in the event we would end

9  up where we are today, which is in a withdrawal liability

10 situation that the rates that were but for this accommodation

11 required would be used as the basis for the withdrawal

12 liability calculation, all other rules apply.  That, in the

13 case of the New York State Teamsters, has an actual name and

14 it's called Schedule G in the rehabilitation plan and Western

15 Pennsylvania has its own counterpart in its rehabilitation

16 plan.

17         So, what happened is there was a little tug of

18 war, a little back and forth between the lawyers, Ms.

19 Kilkenney, you know, representing her client ably was arguing

20 about what the conditions should be for what was called a re-

21 entry into the plan at the time.  The New York State

22 Teamsters, represented ably by Mr. Vincent DiBello

23 (phonetic), who is sitting to my left at counsel table, was

24 arguing with her about security and a wide variety of things.

25         Well, there was a set of these conditions set

1   forth in Schedule G, one of them being this idea that if

2   there was a withdrawal it would be based upon the original

3   required rates.  And at the end of the day, and its Exhibit C

4   to Mr. Sullivan's declaration which is attached to the Fund's

5   opposition, the SFA MEPP's opposition to the debtors' motion

6   for summary judgment, is an email that came from Ms.

7   Kilkenney in response to, effectively, a demand from Mr.

8   DiBello that you either agree with this or we have no deal.

9   Then you will be stuck with your consequences whether you

10  file for bankruptcy or whether you find the money and you pay

11  us off now on the then existing withdrawal liability, which

12  is pre-ARPA, which they would have none of the arguments that

13  we are dealing with here today.

14          That exhibit, Your Honor, and I think we can post

15  it up for others to see if I am correct.  I can read from it

16  and if I'm wrong I -- but it is handy in the papers anyway.

17  So, there was an email from Ms. Kilkenny to Mr. DiBello at

18  which she -- this one is for context. There was an email on

19  January 25th of 2014 on a Saturday where Ms. Kilkenney was

20  arguing with Mr. DiBello over whether a security provision

21  would be binding.  Mr. DiBello wrote her and said I want you

22  to rescind that. So, we can take that down.

23          What we should put up is the exhibit that was to

24  Mr. Sullivan's declaration.  That is an email, if we have it,

25  of January 28th, 2014 9:30 a.m., Ms. Kilkenney responds to

1  Mr. DiBello's demand that she rescind this objection to the

2  security issue and she said "As requested, please be advised

3  that my email of January 25th is rescinded.  Further, this

4  will confirm that the terms and conditions of the re-entry

5  letter, with the exception of Paragraph 8" - that is the

6  security provision they were arguing about - "remain binding

7  on WRCW.  Additionally, this will further confirm that

8  nothing in the amended and restated CDA" - contribution

9  deferral agreement - "prejudices in any way the rights of the

10 Pension Fund" - they are referring to the New York State

11 Teamsters - "to enforce its rules and regulations including

12 the rights of the Pension Fund to contributions, withdrawal

13 liability, liquidated damages, interests, costs, audit fees,

14 attorneys fees, and/or other amounts that may be assessed by

15 a pension fund.  We trust this resolves any concern you may

16 have and look forward to receiving New York Funds signature

17 page."  Mr. DiBello arranged for the executive administrator

18 to send over a signature and it was countersigned and that

19 agreement went into effect. It was in effect for 10 years

20 roughly until the case was filed last year.

21          At her deposition, Ms. Kilkenney, as we noted by

22 attaching excerpts to our response to summary judgment,

23 acknowledged that at no time during those 10 years did she

24 take back her rescission, at no time did she raise a

25 question, doubt, or I changed my mind, anything of that

1   nature.  And we did find out from, what I think was probably

2   a 20 minute, 30 minute deposition of Darren Hawkins, who was

3   a 30(b)(6) witness designated by the debtors, that at no time

4   was Mr. Hawkins aware that the agreements with the New York

5   State Teamsters or Western Pennsylvania were in doubt, in

6   question, being rethought, invalid, anything of any nature

7   whatsoever.

8           THE COURT:  Okay.  What is your response to the

9   argument that this would need to have been approved by the

10  PBGC?

11          MR. MEEHAN:  the response, Your Honor -- and I'm

12  sure Your Honor got where my sentence was going to go, which

13  is for 10 years we relied upon this and, at a minimum, there

14  would have to be an argument of an equitable estoppel.  But a

15  response on, sort of, the authority point of view and do we

16  need to go to PBGC is we do not need PBGC's approval for

17  this.

18          One argument, Your Honor, is that as the debtors

19  have acknowledged and I know debtors counsel this morning

20  mentioned it orally, but it's also in the reply papers that

21  the debtors put in on summary judgment, these funds use the

22  presumptive method, and that is one of the methods that is

23  authorized under the statute.  And under that presumptive

24  method there is a formula, which I won't go through, but it

25  goes back for a period of time, it takes into account the

1   contributions of employers, determines legacy liabilities.

2   So, you are looking at a broader, sort of, picture of time of

3   these liabilities.

4          The presumptive method would be based upon the

5   original unmodified contribution rates that this agreement --

6   you know, the contribution deferral agreement in Schedule G

7   in the New York States case modified, as I say, is an

8   accommodation.  There was no change in methodology.  The

9   methodology remained completely the same.  So, to the extent

10  the question arises of is it permissible for an employer and

11  a fund to contract to make adjustments like the one that was

12  done here the answer is yes.

13         There is actually an opinion letter, Your Honor,

14  we cited in our briefs from the PBGC 89-8, I believe it is,

15  where this specific question, not with respect to this set of

16  contracts, but this specific question of whether it is

17  permissible for an employer and a fund to, in essence, raise

18  the floor of ERISA by having an employer say I waive certain

19  of my rights or, you know, I will pay more withdrawal

20  liability.  Even if that were to be implicated here then the

21  PBGC has agreed there is authority for that to happen.

22         You know, so, Your Honor, on that basis it is, in

23  our view, enforceable and I won't belabor it because I know

24  we went through this in our papers to some extent, but to the

25  extent Your Honor were to conclude that for some reason the T

1 wasn't crossed or an I was failed to be dotted here, and so

2 these contracts are not enforceable, they would put us back

3 where we were in 2014 where the debtors had clear withdrawal

4 liability with none of the defenses they have asserted.

5          THE COURT:  I understand.

6          MR. MEEHAN:  So, we think it is ultimately

7 counterproductive.

8          Your Honor, let me just check one thing for a

9 moment, please.

10          THE COURT:  Certainly.

11          MR. MEEHAN:  Your Honor, I think that is all I

12 need to address right now. Thank you, Your Honor, for your

13 patience.

14          THE COURT:  Thank you, Mr. Meehan.

15          Okay. Happy to hear from whoever is next as a

16 matter of logic.

17          MR. BERLINER:  Your Honor, I am not next and I

18 apologize.

19          THE COURT:  I think I remember hearing from you

20 already.

21          MR. BERLINER:  I told you I would advise you of

22 the case cites on the voluntary versus involuntary issue.  I

23 don't know if you would like them now.

24          THE COURT:  Hold on one second.  Okay.

25          MR. BERLINER:  I apologize, Brad Berliner for the

1   record again.  First one is 762 F.2d 1124, <u>Keith Fulton &</u>

2   <u>Sons</u>, it's a First Circuit case.  There is a <u>Board of</u>

3   <u>Trustees of Western Conference of Teamsters</u>, I believe, 749

4   F.2d 1396, it's a Ninth Circuit also 1984 opinion.

5           THE COURT:  Okay. Thank you very much.

6           MR. BERLINER:  Thank you, Your Honor.

7           THE COURT:  Now who is next?

8           MR. KELLY:  Good afternoon, Your Honor.  Benjamin

9   Kelly here on behalf of the Pension Benefit Guaranty

10  Corporation.

11          Judge, debtors here ask that the Court invalidate

12  the phase and condition and a no receivable condition.

13  Invalidation of those conditions would turn the special

14  financial assistance program into a taxpayer funded bailout

15  for contributing employers. It would boost the pension

16  benefits of the millions of men and women that Congress

17  passed the American Rescue Plan to help.

18          Judge, there is no reason to invalidate the

19  conditions here.  Congress expressly delegated authority to

20  PBGC in Section 1432(m)(1) to impose the conditions. Now

21  there has been some discussion this morning about whether the

22  phase and condition and no receivable condition are

23  conditions.

24          THE COURT:  They are conditions. The question is

25  whether they are conditions on the plan.

1          MR. KELLY:   Whether they are conditions on the

2    plan. So, I understand your concern, Judge, but there is

3    another condition that the PBGC has promulgated here which is

4    indisputably a condition and that is approval of withdrawal

5    liability settlements.  There are two.  There is a

6    restriction on the way a plan would calculate withdrawal

7    liability.  PBGC ultimately would review the settlements that

8    a plan enters into with a withdrawing employer.

9          The PBGC would only reject the settlement if the

10   settlement was to the detriment of the plan. If it benefited

11   the employer at the expense of the plan.  So there too we

12   have a condition that ultimately benefits the employer -- I'm

13   sorry, benefits the plan at the expense of the employer.  Now

14   why would a plan ever enter into a settlement agreement that

15   would --

16          THE COURT:  No, I understand. It makes -- there --

17   maybe I haven't articulated what is bothering me well enough.

18   There is a perfect common sense to the notion, at least by my

19   lights, that -- look, it's the agency's job to make sure that

20   these funds don't run themselves into the ground. I get they

21   don't intend to run themselves into the ground, but just in

22   case there is a role for the PBGC that if they are doing

23   something, you know, to be colloquial about it, really

24   stupid, you are going to stop that because it's your job --

25   because you are the backstop if they fail.  So, that is you

1  job.

2          So, the notion that a restriction on their ability

3  to enter into a settlement is restricting them. It's

4  something that they want to do and you are saying, no, you

5  can't do it.  That is what I would think of paradigmatically

6  as a restriction on the plan whereas saying the person who

7  owes you money owes more then they think they owe you win

8  this dispute you have with this other party doesn't feel to

9  me -- just ordinary English, I don't -- this isn't

10 complicated legalese, just ordinary English if I say I'm

11 imposing a restriction on you, the guy who owes you money

12 owes you more then he thinks, you get more money then you

13 thought, that is my restriction on you.  You would look at me

14 and say that's not a restriction on me.  That is where I am

15 stuck.

16          MR. KELLY:  Restriction on settlement agreements

17 would also affect the legal rights and entitlements of the

18 withdrawn employer.

19          THE COURT:  Incidentally, yes, but the idea is

20 that the Fund -- if the Fund if the one that requires the

21 approval, the Fund here meaning the plan, I don't mean fund

22 as in like money, but because the plan needs your approval

23 the plan can enter it.  And, yes, that has incidental rights

24 on other parties, that happens all the time when restrictions

25 on the use of federal funds restrict the recipient and that

1  has incidental effects on people with whom the recipient does

2  business, but it doesn't, in the first instance, drive the

3  legal entitlements or the legal obligations of the

4  counterparty.  That is what is weird about this to me.

5          I apologize if I'm the only one who has this

6  hangup, which might suggest that I'm thinking about it the

7  wrong way, and I'm open to hearing that, but it would help

8  persuade me of that if you had another -- restrictions on the

9  use of federal funds is a very common form of regulatory

10  scheme. If you had another one that did this in all of

11  American history this way that would be very helpful to me.

12          MR. KELLY:  Judge, we will look into this issue.

13  We will think harder about it, but I would also point to

14  PBGC's broad authority which has been mentioned under

15  1302(b)(3) as well as PBGC's specific authority under

16  1393(a)(2) to prescribe the methods plans can use to

17  calculate withdrawal liability.  All of those act

18  consistently to show that the agency did have the authority

19  to impose the conditions here.

20          Now the conditions are also consistent with both

21  the text and the purpose of the American Rescue Plan, ARP,

22  the Multi-Employer Pension Plan Amendment Act, MEPPA, and

23  Title 4 of ERISA generally.  There, within the statutory

24  boundaries under the standard announced by the Supreme Court

25  in Loper Bright.  Nor are the conditions arbitrary or

1  capricious.  They are the product of deliberate reasoned

2  decision making by the agency.

3          Now that decision making included three rounds of

4  comments from stakeholders.  The PBGC received 33 comments

5  from unions, from employers, from plans, from other

6  stakeholders, all of which advised the agency that without

7  conditions the receipt of SFA would incentive contributing

8  employers to withdrawal for two reasons:

9          First, to get out from the costly contribution

10 obligation.  The cost of withdrawal will have plummeted, but

11 the cost of contributing to a plan will be no lower than

12 before the plan received SFA.

13         Second, to get out while the getting good.  Under

14 our plans we have received enough SFA to remain solvent

15 through 2051 but there is no guarantee plans will be fully or

16 even well-funded for any period of time.  That being the

17 case, as post 2051 benefits grow liabilities paid after 2051

18 plan funding will decline, UVB's will increase.  So, there

19 really is an incentive for employers to get out from a plan

20 soon after its received SFA while unfunded vested benefited

21 are low.

22         Now, here is why the conditions are consistent

23 with the statutory purposes, Judge.  Congress introduced the

24 concept of withdrawal liability in MEPPA to disincentive

25 employer withdrawals.  The conditions do the same thing. They

1  encourage employers to continue to participate in recipient

2  plans. Without the conditions, without that disincentive the

3  receipt of SFA would contravene the purposes of ARPA and

4  would lead to disfunctioning of the special financial

5  insistence program generally.  Again, plans have only

6  received an SFA to remain solvent through 2051 if employers

7  continue to contribute.

8         Without those contributions, plans won't have the

9  cash on hand to pay benefits as they come due.  They will go

10  insolvent before 2051.  Beyond 2051 withdrawals would

11  threaten a plan's long-term solvency. The agency's mission,

12  under Title 4 of the statute, is to provide for the

13  indefinite maintenance and continuation of private pension

14  plans (indiscernible).

15         THE COURT:  Can I say a few words about the same

16  issue.  If to the extent the driver of this is the need to

17  create incentives to keep plans in can you respond to the

18  argument that it was arbitrary and capricious not to

19  separately address involuntary withdrawals, again, without

20  prejudice on the facts whether this is or isn't an

21  involuntary withdrawal that is not before me today, but at

22  least the legal question.

23         MR. KELLY:  Understood.  So, if PBGC were to

24  distinguish between an involuntary and a voluntary withdrawal

25  on the rule that agency would have needed to rewrite the

1 statute. Nowhere has Congress made that distinction.  This

2 has been widely recognized by the Circuit Courts.  I can give

3 you a couple case cites noting this.  We have Keith Fulton,

4 this is a First Circuit case at 762 F.2d 1124.

5            THE COURT:  Hold on, slow down.

6            MR. KELLY:  I apologize.

7            THE COURT:  No, my fault. I'm a little slow.  You

8 are all use to that.  So, there is a First Circuit decision

9 that is where?

10           MR. KELLY:  This is 762 F.2d 1124.

11           THE COURT:  Oh, I see.  That was the same case

12 that Mr. Berliner pointed me to.  Okay.

13           MR. KELLY:  Right.  And we also have Western

14 Conference Teamsters Pension Fund v. Thompson, 749 F.2d 1386,

15 this is a Ninth Circuit case.

16           THE COURT:  That was also in his case.

17           MR. KELLY:  Right.

18           THE COURT:  Got it. Okay.

19           MR. KELLY:  So, those cases show that Congress did

20 make a distinction between voluntary and involuntary

21 withdrawals.  Even if PBGC could have made that distinction

22 in the rule, which would have been beyond the statutory

23 boundaries under Loper Bright, even if it could have made

24 that distinction the rule would have been unworkable.  There

25 is no criteria to determine when a withdrawal has been

1  voluntary and involuntary.  Making that distinction would

2  introduce an element of intent which would be difficult to

3  prove. It would provoke confusion and litigation by

4  withdrawing, you know, between plans and withdrawn employers.

5          THE COURT:  Okay.

6          MR. KELLY:  Beyond that, Judge, introducing that

7  element of voluntary versus involuntary that would have

8  created reverse incentive.  Whatever carveout PBGC had

9  recognized was involuntary would have become the avenue for

10 employers to pursue to get out from under the conditions.  If

11 PBGC had said bankruptcy was involuntary lawyers would

12 declare bankruptcy.

13         Now, the most important point here is that the

14 agency received zero comments on this distinction. So, its

15 hard to take seriously the notion that he agency ignored an

16 important component of the issues when no party raised that

17 before the agency.

18         Now, Judge, I have gone through why the conditions

19 are consistent for statutory purposes, but I want to turn to

20 the text.  So, debtors have argued in their papers, at times

21 forcefully, that SFA is a plan asset.  The PBGC doesn't

22 disagree, but the question for the Court is how should that

23 asset be valued.  More specifically, does 1393(c) require a

24 plan to calculate UVB's, unfunded vested benefits, using the

25 immediate recognition of the full fair market value of SFA.

1  And, Judge, it does not.

2         The UVB's are, we have gone over this several

3  times, the value of plan liabilities less the value of plan

4  assets.  The term "value of plan assets" isn't defined in the

5  statute.  Congress knew how to prescribe an asset valuation

6  method for the calculation of unfunded liabilities. That is

7  evident from its definition of unfunded benefit liabilities.

8  It's the analog to UVB's for single employer claims.   There,

9  Congress clearly required that a plan use the fair market or

10  current value of plan assets.

11         Congress made no such requirement in the UVB

12  calculation. Once more, under 1393(a)(2), Congress permitted

13  PBGC to prescribe the methods that a plan would use to

14  calculate withdrawal liability.  So, there is space under the

15  statute for PBGC to have prescribed the phasing condition

16  here. It's not -- it's within the statutory boundaries,

17  again, but the method the debtors argue should be used to

18  calculate UVB's here actually would be inconsistent with the

19  statute.  It would be inconsistent with 1393(b)(1).

20         THE COURT:  Help me, 1393(b)(1) says that in

21  determining the unfunded vested benefits the actuary may rely

22  on the most recent actuarial valuation.

23         MR. KELLY:  That is right, Judge.  And in relying

24  on the most recent actuarial valuation under ARPA, SFA is --

25  that is the most recent actuarial valuation is the most

1  recent funding requirement. So, under ARPA, SFA is

2  disregarded for plan funding purposes.  It won't show up in

3  that most recent actuarial valuation.

4         THE COURT:  But 1393(b)(1) says a plan actuary

5  may.  That is a funny way of saying that is required, isn't

6  it?

7         MR. KELLY:  I'm not saying that its required, but

8  that is an inconsistency.  A plan that didn't want to rely on

9  its most recent actuarial valuation, that didn't want to use

10 that funding report. If it did, it wouldn't recognize SFA. It

11 would be disregarded under the express terms of ARPA.  So,

12 there is no way to reconcile that inconsistency between --

13        THE COURT:  You could read that as sort of

14 creating a safe -- so, even if you read this as, sort of,

15 creating a safe harbor, if you are the actuary and you are

16 conducting the valuation you are, essentially, safe harbored

17 if you rely on the most recent actuarial valuation and your

18 saying that if you couldn't --

19        MR. KELLY:  Couldn't, the safe harbor would

20 disappear.

21        THE COURT:  -- isn't that circular in the sense

22 that the actuarial valuation exists by virtue of the

23 regulation.

24        MR. KELLY:  No, the actuarial valuation, Judge,

25 doesn't exist as a product of 1393.  The actuarial valuation

1   is under Title 2 of the statute. Its under the tax code.

2   This is a separate report produced for funding purposes.

3             THE COURT:  Okay.  I take it that excludes the

4   ARPA funds, right?

5             MR. KELLY:  Absolutely.

6             THE COURT:  And it excludes the ARPA funds because

7   there is a regulation that says that you should exclude them.

8             MR. KELLY:  Well, no, its because Congress, in

9   ARPA, explicitly said SFA funds shall not be taken into

10  account for funding purposes.

11            THE COURT:  Okay.  So, tell me where that is.

12            MR. KELLY:  So, that is Code Section 432(k)(2)(d).

13            THE COURT:  432(k) --

14            MR. KELLY:  There is where its codified. I can't

15  give you the --

16            THE COURT:  So, what title? Is it Title 29?

17            MR. KELLY:  Title 26.

18            THE COURT:  All right.  Hold on.

19            MR. SLADE:  I've got that one.  Its 26 U.S.C. --

20            MR. KELLY:  432(k)(2)(d).

21            THE COURT:  432(k)(2)(d).  And that is the long

22  statutory section, so thanks for your patience.  (k)(2) in

23  the case of a multi-employer plan receiving special financial

24  assistance, (d) they shall not be taken into account for

25  determining contributions required under 431.  I take it

1 contributions required under 431 -- and so, this connects

2 back to 1392 --

3         MR. KELLY:  Judge, it's a rabbit hole. Its 431

4 connects to Section 412, which connects to 1393(b)(1).

5         THE COURT:  Hold on.  Let me go back to

6 1393(b)(1).  Its not unreasonable to ask me to follow cross-

7 references through a statute to figure out what it means.  I

8 appreciate that.

9         MR. KELLY:  Not at all.

10         THE COURT:  I see.  So, you are saying that

11 (b)(1), that -- I see, the most recent actuarial valuation

12 used for purposes of 412 of Title 26, which is what you were

13 just pointing me to --

14         MR. KELLY:  You will see in Code Section 412 a

15 reference to 431, which connects to 432.

16         THE COURT:  Okay.  So, therefore, your position is

17 that this safe harbor wouldn't operate as intended unless

18 your valuation method were proper.

19         MR. KELLY:  Well, if a plan was required to

20 immediately recognize the full fair market value of SFA.

21 That would be in direct conflict with 1393(b)(1).

22         THE COURT:  Okay.  Got it.  That is helpful.

23         MR. KELLY:  We spent a lot of time talking about

24 the phase and condition today. I want to make sure we also

25 talk about the no receivable condition which represents about

1   two-thirds of the money in dispute in this case.

2           THE COURT:  Just by virtue of the happenstance of

3   the timing of when grants were made versus the funds

4   received.

5           MR. KELLY:  That is exactly right, Judge.

6           THE COURT:  Okay.

7           MR. KELLY:  So, if the phase and condition, you

8   could think of it as how do we value SFA once its become a

9   plan asset, the no receivable condition is about when does

10  SFA become a plan asset.  Now, nowhere in ERISA has Congress

11  required a plan to treat a promised sum as a plan asset

12  before its been paid.  Congress has not required the accrual

13  method of accounting for purposes of the UVB calculation.

14  Debtors can point to no statutory conflict between the no

15  receivable condition and ERISA.

16          THE COURT:  So, when you say no receivable -- I

17  mean, why is it -- does the statute tell you -- if you are

18  holding a six-month treasury bond, does the statute tell you

19  how to value that?

20          MR. KELLY:  For purposes of a UVB calculation?

21          THE COURT:  Yeah.

22          MR. KELLY:  No, Judge.

23          THE COURT:  And is there a regulation that tells

24  you how to value that?

25          MR. KELLY:  PBGC has an issue to regulation about

1  how to value plan assets for purposes of the UVB calculation.

2          THE COURT:  Okay.  Presumably, it's based on the

3  market, what someone would pay for that bond today.

4          MR. KELLY:  That would be reasonable based on what

5  the asset is.  So, it would fall under 1393(a)(1). It would

6  be a reasonable method used to calculate UVB.

7          THE COURT:  And if someone said, well, look, the

8  Government might pay and it might not pay.  So, after all

9  just a promise, lets trade it at zero until you get paid in

10  cash. Would that be a reasonable method?

11          MR. KELLY:  Judge, under 1393(a)(2) PBGC has the

12  authority to prescribe what method is used. Its not

13  necessarily a reasonable or an unreasonable method. Now, it

14  might not be a reasonable method for another reason. It might

15  be arbitrary and capricious, right, because it would be so

16  divorced from the purposes of the statute that there be no

17  reason to have that method, but it wouldn't violate 1393.

18          Here, this is a reasonable method.  This is

19  reasonable given the purposes that Congress made clear of why

20  it was providing this money to plans, to keep plans solvent

21  through 2051.  The no receivable condition, like the phase

22  and condition, disincentivizes withdrawals, ensures that

23  plans have the contributions they will need to make it to

24  that statutory goal.

25          THE COURT:  Okay.

1          MR. KELLY:  So, what little guidance there is

2     about how to treat an unpaid sum as a plan asset actually

3     goes the other way, Judge.  So, we pointed in our briefs to

4     Department of Labor Advisory Opinions which say that an

5     employer contribution shall not be treated as a plan asset

6     until its actually been paid.  We have also pointed to the

7     instructions of the Form 5500 which require plans not to list

8     receivables as plan assets.

9          This shows a consistent basis that plan assets do

10    not include receivables. There is no statutory conflict here

11    and like the phasing condition, no receivable condition is

12    within the boundaries of the statute.

13         THE COURT:  Okay.  I am a little stuck, truth be

14    told, conceptually on how a promise made by the United States

15    through this mechanism is a receivable whereas the obligation

16    of the issue of a bond is not. I mean they seem to me

17    analytically a lot alike.  They are both, essentially,

18    obligations of the United States backed by treasury and so I

19    understand your point that there might be good policy reasons

20    to draw a distinction, but the notion that we are calling one

21    thing a receivable and we're calling another thing something

22    different feels a little bit -- I mean, I get that at some

23    level that is the convention, but in terms of, at the end of

24    the day, what is this thing they seem a lot like the same

25    thing.

1          MR. KELLY:  Well, Judge, (indiscernible) this is.

2     This is a challenge to a regulation under Section 706.  Under

3     the Loper Bright standard here, given PBGC's express

4     delegation of authority to act, the Court's role is to

5     determine whether the agency has acted within the statutory

6     boundaries.  Without a statutory conflict the PBGC is within

7     the statutory boundaries.

8          THE COURT:  I hear you.  Okay.  Let me let you

9     continue.

10          MR. KELLY:  Judge, the conditions here are also

11    neither arbitrary nor capricious. They are reasonable

12    conditions because they serve the purposes of MEPPA, of ARPA,

13    and of Title 4 generally.  They're also the product of

14    reasoned decision making. The PBGC went through three rounds

15    of comments: a pre-interim final rule listening session,

16    comments based on the interim final rule published in July of

17    2021, and a final round of comments after the publication of

18    the final rule in July 2022.

19          Those comments were directed solely to the phase

20    and condition and the no receivable condition.  This has been

21    a fulsome rule-making process that has given every

22    stakeholder the opportunity to be heard.  What we heard form

23    those stakeholders is that without these conditions the SFA

24    program won't work.

25          Judge, that is really all I have.  I am happy to

1  take additional questions.

2          THE COURT:  I'm not shy when I have them.  So, I

3  think you have answered the questions that come to mind. So,

4  thank you very much.

5          MR. KELLY:  Thank you, Your Honor.

6          THE COURT:  Okay.  I am happy to hear from whoever

7  is logically next.

8          MR. GINSBERG:  John Ginsberg, also for the PBGC.

9          I just didn't want to leave unanswered the

10 question that seems to really be bothering the Court. If I

11 could answer, and I don't know if I can, but I'm going to

12 give it a shot.  So, you said that this is an unusual

13 restriction on a grant of federal funds because it affects

14 the liability of third parties not on the plan, and you gave

15 the example of an HHS grant program on a hospital.

16          So, I don't know that we will be able to find a

17 case anywhere in American  history that is anything like this

18 case, but I think what is important to recognize here is that

19 this is an extremely unusual program where the grant is

20 filling a hole and the size of the hole is determined by

21 whether these employers are going to be there and whether

22 they're going to be there to make the contributions that the

23 plans are counting on and assuming that they will have in

24 determining how much special financial assistance they need

25 to make it through 2051 is going to be effected by whether or

1  not this withdrawal liability exists or whether the

2  disincentive to withdrawal from the plans disappears by

3  virtue of the plans having received the grant.

4         So, I don't know that there is any analog. I see

5  the unusualness of it.  You might look at it as like a donor

6  designated funds in a donation to a non-profit. Its being

7  designated for the science building on the campus.  An entity

8  to whom the donee owes money can't complain, hey, look, that

9  money is on your books, its improper for it to be restricted

10 and I should have a credit on the -- I should be able to

11 collect on those funds.

12         THE COURT:  I understand that.  I still think is

13 the not the donee saying I want this money -- not the third

14 party saying I want this money, it's the third party saying

15 by virtue of your agreeing to take that person's money, my

16 obligations to pay you are more than they would have,

17 otherwise, been.  I am not saying the agency can't do that

18 under its organic authority to promulgate regulations with

19 respect to the operations of the MPAA.  That is a different

20 question.

21         I am saying that if the source of the authority is

22 the authority to grant regulations with respect -- to impose

23 conditions on the recipients of the funds, meaning the plans,

24 this feels like a funny condition -- it doesn't feel like its

25 not a condition on the plan, it's a condition -- its changing

1  the obligations of the employers, not the plans. That is

2  where I am stuck.

3         MR. GINSBERG:  I understand.  But do understand

4  that it is absolutely necessary to the structure of the

5  program, if in the absence of these conditions the hole gets

6  much, much larger.

7         THE COURT:  I get as a matter of policy why this

8  is a sensible rule, which is different from the question is

9  it a rule that was authorized by the statute that purports to

10 provide the authority.

11        MR. GINSBERG:  Well, we're past -- most of this

12 fund by projected dollar amount, most of this program has

13 already been administered.  So, the bulk of the money has

14 been handed out.  There is going to be a hole created with

15 bearing upon the pension benefits of millions of people if

16 this rule is invalidated.

17        THE COURT:  I get it and I'm not taking my job

18 lightly, I get it, but I still have to call balls and

19 strikes.  This is very helpful.  Thank you.

20        MR. GINSBERG:  Thank you.

21        THE COURT:  Anyone else on the Fund/PBGC side of

22 this that I should hear from?

23     (No verbal response)

24        THE COURT:  Okay. If not, I'm happy to hear

25 rebuttal, if you want a few minutes before that, whatever

1  your preference.

2           MR. SLADE:  I'm good, Your Honor.

3           THE COURT:  Okay.

4           MR. SLADE:  I don't think I'm going to have all

5  that much.

6           THE COURT:  Mr. Slade.

7           MR. SLADE:  I'm actually going to take the issues

8  in reverse order because I think the first one is the most

9  substantive.  With respect to issue three about the inputs

10  into the annual payments, this Mr. Meehan addressed directly.

11  He and I agree that these are a series of undisputed facts.

12  There was a contract signed.  It was not approved by PBGC.

13  We think it needed to be approved by PBGC and because it was

14  not it is invalid and that is a legal question for the Court

15  to make.

16           THE COURT:  So, your position though depends on

17  the proposition that it's not something that flows -- well,

18  your position is that because the PBGC didn't itself

19  authorize that agreement its then disregarded for the

20  purposes of calculating --

21           MR. SLADE:  Withdrawal liability.

22           THE COURT:  -- withdrawal liability.

23           MR. SLADE:  Yes. I mean, they changed the

24  statutory payment calculation method and that you need

25  approval, which they did not receive.

1           THE COURT:  Okay.  I understand your position

2    there.

3           MR. SLADE:  With respect to the 20-year cap I

4    think there is a -- that is a big issue here and I think

5    Central States is a good example.  So, their withdrawal

6    liability that they claim is for $5 billion if you ignore the

7    SFA payments when you are calculating their unfunded vested

8    benefits.  The largest possible payment stream that would be

9    owed, depending on how you did the calculation, its about $50

10   million a year. So, if you just multiply that by 20, even if

11   you don't discount it at all that's $1 billion.

12          So, our view is that is the most that could be

13   required because 1381 says so, you should not be able to

14   avoid the adjustment that is required by 1381(b)(1)(c) merely

15   by calling a default under 1399(e).  I think its notable, Your

16   Honor, that Congress said specifically in a mass withdrawal

17   the 20-year cap does not apply.

18          THE COURT:  So, slow down. I want to hear what you

19   just said again because I was focused on -- I was just

20   thinking back to the Central States argument. So, I guess I'm

21   interested to begin at, you know, they make the argument

22   about the distinction in the language between 1399(c)(4)

23   versus (c)(5).  What is your response to that and if your

24   answer is, Judge, you need to look at another section in

25   order to think about that I'm happy to hear that, but why

1  don't we start there.

2          MR. SLADE:  Yeah, I think what you need to start

3  with is 1381 and then you need to talk about what does 1399,

4  if anything, do to 1381.  What 1399 says is that you can

5  accelerate withdrawal liability and the withdrawal liability

6  is calculated with the cap.  And if you are saying, Your

7  Honor, that in a bankruptcy situation there is no cap,

8  basically you are interpreting the statute to say that

9  outside of bankruptcy there is a cap, but inside of

10 bankruptcy there is not.

11         THE COURT:  Forget bankruptcy for a second because

12 I don't think any of this turns on bankruptcy per say because

13 what happened here, as I understand it, is you got a default

14 based on under 1399 before you filed for bankruptcy. So,

15 whatever special bankruptcy rules we -- I am old fashioned

16 here and I think the obligations of the debtor, the allowance

17 of claims against the estate are the liabilities as they

18 existed at the moment you filed.

19         So, if they did something after the bankruptcy

20 that had the effect of monkeying with the liability there are

21 special rules about that, but to the extent this was all done

22 before you filed then we are not really talking about, you

23 know, bankruptcy rules.  We're just talking about non-

24 bankruptcy liability.

25         MR. SLADE:  So, let's just say -- let's use the

1    word "solvency" instead of "bankruptcy."

2             THE COURT:  Okay.

3             MR. SLADE:  So, what they are saying is that for a

4    solvent employer they get to pay less.  The insolvent

5    employer has to pay more because they can artificially

6    increase --

7             THE COURT:  Right. I understand that.  I have got

8    all sorts of questions as a matter of policy about whether

9    that is a good idea because I live in the world of bankruptcy

10   and I tend to think those rules are bad ideas, but that is

11   different from the question is that the world that Congress

12   created and its not at all uncommon for people to want to do

13   things like that.  That is why bankruptcy protects against it

14   and you can't do it once you're in bankruptcy, but

15   unfortunately, you know, for reasons that I think are bad

16   policy, outside of bankruptcy, until you are, sometimes the

17   law does that to you.

18            MR. SLADE:  Well, let's eliminate the word

19   "bankruptcy" and just substitute it with "solvency."

20            THE COURT:  Okay.

21            MR. SLADE:  Their argument is that in a solvent

22   employer situation, the solvent employer gets to pay less.

23   The insolvent employer --

24            THE COURT:  Right, has to pay more.

25            MR. SLADE:  -- which by definition has less money

1    to spread among different creditors.  That is not a sensible

2    way to interpret the statute.

3           THE COURT:  Well, look, Mr. Slade, in the real

4    world people who are better credit risks have to pay less

5    interests then someone who is a higher credit risk. This is

6    just a variant on that them.  To the extent the pension

7    system faces exposure as a result of someone's financial

8    instability we are not cutting them the same slack that we

9    cut someone where we think it's a safe bet to do so.  I

10   understand the societal consequences of that and I hear your

11   points about why that is a bad idea, but that is sort of

12   above my pay grade.

13          MR. SLADE:  Yeah, I think Section 1381 answers the

14   question and provides that the withdrawal liability is what

15   you are owed after the cap and that is what they can

16   accelerate not before. They have a chicken before the egg

17   problem or whatever the incorrect one is the way that they

18   are saying it.

19          THE COURT:  Which did come first.

20          MR. SLADE:  Sure.  That is not before the Court

21   today.

22          THE COURT:  Thankfully.

23          MR. SLADE:  So, let's focus on the SFA, the issue

24   that most of the dialog has talked about and I want to talk

25   about a variety of things that my colleagues on the other

1  sides raised.  First, I want to focus on the alleged

2  alternative sources of authority other then 1432(m).  Start

3  with 1302(b)(3), PBGC has authority, as maybe necessary, to

4  carry out the purposes of this chapter.  Obviously, very

5  vague, non-specific and precisely the language that the

6  Supreme Court's cases would tell you don't give you specific

7  authority like this.  Particularly, Your Honor, that can't

8  give you authority to do something that would be inconsistent

9  with ERISA, which is what we think these regulations are.

10          You asked whether the PBGC --

11          THE COURT:  So, stop.  Hold on because that is an

12  important point and I want to not miss it.  So, the provision

13  that we are now talking about is 1302 --

14          MR. SLADE:  (b)(3).

15          THE COURT:  -- (b)(3) and it says that the PBGC

16  has the authority to grant regulations as may be necessary to

17  carry out the purposes of the subchapter. I completely agree

18  with you that that doesn't mean -- it's a little bit like

19  Section 105, right, you can't do -- the authority to carry

20  out the provisions of ERISA don't give you the authority to

21  do the opposite of what ERISA says.

22          I take it your story for why this is the opposite

23  all ties to your principle argument about what the definition

24  of an unfunded vested benefit is and your view that is a

25  matter of ordinary commonsense, the promise from the

1    Government to pay the SFA is an asset.

2            MR. SLADE:  Yeah, if the PBGC passed a regulation

3    that says all equities shall be valued at zero for purposes

4    of the UVB calculation that would not be authorized by this

5    provision of the code because that is not consistent with

6    ERISA.  That, in our view, is effectively what they did.

7            THE COURT:  Okay.

8            MR. SLADE:  And actually, you asked the question

9    of whether the PBGC noted these things in the administrative

10   record. In the administrative record the PBGC referenced

11   1303(b)(3) but then acknowledged that it needed additional

12   authority to pass this regulation and rely on 1432(m).  So,

13   if you look at the administrative record that is what the

14   PBGC --

15           THE COURT:  So, hold on. I have a document.  So,

16   what I have, with thanks to the hardworking team in Chambers,

17   is the section of the federal register that deals with -- is

18   that what -- are you pointing me to the same thing.

19           MR. SLADE:  Yeah, I am looking at page 40997 in

20   the upper right-hand corner.

21           THE COURT:  40997.  Okay. I am on that page. So,

22   tell me how the paragraph begins.

23           MR. SLADE:  It's a super long paragraph that

24   starts "In listening sessions."

25           THE COURT:  "In listening sessions," I have got

1  that paragraph.

2        MR. SLADE:  The sentence that they are talking

3  about, Section (m), they use different numbers then the

4  actual code sections. This grant by Congress expands PBGC's

5  authority beyond its existing authority under what we have

6  been talking about --

7        THE COURT:  Right.

8        MR. SLADE:  -- and authorizes PBGC to provide

9  rules that define how SFA should be treated in a calculation

10 of withdrawal liability.  So, they're relying on (m),

11 1432(m), as a supplement to this 1302(b)(3) to justify

12 exercising their authority to enter this rule.  So, I just

13 wanted to answer the Court's question.

14        THE COURT:  I hear you.  That doesn't quite say

15 and without it we wouldn't have the authority.

16        MR. SLADE:  Its not an admission that against

17 better interests --

18        THE COURT:  Right, I understand.

19        MR. SLADE:  I mean, I read it to say that --

20        THE COURT:  I understand why you read it the way

21 you do.

22        MR. SLADE:  Well, I also think now we go to the

23 other section, Your Honor, in relying on today that we did

24 not rely on in the administrative record. Nobody relied on

25 1393(a) until the briefing in this case. There is no reliance

1  on the administrative record.  So, this is what I would say

2  about 1393(a).  The SFA is a single lumpsum cash payment.

3  There is no actuarial assumption or method involved in

4  valuating that.  Smoothing, which is what Mr. Berliner

5  referred to, refers to how you value something that

6  fluctuates year to year, you smooth the assets.

7          THE COURT:  Certainly, the no receivable rule,

8  right, the rule that says we -- the statute says we look at

9  it on the year prior to the -- the end of the year prior to

10  the withdrawal and here we have this, you know, for most of

11  the funds anomalous situation or at least unusual situation

12  in which the promise is made in December and the funds are

13  received in January, so the question is when do we count it

14  as an asset.

15          MR. SLADE:  I guess my question about that, I am

16  going to get to there in a little bit, is there is no

17  explanation for why that is there. There is no explanation

18  for why you would not count this as a receivable when

19  Congress has directed the payment to be made and the PBGC has

20  authorized that it will be made.  There is nothing in the

21  administrative record to offer a rational, nothing, for it.

22  It just doesn't make any sense.

23          I mean, maybe you can come up with a rational for

24  why it would make sense, but none has been offered.  With

25  respect to --

1          THE COURT:  I guess my question is, is that a

2  method, right.  I understand your point that the -- well, why

3  isn't the amortization rule a method for valuing the -- I

4  mean you may think it's a bad method because they have got

5  the cash and so I get the commonsense of saying pretend the

6  cash isn't here and imagine it comes into your possession

7  later you might say that's weird as a method for valuing

8  cash, after all I have the cash, but to the extent they have

9  got authority why isn't that as just a matter of English a

10  method.

11          MR. SLADE:  A method for doing what?

12          THE COURT:  For figuring out --

13          MR. SLADE:  For ignoring the reality, yeah, it is

14  a method for doing that.  I don't think --

15          THE COURT:  Well, for giving effect to the concern

16  about making sure that by Congress appropriating these funds

17  for the benefit of the pension system that they not operate

18  to harm the pension system.

19          MR. SLADE:  well, I mean what it says is that you

20  can prescribe actuarial methods and assumptions which in the

21  aggregate are reasonable when combined with taking into

22  account the experience of the plan and reasonable

23  expectations and, which, in combination offer the actuaries

24  best estimate of anticipated experience under the plan or,

25  and this is what Mr. Berliner focused on, actuarial

1  assumptions and methods set forth in the PBGC's regulations

2  for purposes of determining an employer's withdrawal

3  liability. How is this a method for doing that?

4         I would also say, even it was, it has to be

5  reasonable.  We got two arguments to the contrary there.  So,

6  1401(b)(3) is clear that it has to be reasonable and based on

7  the plan's actual experience and expectations. They had a

8  hundred percent expectation that they were going to receive

9  the money.  Any contrary expectation would defy logic. I

10 think I heard from the PBGC that they interpret 1399(a)(2) to

11 allow them to pass any regulation and it doesn't have to be

12 reasonable. I think that is what they argued.  I don't think

13 that is the law.  It can't be the law.

14        Mr. Berliner also argued, and I'm not sure I

15 totally followed this, that it would interfere with the

16 purposes of SFA which are to pay benefits and the

17 administrative expense of the plan.  I don't see how it would

18 interfere with that.  The SFA is on their balance sheet. Its

19 going to pay all of the benefits and the plan expenses

20 through, at least 2051. If we had a trial, we would prove it

21 was much longer then that, but this absolutely satisfies the

22 goals of ARPA.  That is what it does.

23        I think the third point I would make, Your Honor,

24 is Your Honor made the point that you thought it was logical

25 to have a make-whole remedy for withdrawal and I totally hear

1  that, but the point of the summary judgment motions, and Your

2  Honor's questions, is what if there isn't a hole. Now,

3  Central States mostly dodged the question by saying we think

4  after SFA there's still a hole. They can argue that.  The

5  question in front of the Court is whether you can impose

6  withdrawal liability when, in fact, there is no -- or when

7  you -- whether you can ignore the SFA when identifying the

8  particular hole.

9            Our whole point, Your Honor, is that we think

10  ERISA requires everybody to recognize reality and based on

11  that reality, if there are unfunded vested benefits, then we

12  got to eat some of those and there will be a claim for that.

13  Their reading actually encourages the Funds to kick us out of

14  the funds.  They are better off with us dead then they were

15  with us alive.  If Yellow is still in the Fund our employees

16  would still be accruing liabilities because they would still

17  be accruing benefits.  Under their view of the world our

18  employees stop accruing benefits.  Their liabilities aren't

19  increasing and they get to collect $5 billion.  That is

20  certainly not what Congress intended.

21            I think I want to finish, Your Honor, with getting

22  at the point that you were hitting repeatedly. Is this a

23  condition on a MEPP related to withdrawal liability.  Now

24  Central States kept changing the words in the statute. They

25  said it's a reasonable regulation relating to withdrawal

1    liability, but that is not what the statute says.  The

2    statute delegated to PBGC the ability to pass reasonable

3    conditions on a MEPP related to a list of items and at the

4    end of them was withdrawal liability.

5         This is not such a condition.  And their reading

6    is, at best, an awkward way to read the statute which under

7    Loper Bright means that they lose even if it is not a major

8    question because the delegation was not clear.

9         THE COURT:  Can I -- not to be anticlimactic, but

10   can I take you back to another statutory provision that I'm

11   interested in your reactions to. So, I understand it's a

12   little bit tangential, but it might -- well, I'm interested

13   in your reaction to how to make sense of 432(k)(2)(d) which

14   is the one that says for purposes of determining --

15        MR. SLADE:  Yes.

16        THE COURT:  -- because that --

17        MR. SLADE:  This is an argument that the PBGC made

18   in its reply brief, its like page 7 of their reply brief.

19   They say that immediate recognition of the SFA would

20   contradict 1393(b)(1).  Let's just -- the Funds don't even

21   make this argument.  I think the reason that they don't make

22   the argument is that it actually runs in our favor.  All

23   1393(b)(1) says, all it says, is that a plan can calculate

24   unfunded vested benefits by using its most recent AVR and

25   estimate it forward. It doesn't have to wait for the actuary

1  to have a new AVR.

2         So, even though Congress, it specifically stated

3  in that provision that mentioned that SFA cannot be included

4  in determining minimum required contributions.  The SFA, it's

5  still going to be included as an asset in the AVR.  There's

6  just going to be a section in the AVR that says when we

7  calculate minimum funding contributions you have to exclude

8  the SFA because that is what Congress required you to do.

9         THE COURT:  So, here is my question, and this -- I

10 mean, the commonsense on their side of the ledger here is,

11 look, there is a one time cash infusion designed to solve the

12 problems, at least not necessarily solve, but at least patch

13 some of the problems but I think the thematic point is we

14 don't want that new money in to operate to reduce other money

15 that would otherwise come in because if we did that we would

16 be defeating the purpose of fixing this essentially.

17         To the extent there are express statutory

18 provision that point in that general direction that say for

19 this purpose or for that purpose ignore this money. Now I

20 know you could argue Congress knew how to say that and they

21 didn't say it here, but you could also say to the extent we

22 have got the question of whether directing the fund to --

23 directing the calculation be done this way that they did it

24 expressly in other circumstances at least supports the notion

25 that this is broadly consistent with what Congress was trying

1   to accomplish.

2          So, help me with your response to that way of

3   thinking about it. That is all the words from me and I'm not

4   sure they were helpful to you.

5          MR. SLADE:  They were.  Congress specifically

6   stated in that section of the tax code that you can't use the

7   SFA when you are calculating minimum funding contributions.

8   That is what it specifically said. There is nothing anywhere,

9   not in ARPA, not in the tax code, nowhere, that says you

10  exclude it for purposes of withdrawal liability.

11         To accept their argument would mean that Congress

12  chose to say nothing about the SFA withdrawal liability

13  because vague language that an actuary could rely on the most

14  recent AVR and estimate it forward was sufficient even though

15  Congress did not think that was sufficient for the minimum

16  funding rules.  That is not the right way to read statute.

17  When Congress wanted to do things like this it said so.

18         THE COURT:  Okay.

19         MR. SLADE:  So, just briefly I will go back to the

20  no receivable regulation no one explains why its in there.  I

21  would also say the rules are very clear that any assumption

22  has to be a reasonable assumption consistent with the plan

23  experience and expectations.  This cannot be.  They know they

24  are getting the money.  They are assuming they are not

25  getting the money.  That is the opposite of a reasonable

1  expectation.  It's very easy to value a lumpsum payment from

2  the Government in cash and it is hard to understand why

3  valuing in some other way would be reasonable.

4            THE COURT:  Okay.

5            MR. SLADE:  That is all I got, Your Honor.

6            THE COURT:  Thank you, Mr. Slade.

7            MR. SLADE:  Thank you very much.

8            MR. WINSTON:  Your Honor, may I have five to ten

9  minutes?

10            THE COURT:  You may.

11            MR. WINSTON:  For the record Eric Winston of Quinn

12  Emanuel on behalf of MFN.

13            Like before, I am not going to duplicate what Mr.

14  Slade said and hopefully I won't step on his toes. I do want

15  to pick up with a comment he made about filing the hole

16  because I think Gestalt if you credit SFA as a plan asset for

17  purposes of calculating UVB's there are going to be some

18  funds that have received SFA in this case that will have

19  UVB's.  We want to pay them.  My client wants to see them get

20  paid their allowed claim because hopefully there is money

21  that is left over.

22            This debate doesn't change that fact.  Also,

23  Gestalt, SFA doesn't solve the problem for quite a few Funds.

24  There are Funds that have received SFA where SFA really makes

25  no difference to them, including some of Mr. Meehan's

1  clients.  There are Funds that did not receive SFA that are

2  in this case that stand to lose if Central States and the

3  folks on that side of the table prevail.

4          So, if the purpose of all this was to help the

5  pension system this regime that they are articulating isn't

6  going to work in this case.  I just heard, in defending the

7  reasonableness of the conditions and arguing against

8  arbitrary and capricious standard the PBGC lawyers mentioned,

9  I thought, two themes, two rationales: one was contribution,

10 one was solvency.

11         Contribution has literally nothing to do with

12 withdrawal liability. In fact, when you look at (m)(1) of

13 ARPA it separates reductions and employer contribution rates

14 from withdrawal liability and in (m)(4) it very clearly

15 states that even if you receive SFA you are still treated in

16 critical status until the end of plan year 2051.  Being

17 critical plan status implicates heightened contribution

18 rates.  So, Congress was telling the world, including the

19 PBGC, that is where you can hold employers accountable

20 because they are not going to get a free pass-through reduced

21 contributions rates and you can pass conditions on that.

22         On solvency I think it's very laudable.  In fact,

23 you know, I can reveal my personal policy philosophies here.

24 I think this is one of the best pieces of legislation I can

25 think of to solve a problem that has been vexing for decades

1   and my very, very smart associate sitting a couple rows back

2   quipped.  Everything before was on the supply side.  What

3   ARPA did was fix the demand side and I think that is a very

4   smart way to think about it, but it is a bailout. It has

5   reacknowledged incidental effects, but those incidental

6   effects don't, we think, advance the rational that they are

7   supposed to make which is reducing the incentive for

8   withdrawals.  And the rationale about solvency doesn't make

9   sense because ARPA also deals with that in (m)(5).

10          If a Fund has received SFA but then becomes

11  insolvent it doesn't get the benefit of the regulations

12  because solvency is determined in reference to plan assets.

13  If you trace through the definitions, it is very clear that

14  if a Fund that received SFA went insolvent tomorrow, if it

15  has on its balance sheet the cash or receivable from SFA that

16  counts for those purposes.  So, Congress again addressed the

17  solvency concern decades from now.

18          I think its interest, because I didn't hear any

19  discussion about this but we looked it up in the register

20  just to make sure I wasn't wrong about this, if this

21  rationale was so important when the PBGC first announced the

22  interim rule and funds applied for SFA and got it they

23  couldn't exclude SFA from calculations of UVB's for purposes

24  of withdrawal liability.  When they passed the final rule,

25  the ones that got the money under the final rule could, but

1  the ones that got the money on the interim rule couldn't.

2  They had to reapply.  And if anyone didn't reapply, they have

3  to treat the SFA as a plan asset.  So, again, if the purpose

4  is to deter withdrawal liability that is an internally

5  inconsistent reason for doing so.

6           I want to turn very briefly to, this was mostly

7  from the Central States lawyers, the arguments in favor of

8  why its not arbitrary and capricious.  Again, they made the

9  comments about no one commented on this. I think the easy

10 answer is it wasn't ever brought up but the Third Circuits

11 Trenton case where it says take a hard look, I think imposes

12 on the PBGC that in calculating UVB's for purposes of

13 withdrawal liability this would have been a case that was an

14 important aspect of the problem to focus on the difference

15 between voluntary and involuntary.

16           THE COURT:  Okay.  Mr. Kelly made the point that

17 drawing this distinction -- I mean, holding aside the cases

18 they point to that they say would prohibit that and I haven't

19 gone and looked at those cases, but hold that aside for a

20 second. I thought Mr. Kelly made a seemingly commonsensical

21 point that said, look, if we drew that distinction we would

22 then have a whole administration problem of asking as to

23 every case was this a voluntary or involuntary withdrawal in

24 that the cost of -- essentially, the argument was, as I took

25 it, and I may have taken it wrong, that game just isn't worth

1  the candle, that the time we spent policing that line makes

2  drawing that line unmanageable.  Why isn't that within their

3  discretion to say?

4          MR. WINSTON:  So, I think the administrative

5  burden argument, to the extent it's a legitimate reason to

6  promulgate a regulation that we just don't want to deal with

7  some of the administrative headaches, one, this is a pretty

8  important one.  I don't want to talk about it from a major

9  questions perspective, but we are talking over $100 billion

10 of taxpayer money that is non-recourse affecting the pension

11 system which has bedeviled everybody for decades.

12          This may be the time to invest in passing

13 regulations that do try to answer difficult questions. I

14 would also point out that its fairly common across a large

15 section of the federal agencies to promulgate regulations

16 that detail very specific issues like showing up on a

17 fisherman's boat which leads to the Supreme Court.  Those

18 things maybe administratively difficult to monitor, but in

19 the light of why you are doing it and how important the issue

20 is it makes a lot of sense.

21          Here, how hard is it to say here is the rule. If

22 you voluntarily withdrawal you get penalized, but if you

23 don't voluntarily withdrawal, you're treated like everybody

24 else; you guys, the Funds and the employers who litigate that

25 question.  Now how often it gets litigated, well, probably

1  there would be a plethora early on just like in 1980 and then

2  it will start to figure itself out as precedence come out.

3         The two cases that they cite, because I happen to

4  write down the cites and quickly look them up on my phone,

5  both are 1980 MPPAA cases.  No one is disputing what Congress

6  did in 1980 and there is no distinction between

7  voluntary/involuntary in that case, but that is the supply

8  side.  They are trying to fix a problem that hasn't worked as

9  well as they thought, so instead they use taxpayer money to

10  give it to the Funds and that money will never be touched.

11  Its to be spent by the Funds.  It has no impact on employers

12  rights or not, its just a question of whether or not an

13  employer does withdrawal.  We are arguing, at minimum,

14  involuntarily that it should count which is what the statute

15  really mandates.

16         Two last points and then I will sit down.  I

17  heard, I think this is the Central States lawyer make the

18  comment, that the PBGC regulation on smoothing isn't supposed

19  to be one size fits all. That is exactly the problem with

20  excluding SFA. It is one size fits all and it just doesn't

21  fit.

22         Last point, the PBGC counsel said they don't want

23  to change the wording of the statute, but also admitted it is

24  a plan asset.  The statute says plan assets go into the

25  formula for UVB's. If you accept their position, they are

1  changing the statute.

2         Unless Your Honor has any further questions, I

3  will sit down.

4         THE COURT:  Nothing further.  Thank you very much.

5         MR. WINSTON:  Thank you, Your Honor.

6         THE COURT:  Okay. I have heard a lot and I have

7  understood a lot of it.  I have got some thinking to do.

8         Is there anyone else who would like to be heard

9  while we are here on this topic today?

10        MR. BERLINER:  Your Honor, could I make a couple

11  points?

12        THE COURT:  Mr. Berliner, yes.

13        MR. BERLINER:  Thank you.  Brad Berliner for the

14  record.

15        Your Honor, I want to touch upon a couple issues

16  briefly.  Mr. Slade was talking about 1399(c)(4) and (c)(5)

17  and we were connecting that or he was connecting that to 1381

18  and saying that it would override 1381. I just want to remind

19  the Court that 1381, when it talks about the 20-year

20  limitation on payments, provides to the extent applicable.

21  So, there is -- excuse me, it says to the extent necessary.

22        THE COURT:  Right. I understand that.  We have

23  this question of like what is the cart and what is the horse

24  that I have to figure out.

25        MR. BERLINER:  But even if it -- I don't believe

1  there is a chicken and egg or cart and horse scenario because

2  it acknowledges in 1381 that it applies only to the extent

3  necessary.  So, it doesn't automatically apply and 1381 says

4  specifically that.

5          THE COURT:  Okay.

6          MR. BERLINER:  The other point I wanted to make in

7  response to what Mr. Winston just said is he talked about how

8  some funds, you know, are going to be fully funded by 2051,

9  maybe other plans are not going to be as well funded. I think

10  that really gets to the essence of the intelligence behind

11  the PBGC's phase in as opposed to an exclusionary rule

12  because the phase in operates to phase in portions of the SFA

13  year by year to reflect how that money is being spent.  Thus,

14  an exclusionary blanket rule of 15 years or five years or

15  even a phase in that applied over a definitive number of

16  years without taking account how the SFA is actually being

17  spent would be illogical.

18          With respect to the receivable condition the only

19  couple points I will note are points that we noted in our

20  brief.  First thing is the money is not paid immediately.

21  So, the PBGC has up to a year to pay it. That means even

22  after an application for SFA has been granted, the pension

23  fund does not have that money to be able to pay any of the

24  benefits the money is to be used for or any of the plan

25  expenses.

1          So, to begin phasing it in a year before that

2     money could even be put to the use that its intended for by

3     Congress and limited to by Congress --

4          THE COURT:  Well, you have other assets that are

5     liquid, right.  We count them.

6          MR. BERLINER:  Well, Your Honor, the key is that

7     several of these plans, including Central States, were

8     destined to become insolvent in the very near future.  So,

9     that is not necessarily true that these plans could rely upon

10    other assets. That is --

11         THE COURT:  No, no, no, I'm sorry. I may have

12    asked my question poorly.  It's a receivable, right, you

13    don't have the money but you have got, essentially, a promise

14    to pay.  You have other assets -- so, therefore, because it's

15    a receivable that you haven't collected yet, just as a matter

16    of ordinary commercial sense hold aside the arguable

17    authority to create different rules in this context, but in

18    ordinary commercial sense you would treat a receivable as an

19    asset, it would be true that you wouldn't have the cash, but

20    that wouldn't mean in the ordinary sense we would treat your

21    receivable as an asset that has value.  To the point that I

22    don't have the cash today lots of your other assets might be

23    a liquid and not easily translatable into cash today, but

24    that wouldn't mean that those aren't assets that have value.

25         MR. BERLINER:  In the technical bookkeeping sense,

1  I think that is correct; however, in the real world of a

2  pension plan having to pay benefits and having to pay cash in

3  the form of plan expenses without that SFA the --

4           THE COURT:  I understand.

5           MR. BERLINER:  Okay.  The last thing I want to get

6  to here or touch upon is 1393 and in particular you were

7  discussing with Mr. Slade whether a phase in or smoothing or

8  anything of the sort can be considered a method.  It's

9  absolutely a method, its not an assumption, and its

10 authorized by 1393.  Not only that, and I will just

11 reiterate, given the language we just saw in the last couple

12 of months from the Supreme Court in the Loper Bright case,

13 that Congress giving an agency broad authority to regulate in

14 terms such as reasonable, you know, justifies the regulations

15 set forth in this case and notwithstanding the PBGC's failure

16 to specifically note their authority under 1393 doesn't mean

17 that authority does not and did not exist when they enacted

18 this regulation.

19          I think one of the problems with debtors' analysis

20 to date is that they have assumed that there is only one way

21 to calculate withdrawal liability, that there is only one

22 method for valuing assets and that there is only one way to

23 calculate the withdrawal liability.  We know from 1393 that

24 simply is not the case. And in this particular instance this

25 is a very unusual instance, we haven't' seen it before,

1   numerous pension funds facing imminent insolvency and

2   Congress ordering the PBGC to make special financial payments

3   that could be used for two and only two reasons.  The

4   conclusion to be drawn is that the words "related to" and

5   "reasonable" signify Congress's understanding of both the

6   complexity and urgency of the issue.

7           That is all I have. Thank you, Your Honor.

8           THE COURT:  Thank you, Mr. Berliner.

9           Mr. Meehan, I confess that I'm hitting diminishing

10  marginal returns.  So, I encourage folks to be brief, but I

11  do want to make sure everyone has a chance to say their

12  peace.

13          MR. MEEHAN:  Thank you, Your Honor.  I expected

14  that.  I think I'm maybe 75 seconds and, again, Mr. Berliner,

15  since we worked so cooperatively over the case, he has

16  covered most of what I would say.

17          THE COURT:  I won't begrudge you 75 seconds.

18          MR. MEEHAN:  Perfect.  Let's start now. I think we

19  got into a little bit of a detour when people started getting

20  back up because we're starting to talk about who has got

21  money and who doesn't money, and Your Honor is focused on the

22  statutory power. That is where we need to stay, but I do wat

23  to note that under the statute that funds that cut benefits,

24  and there are those funds in our group, are required to

25  restore those benefits.  That is where the money goes, first

1  and foremost.  So, there is not a pot of cash sitting around

2  here.

3          In Your Honor's hospital example, I would say that

4  the essence is the moment before this statute these

5  employers, well we will stick with Yellow, owed withdrawal

6  liability.  If the statute is interpreted as its gone now, in

7  the debtors' reply they do talk about how the statute would

8  be reasonable -- I mean, this regulation would be reasonable

9  if it avoided money going into thin air. That is exactly what

10 is happening here.

11         THE COURT:  Okay.

12         MR. MEEHAN:  The path to authority is the simple

13 one.  Mr. Berliner did touch on it, but its 1302(b)(3) is the

14 generic power to effectuate the purpose of the statute.

15 1393(a)(2) does talk about assumptions and methods.  The

16 statute, in terms of computing the unfunded vested benefits

17 doesn't say unforfeitable benefits minus assets value.

18         So, an assumption, a method that goes to value and

19 if what happens here, and I am within a few seconds and I

20 promise done, Judge, is the money goes effectively as a

21 passthrough through the Fund to negate the withdrawal

22 liability we're violating 1432(l) which limits the use of the

23 money for benefits and expenses.  Withdrawal liability is an

24 obligation of Yellow, it's not a benefit or expense.

25         Thank you.

1          THE COURT:  Thank you, Mr. Meehan.

2          Mr. Slade, anything further on your end?  You are

3 entitled to the last word.

4          MR. SLADE:  This is a fact that I thought was

5 interesting that Mr. Berliner cited the potential short delay

6 between PBGC approval of a payment and the receipt by the

7 Fund.  PBGC pays interest for that period.

8          That is all. Your Honor, thank you so much for

9 your time.

10          THE COURT:  All right.  So let me say thank you to

11 all. This is extremely helpful. I hope its clear that I'm

12 struggling and really doing my best to get it right. I have

13 got more work to do, but the professionalism of this

14 presentation and the skill is not unnoticed and very much

15 appreciated.  So, you all -- I can't tell you, you have made

16 my job easy, but you have made it easier than it would have

17 been in the absence of your very hard and very good work. So,

18 you have my thanks for that.

19          I am going to take this under advisement. If you

20 thought I was going to rule right now I'm sorry to disappoint

21 all of you. I am going to go back and try to get you

22 something as promptly as reasonably possible while balancing

23 the need for speed with the need to be comprehensible and

24 maybe correct.

25          So, with that and my thanks to all of you, we are

1 adjourned.   Thank you.

2        (Proceedings concluded at 2:59 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ Tracey J. Williams                   August 7, 2024

8    Tracey J. Williams, CET-914

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                    August 7, 2024

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25